**From:**    Holmes, David E (OIG)
**To:**     Jeffrey Mcdermott
**Subject:**   <DOS>Original Submission H20171635
**Date:**    Monday, November 26, 2018 2:37:40 PM

-----Original Message-----
From: ████████████████████████████████
Sent: Thursday, July 6, 2017 11:55 AM
To: OIG Hotline (State) ███████████████
Subject: Form submission from: OIG Hotline Submission Form

Submitted on: Thursday, July 6, 2017 - 11:54

Submitted by user: Anonymous

Submitted values are:
Would you like to submit this form anonymously? No

Are you willing to waive your confidentiality in the event that your complaint is referred to Department of
State/Broadcasting Board of Governors management for resolution? No

==Your Information (not required)==
    Name: Karen Iovino, DVM
    E-mail: ████████████████████
    Street Address: ██████████████████
    City, State and Zip: ████████
    Phone Number: ██████████████████

    ==Complaint Information==
    Where did this incident of waste, fraud or abuse happen? Canine
    Validation Center, Winchester VA
    What date(s) did it happen? on going
    What kind of waste, fraud, or abuse are you reporting? (check all
    that apply):
     - Contract/Procurement Fraud
     - Conflict of Interest/Ethics Violations
     - Employee Misconduct
    Please summarize what you know about this incident:
    Summary of 'waste, fraud and abuse':
    1. Time sheet fraud, leaving work early yet claiming full day, OT
    encouraged(will recieve OT one day, leave early the next but
    claim 8 hr day-cameras and key fobs can be checked for these
    inaccuracies)
    2. taking PTO without claiming it
    3. forcing employee(me) to take PTO and not clamining it instead
    of paying me for hours worked
    4. hiring of friends for contracted work when not qualified
    5. use of gov't vehicles for personal use
    6. living at facility(illegial as explosives are housed on site)
    7. abuse of power-forcing subordinates to hire friends even
    though not qualified for positions
    8. abuse of power- supervisors without just cause to provide a

position for friends(several demotions have occurred)
9. procurement of equipment not utilized(large generators
purchased but not connected therefore not usable)
10. 'gifting' canines to Foreign countries without proper follow
through to assure they are cared for(claims have been made by
individual who have visited sites and by Foreign students that
they are in poor condition/housed in dirty kennels).  There are
reports canines are dying due to medical conditions/lack of
veterinary care/poor working conditions.  Canines need to be
healthy to performed their job duty(search for explosives)

Name of company or individual responsible for this incident: Josh
Carter, DoS Program Manager; Alan Bower, MSA HR, most likley
others that I am not aware of.
Individual's title, if applicable: See above
Company or individual's address: MSA Security/CVC 390 Airport Rd,
Unit L, Winchester, VA 22602
Company or individual's phone number: 540-300-6028
How do you know this incident occurred? On site performing job
duties when individals leave site early yet are paid, reports
from Foreign Students and others about physical condition of
canines and kennel conditions. Have personally been demoted to
allow a 'friend'(he is a male and under 40 years of age-I am
female and over 40 years of age) to be hired into my previous
position.  Previous supervisor demoted without just cause to
allow a friend to be promoted.
Do you have any further evidence of this incident? (i.e.
documents, photos, e-mails, etc.): Yes


==Does anyone else know about this incident?==
Name: most employees at faciltiy
Title:
Address:
Phone number:
How do they know of this incident?
Is there anything else you want to tell us about this incident?
Most at the facility are either too afraid to come forward or
part of the group hired because they are friends with Leadership
and usually not qualified for their positions. Several people
have been wrongly demoted(no previous complaints, poor work
performance, or counseling) so friends can be hired into those
positions. The supervisors have a lack of concern for the
well-being of the program, both WPS and ATA, and the canines that
work overseas with the DoS contracted vendors and the Foreign
countries awarded EDC's(explosive detection canines).
I have personally been descrimated against through demotion and
lack of reliable resources to properly perform job duties. (hired
LVT no longer assists me in full service hospital, she is also
not reprimated for 'no show' and late days.  She has also had
alcohol odor to her several times.)
I realize my claim is very widespread. It is my hope for a
thorough investigation.  Several employees have stated they
wanted to file a complaint but were too fearful.

Official - SBU
UNCLASSIFIED

000003

| | |
|---|---|
| **From:** | David Holmes |
| **To:** | Jeffrey Mcdermott |
| **Subject:** | Reprisal HL H20171740 |
| **Date:** | Wednesday, July 26, 2017 10:50:15 AM |
| **Attachments:** | FW EXTsummary of events discussed.msg |
| | hotline_intake_H20171635.pdf |

Jeff,

Below is a new reprisal HL that came in from a complainant we are working with on her other complaints.  She has NOT waived confidentiality.  Attached from her original complaint, H20171635, are the original HL submission and an email from her with additional information.  I highlighted the part in yellow.  Below is the WBR form she submitted to the HL (H20171740).

She is more than willing to talk to you and filed the WBR form at my suggestion.  I sent this via regular email because it was easier since I can't combine attachments from two HLs from within our system.

Please let me know what you do with it.

Thanks,

Dave

**Whistleblower Reprisal Form**


**--------- CONTACT INFORMATION ---------**

**Name**: Karen Iovino, DVM

**Address**: ███████████ - 

████████████████

**E-mail**:███████████████

**Phone Number**: █████████████


**--------- DISCLOSURE INFORMATION ---------**

**Disclosure Information**: Gross mismanagement of a Federal contract or grant ; Gross waste of Federal funds ; An abuse of authority relating to a Federal contract or grant ; A violation of law, rule, or regulation related to a Federal contract (including the competition for, or negotiation of a contract) or grant

**Complaint Description**: Please see OIG case No. H20171635. For approx 1 1/2 years I have been expressing concern regarding the care of EDC's(explosive detection canines) gifted to foreign countries. ████████ also expressed concerns.  As PM(Program Manager) he worked to put a plan in place to ensure they received proper veterinary care. He met resistance and the plan was not put in place. Like me, he was demoted.  My demotion was in Oct 2016, when Josh Carter, DoS PM, and Alan Bower, MSA Security HR/Facilities Mgr, hired Mike Ratcliff, DVM for my position without Zane's knowledge(he was my supervisor). I was demoted from Lead Veterinarian to Lead ATA(Anti-Terrorist Assistance) Veterinarian. In February 2017, I was reprimanded by Mike and Alan without Zane's knowledge or presence.  The reprimand was unjust: Mike-asking the LVT(Licensed Veterinary Technician) to stay late to assist me and Alan-for 'working to hard'.

One of my responsibilites was oversight of kennel and the kennel technicians. In May 2017, without my knowledge, Mike promoted a KT, Brett Harshberger, to lead KT and removed oversight of kennel and KT's from my supervisory role.  Per Mike, this was done to allow me to focus on the ATA Hospital.  However, the main issue was his lack of support of the needs to run a full service hospital.  The LVT that was hired to assist me who has made numerous medical mistakes(several life threatening), a is often 'no show' or late numerous times for work.  She is being protected by Mike and Alan.

In Feb 2017, Mike informed me the ATA veterinary position would transition from 30hrs/wk to 40 hrs/week once the contract modification was signed.  He asked me to accept the change(which I did).  We discussed and agreed upon my schedule.  On July 14, 2017 he informed me I must apply for the position on line and as of Aug 18, 2017 the current position will no longer exist.  Also, the schedule we discussed will not be honered. MSA is hiring 10+ employees, I am the only one who had to apply on line.  The rest are friends of Josh Carter, Alan Bower and John Hoover.

Yesterday I was excluded from a meeting involving the ATA program.  One of the items discussed was procurement of 30+ canines for the new laptop detection program.

In March 2017, I cared for a canine that was seriously injured.  I worked more than my scheduled 30 hrs/week.  I was told I could not be paid but had to take PTO and not claim it in our tracking system.

On July 19, 2017, MSA receive my EEOC complaint on age and sex discrimination.  Yesterday, I requested by email an update on the ATA Lead Veterinary position.  Aug 19, 2017 the new position begins. I have not received a reply.

I have over 30 write ups/documents describing the improper treatment I have received.  I also have information on fraud and mismanagement of funds.  I have asked OIG for a through investigation in light of the fact that an EDC gifted to Jordan died 2 weeks ago due to suspected hyperthermia.

I believe my outspoken concern for the care of the overseas EDC's, the frequent concerns I express about the grave mistakes made my the LVT(of note, Va Vet. Law requires a LVT perform many of the procedures done at the ATA hospital such as anesthesia, IV catheter

placement, etc) and my recent EEOC complaint is leading to retaliation and my loss of employment(beginning Aug 19, 2017)

**To whom was disclosure made**: An Inspector General

**Additional details on whom**: As stated above, I have 30+ write ups/documents on the improper treatment I receive, lack of support to perform my job duties, hostile work environment.


--------- **REPRISAL INFORMATION** ---------

**Reprisal action**: discharged ; demoted ; otherwise discriminated against

**Additional details on reprisal**: See above regarding my need to apply for the position I currently hold.  On Aug 19, 2017, I suspect I will no longer have a job.

**Who have you addressed reprisal to**: federal administrative proceeding

**Who was reprisal addressed to**: EEOC and OIG complaints filed


--------- **EMPLOYMENT INFORMATION** ---------

**Employment status at time of reprisal**: employee of a contractor

**Employment detail**: MSA Security, Canine Validation Center, 390 Airport Rd, Unit L, Winchester VA 22602, 540-300-6028.

July 2015-approx Oct 2016-relief veterinarian, Oct 2016-present PT veterinarian.

I am currently Lead ATA Veterinarian.  I oversee the EDC's in the ATA program including: intake examinations, performing surgeries(spay/neuter/gastropexy/dental prophylaxis), IHC's(international health certificates), work with ATA trainers to assure EDC's are ready to train, work with KT's to ensure care of the EDC's, on call after hours for trainers and KT's.

**From:** David Holmes
**To:** David Holmes
**Subject:** FW: <EXT>summary of events discussed
**Date:** Wednesday, July 26, 2017 10:44:01 AM

**From:** Karen Iovino
**Sent:** Tuesday, July 18, 2017 8:48 PM
**To:** David Holmes
**Subject:** <EXT>summary of events discussed

Hi Mr. Holmes,

Thank you for calling me twice today to discus the latest developments regarding canines.

To summarize:

- June 2017-a Jordanian mentor (under DoS) contract confided in me that he was instructed by his supervisor to change his report on the care of the EDC's (Explosive Detection Canines) and remove the pictures (pictures showed a dog severely emaciated). His report was presented to DoS in Washington D.C.
- June 2017-when the Jordanian class was at CVC, several of the Jordanian handlers expressed concern during the First Aid class I presented that EDC's are working in hot conditions. Per the handlers, their superiors instruct them to work the EDC's until they are overheated. They gave me the example of EDC's working in extreme temperatures in the Dead Sea (temps reach 140F) and dying.
- The previous ATA (Anti-Terrorist Assistance) Program Manager (PM) was demoted then suspended for a week. I believe this was due to his vocal concern about care of the EDC's OCONUS.
- Feb 2017-my supervisor informed me that the ATA veterinary position which I hold will be FT (currently 3/4) once the new contract modification was signed. He asked 'what do I have to do so you will be FT'. We agreed on a schedule as well. July 14, 2017 he informed me the contract modification was signed as of Aug 18, 2018 the 3/4 position will no longer exist. The ATA position will be FT. He also informed me the schedule is different from what was agreed upon in February and I must apply online. Several other positions at CVC are currently being filled by individuals who did not apply online. They are friends of DoS PM and CVC Leadership. I mention this event as it shows a pattern to remove individuals who are concerned and vocal about the care of the EDC's overseas.
- July 18, 2017 AM-on the biweekly conference call with the Jordanian mentors, it was learned that Zoe 7363 died of apparent heat stroke. The previous ATA PM (discussed above) initiated these calls so that we could be provided updates on the EDC's as he was concerned about their well being.
- July 18, 2017 afternoon-during a meeting with an ATA trainer, an ATA assistant and the new ATA PM, the death of Zoe 7363 was discussed. It was mentioned by PM that Jordan will receive a replacement EDC. The trainer asked:
  - why are we sending a replacement canine? The handler and canine must be paired therefore the handler should travel to CVC.
  - More importantly, why are we sending any more EDC's to Jordan before the investigation into Zoe 7363 death is completed. The response from the PM

000007

shocked the trainer so much he asked him to repeat himself.  The PM said 'they (the Jordanians) can do whatever they want with the dogs, if they want to take them out on the street and shoot them, they can'.

- During a trip overseas in June 2016 by the previous PM, elderly EDC's (from ATF program) were found in poor condition with medical conditions such has hip dysplasia, broken teeth.  Many were still working past retirement age(7yo).  These dogs are given away by Jordanian Commanders as 'trophies'.  The kennels were/are in poor condition, Parvovirus is endemic.  Puppies in their breeding program are dying. Previous PM provided a report to Leadership including pictures of the deplorable conditions.  He was working to have a computer program developed so the ATA veterinarian could track the health and welfare of the EDCs. There is no mechanism for accountability on the care of the EDC's gifted to Jordan.  Also, the DoS PM and previous PM traveled to Jordan in March 2016.  The DoS PM saw first hand the conditions in Jordan and did nothing to improve them.

As discussed, 10 more EDC's are scheduled to depart for Jordan between August 1-5, 2017.  Many individuals at CVC are upset over the lack of concern for the well being of the EDC's.  Several have confided in me that they hope for a thorough, on site investigation.  I have encouraged them to file complaints on their own.  They are afraid to speak up for fear of retaliation due to the scare tactics and position abuse of DoS and CVC Leadership (see my initial complaint).   I can attest though that they want to bring to light the very severe issues with waste, fraud, and abuse at CVC.

Feel free to reach out should you have any questions  My cell #: ███████████

V/R,
Karen Iovino, DVM

| From: | Jeffrey Mcdermott |
|---|---|
| To: | PDeegan@msasecurity.net |
| Subject: | Initiation of Investigation/Request for Documents |
| Date: | Thursday, August 10, 2017 3:02:00 PM |

Dear Mr. Deegan,

The Office of Inspector General (OIG) for the Department of State has received allegations that MSA Security suspended an employee, Dr. Karen Iovino, for providing information to OIG. Based on these allegations, OIG has decided to open an investigation into whether MSA is engaging in whistleblower retaliation and requiring its employees to sign confidentiality agreements that violate federal law.

We are requesting the following information from MSA in order to conduct our investigation:

• Dr. Iovino's employment agreement
• All personnel records of Dr. Iovino
• All records related to the work to be performed by Dr. Iovino under a Department of State contract
• All records related to the decision to suspend Dr. Iovino
• Any confidentiality agreements that MSA requires its employees to sign, including any such agreements signed by Dr. Iovino.

Please provide these records to OIG within 15 business days. After reviewing the records, we may identify additional documents for production and request interviews with MSA officials.

Please do not hesitate to call me if you have questions about this request and to make arrangements for production.


Thank you,

Jeff McDermott
Senior Investigative Counsel
Office of Inspector General
U.S. Department of State
202-663-0366

Memo of Conversation: Jeff McDermott & Peter Deegan

On September 1, 2017, I phoned Peter Deegan, Vice President for Human Resources for MSA Security, to follow up on OIG's document request from August 10, 2017. MSA had not yet responded to the request even though the deadline was August 31, 2017.

Mr. Deegan claimed that he had not received the original request and asked that I re-send it, which I did. He expressed a reluctance to respond and inquired if OIG was subpoenaing the documents. I replied that because Dr. Iovino had presented evidence that she made a disclosure that contributed to her suspension, that MSA had the burden to show by clear and convincing evidence of a non-retaliatory justification for the action. MSA was free to ignore our document request, but then would not meet its burden. Mr. Deegan stated that he understood and would consult with MSA counsel once I resent the request.

| | |
|---|---|
| **From:** | Peter Deegan |
| **To:** | Jeffrey Mcdermott |
| **Subject:** | <EXT>RE: Initiation of Investigation/Request for Documents |
| **Date:** | Friday, September 1, 2017 9:37:18 PM |

Hello Mr. McDermott,

Thank you for reaching out.   It seems that I just receiving this as a result of your follow-up. Somehow I didn't receive it originally, nor did I get mailed correspondence if it was sent.  So, I will be back in the office on Tuesday and will arrange to all these documents to be sent to you as soon as possible.

Thank you again and best wishes for a nice holiday weekend.

Sincerely,

Peter Deegan

PETER DEEGAN | VICE PRESIDENT, HUMAN RESOURCES | OFFICE: +1 (212) 509-1336 EXT. 242 | MOBILE: +1 (347) 949-3453
MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™ | WEB: WWW.MSASECURITY.NET

**From:** Jeffrey Mcdermott [mailto: ███████████████]
**Sent:** Friday, September 1, 2017 2:09 PM
**To:** Peter Deegan <PDeegan@msasecurity.net>
**Subject:** FW: Initiation of Investigation/Request for Documents

Hi Mr. Deegan,

Just checking on the status of this.

Thank you,


Jeff McDermott
Senior Investigative Counsel
Office of Inspector General
U.S. Department of State
202-663-0366



**From:** Jeffrey Mcdermott
**Sent:** Thursday, August 10, 2017 3:02 PM
**To:** 'PDeegan@msasecurity.net' <PDeegan@msasecurity.net>
**Subject:** Initiation of Investigation/Request for Documents

Dear Mr. Deegan,

The Office of Inspector General (OIG) for the Department of State has received allegations that MSA Security suspended an employee, Dr. Karen Iovino, for providing information to OIG. Based on these allegations, OIG has decided to open an investigation into whether MSA is engaging in whistleblower retaliation and requiring its employees to sign confidentiality agreements that violate federal law.

We are requesting the following information from MSA in order to conduct our investigation:

- Dr. Iovino's employment agreement
- All personnel records of Dr. Iovino
- All records related to the work to be performed by Dr. Iovino under a Department of State contract
- All records related to the decision to suspend Dr. Iovino
- Any confidentiality agreements that MSA requires its employees to sign, including any such agreements signed by Dr. Iovino.

Please provide these records to OIG within 15 business days. After reviewing the records, we may identify additional documents for production and request interviews with MSA officials.

Please do not hesitate to call me if you have questions about this request and to make arrangements for production.


Thank you,

Jeff McDermott
Senior Investigative Counsel
Office of Inspector General
U.S. Department of State
202-663-0366

The information contained in, or attached to this email may contain confidential information, intended solely for the use of the addressed individual or entity, and may be subject to legal privilege. If you have received this email in error, you should (1) notify the sender immediately by reply email, and (2) delete the message from your system(s) and notify your IT department. Please do not copy, disclose, or disseminate the contents of this email to any other unintended person(s) or entity. The views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. The recipient should check this e-mail and any attachments for the presence of malicious software. The sender of this message accepts no liability for any damage caused, directly or indirectly, by any malicious software transmitted in this email.

| | |
|---|---|
| **From:** | Peter Deegan |
| **To:** | Jeffrey Mcdermott |
| **Subject:** | <EXT>RE: Initiation of Investigation/Request for Documents |
| **Date:** | Tuesday, September 19, 2017 7:18:37 AM |
| **Attachments:** | IOVINO DOCS PACKET OIG PII redacted.pdf |

Hello Mr. McDermott,

As requested, here are the documents for Karen Iovino.

Let me know if you have any questions.

Kind regards,

Peter Deegan

PETER DEEGAN | VICE PRESIDENT, HUMAN RESOURCES | OFFICE: +1 (212) 509-1336 EXT. 242 | MOBILE: +1 (347) 949-3453

**MSA SECURITY** | IN THE BUSINESS OF BUSINESS-AS-USUAL™ | WEB: WWW.MSASECURITY.NET

**From:** Jeffrey Mcdermott ████████████████████
**Sent:** Friday, September 1, 2017 2:09 PM
**To:** Peter Deegan <PDeegan@msasecurity.net>
**Subject:** FW: Initiation of Investigation/Request for Documents

Hi Mr. Deegan,

Just checking on the status of this.

Thank you,

Jeff McDermott

Senior Investigative Counsel

Office of Inspector General

U.S. Department of State

202-663-0366

**From:** Jeffrey Mcdermott
**Sent:** Thursday, August 10, 2017 3:02 PM
**To:** 'PDeegan@msasecurity.net' <PDeegan@msasecurity.net>
**Subject:** Initiation of Investigation/Request for Documents

Dear Mr. Deegan,

The Office of Inspector General (OIG) for the Department of State has received allegations that MSA Security suspended an employee, Dr. Karen Iovino, for providing information to OIG. Based on these allegations, OIG has decided to open an investigation into whether MSA is engaging in whistleblower

retaliation and requiring its employees to sign confidentiality agreements that violate federal law.

We are requesting the following information from MSA in order to conduct our investigation:

•       Dr. Iovino's employment agreement
•       All personnel records of Dr. Iovino
•       All records related to the work to be performed by Dr. Iovino under a Department of State contract
•       All records related to the decision to suspend Dr. Iovino
•       Any confidentiality agreements that MSA requires its employees to sign, including any such agreements signed by Dr. Iovino.

Please provide these records to OIG within 15 business days. After reviewing the records, we may identify additional documents for production and request interviews with MSA officials.

Please do not hesitate to call me if you have questions about this request and to make arrangements for production.

Thank you,

Jeff McDermott
Senior Investigative Counsel
Office of Inspector General
U.S. Department of State
202-663-0366

---

The information contained in, or attached to this email may contain confidential information, intended solely for the use of the addressed individual or entity, and may be subject to legal privilege. If you have received this email in error, you should (1) notify the sender immediately by reply email, and (2) delete the message from your system(s) and notify your IT department. Please do not copy, disclose, or disseminate the contents of this email to any other unintended person(s) or entity. The views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. The recipient should check this e-mail and any attachments for the presence of malicious software. The sender accepts no liability for any damage caused, directly or indirectly, by any malicious software transmitted in this email.

February 26, 2017

At approximately 0730 on Friday February 24, 2017, Mike Ratcliff asked to speak to me. He said he had a problem he wanted help solving.

He began by saying 'what can I do to make you come on full time?'. I said I thought this request might be coming soon as the ATA side is becoming busier. I explained that I currently work 30-33/hrs week caring for up to 24 canines with little support as the LVT hired to work in the ATA hospital assists on Wednesday's only(that day we schedule procedures only). With the expansion, there will be an estimated additional 16 kennel spaces with no canines housed off site. That is essentially only 6 more canines for me to care for. I asked if there have been any complaints about my performance. He said 'no, quite the opposite, everyone loves you'. I explained I was hired as the 3/4 vet(the DoS contract is for 2 FT vets and one 3/4 vet). I also said I chose the 3/4 position as I thought (as did Zane Roberts) that a new hire would want the FT position.

We discussed hiring a PT veterinarian to work Tuesday's and Thursday's. I mentioned I had someone in mind and would be happy to reach out to her. I did indicate she doesn't have any working dog experience but is an excellent veterinarian and is willing to learn. At that point he asked if she was 'trainable'. I again said 'yes'.

I then asked if he would be comfortable with me working 3 11-12 hr days and one 1/2 day. Carolyn might be willing to work longer days(and fewer) so the facility could have veterinary coverage for longer periods of time. He said the WPS side has a different mission. He said he would be thrilled to have me work Mon, Wed, Fri 9 hrs and 5-6 hrs Thursday. I said that only adds up to 33 hrs. He said he knows I work from home and he has never had anyone so 'reachable' when they are off site. I am also on call for the kennel techs early mornings, nights and weekends. I said I would be comfortable with 3 10 hr days and 1-1/2 day for a total of 35-36/hrs on site and 4-5 hrs remotely. He said he is happy with that. When I asked if he had to ask Leadership he said he was told to run his shop the way he sees fit.

At 1400 the same day, we had our regularly scheduled Friday dvm outbrief. I asked if he spoke to Leadership about my schedule change. He said he had and they were very happy. Most likely the change would occur mid to late March.

Also during our meeting I brought up how Jenn was late again Wed Feb 22nd by 20 or so minutes(I did not mention the smell of alcohol on her breath). I asked what was being done about her chronic tardiness. He said he was tracking it. He said she gave a reason but he isn't sure he believes her.

Karen Iovino, DVM

**MSA SECURITY**

IN THE BUSINESS OF BUSINESS AS USUAL™

April 19, 2017

Dr. Iovino,

On behalf of the entire MSA Security team, we wish to extend our sincere thanks and appreciation for all of your above-and-beyond efforts with Frank 9656. Frank is happy, healthy, and well-traveled down the road to recovery in large part to the care and compassion which you provided.

Frank suffered serious traumatic injuries to his right rear leg and toes, along with severe damage to the tip of his tail during the morning of March 16, 2017. You selflessly rushed in on your scheduled day off to provide emergent care and surgery. You stepped up and did an incredible job leading the team that provided the immediate surgical care. During the days that followed you continued to display the highest quality medical care and compassion in your efforts to treat the injuries and manage his pain.

As expected, the injuries progressed to where the leg required amputation. While performing the surgery you displayed an unparalleled amount of surgical skill and poise, successfully amputating the leg without complications. We fully understand and appreciate the high stress levels involved with these types of procedures. Your selfless actions during the surgery truly personify the high level of care that we provide to our canine patients, and service to our clients.

Your compassion and medical expertise remained steadfast throughout Frank's recovery. We recognize and thank you for all of the early mornings and late nights that you spent both on-site providing care, and from home constantly thinking and formulating medical plans to aid in recovery. In regards to recovery, you again went above-and-beyond to borrow a brand new Class IV therapy laser. Your compassionate calls for assistance were answered by the company express shipping the laser to use on Frank. Adding laser therapy to his recovery treatments truly helped expedite the excellent recovery that we still see today.

Through several more surgeries, numerous sedations, and countless bandage changes; Frank has fully recovered from his injuries. He has sense been adopted into the best of homes that will still allow him the option of visiting the CVC on a very regular basis. You were instrumental in this great outcome.

As we constantly strive to provide the best industry-leading veterinary care to our canines, this translates into us providing our clients with nothing short of the best. On behalf of the entire MSA team, the Canine Validation Center, Frank Olech, and all of our Canines worldwide; thank you for the outstanding job!

Michael O'Neil
Chief Executive Officer
MSA Security

Dr. Iavino,

June 17, 2019

Thank you for all that
you do here at the CVC!
I sincerely appreciate
your dedication, leadership &
support regarding "FRANK"

Gerald Cross

July 14, 2017

Below is the summary of a discussion between Mike Ratcliff and myself this morning:

He started by stating that the contract mod(modification) was finally signed.  As of August 18, 2017, the ATA PT veterinary position will no longer exist.  As of August 19, 2017 the position will be FT.  I explained we had discussed this change in February 2017.  He then said the bad new is I must be on site Monday-Friday 7:30am-3:30pm.  I asked why our discussion in February isn't going to be honored(see write up Feb 26, 2017).  He said the position is a 5 day a week position. I mentioned our discussion regarding my on site schedule, it was 3 long days and 1/2 day, was due to the fact that I am on call for KT's evenings and weekends.  He said paid time must be on site per Leadership.

He asked that I think about it and discuss with Dave.  We then discussed a few other items.  He asked at the end of our meeting what I thought my decision would be.  I indicated I would have to speak to Dave but he would support me in whatever I decide and I needed time to think about my decision.

----Original Message-----
From: Karen Iovino
Sent: Monday, July 17, 2017 7:44 AM
To: Michael D. Ratcliff <MRatcliff@msasecurity.net>
Subject: RE: FT position

Mike,

My resume is on my home computer.  Will submit resume tonight.  I assume it's just a formality?

No worries about the travel.  Checking up on the oversea program and canines is a good move forward.

Karen

KAREN IOVINO, DVM
VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: ███████ | F: 540.545.4138

-----Original Message-----
From: Michael D. Ratcliff
Sent: Monday, July 17, 2017 7:09 AM
To: Karen Iovino <KIovino@msasecurity.net>
Subject: RE: FT position

Karen,
Good deal.  Because it's a new CLIN with a new PD (and bio approval), you'll need to submit your resume
again through the website.  The posting will be up tomorrow and only run through the end of the week.

One thing that I forgot to mention last week is that the FT gig will involve travel.  With the potential new
projects on the horizon, we will likely need to divide the travel up amongst each other to keep things moving
efficiently here at the CVC.

Holler with questions.

Thank you,
Mike

Mike Ratcliff, MS, DVM

-----Original Message-----
From: Karen Iovino
Sent: Friday, July 14, 2017 6:58 PM
To: Michael D. Ratcliff <MRatcliff@msasecurity.net>
Subject: FT position

Mike,

I would embrace the opportunity to move from 3/4 time to FT to help the ATA program grow. I will plan on
moving to FT status Aug 19, 2017. Please send me any paperwork I need to complete to make the
transition.

Thanks,
Karen

Karen Iovino, DVM
Veterinarian
Canine Validation Center

July 24, 2017

Below are two conversations with Mike Ratcliff that occurred today.

This morning the ATA trainers informed me that the laptop program contract is close to being signed by DoS. It will require procurement of approx 40 canines. The timeline for having canines trained is short. They heard that the dogs will not be spayed/neutered or have prophylactic gastropexy They will be deployed to foreign 3rd world countries (3rd world countries have substandard veterinary care). Around 10 am, I asked Mike for an update on the laptop canine program. He said the timeline is short. I specifically asked if the canines would be spayed/neutered/pexied after the initial 2-3 week imprinting period. He said the timeline is up to John(John Hoover is new ATA Lead). Of note, the surgical procedures are performed to mitigate pyometra/mammary cancer in females, testicular or prostatic cancer/disease in males. Gastropexy prevents GDV(gastric dilation and volvulus which is life threatening and the #1 cause of preventable deaths in working canines).

At approx 2:30 pm today, I learned an ATA meeting was held (recently ended)about the laptop program. I was not invited to attend. I asked Mike why I wasn't included. He said he 'forgot' and he would provide me with updates when he has them. I said he remembered to invite Brett and Jonah(they are kennel tech's-the kennel is located next to the ATA hospital). I said since the meeting involved discussion of the ATA program, I should have been included as it directly affects my work. I asked about procurement of canines, when I can expect records/radiographs. He said they would be coming to him and we could review together. This is a change as in the past records/radiographs came directly to me for review.

There is a pattern of excluding me from meetings that involve the ATA program. See write up May 11, 2017 where I ask to be included in the bi-weekly ATA conference calls with the Jordanian mentors.

Karen Iovino, DVM

**From:** **Karen Iovino** Kiov no@msasecur ty.net ▮
**Subject:** FW: student code
**Date:** Ju y 31, 2017 at 9:24 AM
**To:** ▮▮▮▮▮▮▮▮▮▮



**KAREN IOVINO, DVM**



**VETERINARIAN, CANINE VALIDATION CENTER**
O: 540.300.6028 X345 | C:▮▮▮▮▮▮▮ | F: 540.545.4138

**From:** Karen Iovino
**Sent:** Friday, July 28, 2017 7:52 AM
**To:** Michael Hayes <MHayes@msasecurity.net>
**Subject:** RE: student code

Hi Mike,

I received your email response on July 26th. You indicated 'more to follow'. I have not received an update.

As you know, Aug 19th is 3 weeks away. I respectfully request an update.

Thanks,
Karen

**KAREN IOVINO, DVM**



**VETERINARIAN, CANINE VALIDATION CENTER**
O: 540.300.6028 X345 | C:▮▮▮▮▮▮▮ | F: 540.545.4138

**From:** Karen Iovino
**Sent:** Monday, July 24, 2017 4:32 PM
**To:** Michael Hayes <MHayes@msasecurity.net>
**Cc:** Michael D. Ratcliff <MRatcliff@msasecurity.net>
**Subject:** RE: student code

Hi Mike,

Thank you for the update on the growth at CVC.

As instructed by Mike, I have applied for the ATA veterinary position. However, Mike indicated in

February of this year the only change in my current position would be from 30 hrs/week to 40 hrs/week. At that time we discussed and agreed upon a schedule which I have been informed by Mike will not be honored.

To my knowledge, the new hires were not required to apply on line as I was. In fact, I believe I was the only individual required to apply on line for a position. Which, as you know, I currently hold.

Please provide me with an update on my position as ATA Lead Veterinarian.

Thanks,
Karen

KAREN IOVINO, DVM | CVC VETERINARIAN | Office 540-300-6028 x 345 | Cell +1 ███████
MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL(tm) | WEB: WWW.MSASECURITY.NET

---

**From:** Michael Hayes
**Sent:** Monday, July 24, 2017 9:18 AM
**To:** Alan Bower; Amy Callihan; Ben E. Orndorff; Brandt Gawor; Brett N. Harshberger; Carolyn Olech; Duane Harris; Earl W Shaw; Edward Pasqualini; Garrett Lancaster; Gary Yonley; Ian Styer (Ian.styer@matlockllc.com); Jason Bowen; Jeff M. Piacquadio; Jenn Houston; Jessica K. Bellone; Jonah Ballenger; John Hoover; Joseph Harrington; Karen Iovino; Mark Potter; Mike Guevremont; Michael D. Ratcliff; Nolan Garcia; Pamela M. Lowande; Phillip Wingerd; Richard Strobel; Samuel Wiater; Thomas McPherson Jr.; John T. Harvey; Wayne LaFollette; Zane Roberts
**Subject:** RE: student code

*Team,*

As you are aware with the signing of the modification we anticipate growing by about 10 -12 more personnel. Also, with another DoS project about to be funded to MSA, we can expect, in addition to those 10-12 new hires, about 7-9 IC's coming in to assist us. That is quite an uptake in personnel in this bldg. And of course the MIC and Schneider bldg's will be and are going thru some renovations. Smaller footprint to work with - allot more folks on board.

This also means we will be refining our scope of work – it will increase. This means we will be working with new personnel as we manage our increase in work. We were all welcomed in to this bldg. and our current positions with open arms. I expect all hands to welcome in our new hires/ICs in a professional, tactful and respectful manner. We will have some hiccups - expected. But we will traverse this challenge and provide the client with a quality product.

Thanks in advance for embracing this opportunity and lets make it work with the least amount of drama possible.

Thank you. mike

000022

 

The information contained in, or attached to this email may contain confidential information, intended solely for the use of the addressed individual or entity, and may be subject to legal privilege. If you have received this email in error, you should (1) notify the sender immediately by reply email, and (2) delete the message from your system(s) and notify your IT department. Please do not copy, disclose, or disseminate the contents of this email to any other unintended person(s) or entity. The views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. The recipient should check this e-mail and any attachments for the presence of malicious software. The sender of this message accepts no liability for any damage caused, directly or indirectly, by any malicious software transmitted in this email.

000023

August 2, 2017

Today at approximately 1000 am I went to Unit L to check whether a package was picked up.   Amy Callihan's desk is by the front door and there is a window so she can see hallway/front door area.

I mentioned to her that the package was supposed to be picked up.  She then quietly told me that Alan Bower told her not to speak to me about work.  Nolan Garcia was in her office.  He asked why.  I explained my last day is Aug 17th and I was required  to apply for the FT position.  He said he hadn't heard about that and was confused as to why.  I mentioned I also had an EEOC complaint against MSA.

I also informed KT's, Ben and Jonah, about my leaving.  They were both surprised and upset.  Jonah said I should be the obvious person for the job. I asked if either had an issue with my job performance, was unable to reach, etc.  They said no. I also informed them I filed an EEOC and OIG complaint.

Karen Iovino, DVM

August 4, 2017

Today at approximately 7:30am when I arrived at the CVC, Alan Bower and Mike Ratcliff were waiting for me at the door.  Alan asked to speak to me.  He ushered me into an empty office(Mike Hayes').  Mike also entered the office.

Alan informed me effective immediately I am suspended for disclosing confidential information.  I asked if it was with or without pay.  He said I should contact Peter Deegan.  He asked if I had his contact information.  I indicated 'no' and Alan provided his phone number on a piece of paper.  I asked if I was allowed to go to the hospital to remove my personal items such as veterinary books and pictures.  He said 'no', they would be returned to me.

I informed both Mike and Alan that Virginia Board of Veterinary Medicine requires 5 days notice on change of 'veterinarian in charge' and since I cannot provide that, the hospital should not be utilized.

Alan then asked for my key fob.  I had two additional keys on the key ring.  I informed Mike one was for the controlled drug lock box in the refrigerator and one was for the safe.

I was then escorted out of the building.

**Peter Deegan** 📎 
000025

Administrative Leave and Reminder of Obligations

August 4, 2017 at 7:02 PM



**To:** Karen Iovino

---

📙 New contact info found in this email: Peter Deegan pdeegan@msasecurity.net        add...    

---

Dear Karen:

As you know, effective today, you have been placed on leave with pay while concerns involving you regarding the disclosure of confidential information are investigated. To that end, additionally, we take this opportunity to remind you of the confidentiality obligations you have pursuant to the various agreements you have entered into with MSA Security, certain of its clients and the United States government.

Kind regards,
Peter Deegan

**PETER DEEGAN | VICE PRESIDENT, HUMAN RESOURCES | OFFICE: +1 (212) 509-1336 EXT. 242 | MOBILE: +1 (347) 949-3453**
**MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™ | WEB: WWW.MSASECURITY.NET**

August 1, 2017

Yesterday, July 31st, Mike Hayes asked me to meet him in the conference room at 1530.

At 1530 Mike H., Mike Ratcliff and I met.  Mike H. stated he was following up on my emails(add email)requesting an update on my position.  As of Aug 17, 2017 my position will no longer exist as there is a new contract modification.  They are still working on the applications.

He said he wanted to clarify one point in my email about new hires.  Per Mike H. they did have to apply on line.

I mentioned at the end of the meeting that per Va regs, the state must be notified 5 days prior to a change in veterinarian-in-charge.

At no time did he or Mike R. mention scheduling my job interview.

Karen Iovino, DVM

## Peter Deegan

**From:** Alan Bower
**Sent:** Thursday, September 7, 2017 8:59 AM
**To:** Peter Deegan
**Subject:** Veterinarian

Peter,

This is the position description for all veternarians here at the CVC, it covers both full time and part time.

### 3.2 Veterinarian
This contractor position is responsible for overall canine health CONUS and OCONUS.

### 3.2.1 Minimum Position Requirements

•

   Shall be a U.S. Citizen and possess a valid U.S. Passport.

• Shall possess or be able to obtain a minimum SECRET level clearance.

• Shall have a degree from a 4-year program at an accredited college of veterinary medicine

• Shall be licensed as a Doctor of Veterinary Medicine (D.V.M or V.M.D.)

• Shall have a minimum experience of two (2) years as a veterinarian in a private practice or the military

• Shall have knowledge of the chemical composition, structure, and properties of substances and of the chem- ical processes and transformations that they undergo (this includes uses of chemicals and their interactions, danger signs, production techniques, and disposal methods)

• Knowledge of plant and animal organisms, their tissues, cells, functions, interdependencies, and interac- tions with each other and the environment.

• Experience in maintaining canine health records and canine international health certificates

• Shall have experience with a microchip program that scans, reads and tracks canines

• Shall be willing to live and work in conflict/combat areas or similar hazardous environments

### 3.2.2 Position Duties
• Examine animals to detect nature of diseases or injuries.

• Treat sick or injured animals by prescribing medication, setting bones, dressing wounds, or performing sur- gery.

• Inoculate animals against various diseases such as rabies and distemper.

• Collect body tissue, feces, blood, urine, or other body fluids for examination and analysis.

• Operate diagnostic equipment such as radiographic and ultrasound equipment, and interpret the resulting images.

• Advise handlers regarding sanitary, feeding, and general care necessary to promote health of animals.

• Educate handlers/trainers about diseases that can be spread from animals to humans.

• Train and supervise workers who handle and care for animals.

• Euthanize animals at the direction of the COR.

- Establish and conduct quarantine and testing procedures that prevent the spread of diseases to other anim- als or to humans, and that comply with applicable government regulations.

- Conduct postmortem studies and analyses to determine the cause of animals' deaths.

- Perform administrative duties such as scheduling appointments and maintaining records.

- Inspect and test animals to detect the presence of communicable diseases.

- Research diseases to which animals could be susceptible.

- Inspect animal housing to determine cleanliness and adequacy.

- Work effectively independently, however be capable to give medical advice telephonically to a staff of Veterinarian Technicians that are operating at remote locations.

ALAN BOWER | DEPUTY PROGRAM MANAGER, FACILITIES AND SUPPORT | OFFICE: (540) 300-6028 EXT. 331 | MOBILE: (571) 326-8684
MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™ | WEB: WWW.MSASECURITY.NET



000029

## Peter Deegan

| | |
|---|---|
| **From:** | Alan Bower |
| **Sent:** | Friday, August 4, 2017 8:32 AM |
| **To:** | Peter Deegan |
| **Cc:** | Gerald Goss; Michael Hayes |
| **Subject:** | Karen Iovino |

Sir,

This morning at approximately 0736 hrs, Karen Iovino arrived to work. With Dr Ratcloiff as a witness I asked Karen to step into an office. Once there I advised her she was being placed on administrative leave effective immediately. I then read " There is an ongoing administrative investigation regarding confidential information that could involve you. You are being placed on administrative leave immediately as a result". She laughed and asked is this paid or unpaid? I advised her to call Peter Deegan at Human recourses about that. I gave her Peters phone number. She then said she was going to call the state vet board and have the hospital shut down. Dr Ratcliff has already contact the Vet board and is in the process of name reassignment to his name. He assures me there will be no interruption in Vet services. She was advised she is not to come back on either property, 390 Airport Rd or 220 Admiral Bird, unless given permission by Peter Deegan. She was also told not to have any contact with any MSA clients and not to discuss MSA business with our employees.

I have her company issued Surface pro, and also her fob which grants access to the building. All of her security access to the building has been deactivated. Her company email has been suspended.

Please let me know if you have any questions.

Thanks
Alan

ALAN BOWER | DEPUTY PROGRAM MANAGER, FACILITIES AND SUPPORT | OFFICE: (540) 300-6028 EXT. 331 | MOBILE: (571) 326-8684
MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™ | WEB: WWW.MSASECURITY.NET



1

## Peter Deegan

| From: | Gerald Goss |
|---|---|
| Sent: | Friday, August 4, 2017 10:42 PM |
| To: | Valerie A. Price |
| Cc: | Michael Kennedy; Peter Deegan; Cassandra Murphy; Alan Bower |
| Subject: | FW: Situational Report - MSA Administrative Internal Investigation regarding an employee matter at CVC |

| Importance: | High |
|---|---|

FYSA

**From:** Gerald Goss
**Sent:** Friday, August 4, 2017 10:33 PM
**To:** 'Garcia, Anna M' <GarciaAM@state.gov>
**Cc:** 'Bachman, Loren M'
**Subject:** Situational Report - MSA Administrative Internal Investigation regarding an employee matter at CVC

Ms. Garcia,

Per your direction, please see my written situational update regarding MSA actions as of close of business today associated with Dr. Karen Iovino, DVM who has been placed on leave with pay while concerns involving her and the possible disclosure of confidential information are being investigated. Dr. Karen Iovino provides veterinarian support at the CVC Center.

**Background:** During the evening of August 03, 2017 I was advised that Dr. Karen Iovino, a part time Veterinarian employed by MSA Security at the CVC emailed Ms. Cathy Read, Director, Office of Acquisitions Management, Department of State at some point over the last couple of weeks suggesting there may be alleged misconduct and furthermore, that she has filed an OIG report.

In addition, I was advised that she may have or is considering engaging in discussions with media and other third-party personnel regarding confidential and privileged information. An internal investigation was commenced this morning regarding the extent to which Dr. Iovino may have divulged confidential information or may do so in the future. Simultaneously Dr. Iovino was advised that effective as of today she was placed on administrative leave with pay pending the completion of our investigation. Dr. Iovino then advised MSA leadership at the CVC that she plans to contact the State Vet Board and have the DoS Canine Validation Hospital shut down.

**Based on the results of our investigations thus far, Ms. Iovino's Concerns/Allegations may include the following, however we cannot be certain:**

1. Questions regarding the use of Government Facilities
2. Time Keeping Practices associated with overtime
3. Hiring and Employment Practices
4. Health and Wellness | Care Canines both OCONUS /CONUS
5. HR matters associated with Promotions, Position Titles and Status of Employment

1

6.  Best Veterinarian Care Practices, specifically associated with Amputation of said Canine "Frank"

7.  Emails and Photographs

**Situation:** At the time of this email, there are no mission impacts to the Department of State Contract. All duties and operations continue IAW the expectations of the contract. All concerns regarding the above allegations have been reported to both the CO and the COR verbally. MSA is conducting an internal Administrative investigation as well as a forensic computer investigation to ensure confidential and privileged information has been protected. MSA will provide a report of our findings upon completion to the Department of State regarding the outcomes of the investigation as well as this employee matter.

**Regarding OIG or Allegations by Employees:**  We believe that the allegations of Dr. Iovino as we understand them thus far are wholly baseless and without merit. We hold ourselves here at MSA to the highest standards of integrity with regard to our employment practices and the care of both our employees and service canines.  We continue to encourage our employees to report any irregularities to the Office of Inspector General and we would never retaliate against any employee for doing so.

**Courses of Action Today:**

- Verbally communicated what I understand to be the situation and our intended courses of action with Mr. Loren Bachman, Ms. Anna Garcia and Mr. Josh Carter from Department of State. I have verbal authorization and concurrence by all parties to communicate the situation with Ms. Cathy Read when she returns.
- Effective today, Dr. Iovino has been placed on administrative leave with pay while concerns involving her regarding the disclosure of confidential information are investigated.
- To that end, we have additionally taken the opportunity to remind her of the confidentiality obligations she has pursuant to the various agreements she has entered into with MSA Security, certain of its clients and the United States government.
- MSA has notified our FSO who has removed her access in JPAS (DoD)and upon further review will submit an incident report to DSS regarding this Investigation, (threats to impact the customer mission and shut down CVC hospital or to disclose privileged and confidential information to media based on allegations yet to be expressed to her employer  make suitability to maintain a clearance "high-risk" at this juncture).
- We have collected all work related items from her and done this in a manner that ensures we were able to retrieve our property and information without causing undue disruption to the customer or operations. This includes laptops and CVC Key Fobs.
- We have removed Dr. Iovino's access to the facility.
- We have boxed up computers associated with this investigation and forwarded them to the MSA Computer Forensic Investigation team for analysis.
- We have ensured the hospital remains operational, and 100% within VA compliance to ensure the continued quality health and wellness of Canines.

  o  The Veterinarian-In-Charge is Dr. Mike Ratcliff, MS, DVM. The State has acknowledged in writing that we are OK to continue to operate.  We should have the official certificate late next week.

  o  Controlled substances ordered under Ms. Iovino's DEA license have been logged and loaded into a safe.  That safe has now been sealed, and the combination changed.  Dr. Ratcliff is the only one who knows the new combination, and the emergency access keys are locked in the safe in his office.

I will continue to keep you informed regarding this matter and am available to speak with you or other leadership at the Department of State at your request.

V/r-

Gerald

Gerald G. Goss
MSA Security, Executive Management Team
Office Address: Suite 100
1655 North Ft. Myer Drive,
Arlington, VA 22209
Office: 571-375-5018
Email: ggoss@msasecurity.net

**GERALD G. GOSS| EXECUTIVE MANAGEMENT TEAM** | Office: 571-375-5018
**MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™** | WEB: www.msasecurity.net



## Peter Deegan

**From:** Peter Deegan
**Sent:** Friday, August 4, 2017 7:26 AM
**To:** ████████████████████
**Subject:** Administrative Leave and Reminder of Obligations

Dear Karen:

As you know, effective today, you have been placed on leave with pay while concerns involving you regarding the disclosure of confidential information are investigated. To that end, additionally, we take this opportunity to remind you of the confidentiality obligations you have pursuant to the various agreements you have entered into with MSA Security, certain of its clients and the United States government.

Kind regards,
Peter Deegan

**PETER DEEGAN | VICE PRESIDENT, HUMAN RESOURCES |** OFFICE: +1 (212) 509-1336 EXT. 242 | MOBILE: +1 (347) 949-3453
**MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™ |** WEB: WWW.MSASECURITY.NET



1

## Peter Deegan

| | |
|---|---|
| **From:** | Peter Deegan |
| **Sent:** | Wednesday, July 26, 2017 11:16 AM |
| **To:** | Karen Iovino |
| **Subject:** | RE: Litigation Against the Company and Press Inquiries |

Karen,

Thank you for your reply. The EEOC complaint will be dealt with through the established channels since you chose to make us aware of your sex and age complaint via that process.

As I am sure you are aware, as an employee on a government contract, you have fiduciary responsibility to bring allegations of impropriety to our attention. Accordingly if you have concerns of impropriety relating to the CVC aside from your complaint of sex and age discrimination, you must report these to me. Additionally, if you have concerns (aside from your complaint of sex and age discrimination), we must make the client aware, as well as notify the IG of the issues for investigation.

I await your reply.

Kind regards,
Peter Deegan

PETER DEEGAN | VICE PRESIDENT, HUMAN RESOURCES | OFFICE: +1 (212) 509-1336 EXT. 242 | MOBILE: +1 (347) 949-3453
MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™ | WEB: WWW.MSASECURITY.NET

**From:** Karen Iovino
**Sent:** Wednesday, July 26, 2017 7:51 AM
**To:** Peter Deegan <PDeegan@msasecurity.net>
**Subject:** RE: Litigation Against the Company and Press Inquiries

Mr. Deegan,

In light of the fact that I felt compelled to file an EEOC complaint, I don't feel it would be appropriate to elaborate on the issues at CVC at this time.

I would be happy to have a face to face discussion at the appropriate time.

Karen

KAREN IOVINO, DVM



VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C:                | F: 540.545.4138

**From:** Peter Deegan
**Sent:** Tuesday, July 25, 2017 10:43 PM
**To:** Karen Iovino <Klovino@msasecurity.net>
**Subject:** RE: Litigation Against the Company and Press Inquiries

1

Hi Karen,

Yes, I am aware of your EEOC charge. We will be responding in due course. When you say there are serious issues at CVC, what do you mean?

Kind regards,
Peter

**Peter Deegan | Vice President, Human Resources** | Office: +1 (212) 509-1336 ext. 242 | Mobile: +1 (347) 949-3453
**MSA Security | IN THE BUSINESS OF BUSINESS-AS-USUAL™** | Web: www.msasecurity.net

**From:** Karen Iovino
**Sent:** Tuesday, July 25, 2017 8:03 PM
**To:** Peter Deegan <PDeegan@msasecurity.net>
**Subject:** Re: Litigation Against the Company and Press Inquiries

Hi Mr Deegan,

I understand the company is under scrutiny. Are you aware of the EEOC complaint I filed against MSA? The CVC seems to operate separately. There are some very serious issues at the CVC.

Karen

Karen Iovino, DVM
Veterinarian
Canine Validation Center

Sent from my iPhone

On Jul 25, 2017, at 4:50 PM, Peter Deegan <PDeegan@msasecurity.net> wrote:

Dear Colleagues:

As you might be aware, a lawsuit was filed against the Company recently. The Post published an article this past weekend referencing the litigation and the group of former and current employees who are parties to it. I know that many of you, understandably, have expressed concern and/or have questions regarding this matter. What we can tell you now is that we are evaluating the claims alleged in the suit and intend to vigorously defend claims without merit. However, as is the typical process when litigation is pending, we are unable to make any further comment to you regarding this matter at this time on the advice of our legal counsel.

Prior the article, the press made inquiries to staff members and attempted to gain information. This is a good reminder to all employees that all press inquiries in regards to this and any other legal or employee matter should be brought to my attention so that we can review and channel internally as appropriate.

We also ask that employees be mindful of calls coming into the Company for information. Even a seemingly harmless request could be misconstrued as you speaking on behalf of the Company. If you have a question regarding these matters or you get a call that is questionable, please bring it to my attention immediately.

Thank you in advance for your cooperation in this matter.

000036

Regards,
Peter


**PETER DEEGAN | VICE PRESIDENT, HUMAN RESOURCES** | OFFICE: +1 (212) 509-1336 EXT. 242 | MOBILE: +1 (347) 949-3453
**MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™** | WEB: WWW.MSASECURITY.NET

<image001.jpg>
        <image003.png>

**MSA SECURITY**

IN THE BUSINESS OF BUSINESS AS USUAL™

NEW YORK | 212-509-1336
BOSTON | 617-436-0521
WEST COAST | 609-395-7143
NATIONAL CAPITAL REGION | 571-375-5018

August 18, 2017

Ms. Karen Iovino

Dear Karen,

As per our previous discussions, your part time assignment as Veterinarian has come to completion as of today, August 18, 2017.

You will receive your final paycheck directly from our Payroll department.  You will be paid for any accrued, but unused PTO.  You will receive a separate letter from our HR department regarding continuation benefits under COBRA.

Sincerely,

Human Resources Department
MSA Security

Copies: HR, File

000038





## EMPLOYEE INFORMATION
(To be completed upon hire)

LAST NAME _Iovino_   FIRST NAME _Keven_   M.I. ____

STREET ADDRESS ████ ██ ████ ███ ████   APT # ____

CITY ▌████████████   STATE _Va_   ZIP _20135_

DATE OF BIRTH ██████████ SOCIAL SECURITY # _____

HOME PHONE # ██████████   CELL # ██████████

PRIMARY PERSONAL EMAIL ADDRESS ██████████████

SECONDARY EMAIL ADDRESS _____

NAME OF EMERGENCY CONTACT _Dave Kiser_   TELEPHONE # ██████████

DRIVER'S LICENSE # ██████████   STATE OF ISSUE _Va_   EXPIRATION _5/17/20_

ARMED SECURITY GUARD LICENSE# _____ EXPIRATION ____

FIREARMS CARRY PERMIT _____ STATE OF ISSUE ____ EXPIRATION ____

UNARMED SECURITY GUARD LICENSE # _____ EXPIRATION ____

CPR/AED CERTFICATE # _____ STATE OF ISSUE ____ EXPIRATION ____

---

### ***For Office Use Only***

Date of Hire _____ Date Entered Into Vision _____ EMP# ____ Hourly Rate $ ____

Admin Staff Hires:  Position Title _____ Supervisor _____

Field Hires: State ____ Position Title _____ Division ____ Manager ____

Active Law Enforcement? Agency Name and State _____ _____

Retired Law Enforcement? Agency Name and State _____ _____

Former Military/Active Reserves: Branch ____ _____ _____

NYS DOL UID # ____ _____ EXPIRATION ____ _____

TWIC EXPIRATION _____ SWAC EXPIRATION _____



# Application for Employment

Our policy is to provide equal employment opportunity to all qualified persons without regard to race, creed, color, religious belief, sex, age, national origin, ancestry, physical or mental disability, or veteran status.

Date 10 / 9 / 15
Last name Fovino    First name Karen    Middle name Ann
Street Address ████
City ████    State Va    ZIP 20135
Telephone ████    Social Security # ████

Position applied for Veterinarian
How did you hear of this opening? Zane Roberts + Steve Velling
When can you start? immediately    Desired Wage $650/day
Are you a U.S. citizen or otherwise authorized to work in the U.S. on an unrestricted basis? (You may be required to provide documentation.) ☒ Yes  ☐ No
Are you looking for full-time employment? ☐ Yes  ☒ No
If no, what hours are you available? 7am - 8pm PT
Are you willing to work swing shift? ☒ Yes  ☐ No
Are you willing to work graveyard? ☐ Yes  ☒ No
Have you ever been convicted of a felony?
☐ Yes  ☒ No
If yes, please describe conditions. _____

_____

_____

## Education

| School Name and Location | Year | Major | Degree |
|---|---|---|---|
| High School Hauppauge HS | 1985 | | |
| College Wilson College | 1989 | science | BS |

000040



College _____

Post-College _Ross University_____ _1993_____ _DVM_

Other Training _____

In addition to your work history, are there other skills, qualifications, or experience that we should consider?

_____
_____
_____
_____
_____

**Employment History**    (Start with most recent employer)

Company Name _Valley Veterinary Emergency + Referral Center_

Address _210 Costello Dr Winchester_ Telephone _540 662 7811_

Date Started _8/09_ Starting Wage _$60/hr_ Starting Position _relief veterinarian_

Date Ended _current_ Ending Wage _$70/hr_ Ending Position _"_

Name of Supervisor _Karen Magaha_

May we contact? ☒ Yes ☐ No

Responsibilities _hospitalized patients, emergency surgeries_

_trauma cases_

Reason for leaving _currently employed_

Company Name _Dept of Health + Human Services_

Address _Washington DC_ Telephone _540 553 5329_

Date Started _8/01_ Starting Wage _GS-13_ Starting Position _vet med officer_

Date Ended _current_ Ending Wage _GS 14 Step 9_ Ending Position _Regional Leader_

Name of Supervisor _Walter Kaplan_

May we contact? ☒ Yes ☐ No

Responsibilities _team readiness, out reach to local, state_

_federal partners, lead team during deployments_

Reason for leaving _currently employed_

000041

 **MSA**

Company Name _Old M.11 veterinary Hospital_
Address _91 Lawson Rd. Leesburg Va._ Telephone _703 779d903_
Date Started _7/10_ Starting Wage _$80,000 P_ Starting Position _associate vet_
Date Ended _7/13_ Ending Wage _$85,000 PT_ Ending Position _"_
Name of Supervisor _Chris Hussion, DVM_
May we contact? ☑ Yes ☐ No
Responsibilities _appointments, surgery, dental procedures,_
_client communication_
Reason for leaving _pursue emergency hospital position + federal_
_position_

Company Name _Blue Ridge Veterinary Associates_
Address _120 E Cornwell La Purcellville Va._ Telephone _540 338) 382_
Date Started _8/02_ Starting Wage _$80,000 PT_ Starting Position _associate vet._
Date Ended _6/10_ Ending Wage _$80,000 PT_ Ending Position _"_
Name of Supervisor _Chris Dale_
May we contact? ☑ Yes ☐ No
Responsibilities _appointments, surgery, dental procedures,_
_client communication_
Reason for leaving _pursue greater private practice_

Attach additional information if necessary.

I certify that the facts set forth in this application for employment are true and complete to the best of my knowledge. I understand that if I am employed, false statements on this application shall be considered sufficient cause for dismissal. This company is hereby authorized to make any investigations of my prior educational and employment history.

I understand that employment at this company is "at will," which means that either I or this company can terminate the employment relationship at any time, with or without prior notice, and for any reason not prohibited by statute. All employment is continued on that basis. I understand that no supervisor, manager, or executive of this company, other than the president, has any authority to alter the foregoing.

Signature: ██████████    Date _10/9/15_

## EMPLOYEE CONFIDENTIALITY, INVENTION ASSIGNMENT AND NON-SOLICIATION AGREEMENT

I, Karen Iovino (print name) as a condition of my employment with MSA, Ltd, its subsidiaries, affiliates, successors and assigns (together the "Company"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by the Company, I agree the following:

1. **MSA (Company) Business**: I acknowledge that MSA is engaged in the business of security services.

2. **Confidential Information**: I acknowledge that for the purposes of this Agreement, the term confidential information means all information financial, technical or otherwise in whatever form written, oral or otherwise which is disclosed to me or acquired by me in the course of my employment in any way concerning the trade secrets, projects, activities, business, clients, trade practices, know-how or affairs of the Company that provide the Company an economic advantage over its competitors, including, without limitation, all information concerning products, business formulas, discoveries, ideas, concepts, know-how, techniques, diagrams, flow charts, data, client preferences, history and other information, computer software, technology, operations, solutions, tools, marketing and development plans, investors, transactions, acquisitions, marketing plans, strategies and forecasts and other technical or business information, regarding existing and/or contemplated products, processes, techniques or know-how, or any data or information developed by me pursuant to the performance of my services hereunder. I further understand that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the Confidential Information involved.

3. **Use of the Confidential Information**: During the term of my employment, and for all times thereafter, I will treat as confidential and, except as required in the performance of my employment duties and responsibilities, will not disclose, publish, use or otherwise make available to the public or to any individual, firm or corporation any confidential information.

4. **Return of Confidential Information**: All confidential information, together with all notes and records relating thereto, and all copies, duplicates, reproductions, facsimiles or except thereof in my possession, are the exclusive property of the Company. I will return promptly all such materials to the Company upon the termination of my employment or upon the Company's demand. In addition, I will return promptly to the Company upon the conclusions of my employment all reports, files, memoranda, records and software, credit cards, cardkey passes, door and file keys, computer access codes or disks, instructional material, and other

physical or personal property which I receive or prepare in connection with my
employment with the Company.

5. **Proprietary Rights**:

    a. All creations, inventions, ideas, designs, copyrightable materials,
trademarks, and other technology and rights (and any related
improvements or modifications), whether or not subject to patent or
copyright protection (collectively, "Creations"), relating to any activities
of the Company that are conceived by me or developed by me in the
course of my employment, whether conceived alone or with others and
whether or not conceived or developed during regular business hours,
and if based on Confidential Information, after the termination of my
employment shall be the sole property of the Company and, to the
maximum extent permitted by applicable law, shall be deemed "works
made for hire" as the term is used in the United States Copyright Act.

    b. To the extent, if any, that I retain any right, title or interest with respect
to any Creations that are delivered to the Company or relate to my
employment with the Company, I hereby grant to the Company an
irrevocable, paid-up, transferable, sub-licensable, worldwide right and
license (i) to modify all or any portion of such Creations, regardless of
the medium (now or hereafter known) into which such Creations may
be modified and regardless of the effect of such modifications on the
integrity of such Creations, and (ii) to identify me, or not to identify
me, as one or more authors of or contributors to such Creations or any
portion thereof, whether or not such Creations or any portion thereof have
been modified. I further waive any "moral" rights, or other rights with
respect to attribution of authorship or integrity of such Creations that I
may have under any applicable law, whether under copyright, trademark,
unfair completion, defamation, right of privacy, contract, tort or other
legal theory.

    c. I will promptly inform the Company of any Creations. I will (whether
during my employment or after the termination of my employment)
execute such written instruments and do other such acts as may be
necessary in the opinion of the Company or its counsel to secure the
Company's rights in the Creations, including obtaining a patent,
registering a copyright, or otherwise (and I hereby irrevocably appoint
the Company and any of its officers as my attorney in fact to undertake
such acts in my name). I agree that my obligation to execute written
instruments and otherwise assist the Company in securing its right in the
Creations will continue after the termination of my employment for any
reason.

000044

6. **Non-Solicitation**: During my employment and for a period of eighteen (18) months following the termination of my employment for any reason, I will not, directly or indirectly, take any of the following actions, and, to the extent that I own, manage, operate, control, am employed by or participate in the ownership, management, operation or control of, or am connected in any manner with, any business of the type and character engaged in and competitive with the Business of the Company or any of its subsidiaries or affiliates during the period of my employment, I will use my best efforts to ensure that such business does not take any of the following actions:

   a. Persuade or attempt to persuade any client of the Company to cease doing business with the Company, or to reduce the amount of business it does with the Company.

   b. Solicit or service for me or for any person or entity other than the Company, the business of any client of the Company or any individual that was a client of the Company within six months prior to the termination of my employment (except this restriction will not apply to those clients with which I had a pre-existing professional relationship prior to the commencement of my employment with the Company);

   c. Persuade or attempt to persuade any employee of or consultant to the Company to leave the Company's employ; or

   d. Solicit or hire for me or for any person or entity other than the Company, any employee of or consultant to the Company or any individual that was an employee of or the consultant to the Company one year prior to the termination of my employment.

7. **Special Remedy**: I recognize that the confidential information to be protected by this Agreement is special, unique and extraordinary in character, and that in the event of any breach by me of any of the terms or conditions of this Agreement, the Company shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction, either in law or in equity, to obtain damages from me for any such breach or to enforce the specific performance of this Agreement by me. I further acknowledge that a breach of my obligations under this Agreement would cause the Company irreparable harm for which no adequate remedy at law would be available, and that the Company in such circumstances would be entitled to injunctive relief preventing or enjoining any breach of my obligations, without the need to post any bond. I specifically consent to the jurisdiction of the United States District Court for the Southern District of New York, or if that court is unable to exercise jurisdiction for any reason, to the New York State Supreme Court, New York County, for this purpose and irrevocably waive any obligation I have or hereafter may have as to the venue of any such action brought under this Section.

000045

8. **Miscellaneous**:

    a. **Covenants Reasonable**. I expressly acknowledge and agree that the covenants set forth herein are reasonable in all respects, and necessary in order to protect, maintain and persevere the value and goodwill of the Company, as well as the proprietary and other legitimate business interests of the Company. I further acknowledge and agree that the covenants and agreements set forth herein constitute a significant part of the consideration given by me to the Company in exchange for the payment of my salary and benefits by the Company, and are material reason for such payment.

    b. **At Will Employment**. I understand and acknowledge that this Agreement is not intended to, and shall not be construed as, creating a contract of employment for any specific duration. Unless I have entered into a written employment contract signed by an officer of the Company providing otherwise, my employment with the Company remains "at-will," meaning that either I or the Company may, at any time, terminate my employment with or without cause and with or without notice.

    c. **Validity**. I agree that the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall otherwise remain in full force and effect. Moreover, if any one or more of the provisions contained in this Agreement is held to be excessively broad as to duration, scope or activity, I agree that such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent compatible with applicable law.

    d. **Waivers**. The waiver by the Company or me of any right under this Agreement or of any failure to perform or any breach by the other shall not be deemed a waiver of any other right under this Agreement or of any other failure or any other breach by such party, whether of the same or a similar nature or otherwise. No waiver shall be deemed to have occurred unless set forth in writing executed by or on behalf of the waiving party. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

    e. **Governing Law**. This agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its principals of conflicts of law.

000046

f.  **Successors; Binding Agreement**. This Agreement and the rights and obligations of the Company and me under this Agreement shall inure to our benefit and to the benefit of our respective heirs, personal representatives, successors and assigns. I specifically agree that the Company may assign this Agreement to any successor.

g.  **Entire Agreement**. This Agreement sets forth the entire agreement and understanding of the Company and me with respect of its subject matter, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, executive or representative of either party in respect of said subject matter.

h.  **Capacity**. I represent and warrant that I am not a party to any agreement that would prohibit me from entering into this Agreement or performing fully my obligations under this Agreement.

Employee



Karen Iovino

Dated: 10/16/2015

Accepted and Agreed to:

MSA Security

By

Name  T.L. Scarito
Title   Director, Human Resources

000047



DISCLOSURE AND AUTHORIZATION TO OBTAIN CONSUMER REPORTS FOR EMPLOYMENT
PURPOSES

**DISCLOSURE**

A consumer reporting agency ("*CRA*") may assist in the processing of your application for employment purposes with MSA Security (the "*Employer*"). In connection with this process, the *Employer* may procure one or more *consumer reports* and/or *investigative consumer reports* about you, furnished by the *CRA*.

A *consumer report* may include, but is not limited to, your character, general reputation, personal characteristics, mode of living, credit information, criminal history records, including arrests and convictions (compliant with state and federal law), civil court actions, education background, employment history, disciplinary records, driver's license, and motor vehicle registration records. I understand such information may be obtained by direct or indirect contact with former employers, educational institutions, financial or lending institutions, credit bureaus, consumer reporting agencies, federal, state, and local public agencies, including criminal justice agencies, individuals, or other persons who may have such information.

In addition, *investigative consumer reports* may be obtained with information gathered from personal interviews with former employers, past or current neighbors, associates of yours, or other persons who may have information regarding your work performance, character, general reputation, personal characteristics, and mode of living.

Should the *Employer* decide to take adverse action based upon your *consumer report*; i.e. decision not to hire, retain, or promote you, the *Employer* will provide you: a copy of the *consumer report*; a copy of your rights under the Fair Credit Reporting Act; if applicable any other documents under applicable state laws; and the name, telephone number, and address of the *CRA*.

You have the right to dispute incomplete or inaccurate information. If you identify information in your file that is incomplete or inaccurate, and report it to the *CRA*, they must investigate unless your dispute is frivolous. Should an investigative consumer report be conducted, you have the right to request additional information about the nature and scope of the investigation.

000048

*Para información en español, visite www.consumerfinance.gov/learnmore o escribe a la Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.*

### A Summary of Your Rights Under the Fair Credit Reporting Act

The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Here is a summary of your major rights under the FCRA. For more information, including information about additional rights, go to www.consumerfinance.gov/learnmore or write to: Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.

• **You must be told if information in your file has been used against you.** Anyone who uses a credit report or another type of consumer report to deny your application for credit, insurance, or employment – or to take another adverse action against you – must tell you, and must give you the name, address, and phone number of the agency that provided the information.

• **You have the right to know what is in your file.** You may request and obtain all the information about you in the files of a consumer reporting agency (your "file disclosure"). You will be required to provide proper identification, which may include your Social Security number. In many cases, the disclosure will be free. You are entitled to a free file disclosure if:
  • a person has taken adverse action against you because of information in your credit report;
  • you are the victim of identify theft and place a fraud alert in your file;
  • your file contains inaccurate information as a result of fraud;
  • you are on public assistance;
  • you are unemployed but expect to apply for employment within 60 days.

In addition, all consumers are entitled to one free disclosure every 12 months upon request from each nationwide credit bureau and from nationwide specialty consumer reporting agencies. See www.consumerfinance.gov/learnmore for additional information.

• **You have the right to ask for a credit score.** Credit scores are numerical summaries of your credit-worthiness based on information from credit bureaus. You may request a credit score from consumer reporting agencies that create scores or distribute scores used in residential real property loans, but you will have to pay for it. In some mortgage transactions, you will receive credit score information for free from the mortgage lender.

• **You have the right to dispute incomplete or inaccurate information.** If you identify information in your file that is incomplete or inaccurate, and report it to the consumer reporting agency, the agency must investigate unless your dispute is frivolous. See www.consumerfinance.gov/learnmore for an explanation of dispute procedures.

• **Consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information.** Inaccurate, incomplete or unverifiable information must be removed

or corrected, usually within 30 days. However, a consumer reporting agency may continue to report information it has verified as accurate.

• **Consumer reporting agencies may not report outdated negative information.** In most cases, a consumer reporting agency may not report negative information that is more than seven years old, or bankruptcies that are more than 10 years old.

• **Access to your file is limited.** A consumer reporting agency may provide information about you only to people with a valid need -- usually to consider an application with a creditor, insurer, employer, landlord, or other business. The FCRA specifies those with a valid need for access.

• **You must give your consent for reports to be provided to employers.** A consumer reporting agency may not give out information about you to your employer, or a potential employer, without your written consent given to the employer. Written consent generally is not required in the trucking industry. For more information, go to www.consumerfinance.gov/learnmore.

• **You may limit "prescreened" offers of credit and insurance you get based on information in your credit report.** Unsolicited "prescreened" offers for credit and insurance must include a toll-free phone number you can call if you choose to remove your name and address from the lists these offers are based on. You may opt-out with the nationwide credit bureaus at 1-888-567-8688.

• **You may seek damages from violators.** If a consumer reporting agency, or, in some cases, a user of consumer reports or a furnisher of information to a consumer reporting agency violates the FCRA, you may be able to sue in state or federal court.

• **Identity theft victims and active duty military personnel have additional rights.** For more information, visit www.consumerfinance.gov/learnmore.

States may enforce the FCRA, and many states have their own consumer reporting laws. In some cases, you may have more rights under state law. For more information, contact your state or local consumer protection agency or your state Attorney General. For information about your federal rights, contact:

| TYPE OF BUSINESS: | CONTACT: |
|---|---|
| 1.a. Banks, savings associations, and credit unions with total assets of over $10 billion and their affiliates. | a. Consumer Financial Protection Bureau<br>1700 G Street NW<br>Washington, DC 20552 |
| b. Such affiliates that are not banks, savings associations, or credit unions also should list, in addition to the CFPB: | b. Federal Trade Commission: Consumer Response Center -- FCRA<br>Washington, DC 20580<br>(877) 382-4357 |
| 2. To the extent not included in item 1 above: | |
| a. National banks, federal savings associations, and federal branches and federal agencies of foreign banks | a. Office of the Comptroller of the Currency<br>Customer Assistance Group<br>1301 McKinney Street, Suite 3450<br>Houston, TX 77010-9050 |
| b. State member banks, branches and agencies of foreign banks (other than federal branches, federal agencies, and Insured State Branches of Foreign Banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act | b. Federal Reserve Consumer Help Center<br>P.O. Box 1200<br>Minneapolis, MN 55480 |
| c. Nonmember Insured Banks, Insured State Branches of Foreign Banks, and insured state savings associations | c. FDIC Consumer Response Center<br>1100 Walnut Street, Box #11<br>Kansas City, MO 64106 |
| d. Federal Credit Unions | d. National Credit Union Administration<br>Office of Consumer Protection (OCP)<br>Division of Consumer Compliance and Outreach (DCCO)<br>1775 Duke Street<br>Alexandria, VA 22314 |
| 3. Air carriers | Asst. General Counsel for Aviation Enforcement & Proceedings<br>Aviation Consumer Protection Division<br>Department of Transportation<br>1200 New Jersey Avenue, SE<br>Washington, DC 20590 |
| 4. Creditors Subject to Surface Transportation Board | Office of Proceedings, Surface Transportation Board<br>Department of Transportation<br>395 E Street S.W.<br>Washington, DC 20423 |
| 5. Creditors Subject to Packers and Stockyards Act, 1921 | Nearest Packers and Stockyards Administration area supervisor |
| 6. Small Business Investment Companies | Associate Deputy Administrator for Capital Access<br>United States Small Business Administration<br>409 Third Street, SW, 8th Floor<br>Washington, DC 20416 |
| 7. Brokers and Dealers | Securities and Exchange Commission<br>100 F St NE<br>Washington, DC 20549 |
| 8. Federal Land Banks, Federal Land Bank Associations, Federal Intermediate Credit Banks, and Production Credit Associations | Farm Credit Administration<br>1501 Farm Credit Drive<br>McLean, VA 22102-5090 |
| 9. Retailers, Finance Companies, and All Other Creditors Not Listed Above | FTC Regional Office for region in which the creditor operates or Federal Trade Commission: Consumer Response Center -- FCRA<br>Washington, DC 20580<br>(877) 382-4357 |

000051



## DISCLOSURE AND AUTHORIZATION TO OBTAIN CONSUMER REPORTS FOR EMPLOYMENT
### PURPOSES

### AUTHORIZATION

*Please read the attached Disclosure carefully before signing this Authorization*

I have read and understood the attached Disclosure, and I authorize MSA Security (the *"Employer"*) to procure and obtain *consumer reports* and/or *investigative consumer reports*, which includes, but is not limited, to my character, general reputation, personal characteristics, mode of living, and the aforementioned information included in the Disclosure form. I understand that these reports will be furnished by a consumer reporting agency ("*CRA*") for employment purposes.

I agree that if employment is granted and upon request by the *Employer*, the *CRA* may obtain further information to update, renew, or extend my employment through subsequent *consumer reports*, without asking for my authorization again.

I release the *Employer*, the *CRA*, former and current schools and employers, records custodians, and other persons who provide information pursuant to this release, from all liability for damages as result of the release of information in furtherance of this investigation *to the extent permitted by law*.

☐ **California, Minnesota, and Oklahoma applicants only** – Check this box to request a copy of any consumer report ordered on you.

☐ **California applicants only** – I acknowledge receipt of copies of California Consumer Rights in English and in Spanish.

☐ **New York applicants only** – I acknowledge receipt of a copy of Article 23-A New York Correction Law.

☑ **I acknowledge that I have been provided a copy of consumer rights under the Fair Credit Reporting Act.**

I agree that a facsimile or photocopy of this form may be used in lieu of the original.

**The following information is being requested in order to conduct a background check on you**

Karen Lavin
_____        _____
Full Name (print)              Additional Names (AKAs, maiden names, previous names)

                                           Bluemot Va 20135
_____
Current Address

                              Bluemot Va 20135
_____
Previous Addresses (up to seven years prior)


_____
Previous Addresses (up to seven years prior)

                                      Va
_____    _____  _____   _____
Social Security Number     Driver License Number  State of Issue   Date of Birth

                              10 8 15
_____    _____
Signature                  Today's Date

## MSA EMPLOYEE NON-COMPETE, CONFLICT OF INTEREST, AND ETHICAL STANDARDS OF CONDUCT AGREEMENT

### NON-COMPETE

For good consideration and as an inducement for MSA to extend an offer of employment to the undersigned, the undersigned hereby agrees not to seek employment opportunities with a client or business partner of MSA during the period of employment and for a period of twelve (12) months following termination of employment, notwithstanding the cause or reason for the separation of service. The term "non-compete" as used herein shall mean that the employee shall not own, manage, or operate their own business, nor be employed in a business relationship by a client as a result of their employment with MSA. The employee acknowledges that MSA may, in good faith and relying on this agreement, provide the employee with access to trade secrets, customers, and other confidential data. The employee agrees to retain said information as confidential and not to use said information on his or her own behalf or disclose the same to any third party. This non-compete agreement shall be binding upon the parties, their successors, assignees and personal representatives.

### CONFLICT OF INTEREST

In order to safeguard the activities and assets of MSA, employees of MSA should not have interests in outside businesses which conflict or appear to conflict with their ability to act and make independent decisions in the best interest of the MSA. An employee is considered to have an interest in an outside business if the employee or a member of his/ her immediate family holds an ownership in said business or its property, furnishes goods or services to said business, is a creditor, employee, agent, officer, director, or consultant of said business. Outside businesses include any person, firm, corporation or government agency that sells or provides a service to, purchases from, or competes with MSA.

### ETHICAL STANDARDS

MSA expects its employees to observe the highest standards of business ethics. No employee should take any action on behalf of MSA that they know, or reasonably should know, violates any applicable law or regulation. This obviously includes such activities as bribery, kickbacks, falsehoods and misrepresentation. Failure to comply with the aforementioned may result in corrective action, up to and including termination of employment.

*[Signature Page Follows]*

000053

Employee



Karen Iovino

Dated: 10/16/2015

Accepted and Agreed to:

MSA Security

By

Name  T.L. Scarito
Title   Director, Human Resources

000054

## Danette Vaughan

| | |
|---|---|
| **From:** | Allison Birmingham |
| **Sent:** | Wednesday, October 21, 2015 10:59 AM |
| **To:** | Payroll |
| **Cc:** | Janet Toto |
| **Subject:** | Karen Iovino Bank and Tax Information |
| **Attachments:** | Iovino, Karen Payroll Information.pdf |

ENTERED

FOR __11/00/2015__ PAY DATE

ENTERED BY: _____

Hi there,

Attached is Karen Iovino's bank and tax information for purposes of being added to payroll. EE is in Zenefits and Valiant.

Best,

ALLISON BIRMINGHAM | HR ADMINISTRATIVE ASSISTANT | OFFICE: (212) 509-1336, 286 | MOBILE: (917) 656-0388
MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™ | WEB: WWW.MSASECURITY.NET



VAULT ITO: 10/19/2015 DV updated

Vision 10/19/2015
    ↳ DV Changed ITO Vault.

Zenefits 10/21/2015

1

000055

# Form W-4 (2015)

**Purpose.** Complete Form W-4 so that your employer can withhold the correct federal income tax from your pay. Consider completing a new Form W-4 each year and when your personal or financial situation changes.

**Exemption from withholding.** If you are exempt, complete only lines 1, 2, 3, 4, and 7 and sign the form to validate it. Your exemption for 2015 expires February 16, 2016. See Pub. 505, Tax Withholding and Estimated Tax.

**Note.** If another person can claim you as a dependent on his or her tax return, you cannot claim exemption from withholding if your income exceeds $1,050 and includes more than $350 of unearned income (for example, interest and dividends).

**Exceptions.** An employee may be able to claim exemption from withholding even if the employee is a dependent, if the employee:
• Is age 65 or older,
• Is blind, or
• Will claim adjustments to income; tax credits; or itemized deductions, on his or her tax return.

The exceptions do not apply to supplemental wages greater than $1,000,000.

**Basic instructions.** If you are not exempt, complete the Personal Allowances Worksheet below. The worksheets on page 2 further adjust your withholding allowances based on itemized deductions, certain credits, adjustments to income, or two-earners/multiple jobs situations.

Complete all worksheets that apply. However, you may claim fewer (or zero) allowances. For regular wages, withholding must be based on allowances you claimed and may not be a flat amount or percentage of wages.

**Head of household.** Generally, you can claim head of household filing status on your tax return only if you are unmarried and pay more than 50% of the costs of keeping up a home for yourself and your dependent(s) or other qualifying individuals. See Pub. 501, Exemptions, Standard Deduction, and Filing Information, for information.

**Tax credits.** You can take projected tax credits into account in figuring your allowable number of withholding allowances. Credits for child or dependent care expenses and the child tax credit may be claimed using the Personal Allowances Worksheet below. See Pub. 505 for information on converting your other credits into withholding allowances.

**Nonwage income.** If you have a large amount of nonwage income, such as interest or dividends, consider making estimated tax payments using Form 1040-ES, Estimated Tax for Individuals. Otherwise, you may owe additional tax. If you have pension or annuity income, see Pub. 505 to find out if you should adjust your withholding on Form W-4 or W-4P.

**Two earners or multiple jobs.** If you have a working spouse or more than one job, figure the total number of allowances you are entitled to claim on all jobs using worksheets from only one Form W-4. Your withholding usually will be most accurate when all allowances are claimed on the Form W-4 for the highest paying job and zero allowances are claimed on the others. See Pub. 505 for details.

**Nonresident alien.** If you are a nonresident alien, see Notice 1392, Supplemental Form W-4 Instructions for Nonresident Aliens, before completing this form.

**Check your withholding.** After your Form W-4 takes effect, use Pub. 505 to see how the amount you are having withheld compares to your projected total tax for 2015. See Pub. 505, especially if your earnings exceed $130,000 (Single) or $180,000 (Married).

**Future developments.** Information about any future developments affecting Form W-4 (such as legislation enacted after we release it) will be posted at www.irs.gov/w4.

---

## Personal Allowances Worksheet (Keep for your records.)

A  Enter "1" for yourself if no one else can claim you as a dependent . . . . . . . . . . . . . . . A ____

B  Enter "1" if:  { • You are single and have only one job; or
• You are married, have only one job, and your spouse does not work; or
• Your wages from a second job or your spouse's wages (or the total of both) are $1,500 or less. } . . . B ____

C  Enter "1" for your spouse. But, you may choose to enter "-0-" if you are married and have either a working spouse or more than one job. (Entering "-0-" may help you avoid having too little tax withheld.) . . . . . . . . . . . . C ____

D  Enter number of dependents (other than your spouse or yourself) you will claim on your tax return . . . . . D ____

E  Enter "1" if you will file as head of household on your tax return (see conditions under Head of household above) . . E ____

F  Enter "1" if you have at least $2,000 of child or dependent care expenses for which you plan to claim a credit . . . F ____
(Note. Do not include child support payments. See Pub. 503, Child and Dependent Care Expenses, for details.)

G  Child Tax Credit (including additional child tax credit). See Pub. 972, Child Tax Credit, for more information.
• If your total income will be less than $65,000 ($100,000 if married), enter "2" for each eligible child; then less "1" if you have two to four eligible children or less "2" if you have five or more eligible children.
• If your total income will be between $65,000 and $84,000 ($100,000 and $119,000 if married), enter "1" for each eligible child . . . G ____

H  Add lines A through G and enter total here. (Note. This may be different from the number of exemptions you claim on your tax return.) ▶ H ____

For accuracy, complete all worksheets that apply.
• If you plan to itemize or claim adjustments to income and want to reduce your withholding, see the Deductions and Adjustments Worksheet on page 2.
• If you are single and have more than one job or are married and you and your spouse both work and the combined earnings from all jobs exceed $50,000 ($20,000 if married), see the Two-Earners/Multiple Jobs Worksheet on page 2 to avoid having too little tax withheld.
• If neither of the above situations applies, stop here and enter the number from line H on line 5 of Form W-4 below.

------- Separate here and give Form W-4 to your employer. Keep the top part for your records. -------

## Form W-4    Employee's Withholding Allowance Certificate

Department of the Treasury
Internal Revenue Service
▶ Whether you are entitled to claim a certain number of allowances or exemption from withholding is subject to review by the IRS. Your employer may be required to send a copy of this form to the IRS.

OMB No. 1545-0074
**2015**

| 1 Your first name and middle initial | Last name | | 2 |
|---|---|---|---|
| Karen | Iovino | | |

Home address (number and street or rural route)
[redacted]

City or town, state, and ZIP code
Bluemont, VA, 20135

3  ☐ Single  ☒ Married  ☐ Married, but withhold at higher Single rate.
Note. If married, but legally separated, or spouse is a nonresident alien, check the "Single" box.

4  If your last name differs from that shown on your social security card, check here. You must call 1-800-772-1213 for a replacement card. ▶ ☐

5  Total number of allowances you are claiming (from line H above or from the applicable worksheet on page 2)  **5** 0

6  Additional amount, if any, you want withheld from each paycheck . . . . . . . . . . **6** $ 0

7  I claim exemption from withholding for 2015, and I certify that I meet both of the following conditions for exemption.
• Last year I had a right to a refund of all federal income tax withheld because I had no tax liability, and
• This year I expect a refund of all federal income tax withheld because I expect to have no tax liability.
If you meet both conditions, write "Exempt" here . . . . . . . . . . . . ▶ **7**

Under penalties of perjury, I declare that I have examined this certificate and, to the best of my knowledge and belief, it is true, correct, and complete.

Employee's signature
(This form is not valid unless you sign it.) ▶ [redacted]   Date ▶ 10/16/2015

| 8 Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.) | 9 Office code (optional) | 10 Employer identification number (EIN) |
|---|---|---|

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat. No. 10220Q    Form W-4 (2015)

ENTERED
FOR 11/20/2015 PAY DATE
ENTERED BY: [mark]



**Direct Deposit Authorization Form**

ENTERED To Pre-note

FOR 11/06/2015 PAY DATE

ENTERED BY: (D)

████████████████████████████████

**Bank Account Information**

| | |
|---|---|
| Name | ☐ New Member |
| Address | ☐ Existing Member |
| Address 2 | Change of account |
| City, State & ZIP | ☐ Checking |
| Routing & Transit number | ☐ Savings |
| Account number | Amt or % _____ |
| Attach copy of Voided Check, Bank Letter or Specification Sheet | |

**Authorization**

I (we) hereby authorize VALIANT PAYROLL SERVICE, INC., to initiate credit entries to my (our) account (s) indicated below and the depository named below, as advised by my employer named above. In the event that funds are erroneously credited into my account, I authorize Valiant to debit my account for an amount not to exceed the original amount of the erroneous credit.

I understand that deposit of my earnings into my account by Valiant Payroll Service, may be an advance of funds on behalf of my employer, which is subject to the successful collection of these funds by Valiant from my employers bank. If my employer does not make available to Valiant the funds that were advanced to make the deposit to my account, I authorize Valiant to charge my account to recover said advance. I agree to hold Valiant harmless from loss and to indemnify it, limited to the amount of the deposit.

Signature, Date ████████ 1/16/15

Phone (516) 390 1100 • Fax (516) 390 1111
info@valiant.com • valiant.com
110 Crossways Park Drive • Woodbury, NY 11797

000057



000058

### DRUG FREE WORKPLACE POLICY

MSA is a drug free workplace. The nature of our business requires that all employees be in a condition to perform their jobs safely and efficiently, free from any impairment caused by alcohol or drugs.

We maintain a zero tolerance to the use of alcohol or drugs by employees during working hours. The term "use" includes consuming, possessing, selling, concealing, agreeing or arranging to buy or sell, being under the influence, or reporting for duty under the influence of alcohol or drugs to any degree.

It is our policy to conduct a drug and alcohol-screening test upon offer of employment. Any applicant who tests positive for illegal or non-prescribed drugs or alcohol shall be rejected for employment. Additionally, we maintain the right to conduct drug and alcohol testing throughout the employment period on the basis of reasonable suspicion, and as a part of our post-accident investigation process.

Any employee who is suspected of violating our Drug Free Workplace Policy will be subject to immediate suspension, pending investigation. Employees found to be in violation of this policy, or who refuse to consent to drug/alcohol testing upon request by the Company, will be terminated.

By signing below, you acknowledge that you have read and understand the Company's Drug Free Workplace Policy, and that you agree to all the requirements of this policy, including reasonable suspicion and post-accident drug/alcohol testing during your employment.

*[Signature Page Follows]*

000059

Employee



Karen Iovino

Dated: 10/16/2015

Accepted and Agreed to:

MSA Security

By

Name  T.L. Scarito
Title    Director, Human Resources

000060



9 Murray Street, 2nd Floor
New York, New York 10007
Office 212.509.1336

## *PERSONNEL ACTION NOTICE*

**Date Received:**  10/8/15          **Date Entered in Valiant:**

**Last Name:**  KAREN          **First Name:**  Iovino

### Employment Status Change

**The above employee's employment status is changed from:**
*Part time Veternarian*
                                        **to**

**Effective Date:**  10/9/15

### Request for Personnel Action

**I request the following action be taken:**

| | | | |
|---|---|---|---|
| ☐ | 401(k) Enrollment or Change | ☐ | Promotion/Reassignment/Title Change *See approval below |
| ☐ | Address Change *Request must be in writing from EE | ☐ | Resignation/Termination |
| ☐ | Change of Name/SSN/DOB *Must provide documentation | ☐ | Retirement |
| ☐ | Leave of Absence Request | ☐ | Transfer Request |
| ☐ | Marital Status Change | ☐ | Wage Garnishment/Court Order |
| ☐ | Plan Enrollment or Change *Request must be in writing from EE (*medical* benefit enrollments during OE only unless QLE; see approval below). | ☐ | Work Status Change |
| | | ☐ | W-4 Change of Exemptions |
| ☒ | Pay Rate/Salary Adjustment | ☐ | Other |

### Remarks

**Reference is made to contract number SAQMM15C0239.  Effective 10/9/15 the above named employee is being hired as a part time veterinarian and is paid at a rate of $70.00 an hour under clin 0003AB**

### Authorized By

*Authorization By (Name, Title)*          *Signature*          *Date*

### For Human Resources Use Only

*HR Representative Signature*          *Date*

000061

# KAREN ANN IOVINO, DVM



Bluemont, VA 20135

@ .com

**Professional profile:**
Associate veterinarian in private practice since graduation in 1993. Clinical experience in small animal, equine and exotic medicine, surgery, dentistry, ultrasound and endoscopy. Experience in hospital management/administration as well as managing people in austere conditions. Special interest in emergency, disaster medicine and animal rescue.

**Professional Experience:**

*Valley Veterinary Emergency and Referral Center*                    Winchester, VA
                                                                     Aug 2009-present
Part time relief veterinarian emergency and referral center. Variety of cases, including serious emergencies, allows exposure to current practices in critical care medicine and surgery. Interim Medical Director Oct 2013-Feb 2014

***Old Mill Veterinary Hospital***                    Leesburg, VA
                                                      July 2010-July 2013
Exclusively small animal practice in fast growing Loudoun County whose clients expect high quality medicine. Responsibilities as a part time associate include patient appointments, client communication, surgery, dentistry and routine and ill care of animals boarding at Old Mill Kennel.

***Blue Ridge Veterinary Associates***                    Purcellville, VA
                                                          Aug. 2002-June 2010
Progressive small animal, equine and exotic practice. Busy ten doctor practice allows for a variety of challenging cases. Duties include evening staff supervisor, patient appointments, client communication, surgery, endoscopy, ultrasound, primary doctor overseeing dental scaling, polishing, dental radiography, and tooth extractions. Also established the Community Assistance Fund. The Fund provides financial assistance to clients and their pets during times of need.

***National Veterinary Response Team***                    Region 3
                                                           August 2001-present
Regional Leader of Federal disaster response team comprised of veterinarians, veterinary technicians and other support personnel. National Disaster Medical System is a branch of the Office of the Assistant Secretary for Preparedness and Response in the Department of Health and Human Services. Deploy as Group Supervisor to veterinary squads that provide support to working animals during National Special Security Events or post natural or man made disaster declaration.

**Karen Ann Iovino, DVM**
Page 2

**Volunteer activities:**

Briggs Animal Adoption Center                                  Charles Town, WVA
Volunteer Veterinarian                                         December 2011-present
Non-profit no kill animal shelter located in a rural area. Volunteer veterinary services one day a
month.  Perform examinations, spays and neuters on shelter dogs, cats, puppies and kittens.

**NDMS Deployments:**

- NYC Ground Zero, September 2001, VMO
- Low Pathogenic Avian Influenza (LPAI), Harrisonburg, VA May 2002, VMO
- Hurricane Isabel, Fort AP Hill, Fredericksburg, VA, September 2003, MST VMAT SME
- Hurricane Frances, Southern Pines, NC, May 2004, VMO
- Hurricane Katrina, Biloxi, MS. Sept. 2005, TC
- Hurricane Ike, September 2008, Tallahassee, Florida, IRCT Veterinary LNO
- Hurricane Irene, August 2011, Washington, DC, NRCC ESF #8 LNO
- Derecho/Mid-West-Atlantic severe storms, June 2012, Washington, DC NRCC ESF #8
  LNO
- Hurricane Issac-Baton Rouge, LA August 2012, IRCT VMO LNO
- Superstorm Sandy-NJ/NY deployment, Oct-Nov 2012, NVRT-2 Team Commander
- Concert For Valor, Washington DC, November 2014, NVRT Group Supervisor
- Independence Day, Washington DC, July 4, 2015, NVRT Group Supervisor
- Papal Visit, Philadelphia PA, September 2015, NVRT Group Lead

**NDMS Committees:**

- *Senior Medical Policy Group* (2006). Committee member responsible for reviewing NDMS
  policy, providing guidance and recommendations for policy and infrastructure changes.
  Reported directly to NDMS Chief Medical Officer.
- *IRCT Operations Working Group (2009-2010).* Veterinary representation on Working Group
  tasked with defining positions within IRCT and developing the Field Operations
  Guide(FOG).  Members include Deputy Director of Operations at HHS, DMAT and DMORT
  TC's.
- *NVRT Fundamentals Training Committee (2013-2014).* Committee responsible for organizing
  the first NVRT Fundamentals Training at the Center for Domestic Preparedness, Anniston,
  AL held August 2014.
- Management Working Group October 2014-present

**Education:**
Ross University                                               St. Kitts, West Indies
                                                              Graduated 1993, DVM degree

Wilson College                                                Chambersburg, PA
                                                              Graduated 1989, BS degree


References available upon request

000063



## New Hire EEO-1 Data Sheet

Please complete this New Hire EEO-1 Data Sheet. It will supply us with information we need for federal reporting obligations. Please be advised that this information will be used and kept confidential, in accordance with applicable laws and regulations. This information will not be used as the basis for any adverse employment decision.

Name _Lolno____Karen__Ann_____    Social Security # (last 4 digits) ▮▮▮▮
     Last     First     Middle

## EEO-1 Self-Identification

We are subject to certain government recordkeeping and reporting requirements for the administration of civil rights laws and regulations. To comply with these laws, we invite you to voluntarily self-identify your race or ethnicity. **Submission of this information is voluntary and refusal to provide it will not subject you to any adverse treatment.** The information obtained will be kept confidential and separate from personnel files. It may only be used in accordance with the provisions of applicable laws, executive orders, and regulations, including those requiring information to be summarized and reported to the federal government for civil rights enforcement. When reported, data will not identify any specific individual.

**Please check the EEO Identification Group that <u>best</u> applies to you:**

☐ **Hispanic or Latino:** A person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.

- OR -

☒ **White (<u>Not</u> Hispanic or Latino):** A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

☐ **Black or African American (<u>Not</u> Hispanic or Latino):** A person having origins in any of the black racial groups of Africa.

☐ **Native Hawaiian or Other Pacific Islander (<u>Not</u> Hispanic or Latino):** A person having origins in any of the peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

☐ **Asian (<u>Not</u> Hispanic or Latino):** A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian Subcontinent, including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

☐ **American Indian or Alaska Native (<u>Not</u> Hispanic or Latino):** A person having origins in any of the original peoples of North and South America (including Central America), and who maintain tribal affiliation or community attachment.

☐ **Two or More Races (<u>Not</u> Hispanic or Latino):** All persons who identify with more than one of the above races, excluding those who identify themselves as Hispanic or Latino.

**Gender:** ☐ Male    ☒ Female

- OR -

☐ I do not wish to self-identify

▮▮▮▮▮▮▮▮▮ _____    _10/19/15_
Signature                                      Date

*If you should have any questions regarding this form, please contact Human Resources.*

Revised 8.4.2014 MSA Security

000064



000065



# **Emergency Contacts**



000067



# Employment Eligibility Verification

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-9**
OMB No. 1615-0047
Expires 03/31/2016

▶**START HERE.** Read instructions carefully before completing this form. The instructions must be available during completion of this form.
**ANTI-DISCRIMINATION NOTICE:** It is illegal to discriminate against work-authorized individuals. Employers **CANNOT** specify which document(s) they will accept from an employee. The refusal to hire an individual because the documentation presented has a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Attestation** *(Employees must complete and sign Section 1 of Form I-9 no later than the **first day of employment**, but not before accepting a job offer.)*

| Last Name *(Family Name)* | First Name *(Given Name)* | Middle Initial | Other Names Used *(if any)* |
|---|---|---|---|
| Iovino | Karen | N/A | N/A |

| Address *(Street Number and Name)* | Apt. Number | City or Town | State | Zip Code |
|---|---|---|---|---|
| ▮ | | | VA☑ | 20135 |

| Date of Birth *(mm/dd/yyyy)* | U.S. Social Security Number | E-mail Address | Telephone Number |
|---|---|---|---|
| ▮ | ▮ | @▮.com | ▮ |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):

☑ A citizen of the United States

☐ A noncitizen national of the United States *(See instructions)*

☐ A lawful permanent resident (Alien Registration Number/USCIS Number): _____

☐ An alien authorized to work until (expiration date, if applicable, mm/dd/yyyy) _____. Some aliens may write "N/A" in this field. *(See instructions)*

*For aliens authorized to work, provide your Alien Registration Number/USCIS Number OR Form I-94 Admission Number:*

**1.** Alien Registration Number/USCIS Number: _____

**OR**

**2.** Form I-94 Admission Number: _____

If you obtained your admission number from CBP in connection with your arrival in the United States, include the following:

Foreign Passport Number: _____

Country of Issuance: _____

Some aliens may write "N/A" on the Foreign Passport Number and Country of Issuance fields. *(See instructions)*

| 3-D Barcode |
|---|
| Do Not Write In This Space |

| Signature of Employee: ▮ | Date *(mm/dd/yyyy)*: 10/16/2015 |
|---|---|

**Preparer and/or Translator Certification** *(To be completed and signed if Section 1 is prepared by a person other than the employee.)*

I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Signature of Preparer or Translator: | Date *(mm/dd/yyyy)*: |
|---|---|

| Last Name *(Family Name)* | First Name *(Given Name)* |
|---|---|

| Address *(Street Number and Name)* | City or Town | State | Zip Code |
|---|---|---|---|
| | | ☑ | |

🛑 *Employer Completes Next Page* 🛑

## Section 2. Employer or Authorized Representative Review and Verification

*(Employers or their authorized representative must complete and sign Section 2 within 3 business days of the employee's first day of employment. You must physically examine one document from List A OR examine a combination of one document from List B and one document from List C as listed on the "Lists of Acceptable Documents" on the next page of this form. For each document you review, record the following information: document title, issuing authority, document number, and expiration date, if any.)*

Employee Last Name, First Name and Middle Initial from Section 1: **Iovino, Karen**

| List A<br>Identity and Employment Authorization | OR | List B<br>Identity | AND | List C<br>Employment Authorization |
|---|---|---|---|---|
| | | Document Title: | | Document Title: |
| | | Issuing Authority: | | Issuing Authority: |
| | | Document Number: | | Document Number: |
| | | Expiration Date *(if any)(mm/dd/yyyy)*: | | Expiration Date *(if any)(mm/dd/yyyy)*: |
| Document Title: | | | | |
| Issuing Authority: | | | | |
| Document Number: | | | | |
| Expiration Date *(if any)(mm/dd/yyyy)*: | | | | |
| Document Title: | | | | 3-D Barcode<br>Do Not Write In This Space |
| Issuing Authority: | | | | |
| Document Number: | | | | |
| Expiration Date *(if any)(mm/dd/yyyy)*: | | | | |

### Certification

I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.

The employee's first day of employment *(mm/dd/yyyy)*: __10/16/2015__ (*See Instructions for exemptions.*)

| Signature of Employer or Authorized Representative<br>*Allison b.* | Date *(mm/dd/yyyy)*<br>10/19/2015 | Title of Employer or Authorized Representative<br>HR Administrative Assistant |
|---|---|---|
| Last Name *(Family Name)*<br>Birmingham | First Name *(Given Name)*<br>Allison | Employer's Business or Organization Name<br>MSA Security |
| Employer's Business or Organization Address *(Street Number and Name)*<br>9 Murray Street | City or Town<br>New York | State<br>NY / Zip Code<br>10007 |

## Section 3. Reverification and Rehires *(To be completed and signed by employer or authorized representative.)*

| A. New Name *(if applicable)* Last Name *(Family Name)* First Name *(Given Name)* | | Middle Initial | B. Date of Rehire *(if applicable) (mm/dd/yyyy)*: |
|---|---|---|---|
| | | | |

C. If employee's previous grant of employment authorization has expired, provide the information for the document from List A or List C the employee presented that establishes current employment authorization in the space provided below.

| Document Title: | Document Number: | Expiration Date *(if any)(mm/dd/yyyy)*: |
|---|---|---|
| | | |

I attest, under penalty of perjury, that to the best of my knowledge, this employee is authorized to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative: | Date *(mm/dd/yyyy)*: | Print Name of Employer or Authorized Representative: |
|---|---|---|
| | | |

000069
E-Verify - Print Case Details - Preview                                                                    Page 1 of 2

## SENSITIVE BUT UNCLASSIFIED

| Department of Homeland Security | Report Prepared: 10/19/2015 |
|---|---|
| E-Verify | Page: 1 of 1 |

### Case Verification Number: 2015292142145UG

## Case Information:

**Employee Information:**

| Last Name: | Iovino | First Name: | Karen |
|---|---|---|---|
| Middle Initial: | | Other Names Used: | |
| Social Security Number: | *** ** ▮ | Date of Birth: | ▮ |
| Citizenship Status: | A citizen of the United States | Email Address: | |

**Document Information:**

| List A Document: | U.S. Passport or Passport Card | | |
|---|---|---|---|
| Passport or Passport Card Number: | ▮ | Document Expiration Date: | ▮ |
| Alien Number: | | I-94 Number: | |

**Additional Information:**

| Hire Date: | 10/19/2015 | Employer Case ID: | |
|---|---|---|---|
| Three-Day Rule Reason: | | Three-Day Rule - Other: | |
| Submitted By: | ABIR2971 | Submitted On: | 10/19/2015 |

## Initial Case Result:

| Case Result: | Employment Authorized |
|---|---|

## Employee Referred to SSA:

| Referred By: | | Referred On: | |
|---|---|---|---|

## Case Result from SSA (after SSA Tentative Nonconfirmation):

| Case Result: | | Response Date: | |
|---|---|---|---|

## Resubmitted to SSA (after Review and Update Employee Data):

| Last Name: | | First Name: | |
|---|---|---|---|
| Middle Initial: | | Other Names Used: | |
| Social Security Number: | | Date of Birth: | |
| Resubmitted By: | | Resubmitted On: | |

## Case Result from SSA (after Resubmission):

| Case Result: | |
|---|---|

## Request Name Review:

| Comments: | | | |
|---|---|---|---|
| Submitted By: | | Submitted On: | |

## Case Result from DHS (after DHS Verification in Process):

| Case Result: | | Response Date: | |
|---|---|---|---|

## Employee Referred to DHS:

| Referred By: | | Referred On: | |
|---|---|---|---|

## Case Result from DHS (after DHS Tentative Nonconfirmation):

| Case Result: | | Response Date: | |
|---|---|---|---|

## Photo Matching Results:

| Determination: | |
|---|---|

000070

E-Verify - Print Case Details - Preview                                        Page 2 of 2

**Employee Referred to DHS (Additional):**
Referred By:                                              Referred On:

**Case Result from DHS (after Additional DHS Tentative Nonconfirmation):**
Case Result:                                             Response Date:

**Case Closure:**
Closure Statement:
Closed By:                                               Closed On:

**SENSITIVE BUT UNCLASSIFIED**



NATIONAL CAPITAL REGION | 703-391-6014
NEW YORK | 212-509-1336
BOSTON | 617-438-0521

October 19, 2015

Karen Iovino

██████████,
████████, Virginia 20135

Dear Karen,

We are pleased to inform you that after careful consideration, MSA Security is offering you the position of
*Veterinarian* for Canine Validation Center (CVC) in Winchester, Virginia, reporting to Richard Strobel, Forensic
Chemist. This is a part-time, hourly position. This letter sets forth the terms of your position, which will govern your
employment should you accept.

<u>Duties and Responsibilities</u>
The CVC Veterinarian is responsible for the health and welfare of an estimated twenty (20) canines per week. These
duties include, but are not limited to:

- Verify canine identities when they arrive at the facility
- Provide general health exams to each canine
- Issue International Health Certificates
- Provide support for minor health issues while canines are on site
- Coordinate emergency care with local animal emergency facility in case of canine injury or illness
- Advise handlers regarding grooming standards, proper feeding, and the general care necessary to promote
  health and well-being of the animals
- Educate handlers/trainers about diseases that can be spread from animals to humans.
- Perform administrative duties such as maintaining records.
- Ensure environmental conditions at the CVC are appropriate to maintain health of canines.
- Coordinate as appropriate with veterinary providers and owners of visiting canines.
- Coordinate as appropriate with overseas veterinary care providers overseas.

Your compensation is as follows:

| | |
|---|---|
| Salary | $70.00 per hour |
| 401(k) Plan | Fidelity Investments, eligible ninety (90) days from date-of-hire |
| Company phone | TBD by Direct Report |
| Other company-issued equipment | As designated by Direct Report |

By signing below, you not only accept the terms of this agreement but also represent to MSA Security that you are under no obligation or agreement that would prevent you from becoming an employee of MSA Security or that would adversely affect your ability to perform the expected services. You also acknowledge and understand that you are an at-will employee and this agreement does not create any rights on your part for employment of any fixed period or length of time nor does it impose limitations on the right of MSA to terminate your employment for any reason at any time.

Sincerely,

T.L. Scarito, MA, PHR
Director of Human Resources

_____        _____
**KAREN IOVINO**                                             **DATE**



1345 AVENUE OF THE AMERICAS – 11TH FLOOR
NEW YORK, NEW YORK 10105
TELEPHONE: (212) 370-1300
FACSIMILE:   (212) 370-7889
www.egsllp.com

November 15, 2017

**CONFIDENTIAL EX PARTE COMMUNICATION
FOR SETTLEMENT PURPOSES ONLY**

**VIA E-MAIL: TAMARA.WEST@EEOC.GOV**
Ms. Tamara M. West
U.S. EEOC Washington Field Office
Alternative Dispute Resolution Unit
131 M Street, NE, Suite 4NW02F
Washington, DC 20507

> Re:    Dr. Karen A. Iovino v. MSA Security Canine Validation Center
>        Charge No. 570-2017-01636

Dear Mediator West:

As you know, we represent the Respondent, MSA Security ("MSA") in the above-referenced matter.  We submit the following position statement for your review and consideration in advance of the mediation scheduled in this matter for November 21, 2017.

In her Charge of Discrimination filed with the Equal Employment Opportunity Commission ("EEOC"), former MSA employee Dr. Karen A. Iovino ("Charging Party" or "Dr. Iovino") alleges sex and age discrimination. Specifically, Charging Party claims that on November 27, 2016, she was demoted to the position of Lead Veterinarian for MSA's Anti-Terrorism Assistance Program. *See* Charge at ¶ 1. She further claims that she received two verbal reprimands from the Lead Veterinarian and Program Manager, respectively, on January 5, 2017. *See id.*

Charging Party's claims are without merit. Contrary to her allegations, Charging Party was **never** demoted, she was **never** the Lead Veterinarian, and **never** held a superior job to Lead Veterinarian. At all times she was an employee of MSA, Charging Party held a part-time Veterinarian position.  Moreover, the verbal reprimands which MSA issued to Charging Party on or about January 5, 2017 do not constitute adverse employment actions.



## I.   FACTUAL BACKGROUND.

### A.  Overview of MSA Security.

MSA is in the business of, among other things, providing specialized and proprietary training to canines and handlers for the purpose of providing explosive detection and related services to clients which include governmental agencies. As an employer, MSA is committed to the philosophy of equal employment, and prides itself on providing its employees with a working environment free from discrimination on the basis of any protected category, including but not limited to age and gender/sex.

### B.  Charging Party's Employment.

MSA hired Charging Party on or about October 9, 2015 as a part-time Veterinarian in the Canine Validation Center (the "CVC") to fulfill certain of MSA's obligations under its contract with the Department of State ("DOS") involving the training and care of explosive detection canines. In her position, Charging Party was primarily responsible for the overall healthcare of the canines designated for explosive detection pursuant to two programs under the DOS contract, the Anti-terrorism Assistance program ("ATA") and World Wide Protective Services ("WPS") program. Contrary to Charging Party's assertions, her employment with MSA did not begin in July 2015. In July 2015, MSA contracted with Dogwood Farm, LLC for veterinarian services for its canines. Charging Party was a member of Dogwood Farm and served in a consultant capacity to MSA from July 2015 until October 2015 when she was converted to a part-time employee. *See* Exhibit A – Consultant Agreement.

At all times throughout her employment with MSA, Charging Party was a part-time Veterinarian. Contrary to Charging Party's claims in her Charge, MSA never hired nor promoted her to the position of Lead Veterinarian. *See* Exhibit B – Personnel Action Form. Charging Party was frequently the only veterinarian at her site, and according to colleagues, she viewed, and even at times, referred to herself as Lead Veterinarian. However, simply imagining it does not make it so. At no point did MSA ever designate Charging Party as the Lead Veterinarian or otherwise suggest to her she was the Lead Veterinarian. While she worked alongside technicians and other personnel who assisted in the care of the canines she treated, Charging Party had no managerial level responsibilities in her role as part-time Veterinarian.

During her employment, Charging Party often displayed a negative attitude and a general lack of professionalism. MSA received a number of complaints that Charging Party often treated personnel employees and co-workers with disrespect and condescension.  When provided with constructive criticism, Charging Party boasted about her "23 years" of experience and refused to accept input from anyone. She also had a tendency to interrupt technicians during the course of their duties and insist that they drop their work and attend immediately to her concerns. MSA counseled Charging Party on the negative impact of her interruptions and advised her to allow technicians and personnel to attend to their mission-critical work first before assisting her on routine matters such as clean up.

000075



For example, on November 14, 2016, Dr. Ratcliff, the newly hired Lead Veterinarian for the CVC invited Charging Party to a briefing meeting with CVC's then Program Manager Zane Roberts and the DOS' Program Manager, James Old, where she proceeded to wreck the meeting before it even began. Specifically, upon entering the meeting, Charging Party directed her first comments at Dr. Ratcliff, exclaiming, "I feel like the whole process, and the way you were brought in, was bullshit." Thereafter, she interrupted the meeting constantly to interject, without any particular reason, "I have a problem with this".

Charging Party's negative attitude did not improve with time. About one month later, Charging Party emailed Dr. Ratcliff to demand why he and one of the veterinary technicians had left for the day. *See* Exhibit C – December 30, 2016 Email. As this was the holiday season, Dr. Ratcliff had permitted the technician to leave early that day as there were no critical tasks that necessitated staying late, particularly on the last business day before the New Year's holiday. Dr. Ratcliff responded that there seemed to be minor record-keeping left so he allowed the technician to leave early. Charging Party replied to Dr. Ratcliff by listing the cleaning tasks that had yet to be completed. Dr. Ratcliff concluded the email by stating that he would not engage in a back and forth with Charging Party.

On January 4, 2017, Dr. Ratcliff and Program Manager Alan Bower met with Charging Party to discuss proper protocols for requiring staff to stay late and the negative attitude she often displayed at work. Charging Party did not appear responsive to the counseling.

Not long after this counseling session, Charging Party emailed Dr. Ratcliff on February 27, to follow up on a purchase order he had missed. Acknowledging his oversight with the order, Dr. Ratcliff jokingly suggested he would do push-ups as penance for his error. In response, Charging Party proceeded to stereotype men as incapable of properly attending to their responsibilities, stating, "Men!....Keeping track of you all is a FT job sometimes." *See* Exhibit D – February 27, 2017 Email. Dr. Ratcliff found the statements both offensive and inappropriate.

### C. MSA Never Demoted Charging Party.

As previously explained, at all relevant times, Charging Party held the position of part-time Veterinarian. At no point did MSA "demote" her, as she alleges in the Charge. Her title and salary remained the same during her employment with MSA. Thus, Charging Party's assertion that she was "demoted" in November 2016 is patently false. What did occur in November 2016 is that MSA hired Dr. Michael D. Ratcliff ("Dr. Ratcliff") as Lead Veterinarian of the CVC. Dr. Ratcliff had originally applied to the full-time Veterinarian position, but upon meeting him and reviewing his credentials, it was clear that his qualifications far exceeded those required for the full-time Veterinarian position. *See* Exhibit E – Dr. Ratcliff's Resume. MSA believed he would be particularly well-suited to lead the CVC and, as a result, made the business judgment to designate Dr. Ratcliff as the Lead Veterinarian of the CVC. As Lead Veterinarian, Dr. Ratcliff oversaw all the veterinarians at the CVC, including Charging Party.

For the approximate one year period of her employment up to MSA's employment of Dr. Ratcliff, Charging Party was typically the only veterinarian on site and one might say she felt "in

000076



charge" as a result. Indeed her own self-proclaimed claims to "Lead Veterinarian" corroborates this. Thus, not unsurprisingly, Charging Party was not happy with Dr. Ratcliff's hire as the Lead Veterinarian, perhaps even feeling as though her "power" had suddenly been usurped. Nevertheless, there is no evidence to suggest that MSA ever demoted Charging Party. Even after MSA hired Dr. Ratcliff, Charging Party's salary, benefits, schedule and work responsibilities remained the same.

To the extent Charging Party is attempting to argue she should have been given the full-time Lead Veterinarian position, such an argument has no merit.  Charging Party never even applied to the full-time Lead Veterinarian position. The position was posted on August 24, 2016, and closed in October 2016.  Nineteen individuals applied for the position. Charging Party was not one of them. *See* Exhibit F – Applicant Pool.  Moreover, it was well-known throughout the CVC that Charging Party was not interested in a full-time position or any position which required travel. A review of her employment application confirms that she had no interest in a full-time position. *See* Exhibit G - Employment Application Excerpt. The Lead Veterinarian position was and remains a full-time role which requires travel, both of which are commitments Charging Party had previously denounced. The only reason Charging Party is now claiming she was demoted, though she experienced no change in title or salary, is because she now had to answer to someone.

### D. The DOS Modified The Terms Of Its Contract With MSA, Requiring Elimination Of Charging Party's Position.

On or about May 2017, the DOS communicated to MSA that it would be modifying their contract by providing, among other things, that the ATA program required MSA to provide a new full-time veterinarian who would ideally have a military background and experience working internationally and in combat areas. The DOS was aiming to strengthen its anti-terrorism program and believed veterinarians with military experience and experience living overseas and working in combat areas would better serve this goal. The new position would replace the part-time veterinarian position currently held by Charging Party.  On or about June 2017, Charging Party was informed that her position would be eliminated as a result of the DOS contract modification which was expected to be effective in the coming month or so. MSA posted for the newly required position in July 2017 and began the recruitment process shortly thereafter.

### E. Because Of Charging Party's Lack Of Military And International Experience, Her Negative Attitude And Unprofessional Conduct At Work, And Because It Located a Far Superior Candidate, MSA Did Not Select Charging Party For The New Full-Time ATA Veterinarian position.

Charging Party alleges that she was replaced by someone with 7 years of experience. This is false. No one replaced Charging Party since her position, a part-time veterinarian previously required to be provided by MSA under the DOS contract, was eliminated. To the extent, she is trying to allege she should have been selected for the newly created full-time ATA Veterinarian position, MSA had legitimate, non-discriminatory reasons for not offering her the position.

000077



Charging Party applied to the new full-time Veterinarian position on July 17, 2017. MSA considered her application, but declined to select Charging Party because (1) Dr. Iovino lacked the military and international experience desired for the position; (2) as discussed above, Dr. Iovino often displayed a lack of professionalism in the workplace; and (3) they found a much more suitable candidate.

Charging Party did not have any military experience, which the DOS specifically preferred. *See* Exhibit H – Charging Party's Resume. Moreover, Charging Party had not worked in combat areas or overseas, and had previously expressed an unwillingness to travel. The position specifically requested the candidate be "willing to live and work in conflict/combat areas or similar hazardous environments, or other international locations as mission requires, for periods of time ranging from seven (7) to ninety (90) days". *See* Exhibit I – ATA Lead Veterinarian Job Description. Charging Party's resume did not even contain a single international experience.

In light of the foregoing, MSA did not believe that Charging Party was the right candidate for the new full-time ATA Veterinarian position. In addition to lacking the military and overseas experience, Charging Party did not possess the necessary interpersonal skills to work well with others. The full-time position would require travel to combat areas, and it was clear Charging Party did not possess the diplomatic skills necessary to work and cooperate with various constituents, including but not limited to government officials, members of the military and other contractors.

On or about July 27, 2016, MSA informed Charging Party of its decision to not offer her the full-time ATA Veterinarian position, and that consistent with the terms of the modified contract with the DOS, her position would end effective August 18, 2017.[1]

### F.  MSA Ultimately Selected Dr. Lee Palmer, A Candidate With An Impressive Military Background And Experience Working Overseas, For The Full-Time ATA Veterinarian Position.

After considering the candidacy of several individuals for the new full-time ATA Veterinary position, Charging Party included, MSA ultimately elected to choose Dr. Lee Palmer ("Dr. Palmer"), whose vast military and professional experience made him the ideal candidate. There can be no serious argument that Dr. Palmer's credentials for the position vastly overshadowed Charging Party's. *See* Exhibit J – Candidate Assessment and Exhibit K – Dr. Palmer's Resume. Charging Party's resume, of 3 pages, shows that her experience was more focused at the general practitioner level. *See* Exhibit H – Dr. Iovino's Resume. In contrast, Dr. Palmer's resume, which is 12 pages long, lists relevant emergent care experience, various leadership roles within the Army Reserves, peer reviewed articles, publications, lectures and teaching positions. *See* Exhibit K. Moreover, Dr. Palmer was also certified as an EMT which

---

[1] On or about August 3, 2017, MSA discovered that Charging Party had threatened to disclose confidential information to the press pertaining to the Jordanians' treatment of dogs in the country of Jordan and surrounding areas, information she only had access to by virtue of her employment with MSA and MSA's contract with the DOS, and that further she had information and access to certain confidential materials and restricted areas that she should not have had access to. MSA suspended her employment during its investigation into Charging Party's conduct and potential security breach. Charging Party remained on suspension and was <u>paid</u> the same salary until the termination of her position on August 18 pursuant to the DOS contract modification.

000078



MSA found to be useful given that the position would require travel to combat zones. Based on his superior qualifications, MSA, through Dr. Ratcliff, made an offer to Dr. Palmer in or about August 2017.

### G. MSA Contracted Candace McCall, A Female Who Is 13 Years Older Than Charging Party, To Fill The Void Created By Dr. Palmer's Inability To Start Immediately, Significantly Weakening Any Claims of Age and Sex Discrimination.

After Dr. Ratcliff offered the full-time ATA Veterinarian position to Dr. Palmer, MSA continued to negotiate compensation and other details related to the offer. Dr. Palmer also could not start immediately as he lives in Alabama and would need to relocate his family to Virginia for the position. To date, Dr. Palmer has not started the position. Dr. Palmer's inability to start right away created a need to temporarily fill this position. As a result, MSA contracted for Dr. Candace McCall, a licensed veterinarian, to fill the position on a temporary basis. Dr. McCall is well qualified for the role with more than 30 years of practicing veterinary medicine and numerous deployments overseas as an Air Force Officer. See Exhibit L – Dr. McCall's Resume. Dr. McCall is a female who at 63 years old is thirteen years older than Charging Party, severely undermining any claims of age and sex discrimination.

### H. MSA Also Hired A Female Veterinarian Technician Who Is One Year Older Than Charging Party After Charging Party's Termination, Further Undercutting Any Claims of Age and Sex Discrimination.

After Charging Party's departure, MSA also hired Christine Wassenaar, who is 51 years old, one year older than Charging Party, for the veterinarian technician position under the ATA program of the DOS' contract. MSA's hire of Ms. Wassenaar shortly after Charging Party's separation from employment severely undermines any claims of age and/or sex discrimination.

## II. CHARGING PARTY CANNOT STATE A CLAIM OF DISCRIMINATION ON THE BASIS OF AGE OR SEX.

To succeed on a Title VII or ADEA discrimination claim, Charging Party has the initial burden of establishing a prima facie case of discrimination by showing that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Greer v. Bd. of Trustees of Univ. of D.C.*, 113 F. Supp. 3d 297, 310 (D.D.C. 2015); *Montgomery v. Chao*, 495 F. Supp. 2d 2, 10–11 (D.D.C. 2007), aff'd, 546 F.3d 703 (D.C. Cir. 2008).

Charging Party cannot make out a prima facie case because she suffered no adverse employment action. As previously explained, MSA did not "demote" Charging Party. At all times throughout her employment, she held the position of part-time Veterinarian, and her title, salary and job duties remained the same. She never held the role of Lead Veterinarian. Nor did MSA "replace" her with someone with 7 years of experience as she alleges in her Charge. To the extent she is alleging Dr. Ratcliff replaced her, such a claim is false. Dr. Ratcliff was hired directly as the

Case 5:21-cv-00064-TTC-CKM   Document 14-2   Filed 01/10/22   Page 79 of 146
Pageid#: 232

000079

Mediation Statement
November 15, 2017
Page 7 of 11



Lead Veterinarian, a role which is full-time and requires travel, both of which are commitments Charging Party expressly stated she did not want. Charging Party's part-time Veterinarian position was later eliminated due to legitimate, business reasons wholly unrelated to discrimination—the DOS' modification of its contract with MSA.[2]

For the reasons explained below, Charging Party's remaining allegations of non-promotion and reprimands are, as a matter of law, insufficient to support a claim of discrimination.

### A.  Charging Party Cannot State A Claim For Failure To Promote.

To the extent Charging Party's allegations can be construed as a failure to promote claim, such a claim will fail because all actions taken by MSA were based on legitimate, non-discriminatory reasons.

In order to establish a prima facie case of discrimination based on failure to promote, Charging Party must show she (1) is a member of a protected class; (2) was qualified for and applied for a promotion; (3) was considered for and denied the promotion; and (4) after her rejection, the employer continued to seek applications from individuals who were no more qualified than Charging Party or awarded the position to such a person. *Powell v. Washington Metro. Area Transit Auth.*, 238 F. Supp. 2d 160, 164 (D.D.C. 2002) citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Charging Party cannot meet this burden.

> **1.  Charging Party's failure to promote claim with respect to the Lead Veterinarian role will fail because she never applied to the full-time position, and MSA made a legitimate business decision to designate Dr. Ratcliff as the Lead Veterinarian based on his superior qualifications.**

If Charging Party is now attempting to assert a failure to promote claim for the Lead Veterinarian role which Dr. Ratcliff holds, such a claim will fail because she never applied to the full-time position which was posted at the time of Dr. Ratcliff's application. *See* Exhibit F – Applicant Pool. Equally as important, Charging Party made it clear that she did not want a full-time position or a position which required travel, both of which are requirements for the Lead Veterinarian role. Indeed, on her employment application, Charging Party checked "No" in response to the question of whether she was looking for full-time employment. *See* Exhibit G – Employment Application Excerpt.

Moreover, in light of Dr. Ratcliff's extensive military experience, including veterinarian posts held in combat zones in Iraq and Kabul and MSA's mission to train canines to work in combat areas, he is supremely qualified for the Lead Veterinarian position. Charging Party's

---

[2] Though not addressed specifically in her Charge, if Charging Party attempts to assert a retaliation claim on the basis of her termination of employment, such a claim will also fail. Charging Party's termination of employment was already slated to occur due to the DOS' contract modification which eliminated her position. Communication and planning of the contract modification began on or about May 2017, well before the filing of the instant Charge in July 2017. And MSA informed her of the upcoming modification in June 2017. As such, Charging Party cannot show any causal nexus between her filing of the instant Charge and the termination of her employment.

000080

Ellenoff Grossman & Schole LLP

experience simply cannot compare. *See* Exhibit E – Dr. Ratcliff's Resume and Exhibit H – Dr. Iovino's Resume. And while Charging Party may have resented MSA's decision or felt it unfair, such sentiments cannot form the basis of a discrimination claim. More importantly, the EEOC should not allow Charging Party to use the EEOC's complaint procedure to circumvent MSA's business judgment in designating Dr. Ratcliff as the Lead Veterinarian. Even if the EEOC disagrees with MSA's decision here, it may not substitute its own judgment or Charging Party's for that of MSA. Because Charging Party has failed to provide even a scintilla of discriminatory motive, the EEOC must leave the business judgment surrounding this role where it rightfully belongs—solely with MSA. *See Bauknight v. Pope*, No. 1:11CV1176 LMB/JFA, 2012 WL 681632, at *4 (E.D. Va. Feb. 27, 2012) ("Employment-discrimination laws have not vested in ... [the EEOC] the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers").

2. **Charging Party's failure to promote claim with respect to the full-time ATA Veterinarian position will also fail because MSA made a legitimate, business decision to hire a more qualified candidate, Dr. Lee Palmer.**

Charging Party's failure to promote claim regarding the full-time ATA Veterinarian position will not survive because: (1) she cannot show that she was more qualified than Dr. Palmer, whom MSA selected for the position and (2) MSA has articulated a legitimate, non-discriminatory reason for its decision not to hire her for the position, namely her lack of military and overseas experience and her rude conduct in the workplace.

A comparison of both Charging Party's and Dr. Palmer's resume leave no doubt that Dr. Palmer was eminently more qualified for the position. The DOS specifically requested military experience. Charging Party had no military experience. *See* Exhibit H – Dr. Iovino's Resume. By contrast, Dr. Palmer's 19 years of military experience listed under the "Military Biography" section of his resume included the following non-exhaustive list of assignments:

- EOD Team Leader, 92nd Explosive Ordinance Disposal in Fairchild AFB, WA
- EOD Team Leader, 446th Explosive Ordinance Disposal in Flight US Air Force Reserve, McChord AFB, WA
- Field Veterinary Service Officer, 43rd MED DET (VS) in Fort Hood, Texas
- Clinical Veterinary Specialist, 149th MED DET (VS), JBLM, WA

Dr. Palmer also completed coursework at the following military institutions:

- Anti-Terrorism Officer Training Course II
- USAF Basic Military Training
- Naval School Explosive Ordinance Disposal
- USAF Airman Leadership School
- USAF Advanced EOD MGMT/Tech Course
- USAF EOD Craftsman, 7-Level School
- AMEDD Veterinary Clinical Proficiency Course

He had additional military training which consisted of, among other things:

000081



- Survival, Evasion, Resistance and Escape (SERE) 100.1 Level A – Code of Conduct
- Anti-Terrorism Level 1 AR 350-1, G-7, AR 525-13 PMG Annual
- Sexual Harassment Assault Response and Prevention (SHARP)
- Operations Security (OPESC) AR 530-1 HQDA, DCS, G-3/5/7

Furthermore, Dr. Palmer was a decorated Officer who had earned numerous awards such as the:

- Bronze Star
- Overseas Service Ribbon – (2)
- Air Force Commendation Medial
- Air Force Achievement Medal
- Global War on Terrorism Service Ribbon
- National Service Defense Ribbon
- Air Force Reserve Medal (M device)
- Iraqi Campaign Medal
- Air Force Outstanding Unit Award

Above and beyond this extensive and impressive military experience, which the DOS specifically preferred, Dr. Palmer was a highly accomplished professional. His resume boasted 7 specialty certifications, including tactical paramedic, senior explosive ordinance disposal and canine rehabilitation. In contrast, Charging Party had no special certifications listed on her resume. Dr. Palmer's resume featured 18 lectures, 6 book publications, 12 peer-reviewed articles and 9 periodicals on various veterinary and emergent care topics. Charging Party's resume, by comparison, had none of these job-relevant accolades. Not a single publication was featured in Charging Party's resume.

While Dr. Palmer is a male who happens to be younger than Charging Party, it is also indisputable that he is the more qualified candidate. This is fatal to Charging Party's failure to promote claim as the courts cannot infer discrimination absent a showing that her qualifications were "far superior" to those of the successful candidate. *Tolson v. James, 315 F. Supp. 2d 110, 116 (D.D.C. 2004) citing Edwards v. Principi,* No. 03–50504, 2003 WL 22709001, at *2 (5th Cir. Nov. 18, 2003) (to show pretext, "a plaintiff [must] show a difference in his qualifications superior to that of the person selected so apparent as to virtually jump off the page and slap us in the face").

Courts have held even where the selection process is "imperfect", riddled with irregularities and favoritism, such evidence is insufficient to establish that the employer's proffered explanation for its decision is pretextual absent some actual evidence that the employer defendant acted on a motivation to discriminate against plaintiff based on her age or sex. *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 312–13 (D.D.C. 2005) quoting *Fischbach v District of Columbia Dept. of Corrections*, 86 F.3d 1180, 1183 (1996) ("Even if a court suspects that a job applicant 'was victimized by ….poor selection procedures' it may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive."). Aside from pointing to her age (50) and gender (female), Charging Party provides no facts to support an inference of discrimination with

Case 5:21-cv-00064-TTC-CKM    Document 14-2    Filed 01/10/22    Page 82 of 146
Pageid#: 235

000082

Mediation Statement
November 15, 2017
Page 10 of 11



respect to MSA's decision. This is not enough. *See Acosta v. City of New York*, No. 11 CIV. 856 KBF, 2012 WL 1506954, at *4 (S.D.N.Y. Apr. 26, 2012) (the recitation "of the faulty syllogism: (1) I am (insert name of a protected class); (2) something bad happened to me at work; (3) therefore, it happened because I am (insert name of protected class)" is insufficient to support a claim of discrimination).

And Charging Party's own self-serving reference to her "25 years of experience with working dogs, emergency medicine and disaster response" cannot rescue her claim. *See Waterhouse v. D.C.*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000), aff'd, 298 F.3d 989 (D.C. Cir. 2002) (Plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for "plaintiff's perception of herself, and of her work performance, is not relevant. It is the perception of the decision maker which is relevant.").

In addition, MSA's record of hiring female candidates over the age of 40 for consultant and employment roles within the veterinary field significantly undermines any claims of age and gender/sex discrimination. Indeed, MSA hired Charging Party directly as an employee in October 2015 after her consulting role through Dogwood Farm LLC ended. At the time of her application for employment in October 2015, MSA was well aware of her sex and age, and still decided to hire her. After the termination of Charging Party's employment, MSA continued to hire females over the age of 40 consistent with its commitment to hire the best candidate for each role. MSA hired Dr. McCall, a 63 year old female Veterinarian, as a consultant to fill the need created by Dr. Palmer's need to relocate. MSA hired Ms. Wassenaar, a 51 year old female, for a full-time Veterinary Technician position under the DOS contract. Both Dr. McCall and Ms. Wassenaar are female, and older than Charging Party, making it clear that MSA's decision to not offer Charging Party the full-time ATA Veterinarian position had nothing to do with her age or sex.

Moreover, the demographic make-up of the veterinarians at the CVC belie Charging Party's allegations of age and gender-based discrimination. Of the four veterinarians who worked at the CVC in the 2016-2017 year, two are female, and three are over the age of 40.

Because Charging Party cannot rebut MSA's legitimate, business reasons for its decision not to select her for the full-time ATA Veterinarian position and the termination of her employment pursuant to the DOS contract modification, her claim of discriminatory failure to promote will fail.

### B. Charging Party Cannot State A Claim For Discrimination On The Basis of The Verbal Reprimands She Alleges Because These Are Not Adverse Employment Actions.

Charging Party alleges that the Lead Veterinarian, Dr. Ratcliff, reprimanded her for asking a technician to stay late one day and that the Deputy Program Manager, Facilities & Support, Alan Bower, reprimanded her for working too hard. At the outset, Mr. Bower did not reprimand Charging Party for working too hard as she alleges. Rather, he advised her to try to keep her hours to the thirty hours prescribed for part-time veterinarians.[3] More importantly, these allegations

---

[3]    Generally, part-time employees work up to 30 hours per week. On those occasions where Charging Party worked more than 30 hours, MSA compensated her in full for all hours worked.



cannot support a discrimination claim because such actions do not constitute adverse employment actions. It is well established that in order to establish a claim of employment discrimination, a Charging Party must allege she suffered an adverse employment action. An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Jones v. Bush*, 160 F. Supp. 3d 325, 346 (D.D.C. 2016), aff'd, No. 16-5103, 2017 WL 2332595 (D.C. Cir. Feb. 21, 2017) (internal citations omitted).

Courts routinely hold that reprimands, criticisms and even unsatisfactory performance reviews do not constitute adverse employment actions. *See Baloch v Kempthorne*, 550 F.3d 1191, 1199 (concluding that letter of counseling, letter of reprimand and unsatisfactory performance review were not adverse employment actions); *Stewart v Evans*, 275 F.3d 1126, 1136 (noting that "formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits do not constitute adverse employment actions"); *Kline v. Springer*, 602 F.Supp.2d 234, 242 (D.D.C.2009) (finding that a letter of reprimand was not an adverse employment action), aff'd sub nom, *Kline v. Berry*, 404 Fed. Appx. 505 (D.C.Cir.2010) (per curiam); *Runkle v. Gonzales*, 391 F.Supp.2d 210, 225 (D.D.C.2005) ("Formal letters of admonishment and disciplinary notices that have no effect on an employee's grade or salary level, job title, duties, benefits or work hours, for example, do not constitute adverse actions.").

As a result, what reprimands and counseling Charging Party received were not sufficiently material to constitute adverse employment actions. Even, assuming arguendo, they were, the reprimand and counseling were based on legitimate, non-discriminatory reasons, namely MSA's desire to maintain a professional workplace and ensure all staff are treated with respect.

## III.  SETTLEMENT POSITION.

As demonstrated herein, Dr. Iovino's claims are demonstrably without merit. Nevertheless, in an effort to avoid protracted litigation, MSA may consider settling for a reasonable sum.

*       *       *

We look forward to working with you to hopefully resolve this matter. Should you wish to discuss this matter in advance of the mediation, please email me at afugazy@egsllp.com to let me know when you would like to speak.

Very truly yours,

ELLENOFF GROSSMAN & SCHOLE LLP



Amanda M. Fugazy
Stephania C. Sanon

000084

# EXHIBIT A



**CONSULTING AGREEMENT**

**THIS CONSULTING AGREEMENT**, made as of this 28th day of June, 2015 between **MSA SECURITY, INC.**, a New York corporation having an address at 9 Murray Street, 2nd Floor, New York, New York 10007 (**"MSA"**) and Dogwood Farm, LLC, a Virginia Limited Liability Corporation having an address at ███████████, ███████ VA 20135, Karen A. Iovino, DVM (**"Consultant"**) is a member of Dogwood Farm LLC.

**NOW, THEREFORE**, the parties hereto agree as follows:

1.    **Term; Termination.**

        (a)    The initial term of this Agreement (the **"Initial Term"**) shall be for one year, commencing on ___July 6, 2015_____ (the **"Commencement Date"**) and continuing until ___July 5, 2016____ (the **"Expiration Date"**), unless sooner terminated as provided below. The Initial Term may be extended in writing by MSA for an additional period upon the same terms and conditions as set forth herein (the **"Renewal Term"**). The Renewal Term, if exercised, together with the Initial Term, shall hereinafter be referred to collectively as the **"Term"**.

        (b)    MSA shall have the right to terminate this Agreement on written notice to Consultant. Upon termination of this Agreement, MSA shall pay any outstanding Consultant Fees (as defined in Section 3(a)) due and owing to Consultant under the terms of this Agreement.

2.    **Consulting Services.**

        The Company hereby retains Consultant, and Consultant hereby agrees to be retained by MSA, to provide certain consulting services to MSA, from time to time, at MSA's request, as described in **Schedule A** and made a part hereof (the **"Consulting Services"**). From time to time, MSA and Consultant may modify or expand the Consulting Services by a mutually agreed upon written amendment to this Agreement.

3.    **Compensation.**

        (a)    As compensation for the Consulting Services, MSA agrees to compensate Consultant for the Consulting Services in accordance with and as set forth on **Schedule B** (the **"Consulting Fees"**).

        (b)    Payments made to Consultant for Consulting Services rendered shall be reported at year end on IRS Form 1099. No Federal, state, or local income tax or payroll tax of any kind shall be withheld or paid by MSA on behalf of Consultant. Consultant shall not be treated as an employee with respect to the Consulting Services performed hereunder for Federal or state tax purposes. Consultant understands that he/she shall be responsible to pay, according to law, Consultant's income tax and any other taxes that Consultant may be required to pay for providing the Consulting Services. Any taxes, workers' compensation, unemployment compensation or any other federal or state payment payable as a result of the Consulting Fee, reimbursable expenses or Consulting Services shall be entirely the responsibility of Consultant, and Consultant shall be responsible for filing all applicable tax returns, tax declarations and tax schedules.

1

5035181.1



4.    **Independent Contractor Relationship.**

(a)    This Agreement shall not be construed to create between MSA and Consultant the relationship of principal and agent, joint-ventures, co-partners, employer and employee, franchiser and franchisee or any other similar relationship, the existence of which is hereby expressly denied by each party. It is understood that Consultant is an independent contractor, and is not an employee or agent of MSA. Consultant shall not hold himself or herself out to be an employee of MSA or represent himself or herself in any manner inconsistent with the relationship of the parties described in this Section 4 for any purpose whatsoever, nor shall Consultant have any authority whatsoever to enter into contracts on behalf of MSA or otherwise bind MSA.

(b)    Consultant acknowledges and agrees that he/she is not eligible for, and shall not participate in, any employee pension, health, or other fringe benefit plan, of the MSA or any other benefits received by MSA's employees, including, without limitation, workers' compensation benefits, insurance benefits, benefits under retirement, savings, profit sharing, 401(k) or stock purchase plans, stock options or any vacation, holiday or other time off benefits.

5.    **Certification Compliance.**  Consultant represents, warrants and covenants that he/she has complied, and shall continue to comply, with all applicable Federal, state and local laws and regulations, including, without limitation, any applicable laws and regulations regarding permits, certificates, licenses and other qualifications, if any, that may be required to carry out the Consulting Services to be performed under this Agreement.

6.    **Indemnification.**  Consultant shall indemnify and hold harmless MSA from and against any claims, suits, liability, loss, costs, expenses (including, without limitation, reasonable attorneys' fees) or damages relating to, resulting from or arising out of any act or omission by the Consultant in the course of performing the Consulting Services or otherwise fulfilling his/her obligations under this Agreement.  If MSA seeks indemnity under this Section, it shall promptly notify Consultant of the subject claim.  At MSA's option, it may tender its defense thereof to Consultant, in which event both parties shall fully cooperate with each other in the defense of any such action.  If the defense is not so tendered, Consultant shall fully cooperate with MSA in its response to any such claim.

7.    **Governing Law; Dispute Resolution; Attorneys' Fees.**  This Agreement shall be governed by and in accordance with the substantive law of the state of New York.  Consultant acknowledges and agrees that any dispute, complaint, controversy, claim or grievance arising under, out of, in connection with Consultant's performance of the Services or this Agreement shall be submitted to binding arbitration before the American Arbitration Association.  Arbitration proceedings as discussed in this section may be commenced by notice from either Party hereto to the other Party.  The Parties will agree upon an arbitrator from a list of arbitrators supplied by the American Arbitration Association.  Consultant understands that any decision and award of the arbitrator shall be final, binding and conclusive upon the Parties, and such decision and award may be entered as a final judgment in any court of competent jurisdiction.    Consultant understands and acknowledges that by signing this Agreement and agreeing to this arbitration provision, he/she is forever waiving other remedies in favor of arbitration as the sole method of resolving disputes with MSA.  **CONSULTANT HEREBY EXPRESSLY WAIVES HIS/HER RIGHT TO A TRIAL BY JURY FOR ALL DISPUTES, COMPLAINTS, CONTROVERSIES, CLAIMS AND GRIEVANCES ARISING UNDER, OUT OF, IN CONNECTION WITH THE PERFORMANCE OF THE SERVICES OR THIS AGREEMENT, INCLUDING**

2



**WITHOUT LIMITATION ANY AND ALL STATUTORY CLAIMS AND COMMON LAW CLAIMS, AND HEREBY EXPRESSLY AGREES TO ARBITRATE ANY AND ALL DISPUTES, COMPLAINTS, CONTROVERSIES, CLAIMS AND GRIEVANCES ARISING UNDER, OUT OF, IN CONNECTION WITH HIS PERFORMANCE OF THE SERVICES OR THIS AGREEMENT.**

8.    **Non-waiver; Cumulative Remedies.** Consultant understands that MSA's failure to enforce the breach of any provision of this Agreement will not constitute a waiver of MSA's right to enforce any other breach of this Agreement or to enforce any other covenant by Consultant. All of MSA's rights shall be cumulative and pursuit of one remedy shall not be deemed to exclude any other remedies which may be available hereunder, at law and/or in equity.

9.    **Independent Counsel.** Consultant hereby acknowledges and confirms that he/she has had an opportunity to review this Agreement with counsel of his/her own choosing; that he/she has read this Agreement in its entirety and fully understands its provisions; and that Consultant has entered into this Agreement as his/her voluntary act and deed. Accordingly, Consultant agrees that the normal rules of construction, whereby ambiguities are to be resolved against the drafting party, shall not apply to this Agreement or its interpretation and/or enforcement.

10.    **Entire Agreement.** This Agreement constitutes the entire agreement of the parties and supersedes any prior agreements between them with respect to the subject matter hereof. This Agreement may not be modified, altered or cancelled except by further written agreement of the parties.

11.    **Counterparts.** This Agreement may be executed in counterparts, each of which shall be an original and all of which shall be deemed one and the same agreement.

**IN WITNESS WHEREOF,** the parties hereto have executed, or have caused their authorized representatives to execute, this Agreement as of the date first set forth above.

MSA SECURITY, INC.

By: _____
    Name:
    Title:

CONSULTANT:
_____ , DVn
Karen Ivins DVn
**[CONSULTANT'S PRINTED NAME]**

3

5035181.1

000088

# EXHIBIT B

000089

 **MSA SECURITY**

9 Murray Street, 2nd Floor
New York, New York 10007
Office 212.509.1336

*PERSONNEL ACTION NOTICE*

| Date Received: | 10/8/15 | | Date Entered in Valiant: | |
|---|---|---|---|---|
| Last Name: | **KAREN** | | First Name: | **Iovino** |

### Employment Status Change

The above employee's employment status is changed from:
*Part time Veternarian*

_____ to _____

**Effective Date:** 10/9/15

### Request for Personnel Action

I request the following action be taken:

| | | | |
|---|---|---|---|
| ☐ | 401(k) Enrollment or Change | ☐ | Promotion/Reassignment/Title Change *See approval below |
| ☐ | Address Change *Request must be in writing from EE | ☐ | Resignation/Termination |
| ☐ | Change of Name/SSN/DOB *Must provide documentation | ☐ | Retirement |
| ☐ | Leave of Absence Request | ☐ | Transfer Request |
| ☐ | Marital Status Change | ☐ | Wage Garnishment/Court Order |
| ☐ | Plan Enrollment or Change *Request must be in writing from EE (*medical* benefit enrollments during OE only unless QLE; see approval below). | ☐ | Work Status Change |
| | | ☐ | W-4 Change of Exemptions |
| ☒ | Pay Rate/Salary Adjustment | ☐ | Other |

### Remarks

Reference is made to contract number SAQMM15C0239. Effective 10/9/15 the above named employee is being hired as a part time veterinarian and is paid at a rate of $70.00 an hour under clin 0003AB

### Authorized By

*Authorization By (Name, Title)*          *Signature*                    *Date*

### For Human Resources Use Only

*HR Representative Signature*                            *Date*

000090

# EXHIBIT C

000091

**From:** "Michael D. Ratcliff" <MRatcliff@msasecurity.net>
**Date:** December 30, 2016 at 2:46:24 PM EST
**To:** Karen Iovino <Klovino@msasecurity.net>
**Subject: Re: Where did everyone go?**

I don't argue over email, so I won't here.

The needs of the hospital weren't communicated, therefore we did not know them.
We would have stayed if we had known.


Sent from my iPhone

On Dec 30, 2016, at 2:43 PM, Karen Iovino <Klovino@msasecurity.net> wrote:

> Mike,
>
> The autoclave needs to have a cleaning cycle. The post op pts need
> another once over.

I am more concerned about her actions last Friday when I had a lot of
work to do and she insisted on leaving.  Leaving early sets a bad
precedence.  There is always work to do.

Karen
KAREN IOVINO, DVM
<image001.png>
VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: ██████████ | F: 540.545.4138

**From:** Michael D. Ratcliff
**Sent:** Friday, December 30, 2016 2:41 PM
**To:** Karen Iovino <Klovino@msasecurity.net>
**Subject:** Re: Where did everyone go?

She left because I let her go. I asked what you had left to do, and it was
just records. I helped her with her remaining due outs for the day.

What was left in the hospital that she needed to do?


Sent from my iPhone

On Dec 30, 2016, at 2:37 PM, Karen Iovino <Klovino@msasecurity.net>
wrote:

> Mike,
>
> I just went looking for Jenn to ask her a question and both
> she and you are gone.  Considering her insistence on leaving
> after 8 hrs last Friday when there was still a great deal of
> work to do allowing her to leave early is not a good
> precedent.  Can I ask why she left early when there are still
> things to do in the hospital?
>
> Karen
>
> KAREN IOVINO, DVM
> <image001.png>
> VETERINARIAN, CANINE VALIDATION CENTER
> O: 540.300.6028 X345 | C: ██████████ | F: 540.545.4138

000093

# EXHIBIT D

**From:** Karen Iovino
**To:** Michael D. Ratcliff
**Subject:** RE: Furminator
**Date:** Monday, February 27, 2017 10:38:47 AM
**Attachments:** image001.png
image002.png
image003.png

Men! No worries. Keeping track of you all is a FT job sometimes.

KAREN IOVINO, DVM



VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: ▮▮▮▮▮▮ | F: 540.545.4138

**From:** Michael D. Ratcliff
**Sent:** Monday, February 27, 2017 10:36 AM
**To:** Karen Iovino <Klovino@msasecurity.net>
**Subject:** RE: Furminator

How did I miss this????????????? I'm sorry, Doc.

The order will be put in this week.

Push-ups forthcoming.

MICHAEL D. RATCLIFF, MS, DVM



**From:** Karen Iovino
**Sent:** Monday, February 27, 2017 10:35 AM
**To:** Michael D. Ratcliff <MRatcliff@msasecurity.net>
**Subject:** FW: Furminator

KAREN IOVINO, DVM



VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: ▮▮▮▮▮ | F: 540.545.4138

**From:** Karen Iovino
**Sent:** Friday, February 10, 2017 10:38 AM
**To:** Michael D. Ratcliff <MRatcliff@msasecurity.net>
**Subject:** RE: Furminator

https://www.amazon.com/FURminator-Short-Hair-deShedding-Large/dp/B0040QW3D2/ref=sr_1_1?
ie=UTF8&qid=1486741048&sr=8-1&keywords=furminator+short+hair

KAREN IOVINO, DVM



VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: ▮▮▮▮▮ | F: 540.545.4138

**From:** Michael D. Ratcliff
**Sent:** Friday, February 10, 2017 10:37 AM
**To:** Karen Iovino <Klovino@msasecurity.net>
**Subject:** RE: Furminator

Could you send an Amazon link (if there is one)?

MICHAEL D. RATCLIFF, MS, DVM



**From:** Karen Iovino
**Sent:** Friday, February 10, 2017 10:33 AM
**To:** Michael D. Ratcliff <MRatcliff@msasecurity.net>
**Subject:** Furminator

Mike,

Can the kennel get a large, short hair Furminator?  Usually TJ orders these items from Petsmart.

000096

Thanks,
Karen

KAREN IOVINO, DVM



VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: ▮▮▮▮▮▮ | F: 540.545.4138

000097

# EXHIBIT E

# Michael D. Ratcliff, MS, DVM

Alexandria, AL 36250
Mobile: ▇▇▇ ▇▇▇ ▇▇▇▇
▇▇▇▇▇▇▇▇@▇▇▇.com

## EDUCATION

**Doctor of Veterinary Medicine**                                    **May 2009**
Louisiana State Univ., Baton Rouge, LA
School of Veterinary Medicine
Clinical Track: Mixed Animal Medicine

**Master of Science**                                                **Aug. 2005**
Univ. of Arkansas, Fayetteville, AR
Field of Study: Ruminant Nutrition/Stocker Cattle Herd Health
Thesis Title: The Impacts of the Need for Castration and Different Methods
of Castration on Growth Performance and Morbidity of Stocker Cattle
Advisor: Dr. Elizabeth Kegley

**Bachelor of Science**                                              **May 2002**
Louisiana State Univ., Baton Rouge, LA
Field of Study: Dairy Science
Focus Area: Science and Technology

## PROFESSIONAL EXPERIENCE

**Senior Veterinarian**                                    **Jun. 2016 – Present**

*American K-9 Detection Services, LLC*

- Oversee veterinary care and overall Wellness & Performance of all AMK9 Working Dogs
- Maintain technical oversight of all AMK9 veterinary facilities and veterinarians; Kabul Training Center in Afghanistan, Iraq Energy City in Basra, Iraq, and Balad Airbase in Balad, Iraq
- Oversee the AMK9 K9 Wellness & Performance Department (i.e. 180-run kennel plus Quarantine) at the Operations hub in Anniston, AL
- Serve as the Hiring Manager for veterinarians applying for positions within AMK9
- Serve as the Subject Matter Expert for veterinary and canine wellness care to all departments within AMK9
- Working to stand up and operate an AMK9 Veterinary Support Hospital in Anniston, AL; anticipated opening – October, 2016

**Veterinarian**                                           **Jan. 2015 – Jun. 2016**

*Comprehensive Health Services*

Basra, Iraq – August 2015 to June 2016 – U.S. Department of State contractor

- Operated a fully-functional veterinary facility on the Basra, Iraq U.S. Consulate General compound providing routine, preventive, and emergent veterinary care (including surgical) to EDCs on:
  - o  Task Order 12 – Supporting AMK9 static and movement  EDC teams

Kabul, Afghanistan  – January 2015 to July 2015 – U.S. Department of State contractor

- Stood up a fully-functional veterinary facility providing routine, preventive, and emergent veterinary care (including surgical) to KESF EDCs on:
  - o  Task Order 9 – Supporting IDS/Academi movement  EDC teams
  - o  Task Order 10 – Supporting Aegis static EDC teams

### Veterinarian                                                              Oct. 2013 – Jan. 2015

*American K-9 Detection Services, LLC*

Consulate General Compound, Basrah, Iraq & Kabul, Afghanistan  (April 2014 – November 2014)

- On a Department of State contract, deployed as the embedded veterinarian to a kennel of 26-28 CWDs charged with explosive detection on the installation
- Stood up a fully functional veterinary facility on the Consulate General Compound to include routine diagnostic, surgical, dental, and disease prevention capabilities
- Provided Role III care and consultation to 35-45 CWDs deployed on private oil field contracts throughout south Iraq
- Initiated a prophylactic gastropexy campaign in an effort to reduce the incidence of Gastric Dilatation with Volvulus in assigned CWDs; performing grid gastropexies on 75% of assigned canines within a 3-month timeframe
- Served as the veterinary advisor to the prime contractor (Global Integrated Security) and Regional Security Officers assigned to the Consulate General
- Acted as the subject matter expert to AMK9 corporate HR for the interview and selection process of veterinarians assigned to various contracts worldwide
- Worked with and provided consultation to the AMK9 Afghanistan country team on various CWD medical cases in their area of operations
- Led a team charged with rewriting various AMK9 health, safety, and veterinary standard operating Procedures (SOPs)
- In a relief veterinarian role, provided on-site coverage to 130 canines assigned to the AMK9 Kabul Training Center (KTC) in Kabul, Afghanistan
- Completed the surgical stand-up process at the KTC veterinary clinic, and subsequently performed the first surgical procedure at that location

Balad Joint Airbase, Iraq (October 2013 – April 2014)

- On a Department of Defense contract, deployed as the embedded veterinarian to a kennel of 26-28 CWDs charged with explosive detection on the installation
- Provided routine and emergent care to the CWDs to include: sick call, annual vaccinations, emergency surgery, and health certificates for international travel
- Starting with the bare minimal supplies and equipment, established a functional and effective veterinary clinic on the installation stocked with current standard-of-care medications following closely Army Regulation 40-905

2

- Helped develop and implement changes to the online record keeping database (PMIS)
- Assembled canine first aid kits and distributed to all vehicles conducting missions with CWDs
- Performed quarterly canine handler training on basic and advanced canine first aid
- Performed quarterly kennel inspections
- Served as canine safety officer for weekly dedicated EDC training
- Worked with installation human providers to assemble, distribute, and simulate MASCAL protocols for both human and canine patients
- Served as veterinary advisor and consulted on cases throughout various contracts held in Iraq, being the only veterinarian employed by AMK9 for an extended period
- Ordered and distributed monthly heartworm and flea/tick preventatives

### Veterinary Medical Officer                                         Jul. 2012 – Oct. 2013

*U.S. Army Public Health Command District-Fort Hood; Fort Polk, LA, GS-0701-12*

- Served as the primary veterinary care provider of medical care to 16 Military Working Dogs (MWDs) assigned to Joint Readiness Training Center (JRTC)/Fort Polk. Provide urgent/emergent care to MWDs and Contracting Working Dogs from other installations/locations on temporary assignment to participate in JRTC training rotations
- Oversaw activities and was the practice manager of the Fort Polk Veterinary Treatment Facility (VTF), maintaining a 99% customer satisfaction rating among the approximately 12,000 active patients
- In a general practice veterinary environment, provided veterinary care and routine surgical procedures (to include dentistry) on pets belonging to Active Duty Service Members and Retirees located in the Fort Polk community
- Supervised a staff of ten Non-Appropriated Funds Civilians, and conduct all personnel evaluations, annual appraisals, and hiring/separation actions
- Conducted initial and routine sanitary audits of commercial food production facilities within Louisiana that distribute products to the Department of Defense; 22 audits conducted within 15 months
- Served as the senior general practitioner to the U.S. Army Remote Online Veterinary Record (ROVR) design team, focus groups, and software Beta testing team
- Served as the veterinary SME on the new Fort Polk/JRTC MWD kennel construction project estimated to be completed in 2014, and the ongoing MWD Kennel construction project ongoing at the Naval Air Station Joint Reserve Base (NASJRB) New Orleans, LA
- Performed Military Sanitary Inspections of 14 food distribution facilities on Fort Polk, NASJRB NOLA, Camp Beauregard, and Red River Army Depot
- Oversaw and conducted routine, hands-on training to U.S. Army veterinary technicians and MWD handlers to provide the highest standard of veterinary care in deployed and non-deployed environments
- Provided overall herd health for Fort Polk/JRTC Farm Activities including 78 goats, 3 mules, and 2 horses
- Performed routine Animal Facility Inspections of 1 stray animal facility, 2 MWD facilities, and 1 farm animal facility

**Louisiana Branch Chief**                                    **Jun. 2009 – Jun. 2012**

*U.S. Army Public Health Command District-Fort Hood; Fort Polk, LA; Terminal at Captain (O-3)*

- Served as the primary veterinary care provider medical care to 27 MWDs on 3 Military Installations
- As a Veterinary Corps Officer, oversaw veterinary activities at Fort Polk/JRTC, Barksdale Air Force Base, and NASJRB New Orleans
- Supervised 16 Soldiers and 13 Civilians (3 General Schedule (Grade 5, 7, 12), 10 Non-appropriated funds)
- In a general practice veterinary role, routinely treated privately owned animals (Service Member's pets) in 2 VTFs and 1 Veterinary Clinic throughout Louisiana, with the three facilities having over 20,000 active patient records combined
- Served as the animal health/veterinary consultant for 4 MWD kennel design team for building projects on Barksdale Air Force Base, Fort Polk, JRTC, and the NASJRB New Orleans, LA
- Performed over 27 routine audits, and three initial commercial sanitary audits of facilities within Louisiana which produced food procured by the Department of Defense
- Performed Military Sanitary Inspections of 12 food distribution facilities on Fort Polk, NASJRB NOLA, Camp Beauregard, and Red River Army Depot
- Oversaw and conducted routine, hands-on training to U.S. Army veterinary technicians and MWD handlers to provide the highest standard of veterinary care in deployed and non-deployed environments
- Provided overall herd health for Fort Polk/JRTC Farm Activities including 65 goats, 3 mules, 5 horses, and 1 pig
- Served as the installation veterinary SME for zoonotic disease control and prevention and worked closely with the Preventive Medicine department on the prevention and control of zoonosis
- Performed periodic Animal Facility Inspections of 1 stray animal facility, 2 MWD facilities, and 1 farm animal facility
- Consulted with Installation Command, Post Wildlife, and Environmental entities on the management strategy of over 500 feral horses on the Fort Polk/JRTC installation
- Honorably Discharged; June 2012

## PROFESSIONAL ORGANIZATIONS/MEMBERSHIPS

- American Veterinary Medical Association – (2009 - present)
- Arkansas Veterinary Medical Association – (2010 - 2013)
- U.S. Army Veterinary Corps Standardization Board; Business Management Committee - (2010-2012)
- American Society of Animal Science – (2003-2006)
- University of Arkansas Animal Science Graduate Student Association – (member 2003 – 2005; President 2004 – 2005)

## PROFESSIONAL VETERINARY LICENSES/ACCREDITATIONS

- Florida; #VM13198 (2015-present)
- Alabama; #6735 (2015-present)
- Louisiana; # 3001 (2011-present)
- Arkansas; # 2801 (2009-present; Inactive)

4

- DEA License (Florida credential)
- USDA APHIS Accredited; # 048113 (Louisiana and Alabama credentials)
- Military Working Dog Medicine and Surgery Credentialed (2010-2013)
- Military Working Dog Grid Gastropexy Credentialed (2011-2013)
- U.S. Army Sanitary Audit Phases I and II Credentialed (2009-2013)

## CLEARANCES

- U.S. Department of Defense
- U.S. Department of State

## PROFESSIONAL CONFERENCE ATTENDANCE

- Western Veterinary Conference (2008, 2015)
- AVMA Annual Meeting (2008, 2012, 2013)
- North American Veterinary Conference (2011, 2012)
- Armed Forces Public Health Conference (2011; Speaker)
- Veterinary Leadership Experience (2007)

## TRAINING ATTENDANCE

- PMP Exam Preparation Course; Simplilearn (2015)
- Non-PSS Pre-Deployment Training Course; O'Gara Training Center; Montross, VA (2015)
- U.S. Army Veterinary Track; Fort Sam Houston, TX (2009)
- U.S. Army Medical Command Basic Officer Leadership Course; Fort Sam Houston, TX (2009)

## COMPUTER & SOFTWARE SKILLS

- Microsoft Office Suite
- OnWard Vet
- AVImark
- Quckbase
- Windows & Mac Operating Systems

## HONORS/ACTIVITIES

- Certificate of Appreciation; 993rd Medical Detachment (Veterinary Services) – 2013
- Army Commendation Medal – 2012
- Army Achievement Medal – 2011
- Certificate of Appreciation; U.S. Department of Justice – 2011
- Certificate of Achievement; U.S. Army – 2010
- Army Service Ribbon – 2009
- National Defense Service Medal – 2009
- Global War On Terror Service Ribbon – 2009
- Western Veterinary Conference Scholarship – 2008
- President – LSU SCAVMA (2007-2008)
- Student of the Year, LSU SVM Class of 2009 – 2007

5

- Dean Michael Rhoades Memorial Scholarship − 2007
- Treasurer − LSU Student Chapter of the American Association of Bovine Practitioners (2006)
- LSU SVM Class of 2009 Representative − (2006 − 2009)
- Dale Bumpers College of Agriculture Representative to the Graduate Dean's Student Advisory Board − (2004 − 2005)
- President − University of Arkansas Animal Science Graduate Student Association (2004)
- Coach − 2010 and 2011 Fort Polk/JRTC Army Ten Miler Team
- Texas Ironman 70.3 − Finisher (2010)
- New Orleans Ironman 70.3 − Finisher (2009)
- Completed 5 Marathons − Phoenix, AZ (2009); Memphis, TN (2009); Las Vegas, NV (2010); Ashland, OR (2011); Fort Collins, CO (2013)
- Louisiana 4-Mile Running State Championship; 3rd Place (Age Group; 2012)
- Louisiana Half-Marathon State Championship; 3rd Place (Age Group; 2009)
- Louisiana Duathlon State Championship; 2nd Place (Age Group; 2009)
- Gamma Sigma Delta Member (2004)
- TOPS Scholarship (1998-2002)
- Alpha Zeta Member (2001)

## PUBLICATIONS & PRESENTATIONS

### Journals:

**M. D. Ratcliff,** E. B. Kegley, J. G. Powell, J. Hawley, K. S. Lusby, M. P. Rowe, S. A. Gunter, L. B. Daniels, and D. S. Hubbell III. *Effect of method and timing of castration on newly arrived stocker cattle*. Professional Animal Scientist 2014 30:457-465.

**M. D. Ratcliff,** E. B. Kegley, J. G. Powell, J. Hawley, K. S. Lusby, M. P. Rowe, S. A. Gunter, L. B. Daniels, and D. S. Hubbell III. *Assessment of the effect of castration upon arrival on long-term growth performance of stocker cattle*. Professional Animal Scientist 2014 30:466-475

### Scientific Abstracts:

**Ratcliff, M. D.,** E. B. Kegley, S. L. Krumpelman, and J. A. Hornsby. 2005. *Effect of method and timing of castration on growth performance and morbidity of newly arrived stocker cattle*. J. Anim. Sci. Vol. 83 (Suppl. 1):264.

### Experiment Station Reports:

Fry, R. S., E. B. Kegley, M. E. Davis, **M. D. Ratcliff,** D. L. Galloway, and R. A. Dvorak. 2005. *Level and Source of Supplemental Selenium for Beef Steers*. Arkansas Agri. Exper. Sta. Research Series 535:105-108.

**Ratcliff, M. D.,** E. B. Kegley, K. S. Lusby, S. A. Gunter, L. B. Daniels, and D. S. Hubbell, III. 2005. *Assessment of the Impact of Castration upon Arrival on Long-Term Growth Performance of Stocker Cattle*. Arkansas Agri. Exper. Sta. Research Series 535:112-114.

6

**Ratcliff, M. D.**, E. B. Kegley, S. L. Krumpelman, and J. A. Hornsby. 2005. *Effect of Method and Timing of Castration on Newly Arrived Stocker Cattle*. Arkansas Agri. Exper. Sta. Research Series 535:115-117.

Powell, J. G., **M. D. Ratcliff**, D. S. Hubbell, III, and J. A. Hornsby. 2004. *Incidence of Persistent Bovine Diarrheal Infection in Arkansas Stocker Calves*. Arkansas Agri. Exper. Sta. Research Series 522:121-122.

**Presentations:**

Explosive Detection Dogs and Veterinary TACMED (Guest lecturer). 2014, 2015. Louisiana State University School of Veterinary Medicine, Shelter Medicine rotation. Baton Rouge, LA.

How to Thrive in Veterinary School. 2012, 2013, 2015. Louisiana State University School of Veterinary Medicine First Year Student Orientation. Baton Rouge, LA.

Primary Care in a Veterinary Teaching Hospital. 2013. Louisiana State University School of Veterinary Medicine. Baton Rouge, LA

Pets & Pregnancy – How to Prepare for the New Arrival. 2013. JRTC/Fort Polk, curriculum for expecting Soldiers and spouses.

Environmental and Population Health Concerns of a Feral Equine Population. 2011. Armed Forces Public Health Conference. Hampton, VA.

Tendon Structure as a Functional Apparatus of Motion. 2006. Animal Biomechanics Rounds. Baton Rouge, LA.

Effect of method and timing of castration on growth performance and morbidity of newly arrived stocker cattle. 2005. Joint ASAS-ADSA-CSAS Meeting. Cincinnati, OH.

The impacts of the need for castration and different methods of castration on growth performance and morbidity of stocker cattle. 2005. Animal Science Department. Fayetteville, AR.

Role of TNF-α in pathogenesis of Bovine Respiratory Disease Complex. 2005. Arkansas Anim. Sci. Departmental Seminar. Fayetteville, AR.

000105

# EXHIBIT F

11/14/2017                                          Veterinarian

## Veterinarian
CVC - Winchester, Virginia

Hiring Lead
**Melissa Latella**

| Status |
| Filled |

☞ View Full Job Description

19 Applicants   [+ Add ] - This job is not open. Edit this job opening to change its status.          Showing   All

| Name | Rating | Date | Phone | Status | | |
|---|---|---|---|---|---|---|
| Jeffrey Zolkiewicz | | Oct 04, 2016 | . | Reviewed (a year ago ) | | |
| William Ley | | Oct 03, 2016 | | Reviewed (a year ago ) | | |
| Hasan Albasan | | Oct 03, 2016 | · | Reviewed (a year ago ) | | |
| Edwin Cuevas | | Sep 25, 2016 | . | Reviewed (a year ago ) | | |
| Gabriele Triberti | | Sep 19, 2016 | ....) | Reviewed (a year ago ) | | |
| Kimberly Arthur | | Sep 10, 2016 | | Reviewed (a year ago ) | | |
| Kimberly Arthur | | Sep 10, 2016 | | Reviewed (a year ago ) | | |
| David Bowen | | Sep 08, 2016 | ' | Reviewed (a year ago ) | | |
| Heather Jue | | Sep 01, 2016 | ..· | Reviewed (a year ago ) | | |
| Guy Maxwell | | Sep 01, 2016 | | Reviewed (a year ago ) | | |
| Edwin Cuevas | | Aug 31, 2016 | | Reviewed (a year ago ) | | |
| Olivia Schlichting | | Aug 30, 2016 | | Reviewed (a year ago ) | | |
| Mallory Tate | | Aug 29, 2016 | | Reviewed (a year ago ) | | |
| April Grothe | | Aug 28, 2016 | | Reviewed (a year ago ) | | |
| Edwin Cuevas | | Aug 25, 2016 | : | Reviewed (a year ago ) | | |
| Paula Lenhard-Rogers | | Aug 25, 2016 | | Reviewed (a year ago ) | | |
| Suma Rao | | Aug 24, 2016 | | Reviewed (a year ago ) | | |
| Seth Finger | | Aug 24, 2016 | .... | Reviewed (a year ago ) | | |
| Erika Alt | | Aug 24, 2016 | | Reviewed (a year ago ) | | |

1 - 19 of 19

# EXHIBIT G



# Application for Employment

Our policy is to provide equal employment opportunity to all qualified persons without regard to race, creed, color, religious belief, sex, age, national origin, ancestry, physical or mental disability, or veteran status.

Date 10 9 15

Last name Tuvins   First name Karen   Middle name Ann

Street Address ▮▮▮▮▮

City ▮▮▮▮▮   State Va   ZIP 2135

Telephone ▮▮▮▮▮   Social Security # ▮▮▮▮▮

Position applied for Veterinarian

How did you hear of this opening? Zone Roberts + Steve Velling

When can you start? immediately   Desired Wage $ 650/day

Are you a U.S. citizen or otherwise authorized to work in the U.S. on an unrestricted basis? (You may be required to provide documentation.) ☒ Yes ☐ No

Are you looking for full-time employment? ☐ Yes ☒ No

If no, what hours are you available? 7am - 8pm PT

Are you willing to work swing shift? ☒ Yes ☐ No

Are you willing to work graveyard? ☐ Yes ☒ No

Have you ever been convicted of a felony?
☐ Yes ☒ No

If yes, please describe conditions.

## Education

| School Name and Location | | Year | Major | Degree |
|---|---|---|---|---|
| High School | Hauppauge HS | 1985 | | |
| College | Wilson College | 1989 | science | BS |

000109

# EXHIBIT H

# KAREN ANN IOVINO, DVM



20135
cell
@     .com

**Professional profile:**

Veterinarian with diverse experience since graduating in 1993. Clinical proficiency in small animal general practice, emergency and working dog medicine, small animal surgery, dentistry, ultrasound and endoscopy. Previously a member of the National Veterinary Response Team for 15 years. Gained real world experience leading a team in austere environments during natural and man-made disasters. Experience in hospital management/administration and public speaking. Special interest in emergency, disaster and working dog medicine.

**Professional Experience:**

***Canine Validation Center***                                    Winchester, VA
                                                              July 2015-present

Relief veterinarian until Oct 1, 2016 when I became 3/4-time veterinarian. Currently Lead Veterinarian for ATA (Anti-Terrorist Assistance) canine explosive detection program. Duties include pre-procurement medical record/radiograph review, overall wellness of canines including prophylactic gastropexy, managing full service veterinary hospital, working closely with trainers to assure canines are prepared to train, developing and delivering canine first aid presentations for foreign students.

***Valley Veterinary Emergency and Referral Center (VVERC)***    Winchester, VA
                                                              Aug 2009-present

Part time relief veterinarian at emergency and referral center. Variety of cases, including serious, life-threatening emergencies, allows exposure to current practices in critical care medicine and surgery.

***National Veterinary Response Team (NVRT)***                   Region 3
                                                              August 2001-June 2016

Regional Leader of Federal disaster response team comprised of veterinarians, veterinary technicians and other support personnel. The team is part of the National Disaster Medical System (NDMS) under the Department of Health and Human Services. Deploy as Group Supervisor to veterinary squads that provide leadership, support to working animals during National Special Security Events or post natural or man made disaster declaration.

***Deputy Chief Veterinary Officer (CVO)***                      Bluemont, VA
                                                              August 2013-June 2016

Assist NDMS Chief Veterinary Officer with duties including writing or revising policy and procedures, writing clinical requirements for NVRT members, attend HQ or regional conference calls, represent NDMS at national or state meetings and give presentations at Federal, state and private sector meetings and conferences.

**Karen Iovino, DVM**
Page 2

*Interim Medical Director, VVERC*                    Winchester, VA
                                                     Nov 2013-Feb 2014

Requested by the Board of Directors to serve as interim Medical Director. Responsibilities
included writing and implementing policy and procedures, liaison to veterinary specialists,
address and resolve staff issues with the Hospital Administrator, hiring doctors, maintain
accountability for equipment including routine maintenance and repairs , completing 24/7
doctor schedules, handling client complaints, and attend monthly meeting with the Board of
Directors.

*Old Mill Veterinary Hospital*                       Leesburg, VA
                                                     July 2010-July 2013

Small animal exclusive practice in fast growing Loudoun County whose clients expect
high quality medicine. Responsibilities as a part time associate include patient
appointments, client communication, surgery, dentistry and routine and ill care of
animals boarding at Old Mill Kennel. Focus on fostering strong client-patient-
veterinarian relationship.

*Blue Ridge Veterinary Associates*                   Purcellville, VA
                                                     Aug. 2002-June 2010

Progressive small animal, equine and exotic practice. Busy ten-doctor practice allowed
for a variety of challenging cases. Duties included evening staff supervisor, patient
appointments, client communication, surgery, endoscopy, ultrasound, and primary
doctor overseeing dental scaling, polishing, dental radiography, and tooth extractions.
Also established the Community Assistance Fund which provided financial assistance to
clients and their pets during times of need.

**Volunteer activities:**

*Briggs Animal Adoption Center*                      Charles Town, WVA
                                                     December 2011-present

Volunteer veterinarian at a non-profit, no kill animal shelter. Volunteer services one day a
month. Perform examinations, spays and neuters on dogs, cats, puppies and kittens.

**NDMS Committees:**
- *Senior Medical Policy Group* (2006). Committee member responsible for reviewing NDMS
  policy, providing guidance and recommendations for policy and infrastructure changes.
  Reported directly to NDMS Chief Medical Officer.
- *IRCT Operations Working Group (2009-2010)*. Veterinary representation on Working Group
  tasked with defining positions within IRCT and developing the Field Operations Guide(FOG).
  Members include Deputy Director of Operations at HHS, DMAT and DMORT TC's.
- *NVRT Fundamentals Training Committee (2013-2014)*. Committee responsible for
  organizing the first NVRT Fundamentals Training at the Center for Domestic Preparedness,
  Anniston, AL held August 2014.
- Management Working Group October 2014-June 2016

**Karen Iovino, DVM**
Page 3

**Awards/Accolades:**
- Founding Member Accommodation, Tom Ridge, Secretary, Department of Homeland Security, March 2003
- NDMS Outstanding Achievement Award, J. Gary Sirmons, Acting Chief, NDMS, April 2004
- Certificate of Appreciation, Federal Emergency Management Agency and State of Florida, 2004
- Personal 'Thank You' letter post Hurricane Katrina deployment, Frank Wolf, Congressman, 2005
- Distinguished Team Member, NDMS, 2005
- Certificate of Appreciation from NDMS Director Andrew Garrett, MD, MPH, 2014
- Certificate of Appreciation for service during Operation Blue Lion, Philadelphia Pa September 20-28, 2015, from Federal Protective Service Region 3 Director Cathy Long
- Letter of Appreciation from MSA Security CEO Michael O'Neil, April 2017

**Education:**
Ross University

St. Kitts, West Indies
Graduated 1993, DVM degree

Wilson College

Chambersburg, PA
Graduated 1989, BS degree

References available upon request

# EXHIBIT I

**Veterinarian**
CVC - Winchester, Virginia

 Hiring Lead
**Melissa Latella**

Status
**Filled**

4 Applicants

Since 1987, MSA Security has served as an industry leader in high-consequence threat protection and specialized training for corporate and government clients. The MSA team is comprised of security professionals with diverse backgrounds in law enforcement, elite military units, and the private sector, all working together to provide unparalleled explosive detection, consulting, training and perimeter security services. MSA combines hands-on expertise with information and technology to minimize our client's vulnerabilities to threats and lessen risks in order to protect their personnel and property.

**Job Summary:**
This contractor position is responsible for overall canine health CONUS and OCONUS.

**Minimum Position Requirements:**
• Shall be a U.S. Citizen and possess a valid U.S. Passport.
• Shall possess or be able to obtain a minimum MRPT level clearance.
• Shall have a degree from a 4-year program at an accredited college of veterinary medicine
• Shall be licensed as a Doctor of Veterinary Medicine (D.V.M or V.M.D.)
• Shall have a minimum experience of two (2) years as a veterinarian in a private practice or the military
• Shall have knowledge of the chemical composition, structure, and properties of substances and of the chemical processes and transformations that they undergo (this includes uses of chemicals and their interactions, danger signs, production techniques, and disposal methods)
• Knowledge of plant and animal organisms, their tissues, cells, functions, interdependencies, and interactions with each other and the environment
• Experience in maintaining canine health records and canine international health certificates
• Shall have experience with a microchip program that scans, reads and tracks canines
• Shall be willing to live and work in conflict/combat areas or similar hazardous environments, or other international locations as mission requires, for periods of time ranging from seven (7) to ninety (90) days

**Position Duties:**
• Examine animals to detect nature of diseases or injuries.
• Treat sick or injured animals by prescribing medication, setting bones, dressing wounds, or performing surgery.
• Effectively interact and communicate with the COR and other leadership entities regarding veterinary care and recommendations.
• Inoculate animals against various diseases such as rabies and distemper.
• Collect body tissue, feces, blood, urine, or other body fluids for examination and analysis.
• Operate diagnostic equipment such as radiographic and ultrasound equipment, and interpret the resulting images.
• Advise handlers regarding sanitary, feeding, and general care necessary to promote health of animals.
• Educate handlers/trainers about zoonotic diseases
• Train and supervise workers who handle and care for animals.
• Euthanize animals at the direction of the COR.
• Establish and conduct quarantine and testing procedures that prevent the spread of diseases to other animals or to humans, and that comply with applicable government regulations.
• Conduct postmortem studies and analyses to determine the cause of animals' deaths.
• Perform administrative duties such as scheduling appointments and maintaining records.
• Inspect and test animals to detect the presence of communicable diseases.

4 Applicants    [ + Add ] - This job is not open. Edit this job opening to change its status.

Location
**Winchester, Virginia**

Department
**CVC**

Employment Type
**Contractor**

Minimum Experience
**Experienced**

Internal Job Code
**V-CVC**

EXHIBIT J

**Hiring Decision & Justification:** CVC ATA Full time Veterinarian
**Hiring Manager:** Michael D. Ratcliff, MS, DVM; CVC Lead Veterinarian
Applicants:
Dr. Cuevas, Edwin
Dr. Iovino, Karen
Dr. Orta, Colleen
Dr. Palmer, Lee

Preliminary Screening:
Review of résumés excludes Drs. Cuevas and Orta from selection since they do not demonstrate significant experience with Working Dogs when compared to the other two applicants.

Final Candidates:
Dr. Iovino (current ATA part-time veterinarian) and Dr. Palmer

Assessment Parameters:
I have known and worked with both Drs. Iovino and Palmer as veterinary colleagues for a minimum of 6 months. Dr. Iovino has worked directly for me during this time. These assessments are based off of personal experience working side-by-side, ample conversations, and numerous email and telephone communications with each.

| Qualitative Criteria | | |
|---|---|---|
| Criteria/Applicant | Dr. Iovino | Dr. Palmer |
| Minimum 2 years veterinary experience[1] | X | X |
| Possess, or ability to possess, a SECRET clearance[1] | X | X |
| Willing to live/work in combat areas for up to 90 days[1] | X | X |
| Board Certified Veterinary Specialist | | $X^2$ |
| Canine Rehabilitation Certification | | X |
| Working Dog experience | X | X |
| Military Working Dog experience | | X |
| Military service | | X |
| Overseas (austere) deployed veterinary experience | | X |
| DoS Explosive Detection Canine veterinary experience | X | |
| Effective diplomacy & communications internationally | | X |
| Research and R&D experience | | X |
| Journal publications | | X |
| Textbook publications | | X |
| Conference lecture experience | | X |
| EOD experience | | $X^3$ |
| Additional advanced degree (MS, MA, PhD) | | X |
| Experience working with DHS/FEMA | $X^4$ | X |
| Experience training handlers on Tactical Combat Care | | X |
| Emergency Medical Technician (Human) | | X |
| Deputy Sheriff | | X |

[1] Mandatory DOS requirement
[2] Emergency/Critical Care specialist
[3] Senior EOD Technician with the U.S. Air Force
[4] CONUS deployments to assist after various natural disasters

**Additional Criteria**

Day-to-day Working Dog experience:                Candidate advantage:    NONE/TIE
Both candidates possess the abilities necessary to provide routine, day-to-day veterinary care (including elective surgical) to Explosive Detection Canines on the various ATA projects.

Emergency Response:                                Candidate advantage:    Dr. Palmer
Though Dr. Iovino has significant experience as an Emergency Veterinarian, it is all at the General Practitioner level. Dr. Palmer is a board certified specialist in Emergency and Critical Care, which required a 1-year internship, 3-year residency, and passing a very strenuous examination.

Client and Leadership Professional Relationships:    Candidate advantage:    Dr. Palmer
Based on past performance and feedback from the client and MSA senior leadership, our confidence in Dr. Iovino's ability to work and communicate effectively with these entities is poor. She lacks the ability to professionally relate to these individuals, and she struggles to inspire confidence when she makes recommendations. Dr. Palmer has a long history of dealing with high-level government officials across a spectrum of agencies, including SOCOM. These entities frequently reach out to him for SME guidance regarding all aspects of Working Dog care. He comes recommended by SOCOM and HHS, among others.

Team Work/Leadership:                              Candidate advantage:    Dr. Palmer
Dr. Iovino has failed to consistently work with her existing team with tactfulness, respect, or professionalism. Dr. Palmer displays a high capacity for interacting with a team with a better level of diplomacy. Dr. Palmer brings a vast history of leadership experience- including Military service as an Officer, University-level leadership, Law Enforcement, and leading numerous committees to advance veterinary protocols in emergent situations.

Teaching/Instructing:                              Candidate advantage:    Dr. Palmer
Dr. Palmer is an international SME in regards to pre-hospital veterinary care. He is frequently invited to lecture and train with all levels of Canine Professionals, from the handler level all the way to human trauma surgeons who could potentially work on dogs (if needed). He demonstrates the ability to relate to all of these individuals, and provide viable training that could potentially save a K9's life in a tactical situation. Dr. Iovino does have experience training handlers on various K9 first aid topics, but her experience is vastly overshadowed by Dr. Palmer's.

International Travel/Diplomacy:                     Candidate advantage:    Dr. Palmer
We are reluctant to send Dr. Iovino out on international missions, a large part of the newly-developed full time position, based on her attitude and personality when dealing with leadership. We worry that she does not possess the ability to relate to international canine personnel in an effective way, which could negatively impact the MSA/CVC mission in regards to client satisfaction.


**Recommended Selection:        Dr. Lee Palmer**

Summary:
Though both candidates satisfy DOS criteria for the full time ATA veterinary position, Dr. Palmer's
additional experience and qualifications make him the superior candidate. Both demonstrate ample
medical competencies, but Dr. Palmer being a board-certified veterinary specialist with a history of EOD
and human EMT work makes him a more well-rounded fit for the overall future of the Canine Validation
Center, the ATA program, and the K9 industry as a whole. Dr. Iovino's overall attitude towards the
mission and inability to relate diplomatically to leadership preclude her from being selected for
international missions, a key component of the full time position. The client is simply not comfortable
with us using Dr. Iovino in this capacity. We would be fully comfortable deploying Dr. Palmer to these
locations, and confident that he could deliver clear and concise recommendations in a diplomatic fashion
back to the client and MSA/CVC leadership. It is for all of the above, in addition to the documented
selection criteria, that we chose Dr. Lee Palmer as the overarching choice for the position of full time
ATA veterinarian.

**Resumes** (double-click to open)

Dr. Iovino:



Dr. Palmer:



# EXHIBIT K

**Lee E. Palmer, DVM, MS, DACVECC, NRP, EMT-T, WEMT, CCRP, TP-C**
Auburn, Alabama
@█████.com

## SPECIALTY CERTIFICATIONS

**Diplomate,** American College of Veterinary Emergency and Critical Care (ACVECC)

**National Registry Paramedic,** (NRP)

**Certified, Tactical Paramedic** (TP-C) International Board of Specialty Certification

**Wilderness Emergency Medical Technician** (WEMT), Wilderness Medicine Institute

**EMT – Tactical** (EMT-T), Counter Narcotics and Terrorism Operational Medical Support

**Senior Explosive Ordnance Disposal (EOD) technician**, NAVSCOLEOD, USAF

**Canine Rehabilitation Certificate Program** (CCRP), University Tennessee

## EDUCATION

**Clinical Residency** – Small Animal Emergency and Critical Care, 2010 – 2013
*Auburn University, College of Veterinary Medicine, Auburn, AL*

**Master's of Science**, Biomedical Science, 2013
*Auburn University, College of Veterinary Medicine,* Auburn, AL

**Internship – Small Animal Emergency and Critical Care**, 2009 – 2010
*Allegheny Veterinary Emergency Trauma and Specialty,* Monroeville, PA

**Doctor of Veterinary Medicine**, 2006
*Washington State University, College of Veterinary Medicine, Pullman, WA*
Graduated Summa Cum Laude

**Bachelor of Science, Veterinary Science**, 2003
*Washington State University*, Pullman, WA
Graduated Summa Cum Laude

**Associate in Applied Sciences,** Paramedic/EMS Program, 2016
*Southern Union State Community College*, Opelika AL
Graduated with "Highest Honors"

## PROFESSIONAL EXPERIENCE – CURRENT

**Assistant Professor,** Emergency and Critical Care, Feb 2016 – Present
*Wilford & Kate Bailey Small Animal Veterinary Teaching Hospital, Auburn University, AL*

**Adjunct Instructor,** Emergency Medical Services Program, 2017 – Present
*Southern Union State Community College, Opelika AL*

**Paramedic,** Per Diem
*East Alabama Medical Center, Opelika AL,* Feb 2017 - Present

1

**SWAT Medic**, 2017 – Present
*Lee County SWAT Team, East Alabama Medical Center, Opelika AL*

**Officer-in-Charge, Veterinary Detachment**, *Current Rank*: MAJOR, 2003 – Present
*United States Army Reserves, Veterinary Corps*, Locations: Various

### PROFESSIONAL EXPERIENCE – PAST

**Medical Director / Instructor, K9 Operations**, 2014 – 2017
*K9 MEDIC, LLC, Walnut CA*

**Clinical Assistant Professor, Emergency and Critical Care**, 2014 - 2015
*Oregon State University, College of Veterinary Medicine*
- Director of Critical Care Service
- Antimicrobial Steward / Infectious Disease Control Manager, Small Animal VTH

**Emergency Relief Veterinarian**, 2006 – 2009
*Animal Emergency Clinic of Central Texas, Round Rock, TX*

### PROFESSIONAL ENDEAVORS

**Reserve Deputy Sheriff**, 2016 – Present
*Lee County Sheriff's Office, Opelika AL*

**Consultant, Veterinary – K9**
- a.  *United States Air Force Pararescue Group*
- b.  *United States Marshal Service, K9 Explosive Detector Dog Program*
- c.  *Dept. Homeland Security, Office of Health Affairs, K9 Handler Med. Training Program*

**K9-TECC Working Group - Founder and Co-chair**, 2014 - Present
*Committee for Tactical Emergency Casualty Care, K9 TECC Working Group*

**Board of Advisers, C-TECC**, 2015 – Present
*Committee for Tactical Emergency Casualty Care (C-TECC)*

**Co-Lead Pre-Hospital Subcommittee**, 2014- Present
*ACVECC Veterinary Committee on Trauma (VETCoT)*

**Committee member - National TEMS Council**, 2017 – Present
National Tactical Officer Association (NTOA)

**Committee Member – VATLS Education**, 2014- Present
*ACVECC Veterinary Committee on Trauma (VETCoT)*

**Committee Member**, 2014 - Present
*ACVECC Credentialing Examination Committee*

**Committee Member**, 2016 - Present
*ACVECC Joint Committee*

**Consultant, Emergency and Critical Care**, 2013 – Present
*Veterinary Information Network (VIN)*

**Associate Editor, (Emergency Folder)**, 2009 – 2013
Veterinary Information Network (VIN)

## CIVILIAN EMS TRAINING

- **Advanced Cardiac Life Support (ACLS),** 2016
- **Pediatric Advanced Life Support (PALS),** 2016
- **International Trauma Life Support (ITLS),** 2016
- **Medical Director Course (Tactical Medicine),** US Health & Human Services CONTOM, 2016
- **EMT-Tactical Course -120,** US Health and Human Services CONTOM, 2015
- **Wilderness Upgrade for Medical Professionals,** NOLS-WMI, 2015
- **Basic Life Support for Healthcare Providers (CPR / AED),** 2016
- **Emergency Medical Technician Certification,** JTM Training Center, August 2015
- **Benton County Search and Rescue Academy,** April 2015

## VETERINARY SPECIALTY TRAINING

- **University of Tennessee** *Canine Rehab Certificate Program (CCRP),* 2015
- **Veritas CPR: Advanced Life Support,** May 2015
- **Companion Animal Pain Management Certificate Program,** *Univ. Tenn.* Jan 2015
- **Veritas Cardiopulmonary Resuscitation: Basic Life Support,** April 2014
- **UC Davis** *Advanced Certification Program for Extracorporeal Therapies,* 2014
- **Advanced Renal Therapies Symposium 2012** – *Animal Medical Center, NYC,* Feb 2012

## CIVILIAN - FEDERAL COURSES ATTENDED

- **ATF, Post-blast investigative techniques course,** 1999
- **NBC Domestic Preparedness Training,** 2000
- **Train-the-Trainer, Emergency Responder Nuclear, Biological, and Chemical -** HAZMAT Course, 2000
- **FEMA - ICS-100 -** Introduction to Incident Command System
- **FEMA 200**
- **FEMA 700**
- **FEMA 800**
- **WMD / Terrorism Awareness for Emergency Responder –** Texas A&M Engineering Extension Service
- **FEMA - IS-00907 –** Active Shooter

\*See Military Biography at end for a list of military courses attended

## LECTURE EXPERIENCE

**ANTIMICROBIAL STEWARDSHIP IN THE ICU**
*SOCIETY OF VETERINARY HOSPITAL PHARMACISTS ANNUAL CONFERENCE, 2017*
**ECG BASICS FOR THE EMERGENCY CLINICIAN – PART I**
*AMERICAN ANIMAL HOSPITAL ASSOCIATION CONFERENCE, NASHVILLE, TN, 2017*
**ECG BASICS FOR THE EMERGENCY CLINICIAN – PART II**
*AMERICAN ANIMAL HOSPITAL ASSOCIATION CONFERENCE, NASHVILLE, TN, 2017*
**TRAUMA TRIAGE FOR THE POLYTRAUMA PATIENT**
*AMERICAN ANIMAL HOSPITAL ASSOCIATION CONFERENCE, NASHVILLE, TN, 2017*
**CHALLENGES FACING PREHOSPITAL CARE FOR OPERATIONAL K9S INJURED IN THE LINE OF DUTY**
*AMERICAN ANIMAL HOSPITAL ASSOCIATION, NASHVILLE, TN, 2017*
**AN INTRODUCTION TO K9 TACTICAL EMERGENCY CASUALTY CARE**
*EMSWORLD EXPO, NEW ORLEANS, 2016*
**CHALLENGES FACING THE POLYTRAUMA PATIENT**
*INTERNATIONAL VETERINARY EMERGENCY AND CRITICAL CARE SYMPOSIUM, 2016*
**CHALLENGES FACING PREHOSPITAL CARE FOR OPERATIONAL K9S INJURED IN THE LINE OF DUTY**
*2016 Penn Vet Working Dog Conference, Philadelphia, APR 2016*
**OPERATIONAL K9 FIRST AID & K9 TECC**
*2016 POLICE K-9 CONFERENCE & VENDOR SHOW, LAS VEGAS, MAR 2016*
**OPERATIONAL K9 FIRST AID & K9 TECC**
*ALABAMA POLICE AND MILITARY K9 CONFERENCE, Alabama, OCT 2015*
**ANTIMICROBIAL STEWARDSHIP: WHO, WHAT AND HOW**
*INTERNATIONAL VETERINARY EMERGENCY AND CRITICAL CARE SYMPOSIUM 2015, Wash. DC, Sep 2015*
**A HANDS ON INTRODUCTION TO K9 Tactical Emergency Casualty Care**
*K9 COP CONFERENCE, July 2015*
**ABSTRACT: K9 Tactical Emergency Casualty Care Initiative**
*ACVECC VETERINARY COMMITTEE ON TRAUMA, INAUGURAL CONFERENCE, Las Vegas, March 2015*
**Field Care for Working Dogs: Part II Tactical Field Care**
*VETERINARY INFORMATION NETWORK, VECCS Webinar Sep 2014*
**Field Care of Working Dogs: Part I Prevention and Preparedness**
*VETERINARY INFORMATION NETWORK, VECCS Webinar June 2014*
**Resident Focus: "Acute Traumatic Coagulopathy"**
*INTERNATIONAL VETERINARY EMERGENCY AND CRITICAL CARE SYMPOSIUM, Sep 2012*
**"Analgesia and Anesthesia in Small Animal Critical Care"**
*AUBURN UNIVERSITY, SMALL ANIMAL EMERGENCY AND CRITICAL CARE SYMPOSIUM, Oct 2010*
**Southern Iraq Veterinary Conference: "Rabies Prevention and Control**
*UNITED STATES ARMY VETERINARY CORPS, April 2008*

## K9 CASUALTY CARE COURSE INSTRUCTOR

**Operational K9 Tactical Emergency and Casualty Care, 16 h**
*University of Alabama Police Dept., July 2017*
**Operational K9 Tactical Emergency and Casualty Care, 16 h**
*Naval Surface Warfare, ST 2 and 4, Norfolk VA, June 2017*
**Operational K9 Tactical Emergency and Casualty Care, 8 h**
*350 Civil Affairs Command, Pensacola FL, May 2017*

4

.000124

**Operational K9 Tactical Emergency and Casualty Care, 8 h**
*Special Operations Medical Scientific Assembly, Charlotte NC,* May 2017
**K9 First Aid and First Responder (4 hours)**
*Alabama EMS Association Conference, Orange Beach FL.,* May 2017
**K9 Tactical Emergency and Casualty Care – Core Plus (3 Days)**
*US Customs and Border Protection, Hidalgo Sheriff's Office,* Sep 2016
**K9 First Aid and Basic Life Support (BLS) (4 hours)**
*Lee County Sheriff's Office, Opelika Police Dept., Opelika AL,* Aug 2016
**K9 Tactical Emergency Casualty Care (K9 TECC), 8 hour course**
*San Mateo Sheriff's Office, CA,* July 2016
**Operational K9 CBRN Decontamination Course (2 days)**
*Canadian Special Forces, I-K9,* June 2016
**K9 First Aid and First Responder (4 hours)**
*Canine Sports Performance Service, Auburn Univ.,* Feb 2016
**"K9 Tactical Field Care & Paramedicine for EMS/Fire, LEOs, & K9 Handlers" (2 days)**
   a. *US Air Force Pararescue Group,* 103rd RQS, NYC, Nov 2016
   b. *National Geospatial Intelligence Agency,* St. Louis, MO, May 2016
   c. *K9 MEDIC™,* Oquendo Center, Las Vegas NV, April 2016
   d. *Alcohol, Tobacco, & Firearm (ATF),* Long Island NY, Jan 2016
   e. *US Air Force Pararescue Group,* 103rd RQS, Gabreski AFB, NY, Jan 2016
   f. *K9 MEDIC™,* Oquendo Center, Las Vegas NV, November 2015
   g. *Alcohol, Tobacco, & Firearm (ATF),* Long Island NY, November 2015
   h. *National Geospatial Intelligence Agency,* Washington DC, July 2015
   i. *Spokane County Sheriff's Department,* Spokane WA, June 2015
**K9 Tactical Field Care & Paramedicine (5 day)**
*Georgia Emergency Management Agency,* Savannah GA, April 2015

### VETERINARY-RELATED COURSE INSTRUCTOR

**Advanced Surgical Procedures Wet Lab (4 hours)**
International Veterinary emergency Critical Care Symposium, 2016
**"Fundamentals of Small Animal Anesthesia Module II" (offered annually)**
Course Instructor, Distance Learning - Continuing Education Course, 2014, 2015, 2016
Veterinary Information Network (VIN)
**"Fundamentals of Small Animal Anesthesia Module I" (offered annually)**
Course Instructor, Distance Learning - Continuing Education Course, 2014, 2015, 2016
Veterinary Information Network (VIN)
**"Getting through the Night I, II, and III" (Offered annually)**
Course Instructor, Distance Learning - Continuing Education Course, 2010 - 2015
Veterinary Information Network (VIN)
**"TECH173-0309: Canine and Feline Pharmacology"**
Course Instructor, Distance Learning - Continual Education Course, 2009
Veterinary Support Personnel Network (VSPN.org)

## CURRENT PROFESSIONAL AFFILIATIONS

- **American Veterinary Medical Association (AVMA)**, 2007
- **American College of Veterinary Emergency and Critical Care (ACVECC)**, 2009
- **Veterinary Emergency and Critical Care Society (VECCS)**, 2009
- **International Society for Companion Animal Infectious Diseases (ISCAID)**, 2014
- **ACVECC Veterinary Committee on Trauma (VETCoT)**, 2014
- **Special Operations Medical Association (SOMA)**, 2014
- **Committee for Tactical Emergency Casualty Care (C-TECC)**, 2014
- **National Association of Search and Rescue (NASAR)**, 2014
- **Benton County Sheriff's Office Search and Rescue**, 2015
- **National Association of Emergency Medical Technicians (NAEMT)**, 2015
- **Alabama Tactical Officers Association (ATOA)**, 2015
- **Wilderness Medicine Institute (WMI)**, 2016
- **Sheep Dog® Impact Assistance**, 2016
- **Southern State Police Benevolenct Assoc.**, 2017

## BOOK PUBLICATIONS

**Palmer LE.** Chap. 204, Disaster Medicine. In: *Textbook of Small Animal Emergency Medicine* (ed. Drobatz KJ.), pp. 00–00. John Wiley & Sons, Inc., Hoboken, NJ. *In press*

**Palmer LE.** Hypothermia and Frostbite. In: *Small Animal Trauma Management ("The Work")*. (eds A. Shih and A. de Laforcade). John Wiley & Sons, Inc., Hoboken, NJ. *In press*

**Palmer LE**, Hanel R. General Concepts of Prehospital Trauma Care and Transport. In: *Small Animal Trauma Management ("The Work")*. (eds A. Shih and A. de Laforcade). John Wiley & Sons, Inc., Hoboken, NJ. *In press*

De Morias HA, **Palmer LE.** Metabolic Acidosis. In: *Blackwell's 5-Minute Veterinary Consult: Canine and Feline, 6th Ed. (*eds LP Tilley and FWK Smith Jr), pp 12-13. John Wiley & Sons, Inc., Hoboken, NJ.

De Morias HA, DiBartola SP, **Palmer LE.** Metabolic Alkalosis. In: *Blackwell's 5-Minute Veterinary Consult: Canine and Feline, 6th Ed.* (eds LP Tilley and FWK Smith Jr), pp. 56-58. John Wiley & Sons, Inc., Hoboken, NJ.

**Palmer LE**, Martin LG: Chap 56: The Approach to Hypokalemia and Hypomagnesemia. *Kirk's Current Veterinary Therapy XV*. Eds. Bonagura, JD, Twedt, DC. Saunders 2014.

## PEER-REVIEWED JOURNAL ARTICLES

Kendon K, **Palmer LE**. Part 1: Pathophysiology of Hemorrhagic Shock and Lethal Triad of Trauma. J Vet Emerg Crit Care 2016. *In editing.*

**Palmer LE.** Part 2: Hemorrhage control –How to properly apply direct pressure, pressure dressings and tourniquets for controlling acute life-threatening hemorrhage. J Vet Emerg Crit Care 2016. *In editing.*

**Palmer LE,** Yee A. TacMed Updates: K9 Tactical Emergency Casualty Care Direct Threat Care Guidelines. J Spec Oper Med. 2017 Summer;17(2):174-187.

**Palmer LE**. Chapter 29: Fluid Management in Patients with Trauma: Restrictive versus Liberal Approach. Vet Clin North Am Small Anim Pract. 2017 Mar; 47(2):397-410.

Baker J, Maurer T, Roche C, Brenner J, **Palmer LE**. Survey of State Veterinary and Emergency Medical Services Practice Acts language allowing for life-saving field treatment of Operational Canines by non-veterinary emergency medical responders. *In review.*

**Palmer LE.** Prehospital Trauma Life Support for Companion Animals and 'Operational Canines'. *Journal of Veterinary Emergency and Critical Care* 2016; 26: 161–165.

Rita H, **Palmer LE**, Baker J, et al. Best practice recommendations for prehospital veterinary care of dogs and cats. *Journal of Veterinary Emergency and Critical Care* 2016; 26: 166–233.

**Palmer LE**, Maricle R, Brenner J. The Operational Canine and K9 Tactical Emergency Casualty Care (K9-TECC) Initiative. *Journal of Special Operations Medicine*. Volume 15, Edition 3/Fall 2015: 33-39.

**Palmer LE**, Martin LG. (2014), Traumatic coagulopathy-Part 1: Pathophysiology and diagnosis. *Journal of Veterinary Emergency and Critical Care,* 24: 63–74.

**Palmer LE**, Martin LG. (2014), Traumatic coagulopathy-Part 2: Resuscitative strategies. *Journal of  Veterinary Emergency and Critical Care, 24: 75–92.*

**Palmer LE,** Martin LG: Serotonin Toxicity. *Stand Care.* 11(1). January-February 2009

**Palmer LE**, Byers CG, Caruso K: Acute Glaucoma. *Stand Care.* 10(6). July 2008

7

## EDUCATIONAL / PERIODICALS

**Palmer LE.** An Introduction to K9 Tactical Emergency Casualty Care.
*EMSWorld®.* October 2016;45(10): 84-87.
**Palmer LE.** Heat-Related Injuries – Part I: Physiology and Risk Factors.
*K-9 COP Magazine™. In press for future print.*
**Palmer LE.** Transport and Evacuation of an Injured Operational K9.
*K-9 COP Magazine™.* 2016; Issue 39.
**Palmer LE.** A Stepwise Approach for Triaging your Injured K9 - the ABCDs.
*K-9 COP Magazine™.* December 2015 – March 2016.
**Palmer LE.** Toxicological Risks for the Operational K-9.
*K-9 COP Magazine™.* October - November 2015.
**Palmer LE.** Gastric Dilatation-Volvulus (GVD) in the Operational K-9.
*K-9 COP Magazine™.* August - September 2015.
Cook S, **Palmer LE.** Importance of K9 Decontamination.
*K-9 COP Magazine™.* April-July 2015: 42-47
**Palmer LE.** The K9 Tactical Emergency Casualty Care (K9-TECC) Initiative.
*Police K-9 Magazine.* February/March 2015: 42-47.
**Palmer, LE,** Brenner J. Protecting the Operational Canine.
*Tactical Medicine: Defense   Standards.* Winter 2014.

## LICENSURE

Veterinary
**Alabama** ▆▆▆ (*current, active*)
**Oregon** ▆ (*current, active*)
**Idaho** ▆▆ (*current, inactive*)

EMS
**Alabama** Paramedic ▆▆▆
**NRP** 

## LEADERSHIP EXPERIENCE

**Officer-in-Charge, Veterinary Service Support Team,** 2016 – Present
*7350 Medical Detachment (Veterinary),* US Army Veterinary Corps
**Executive Officer /Veterinary Plans and Operations Officer,** May – Sep 2011

*358th Medical Detachment (Veterinary Services),* US Army Veterinary Corps, Reserves
**Officer-in-Charge, Veterinary Service Support Team,** 2010 – 2011

*358th Medical Detachment (Veterinary Services),* US Army Veterinary Corps
**Officer-in-Charge, Veterinary Service Support Team-Bravo,** 2006 – 2009

*43rd Medical Detachment (Veterinary Services),* US Army Veterinary Corps
**Platoon Leader,** 6th Platoon, 2004
*Army Medical Department Officer Basic Course,* United States Army
**Non-Commissioned Officer-In-Charge, EOD Team Leader,** 2000-2003

*446th Explosive Ordnance Disposal Flight (EOD),* United States Air Force Reserves
**Non-Commissioned Officer-In-Charge, EOD Team Leader,** 1999-2000

*92nd Explosive Ordnance Disposal Flight,* United States Air Force

.000128

### LEADERSHIP AWARDS

**Colonel George R. Lynch Leadership Award,** *Officer Basic Course, US Army,* 2004

**John L. Levitow Award,** *Airman Leadership School, United States Air Force,* 2000

### MILITARY LEADERSHIP SCHOOLS

**USAF Airman Leadership School,** 2000
**Army Medical Department (AMEDD) Officer Basic Course,** 2004
**AMEDD Captain Career's Course Phase I,** 2011
**AMEDD Captain Career's Course, Phase II,** 2012

### ACADEMIC AWARDS & HONORS

**Proficiency in Emergency and Critical Care Award,** 2006
**United States Army Health Professional Scholarship,** 2003-2006
**First-Place in Individual and Team Freshman Anatomy, SAVMA Symposium** 2003
**Golden Key Honor Society,** 2003
**President's Honor Roll, Washington State University,** Spring / Fall 2002 and Spring 2003

REFERENCES AVAILABLE UPON REQUEST

# MILITARY BIOGRAPHY

**Total Years of Service**: over 19 years

**Mandatory Removal Date**: 01 June 2031

**Security Clearance**: Secret

**Military Schools Attended:**

| | |
|---|---|
| USAF Basic Military Training | 1997 |
| Naval School Explosive Ordnance Disposal | 1997 |
| USAF Phoenix Readiness | 1998 |
| USAF Airman Leadership School | 2000 |
| USAF Advanced EOD MGMT/Tech Course | 2000 |
| USAF EOD Craftsman, 7-Level School | 2002 |
| AMEDD Officer Basic Course | 2004 |
| Veterinary Support in Theatre of Operations | 2006 |
| AMEDD Veterinary Corps Basic Officer | 2006 |
| AMEDD Veterinary Clinical Proficiency Course | 2007 |
| Anti-Terrorism Officer Training Course II | 2007 |
| AMEDD CCC Phase I | 2011 |
| AMEDD CCC Phase II | 2012 |
| US Army Basic Airborne Course | 2012 |

**Additional Military Training Courses attended**:

- Survival, Evasion, Resistance and Escape (SERE) 100.1 Level A - Code of Conduct, (8 h)
- Anti-Terrorism Level 1 AR 350-1, G-7, AR 525-13 PMG Annual
- Personnel Recovery & Code of Conduct AR 525-28 HQDA, DCS, G-3/5/7 Annual
- Information Security AR 380-5, AR 380-67 HQDA, DCS, G2 Annual
- Combat Trafficking in Persons www.combat-trafficking.army.mil ASA (M&RA) Annual
- Privacy Act/HIPAA AR 340-21, AR 40-66 Annual
- Sexual Harassment Assault Response and Prevention (SHARP) AR 600-20 HQDA, DCS, G-1
- Cyber Awareness AR 25-2 ICTD Annual
- Composite Risk Management AR 385-10 G-3/5/7, ASO Ongoing
- Operations Security (OPSEC) AR 530-1 HQDA, DCS, G-3/5/7 Annual
- Resilience & Perform Enhancement AD 2013-07, 25 MAR 13 HQDA, DCS, G-1 Annual
- Army Suicide Prevention Program AR 600-63 HQDA, DCS, G-1 Annual
- Equal Opportunity AR 600-20 HQDA, DCS, G-1 Semiannual
- Army Substance Abuse Program (ASAP) AR 600-85 HQDA, DCS, G-1 Annual

**US Military Decorations and Ribbons**

Bronze Star
Air Force Commendation Medal
Air Force Achievement Medal
Air Force Good Conduct Medal
National Service Defense Ribbon
Air Force Reserve Medal (M device)

10

Global War on Terrorism Service Ribbon
Iraqi Campaign Medal
Amy Service Ribbon
Overseas Service Ribbon – (2)
USAF NCO Professional Military Education Graduate Ribbon
Air Force Longevity Service Medal
Air Force Basic Military Training Honor Graduate Ribbon
Air Force Training Ribbon
Meritorious Unit Citation (43rd MDVS OIF 07-09)
Air Force Outstanding Unit Award

**US Military Badges**
Basic Parachutist Badge
Explosive Ordnance Disposal Senior Badge

**US Military School Awards / Honors**
John Levitow Leadership Award (USAF – Airman Leadership School)
Academic Achievement Award (USAF – Airman Leadership School)
Lynch Leadership Award (AMEDD - Officer Basic Leader Course)
Honor Graduate
- USAF Basic Military Training
- NAVSCOLEOD
- AMEDD OBLC

**Chronological list of Appointments (US Air Force - enlisted):**

| | | |
|---|---|---|
| Airman First Class (E-3) | USAF | December 1996 |
| Senior Airman (below-the-zone) (E-4) | USAF | |
| Staff Sergeant (E-5) | USAF | 1 August 2000 |
| Technical Sergeant (E-6) | USAFR | 1 November 2002 |

**Chronological list of Appointments (US Army):**

| | | |
|---|---|---|
| Second Lieutenant | USAR | 22 May 2003 |
| Captain | RA | 12 May 2006 |
| Captain | USAR | 25 August 2009 (adjusted) |
| Major | USAR | 22 March 2011 |

| **Chronological Record of Duty Assignments:** | **From:** | **To:** |
|---|---|---|
| **ENLISTED SERVICE:** | | |
| **Active Duty USAF** | | |
| *Explosive Ordnance Disposal Journeyman* | Oct 1997 | Oct |
| 1999 92nd Explosive Ordnance Disposal Flight, Fairchild AFB, WA | | |

11

| | | |
|---|---|---|
| *NCOIC, Training and Evaluations*<br>*EOD Team Leader*<br>92nd Explosive Ordnance Disposal<br>Flight, Fairchild AFB, WA | Oct 1999 | Oct 2000 |
| **USAFR Enlisted – Not on active duty**<br>*NCOIC, Training and Evaluations*<br>*EOD Team Leader*<br>446th Explosive Ordnance Disposal<br>Flight US Air Force Reserve, McChord<br>AFB, WA | Oct 2000 | May 2003 |

COMMISSIONED SERVICE:

USAR – NOT ON ACTIVE DUTY

| | | |
|---|---|---|
| *Health Professional Scholarship Student*<br>2006 Washington State University, Coll. Vet. Med.<br>USAR Control Group (delayed) | May 2003 | May |

ACTIVE DUTY – REGULAR ARMY

| | | |
|---|---|---|
| *Field Veterinary Service Officer (64A)*<br>43rd MED DET (VS), FT. Hood, TX<br>- Detachment S2<br>- Antiterrorism Training Officer (ATO)<br>- VSST Team Leader OIC (Operation Iraq Freedom 07-09) | May 2006 | May 2009 |

USAR – NOT ON ACTIVE DUTY

| | | |
|---|---|---|
| *USAR Control Group (Rienforcement)*<br>Individual Ready Reserve (Non-rated time)** | May 2009 | May 2010 |
| *Vet Plans and Ops / Executive Officer*<br>*Field Veterinary Service Officer (64A)*<br>*VSST Team Leader*<br>358th MED DET (VS), Montgomery, AL | Aug 2009 | May 2011 |
| *Veterinary Prev. Med. Officer*<br>350th Civil Affairs Command, HHC, (TAC-ABN) | May 2011 | July 2013 |
| *Clinical Veterinary Specialist*<br>149th MED DET (VS), JBLM, WA | Jul 2013 | May 2016 |
| *Officer-in-Charge,*<br>7350th VET DET (VS), Montgomery, AL | May 2016 | Present |

12

000132

# EXHIBIT L

Candace L. McCall, March 20, 2017; Page 1 of 3

# CURRICULUM VITAE

Candace Lee McCall, DVM, MPH, DACVPM
████████████ Summerfield, FL 34491
Telephone: █████████
E-mail: ██████████ @█████.com

## ACADEMIC TRAINING AND EDUCATION

| | | |
|---|---|---|
| 2004 | American College of Veterinary Preventive Medicine Diplomate | |
| 1999-2001 | Centers for Disease Control and Prevention, EIS Fellowship in Rickettsial Disease/Rabies | Atlanta, GA |
| 1996 – 1997 | University of Texas, School of Public Health Master of Public Health | San Antonio, TX |
| 1977 – 1981 | Louisiana State University School of Veterinary Medicine Doctor of Veterinary Medicine | Baton Rouge, LA |
| 1981 – 1985 | Louisiana Tech University Bachelor of Science | Ruston, LA |

## PROFESSIONAL EXPERIENCE

### 2009 – Present: Executive Vice President, American College of Veterinary Preventive Medicine.

- All administrative duties for the American College of Veterinary Preventive Medicine (ACVPM) to include organizing annual meetings, committee meetings, budgeting, membership activities, organize and administer the board certification exam, web site, newsletters and correspondance. Use Microsoft and Mac computers. Use of Quickbooks Pro, Microsoft Office.

### 2013- Present:  Prevention First Mobile Veterinary Services

- Home health care for pets and horses. Focused on preventive medicine
- Health Certificates
- Exams, vaccinations, wormings, minor health issues

## 2013- Present:  **Relief Veterinarian at Belleview Veterinary Hospital**
- Small Animal Medical practice

## 2012-2015:  **Texas Racing Commission, Regulatory Veterinarian/Project Manager**
- Regulatory work with racing and non racing horses.
  Pre-race exams on all horses racing, observe/treat as needed during races and follow-up horses that did not finish or are lame after the race. Enter data into the national and local databases.
  Mortality investigations and reviews with the trainer, jockey, owner, veterinarians. Project manager for injury and mortality and initiating a necropsy program in Texas.
  Epidemiology to help determine horses to tag as high risk. Provide summary data and briefings to the Commission on an annual basis.

## 2007-2012:  **Banfield Relief Veterinarian** in San Antonio Texas
- Provided healthcare focusing on prevention in small animals

## 1988-2008:  **United States Air Force Public Health Officer**
- Manager for multiple offices focusing on occupational health, infectious diseases, preventive health, immunizations, laboratory, medical intelligence, recruit health.
- USAF Surgeons Generals Office
- Analyst with the DIA Medical Intelligence

## 1999 – 2001: **Epidemic Intelligence Service Officer**,
Staff Veterinary Epidemiologist
Centers for Disease Control and Prevention, Assigned to
Rickettsial and Rabies Division
- Led CDC investigation into pertussis in a hospital pediatric ward
- Led investigation on Leptospirosis in a private highschool in New Hampshire.
- Answered Rabies questions from the public and other offices.
- Authored or co-authored articles on rickettsial diseases at Fort Chaffee, pertussis, rabies report for US, Q-fever.

## 1981 – 1988:  **Private practice in Louisiana and Florida**
Provided all health care, diagnosis and treatment of disease, minor surgery, and dental care for small animals

## Overseas Experience

- Czech Republic – Deployed with the USAF in 2006 – 2 weeks
- Saudi Arabia – deployed with the USAF in 1996 – 4 months
- Panama – lived there from 1991-1993 with the USAF
  - Deployed to Chili, Columbia, Honduras
- Egypt – Deployed wih the USAF in 1993 - 1 month
- Indonesia – visited parents for 1 month

Candace L. McCall, March 20, 2017; Page 3 of 3

- Australia – lived there from age 14-18
- Travelled through Europe and Asia

**Readiness Education**
- Medical effects of Chemical warfare training with the AF
- Medical effects of Nuclear warfare training with the AF
- Medical effects of Biological Warfare traning with the AF
- Command and Control Training for Emergencies on AF Base

## STATE LICENSURE, CERTIFICATION

- American College of Veterinary Preventive Medicine
  Diplomate

- Veterinary Medicine
  ███████████████████████████

- DEA license
- Certified in equine osteopathy

*Previous licenses in Texas, Mississippi, Arkansas, Tennessee all expired or inactive*

Interview with Karen Iovino

Date: November 2, 2017

Participants: Jeff McDermott, Lisa Warffeli, Nate Adams

Dr. Iovino worked for MSA Security (MSA) from October 2015 until August 2017. Dr. Iovino began documenting concerns she had with MSA in April 2016. She had multiple concerns with MSA including treatment of staff, hiring of friends, and treatment of the dogs.

Iovino learned that the dogs gifted by the Department of State's (Department) Bureau of Diplomatic Security (DS) to other countries were being mistreated. Iovino provided the example of the dogs working in 140 degree heat near the Syrian border and at least one dog dying of dehydration. The conditions the dogs lived in were deplorable as well. When the trainers complained, they were fired by MSA.

Iovino also was concerned about MSA hiring friends to fill positions. Iovino was forced to hire a veterinary technician who arrived to work with alcohol on her breath and almost killed a dog out of negligence. Trainers and handlers were hired who were friends of other MSA personnel and who may not have been qualified for the positions because dogs were unable to consistently locate explosives.

Iovino complained about the living and working conditions of the dogs overseas as well as the veterinary technician to her chain of command. She then complained to Cathy Read, Director of the Department's Office of Acquisition Management. Read told Iovino to contact the Department's Office of Inspector General (OIG). Iovino contacted the OIG on July 6, 2017.

Iovino believed MSA learned of her complaint on July 10, 2017 because after that date she was no longer included in meetings and no one would speak with her. Also, MSA withdrew its offer to Iovino for a full-time veterinarian position. Iovino explained that in February 2017, she had a long conversation with Michael Ratcliff where he asked her if she would work at MSA's facility full-time. Ratcliff told her the trainers liked working with her. She said the issue she had with the offer was that she was to work full-time at the facility. Ratcliff offered her the ability to work three long days and then half-days the other two days and be on call 24/7. On July 17, 2017, she informed Ratcliff that she would accept the position. On August 1, 2017, she was notified that there would be no full-time veterinarian and MSA would be creating a new position. She was notified that she would have to apply for this new position. Iovino then applied. On August 4, 2017, Iovino was met at the door by Michael Ratcliff and Alan Bower and was informed she was suspended for disclosing confidential information. They referred her to Peter Deegan for more information. Deegan told her she was suspended with pay and he reminded her of the confidentiality agreement she had signed. On August 18, 2017, Iovino was informed by letter that her employment with MSA was terminated.

Iovino was not allowed to access the hospital or the lab where any controlled drugs were kept. Iovino is required by the Virginia Board of Veterinary Medicine to provide a five day notice of a change in employment. Because MSA suspended her with no notice and then terminated her, she was unable to provide the five day notice. Iovino is also required to do a count of all controlled substances, which she was unable to do because MSA would not allow her into the lab. Iovino had copied the drug books prior to August 4, 2017. MSA put both her veterinary and DEA licenses at risk by suspending her and terminating her employment in the manner they did.

Interview with Peter Deegan, Vice President for Human Resources, MSA Security

Date: November 15, 2017

Participants:

Jeff McDermott, OIG  ᐧM

Lisa Warffeli, OIG ⱳ

Valerie Price, Counsel, MSA Security

Mr. Deegan stated that certain MSA employees at the Canine Validation Center (CVC) alerted Alan Bower that Karen Iovino had threatened to go to the press with certain information. The information she was planning on sharing pointed to the fact that she had been in a restricted area, a private office at the CVC. Bower brought the issue to Gerald Goss, MSA's Vice President for Business Development.

Deegan was on vacation when these events occurred, but when it was brought to his attention, he stated that he decided that she should be suspended. Deegan was concerned because Dr. Iovino was speaking to clients and to other MSA employees about her concerns, which raised protocol issues because Iovino did not first raise them with anyone in her chain of command at CVC, such as Gerald Goss, Michael Hayes, Alan Bower, or Michael Ratcliff. Deegan stated that the information was not classified, and he is not sure if classified information even resides at the CVC.

Deegan asked clients and Iovino's colleagues about what Iovino had said, but never figured out how she got access to the information. Deegan also asked Iovino how she had gotten the information, but she refused to tell him.

Gerald Goss conducted the investigation of Iovino's conduct for MSA. Documentation was sent to the contracting officer, Ana Garcia, on September 4 regarding Iovino's suspension. Deegan is not sure how Cathy Read (AQM) found out about the concerns that Iovino was raising.

Deegan stated that earlier in 2017, the Department of State expanded its canine assistance under the Anti-Terrorism Assistance program, which necessitated the need for a full-time veterinarian. Dr. Iovino was only part-time, and therefore, MSA officials (including himself) decided that she should have to apply for the full-time position. Deegan stated that Iovino had applied for the full-time position, but other individuals did as well who he (and Dr. Michael Ratcliff, the selecting official) believed were more qualified.

Deegan stated that prior to the vacancy announcement, MSA already had concerns with Iovino's performance, including that she was disagreeable and prickly and resisted coaching on these issues. Deegan promised to send documentation of these issues, some of which were prepared as part of the EEO case that Iovino filed.

Deegan stated that the Department of State contract with MSA required overseas and military experience. According to Deegan, MSA did not think Iovino would be accepted overseas because of her

000138

lack of diplomacy. Deegan stated that he has never heard that Ratcliff offered Iovino the full-time
position before it was announced.

Interview with Alan Bower, Deputy Program Manager, Canine Validation Center (CVC), MSA Security

Date: November 16, 2017

Participants:

Jeff McDermott, OIG

Claire Barnard, OIG

Valerie Price, Counsel, MSA Security

Mr. Bower stated that he has worked for MSA for seven years. As Deputy Program Manager, he is responsible for facilities and support, physical security, and administrative support at the CVC. Bower stated that he supervised Dr. Iovino for one week approximately a year ago, but the program manager at the time did not believe that Bower should be in Iovino's chain of command. Bower had few interactions with Iovino because she primarily worked in the hospital at the CVC. He did counsel her once with Dr. Michael Ratcliff on how she addressed the kennel technicians, which he found to be condescending. Bower also had to remind her to better manage her hours, because the contract with the Department of State only allowed her to bill for 30 hours/week.

According to Bower, Zane Roberts supervised Iovino at first, but Ratcliff became her supervisor once he was hired.

On August 4, 2017, Ratcliff and Bower informed Iovino that she would be placed on administrative leave because on August 3, one of the kennel techs told Bower that another kennel tech reported that Iovino had said that she wanted to go to the media with unspecified concerns. Bower said that Human Resources decided Iovino should be suspended. To Bower's knowledge, Iovino had never approached anyone with concerns at the CVC.

Bower sent Iovino's computer to a forensics lab in New York, which found that she was forwarding emails to her personal account. Although Bower did not believe this explicitly violated MSA's employee handbook, it did raise concerns similar to the rule in the handbook that company business should only be conducted using company email.

Bower stated that he looked into Iovino's concerns about time and attendance, and found no irregularities in the payroll system. He is not sure if anyone else at MSA investigated her other complaints. He was not aware at the time of her suspension that Iovino had approached OIG.

Bower stated that earlier in 2017, the contract line item number (CLIN) for Iovino's position changed and went to full-time, rather than part-time. Bower stated that the Project Manager told him that Iovino was offered the full-time position, but she declined it because she did not want to work full-time.

Bower had no information regarding the termination letter sent to Iovino.

Interview with Dr. Michael Ratcliff

March 26, 2018

Participants: Jeff McDermott (OIG), Claire Barnard (OIG), Valerie Price (Counsel, MSA Associates)

Dr. Ratcliff has worked for MSA Associates since November 2016 and supervised Dr. Karen Iovino from November 2016 until August 2017. As a senior veterinarian, he supervises 2 veterinarians at the Canine Validation Center (CVC) and 3 veterinarians overseas.

Dr. Iovino was the veterinarian for the Antiterrorism Assistance (ATA) program, which initially had very few dogs, so there was only need for a part-time veterinarian. However, after several contract modifications in 2016 and 2017, the number of dogs tripled. Ratcliff then suggested to the Department of State (DoS) that the ATA veterinarian become a full time position because there was no way that a part-time position could support all of the dogs.

Ratcliff asked Iovino if she would be interested in working full time, and she said she would be. Four people applied for the position, including Iovino, which closed in August 2017. Ratcliff said that the selected candidate (Lee Palmer) had much greater qualifications that Iovino. Dr. Palmer had emergency critical care training, prior military experience, and a significant amount of publications. He also had practiced veterinary medicine in a combat zone. Ratcliff stated that these were not requirements in the job announcement. [Note: the announcement does state that the candidate must be "willing to live and work in conflict/combat areas." According to Ratcliff, Iovino's whistleblowing activity was not a consideration in the hiring decision, which he said was based solely on Palmer's more relevant experience.

On August 3, 2017, the lead veterinary tech told Ratcliff that two of the kennel techs had told him that Iovino had threatened to go to *The Washington Post*, in potential violation of MSA's confidentiality agreement. Ratcliff spoke to one of the kennel techs who confirmed that Iovino had made this threat. However, he did not ask and cannot recall ever being told what information she was threatening to release. Ratcliff and Bower spoke on August 3, and Bower said it would be in the best interest of the program to place her on administrative leave. Ratcliff concurred with this decision.

Ratcliff did not conduct any further investigation to confirm if Iovino had made such threats and he did not ask Iovino if she had. On August 4, 2017, Ratcliff and Alan Bower met Iovino on her way into the office and informed her she would be placed on administrative leave. To Ratcliff's knowledge, no one investigated the allegations against Iovino after she was placed on leave. Gerald Goss never contacted him regarding the allegations.

Ratcliff was aware that Iovino was in contact with DoS officials about her concerns about the treatment of dogs, as well as other issues at the CVC, but he is unsure if he learned of this contact before or after she was placed on leave. He believes he learned of the contacts afterwards when a senior CVC leader told him.

Ratcliff stated that while Iovino was a good veterinarian, she was difficult to work with. For example, she entered a meeting on his first day of work with Ratcliff's supervisor, Zane Roberts, and the DoS Deputy Program Manager, James Olds, and stated that she did not agree with the process of Ratcliff's hiring,

which was "bullshit." He and Bower did verbally counsel her once regarding her treatment of colleagues. Iovino was never given a performance appraisal.

Ratcliff has never been faced with an employee who violated the confidentiality agreement. He has given written reprimands for absenteeism and an incident with a dog.

Contractor Whistleblower – Dr. Karen Iovino

Interview with Michael Stapleton Associates

Date: April 4, 2018

Participants: Gerald Goss (Executive Vice President of Business Development, MSA); Valerie Price (General Counsel, MSA); Jeffrey McDermott, Amy Bowser

Mr. McDermott provided Mr. Goss background about the whistleblower retaliation law and OIG investigations under section 4712. Mr. McDermott explained that Mr. Goss was identified as a fact witness for this investigation.

Mr. Goss said he had been with MSA since 2015 as Executive Vice President for Business Development for federal and commercial sectors.

Mr. Goss first became aware of issues raised by Dr. Iovino on August 3, 2017. He knew her as a part-time veterinarian at CVC. Mr. Goss heard from a kennel technician that Dr. Iovino had emailed concerns directly to people outside her chain of command, including officials at the Department including in AQM and OIG, and also heard that she planned to talk about her concerns with the media. Mr. Goss claims he visits CVC 2-3 times per week and makes sure to talk with each employee about their work and concerns (Note: he says later in the call that he was last at CVC a few weeks before Dr. Iovino sent her email). Mr. Goss said that he recognizes the importance of protecting information about government programs and contracts from the media. He was told by program management that Dr. Iovino had sent emails to various AQM officials at the Department and had threatened to talk to the media about a dog loaning or gifting program with Jordan.

Mr. Goss never spoke directly to Karen Iovino about her concerns or who she planned to discuss these concerns with.

Mr. Goss believed that Dr. Iovino's elevation of her concerns was a sign of irrational behavior and he thought that MSA needed to control the severity of the situation. He called various officials at the Department (he noted the COR Josh Carter, the CO Ana Garcia, Cathy Read and Sharon James in AQM, Loren Bachman in DS) to alert them to the issue. He wanted the Department to know that MSA planned to look into the issues and fully disclose to the Department what they find. He said that no one in the Department gave him direction or guidance on how to handle Dr. Iovino. He also said that no one at the Department confirmed an OIG investigation or acknowledged they knew of Dr. Iovino's concerns.

Mr. Goss has no direct knowledge of the issues raised by Dr. Iovino. He heard from a vet tech that Dr. Iovino planned to go to the media and that there was already an OIG investigation underway. He thought it best that Dr. Iovino be placed on administrative leave with pay while MSA investigated. This leave did not impact her clearance. He said the decision to place Dr. Iovino on administrative leave was made at a senior executive level, which included the human resources team. After placing Iovino on leave, MSA had a forensic team review her computer files. Mr. Goss also made sure that Dr. Iovino's access to the CVC was restricted and that MSA had recovered her work computer and cell phone. The forensics investigation showed that Dr. Iovino had forwarded emails to her personal email account. Mr. Goss thought that the forensics report showed at least 10-13 categories of emails that had been forwarded. He said examples were: (1) emails pertaining to Jordan; and (2) emails pertaining to photos

of canines. He could not state the MSA policy on forwarding emails to personal accounts but said that there was at least an expectation that email transmissions from MSA are restricted to their secure network given the sensitivity of the work they do for the government.

Mr. Goss also heard that Dr. Iovino had taken photographs of various parts of the CVC facility. He was unaware of her intent and the exact locations that were photographed. He said he thought the forensics report found photos of closets and rooms at CVC and some were in locked areas. He was unsure how she gained access to those areas.

Mr. Goss said he followed up on all of the issues raised by Dr. Iovino and made sure they were investigated. (note: It sounded like what Mr. Goss meant what that he made sure that any contractual reports and reviews had been done in the past and did not do anything to examine any of her current claims). Mr. Goss also noted that MSA has an audit of billing issues conducted and that he was not aware that any issues were uncovered in that audit.

Regarding the whistleblowing, Mr. Goss said he went to CVC the next day or day after and talked with the program management team at CVC and also checked the facility to see if anything was missing (from a security standpoint). He thought they may have a rogue employee on their hands.

Mr. Goss noted that the part time veterinary position was in the process of being phased out before the whistleblowing occurred. He said that he and others decided to eliminate Dr. Iovino's part-time position based on the client's needs and to announce the new full-time position. He said it was a coincidence that the timing of the administrative leave and the position elimination coincided. He said the issues with Dr. Iovino remained under investigation and therefore she remained on administrative leave until the position was simply eliminated and she was then terminated. Ms. Price prompted and Mr. Goss confirmed that the forensics investigation did not come back until early September 2017 and her position as eliminated in late August 2017.

Mr. Goss confirmed he was not involved in the selection for the full time veterinary position.

Mr. Goss did not have information about another terminated employee – Zane Roberts. Ms. Price recalls that MSA heard rumors that Mr. Roberts was raising the same issues as Dr. Iovino. Ms. Price said that HR went to CVC to discuss these issues with Mr. Roberts but he refused to speak with them after repeated requests. Mr. Roberts claimed not to have any knowledge of the issues raised by Dr. Iovino. The forensics investigation showed that Dr. Iovino had forwarded MSA emails to Mr. Roberts's personal email account and that Mr. Roberts lied about this fact to HR. Ultimately MSA determined that Mr. Roberts' lies to HR warranted termination from his position.

Telephone Interview with ███████████

Participants: Jeff McDermott   JM

Date: April 9, 2018





Interview with Cathy J. Read, Director, Acquisitions Management

Date: April 20, 2018

Participants: Jeff McDermott, Amy Bowser

OIG met with Cathy Read (A/LM/AQM) to discuss concerns that information about an OIG whistleblower (Karen Iovino) may have been inappropriately shared with MSA. OIG shared information about allegations raised by Iovino to AQM and it is unclear whether AQM shared this information with MSA, Iovino's contractor employer, who later retaliated against Iovino for her disclosures. This meeting was to determine if Ms. Read or someone in AQM was the source of the leak of information to MSA.

Mr. McDermott provided a background of the Iovino case and OIG's role in investigating whistleblower retaliation. Ms. Read said that she became aware of Ms. Iovino's concerns because Iovino contacted her directly in the summer of 2017 by both email and phone and then Ms. Read was also forwarded information from OIG. Ms. Read said that when she received the phone calls and emails from Iovino that she notified DS and forwarded the emails to OIG. She was pretty sure that at the time OIG was already aware from Iovino's hotline complaints.



Ms. Read noted that she found it highly improper for Ms. Iovino to come to her directly with concerns. She said that it violated the MSA confidentiality agreements and that there are other mechanisms in place for these types of complaints. Mr. McDermott noted that confidentiality agreements in government contracts are against the law.

Ms. Read claims she did not provide any information that was shared by OIG to MSA. Ms. Read did become aware that MSA had fired Ms. Iovino and that MSA did apologize to her directly for Ms. Iovino breaking protocol and contacting her directly. Ms. Read also noted that AQM works directly with MSA and that she visits the CVC annually and that Josh Carter works directly with them daily.