

UNCLASSIFIED                                                                July 5, 2018

ACTION MEMO FOR THE SECRETARY

FROM:      OIG - Steve A. Linick, Inspector General

SUBJECT:   Report of Investigation Pursuant to 41 U.S.C. § 4712
           OIG Whistleblower Case 2017-0044 (Karen Iovino)

Recommendation

That you refer this report to the Office of the Procurement Executive to determine whether there is a sufficient basis to conclude that the contractor subjected the complainant to a reprisal prohibited by Section 4712(a) and to issue an order denying relief or taking one or more of the remedial actions specified in Section 4712(c)(1). (Approve/Disapprove)

Background

Please see the attached report of investigation of a whistleblower complaint filed under the program for enhancement of contractor protection from reprisal for disclosure of certain information (41 U.S.C. § 4712). In this report, OIG substantiated allegations that the complainant, Karen Iovino, was subjected to reprisal prohibited by law.

As noted in the report, within 30 days after receiving an OIG report pursuant to Section 4712(b), the Department is required to determine based on OIG's findings whether there is a sufficient basis to conclude that the contractor subjected the complainant to a reprisal prohibited by Section 4712(a) and to issue an order denying relief or taking one or more of the remedial actions specified in Section 4712(c)(1).

Please feel free to contact me at (571) 349-9262, or your staff may contact Jeffrey McDermott at (571) 349-9267 or jeffrey.d.mcdermott@stateoig.gov.

cc:   Mr. Nate Adams, Counsel for Dr. Karen Iovino
      Ms. Valerie Price, Counsel for MSA Security, Inc.
      Mr. Stephen Mackey, Acting Procurement Executive, A/OPE



UNCLASSIFIED                                                                July 5, 2018

FROM:       OIG – Jeffrey D. McDermott, Acting Assistant Inspector General  JDM

TO:         OIG - Steve A. Linick, Inspector General

SUBJECT:    Report of Investigation Pursuant to 41 U.S.C. § 4712
            OIG Whistleblower Case 2017-0044 (Karen Iovino)

The Office of Inspector General (OIG) is required to investigate complaints filed by employees of contractors, subcontractors, grantees, sub-grantees, or personal services contractors who provide credible information alleging that they were subject to reprisal for whistleblowing activity.[1] Upon completion of the investigation, OIG is required to submit a report of the findings of its investigation to the complainant, the employer, and the head of the agency. Not later than 30 days after receiving the report of OIG's findings, the head of the agency is required to determine whether there is a sufficient basis to conclude that the employer subjected the complainant to a reprisal prohibited by law and to issue an order denying relief or taking one or more of the remedial actions specified in the law.[2]

As described below, OIG received a complaint from Dr. Karen Iovino, a former employee of MSA Security, Inc. (MSA), a Department of State (Department) contractor. Her complaint alleged that she was suspended and eventually terminated after having made protected whistleblower disclosures. OIG's investigation found that Dr. Iovino was subject to reprisal prohibited by law because MSA did not demonstrate by clear and convincing evidence that it would have taken the same personnel actions absent Dr. Iovino's disclosures.

Allegation

On August 4, 2017, Dr. Iovino filed a complaint with OIG under 41 USC § 4712 alleging that MSA suspended her in retaliation for making a protected whistleblower disclosure. Subsequently, Dr. Iovino also alleged that MSA retaliated against her when MSA: (1) required her to apply for the full-time conversion of her part-time position contrary to past practice, (2) did not select her for the full-time position, and (3) terminated her part-time employment.

In early July 2017, Dr. Iovino contacted the Director of the Department's Office of Acquisitions Management (AQM) with information related to a variety of concerns, including mistreatment of animals, use of government vehicles for personal purposes, conflicts of interest by a Department

---

[1] 41 U.S.C. § 4712. The original act applied only to employees of contractors, subcontractors, and grantees. The act was amended on December 16, 2016, to include sub-grantees and personal services contractors.
[2] 41 U.S.C. § 4712(c)(1).

official, and unnecessary expenditures that were billed to the Department. The AQM Director encouraged Dr. Iovino to report these allegations to OIG, and Dr. Iovino did so on July 6, 2017. MSA suspended Dr. Iovino with pay on August 4, 2017, and she then filed her whistleblower retaliation complaint with OIG. On August 18, 2017, MSA terminated Dr. Iovino's employment.

OIG reviewed Dr. Iovino's allegations of retaliation and determined that they contained sufficient details to allege a claim of retaliation for engaging in a protected whistleblower activity. Consequently, OIG initiated an investigation of the allegations.

Background

Dr. Iovino began work as a part-time veterinarian with MSA in October 2015.[3] She was responsible for the health care of the explosives-detection canines at the Canine Validation Center (CVC) in Winchester, VA. The Department awarded MSA a contract under the World Wide Protective Services program to operate the CVC and train canines to detect explosives that are provided to other nations under the Anti-Terrorism Assistance (ATA) program.

During her time at the CVC, MSA recognized Dr. Iovino as an excellent employee. The MSA official who supervised her for the majority of her time at MSA described her as a "phenomenal employee" and a hard worker who answered calls around the clock despite the fact that she was only employed part time. In April 2017, the Chief Executive Officer of MSA gave her a written commendation for her efforts to save the life of a dog. The commendation noted her "unparalleled" display of "surgical skill and poise."

As noted above, in early July 2017, Dr. Iovino brought several concerns to AQM, and, on July 6, filed an OIG complaint. Shortly thereafter, the AQM Director provided Dr. Iovino's identity and the substance of her complaint to various officials in the Bureau of Diplomatic Security (DS) who oversee the contract with MSA. In mid-July, a DS employee provided Dr. Iovino's name and information about her concerns to various MSA officials. Earlier, in May 2017, MSA asked the Department whether it could convert the CVC veterinarian position to a full-time position. The responsibilities of the position would not change, only the number of hours would increase. The Department agreed to the change. On July 14, MSA informed Dr. Iovino of the position change and asked if she would be willing to work full time rather than part time. MSA informed Dr. Iovino, however, that the part-time position would be abolished as of August 18. Dr. Iovino agreed to work full time. Rather than allowing Dr. Iovino to convert to the full-time position, as had been done on other occasions, MSA posted a vacancy announcement and required Dr. Iovino to apply. MSA posted the vacancy from July 17 through July 22. MSA's Office of Human Resources identified two qualified candidates for the full-time position, Dr. Iovino and another candidate. According to MSA, on July 25, MSA selected the other candidate for the position. MSA's memorandum selecting the other candidate included qualification criteria the other candidate, but not Dr. Iovino, possessed that were not included as criteria in the vacancy announcement or that seemed relevant for a veterinarian position.

---

[3] From July to October 2015, Dr. Iovino served as an independent consultant to MSA.

UNCLASSIFIED

On August 4, 2017, MSA suspended Dr. Iovino with pay due to allegations that Dr. Iovino had disclosed "confidential information." On August 18, 2017, MSA sent Dr. Iovino a letter stating that her assignment "had come to completion," effectively terminating her employment. MSA told OIG that the part-time position was eliminated on August 18. However, the selectee for the full-time position could not begin work immediately because he lived in another state. The selectee did not begin work until January 2018. MSA hired temporary help to fill the gap between Dr. Iovino's termination and the onboarding of the selectee for the full-time position.

A timeline of these events is presented below:



### Standard for Alleging a Claim of Reprisal

As an employee of a Department contractor, Dr. Iovino is entitled to file a complaint under Section 4712. OIG initially reviewed her complaint to determine whether (1) she made a protected disclosure, (2) MSA took an action against her that could be an act of reprisal, and (3) her complaint was filed within 3 years of the alleged reprisal. Dr. Iovino's complaint met these criteria.

### Protected Disclosure

The law provides protection from retaliation for disclosures the whistleblower *reasonably believes* is a violation of law, rule, or regulation related to a federal contract.[4] Reasonable belief means that the whistleblower actually believes in the unlawfulness of the employer's actions and that belief is objectively reasonable, meaning a person similarly situated would also find the actions to be unlawful.[5] The disclosure must be made to one or more of the officials specified in

---

[4] Under section 4712, a whistleblower disclosure is also protected from retaliation if the whistleblower reasonably believes the disclosure is evidence of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority related to a federal contract or grant, or a substantial and specific danger to public health or safety.

[5] *See Craine v. NSF*, 687 Fed. Appx. 682, 691 (10th Cir. Apr. 26, 2017).

UNCLASSIFIED

3

UNCLASSIFIED

the statute, including the Inspector General and federal employees responsible for contract oversight or management at the relevant agency.[6]

Dr. Iovino's contact with AQM and her OIG complaint qualify as protected disclosures under section 4712, as she raised concerns regarding mistreatment of animals, use of government vehicles for personal purposes, conflicts of interest by a Department official, and unnecessary expenditures that were billed to the Department. She made the disclosures to a Federal employee responsible for contract oversight or management at the Department and to OIG. The evidence confirms that Dr. Iovino reasonably believed the disclosures evidenced a gross mismanagement of a Federal contract; a gross waste of Federal funds; an abuse of authority relating to a Federal contract; and a violation of a law, rule, or regulation related to a Federal contract, and that her belief is objectively reasonable.

### Alleged Acts of Retaliation

A contractor may not discharge, demote, or otherwise discriminate against an employee in reprisal for making a protected disclosure.[7] In this case, Dr. Iovino alleged that MSA suspended her with pay on August 4, 2017, and eventually terminated her employment on August 18, 2017, in reprisal for making a protected disclosure.

### Timely Complaint

Dr. Iovino filed her complaint on August 4, 2017, which is within the 3-year statute of limitations from the date of the alleged reprisal.[8]

### Burdens of Proof

Because Dr. Iovino met the standard for alleging a claim of whistleblower reprisal, OIG investigated the matter to determine whether the evidence substantiated that reprisal occurred.

Under 41 U.S.C. § 4712(c)(6), the legal burdens of proof specified in 5 U.S.C. § 1221(e) are controlling for the purposes of any investigation conducted by an Inspector General. Under 5 U.S.C. § 1221(e), an employee must present evidence that he or she made a protected disclosure, which was a contributing factor in a personnel action taken against him or her. The employee may demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that (a) the official taking the personnel action knew of the disclosure and (b) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.

---

[6] 41 U.S.C. § 4712(a)(2).
[7] 41 U.S.C. § 4712(a)(1).
[8] 41 U.S.C. § 4712(b)(4).

UNCLASSIFIED
4

UNCLASSIFIED

Once the employee has met this burden, the burden of proof shifts to the employer, which must present clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure. In *Carr v. Social Security Administration,* the court adopted the following test:

> [W]hen determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the following factors [should be considered]: the strength of the agency's evidence in support of its personnel action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.[9]

The courts have defined clear and convincing evidence as the degree of proof which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is highly probable.[10] However, an employer does not need to prove each of the factors by clear and convincing evidence. Rather, the three factors will be weighed together to determine whether as a whole the evidence is clear and convincing, and a strong showing on one factor may be sufficient.[11]

## Complainant's Burden

OIG obtained documentary and testimonial evidence demonstrating that Dr. Iovino's protected disclosures were a contributing factor in the personnel actions taken against her. MSA's Vice President for Human Resources, who made the decision to suspend Dr. Iovino, directly connected Dr. Iovino's protected disclosures to her suspension when he told OIG that one of his reasons for suspending her was that she was speaking with the "client" (i.e., the Department) about information internal to MSA in violation of her confidentiality agreement.[12] Likewise, MSA's Executive Vice President for Business Development justified her suspension based upon the fact that Dr. Iovino's contacts with AQM and OIG violated company protocol because she did not raise these concerns within MSA.

---

[9] 185 F.3d 1318, 1323 (Fed. Cir. 1999) (citing *Geyer v. Dep't of Justice,* 7 M.S.P.R. 682, 688, aff'd, 116 F.3d 1497 (Fed. Cir. 1997)).

[10] *Road & Highway Builders v. U.S.,* 702 F.3d 1365, 1368 (Fed. Cir. 2012).

[11] *Lucchetti v. Dep't of Interior,* 2017 MSPB LEXIS 743, *11 (Feb 15, 2017) (*citing Phillips v. Dep't of Transportation,* 113 M.S.P.R. 73, 77 (2010)).

[12] The confidentiality agreement required Dr. Iovino to "treat as confidential and ... not disclose, publish, use, or otherwise make available to the public or to any individual, firm or corporation any confidential information." As noted in OIG's forthcoming Management Assistance Report, this confidentiality agreement violates federal law (Pub. L. No. 115-141, Division E, Title VII § 743 (March 23, 2018)) and the Federal Acquisition Regulation (§3.909-1) because it did not allow for disclosures to responsible federal officials— the type of disclosures Dr. Iovino made.

UNCLASSIFIED

5

There is also circumstantial evidence that Dr. Iovino's disclosures were a contributing factor in MSA's decisions to require her to compete for the full-time position and to select another candidate for the position. Whistleblowers may demonstrate circumstantial evidence by showing that the officials taking the personnel action knew of the protected disclosure and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action.[13] Her supervisor at the time, who was the selecting official, told OIG that he was aware of her protected disclosures. MSA's decisions with regard to the selection for the full-time position took place days after her disclosures, and a reasonable person would conclude that the disclosure was a contributing factor in the personnel actions.[14]

Further, MSA terminated Dr. Iovino's part-time employment[15] in August 2017, several months before the selectee of the full-time position could begin work in January 2018. MSA hired temporary help between Dr. Iovino's termination and January 2018, which confirms MSA had a need for the work Dr. Iovino performed. Dr. Iovino was described as an excellent employee and received a commendation for her work from MSA's Chief Executive Officer in April 2017. MSA's decision to terminate Dr. Iovino on August 18, 2017, shortly after her disclosures, when there was an apparent need for her services, would lead a reasonable person to conclude that the disclosures were a contributing factor in taking the personnel action.

Given the evidence as described above, Dr. Iovino established that her protected disclosures were a contributing factor in her suspension and eventual termination. She demonstrated that MSA took personnel actions against her because she raised concerns about various management issues at the CVC. Thus, she met her burden of proof under 5 U.S.C. § 1221(e), and the burden shifts to MSA to present clear and convincing evidence that it would have taken the same personnel actions in the absence of Dr. Iovino's disclosures.

### Employer's Burden

MSA failed to present clear and convincing evidence that it would have suspended and ultimately terminated Dr. Iovino in the absence of her protected disclosures. The first factor that the courts use to weigh whether an employer has met its burden is the strength of the evidence.[16] In examining this factor, the Merit Systems Protection Board[17] examines the evidence

---

[13] 5 U.S.C. § 1221(e)(1).

[14] *Kewley v. Dep't of Health and Human Services*, 153 F.3d 1357, 1363-64 (Fed. Cir. 1998).

[15] Whether the termination here is viewed as a termination of Dr. Iovino's part-time position (which was converted to a full-time position), or as a termination of employment as a part-time employee, would not affect the present analysis. In either case, the question is whether the personnel action was taken for a retaliatory purpose. The Merit Systems Protection Board has held that removing an employee, whether by eliminating the position or by terminating the employment, is prohibited if done for retaliatory reasons. *Carter v. Dep't of the Army*, 62 M.S.P.R. 393, 398 (1994).

[16] *Carr*, 185 F.3d 1318, 1323.

[17] The Merit Systems Protection Board interprets the Whistleblower Protection Act in cases of alleged retaliation against Federal employees. 5 U.S.C. § 1221(a).

supporting the personnel action and whether there were "legitimate reasons" for the personnel action.[18]

With regard to Dr. Iovino's suspension, MSA's Executive Vice President for Business Development sent an email to a Department contracting officer on August 4, 2017, stating:

> During the evening of August 03, 2017 I was advised that Dr. Karen Iovino, a part time Veterinarian employed by MSA Security at the CVC emailed [the] Director, Office of Acquisitions Management, Department of State at some point over the last couple of weeks suggesting there may be alleged misconduct and furthermore, that she has filed an OIG report ... An internal investigation was commenced this morning regarding the extent to which Dr. Iovino may have divulged confidential information or may do so in the future.[19] Simultaneously Dr. Iovino was advised that effective as of today she was placed on administrative leave with pay pending the completion of our investigation.

In addition, the Vice President for Human Resources emailed Dr. Iovino on August 4, 2017, to inform her she was being suspended "while concerns involving . . . the disclosure of confidential information are investigated."

The Executive Vice President similarly explained to OIG that Dr. Iovino's contacts with AQM and OIG violated company protocol because she did not raise these concerns internally. When interviewed by OIG, the Vice President for Human Resources also raised concerns that Dr. Iovino had spoken to the Department without permission.

MSA also claimed it suspended Dr. Iovino because she forwarded work emails to her personal computer in violation of company policy. However, the evidence confirms that this rationale cannot be substantiated. After Dr. Iovino was suspended, MSA performed a forensic examination of her computer, which showed that she had forwarded several MSA emails to her personal email account.[20] The forensic examination of her computer was not completed until September 2017, after Dr. Iovino's employment had been terminated. According to MSA officials, forwarding work emails to a personal account violated MSA's Electronic Mail Security Policy. However, there is no explicit prohibition on doing so in the relevant policy:

---

[18] *Baker v. Dep't of Defense*, 2016 MSPB LEXIS 4567 (2016).

[19] According to Dr. Iovino's supervisor at the time, an MSA employee reported that Dr. Iovino told two kennel technicians she was considering going to *The Washington Post* with unspecified concerns. Dr. Iovino's supervisor spoke with one of the kennel technicians who confirmed this account. Even though Dr. Iovino's supervisor never learned what concerns she was planning to raise, the supervisor considered her alleged intention to go to *The Washington Post* a breach of the confidentiality agreement that Dr. Iovino had signed when her employment began. The Deputy Program Manager gave OIG a similar account.

[20] Dr. Iovino had forwarded these to her personal account so she could share them with OIG.

> Unless permission from the Information Security Manager has first been obtained, workers must not use their personal electronic mail accounts with an Internet service provider or any other third party for any MSA Security business messages. To do so would circumvent logging, virus checking, content screening, and automated backup controls that MSA Security has established.

In addition, according to her original supervisor, MSA may have effectively granted Dr. Iovino permission to use her personal account because MSA agreed to put her MSA email on her personal phone to facilitate her ability to take emergency medical calls outside of her work hours.

According to MSA, the forensic computer analysis was the full extent of the investigation into the misconduct allegations raised against Dr. Iovino. MSA never interviewed Dr. Iovino, the kennel technicians who originally had reported her alleged intention to contact the media, or any other relevant witnesses. In addition, Dr. Iovino's supervisor never documented his conversation with the kennel technicians, which was used as a basis for her suspension.

As noted above, MSA officials gave differing reasons for the decision to suspend Dr. Iovino. Some cited reports that she had threatened to go to the media, while others cited her breach of company protocol by bringing her concerns to AQM and OIG. The differing justifications, the termination before her replacement was available and before the investigation into the alleged breach of confidentiality was complete, and the failure to conduct a thorough investigation demonstrate that MSA had, at best, only weak evidence to support its personnel decisions. Moreover, to the extent MSA's various justifications for suspending Dr. Iovino rely on her alleged violation of the confidentiality agreement she signed, MSA's confidentiality agreement is prohibited by federal law and is not a legitimate reason for a personnel action.

MSA asserted to OIG that its investigation was irrelevant because at the same time of the investigation and Dr. Iovino's suspension, it had decided not to select her for the full-time veterinarian position. In July 2017, MSA decided that it would advertise the full-time position and would require Dr. Iovino to apply for the new position. The selection documents show that only two candidates, Dr. Iovino and an external candidate, were deemed qualified. The selecting official, Dr. Iovino's supervisor at the time, told OIG that he selected the "more qualified" external candidate because he had practiced veterinary medicine in a combat zone. The selecting official told OIG that the pending investigation into Dr. Iovino's disclosures played no role in his selection.

Nonetheless, several aspects of this hiring decision are questionable. MSA could not provide any justification or "legitimate reason" as to why the change in hours of a position required the incumbent to re-apply for her job.[21] In fact, a former MSA official told OIG that it was extremely unusual for MSA to make an incumbent apply for a position when it was converted from part

---

[21] MSA officials told OIG that the change in hours was initiated at its request. MSA suggested to the Department that the veterinarian position be converted from part time to full time and the Department assented to MSA's request in May 2017.

UNCLASSIFIED

time to full time. The official also stated that MSA routinely changed aspects of a position, such as adding hours or changing the supervisory status, without re-advertising the position.

Furthermore, the selection documents indicate that the selecting official considered several criteria not listed as qualification criteria in the vacancy and that do not seem relevant to a veterinarian position. For example, the selecting official used "military service," "textbook publications," and experience as an "emergency medical technician" and as a "deputy sheriff" to rate the candidates, even though there is no mention of these requirements in the vacancy announcement and their connection to the duties of the position is attenuated at best. There do not seem to be legitimate reasons for taking these factors into consideration.

Thus, with regard to the first *Carr* factor, the strength of the evidence supporting the personnel actions and whether there were "legitimate reasons" for the personnel actions, MSA failed to provide evidence that clearly and convincingly supports its decision to suspend Dr. Iovino and to terminate her employment, including its decision to require her to re-apply for her position and to select another candidate for the full-time veterinarian position.

Regarding the existence and strength of any motive to retaliate on the part of the officials who were involved in the decision under the second *Carr* factor, there is substantial evidence of retaliatory motive. Several MSA officials acknowledged that Dr. Iovino's suspension was based on her protected disclosures to AQM and OIG, which, if the disclosures were true, would reflect poorly on MSA's management of the CVC. MSA's Executive Vice President for Business Development told OIG that he was concerned about "chain of command" issues because Dr. Iovino did not raise her concerns internally. Likewise, MSA's Vice President for Human Resources described Dr. Iovino's contact with the "client" as one of the reasons for suspending Dr. Iovino. These same officials were also involved in the decisions regarding advertising and selecting the full-time position.

The third *Carr* factor is not relevant to our analysis because the only other employee who was disciplined for an offense similar to Dr. Iovino was a whistleblower.

## Conclusion

Dr. Iovino made protected disclosures by communicating her concerns regarding the management of the CVC to AQM and to OIG. Shortly thereafter, she was suspended and eventually terminated by MSA. Because Dr. Iovino met her burden under section 4712, MSA was required to provide clear and convincing evidence that it would have taken the same action in the absence of her disclosures.

MSA did not provide clear and convincing evidence that it would have terminated Dr. Iovino absent her protected disclosures. MSA justified her suspension based upon the fact that she violated a confidentiality agreement that is prohibited by federal law. MSA also asserted that it did not select her for the full-time veterinarian position because the other candidate was more qualified. However, MSA's justifications for advertising the full-time position and making a

UNCLASSIFIED
9

UNCLASSIFIED

selection are not credible. Thus, based on the evidence presented, OIG concludes that MSA committed retaliation against Dr. Iovino prohibited by 41 U.S.C. § 4712.