IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| KAREN IOVINO, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:21-cv-00064 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| MICHAEL STAPLETON ASSOCIATES, | ) | By:    Hon. Thomas T. Cullen |
| LTD. d/b/a MSA Security, Inc., | ) |          United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Dr. Karen Iovino is a veterinarian who treats dogs that are specially trained to help law enforcement agencies recover explosives. Her employer, Defendant Michael Stapleton Associates, Ltd. ("MSA"), contracts with the United States Department of State ("DoS") to train and care for these dogs before their deployments. For more than a year, Iovino apparently complained to her supervisors about how the dogs were treated overseas, MSA's billing practices, and staffing decisions that affected her work. Iovino claims that they ignored her, so she filed a whistleblower complaint with DoS's Office of the Inspector General ("OIG"). Less than a month later, MSA declined to renew Iovino's contract, despite an earlier agreement to convert Iovino to a full-time employee.

Iovino appealed the non-renewal to DoS arguing that the decision was retaliatory, and an investigation ensued. But DoS ultimately determined that MSA did not retaliate against Iovino. She now brings this suit against MSA, claiming that her contract was not renewed in violation of 41 U.S.C. § 4712, a statute that protects whistleblowers working for government contractors.

MSA has filed a motion to dismiss or, in the alternative, to strike substantial portions of Iovino's complaint. (ECF No. 7.) For the reasons discussed below, the court construes MSA's motion as one to strike, which it will deny in large part, but grant in part.

## I.  BACKGROUND

Iovino worked as a veterinarian for MSA from October 2015 until August 2017. (Compl. ¶ 16 [ECF No. 1].) MSA is a security company, under contract with DoS to support the department's anti-terrorism programs. (*Id.* ¶ 14.) MSA trains explosive detection canines for foreign law enforcement and deployment to U.S. facilities abroad. (*Id.*) These dogs receive instruction and care at MSA's Canine Validation Center ("CVC") in Winchester, Virginia. (*Id.* ¶¶ 7, 14, 15.)

Iovino was initially hired to work at CVC part-time. (*Id.* ¶ 16.) She helped the onsite veterinary hospital get its operating license and served as its "Veterinarian in Charge." (*Id.*) Zane Roberts, CVC's program manager, served as Iovino's direct supervisor. (*Id.*) Roberts shared Iovino's commitments to CVC's anti-terrorism mission and the dogs' wellbeing. (*Id.* ¶ 17.) They were concerned about the care the dogs received abroad, and Roberts repeatedly expressed these concerns to his supervisors. (*Id.* ¶ 18.) Josh Carter and Alan Bower supervised Roberts and were in charge of CVC at the relevant times. (*Id.*) They later hired Dr. Michael Ratcliff, who eventually replaced Roberts. (*See id.* ¶¶ 16, 107.)

For at least a period of time, MSA apparently considered Iovino a model employee. On February 24, 2017, Ratcliff asked Iovino to work for MSA full-time when her part-time contract expired that fall. (*Id.* ¶ 43.) They negotiated how many hours she would work each

week and whether she could work some of those hours remotely. (*Id.*) The pair reached an agreement, and Ratcliff told Iovino that everyone at CVC loved working with her. (*Id.*)

Iovino accepted the full-time position even though she felt that her relationship with CVC management had been fraying for almost a year. (*Id.* ¶ 26.) In April 2016, Iovino had started sending herself emails documenting her frustrations. (*Id.*) Broadly speaking, her discontent arose from three sources. First, Iovino became concerned about the care the dogs received abroad. Some CVC staff traveled to Jordan in early 2016 to evaluate the treatment of the dogs there. (*Id.* ¶ 19.) Roberts and others who had made the trip told Iovino that the dogs were overworked and poorly sheltered. (*Id.*) In June 2017, canine handlers in Jordan told Iovino that the dogs were forced to work in 140-degree heat. (*Id.* ¶ 57.) Her contact in Jordan allegedly feared for the dogs' safety. (*Id.*) She voiced these concerns to Ratcliff, who dismissed them. (*Id.*) She also learned that handlers had been instructed to remove pictures of an emaciated dog from a report sent to DoS. (*Id.* ¶ 58.) And on July 18, 2017, one of CVC's dogs stationed in Jordan died. (*Id.* ¶ 75). The suspected cause was hyperthermia. (*Id.*)

Second, Iovino alleges that MSA's billing practices made her uncomfortable. On occasions when she worked more than 40 hours in a week, Ratcliff and Bower told her to take unofficial paid time off ("PTO") instead of overtime. (*Id.* ¶ 46.) Iovino did not receive time and a half for these hours, even though MSA billed them to DoS. (*Id.* ¶¶ 46–48.) Iovino also claims that other employees abused the practice, routinely leaving early on Fridays but billing for the entire workday. (*Id.* ¶ 63.) Iovino estimates that DoS paid more than $170,000 a year for these hours that nobody worked. (*Id.*)

Third, Iovino bristled at some of CVC's staffing decisions. On the hiring side, Carter ordered Iovino to hire Jennifer Houston for an open veterinary technician position. (*Id.* ¶ 21.) Iovino had wanted to interview a second candidate, who had worked at CVC on an as-needed basis, but she was overruled. (*Id.*) Houston frequently arrived late to work, sometimes smelling of alcohol. (*See id.* ¶ 56 & n.1.) Other times, she left early without completing her duties. (*Id.* ¶ 33.) When she was working, her performance was sometimes mediocre; on one occasion, Houston, according to Iovino, made an error that could have suffocated one of the dogs. (*Id.* ¶ 32.) MSA never disciplined her beyond a written counseling. (*See id.* ¶ 28.) In 2019, the Virginia Board of Veterinary Medicine suspended Houston's license indefinitely for alcoholism. (*Id.* ¶ 56 & n.1.) Houston admitted to showing up to work drunk on nine occasions, including during her employment at CVC. (*See id.*)

MSA also hired Ratcliff during Iovino's tenure. Ratcliff replaced Iovino as the person in charge of the veterinary hospital. (*Id.* ¶ 29.) Iovino thus perceived his hire as an effective demotion. (*Id.*) Ratcliff soon told CVC staff that DoS wanted MSA to limit the dogs' veterinary care to what could be done onsite. (*Id.* ¶ 34.) The policy stretched CVC staff to their professional limits. For instance, under this new policy, Iovino had to perform her first-ever hindleg amputation on one day's notice. (*Id.* ¶ 45.)

Iovino also saw her closest ally, Roberts, sidelined within CVC. Roberts, throughout his tenure, had voiced his and Iovino's concerns about the dogs' care to his supervisors. Carter eventually suspended Roberts for 10 days and further reduced his responsibilities. (*Id.* ¶ 167.) In October 2017, Roberts left CVC. (*Id.* ¶ 39.)

Iovino's apparent frustration with MSA's treatment of the dogs, billing practices, and staffing decisions prompted her to file an OIG Complaint on July 6, 2017. (*Id.* ¶ 59.) Among other things, she stated that CVC was rampant with "time sheet fraud," "reports [that] canines are dying," and "abuse[s] of power" related to hiring and firing decisions. (*See* OIG Investigation Report at 1 [ECF No. 14-2].) In filing her complaint, she declined anonymity. (*Id.*)

After this submission, Iovino alleges that MSA retaliated against her "by making her compete for [her] own position, not selecting her for her own position, suspending her, and discharging her in retaliation for her protected activities." (Compl. ¶ 189.) Namely, Iovino alleges that, just eight days after she filed her OIG Complaint, Ratcliff told her that MSA had decided to create a new, full-time veterinarian position, rather than convert Iovino's current position into a full-time position (which MSA and Iovino had agreed to that spring). (*Id.* ¶ 70.) Accordingly, she would have to reapply. (*Id.* ¶ 71.) Iovino and Ratcliff had previously discussed MSA converting her position to a full-time position, and so reapplication was "unusual." (*Id.* ¶ 72.)

MSA suspended Iovino with pay on August 4, 2017, because it believed Iovino was considering leaking confidential information to the Washington Post. (*Id.* ¶¶ 89–90.) The contractor allowed Iovino's part-time position to expire on August 18. (*Id.* ¶ 93.) It then hired someone to fill Iovino's position for six months until its preferred full-time candidate could start. (*Id.* ¶ 94.)

Iovino challenged MSA's decision to renege on its February 24, 2017, offer of full-time employment by filing a retaliation complaint with the OIG, asserting that the choice was made

in retaliation for her original OIG Complaint.[1] And she won. (*Id.* ¶ 97; *see also* ECF No. 14-3 (hereinafter, "2018 DoS Decision.") But MSA appealed that determination, and DoS reopened the proceedings. (Compl. ¶¶ 98, 100.) Both sides supplemented the record. Iovino's Supplemental Memorandum of Law ("Agency Filing")[2] states, in the first bolded heading in its argument section, that MSA retaliated against her "for filing a complaint of fraud, waste and abuse with the [OIG]." (ECF No. 8-1, at 7.) She explicitly frames the relevant issue as "whether Iovino was 'discharged, demoted or otherwise discriminated against' as a reprisal for disclosing the information to OIG." (*Id.* at 8.) Her conclusion restates that she had "made protective disclosures . . . to OIG," and reiterates that MSA "engaged in retaliatory conduct" "[a]fter learning of the disclosures." (*Id.* at 13.) On October 30, 2019, DoS reversed its earlier determination and concluded that MSA had done nothing wrong. (Compl. ¶ 102; *see also* ECF No. 8-2 (hereinafter, "2019 DoS Decision").)

Having completed DoS's internal process, Iovino filed a complaint in this court. MSA moved to dismiss the complaint for lack of subject-matter jurisdiction or failure to state a claim upon which relief can be granted. (ECF No. 7.) Alternatively, MSA moves to strike many of Iovino's allegations. (*Id.*)

The court will construe this filing as a motion to strike because this is the most precise way to grant MSA the relief it seeks and to which it is entitled. To be sure, adjudicating a motion to strike in this posture is unusual. Yet, the court declines to construe MSA's motion

---

[1] Technically, Iovino's OIG disclosure included both her OIG Complaint and a conversation with Cathy Read, an official at DoS. (*See* Compl. ¶¶ 81–84.) For simplicity, the court will only discuss the written disclosure.

[2] Both parties treat this Agency Filing as the relevant document for purposes of the exhaustion-of-administrative-remedies analysis. The court will do the same.

under Rule 12(b)(1). Properly understood, courts have jurisdiction over claims, not over factual allegations or theories of recovery. *See Doe v. Settle*, 24 F.4th 932, 938–39, 953 (4th Cir. 2022) (considering supplemental jurisdiction and applying different jurisdictional bases to different claims). And Iovino's core retaliation claim, arising under a federal statute, is a textbook example of federal question jurisdiction. *See* 28 U.S.C. § 1331.

Further, the court declines to construe MSA's motion under Rule 12(b)(6). Iovino has pleaded one count of retaliation. (Compl. ¶¶ 183–91.) MSA's brief explicitly disclaims any challenge to Iovino's core retaliation claim, which both parties agree she presented to DoS. (*See* ECF No. 8 at 11 n.1 ("Counsel recognizes that Iovino has exhausted her remedies as to issues addressed in [the Agency Filing]. If Iovino's complaint had made separate claims for each alleged reprisal, this would be a simple motion to dismiss the 'new' claims.").) Her complaint, then, states one claim—an unchallenged claim upon which the parties agree that relief can be granted.

If MSA had waited until discovery, or later, to raise its concerns about the proper scope of Iovino's allegations, the court could have addressed them more comfortably via a motion *in limine*. But MSA has raised them at the pleadings stage, and the court will resolve its motion in this posture.

## II.   STANDARD OF REVIEW

The Federal Rules of Civil Procedure allow district courts to strike "any redundant, immaterial, impertinent, or scandalous matter" "from a pleading." Fed. R. Civ. P. 12(f). "[S]triking a portion of a pleading is a drastic remedy." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001). Accordingly, such motions are "generally viewed with

disfavor." *Id.* The moving party bears the burden to show that the challenged material is prejudicial. *Hardy v. Lewis Gale Med. Ctr.*, 377 F. Supp. 3d 596, 605 (W.D. Va. 2019); *see also* 5C *Wright & Miller* § 1382 (3d. ed. 2021). Any doubt about whether the challenged material should be stricken is resolved in favor of the non-moving party. *Sturdivant v. Arc of Haywood Cnty., Inc.*, No. 1:18 cv 123; 2018 WL 2138543, at *1 (W.D.N.C. May 9, 2018); *see also* 5C *Wright & Miller* § 1382. And "the decision of whether to strike all or part of a pleading rests within the sound discretion of the [c]ourt." *Smith v. Wash. Post Co.*, 962 F. Supp. 2d 79, 84 (D.D.C. 2013).

## III.   ANALYSIS

### A.  Exhaustion of Administrative Remedies

The doctrine of exhaustion of administrative remedies is well established in administrative law. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). It "provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Pakdel v. City & County of S.F.*, 141 S. Ct. 2226, 2230 (2021) (per curiam). Courts review a statute's plain language to determine whether it requires such exhaustion. *See McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("Where Congress specifically mandates, exhaustion is required."). And Congress often conditions a plaintiff's cause of action under a federal statute on her exhaustion of the applicable administrative remedies. *See Woodford*, 548 U.S. at 93–100 (interpreting the Prison Litigation Reform Act); *McKart v. United States*, 395 U.S. 185, 192–201 (1969) (interpreting the Selective Service Act).

Federal law prohibits government contractors from retaliating against employees who disclose information that the employee reasonably believes to be evidence of gross mismanagement of a government contract to a federal employee responsible for overseeing

that contract. *See* 41 U.S.C. § 4712(a)(1)–(2). A complainant who has made such a disclosure, and believes she has been retaliated against, may submit a complaint to the relevant executive agency's Inspector General. *Id.* § 4712(b)(1). This complaint must be made within three years of the retaliation. *Id.* § 4712(b)(4).

Subject to exceptions inapplicable here, the Inspector General must investigate the complaint and submit a report of the investigation's findings to the complainant, the contractor, and the agency head. *Id.* § 4712(b)(1). Upon receipt of the Inspector General's report, the agency head has 30 days to determine whether the contractor retaliated against the complainant for the protected disclosure. *Id.* § 4712(c)(1). If the agency head determines that retaliation did not occur, he must issue an order denying relief. *Id.* But if the agency head determines that the contractor did retaliate, he must order the contractor "to take affirmative action to abate the reprisal," including an appropriate combination of reinstatement, back pay, and reasonable attorneys' fees, as well as other appropriate relief. *Id.* The agency may appeal an adverse order to the relevant Court of Appeals for review of statutory or procedural defects. *Id.* § 4712(c)(5).

Complainants who receive an adverse order may sue the contractor "in the appropriate district court of the United States, which shall have jurisdiction over such an action." *Id.* § 4712(c)(2). Once the adverse order issues, "the complainant shall be deemed to have exhausted all administrative remedies with respect to the complaint." *Id.*

The subsection establishing these procedures is entitled "Exhaustion of remedies." *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[S]tatutory titles and section headings are tools available for the resolutions of a doubt about the meaning of a

statute." (cleaned up)). And read in conjunction with the rest of the section, it makes clear that whistleblowers working for government contractors must exhaust their administrative remedies before suing in federal court. *See Wright v. Common Ground Health Clinic, Inc.*, No. 16-11623, 2016 WL 4720011, at *3–4 (E.D. La. Sept. 9, 2016) (concluding that 41 U.S.C. § 4712 incorporated an exhaustion of administrative remedies requirement); *Moore v. Univ. of Kan.*, 118 F. Supp. 3d 1242, 1251–54 (D. Kan. 2015) (same); *cf. Robertson v. Intratek Comput., Inc.*, 976 F.3d 575, 580 (5th Cir. 2020) (stating that "[s]ection 4712 requires a complainant like [plaintiff] to exhaust administrative remedies before filing suit" when considering the statute's interplay with the Federal Arbitration Act).

For the court to properly consider Iovino's claim, then, she must have exhausted her administrative remedies. Few federal cases have applied exhaustion of administrative remedies in the context of 41 U.S.C. § 4712. But the Fourth Circuit has provided useful guidance for its application in cases arising under Title VII and the Americans with Disabilities Act. A plaintiff fails to exhaust her administrative remedies if she (1) did not complete the agency's adjudication process; (2) did not make each of the claims she now brings in federal court during that process; or (3) did not make the same specific arguments in support of each of those claims. A plaintiff has failed to exhaust her administrative remedies if she stumbles at any of these steps.[3]

---

[3] Courts often use the word "exhaustion" to refer interchangeably to exhaustion of administrative remedies and issue exhaustion. But "[i]ssue exhaustion should not be confused with exhaustion of administrative remedies." *Carr v. Saul*, 141 S. Ct. 1352, 1358 n.2 (2021). Even if a plaintiff has exhausted his administrative remedies, he may have failed to exhaust the particular issue he raises in federal court. *See Carr*, 141 S. Ct. at 1358–62 & n.2 (considering issue exhaustion where the petitioners had exhausted their administrative remedies).

The parties argue separately that Iovino's claims fail based on "issue exhaustion" as well as on exhaustion of administrative remedies. The court notes, however, that the Fourth Circuit's application of exhaustion of administrative remedies has mostly (and perhaps entirely) subsumed any independent role for

As to the first step, Iovino has completed DoS's adjudication process. She submitted her retaliation complaint in August 2017. (*See* Agency Filing, at 4.) And in October 2019, the appropriate agency head issued an order denying relief. (*See* 2019 DoS Decision.) As a result, Iovino is "deemed to have exhausted all administrative remedies with respect to the complaint," and may file her lawsuit "in the appropriate district court of the United States." 41 U.S.C. § 4712(c)(2). And as to the second step, there is no serious dispute over whether Iovino made the same retaliation claim she asserts here to DoS in her Agency Filing. *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132–35 (4th Cir. 2002) (adjudicating racial discrimination claim that had been exhausted before the agency, but declining to review unexhausted retaliation, sex discrimination, and color discrimination claims not before the agency); *see also Smith v. First Union Nat'l Bank*, 202 F.3d 234, 241–48 (4th Cir. 2000) (reviewing exhausted sexual harassment claim under Title VII but reviewing arguably unexhausted retaliation claim

---

issue exhaustion. The former doctrine applies to plaintiffs: Has the party seeking review in federal court already been through agency proceedings? The latter doctrine applies to arguments: Was this basis for relief presented to the agency?

    And so, the Fourth Circuit's approach is in tension with how the Supreme Court analyzes the division of labor. Just last term, the Supreme Court explained that where multiple parties had "proceeded through each step of the [agency]'s administrative review scheme and received a 'final decision' before seeking judicial review" there was "no dispute that [they] exhausted their administrative remedies." *Carr*, 141 S. Ct. at 1358 n.2. The Court then considered issue exhaustion. In *Sims v. Apfel*, too, the court noted the agency's concession "that petitioner exhausted administrative remedies by requesting review." 530 U.S. 103, 107 (2000). Only after tying up that loose end did the Court consider whether "to obtain judicial review of an issue, not only must [a litigant] obtain a final decision on his claim for benefits, but also must specify that issue in his request for review." *Id.* In both *Carr* and *Sims*, the Court treated exhaustion of administrative remedies and issue exhaustion as independent doctrines.

    More specifically, the second two questions above seem more appropriately labeled as issue exhaustion than as exhaustion of administrative remedies. For example, where a plaintiff raised only a race discrimination claim to the agency, it would be issue exhaustion, not exhaustion of administrative remedies, that would prevent the addition of claims for other kinds of discrimination in his federal lawsuit. *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132–35 (4th Cir. 2002). And issue exhaustion, not exhaustion of administrative remedies, would more appropriately limit a plaintiff's ability to raise new arguments under already exhausted claims. *See Chacko v. Patuxent Inst.*, 429 F.3d 505, 511–13 (4th Cir. 2005).

    Functionally, though, the Fourth Circuit applies issue exhaustion while calling it exhaustion of administrative remedies, and *Bryant* and *Chacko* would likely resolve the same way under either doctrine.

under Title VII only after analyzing exhaustion of administrative remedies as to that claim). So Iovino satisfies the first two steps.

Instead, MSA contends that Iovino's allegations were not "reasonably related to her [Agency Filing] and can[not] be expected to follow from a reasonable administrative investigation." *See Sydnor v. Fairfax County*, 681 F.3d 591, 594 (4th Cir. 2012). "The touchstone for exhaustion is whether plaintiff's administrative and judicial claims are reasonably related, not precisely the same." *Id.* at 595. Under that standard, an Agency Filing alleging retaliation "does not strictly limit a [federal] suit that may follow." *Id.* at 594. Rather, if "a plaintiff's claims in her judicial complaint are reasonably related to her [Agency Filing] and can be expected to follow from a reasonable administrative investigation she may advance such claims in a subsequent civil suit." *Id.* On the other hand, "a plaintiff fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 506 (4th Cir. 2005).

This principle is best illustrated in practice. For example, in *Chacko*, the plaintiff argued before the agency that "three specific confrontations with supervisors" (none of which involved slurs) constituted a hostile work environment. *Id.* at 512. But at trial, his "primary theory of the case was that over his twenty-year career, his coworkers on a daily basis hurled a barrage of national-origin insults and epithets at him." *Id.* at 508. The jury returned a $1,160,000 verdict for the plaintiff. *Id.* After the trial, defendant moved for judgment as a matter of law, which the district court denied. *Id.* at 512. But the Fourth Circuit reversed, reasoning that there was too much distance between plaintiff's theory at trial and his original

administrative charge. *Id.* at 510–13. Specifically, "the main evidence advanced at trial" was not "reasonably related to the allegations in the administrative charges . . . ." *Id.* at 512. The descriptions were so divergent as to "describe two different cases." *Id.* A plaintiff, then, has failed to exhaust his administrative remedies if his administrative charge and his trial evidence deal with "different time frames, actors, and conduct." *Id.* at 511.

*Chisolm v. U.S. Postal Service* came out the other way. 665 F.2d 482 (4th Cir. 1981). The plaintiff there led a class of postal workers alleging that the government's promotion practices were racially discriminatory. *Id.* at 485. His administrative charge mentioned only the "detailing" aspects of promotion applications. *Id.* at 491. After the lead plaintiff won at trial, the district court certified a class of plaintiffs who had alleged that *any* "component[] of the promotion process" was discriminatory. *Id.* at 488. The government appealed the class certification, arguing that the class members challenging the "discipline" and "testing" aspects of the promotion process should have been excluded because the named plaintiff had not included those aspects in his original administrative charge. *Id.* at 491. The Fourth Circuit affirmed the class certification because investigation of the "discipline" and "testing" aspects of the promotion process "could reasonably be expected to occur in light of [the named plaintiff's] complaint." *Id.* And further, "the investigation of the complaint did touch upon specific features of the system, for example, testing and discipline, not raised in the complaint." *Id.*

Similarly, the plaintiff in *Sydnor* also exhausted her claim. The plaintiff in that case lost some use of her left foot after a surgery, and she alleged that her employer discriminated against her because of this disability by denying her a reasonable accommodation. *Sydnor*, 681

F.3d at 592, 594. In her EEOC charge, she told the agency that her request for "light duty work" had been denied. *Id.* at 594. But her federal complaint stated that she had also asked to work in a wheelchair, and this request had been denied too. *Id.* at 596–97. The employer moved to exclude evidence of this request at trial because the plaintiff had never told the EEOC about it. *Id.* at 593. The district court agreed, granted the motion, and dismissed the case. *Id.* But the Fourth Circuit reversed, cautioning that exhaustion of administrative remedies is not "a tripwire for hapless plaintiffs." *Id.* at 594. The court held that the plaintiff had exhausted her claim because both her administrative and her judicial filings "involved the same place of work," "the same actor," and "the same type of discrimination." *Id.* at 595. Those similarities, combined, "make clear that the [employer] was afforded ample notice of the allegations against it." *Id.*

In sum, 41 U.S.C. § 4712 requires the exhaustion of administrative remedies. And Iovino has exhausted her administrative remedies only as to theories of recovery "a reasonable investigation of [Iovino's] [Agency Filing] would have uncovered." *Chacko*, 429 F.3d at 512. With these principles in mind the court will analyze MSA's motion to strike to determine what allegations, if any, were not properly exhausted before the agency.

**B. Motion to Strike**

MSA's motion is styled as a motion to dismiss or, alternatively, a motion to strike. (*See* ECF No. 7.) Given the Fourth Circuit's application of exhaustion of administrative remedies,

the court can provide MSA with all the relief to which it is entitled by construing the pending motion as a motion to strike.[4]

MSA bears the burden of establishing that the challenged material is prejudicial and therefore appropriate for a motion to strike. *See Hardy*, 377 F. Supp. 3d at 605. Any pertinent factual allegations that Iovino uses to sustain a new, unexhausted theory of relief and that a reasonable investigation of the Agency Filing would not have uncovered are prejudicial. *See Chacko*, 429 F.3d at 512; *Smith*, 202 F.3d at 247–48.

MSA moves the court to strike 48 of the 193 numbered paragraphs in Iovino's complaint. The court has grouped similar allegations together and will discuss each group in turn.

### 1. Background: Paragraphs 11, 12, 13, 14, 15

Paragraphs 11–15 describe the size and purpose of MSA's government contract, as well as some of the oversight provided by DoS. This background information does not bear directly on the ultimate facts at issue in Iovino's retaliation claim. The inclusion of this information in her complaint is therefore not prejudicial. *See Hatcher v. Hauffman*, No. 7:20-cv-00474, 2021

---

[4] As a result, the court will not consider whether 41 U.S.C. § 4712's exhaustion-of-administrative-remedies requirement is jurisdictional or merely a claims-processing rule. *See Stewart v. Iancu*, 912 F.3d 693, 699–702 (4th Cir. 2019). The difference between a jurisdictional rule and a claims-processing rule is relevant only if a defendant fails to seek enforcement of the rule. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1849 (2019). MSA has objected to the court's consideration of specific allegations. So, regardless of whether the basis for striking the allegations is jurisdictional or "mandatory," the court cannot consider unexhausted allegations. *Id.* at 1848–51.

Similarly, the court declines to address both (1) whether 41 U.S.C. § 4712 includes an issue-exhaustion requirement and (2) whether that requirement (if any) is jurisdictional or is a claims-processing rule. The Fourth Circuit applies exhaustion of administrative remedies—and not issue exhaustion—to similar facts in other contexts, so this court will follow suit.

WL 3084921, at *2 (W.D. Va. July 21, 2021) (collecting cases). Accordingly, MSA's motion to strike will be denied as to these paragraphs.

### 2.   Legal Conclusions: Paragraphs 135, 136, 137, 138, 166, 167

These paragraphs are legal conclusions. Some attribute actual or constructive knowledge of Iovino's protected OIG complaint to MSA employees. Others assert that certain actions by Iovino's supervisors suggest an intent to retaliate against her for that disclosure.

Legal conclusions are not entitled to a presumption of truth even at the pleadings stage. *Iqbal*, 556 U.S. at 678. As such, they "can provide the framework of a complaint" only if they are "supported by factual allegations." *Id.* at 679. Standing alone, then, Iovino's legal conclusions do not prejudice MSA, and they will not be stricken. *See Austen v. County of L.A.*, No. 15-07372, 2017 WL 2620791, at *4 (C.D. Cal. June 16, 2017); *Sheffield v. City of Boston*, 319 F.R.D. 52, 54 (D. Mass. 2016).

Accordingly, MSA's motion to strike will be denied as to these paragraphs.

### 3.   Allegations Explicitly Mentioned in DoS's Record: Paragraphs 52, 54, 58

Paragraph 52 references DoS's agreement with MSA to convert the part-time position Iovino held into a full-time position. The OIG's first written decision confirms this agreement. (2018 DoS Decision at 3.) Paragraph 54 references a letter Iovino received from MSA's Vice President of Business Development, praising her "dedication" and "leadership." That letter is in the administrative record. (OIG Investigation Report at 16.) And paragraph 58 describes how a Jordanian handler told Iovino that his supervisor had made him edit images of dog in a report to make it look healthier than it was. Iovino emphasized this communication in an email to DoS personnel, and this email is in the record. (*Id.* at 6.)

The best determination of whether "a reasonable investigation of his administrative charge would have uncovered the factual allegations set forth in formal litigation" is whether the agency's investigation in fact uncovered that information. *See Chacko*, 429 F.3d at 512; *see also Chisolm*, 665 F.2d at 491. Here, DoS reviewed the OIG Investigation Record. (2019 DoS Decision at 3.) Iovino attached this document to her brief opposing MSA's motion. (*See* OIG Investigation Report.) That document, and the 2018 DoS Decision, explicitly substantiate the above allegations.

Accordingly, MSA's motion to strike will be denied as to these paragraphs.

### 4. Contextualizing Factual Allegations: Paragraphs 18, 21, 22, 23, 24, 30, 31, 32-B, 33-B, 34, 35, 38, 39, 47, 48, 50, 51, 67, 68

These paragraphs recount multiple events from Iovino's tenure at MSA. For instance, they include conversations with her supervisors, her efforts to improve the CVC's operations, MSA's negative treatment of Roberts, and other details. They are properly before the court only if they are reasonably related to the allegations in Iovino's Agency Filing. *See Chacko*, 429 F.3d at 509, 512.

Although Iovino's complaint includes specifics omitted from her Agency Filing, that document, as is typical, discussed the same alleged misconduct in broader terms. The Agency Filing attributes allegations of "waste, fraud and abuse," "contract/procurement fraud," "conflict of interest/ethics violations," "employee misconduct," the "mistreatment of animals," "use of government vehicles of personal purposes," and "unnecessary expenditures that were billed to the Department" to her OIG Complaint. (Agency Filing, at 3, 8.) The OIG Complaint is undoubtedly reasonably related to DoS's investigation into Iovino's Agency Filing, and it is considerably more specific. Her OIG Complaint includes allegations that MSA

management is "forcing subordinates to hire friends even though [they are] not qualified for positions," ignoring "reports [that] canines are dying due to medical conditions/lack of care," and permitting employees to commit "[t]ime sheet fraud." (*See* OIG Investigation Report at 1–2.)

All Iovino's present complaint does is support the broad allegations in her Agency Filing and OIG Complaint with specific examples of the general types of misconduct alleged. By their nature, retaliation claims require courts and juries to understand the parties' relationship before the event that triggered the alleged retaliation. Iovino's claim is that MSA was treating her one way, then she filed her OIG Complaint, and so MSA started to treat her a different—and worse—way. Iovino's complaint is her first opportunity to tell the court about the important dynamics within that employment relationship.

In some sense, MSA's argument is that Iovino is not entitled to discovery on the conduct that prompted her to file an OIG Complaint in the first instance. This argument is unpersuasive. Nothing could be more reasonably related to DoS's investigation than specific examples of the alleged misconduct Iovino reported to that agency. It is unclear how DoS could have evaluated whether Iovino's OIG Complaint was "a contributing factor in" MSA's decisions not to renew her contract and renege on its decision to convert her to a full-time employee without considering the allegations in that document. *See* 5 U.S.C. § 1221(e). Indeed, the agency could not have concluded that the OIG Complaint was protected in the first instance without considering "whether a disinterested observer with knowledge of the essential facts known to and readily ascertainable by [Iovino] could reasonably conclude that

the actions of [MSA] evidence such violations, mismanagement, waste, abuse, or danger." *See id.* § 2302(b).

All told, the court will not strike these allegations for two reasons. First, as explained above, an investigation into the specific conduct Iovino claimed she witnessed at MSA would likely have followed from a reasonable administrative investigation into her Agency Filing. *See Smith*, 202 F.3d at 247–48; *Chisolm*, 665 F.2d at 491. DoS would have to do so in order to apply the relevant law. These challenged paragraphs, in other words, are material and not prejudicial.

Second, the court notes that it cannot see everything that was before DoS when the agency made its final decision. There are several gaps in the current record before the court, when compared to what the agency reviewed. For example, the 2019 DoS Decision makes explicit mention of a 333-page letter submitted by MSA. (2019 DoS Decision at 4.) The court has not seen this document. Moreover, Iovino's OIG Complaint alerted OIG that she sent herself "over 30 write ups/documents describing the improper treatment [she] ha[d] received" during her time at MSA. (OIG Investigative Record at 4.) The court has not seen these either; the record includes only six such memos. (*Id.* at 14, 17, 19, 23, 24, 26.) The court is reluctant to strike factual allegations that discovery might reveal DoS uncovered and MSA knew about. *See Sydnor*, 681 F.3d at 594 (emphasizing notice to the employer and agency consideration as justifications for exhaustion of administrative remedies); *Chisolm*, 665 F.2d at 491–92 (same).

In sum, none of these allegations widen the scope of the retaliation claim Iovino brought to DoS, or the theory upon which she sought relief. And nothing in the Fourth Circuit's exhaustion-of-administrative-remedies cases suggests that adding contextualizing factual allegations to your complaint that you did not present to the relevant agency is

necessarily improper. *See Sydnor*, 681 F.3d at 594–95 & n.1 (considering request to work in a wheelchair, which had not been presented to the agency, exhausted when the agency and defendant had notice of a request to limit the plaintiff to "light duty work" when evaluating a disability discrimination claim); *Smith*, 202 F.3d at 247–48 (considering new allegations of the retaliation plaintiff experienced, which were not presented to the agency, exhausted when all descriptions of the retaliation stemmed from the disclosures presented to the agency); *Chisolm*, 665 F.2d at 491 (considering discriminatory effect of testing and discipline components of promotion evaluation exhausted when agency investigation considered them even though the plaintiff's agency filing did not discuss those components when evaluating a claim of racial discrimination in promotion evaluation).

Accordingly, MSA's motion to strike will be denied as to these paragraphs.

### 5. Alternate Theories of Recovery: Paragraphs 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 164, 165

All but two of these paragraphs attributes either actual or constructive knowledge of Iovino's conversations with various supervisors either to those supervisors or to other MSA employees. For instance, Paragraph 124 attributes actual knowledge of Iovino's conversation with Ratcliff about the health of the dogs abroad to Ratcliff. In a similar vein, Paragraph 132 attributes constructive knowledge of Iovino's complaints to Ratcliff about his decision to exclusively treat the dogs onsite to Bower, who (Iovino alleges) would have worked closer with Ratcliff and known about Ratcliff's conversations.

By doing so, Iovino presents many conversations between herself and her supervisors, over the course of her entire 23-month tenure at the CVC, as protected disclosures for which MSA retaliated against her. Iovino alleges that "[a]ll of her protected disclosures were within

21 months of MSA's decision to force her to compete for her own position, and many of her disclosures occurred in the seven months prior." (Compl. ¶ 148.) Like the plaintiff in *Chacko*, however, Iovino's allegations would multiply the theories by which she seeks relief on her retaliation claim. No interpretation of the record below can sustain these new, unexhausted theories of retaliation. Iovino's Agency Filing could not be clearer that she believed MSA's alleged retaliation took place in response to one event: her July 6, 2017, OIG Complaint. (*See* Agency Filing, at 3–4, 7–10.) Her allegations that her conversations with MSA officials were instances of her blowing the whistle on those same MSA officials is simply too tenuous a connection to be "reasonably related" to the charge she raised in her OIG Complaint.

To grant relief on any of these alternative theories, the court would have to consider new conduct that occurred across a new time frame. Advancing a theory of relief never mentioned to the reviewing agency was fatal to the claim in *Chacko*, and it is fatal to these allegations here. *Chacko*, 429 F.3d at 511.

In the remaining two paragraphs—paragraphs 164 and 165—Iovino frames actions that took place months before her OIG Complaint as retaliation for her internal complaints to MSA management. But she cannot reframe those earlier internal complaints as protected disclosures, and so she cannot reframe MSA's responses to those complaints as unlawfully retaliatory.

Of course, as explained above, Iovino's internal complaints, and MSA's responses to the same, are factual allegations reasonably related to her Agency Filing and upon which she is entitled to take discovery and present evidence. But Iovino did not argue to DoS that MSA retaliated against her for any conduct other than her July 6, 2017, OIG Complaint. Although

Iovino enters federal court armed with additional factual allegations reasonably related to her OIG Complaint, her theory of recovery must remain the same. Iovino is required to prove that filing her OIG Complaint was a "contributing factor" to MSA's decision to take adverse employment actions against her.

Accordingly, MSA's motion to strike will be granted as to these paragraphs.

## IV.   CONCLUSION

MSA's motion to strike portions of Iovino's complaint (ECF No. 7) will be granted in part and denied in part.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 25th day of April, 2022.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE