## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

**KAREN IOVINO,**

    *Plaintiff,*

    **v.**

**MICHAEL STAPLETON ASSOCIATES, LTD.
d.b.a. MSA SECURITY, INC.,**

    *Defendant.*

**CASE NO. 5:21-cv-0064**

**FIRST AMENDED COMPLAINT**

**JURY DEMAND**

## I.    INTRODUCTION

This is an action arising under the employee protection provisions of 41 U.S.C. § 4712, by Plaintiff Dr. Karen Iovino (hereafter "Plaintiff" or "Dr. Iovino") against her former employer, Michael Stapleton Associates Ltd., d.b.a. MSA Security, Inc. (hereafter "Defendant" or "MSA" or "MSA Security"). Defendant is a federal contractor. Defendant has a contract with the United States Department of State (hereafter "State Department") under the Worldwide Protective Services program to operate the Canine Validation Center (hereafter "CVC") in Winchester, VA. Plaintiff was the employee of a federal contractor. Defendant employed Dr. Iovino as a part-time veterinarian from October 9, 2015 to August 18, 2017. Dr. Iovino worked for Defendant's federal contract under the Worldwide Protective Services program to operate the CVC. Defendant unlawfully retaliated against Dr. Iovino in the terms and conditions of her employment because she disclosed gross mismanagement of a federal contract, abuse of authority related to a federal contract, and regulatory violations related to a federal contract to MSA officials and government agencies.

## II.    JURISDICTION

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 on the basis that this complaint arises and presents federal questions under 41 U.S.C. § 4712, sub-

titled "Enhancement of contractor protection from reprisal for disclosure of certain information."

## III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

2.      Dr. Iovino administratively exhausted her claims under 41 U.S.C. § 4712(c)(2) on or after

October 30, 2019. Hence, this action is timely pursuant to 41 U.S.C. § 4712(c)(2).

3.      Dr. Iovino filed her complaint with the State Department Office of Inspector

General (hereafter "OIG") on August 4, 2017.

4.      On July 5, 2018, the State Department Inspector General, Mr. Steve Linick, forwarded

his report of the investigation of Dr. Iovino's complaint to the Secretary of State. Action Memo for the

Secretary, S. Linick, OIG with attached Report of Investigation (July 5, 2018), Attach. 1. The OIG

substantiated the allegations that Dr. Iovino had been subjected to unlawful reprisal for her

whistleblowing disclosures.

5.      On October 30, 2019, one year after the State Department had ordered MSA to reinstate

Dr. Iovino and pay her compensatory damages and attorney fees, the Acting Procurement Executive of

the United States Department of State, Ms. Sharon D. James, without addressing the key elements of

OIG's reasoning or evidence, changed course 180-degrees and denied Dr. Iovino relief under 41 U.S.C.

§ 4712. Determination Order, S. James (Oct. 30, 2019), Attach. 2.

## IV.    VENUE

6.      Venue lies in this United States District Court under 28 U.S.C. § 1391(b) and (c) by

virtue of the fact that the Defendant, during relevant times, did business in this district.

## V.    PARTIES

7.      Dr. Iovino was the "employee of a contractor" within the meaning of 41 U.S.C. §

4712(a)(1). Dr. Iovino was hired by Defendant on October 9, 2015 as a part-time veterinarian and

remained in that position until Defendant discharged her on August 18, 2017. Dr. Iovino was employed

by the Defendant under the Defendant's contract with the State Department to operate the CVC in

Winchester, Virginia. Therefore, Dr. Iovino was an employee of a federal contractor.

8.      Defendant is a company, with headquarters in New York City, providing security,

intelligence, training, and investigative services in the public and private sector. Defendant operates the

CVC pursuant to a contract with the State Department, and the State Department Bureau of Diplomatic

Security (hereafter "DS") oversees that contract.

## VI.    BACKGROUND FACTS

9.      Pursuant to its contracts with the State Department, MSA operates the CVC to train and

test Explosive Detection Canines (hereafter "EDC") and their handlers.

10.      The State Department then provides the canines to other nations under the Anti-

Terrorism Assistance program (hereafter "ATA"). The CVC includes a fully licensed veterinary hospital

staffed with veterinarians, veterinary technicians, and support staff to provide care to the canines trained

at the CVC.

11.      On September 30, 2014, the State Department issued its first contract, in the amount of

approximately $7.6 million over one year, to MSA for the operation and management of the CVC. In

2016, the CVC became operational and assumed responsibility for the canine training program of the

Bureau of Diplomatic Security. In September 2015, the State Department issued an approximately $11

million, one-year contract to MSA for the operation of the CVC. Finally, in September 2016, the State

Department issued a four-year contract with MSA for the operation of the CVC, with approximately $87

3

million obligated to date. The State Department's total obligations to MSA for the CVC as of the date of May 2021 is $123,318,765.15 (https://www.usaspending.gov, last accessed May 18, 2021).

12.     During the time of the three contracts discussed *supra* at paragraph 11, Ms. Cathy J. Read was the State Department Director of Acquisitions Management, with ultimate responsibility for the three MSA contracts for the operation and management of the CVC with total obligations of more than $100 million.

13.     On information and belief, during the time of the three contracts discussed *supra* at paragraph 11, Ms. James was the Division Director of the Bureau of Diplomatic Security Contracts Division, with responsibility for the three MSA contracts for the operation and management of the CVC with total obligations to date of approximately $105 million, and Ms. James was directly subordinate to Ms. Read.

14.     The CVC conducts training pursuant to two State Department programs: 1) the Worldwide Protective Services program (hereafter "WPS"), which deploys the canines and their handlers to protect State Department facilities, such as embassies and consulates, and State Department personnel around the world; and 2) the Anti-Terrorism Assistance program, which supplies foreign law enforcement agencies with Explosive Detection Canines and trains canine handlers to properly handle and care for those canines.

15.     In March 2016, the Bureau of Diplomatic Security's Office of Antiterrorism Assistance signed a Memorandum of Agreement with the CVC that established responsibility for care requirements of dogs provided to foreign countries with CVC.

16.     Dr. Iovino was a part-time veterinarian at the CVC from October 9, 2015 to August 18, 2017, working approximately 30-33 hours per week. Her title was Veterinarian, and her duties included responsibility for the kennel and supervising the Kennel Technicians (hereafter "KT"). Mr. Zane

Roberts, then MSA Program Manager (hereafter "PM") at CVC, was Dr. Iovino's supervisor. In the months prior to April 2016, Dr. Iovino oversaw the inaugural licensing of the ATA hospital, and she was the designated "Veterinarian-in-Charge" of that hospital when it opened in April 2016 until her unlawful termination in August 2017. Until the arrival of Dr. Michael ("Mike") Ratcliff in November 2016, Dr. Iovino effectively acted as the CVC Lead Veterinarian, with duties that included supervising Ms. Jennifer Houston, the Licensed Veterinary Technician (hereafter "LVT") who was hired in early 2016.

17.     Beginning in 2015, Dr. Iovino and Mr. Roberts shared an understanding that the lack of Standard Operating Procedures for care of the gifted canines in the hands of foreign countries, the lack of adequate veterinary care for these canines, and the lack of adequate accountability to ensure that basic standards of care would be met for these canines was a substantial risk to the bomb-detection and anti-terrorism mission, and a threat to the health and welfare of the dogs, too. They worked tirelessly to create and promote the adoption of Standard Operating Procedures for the health, welfare, and training of the EDCs gifted to foreign countries.

18.     Beginning in late 2015, these concerns (*supra* ¶ 17) were routinely disclosed and discussed at the regular CVC leadership meetings that included the State Department's on-site Program Manager at CVC, Mr. Josh Carter, who was a State Department contractor, but not an MSA employee, and Mr. Alan Bower, then MSA Human Resources/Facilities Manager at CVC. Dr. Iovino was normally not at these meetings, but Mr. Roberts would bring up these concerns with the universal understanding that he was speaking for himself and Dr. Iovino. Mr. Carter and Mr. Bower would listen to these concerns that Mr. Roberts aired, but inevitably they took no action.

19.     In March 2016, Mr. Roberts and Mr. Carter traveled to the Kingdom of Jordan and reported on the poor conditions of the Jordanian kennels, including inadequate sanitation and health care and canine deaths, mostly from the canine parvovirus. The CVC team reported that the canines were

overworked and lacked shelter, sanitation, and care while they were working, and no motivational training was provided to support the canines.

20.     The reports from the CVC trip to Jordan were shared with Dr. Iovino and she and Mr. Roberts renewed their vigorous advocacy with Mr. Carter and Mr. Bower for standards, protocols, and accountability that would help ensure adequate care for the canines gifted to foreign countries, particularly Jordan, and would maintain their effectiveness as Explosive Detection Canines. Again, Mr. Carter and Mr. Bower would listen to Mr. Roberts' concerns, but they took no action.

21.     In early 2016, Mr. Carter, Mr. Roberts, and Dr. Iovino conducted a telephone interview of Ms. Jennifer Houston for the position of Licensed Veterinary Technician. Upon finishing the call, Mr. Carter told Mr. Roberts and Dr. Iovino to "hire her." Dr. Iovino suggested they postpone any hiring decision until after interviewing another applicant who occasionally worked at CVC as a "relief" licensed veterinary technician when Dr. Iovino was especially in need of assistance. Mr. Carter insisted that an offer be extended to Ms. Houston, and she was hired.

22.     When MSA hired Ms. Houston and until Dr. Iovino's unlawful termination, Ms. Houston was the only veterinary technician at CVC. As a licensed veterinary technician, the state of Virginia allowed her to administer medications and anesthesia, to monitor anesthesia, blood pressure, heart rate and oxygen levels during surgery, to perform radiology and ultrasounds procedures, to perform laboratory tests on blood, urine, and feces, to provide nursing care and treatment of hospitalized animals, and to perform dental prophylaxis. In fact, these tasks were routinely required of Ms. Houston while at the CVC.

23.     Dr. Iovino's responsibilities at the ATA hospital included performing frequent mission-critical surgeries, such as spay, neuter, gastropexy, and dental prophylaxis. The surgeries were mission-critical because they were an essential, early step in the process of getting the canines prepared for

scheduled training courses with their prospective handlers. Dr. Iovino and the LVT performed the surgeries together, with no other assistance, and the trust and teamwork between the two was vital to the success of the surgeries.

24.     Prior to the Anti-terrorism Assistance Program hospital being licensed in April 2016, it was not busy enough to provide ample work for Ms. Houston, and she was "loaned" to the Worldwide Protective Services veterinary clinic at CVC. After the ATA hospital was licensed in April 2016, Dr. Iovino required a full-time LVT and asked on multiple occasions that Ms. Houston be returned to the ATA hospital full-time, but CVC leadership, including Mr. Carter insisted that Dr. Iovino should make do by enlisting the Kennel Technicians for support. Dr. Iovino protested, to no avail, that the Kennel Technicians were amply employed with their own responsibilities and were unqualified to do all the tasks of an LVT. MSA's withholding of a full-time LVT to assist Dr. Iovino at the ATA hospital threatened the success of her mission-critical work, including providing a full spectrum of medical care for up to 30 canines.

25.     Dr. Iovino also worked closely with the ATA canine trainers, and these trainers had shared concerns of MSA officials hiring likely-unqualified friends to fill positions, including the dog trainer and handler positions. The ATA canine trainers shared with Dr. Iovino their concern that the dogs under the care of these likely-unqualified trainers were unable to consistently and reliably locate explosives.

26.     Beginning in about April 2016, Dr. Iovino's concerns with MSA Security prompted her to privately document incidents of poor treatment of staff, hiring of friends not based on merit, poor treatment of dogs, and other incidents of misconduct. She continued this practice until her termination in August 2017.

7

27. In mid-to-late 2016, having learned from Mr. Roberts that Ms. Read, the State Department Director of the Office of Acquisitions Management and ultimate State Department official with oversight authority for the MSA/CVC contract, had a substantial interest in the welfare of dogs generally, on the occasion of Ms. Read's annual visit to CVC, Dr. Iovino engaged Ms. Read in conversation about the welfare of the canines at CVC and in the foreign gifting program. This connection would later lead Dr. Iovino to disclose her concerns of canine mistreatment to Ms. Read (*infra* paragraph 83).

28. In August 2016, Mr. Roberts and Mr. Bower counseled Ms. Houston regarding certain performance issues. The written counseling form given to Ms. Houston indicated that Dr. Iovino was Ms. Houston's supervisor, evidence that Dr. Iovino was a supervisor in fact and that MSA treated her as a supervisor.

29. In October 2016, Mr. Carter and Mr. Bower hired Dr. Mike Ratcliff to assume the position of Lead Veterinarian. Dr. Iovino was demoted to Lead ATA Veterinarian, and Dr. Ratcliff became her immediate supervisor. The hiring of Dr. Ratcliff and the demotion of Dr. Iovino was done without the prior knowledge of Mr. Roberts, the then MSA Program Manager at CVC and Dr. Iovino's then supervisor. Mr. Roberts was fearful that Dr. Iovino's demotion would prompt her resignation, but it did not.

30. At the October 7, 2016 meeting when Mr. Roberts informed Dr. Iovino of her impending demotion, she asked about her performance and Mr. Roberts indicated he was extremely happy with her performance, that the canines in her care were healthy, the kennel was running smoothly, and the hospital and clinic were in excellent order. Mr. Roberts further commended Dr. Iovino, stating that her recent handling of both a hyperthermic canine, "Layka 3824" and the tail amputation of "Rocco 4114" had been excellent.

31.     Prior to Dr. Ratcliff starting work at CVC in November 2016, Dr. Iovino had an email exchange with him to orient him to various projects, deadlines, and concerns. Dr. Iovino disclosed some of her concerns with the unreliability of Ms. Houston, the LVT, and the necessity of having a reliable LVT.

32.     On December 22, 2016, Dr. Iovino disclosed to Dr. Ratcliff that the previous day Ms. Houston had made an almost fatal error involving canine "Blake 4960." Dr. Ratcliff was in complete agreement with Dr. Iovino, stating via text, that the error could have resulted in the suffocation of Blake 4960.

33.     On Friday, December 30, 2016, Dr. Iovino disclosed to Dr. Ratcliff that her LVT, Ms. Houston, had left early that day and that the previous Friday, December 23, Ms. Houston had departed the facility with a great deal of work remaining incomplete. Dr. Iovino's concern was that Ms. Houston's leaving without finishing her necessary tasks represented a risk to the health and welfare of the canines. Dr. Ratcliff perfunctorily dismissed Dr. Iovino's concerns, stating "I don't argue over email."

34.     On the morning of January 4, 2017, Dr. Iovino was called to a meeting in the CVC conference room via an announcement over the facility's public address system, an unusual practice that ensured that all employees were aware of the identity of the employee getting reprimanded. Once there, she was met by Mr. Bower and Dr. Ratcliff. Dr. Ratcliff reprimanded Dr. Iovino for Iovino having asked Ms. Houston to work late the previous week. Mr. Bower reprimanded Dr. Iovino for "working too hard." Dr. Iovino understood this to be a threat that she should stop making disclosures of mission threats, such as breakdowns with the foreign gifting program and the unreliable LVT. Dr. Iovino understood Mr. Bower's reprimand as threatening her with some adverse employment action if she continued to blow the whistle.

9

35.    This threat (*supra* ¶ 34) shocked Dr. Iovino and she made no reply. Her considerable professional experience allowed her to complete a full work day, including multiple mission-critical surgeries. However, as she got in her car at the end of the day, the gravity of the confrontation with the two men in the conference room hit Dr. Iovino and her hands began shaking and continued to shake during her 40-minute ride home. Notably, MSA Program Manager Mr. Roberts, Dr. Iovino's second-line supervisor, was conspicuously not present at this meeting, and in fact he was unaware of the reprimand at the time, and he was visibly upset when he learned of the reprimand.

36.    On February 11, 2017, at the weekly veterinarians' meeting with Dr. Iovino, Dr. Ratcliff, and Dr. Carolyn Olech, the WPS clinic veterinarian who was responsible for reviewing medical records and radiographs of EDC's coming the next week for validation, Dr. Ratcliff informed the group that the State Department wanted MSA to only authorize and conduct veterinary tests that could be performed in-house and that out-sourcing of veterinary tests would henceforth be prohibited. Both Dr. Iovino and Dr. Olech disclosed to Dr. Ratcliff that the consequences of this policy would risk the health and welfare of the dogs, and thus the agency's anti-terrorism mission. They suggested, for example, that under this new policy, a dog with an underlying heart murmur would not receive a cardiology work up from a Board-certified cardiologist, which had been past practice. Because none of the CVC veterinarians were Board-certified, that type of specialized, diagnostic testing would henceforth be unavailable, and dogs would possibly die in the field from undiagnosed conditions. Dr. Ratcliff's response was to state, incorrectly, that low-grade heart murmurs were not problematic.

37.    This new policy of prohibiting the out-sourcing of any veterinary tests also had the effect of setting Dr. Iovino up for failure by having her perform her duties and responsibilities regarding the health and welfare of the canines but without the specialized diagnostic tests and support that could only be provided by Board-certified veterinarians. Because none of the CVC veterinarians were Board-

certified, that support and testing was only available via out-sourcing. Dr. Iovino was uniquely situated

to be adversely impacted by this policy because she ran a full-service hospital that performed surgeries.

No other veterinarian at CVC was responsible for that level of care.

38.    At the February 11, 2017 weekly veterinarians' meeting, Dr. Iovino and Dr. Olech also

disclosed to Dr. Ratcliff that the pattern of repeated absence and tardiness of Ms. Houston, the Licensed

Veterinary Technician, was threatening the mission of CVC because Ms. Houston's participation was

required for Dr. Iovino's mission-critical procedures. Dr. Ratcliff repeated his oft-repeated response, that

he was "looking into Ms. Houston's behavior."

39.    At the February 11, 2017 veterinarians' meeting, Dr. Iovino brought up her frustration,

that unlike some other employees, MSA would not pay her overtime pay for the overtime hours she had

worked. She further expressed her belief that Dr. Ratcliff's and Mr. Bower's instruction to her to take

unofficial "Paid Time Off" (hereafter "PTO") in lieu of overtime pay, was improper and a violation of

the rules or regulations stipulating that the government pay MSA for the hours that the contract

employees actually worked. Unofficial Paid Time Off was a practice where an employee would indicate

on their timecard that they had worked and should thus be compensated, when in fact, they had not

worked those hours. MSA would use that timecard to substantiate its billing records to the agency,

having the agency pay MSA for those unofficial PTO hours, though the employee had not worked those

hours.

40.    From early 2016 to February 2017 and until MSA terminated her, Dr. Iovino's coworkers

told her on numerous occasions that they had firsthand knowledge of Mr. Bower describing Dr. Iovino

as a "trouble-maker" and a "pain in the ass," and expressing his animus for her. Dr. Iovino presumed

that Mr. Bower's animus was a result of her multiple disclosures of issues and misconduct at CVC that

evinced gross mismanagement, abuse of authority, and violation of law, rule, or regulation relating to the MSA contract.

41.     In early 2017, Mr. Carter successfully pressured Mr. Roberts to step down as MSA Program Manager. Mr. Bower temporarily stepped in until February 2017, when Mr. Mike Hayes was permanently hired as the MSA Program Manager, and Mr. Bower became MSA Deputy Program Manager and Dr. Iovino's second line supervisor. Mr. Roberts remained at CVC as the titular Deputy Program Manager of ATA, with diminished responsibilities. In July 2017, MSA moved Mr. Roberts into an even more diminished role in research and development, resulting in his October 2017 resignation.

42.     After Mr. Bower assumed the duties of Deputy PM and until MSA terminated Dr. Iovino, Dr. Ratcliff and Mr. Bower routinely had a daily meeting to exchange information about their respective duties and responsibilities.

43.     On February 13, 2017, not long after Mr. Hayes displaced Mr. Roberts, Mr. Hayes had a routine introductory conversation with Dr. Iovino. Dr. Iovino disclosed to Mr. Hayes that she knew of Mr. Bower's animosity toward her and Mr. Bower's characterization of her as a "trouble-maker," but she added, that by all accounts she was a high-performing employee. Dr. Iovino also disclosed to Mr. Hayes the essential details of the January 4, 2017 ambush, where she had been called to the conference room via the public address system and improperly reprimanded by Mr. Bower and Dr. Ratcliff for having disclosed her concerns about the threat to the mission presented by the unreliability of Ms. Houston. As they wrapped up, Mr. Hayes hugged Dr. Iovino and apologized to her for that ugly episode, as well as the painful and stressful treatment she had received that day.

44.     At that February 13, 2017 meeting, Dr. Iovino also disclosed to Mr. Hayes her concerns that the absence and tardiness of Ms. Houston, the Licensed Veterinary Technician, was a threat to the

mission of CVC because certain mission critical procedures required the assistance of Ms. Houston. Mr. Hayes stated that certain things would be changing on his watch, notably that "the days of hiring friends were over," and he assured Dr. Iovino that he would look into her concerns.

45.     At approximately 7:30 a.m. on February 24, 2017, Dr. Iovino's supervisor, Lead Veterinarian Dr. Ratcliff asked to speak with her, saying he had a problem he wanted help solving. He began by asking, "What can I do to make you come on full-time?" Dr. Iovino indicated agreement with his way of thinking and asked if her schedule could be three 11-12 hour days and one half-day. Dr. Ratcliff suggested a schedule of Monday, Wednesday, and Friday for nine hours per day, another day of 5-6 hours, and the balance made up with on-call time, working from home. Dr. Iovino said she would be comfortable with three 10-hour days, one half-day, and 4-5 hours working remotely, and Dr. Ratcliff agreed to this proposal. Dr. Iovino asked Dr. Ratcliff if he had to ask leadership for approval of this arrangement, and he said that was not necessary. He had been told to run his shop the way he sees fit.

46.     During that February 24, 2017 conversation, Dr. Iovino asked Dr. Ratcliff if there had been any complaints about her performance, and he replied, "No. Quite the opposite, everyone loves you."

47.     On March 22, 2017, Dr. Iovino and Dr. Ratcliff discussed the condition of "Frank 9656," a canine whose condition was deteriorating because of a painful hindleg that appeared to have a large area of devitalized tissue, necessitating amputation. Dr. Iovino recommended that a board-certified surgeon perform the amputation, because Drs. Iovino, Olech, and Ratcliff had never amputated a hindleg. Dr. Ratcliff insisted that Mr. Carter would not allow the dog to leave the site for the surgery, but provided no further rationale. Dr. Iovino contacted several travelling surgeons, but none were available in a timely manner. CVC leadership again set Dr. Iovino up for failure by forcing her to

13

perform a complex hindleg amputation under stressful circumstances. Dr. Iovino successfully performed

the amputation the following day.

48.     On April 1, 2017, Dr. Iovino disclosed to Dr. Ratcliff her concern that MSA would not

pay her overtime for the many overtime hours she had spent caring for Frank 9656.

Sometime later, Dr. Ratcliff told Dr. Iovino that Mr. Bower's instructions were for her to take unofficial

PTO. Dr. Iovino reiterated her disclosure to Dr. Ratcliff that she understood that practice to be improper

because it necessarily resulted in MSA billing the government for contractor hours based on falsified

time-keeping records.

49.     Beginning in early 2017, Dr. Iovino also disclosed to MSA CVC Program

Manager Mr. Hayes, Deputy MSA CVC Program Manager Mr. Bower, and MSA CVC Deputy Program

Manager Mr. James Olds her concerns of false or fraudulent government billing relating to the failure of

MSA to pay her overtime and MSA's improper use of unofficial Paid Time Off.

50.     At the weekly veterinarians' meeting on April 15, 2017 with Drs. Ratcliff and Olech, Dr.

Iovino again disclosed that she had not received overtime pay for the overtime hours that she had

worked. As discussed, *supra* paragraph 48, MSA insisted on unofficial PTO rather than pay overtime

and Dr. Iovino voiced her objections to this practice because it meant MSA would be fraudulently

billing the government for contractor hours that had not been worked.

51.     On April 19, 2017, Defendant's Chief Executive Officer, Mr. Michael O'Neil, described

Dr. Iovino as an excellent employee and gave her a written commendation for her work.

52.     On May 8, 2017, Dr. Ratcliff excluded Dr. Iovino from a recurring meeting with a web-

application developer regarding a planned medical records system upgrade. Formerly, Dr.

Iovino had been invited to those meetings as a valued and active participant.

53.    On May 11, 2017, Dr. Iovino offered to attend the bimonthly CVC leadership meetings because of the relevance of those meetings to the ATA mission. Dr. Ratcliff denied her request, yet he asked Kennel Technician, Mr. Brett Harshberger, to attend.

54.    In May 2017, the State Department agreed to MSA's earlier request to convert the ATA hospital veterinarian position to a full-time position, leaving the responsibilities and the position description of the position unchanged and only increasing the hours.

55.    In May 2017, Dr. Ratcliff promoted Kennel Technician, Mr. Brett Harshberger into the newly-created position of Lead Kennel Technician, taking the responsibility for the kennel and for supervising the other Kennel Technicians away from Dr. Iovino and giving those responsibilities to Mr. Harshberger. MSA took these responsibilities away from Dr. Iovino without prior consultation with her. When she protested to Dr. Ratcliff, he stated that it had been done so Dr. Iovino could focus on the ATA hospital. Dr. Iovino asked Dr. Ratcliff if he, or any others had any concerns with her performance, and he assured her there were none. Dr. Iovino suggested that she should retain oversight of the Kennel Technicians because they worked directly with the ATA hospital, but her suggestion was not acted upon. Also, Dr. Iovino explained to Dr. Ratcliff that what she most needed to maintain the exceptional performance of the ATA hospital was a reliable Licensed Veterinary Technician.

56.    On June 7, 2017, Defendant's Vice President for Business Development, Mr. Gerald Goss, praised Dr. Iovino's dedication and leadership to the company, and gave her a hand-written letter of appreciation.

57.    On June 14, 2017, Dr. Iovino disclosed to Drs. Ratcliff and Olech that Licensed Veterinary Technician Ms. Houston, had called in sick, impacting Dr. Iovino's ability to perform mission-critical surgeries that day. Because Dr. Ratcliff was not on-site that day, Dr. Iovino also disclosed to Mr. Hayes the threat to the CVC mission because of the absences and tardiness of

Ms. Houston, especially on days when mission-critical veterinary work was scheduled. Mr.

Hayes only indicated that Dr. Ratcliff was handling the issues with Ms. Houston.

58.    On June 19, 2017, Dr. Iovino disclosed to Mr. Bower and Dr. Olech (acting as Lead

Veterinarian because Dr. Ratcliff was not on-site that day) that Ms. Houston had arrived at work with

the smell of alcohol on her breath, and that Ms. Houston's likely intoxication was a threat to the success

of a mission-critical surgery scheduled for that day. Mr. Bower refused to take control of the situation,

forcing Dr. Iovino to perform the surgery with Ms. Houston assisting, despite her potential impairment.

Again, MSA leadership was setting Dr. Iovino for failure by forcing her to perform a mission-critical

surgery with a Licensed Veterinary Technician hungover at best, and potentially inebriated.[1]

59.    In June 2017, Dr. Iovino disclosed to Dr. Ratcliff that canine handlers from the

Kingdom of Jordan had described to her their concerns with the treatment of canines gifted to Jordan,

specifically that the dogs were being made to work in the extreme, 140-degree heat, to the point that the

canines became overheated. The Jordanian handlers' concerns for the health and welfare of the dogs

included their fears that these actions would result in canine deaths, and that their concerns were ignored

by their Jordanian supervisors. These revelations made Dr. Iovino sufficiently concerned for the

canines' welfare that she asked the Jordanians whether any of the dogs had died, and they replied "no."

When Dr. Iovino made this disclosure to Dr. Ratcliff concerning the dogs' welfare and the consequent

threat to the anti-terrorism mission, he told her to, "take the emotion out of your job."

---

[1] In a December 20, 2019, Consent Order signed by Ms. Houston for the Virginia Board of
Veterinary Medicine, she admitted to consuming alcohol on approximately nine dates between March
2017 and October 2018 to the extent that she was unable to practice veterinary medicine with reasonable
skill and safety. The Virginia Board of Veterinary Medicine ordered Ms. Houston's veterinary
technician license suspended indefinitely. The Board's stay of that order was vacated on April 3, 2020
when Ms. Houston twice failed compliance with the Board-ordered substance-abuse monitoring
program.

60.     In June 2017, a mentor to the Kingdom of Jordan, under contract to Jordan by the

Department of State confided to Dr. Iovino that his supervisor had instructed him to alter his report on

the care of Explosive Detection Canines and remove photographs of a severely emaciated dog. That

report was later presented to the agency. Soon afterward, Dr. Iovino disclosed this incident to then

Deputy Program Manager of ATA, Mr. Roberts.

61.     On July 6, 2017, Dr. Iovino made protected whistleblower disclosures to the State

Department OIG, of mistreatment of animals, misuse of government vehicles, conflicts of interest by an

agency official, and unlawful billing practices by MSA. Dr. Iovino checked the "Contract/Procurement

Fraud," "Conflict of Interest/Ethics Violations," and "Employee Misconduct" checkboxes on the OIG

Hotline report, and she included the following summary:

1.  Time sheet fraud, leaving work early yet claiming full day, OT encouraged (will recieve [sic] OT one day, leave early the next but claim 8-hour day—cameras and key fobs can be checked for these inaccuracies)

2.  taking PTO without claiming it

3.  forcing employee (me) to take PTO and not claiming [sic] it instead of paying me for hours worked

4.  hiring of friends for contracted work when not qualified

5.  use of gov't vehicles for personal use

6.  living at facility (illegal [sic] as explosives are housed on site)

7.  abuse of power-forcing subordinates to hire friends even though not qualified for positions

8.  abuse of power—supervisors without just cause to provide a position for friends (several demotions have occurred)

9.  procurement of equipment not utilized (large generators purchased but not connected therefore not usable)

10. 'gifting' canines to Foreign countries without proper follow through to assure they are cared for (claims have been made by individual who have visited sites and by Foreign students that

17

they are in poor condition/housed in dirty kennels). There are reports canines are dying due to medical conditions/lack of veterinary care/poor working conditions. Canines need to be healthy to performed their job duty (search for explosives)

62.    Dr. Iovino's OIG Hotline report named "Josh Carter, Program Manager," "Alan Bower, MSA [Human Resources]," and unknown others as the individuals responsible.

63.    Dr. Iovino also stated in the OIG Hotline Report:

Most at the facility are either too afraid to come forward or part of the group hired because they are friends with Leadership and usually not qualified for their positions. Several people have been wrongly demoted (no previous complaints, poor work performance, or counseling) so friends can be hired into those positions. The supervisors have a lack of concern for the wellbeing of the program, both WPS and ATA, and the canines that work overseas with the [State Department] contracted vendors and the Foreign countries awarded EDC's (explosive detection canines).

I have personally been descrimated [sic] against through demotion and lack of reliable resources to properly perform job duties. (hired [Lead Veterinary Technician] no longer assists me in full service hospital, she is also not reprimated [sic] for 'no show' and late days. She has also had alcohol odor to her several times.)

I realize my claim is very widespread. It is my hope for a thorough investigation. Several employees have stated they wanted to file a complaint but were too fearful.

64.    Dr. Iovino did not request anonymity when she submitted the OIG Hotline report on July 6, 2017.

65.    Dr. Iovino's Hotline complaint was based in part on her reasonable belief that MSA employees, other than Dr. Iovino and the Kennel Technicians, would routinely leave work early, at 1 or 2 pm, on Fridays and be paid for a full workday. It is estimated that 15 employees would leave 3 hours early every Friday. It is further estimated those employees' average hourly pay rate was $50, and that MSA would bill the government an average of $75 per hour. The total annual fraudulent billing of the State Department because of this practice is thus conservatively estimated at $175,500.00 (15 employees x 3 hours/week x 52 weeks/year x $75 per hour).

66.    Dr. Iovino's Hotline complaint was based in part on her reasonable belief that Mr. Carter was regularly using a government vehicle for personal use. Under the State Department contract, MSA rented a Ford pickup truck (with a cap) to be used in fulfillment of the contract. On information and belief, Mr. Carter regularly used this vehicle for his weekly commute (approximately 180 miles each way) between Winchester and his home in Roanoke, Virginia. In early 2016, a MSA employee confided this information to Dr. Iovino. In addition, on more than one occasion Dr. Iovino came to the CVC on the weekend and noticed Mr. Carter's personal vehicle in the parking lot, while Mr. Carter was not present, reinforcing Dr. Iovino's belief that Mr. Carter had used the government-rented Ford truck for his weekly commute to Roanoke.

67.    Dr. Iovino's Hotline complaint was based in part on her reasonable belief that Mr. Carter was, during the workweek, living at the CVC in violation of regulations concerning the storage of explosives in proximity to an inhabited building. *See* 27 C.F.R. §§ 555.206, *et seq*. (As part of the mission, explosives were stored at the CVC.) In mid-2016, other MSA employees confided this information to Dr. Iovino. In addition, on one occasion, Dr. Iovino reported to the CVC in the morning to find Mr. Carter coming from the men's locker room exhibiting obvious signs of having just showered, reinforcing Dr. Iovino's belief that Mr. Carter was living at the facility. In 2017, a MSA employee, believing that Dr. Iovino was rightfully challenging MSA's corruption at CVC, covertly provided Dr. Iovino with a photograph of Mr. Carter's bedroom at the CVC, and Dr. Iovino included this photograph with her Hotline complaint. The existence of this locked room at CVC was a closely held secret.

68.    Dr. Iovino's Hotline complaint was based in part on her reasonable belief that, in 2016, MSA purchased a generator under the CVC contract, but the generator was never utilized at the facility and instead was taken off-site for the personal use of a MSA employee. In 2017, a MSA employee, believing that Dr. Iovino was rightfully challenging MSA's corruption at CVC, covertly provided Dr.

Iovino with a purchase receipt for that generator, reinforcing her belief that a MSA employee was improperly using the generator.

69.     Dating from late 2015 until the time of her July 6, 2017 OIG disclosure, on numerous occasions Dr. Iovino shared concerns with MSA colleagues Mr. Roberts, Mr. Mark Potter, and Mr. Garrett Lancaster that became the subject matter of her July 2017 OIG disclosure. Although not couched strictly in these terms, all three were generally in agreement with Dr. Iovino that her concerns were evidence of gross mismanagement of the MSA contract, a gross waste of federal funds, an abuse of authority relating to the MSA contract, or a violation of law, rule, or regulation related to the MSA contract.

70.     On July 6, 2017, Mr. Hayes instructed Mr. Roberts to leave the premises for ten days. In the months prior, Mr. Roberts had raised many of the same concerns of gross mismanagement of the MSA contract, abuse of authority relating to the MSA contract, and a violation of law, rule, or regulation relating to the MSA contract, that Dr. Iovino had been raising to MSA and CVC leadership.

71.     In mid-July 2017, an unnamed Bureau of Diplomatic Security agency official provided Dr. Iovino's name and the substance of her OIG Hotline complaint to various MSA officials.

72.     In July 2017, rather than increase the tour-of-duty hours for Dr. Iovino's position to full-time, and contrary to Defendant's standard protocol when converting a part time position to full-time, contrary to MSA's earlier request to the agency that the part time position be simply "converted" to full-time (*supra* ¶ 54), and contrary to Dr. Ratcliff's assertion to Dr. Iovino on February 24, 2017 that he would increase her hours to full-time and retain her four-days-per-week schedule, Defendant decided to allow Dr. Iovino's part time position to expire the next month in retaliation for her protected activities and advertise a new, full-time vacancy.

73.     On July 14, 2017, Dr. Ratcliff notified Dr. Iovino that MSA would abolish or allow her part time position to expire effective August 18, 2017, that a full-time veterinarian position would be created in its stead, and that the schedule would be five days a week. Dr. Iovino asked about the four-day work schedule that she and Dr. Ratcliff had discussed on February 24, 2017, and Dr. Ratcliff was only able to say that "leadership" insisted that the position be five days per week and that all paid time had to be on-site, and he provided no further explanation for the changes. Dr. Ratcliff told Dr. Iovino that she could apply for the full-time position.

74.     On information and belief, it was extremely unusual for Defendant to make an incumbent apply for a position when it was converted from part-time to full-time. In fact, Defendant routinely changed aspects of a position, such as from non-supervisory to supervisory, without advertising the position.

75.     MSA advertised the full-time veterinarian position from July 17 to July 22, 2017. Dr. Iovino applied for the position. Defendant found Dr. Iovino and one other applicant, Dr. Lee Palmer, qualified for the position.

76.     On July 17, 2017, multiple CVC employees observed Mr. Carter to be visibly upset and yelling loudly that "whoever had filed the OIG complaint would be fired." Mr. Carter's rant included mention of the photograph of his secret bedroom at the facility (*supra* paragraph 67). He was referring to the photograph that had been covertly shared with Dr. Iovino, and that she had included with her OIG Hotline complaint.

77.     On July 18, 2017, Dr. Ratcliff notified Dr. Iovino that canine "Zoe 7363" had died of suspected hyperthermia while in Jordan.

78.     On July 19, 2017, OIG official Mr. David Holmes called Dr. Iovino expressing his concern about the potential for MSA to retaliate against her. He asked for her to confirm that she had

waived anonymity and stated that due to the nature of the information in her complaint, OIG's

investigation of her whistleblower disclosure complaint could reveal her identity to MSA and the

agency. Mr. Holmes expressed his concern for Dr. Iovino's future and counseled her to seek legal

advice. Dr. Iovino reiterated her choice to waive anonymity.

79.    The phone call left Dr. Iovino with the impression that Mr. Holmes had asked her to

reiterate her waiver of anonymity as a double-check, seeking to assuage his fear that OIG would be

faulted for revealing the identity of a whistleblower who had requested anonymity. The phone call also

suggested to Dr. Iovino that Mr. Holmes knew that MSA had retaliation in store for her.

80.    On July 24, 2017, CVC leadership excluded Dr. Iovino from a meeting regarding a new

laptop canine program. When asked by Dr. Iovino, Dr. Ratcliff told her that he had forgotten to invite

her, yet Dr. Ratcliff had remembered to invite two Kennel Technicians, Mr. Harshberger and Mr. Jonah

Ballenger.

81.    On or about July 25, 2017, Defendant selected Dr. Palmer for the full-time veterinarian

position. The hiring manager was Dr. Ratcliff. After a reasonable opportunity for further investigation

and discovery, evidence of the identity of any who influenced the selection decision is likely to be

found. Defendant used several criteria not listed on the vacancy announcement, and not relevant to the

veterinarian position to rate the two candidates and find Dr. Palmer more qualified, including "military

service," "textbook publications," and experience as an "emergency medical technician" and as a

"deputy sheriff."

82.    On July 25, 2017, Dr. Iovino filed a whistleblower retaliation Hotline Complaint with

OIG, in which she briefly described her one-and-a-half years of frequent, outspoken concern for the care

of the canines gifted to foreign countries, and some of the other disclosures discussed in this filing. Her

complaint of retaliation included MSA's decision to remove Dr. Iovino's duties overseeing the kennel

and the Kennel Technicians, MSA's practice of excluding her from meetings she had formerly attended, and MSA's decision to force her to compete for her own job.

83.    On July 28, 2017, Dr. Iovino, concerned that she had not had any recent follow through from OIG, contacted Ms. Cathy Read, the Director of the Office of Acquisitions Management for the Department of State (hereafter "AQM") regarding her OIG complaint. *See supra* ¶¶ 12-13. Dr. Iovino reached out to Ms. Read because the two had met on an occasion when Ms. Read was visiting the CVC, and Ms. Read was well known at the CVC as a dog-lover and advocate for the dogs' well-being. Ms. Read asked for a copy of Dr. Iovino's OIG complaint, and Dr. Iovino emailed her a copy.

84.    Prior to reaching out to Ms. Read, *supra* paragraph 83, Dr. Iovino researched and determined that Ms. Read was a covered person under the law that protected Dr. Iovino from reprisal for disclosure of certain information, that is, 41 U.S.C. § 4712. At the time, Ms. Read was a federal employee responsible for oversight or management of the MSA contract. Ms. Read had worked directly with MSA and visited the CVC annually.

85.    The OIG's administrative record of the investigation of Dr. Iovino's retaliation complaint includes a redacted summary of the OIG interview with Ms. Read conducted on April 20, 2018. The OIG summary stated that Ms. Read found Dr. Iovino's protected disclosure highly improper and that Ms. Read incorrectly decided Dr. Iovino's disclosure was a violation of the MSA confidentiality agreement. Upon information and belief, the OIG further stated that shortly after receiving Dr. Iovino's protected disclosure, Ms. Read provided Dr. Iovino's identity and the substance of Dr. Iovino's complaint to various officials in the Bureau of Diplomatic Security.

86.    Based on the reaction of Ms. Read to Dr. Iovino's protected disclosure (*supra* ¶ 85) and on information and belief, Ms. Read perceived Dr. Iovino's July 6, 2017 OIG Hotline disclosure of contract and procurement fraud, conflict of interest and ethics violations, and employee misconduct

concerning MSA's contract to operate the CVC as a professional threat or attack on herself or upon some person or entity that Ms. Read had an interest in.

87.    On August 2, 2017, Ms. Amy Callihan, an MSA front office staffer, informed Dr. Iovino that Mr. Bower had instructed Ms. Callihan not to speak to Dr. Iovino.

88.    On August 4, 2017, MSA Vice President for Business Development, Mr. Goss emailed a State Department contracting officer, stating that because of his learning that Dr. Iovino had made protected disclosures to Ms. Read, the agency's AQM Director and to OIG, Defendant had commenced an internal investigation that day to determine the extent to which Dr. Iovino had divulged or in the future may divulge purportedly confidential information.

89.    At the time (August 2017), Mr. Goss was also Chairman of the Board of the International Stability Operations Association (hereinafter "ISOA"), a trade organization supporting the private military industry, of which MSA is a member.

90.    At a June 7, 2018, ISOA Achievement Awards Dinner, Ms. Read was recognized as a 2017 Government Achievement Awardee, Ms. James was recognized as a 2018 Government Achievement Awardee, and Mr. Goss was recognized as a 2018 Lifetime Awardee. On information and belief, Ms. Read, Ms. James, and Mr. Goss socialized together on at least one occasion, June 7, 2018.

91.    The OIG learned that Mr. Goss' allusion to Dr. Iovino divulging information in the future (*supra* ¶ 88) had been prompted by an MSA employee reporting to Dr. Ratcliff that Dr. Iovino had told two kennel technicians that she was contemplating a disclosure to the Washington Post to disclose matters she had already made internally. Dr. Ratcliff confirmed this as to one kennel technician. Deputy PM Mr. Bower gave OIG a similar account of this episode.

92.    On August 4, 2017 as she arrived at work, Dr. Ratcliff and Deputy PM Mr. Bower, met Dr. Iovino at the door, informed her they were suspending her effective immediately, and told her to

leave the premises. Dr. Iovino informed them that Virginia Board of Veterinary Medicine regulations require five days' notice of change of Veterinarian-in-Charge, one of Dr. Iovino's roles at the ATA hospital. Also, DEA regulations require the outgoing incumbent to conduct a controlled substance inventory upon a change of Veterinarian-in-Charge, but Dr. Ratcliff and Mr. Bower did not allow Dr. Iovino to conduct the required inventory. Prohibiting Dr. Iovino from ensuring that the Virginia Board of Veterinary Medicine had the required notice concerning the change of Veterinarian-in-Charge and from accomplishing the controlled substance inventory threatened Dr. Iovino's continued licensure and her livelihood.

93.     On August 4, 2017, Mr. Peter Deegan, MSA Vice President for Human Resources, notified Dr. Iovino via email that she was suspended, with pay, while concerns involving the disclosure of purportedly confidential information were investigated.

94.     During a later interview, Mr. Deegan explained to the OIG that the investigation of Dr. Iovino had been prompted by her disclosure to the agency, or client, without permission.

95.     On August 18, 2017, Dr. Iovino was informed by letter that her employment with Defendant was terminated.

96.     Defendant hired temporary help to fulfill the duties and responsibilities of Dr. Iovino's position from August 2017 until January 2018, when Dr. Palmer could begin work.

97.     In October 2017, Mr. Goss transitioned from Chairman of the ISOA Board to the ISOA Advisory Council.

98.     On July 5, 2018, via letter to the Secretary of State, OIG substantiated Dr. Iovino's allegation of unlawful retaliation in violation of 41 U.S.C. § 4712.

99.     Pursuant to 41 U.S.C. § 4712(c)(1), on October 3, 2018, the State Department, acting by and through Mr. Eric N. Moore, ordered MSA to reinstate Dr. Iovino, and pay her compensatory

damages and attorney fees. (October 3, 2018). At the time, Mr. Moore was the State Department Acting

Procurement Executive, the State Department designee pursuant to 48 C.F.R. § 603.905.

100.    On November 16, 2018, MSA petitioned the Court of Appeals for the Fourth

Circuit for a stay of the State Department's reinstatement order, pending review under the

Administrative Procedure Act, 79 P.L. 404, 60 Stat. 237, 79 Cong. Ch. 324, codified as amended

beginning at 5 U.S.C. § 500. *Michael Stapleton Assoc., Ltd. v. Dep't of State*, Docket No. 182381 (4th

Cir.).

101.    On February 6, 2019, without consulting or notifying Dr. Iovino and only days after the

end of the longest government shutdown in history, the State Department filed an unopposed motion to

remand the matter to the State Department for its reconsideration. On March 11, 2019, the court ordered

the remand and it took effect upon the court's issuance of a formal mandate on May 3, 2019.

102.    On June 17, 2019, the State Department withdrew its reinstatement order of October 3,

2018, reopened the record for Dr. Iovino's complaint, and invited MSA and Dr. Iovino to supplement

the record, with the record to close on July 19, 2019.

103.    ISOA held its fourteenth annual summit October 28-30, 2019. Ms. James was scheduled

to be a guest speaker, and Mr. Goss was scheduled to moderate a breakout session.

104.    On October 30, 2019, pursuant to 41 U.S.C. § 4712(c)(1), the State Department acting by

and through Ms. Sharon D. James denied relief to Dr. Iovino. As late as June 17, 2019, Mr. Moore had

continued to be the State Department Acting Procurement Executive, but by October 30, 2019, Ms.

James had replaced Mr. Moore. At the time that she denied relief to Dr. Iovino, Ms. James continued in

her position as the Division Director of the Bureau of Diplomatic Security Contracts Division and

continued to be directly subordinate to Ms. Read, while she took on the "acting" role as Procurement

Executive.

## VII.    PLAINTIFF CAN MAKE A PRIMA FACIE SHOWING OF UNLAWFUL RETALIATION IN VIOLATION OF 41 U.S.C. § 4712

105.    Under 41 U.S.C. § 4712(c)(6), the burdens of proof of 5 U.S.C. § 1221(e) are controlling

in a "judicial . . . proceeding to determine whether discrimination prohibited under [§ 4712] has

occurred." Under section 1221(e) of Title 5, the plaintiff must show by preponderant evidence that her

protected disclosure was a contributing factor in the defendant's personnel action. *Chambers v. DOI*,

602 F.3d 1370, 1377-80 (Fed. Cir. 2010). The proper test for whether a disclosure is protected is

"whether a disinterested observer with knowledge of the essential facts known to and readily

ascertainable by the employee . . . could reasonably conclude that the actions of the [defendant]

evidence such violations, mismanagement, waste, abuse, or danger." 5 U.S.C. § 2302(b).

106.    "The employee may demonstrate that the disclosure or protected activity was a

contributing factor in the personnel action through circumstantial evidence, such as evidence that— (A)

the official taking the personnel action knew of the disclosure or protected activity; and (B) the

personnel action occurred within a period of time such that a reasonable person could conclude that the

disclosure or protected activity was a contributing factor in the personnel action." 5 U.S.C. § 1221(e).

107.    After the whistleblower has proved her prima facie case by preponderant evidence, the

burden of proof shifts to the employer to show, by clear and convincing evidence that it would have

taken the same adverse personnel actions in the absence of the whistleblower's protected activities. 5.

U.S.C. § 1221(e). The Federal Circuit Court of Appeals has established a test, with three factors to be

applied flexibly on a case-by-case basis, for determining whether an employer has met its burden: (1)

the strength of the employer's evidence in support of its personnel action; (2) the existence and strength

of any motive to retaliate on the part of the officials who were involved in the decision; (3) and any

evidence that the employer takes similar actions against employees who are not whistleblowers but who

are otherwise similarly situated. *Carr v. SSA*, 185 F.3d 1318, 1323 (Fed. Cir. 1999) (establishing the test

27

in the context of a federal agency's burden to show independent justification). A Second Circuit court

and other circuits have adopted this same test in cases under the Whistleblower Protection Act and 41

U.S.C. § 4712, where the burdens of proof of 5 U.S.C. § 1221(e) are applicable. *See Figueroa v.*

*Nielsen*, 423 F. Supp. 3d 21 n.16 (S.D.N.Y. 2019) (using the *Carr* factor analysis in a federal

whistleblower retaliation case brought under 5 U.S.C. § 2302(b)(8)); *Duggan v. Dep't of Def.*, 883 F.3d

842, 846 (9th Cir. 2018) (action brought under section 2302); *Mottas v. Dep't of Army*, 720 F. App'x 912

(10th Cir. 2017) (action brought under section 2302); *King v. Dep't of the Army*, 570 F. App'x 863 (11th

Cir. 2014) (action brought under section 2302); *Busselman v. Battelle Mem'l Inst.*, No. 4:18-cv-05109-

SMJ, 2019 U.S. Dist. LEXIS 226127, at *18 (E.D. Wash. Nov. 15, 2019) (using the *Carr* factor analysis

in a whistleblower retaliation case brought under 41 U.S.C. § 4712).

### A. Dr. Iovino Engaged in Protected Activities

108.    On multiple occasions beginning in late 2015, Dr. Iovino made disclosures to the

Department of State CVC Program Manager Mr. Carter and MSA officials Mr. Roberts and Mr.

Bower, and later Dr. Ratcliff and Mr. Hayes. She challenged the lack of: 1) Standard Operating

Procedures for care of canines gifted to foreign countries; 2) adequate veterinary care for these canines;

and 3) adequate accountability to ensure that basic standards of care would be met for these canines. She

explained how the deficiencies were a threat to the success of the antiterrorism mission entrusted to

these dogs and their handlers. Mr. Roberts shared Dr. Iovino's concerns and echoed her disclosures to

agency and MSA leadership, with MSA understanding that Dr. Iovino and Mr. Roberts were disclosing

in concert.

109.    Beginning in November 2016, Dr. Iovino complained to her supervisor, Dr.

Ratcliff, about the living and working conditions of the dogs gifted overseas. These included Dr.

Iovino's June 2017 disclosure to Dr. Ratcliff that the Jordanian handlers had grave concerns about the health and welfare of the canines and those concerns were being ignored by their Jordanian supervisors. During this period, Dr. Iovino routinely discussed these issues with many of the ATA canine trainers, and they shared her concerns. It was normal protocol for Dr. Ratcliff to update his immediate supervisors. Initially that was Zane Roberts until he was also demoted. Then he updated MSA's Alan Bower and Department of State's Josh Carter who were on site.

110.    Beginning in early 2017, Dr. Iovino disclosed to her supervisor, Dr. Ratcliff, that the consequences of certain MSA and agency policies were a threat to the health and welfare of the canines, and thus a threat to the anti-terrorism mission of the CVC. These included Dr. Iovino's February 11, 2017 disclosure to Dr. Ratcliff that the consequences of the "in-house only" testing policy threatened the anti-terrorism mission because a dog might die in the field from a condition that went undiagnosed due to this policy. These also included Dr. Iovino's March 2017 disclosure to Dr. Ratcliff that MSA's refusal to take Frank 9565 to a board-certified surgeon to perform the hindleg amputation would substantially increase the risk to the health and welfare of the dog.

111.    Beginning in November 2016, Dr. Iovino disclosed to her supervisor, Dr. Ratcliff, Mr. Roberts, and later MSA Program Manager Mr. Hayes her concerns that the performance of Licensed Veterinary Technician, Ms. Houston, was a grave threat to the health and welfare of the canines, and thus a threat to the CVC's anti-terrorism mission. These included Dr. Iovino's December 2016 disclosures that negligent care by Ms. Houston had nearly proved fatal to Blake 4960, and that the poor attendance practices of Ms. Houston threatened the health and welfare of other canines and the CVC's mission-readiness. These concerns were again disclosed to Dr. Ratcliff in February 2017 by Drs. Iovino and Olech, and to Mr. Hayes that same month by Dr. Iovino alone. On June 14, 2017 Dr. Iovino disclosed to acting Lead Veterinarian Dr. Olech and Mr. Hayes that the erratic attendance of Ms.

Houston was jeopardizing mission-critical surgeries scheduled for that day. On June 19, 2017 Dr. Iovino

disclosed to acting Lead Veterinarian Dr. Olech and to Mr. Bower that the likely on-the-job intoxication

of Ms. Houston was a grave threat to the success of a mission-critical surgery scheduled for that day.

112.    Beginning in early 2017, Dr. Iovino disclosed to her supervisor, Dr. Ratcliff,

MSA CVC Program Manager Mr. Hayes, MSA Deputy Program Manager Mr. Bower, and

Department of State CVC Deputy Program Manager Mr. Olds her concerns relating to the failure of

MSA to pay her overtime and MSA's improper use of Paid Time Off. Dr. Iovino disclosed

these concerns of impropriety to Dr. Ratcliff on February 11, April 1, and April 15, 2017.

113.    On July 6, 2017, Dr. Iovino disclosed to the Office of Inspector General a variety of

concerns, including mistreatment of animals, misuse of government vehicles for personal purposes,

conflicts of interest by an agency official, and unnecessary expenditures by MSA that were billed to the

agency.

114.    On July 28, 2017, Dr. Iovino contacted Ms. Read, the Director of the agency's Office of

Acquisitions Management and a federal employee responsible for the MSA contract oversight or

management. Upon Ms. Read's request, Dr. Iovino disclosed the entirety of her July 6, 2017 OIG

complaint to Ms. Read.

**B.  The reasonableness of Dr. Iovino's belief that her disclosures evinced misconduct
    contemplated by section 4712.**

115.    Dr. Iovino had a reasonable belief that her disclosures to CVC Program Manager

Mr. Carter, agency official Ms. Read, MSA officials, such as the MSA Program Manager Mr. Hayes and

Lead Veterinarian Dr. Ratcliff, and State Department OIG evinced gross mismanagement of a federal

contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or

grant, or a violation of law, rule, or regulation related to a federal contract, and were thus protected

disclosures. 41 U.S.C. § 4712(a)(1).

116.     The reasonableness of Dr. Iovino's belief that she was disclosing evidence of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or grant, or a violation of law, rule, or regulation related to a federal contract, was supported by her professional experience, including her nearly 27 years of experience as a private practice veterinarian. She also had varied experience as a Regional Leader of a federal disaster response team that was comprised of veterinarians, veterinary technicians, and other support personnel that deploy to provide support to working animals during emergency responses as part of the National Disaster Medical System. She also had years of hospital management and administration experience.

117.     Relevant to the reasonableness of Dr. Iovino's belief that Ms. Houston's behavior was a threat to the CVC mission was that Mr. Bower and then MSA Program Manager Mr. Roberts shared her concerns. For example, in August 2016, Mr. Bower and Mr. Roberts gave Ms. Houston a written counseling for performance issues, evidence that they shared Dr. Iovino's concerns. Also relevant was when Mr. Hayes took over as MSA Program Manager in February 2017, he echoed some of Dr. Iovino's concerns about MSA personnel issues when he told her that "the days of hiring friends are over."

118.     Also relevant to the reasonableness of Dr. Iovino's belief that the inadequate care and treatment of the dogs gifted to foreign countries threatened the anti-terrorism mission was that her peers, Dr. Olech, Mr. Roberts, Mr. Potter, and Mr. Lancaster, shared her concerns. In addition, that Jordanians who worked with the canines shared their concern of breakdowns in the ATA program, much the same as Dr. Iovino's concerns, is relevant to assessing the reasonableness of her belief that she had disclosed evidence of gross mismanagement of the MSA contract.

119.     Both the OIG in its July 5, 2018 whistleblower retaliation report, and the State Department in its October 3, 2018 letter ordering MSA to reinstate Dr. Iovino, found that Dr. Iovino's disclosures did, in fact, meet the reasonable belief standard and were protected disclosures. Notably,

even the State Department letter of October 30, 2019, reversing the prior reinstatement order and denying her relief, found that Dr. Iovino's disclosures were protected.

120.    Further evidence of the reasonableness of Dr. Iovino's belief was the OIG's full substantiation of her whistleblower disclosures. In September 2019, OIG published a report of its investigation into the foreign gifting breakdown portion of Dr. Iovino's July 2017 hotline complaint, finding that the health and welfare of the dogs in the ATA and Explosive Detection Canine Program were threatened by the overall lack of policies and standards and the infrequent and inconsistent State Department follow-ups. This OIG report specifically described how the threats to the health and welfare of the canines threatened the agency's anti-terrorism mission of providing foreign partners with EDCs that would properly perform explosive detection work. In addition, OIG found that problems with the health and welfare of the dogs in Jordan had persisted for years, yet the State Department did not adequately plan to ensure that the dogs already in Jordan would be protected. OIG found that one dog, Zoe 7363, had died of preventable causes in Jordan in July 2017, Mencey 5892, another dog given to Jordan was euthanized because of a preventable condition in March 2018, and Athena 4183, a third dog given to Jordan was returned to the U.S. because of inadequate feeding and was nourished back to health. The OIG's unequivocal substantiation of Dr. Iovino's complaint is further evidence of the reasonableness of her belief that she was disclosing evidence of gross mismanagement of a federal contract that threatened ATA and EDC missions.

121.    On information and belief, OIG has open investigations into the other portions of Dr. Iovino's July 6, 2017 Hotline complaint, further evidence of the reasonableness of Dr. Iovino's disclosures.

122.    Dr. Iovino's disclosures described here were made to covered persons and bodies as stipulated in 41 U.S.C. § 4712(a)(2), including an Inspector General, a federal employee responsible for

the contract oversight or management, and a management official or other employee of the contractor, who has the responsibility to investigate, discover, or address misconduct.

123.     MSA Program Manager Mr. Hayes, MSA Deputy PM Mr. Bower, Lead Veterinarian Dr. Ratcliff, and Dr. Olech, when she was acting Lead Veterinarian, were all employees of MSA with responsibility to investigate, discover, or address misconduct related to gross mismanagement of the MSA contract that threatened the CVC's anti-terrorism mission, an abuse of authority related to the MSA contract, a gross waste of federal funds related to the MSA contract, or a violation of law, rule, or regulation related to the MSA contract. Dr. Iovino made her July 6, 2017 disclosure to the OIG, and later that month she reiterated that disclosure to Ms. Read, a federal employee responsible for oversight or management of the MSA contract.

### C.     MSA Officials Had Actual or Constructive Knowledge of Plaintiff's Protected Activities When Defendant Discharged Plaintiff

124.     Mr. Carter's presumptive actual knowledge of Dr. Iovino's OIG complaint. On July 17, 2017, Mr. Carter was heard shouting in the hallways, "whoever had filed the OIG complaint would be fired." Assuming Mr. Carter did not know the identity of the person who filed the July 6, 2017 OIG Hotline complaint and given his demonstrated level of animosity, Mr. Carter is presumed to have come up with a short list of potential whistleblowers to be fired and Dr. Iovino is presumed to have been on that list because of her multiple disclosures of concerns for the health and welfare of the EDCs in the foreign gifting program, and the consequent threat to the CVC anti-terrorism mission, that she had made to MSA officials and Mr. Carter, beginning in 2015. An opportunity for further investigation and discovery is expected to lead to evidence of his actual knowledge.

125.     In addition, the OIG Hotline complaint that Mr. Carter had such a visceral reaction to (*supra* ¶ 124) included language that reiterated the concerns Dr. Iovino had voiced for over one-and-a-half years and it mimicked the language she had used, "'gifting' canines to Foreign countries without

proper follow through to assure they are cared for. . . . There are reports canines are dying due to medical conditions/lack of veterinary care/poor working conditions. Canines need to be healthy to performed their job duty (search for explosives)." *Supra* ¶ 61. The similarity between the specifics in the OIG Hotline complaint and Dr. Iovino's multiple prior disclosures of the same threats to the CVC mission, supports the assertion that Mr. Carter would have had Dr. Iovino on his short list of whistleblowing suspects to be fired.

126.    On information and belief, Mr. Carter had a close personal relationship with MSA Deputy PM Mr. Bower, a relationship established because of their shared experience as former Roanoke, Virginia police officers.

127.    The grave threat to the CVC of a wide-ranging misconduct investigation conducted by the OIG and the close relationship between Mr. Carter and Mr. Bower support the inference that they would have shared information about the nature of the OIG complaint and the suspected identity of the whistleblower. If this exchange did in fact occur, it lends further support to the assertion that Mr. Bower had actual knowledge of Dr. Iovino's OIG Hotline complaint on or about July 17, 2017, and that Mr. Bower would have included Dr. Iovino on his short list of suspected whistleblowers. An opportunity for further investigation and discovery is expected to lead to evidence of his actual knowledge.

128.    On July 19, 2017, prior to not selecting Dr. Iovino for the full-time veterinarian position, OIG informed Dr. Iovino that her whistleblower disclosure Hotline complaint would be closed unless she agreed to the disclosure of her identity to MSA. Dr. Iovino agreed to this. After a reasonable opportunity for further investigation and discovery, there likely will be evidence that MSA officials at most managerial levels had actual knowledge of Dr. Iovino's identity and the substance of her OIG complaint no later than July 19, 2017, especially because of the seriousness of the numerous allegations in her OIG complaint.

129.    On information and belief, the CVC contract is the single largest source of MSA's federal government revenue,[2] making the news of an OIG investigation of multiple and varied misconduct and abuse of authority allegations at CVC of interest to the entire MSA chain of command including the Chief Executive Officer, Mr. O'Neil, MSA Program Manager Mr. Hayes, Deputy PM Mr. Bower, and Lead Veterinarian Dr. Ratcliff.

130.    On information and belief, in mid-July 2017, an unnamed Bureau of Diplomatic Security employee provided Dr. Iovino's name and information about her concerns to various MSA officials. MSA officials thus had actual knowledge of Dr. Iovino's identity and protected activities by mid-July 2017, via a second communication channel separate from the OIG complaint referral. The seriousness of the Hotline allegations, the wide-ranging extent of the allegations, and the potential consequences of the OIG investigation into the alleged misconduct support the presumption that Dr. Iovino's identity and the substance of her complaint would have been shared up and down the MSA chain of command, and broadly supports the assertion of knowledge, actual or constructive, by MSA officials and decision makers. After a reasonable opportunity for further investigation and discovery, there likely will be additional evidentiary support that MSA decision-making officials had knowledge, both actual and constructive, of Dr. Iovino's protected activities before taking certain adverse actions against Dr. Iovino.

131.    The OIG investigation of Dr. Iovino's retaliation complaint found evidence of the extent that information related to Dr. Iovino was shared among MSA's leadership (*supra* ¶ 91). Dr. Ratcliff and Mr. Bower provided to OIG similar accounts of the report that Dr. Iovino was contemplating a disclosure to the Washington Post and the details of MSA's subsequent investigation of Dr. Iovino. After a reasonable opportunity for further investigation and discovery, there likely will be evidence that

---

[2] MSA Security's total revenue from federal government contracts for fiscal years 2014-2017 totaled about $62 million, of which about $58 million was obligated under contracts with the State Department, with the place of performance being Winchester, Virginia, presumably the CVC.

Dr. Ratcliff's knowledge of Dr. Iovino's protected disclosures was shared with Mr. Bower, and Mr.

Bower's knowledge of Dr. Iovino's protected disclosures was shared with Dr. Ratcliff.

### D. Defendant Took Discriminatory Actions Including Discharge of Plaintiff after it Knew Plaintiff had Made Protected Disclosures

132.    Contrary to Defendant's standard protocol when making a change to an employee's

hours, on July 14, 2017, Defendant informed Dr. Iovino that she would be required to compete for a full-

time veterinarian position in order to retain employment with Defendant. Defendant's decision to require

Dr. Iovino to compete for her own position, albeit with 7-10 extra hours per week, but with no change in

duties or responsibilities, was a discriminatory adverse employment action as enumerated in 41 U.S.C. §

4712(a)(1) (defining prohibited reprisals broadly as the employee having been "discharged, demoted, or

otherwise discriminated against").

133.    Defendant posted the full-time veterinarian position from July 17 to July 22, 2017. Dr.

Iovino applied for the position. Defendant identified Dr. Iovino and Dr. Palmer as qualified candidates

for the position. On or about July 25, 2017, Defendant selected Dr. Palmer for the full-time position and

did not select Dr. Iovino. Defendant's non-selection of Dr. Iovino was a discriminatory adverse

employment action as enumerated in 41 U.S.C. § 4712(a)(1).

134.    On August 4, 2017, Defendant suspended Dr. Iovino with pay because of allegations that

she had disclosed purportedly confidential information. Defendant's suspension of Dr. Iovino also was a

discriminatory adverse employment action as enumerated in 41 U.S.C. § 4712(a)(1).

135.    On August 18, 2017, Defendant sent Dr. Iovino a letter stating that her assignment had

come to completion, effectively terminating her employment. Defendant's termination of Dr. Iovino was

a discriminatory adverse employment action as enumerated in 41 U.S.C. § 4712(a)(1). When done for an

unlawful, retaliatory reason, whether Dr. Iovino's termination is viewed as the termination of her part

time position or as the termination of her employment as a part time employee, it does not change that Dr. Iovino's termination was a personnel action cognizable under section 4712. *See Carter v. Dep't of the Army*, 62 M.S.P.R. 393, 398 (1994).

### E. The Circumstances are Sufficient to Raise an Inference that the Protected Activity was a Contributing Factor in the Adverse Actions

136.    The statutory burden of proof to establish the contributing factor nexus between Dr. Iovino's whistleblower disclosures and MSA's decisions to take the adverse actions may be demonstrated by circumstantial evidence that 1) the official taking the personnel action knew of the disclosure or protected activity, and 2) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action. 5 U.S.C. § 1221(e); *See* 41 U.S.C. § 4712(c)(6).

137.    All of Dr. Iovino's protected disclosures were within 21 months of MSA's decision to force her to compete for her own position, and many of her disclosures occurred in the seven months prior.

138.    In June 2017, the month before MSA's decision to force her to compete for her own position, Dr. Iovino made her disclosure of the threat to the anti-terrorism mission due to the inadequate oversight of, and accountability for, the health and welfare of the EDCs gifted to foreign countries.

139.    Also, in June 2017, the month before MSA's decision to force her to compete for her own position, Dr. Iovino twice made disclosures to her supervisor, Lead Veterinarian Dr. Ratcliff, related to the threats presented by the unreliable at best, and inebriated at worst, Licensed Veterinary Technician, Ms. Houston. One of those disclosures was also made to MSA's senior official on-site, Program Manager Mr. Hayes. The other disclosure was also made to MSA's number-two official on-site, Deputy PM Mr. Bower.

140.    The short time period between knowledge of Dr. Iovino's protected disclosures and the Defendant's mandate that Dr. Iovino must re-apply for her position is sufficient for a reasonable person to conclude that her protected disclosures were a contributing factor in the decision to take that personnel action and satisfies the nexus requirement by statute. Here, all her protected disclosures were within 21 months of MSA's first adverse personnel action, many of her disclosures were within seven months, and three came within the month prior to MSA's first adverse personnel action. All of MSA's adverse personnel actions occurred within two months of Dr. Iovino's most recent spate of protected disclosures. This timeline expressly supports the necessary contributing factor nexus between Dr. Iovino's protected activities and MSA's discriminatory adverse employment actions.

141.    Defendant's unexplained, gross deviation from its standard protocol, requiring Dr. Iovino to re-apply for her position because of a change in hours, also is circumstantial evidence that her protected disclosures were a contributing factor in Defendant's decision to make Dr. Iovino re-apply for her own position.

142.    Dr. Ratcliff's decision to select Dr. Palmer and not select Dr. Iovino came about one month after Dr. Iovino's disclosure to him of the risk to the CVC mission presented by the inadequate care of the dogs in Jordan and his response to, "take the emotion out of your job." This satisfies the contributing factor nexus requirement per the statute. 5 U.S.C. § 1221(e).

143.    On August 4, 2017, MSA Vice President for Business Development, Mr. Gerald Goss, informed the State Department, via email, of Dr. Iovino's suspension, because she had "emailed Ms. Cathy Read, Director, Office of Acquisitions Management, Department of State at some point over the last couple of weeks suggesting there may be alleged misconduct and furthermore, that she has filed an OIG report." That same day MSA notified Dr. Iovino of her suspension and again stated that it was

because of her protected activities. OIG Disclosure Report, p. 7, Attach 1. This was an admission that Dr. Iovino's protected disclosures were a contributing factor in Defendant's decision to suspend her.

144.    MSA Vice President for Human Resources, Mr. Peter Deegan stated that one of the reasons for Dr. Iovino's suspension was that she was speaking with the "client," that is, the State Department. Mr. Goss stated Dr. Iovino's suspension was justified, because her contacts with OIG and the State Department had violated MSA protocol. This was an admission that Dr. Iovino's suspension was an unlawful reprisal for her whistleblowing.

145.    Defendant offered differing reasons for suspending Dr. Iovino in August 2017. Some officials cited reports that Dr. Iovino had threatened to go to the media, while others cited her breach of Defendant's protocol by taking her concerns to the State Department and to OIG. While some of these rationales offered by the Defendant are admissions, the differing rationales are otherwise circumstantial evidence that Dr. Iovino's protected activities were a contributing factor in Defendant's decision to suspend her.

146.    Defendant's admitted retaliatory investigation of Dr. Iovino's disclosures is circumstantial evidence that supports a contributing factor finding. *See Martin v. Dep't of the Air Force*, 73 M.S.P.R. 574 (1997). MSA's refusal to allow Dr. Iovino to ensure the Virginia Board of Veterinary Medicine received the required notice of change to Veterinarian-in-Charge and refusal to allow Dr. Iovino to conduct the DEA-mandated close-out inventory, actions that threatened Dr. Iovino's licensure and livelihood, were also circumstantial evidence of MSA's retaliatory motive regarding her suspension.

147.    Defendant hired temporary help between Dr. Iovino's termination in August 2017 and when Dr. Palmer could start in January 2018, indicating that Defendant had a need for the work that Dr. Iovino performed. This calls into question any economic rationale for terminating her. Similarly, it meant that in order to purge Dr. Iovino, Defendant was willing to have less experienced, less stable staff

performing the professional tasks for which it had found her work outstanding. These indicia of animus were circumstantial evidence that Dr. Iovino's protected activities were a contributing factor in Defendant's decision to terminate her employment.

148.    The recent commendation Defendant provided Dr. Iovino on April 19, 2017 for her selfless, "above-and-beyond," month-long effort leading the team that provided care for a traumatically injured canine, and the short time between that commendation and Dr. Iovino's termination suggest a retaliatory motive that further evinces that her protected disclosures were a contributing factor in Defendant's decision to terminate her employment.  The hand-written letter of appreciation Defendant provided Dr. Iovino on June 7, 2017, praising her dedication, leadership, and support, and the short time between that letter of appreciation and Dr. Iovino's termination also suggest a retaliatory motive and is circumstantial evidence that her protected disclosures were a contributing factor in Defendant's decision to terminate her employment.

149.    The hand-written letter of appreciation Defendant provided Dr. Iovino on June 7, 2017, praising her dedication, leadership, and support, and the short time between that letter of appreciation and Dr. Iovino's termination also suggest a retaliatory motive and is circumstantial evidence that her protected disclosures were a contributing factor in Defendant's decision to terminate her employment.

150.    Dr. Iovino's supervisor at MSA, Dr. Ratcliff, when testifying to the OIG, described Dr. Iovino as a "phenomenal employee" and a hard worker who answered calls around the clock despite her part time status. The contradiction between Dr. Ratcliff's praise of Dr. Iovino and MSA's compulsion to silence and terminate her suggests a retaliatory motive and is circumstantial evidence that her protected disclosures were a contributing factor in Defendant's decision to retaliate against her because of her whistleblowing.

151.    Evidence of Defendant's retaliatory motive includes that several MSA officials acknowledged to the OIG that Dr. Iovino's suspension was based on her protected disclosures to the State Department and OIG, with the inference that if her disclosures were well-founded, it would reflect poorly on Defendant and those officials. Defendant's Executive Vice President for Business Development, Mr. Goss, and Vice President for Human Resources, Mr. Deegan, each stated to the OIG that Dr. Iovino's willingness to take her concerns directly to the State Department and the OIG, circumventing the chain of command, was of concern or the reason for her suspension. These statements against interest were admissions of MSA's retaliatory motive for Dr. Iovino's suspension and of MSA's brazen culture of retaliation, but they were also circumstantial evidence of animus related to MSA's other adverse personnel actions against Dr. Iovino. Their willingness to admit that Dr. Iovino's suspension was a reprisal strongly suggests broader retaliatory animus.

152.    Mr. Carter's July 17, 2017, display of rage and violent outburst, "whoever had filed the OIG complaint would be fired," was circumstantial evidence of an organizational motive to retaliate. Because there were no apparent repercussions for Mr. Carter, it was also circumstantial evidence of an organizational acceptance of whistleblower retaliation. MSA's acceptance of whistleblower retaliation strongly suggests retaliatory animus regarding Dr. Iovino's non-selection about one week later. Two of Dr. Iovino's disclosures to the OIG were personally directed at Mr. Carter: 1) the improper use of a government vehicle for personal use, and 2) regularly sleeping at the CVC in violation of regulations concerning the storage of explosives in proximity to inhabited buildings. This further implicates a retaliatory motive by Mr. Carter, the highest-ranking contractor at the CVC.

153.    MSA's removal of duties from Dr. Iovino, such as her supervision of the kennel and the Kennel Technicians, MSA's exclusion of Dr. Iovino from regular meetings she had formerly attended, and Mr. Bower's instructions to front office staff to stop speaking with Dr. Iovino were an effort to

diminish her responsibilities and circumstantial evidence of motive to retaliate and support a
contributing factor finding.

154.    MSA's retaliatory treatment of Mr. Roberts is also circumstantial evidence of motive to
retaliate against Dr. Iovino. Mr. Roberts and Dr. Iovino had shared many of the same concerns and
disclosures with CVC leadership. Mr. Carter then pressured Mr. Roberts to step down in December
2016. MSA then suspended Mr. Roberts for ten days in July 2017, and sidelined him into a research and
development position that same month. MSA's demonstrated facility with reprisal and its institutional
willingness to exercise it are circumstantial evidence of a motive to retaliate against Dr. Iovino and
support a contributing factor finding.

155.    Ms. Read's reaction upon receiving Dr. Iovino's OIG complaint suggests a culture of
corruption and is circumstantial evidence of animus toward whistleblowers. Ms. Read incorrectly
thought Dr. Iovino's complaint to be highly improper and incorrectly thought it to be a violation of
MSA's nondisclosure agreement,[3] so she quickly alerted the Bureau of Diplomatic Security to this
threat, and Diplomatic Security quickly relayed this threat to MSA. The willingness of these agency
officials to go on the offensive against a whistleblower is evidence of a culture of corruption and reprisal
at the State Department and circumstantial evidence that such a culture would permeate the agency's
contractor as well, suggesting a retaliatory motive on MSA's part and supporting a contributing factor
finding.

## VIII. MSA CANNOT MEET ITS BURDEN OF DEMONSTRATING AN INDEPENDENT
## JUSTIFICATION FOR THE ADVERSE PERSONNEL ACTIONS TAKEN AGAINST DR.
## IOVINO BY CLEAR AND CONVINCING EVIDENCE

---

[3] The OIG found MSA's nondisclosure agreement to unlawfully restrict employees' right to make
protected disclosures or engage in protected activities.

A.    **MSA's Decision to Require Dr. Iovino to Compete for her Own Position was not Supported by Strong Evidence, was Tainted by the Existence and Strength of MSA's Motive to Retaliate, and MSA did not Take Similar Action Against Similarly Situated, but non-Whistleblowing Employees**

156.    <u>MSA's decision to require Dr. Iovino to compete for her own position was not supported by strong evidence.</u> In February 2017, Dr. Ratcliff asked to speak with Dr. Iovino, soliciting her assistance with a problem he wanted help solving: "What can I do to make you come on full-time?" He proposed a flexible schedule that would be accommodating to Dr. Iovino, and he assured her that bringing this new arrangement to fruition would be trivial and that "everyone loves you." In April 2017, after Dr. Iovino's herculean efforts with Frank 9656, MSA's Chief Executive Officer gave her a written commendation, and in June 2017, MSA's Vice President gave her a hand-written letter of appreciation. Sometime prior to May 2017, MSA asked the State Department for permission to convert Dr. Iovino's part time veterinarian position to full-time. As late as July 17, 2017, Dr. Iovino had no reason to believe that her transition to a full-time position was other than "just a formality." OIG Administrative Record, p. 18, Attach. 7. The parties agree that the workload was increasing at the CVC, and the facility needed increased veterinarian support. This narrative of the value and esteem that Dr. Ratcliff and MSA held for Dr. Iovino along with the need for more veterinarian support and the efforts MSA made to entice Dr. Iovino to work increased hours, weakens any evidence that MSA may proffer that Dr. Iovino was less than an "excellent" or "phenomenal" employee, that MSA had not striven to retain her with extended hours and accommodations to her schedule, and that MSA had a valid nonretaliatory reason for its decision to require Dr. Iovino to compete for her own position.

157.    In its Stay Motion before the Fourth Circuit in November 2018, MSA acknowledged how damaging this narrative (*supra* ¶ 156) was to its proffer of non-retaliatory reasons for requiring Dr. Iovino to compete for her job, and so it cast the full-time upgrade as an action taken at the State Department's behest. *Michael Stapleton Assoc., Ltd. v. U.S. Dept. of State*, Docket No. 18-2381 (4th

Cir.). This assertion contradicted MSA's prior statements as recounted by the OIG, "MSA officials told OIG that the change in hours was initiated at [MSA's] request. MSA suggested to the Department that the veterinarian position be converted from part time to full time and the Department assented to MSA's request in May 2017." These shifting explanations and prior inconsistent testimony diminish MSA's credibility on this point and weaken MSA's evidence in support of its decision to require Dr. Iovino to compete for her own position. The language MSA used in the Fourth Circuit filing, describing the position change as a "conversion" not a "new position," undermines any proffered requirement for Dr. Iovino to compete for her own position and further weakens MSA's evidence in support of its decision.

158.    The OIG report noted that MSA was unable to provide a justification or legitimate reason for requiring Dr. Iovino to compete for her existing position with a nominal increase of hours worked.

159.    MSA's position description for "Veterinarian" covers both full-time and part time veterinarians, further evidence that the minimal change in Dr. Iovino's hours was a trivial matter, as Dr. Ratcliff assured Dr. Iovino it was in February 2017, and the change would not warrant the time, expense, and risks associated with a competition for the position. This further weakens MSA's evidence in support of its decision to require Dr. Iovino to compete for her own position.

160.    MSA's decision to require Dr. Iovino to compete for her own position was tainted by the existence and strength of MSA's motive to retaliate. The existence and strength of MSA's motive to retaliate has been discussed *supra*, paragraphs 152 - 168, and it can be summarized as stemming from MSA officials' fear that Dr. Iovino's whistleblowing exposed the threat to the anti-terrorism mission caused by the inadequate care of the dogs gifted to foreign countries, by the danger to the mission-critical canines at CVC because of an unreliable Licensed Veterinary Technician, and by the hiring of unqualified dog trainers and handlers. Circumstantial evidence of the existence and strength of MSA's motive to retaliate includes MSA's public announcement of Dr. Iovino's January 2017 dressing down,

MSA's denial of Dr. Iovino's access to necessary, outsourced veterinary tests, MSA's requirement that

Dr. Iovino perform a complex hindleg amputation that should have been outsourced to a board-certified

surgeon, MSA's singling out of Dr. Iovino for withholding overtime pay, MSA's exclusion of Dr.

Iovino from relevant meetings she had formerly attended, MSA's removal of duties from Dr. Iovino,

such as supervision of the Kennel Technicians, MSA's requirement that Dr. Iovino perform the June

2017 mission-critical surgery with only the assistance of the diminished-capacity Ms. Houston, and

MSA's widely shared characterization of Dr. Iovino as a "trouble-maker" and a "pain in the ass."

MSA's motive to retaliate existed and was strong at the time MSA officials made the decision to require

Dr. Iovino to compete for her own position.

161.    <u>MSA did not take similar action against similarly situated, but nonwhistleblowing</u>

<u>employees.</u> MSA did not require similarly situated non-whistleblowing employees to compete for their

own position simply because of an increase in number hours worked. The OIG report cited the statement

of a former MSA official that characterized MSA's requirement that Dr. Iovino compete for her own

position was "extremely unusual." After a reasonable opportunity for further investigation and

discovery, further evidence of MSA's practice is likely to be found.

**B.      MSA's Decision to Not Select Dr. Iovino and Select Dr. Palmer Instead was not
          Supported by Strong Evidence and was Tainted by the Existence and Strength of
          MSA's Motive to Retaliate**

162.    <u>MSA's decision to not select Dr. Iovino and select Dr. Palmer instead was not</u> supported

<u>by strong evidence.</u> Dr. Ratcliff was the selecting official for full-time veterinarian position and he chose

Dr. Palmer based on a number of seemingly irrelevant selection criteria, including "military service,"

"textbook publications," "Emergency Medical Technician (Human)," and "Deputy Sheriff." MSA

mentioned none of these criteria in the vacancy announcement, and they have no apparent connection to

the duties of the veterinarian position. The existence of these irrelevant selection criteria that MSA used

to distinguish the two qualified candidates weakens MSA's evidence that Dr. Palmer was a stronger

candidate than Dr. Iovino.

163.    Not only did MSA misleadingly claim in its filing before the Fourth Circuit that the State

Department had initiated the conversion of Dr. Iovino's position from part time to fulltime (*supra* ¶

157), but MSA also asserted that the State Department had indicated to MSA its preference that the

position be filled by someone with a military background. Yet Ms. James, the Acting Procurement

Executive who made the final State Department determination on Dr. Iovino's complaint, in laying out

the agency's case for denying Dr. Iovino's claim in October 2019, made no mention of the State

Department's preference for a veterinarian with military experience, or Dr. Palmer's military experience,

where this information would have directly supported her denial of relief for Dr. Iovino. This

inconsistent and potentially misleading assertion weakens MSA's claim that Dr. Palmer's military

experience was a necessary or relevant criteria for selecting him.

164.    MSA's decision to select Dr. Palmer and not select Dr. Iovino was tainted by the

existence and strength of MSA's motive to retaliate. The existence and strength of MSA's motive to

retaliate has been discussed *supra*, paragraphs 152 - 168, and it was summarized in paragraph 160.

MSA's motive to retaliate existed and was strong at the time Dr. Ratcliff and other MSA officials made

the decision to not select Dr. Iovino and select Dr. Palmer in her stead.

**C.    MSA's Decision to Suspend Dr. Iovino was not Supported by Strong Evidence**

165.    MSA's decision to suspend Dr. Iovino was not supported by strong evidence. In addition

to MSA officials admitting that they suspended Dr. Iovino because of her protected disclosures (*supra*

¶¶ 143-144), MSA also told the OIG that Dr. Iovino was suspended for misuse of her work email.

However, the OIG found grave inconsistencies with that narrative and could not substantiate MSA's

rationale, finding MSA's policy silent on Dr. Iovino's alleged misuse, finding that MSA's forensic

46

examination of Dr. Iovino's computer was concluded one month after Dr. Iovino's suspension, and citing testimony that Dr. Iovino had supervisory approval for her conduct. OIG also found MSA's investigation of Dr. Iovino's conduct did not include an interview with Dr. Iovino, did not include an interview with the kennel technicians who originally had made the report nor any other relevant witnesses, and Dr. Ratcliff had never documented his initial conversation with the kennel technician that had purportedly formed the basis for Dr. Iovino's suspension. MSA's failure to conduct a thorough investigation and these additional flaws weaken MSA's evidence in support of its decision to suspend Dr. Iovino.

166.    MSA's various proffered shifting, inconsistent rationales for suspending Dr. Iovino included that she had spoken with the State Department, or client, that she had filed a report with the OIG, that she had threatened to make a disclosure to the media, and that she had misused her work email. These inconsistent explanations weaken MSA's evidence in support of its decision to suspend Dr. Iovino.

### D.    MSA's Decision to Suspend Dr. Iovino was Tainted by the Existence and Strength of MSA's Motive to Retaliate

167.    <u>MSA's decision to suspend Dr. Iovino was tainted by the existence and strength  of MSA's motive to retaliate.</u> The existence and strength of MSA's motive to retaliate has been discussed *supra*, paragraphs 152 - 168, and it was summarized in paragraph 160. In addition, by the time MSA decided to suspend Dr. Iovino, they had knowledge of her OIG complaint and thus further motive to retaliate. MSA's motive to retaliate existed and was strong at the time MSA officials made the decision to suspend Dr. Iovino.

E.    **MSA's Decision to Terminate Dr. Iovino was not Supported by Strong Evidence**

168.    MSA's decision to terminate Dr. Iovino was not supported by strong evidence. The weakness of MSA's evidence in support of its decision to force Dr. Iovino to compete for her own position has been discussed *supra*, paragraphs 141-155. The weakness of MSA's evidence to fail to select Dr. Iovino for the full time veterinarian position has been discussed *supra*, paragraphs 162-163. In addition to these two personnel actions, MSA officials terminated Dr. Iovino's employment on August 18, 2017, making yet another retaliatory decision, one that MSA has couched, in related filings, as not a decision in and of itself, but simply the innocent result of the decisions to end the part time veterinarian position and to not select Dr. Iovino for the full-time position. Were this the case, MSA would not have terminated Dr. Iovino without a permanent replacement, forcing MSA to hire temporary, less experienced, less stable staff to perform the mission critical tasks for which MSA had found Dr. Iovino's work outstanding. MSA's couching of Dr. Iovino's removal as simply how things turned out, without offering any substantive rationale, while having to hire five months of inherently-less-competent, temporary help, demonstrates the weakness of MSA's evidence in support of its August 18, 2017 decision to terminate Dr. Iovino's employment.

F.    **MSA's Decision to Terminate Dr. Iovino was Tainted by the Existence of MSA's Motive to Retaliate**

169.    MSA's decision to terminate Dr. Iovino was tainted by the existence and strength of MSA's motive to retaliate. The existence and strength of MSA's motive to retaliate has been discussed *supra*, paragraphs 141-155, and it was summarized in paragraph 160. In addition, by the time MSA decided to terminate Dr. Iovino's employment, they had knowledge of her OIG complaint, substantially adding to MSA's already strong motive to retaliate at the time MSA officials made the August 18, 2017 decision to terminate Dr. Iovino.

## CLAIMS AND DAMAGES

### COUNT 1: DISCRIMINATION IN VIOLATION OF 41 U.S.C. § 4712.

170.    Plaintiff realleges Paragraphs 1 through 182 above.

171.    In discharging Plaintiff, Defendant violated 41 U.S.C. § 4712, which protects  employees of federal contractors, subcontractors, grantees, subgrantees, and personal services contractors from being "discharged, demoted, or otherwise discriminated against as a reprisal for disclosing . . . information that the employee reasonably believes is evidence of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of authority relating to a federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal contract (including the competition for or negotiation of a contract) or grant." 41 U.S.C. § 4712. The disclosure must be made to a Member of Congress or a representative of a committee of Congress, an Inspector General, the Government Accountability Office, a federal employee responsible for contract or grant oversight or management at the relevant agency, an authorized official of the Department of Justice or other law enforcement agency, a court or grand jury, or a management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct. *Id.*

172.    The foregoing facts demonstrate that Defendant is and was during the relevant times a federal contractor. Defendant had a contract with the United States Department of State under the Worldwide Protective Services program to operate the CVC.

173.    The foregoing facts demonstrate that Plaintiff was the employee of Defendant, a  federal contractor, from October 9, 2015 to August 18, 2017.

174.    The foregoing facts demonstrate that Plaintiff engaged in a protected activity by disclosing to appropriate persons and bodies information that Plaintiff reasonably believed was evidence

of gross mismanagement of a federal contract or grant, a gross waste of federal funds, an abuse of

authority relating to a federal contract or grant, or a violation of law, rule, or regulation related to a

federal contract or grant. Plaintiff's disclosures included the mistreatment of canines, use of government

vehicles for personal purposes, conflicts of interest by a State Department official, over-billing by

Defendant, and the compromised integrity of the canine's anti-terrorism role in detecting explosives or

other threats resulting from their abuse.

175.    The foregoing facts demonstrate that Plaintiff made her disclosures to the persons  and

bodies required by 41 U.S.C. § 4712(a)(2): 1) an Inspector General, 2) a federal employee responsible

for contract or grant oversight or management at the relevant agency, and 3) a management official or

other employee of the contractor, MSA, who had the responsibility to investigate, discover, or address

misconduct.

176.    The foregoing facts demonstrate that Defendant committed a prohibited adverse

act of discrimination against Plaintiff by making her compete for own position, not selecting her for her

own position, suspending her, and discharging her in retaliation for her protected activities, thereby

violating 41 U.S.C. § 4712.

177.    Defendant's retaliatory actions against Plaintiff have caused her actual, economic,  non-

economic, compensatory and special damages, including but not limited to (a) damage to her career and

ability to obtain the highest level of employment within her industry, (b) lost wages, income, and

benefits, (c) damage to her professional reputation and interruption of her demonstrated work history,

and (d) ongoing mental and emotional distress, humiliation, embarrassment, loss of self-esteem, and

diminution in her enjoyment of life.

**PRAYER FOR RELIEF**

178.    *WHEREFORE*, Plaintiff requests that the Court award her the following:

a. Offer of reinstatement to employment with Defendant at the same position she held before the reprisal, and if reinstatement is not ordered, then front pay for a period of at least five years;

b. Upon reinstatement, an injunction directing Defendant to remediate the hostile work environment, harassment, and intimidation to which it subjected Plaintiff;

c. Back pay for all lost wages and benefits, including lost bonuses;

d. Economic damages for injury to Plaintiff's career, professional reputation, and earning capacity, in an amount to be determined at hearing;

e. Non-economic damages for mental and emotional distress, embarrassment and humiliation, in an amount to be determined at hearing;

f. Expungement of written warnings, reprimands, negative performance appraisals, and other derogatory information and references which have been placed in Plaintiff's personnel file;

g. Posting of a notice to Defendant's employees indicating that Defendant has been ordered to comply with 41 U.S.C. § 4712 and to make appropriate restitution to Plaintiff;

h. Reasonable costs and attorney's fees, together with the cost of expert witnesses; and

i. Defendant should be ordered to provide a neutral employment reference, to include dates of employment, job title, and final wage rate, to all potential employers regarding Plaintiff in the event reinstatement is not ordered; and

j. All other relief that may be available from law and equity.

k. Plaintiff demands trial by jury.

Respectfully Submitted,

/s/Nate L. Adams III
VSB No. 20707
Nate L. Adams III, P.C.
ADAMS AND ASSOCIATES
11 South Cameron Street
Winchester, VA 22601 (540) 667-
1330
*nadams@nadamslaw.com*

/s/ John A. (Jack) Kolar
Admitted *pro hac vice*
Government Accountability Project
1612 K Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 926-3311
JackK@whistleblower.org

Attorneys for Dr. Iovino