## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

|  |  |  |
|---|---|---|
| **DR. KAREN IOVINO,** | ) | |
| | ) | |
| **Plaintiff and** | ) | |
| **Counterclaim Defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 5:21-CV-00064** |
| | ) | |
| | ) | **Hon. Thomas T. Cullen, U.S.D.J.** |
| **MICHAEL STAPLETON ASSOCIATES,** | ) | |
| **LTD., d.b.a. MSA SECURITY, INC.,** | ) | |
| | ) | |
| **Defendant and** | ) | |
| **Counterclaim Plaintiff.** | ) | |

### COUNTERCLAIM DEFENDANT DR. IOVINO'S MEMORANDUM
### IN SUPPORT OF HER MOTION TO DISMISS MSA's COUNTERCLAIM,
### PURSUANT TO FED. R. CIV. P. 12(b)(6), AND FOR JUDGMENT
### ON THE PLEADINGS, PURSUANT TO FED. R. CIV. P.12(c)

Filed: June 27, 2022

John A. Kolar
(DC Bar No. 953292)
GOVERNMENT ACCOUNTABILITY
PROJECT
1612 K Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 966-3311
Jackk@whistleblower.org
(Admitted *pro hac vice*)

Nate L. Adams III
(VSB No. 20707)
ADAMS AND ASSOCIATES, , P.C.
11 S. Cameron Street
Winchester, VA 22601
(540) 667-1330
nadams@nadamslaw.com

Ned Miltenberg
LAW OFFICES OF NED MILTENBERG
5410 Mohican Road -- Suite 200
Bethesda, MD 20816
(202) 656-4490
NedMiltenberg@gmail.com

Counterclaim Defendant Dr. Karen Iovino ("Dr. Iovino"), by her undersigned counsel, has moved to dismiss the counterclaim of Defendant and Counterclaim Plaintiff Michael Stapleton Associates, Ltd., *d.b.a.* MSA Security, Inc.'s ("MSA"), pursuant to Fed. R. Civ. P. 12(b)(6), and for judgment on the pleadings regarding MSA's counterclaim, pursuant to Rule 12(c). MSA has counterclaimed against Dr. Iovino for breach of contract, with the purported contract being an agreement titled "Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement" dated October 16, 2015 (the "NDA"). [1] As Dr. Iovino explains below, MSA's purported contract/NDA is illegal, void and unenforceable in its entirety. Consequently, MSA's counterclaim fails to state a claim upon which relief may be granted and this Court should dismiss it with prejudice pursuant to Rule 12(b)(6). For the same reason, and pursuant to Rule 12(c), this Court should grant Dr. Iovino judgment on the pleadings regarding MSA's counterclaim and dismiss it on this ground as well.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Dr. Iovino has sued MSA for whistleblower retaliation in violation of the whistleblower anti-reprisal statute specifically applicable to government contractors, 41 U.S.C. § 4712. Section (a)(1) of that statute expressly bars a government-contractor—such as MSA was and is—from "discharg[ing], demot[ing], or otherwise discriminat[ing] against [employees] as a reprisal for" making protected disclosures. The protection applies to an employee's disclosures of --

> information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract . . . .

---

[1]   A copy of MSA's purported contract/NDA is attached as Exhibit 1 to MSA's Answer to First Amended Complaint and Defendant's Counterclaim (Docket Entry ("D-") 31), which is referred to below as "MSA's Counterclaim." The NDA is D-31-1.

*See* § 4712(a)(2). Disclosures of these types of information are protected whenever an employee makes disclosures to one of the persons identified in § 4712(a)(2), including the Inspector General of the agency involved, agency employees responsible for contract oversight, or contractor employees responsible for discovering, investigating, or addressing misconduct.

### A. MSA's Hiring and Firing of Dr. Iovino

Defendant MSA maintains and operates a facility — the Diplomatic Security Global Canine Services Center (the "DGCSC") — in Winchester, Virginia under a contract with the U.S. Department of State ("DoS"). D-31, Counterclaim at 41, ¶¶ 4 and 7. MSA hired Dr. Iovino to work as a Part-Time Veterinarian on its DoS contract. *Id.* ¶ 6. On October 16, 2015, Dr. Iovino signed the NDA. *Id.* ¶ 13.

Over the next two years, Dr. Iovino brought several allegations of wrongdoing to the attention of MSA's managers and also to DoS officials overseeing MSA's contractual performance. *See* Dr. Iovino's First Amended Complaint ("FAC"), D-30, *passim*. On August 18, 2017, Dr. Iovino was informed by letter that her employment with Defendant was terminated. FAC ¶ 95.

### B. Dr. Iovino's Complaint to the DoS Office of Inspector General

On August 4, 2017, Dr. Iovino filed a § 4712 retaliation complaint against MSA with the DoS Office of Inspector General ("OIG"). *See* FAC ¶ 3. On July 5, 2018, the DoS Inspector General, Mr. Steve A. Linick, forwarded his report of the investigation of Dr. Iovino's complaint to the Secretary of State. Mr. Linick's report substantiated Dr. Iovino's allegations that MSA had subjected her to unlawful reprisals for her whistleblowing disclosures. FAC ¶ 4.

On October 30, 2019, one year after the DoS, acting on the Inspector General's finding, had ordered MSA to reinstate Dr. Iovino and pay her compensatory damages and attorney fees,

the DoS's Acting Procurement Executive, Ms. Sharon D. James, changed course 180-degrees and denied Dr. Iovino relief under 41 U.S.C. § 4712; Ms. James did so without addressing the key elements of OIG's reasoning or evidence. FAC ¶ 5.

On September 21, 2021, Dr. Iovino availed herself of her rights pursuant to § 4712(c)(2) and filed the instant lawsuit. *See* D-1, Complaint. On May 2, 2022, after this Court granted, in part, MSA's motion to strike certain allegations in the original complaint, Dr. Iovino filed her FAC, D-30. MSA filed its Answer and Counterclaim, D-31, on May 16, 2022.

### C. MSA's NDA

The NDA consists of eight paragraphs, spread across four full single-spaced pages. The NDA reveals its non-negotiated, contract-of-adhesion character in its first, unnumbered paragraph, which requires the prospective employee to "print [his or her] name" and to accept all that follows "as a condition of my employment with MSA." D-31-1 at page 1.

NDA ¶ 3 covers an employee's "Use of the Confidential Information" and states, in full:

> During the term of my employment, and for all times thereafter, I will treat as confidential and, except as required in the performance of my employment duties and responsibilities, will not disclose, publish, use or otherwise make available to the public or to any individual, firm or corporation any confidential information.

NDA ¶ 2 defines "Confidential Information," in full as follows:

> I acknowledge that for the purposes of this Agreement, the term confidential information means all information financial, technical or otherwise in whatever form written, oral or otherwise which is disclosed to me or acquired by me in the course of my employment in any way concerning the trade secrets, projects, activities, business, clients, trade practices, know-how or affairs of the Company that provide the Company an economic advantage over its competitors, including, without limitation, all information concerning products, business formulas, discoveries, ideas, concepts, know-how, techniques, diagrams, flow charts, data, client preferences, history and other information, computer software, technology, operations, solutions, tools, marketing and development plans, investors, transactions, acquisitions, marketing plans, strategies and forecasts and other technical or business information, regarding existing and/or contemplated products, processes, techniques or know-how, or any data or information

developed by me pursuant to the performance of my services hereunder. I further understand that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the Confidential Information involved.

NDA ¶ 8. e., titled Governing Law," states, in pertinent: part: "This agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its principals [sic] of conflicts of law."

NDA ¶ 8. g., titled "Entire Agreement," states, in pertinent: part:

This Agreement sets forth the entire agreement and understanding of the Company and me with respect of its subject matter, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, executive or representative of either party in respect of said subject matter.

## II.    ARGUMENT

### A. The Standard for Dismissal Under Fed. R. Civ. P. 12(b)(6)

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint (in this case, a counterclaim). *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011), as amended (Jan. 20, 2017); *Conner v. Cleveland County, N. Carolina*, 22 F.4th 412, 416 (4th Cir. 2022). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is facially plausible when the plaintiff's allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Although a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of further factual enhancement," or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in

original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557). Moreover, a court need not "assume the veracity of the legal conclusions drawn from the facts alleged." *Id.*

### B. The Standard for Judgment on the Pleadings Under Rule 12(c)

As this Court explained earlier this year, "'[a] motion for judgment on the pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss under Rule 12(b)(6).'" *Wilson v. Town of Mt. Jackson*, 5:21-CV-00055, 2022 WL 819531, at *3 (W.D. Va. Mar. 17, 2022) (Cullen, J.) (quoting *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013)). See *Conner v. Cleveland County, N. Carolina*, 22 F.4th 412, 416 (4th Cir. 2022) (citations omitted). "As such, [courts] recount the facts as alleged by Plaintiff, accepting them as true and drawing all reasonable inferences in Plaintiff's favor." *Id.,* (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

In this case, as demonstrated below, MSA's breach of contract counterclaim fails to state a proper claim to relief, and Dr. Iovino is entitled to judgment on the pleadings dismissing that counterclaim because the alleged contract on which it is predicated, the NDA, is void and unenforceable under both Federal law and New York law, which governs its interpretation.

### C. The Court Should Dismiss MSA's Counterclaim Because it Based on a Purported Contract which was Illegal, Void and Unenforceable under Federal Law.

Since 2015, Congress has annually enacted a provision that prohibits Federal agencies from using appropriated funds for any contract

> with an entity that requires employees or contractors of such entity seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contactors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information.[2]

---

[2]    *See, e.g.,* Consolidated and Further Continuing Appropriations Act ("CFCAA"), 2015, Pub. L. No. 113-235, § 743 (Dec. 16, 2014); CFCAA, 2016, Pub. L. No. 114-113, § 743 (Dec.

In order for a confidentiality agreement to be valid, it must contain an exception or carve-out that specifically allows employees to report fraud, waste, or abuse to government officials.

The Federal Acquisition Regulations ("FAR") implement this prohibition and this requirement for a carve-out. The FAR states that in order to be eligible for a contract award, an offeror must represent that it will not require its employees to sign an NDA, warns that "any offeror that does not so represent is ineligible for award of a contract," and instructs the Contracting Officer to insert carve-outs (or "prohibition clauses") into all government contracts. 48 C.F.R. § 3.909-2, "Representation by the offeror"; § 3.909-3, "Solicitation provision and contract clause"; and § 3.909-1, "Prohibition" clauses. *See also* 2 C.F.R. § 1402.300(6).

Because the NDA that MSA mandated Dr. Iovino to sign did not contain a FAR required carve-out, MSA's NDA violated Federal law, and thus had no force and effect on her. MSA's counterclaim therefore should be dismissed because "the familiar rule [in New York is] that illegal contracts, or those contrary to public policy, are unenforceable and that the courts will not recognize rights arising from them." *Szerdahelyi v. Harris*, 67 N.Y.2d 42, 48, 490 N.E.2d 517, 521, 499 N.Y.S.2d 650, 654 (1986). *See New York Hosp. Med. Ctr. of Queens v. Microtech Contracting Corp.*, 22 N.Y.3d 501, 509, 5 N.E.3d 993, 997, 982 N.Y.S.2d 830, 834 (2014). *Hancock Co. v. Stephens,* 177 Va. 349 (1941) (same under Virginia law). [3]

---

18, 2015); CFCAA, 2017, Pub. L. No. 115-31, § 743 (May 5, 2017); CFCAA, 2018, Pub. L. No. 115-141, § 743 (March 23, 2018).

[3]    This "familiar rule" has a very long history. *See Griswold v. Waddington*, 16 Johns. 438, 487, 1819 WL 1793 (N.Y. 1819); *Ritchie v. Garrison*, 10 Abb. Pr. 246, 1858 WL 6621 (N.Y. 1858); *Hull v. Ruggles*, 56 N.Y. [11 Sickels] 424, 428, 1874 WL 11102, at *3 (1874); *Hunt v. Knickerbacker,* 5 Johns. 327, 333, 1810 WL 1046 (N.Y. Sup. Ct. 1810). *See also Armstrong v. Toler,* 24 U.S. [11 Wheat.] 258, 268 (1826) (per Marshall, C.J.).

In August 2018, the DoS OIG explicitly found MSA's NDA was illegal and therefore recommended to the DoS Bureau of Administration, Office of Logistics Management ("A/LM") that it compel MSA "to rescind its confidentiality agreements or to modify them to include an exception for reporting fraud, waste, or abuse to a designated investigative or law enforcement representative and to notify all employees regarding the rescission or modification." U.S. Dept. of State, OIG, *Management Assistance Report: Use of Confidentiality Agreements by a Department of State Contractor*, OIG Report No. ESP-18-03, at 2 (Aug. 2018) , https://www.stateoig.gov/reports/10369 (last viewed on June 27, 2022). (A copy of the OIG Report is attached as Exhibit A hereto). The OIG further stated: "If MSA does not promptly rescind or modify these agreements, A/LM should terminate its contracts with MSA for default." *Id.*

The DOS A/LM's Office of Acquisitions Management ("A/LM/AQM") duly accepted the OIG's recommendation and directed MSA to rescind the NDA that Dr. Iovino had signed, and to issue one that complied with Federal law. As the OIG Report further stated, at 2-3:

> In its July 31, 2018, response, the … A/LM/AQM concurred with the recommendation. The A/LM/AQM Contracting Officer will issue a letter to the vendor requesting MSA rescind or amend the confidentiality agreement with their employees. A/LM/AQM will provide the vendor 60 days for employee notification and execution of agreements.

Tellingly, in its counterclaim, MSA nowhere mentions the OIG Report or its finding that its NDA violated Federal law. Nor does MSA mention that the DoS directed it to rescind or amend that original version of its NDA, *i.e.,* the one that Dr. Iovino signed, and the one upon which MSA's the instant counterclaim is predicated.

**D. This Court Should Dismiss MSA's Counterclaim Because it is Reasonable to Infer That MSA Replaced and/or Superseded the NDA Dr. Iovino Executed with a New Version the DoS Ordered MSA to Implement, a New Version Dr. Iovino Never Signed, as She had by then Been Terminated.**

As shown above, the DoS required MSA to replace, rescind, or amend — *i.e.,* to effectively nullify — the NDA that Dr. Iovino had executed in 2016, or face having the DoS terminate MSA's contract with that agency. MSA has not presented evidence in its counterclaim that it replaced, rescinded, or amended the NDA to comply with the law and the DoS directive. Nevertheless, it is reasonable to assume that MSA fully complied with this DoS directive.[4] Consequently, the NDA on which MSA's counterclaim is based was rescinded by MSA and ceased to be applicable to — or enforceable regarding — Dr. Iovino's conduct. Furthermore, despite MSA's failure to introduce the amended NDA that it would have implemented in 2018 as a result of the DoS mandate, any such amended NDA would not apply to Dr. Iovino because MSA terminated her before 2018 and thus she never executed whatever amended NDA MSA issued after it terminated her.

---

[4]    Given OIG's 2018 directive the DoS would "terminate its contracts with MSA" if "MSA does not promptly rescind or modify" the prior NDA — and given the fact with the average value of DoS's total contracts with MSA more than doubled in size from the three Fiscal Years before 2018 (*i.e.*, an average of $16,485,607 per Fiscal Year for FYs 2015, 2016, and 2017) to the three Fiscal Years after 2018 (*i.e.*, an average of $33,533,101 per Fiscal Year for FYs 2019, 2020, and 2021) — it is safe to conclude that MSA "promptly" complied with DoS's ultimatum. *See* USASPENDING.GOV, *U.S. Department of State, Spending by Prime Award, to Michael Stapleton Associates, Ltd.*, for FY 2014 – FY 2021, https://www.usaspending.gov/search/?hash=6158e5606ccd4719a260d5099abb6d54 (last viewed on June 26, 2022).

In ruling on a Fed.R.Civ.P. 12(b)(6) motion to dismiss or a Fed.R.Civ.P. 12(c) motion for judgment on the pleadings, a court may rely on public records that are subject to judicial notice under Fed.R.Evid. 201 — especially official federal government records — without converting the proceeding into a Fed.R.Civ.P. 56 motion for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508-09 (4th Cir. 2015) (citing *Zak v. Chelsea Therapeutics Int'l Ltd.*, 780 F.3d 597, 606-07 (4th Cir. 2015); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). *See Hall v. Virginia*, 385 F.3d 421, 424 n. 3 (4th Cir. 2004).

It is well-settled that a "contract is not binding upon [a person who] did not sign it …."
*Middleworth v. Ordway*, 191 [29 Bedell] N.Y. 404, 412, 84 N.E. 291, 293 (1908). *See Jordan Panel Sys., Corp. v. Turner Const. Co.*, 45 A.D.3d 165, 173, 841 N.Y.S.2d 561, 567 (N.Y. App. Div. 2007); *Ciaramella v. Reader's Dig. Ass'n, Inc.*, 131 F.3d 320, 322 (2d Cir. 1997)(applying N.Y. law); *Vesterhalt v. City of New York*, 667 F. Supp. 2d 292, 303 (S.D.N.Y. 2009).

It also is important to note that ¶ 8. g. of the NDA Dr. Iovino signed in 2015 states, in pertinent part: "This Agreement sets forth the entire agreement and supersedes all prior agreements [and] covenants …." Because it is reasonable to suppose that whatever amended NDA adopted as a replacement would contain a similar provision, it also is reasonable to suppose that the new NDA would expressly "supersede" the version Dr. Iovino had signed. Finally, pursuant to NDA ¶ 8. e., New York law, which governs interpretation of the NDA, establishes that a superseding agreement automatically does three things: *(a)* renders prior agreements "invalid and of no effect," *L.I. Ass'n for Children with Learning Disab., Inc. v. Sobol*, 175 A.D.2d 520, 522, 572 N.Y.S.2d 787, 789 (N.Y. App. Div. 1991); *(b)* "extinguishes rights under a superseded contract as a matter of law," *Silverberg v. SML Acq. LLC*, 15-CV-7129 (CS), 2017 WL 758520, at *7 (S.D.N.Y. Feb. 27, 2017) (citations omitted); and *(c)* "makes any arguable breach of the original [contract] irrelevant." *Small Bus. Bodyguard Inc. v. H. of Moxie, Inc.*, 230 F. Supp. 3d 290, 322 (S.D.N.Y. 2017).[5]

Thus, MSA's original, 2015 NDA was void and ineffective when Dr. Iovino filed her first claim with DoS OIG in July 2017, when she subsequently contacted various media to report

---

[5]    *See In re Arbitration between Capital Siding & Const., LLC*, 138 A.D.3d 1265, 1266, 31 N.Y.S.3d 230, 232 (N.Y. App. Div. 2016); *Bottini v. Lewis & J. Co., Inc.*, 211 A.D.2d 1006, 1008, 621 N.Y.S.2d 753, 754 (N.Y. App. Div. 1995); *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 778 F. Supp. 2d 375, 401-02 (S.D.N.Y. 2011); *Revonate Mfg., LLC v. Acer Am. Corp.*, 12 CIV. 6017 KBF, 2013 WL 342922, at *5 (S.D.N.Y. Jan. 18, 2013).

that she had lodged whistleblowing claims with the DoS OIG, and when MSA filed its counterclaim against her earlier this year.[6] As such, MSA's original but now superseded NDA cannot form the basis of a valid counterclaim.

Hence, this Court should dismiss MSA's Counterclaim in its entirety.

**E.   This Court Should Dismiss MSA's Counterclaim Because it is Based on a "Restrictive Covenant" that Violates New York Law**

NDAs are disfavored and strictly construed under New York law. They are enforced only if they satisfy well-established standards. MSA's NDA violates those standards. It therefore is unenforceable.

**1.   New York Courts "Strictly Scrutinize" NDAs, Which Are "Disfavored"**

**a.      NDAs are regarded as "restrictive covenants"**

New York courts consistently hold that employer-imposed "non-disclosure agreements" and "confidentiality agreements" (just like non-competition and non-solicitation agreements) are considered to be "restrictive covenants." *Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 59 A.D.3d 97, 102, 869 N.Y.S.2d 465 (App. Div. 2008), *aff'd as modified*, 14 N.Y.3d 774, 898 N.Y.S.2d 542, 925 N.E.2d 581 (2010) (quoting *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 89, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999) (internal citations omitted)). Federal courts construing New York law invariably agree that NDAs qualify as "restrictive covenants." *See Denson v.*

---

6    The new, 2018 NDA rendered the one Dr. Iovino signed in 2015 null, void, ineffective, and unenforceable — and "extinguish[ed]" all filed, pending, or potential claims under the 2015 NDA — "[e]ven though the [superseding] Agreement contained no language expressly releasing claims under the prior agreements, [inasmuch as] such language is not necessary to extinguish claims under the prior contracts." *Revonate Mfg., LLC v. Acer Am. Corp.*, 12 CIV. 6017 KBF, 2013 WL 342922, at *5 (S.D.N.Y. Jan. 18, 2013)(citations omitted). *See Nieves v. Comm. Choice Health Plan of Westchester, Inc.*, 08 CIV. 0321 VB PED, 2011 WL 5533328, at *4 (S.D.N.Y. Aug. 31, 2011), *rept. & rec. adopted,* 2011 WL 5531018 (S.D.N.Y. Nov. 14, 2011).

*Donald J. Trump for Pres., Inc.*, 530 F. Supp. 3d 412, 431 (S.D.N.Y. 2021) ("'restrictive

covenants, such as … confidentiality agreements ….'" (quoting *Ashland*, 59 A.D.3d at 102).[7]

**b.    Restrictive covenants are "strongly disfavored" and "strictly construed" under New York law**

Classifying NDAs as restrictive covenants has significant consequences. Because all

restrictive covenants are viewed with "'judicial disfavor,'" *Brown & Brown, Inc. v. Johnson*, 25

N.Y.3d 364, 370, 34 N.E.3d 357, 361, 12 N.Y.S.3d 606, 610 (2015) (quoting *Reed, Roberts*

*Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 307, 353 N.E.2d 590, 593, 386 N.Y.S.2d 677, 679

(1976) — and, indeed, are "strongly disfavored," *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69

(2d Cir. 1999)[8] — they must be "carefully scrutinized." *BDO Seidman v. Hirshberg*, 93 N.Y.2d

382, 388, 712 N.E.2d 1220, 1222, 690 N.Y.S.2d 854, 856 (1999) (citing *Columbia Ribbon &*

*Carbon Mfg. Co. v. A–1–A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4

(1999)), and "'strictly construed.'" *Brown & Brown,* 34 N.E.3d at 361 (citation omitted). Federal

courts apply the same "strict" and "heightened" standards and subject NDAs to the same

"rigorous" and "stringent" scrutiny. *See Crye Precision LLC v. Bennettsville Printing*, 755 Fed.

Appx. 34, 36 (2d Cir. 2018).[9]

---

[7]    *See Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 28 (S.D.N.Y. 2010)(re NDA). *See also Jefferies LLC v. Gegenheimer*, 849 Fed. Appx. 16, 18 (2d Cir. 2021); *Crye Precision LLC v. Bennettsville Printing*, 755 Fed. Appx. 34, 36 (2d Cir. 2018).

[8]    *See Banner Industries of N.E., Inc. v. Wicks*, 631 Fed. Appx. 79, 80 (2d Cir. 2016); *Lucente v. IBM Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *Alves v. Affiliated Care of Putnam, Inc.*, 16-CV-1593 (KMK), 2022 WL 1002817, at *17 (S.D.N.Y. Mar. 30, 2022)..

[9]    *See also Singas Famous Pizza Brands Corp. v. N.Y. Advert. LLC*, 468 Fed. Appx. 43, 45 (2d Cir. 2012); *Chem. Eng'rs*, 682 F.2d at 387; *Teachers Ins. & Ann. Assn. v. Simons*, 21-CV-3712 (ALC), 2022 WL 912699, at *2 (S.D.N.Y. Mar. 29, 2022).

### c.    Restrictive covenants are assessed under a four-part test for validity and enforceability.

New York courts use a four-prong test to determine if a restrictive covenant meets that

state's "strict" standards for such covenants and therefore should be enforced.

Restrictive covenants, such as the confidentiality agreements herein, are subject to specific enforcement to the extent that they are

"'[1] reasonable in [a] time and [b] area,

[2] necessary to protect the employer's legitimate interests,

[3] not harmful to the general public and

[4] not unreasonably burdensome to the employee.'"

*Ashland,* 59 A.D.3d at 102 (quoting *BDO,* 712 N.E.2d at 1223 (internal citations omitted)). *See*

*Am. Inst. of Chem. Eng'rs. v. Reber–Friel Co.*, 682 F.2d 382, 386–87 (2d Cir.1982).[10]

As a longstanding general rule, a party seeking to enforce a contract has "the burden of

establishing, by a preponderance of evidence, that it was a good and valid contract, having a

legal inception which was binding upon the defendant." *Murray v. Narwood*, 192 N.Y. 172, 177,

84 N.E. 958, 959 (1908). *See Fleming v. Ponziani*, 24 N.Y.2d 105, 110, 247 N.E.2d 114, 118,

299 N.Y.S.2d 134, 139 (1969). That "burden" of demonstrating "valid[ity]" never shifts; instead,

it "continue[s] … throughout the case." *Id.*[11]

This general rule of contract law is specifically applicable to employment-based

restrictive covenants. As a result, in those cases, the employer needs to prove that the restrictive

covenant and the underlying employment agreement was valid and enforceable both overall,

---

[10]    *See also Denson,* 530 F. Supp. 3d at 432; *Banner Ind. of N.E., Inc. v. Wicks*, 71 F. Supp. 3d 284, 289 (N.D.N.Y. 2014), *aff'd*, 631 Fed. Appx. 79 (2d Cir. 2016).

[11]    *See Fleming,* 247 N.E.2d at 118; *Kramer v. Greene*, 142 A.D.3d 438, 440, 36 N.Y.S.3d 448, 450 (N.Y. App. Div. 2016); *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 240 (S.D.N.Y. 2020); *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010).

*Brown & Brown,* 34 N.E.3d at 361,[12] and also regarding each of the covenant's various particulars. For example, an employer seeking to enforce a restrictive covenant has the burden of "establish[ing] that its customer lists and model contact information are confidential," *1 Model Mgt., LLC v. Kavoussi*, 82 A.D.3d 502, 503, 918 N.Y.S.2d 431, 432 (N.Y. App. Div. 2011), "demonstrating, among other things, that the restraints sought were reasonably limited, that they were neither harmful to the public nor unduly burdensome," and "that they served an acceptable purpose." *Suffolk Anesthesiology Associates, P.C. v. Verdone*, 74 A.D.3d 953, 954, 903 N.Y.S.2d 91, 92 (N.Y. App. Div. 2010) (citations omitted).

**d.     Violation of any one of the four "prongs" of the *Ashland/BDO* test renders an NDA entirely invalid and unenforceable**

Significantly, each one of the four elements or "prongs" in the *Ashland/BDO* test, standing alone, provides independent and sufficient grounds to deny enforcement of an NDA or other restrictive covenant. Simply put, "[a] violation of **any** prong renders the covenant invalid" and completely unenforceable. *Ashland,* 59 A.D.3d at 102, 869 N.Y.S.2d at 470 (quoting *BDO,* 712 N.E.2d at 1223). *See Intl. Bus. Machines Corp. v. Lima*, 833 Fed. Appx. 911, 912 (2d Cir. 2021) ("any prong," quoting *BDO*).

**2.     MSA's NDA Violates the *Ashland/BDO* test**

As shown below, just as in the *Denson* case, the NDA at issue on MSA's counterclaim "does not meet any of the elements of the *Ashland*[/*BDO*] test." *Denson*, 530 F. Supp. 3d at 432.

---

[12]    *See Eastman Kodak Co. v. Carmosino*, 77 A.D.3d 1434, 1435, 909 N.Y.S.2d 247, 249 (N.Y. App. Div. 2010); *1 Model Mgt., LLC v. Kavoussi*, 82 A.D.3d 502, 503, 918 N.Y.S.2d 431, 432 (N.Y. App. Div. 2011); *Allways Elec. Corp. v. Abrams*, 74 A.D.3d 1001, 1001, 902 N.Y.S.2d 670, 670-71 (N.Y. App. Div. 2010).

a.      **MSA's NDA simultaneously violates both the first *Ashland/BDO* prong — because it is not "'[1] reasonable in [a] time and [b] area" — and the second *Ashland/BDO* prong because it seeks to keep confidential matters in which, as a matter of law, employers have no "legitimate interest."**

*Denson* held that the NDA at issue in that case violated the first prong of the *Ashland/BDO test* — and thus was unreasonable, invalid, and unenforceable — because of the NDA's "unlimited" and unreasonable "scope" and "duration."[13] As *Denson* explained regarding the first prong:

> [a]s to the scope of the provision, it is — as a practical matter — unlimited. "Confidential Information" includes thirty-five categories of "private, proprietary, or confidential" information. Many of the categories – including "personal life," "relationships," and "political and business affairs" – are vague, and none of the categories are further defined or limited.

*Denson,* 530 F. Supp. 3d at 432.

The roster of "confidential" topics in MSA's NDA is longer, and more "unlimited" than the one *Denson* deemed to be overbroad. MSA's NDA includes forty (40) categories of alleged "confidential information," NDA ¶ 2, many of which are vague. Moreover, as in the NDA in dispute in *Denson,* "none of the categories" in MSA's NDA are defined in any fashion. 530 F. Supp. 3d at 432.

For example, among the 40 topics (by Dr. Iovino's count) that MSA's NDA ¶ 2 asserts can never be disclosed or discussed (because MSA has labeled them "confidential") are MSA's:

- "projects,"
- "activities,"
- "business,"

- "clients,"
- "know-how,"
- "affairs,"

---

[13]    Notably, New York state courts construe the term "area" in the *Ashland/BHO* test as encompassing the "breadth" and "scope" of a covenant's subjects as well as the "geographic area," bounds, location, or vicinity" covered by it. *See Brown & Brown, Inc.,* 34 N.E.3d at 360; federal courts do the same. *See Chem. Eng'rs,* 682 F.2d at 386-87.

- "products,"

- "business formulas,"

- "discoveries,"

- "ideas,"

- "concepts,"

- "techniques,"

- "diagrams,"

- "flow charts,"

- "data,"

- "client preferences,"

- "history,"

- "other information,"

- "computer software,"

- "technology,"

- "operations,"

- "solutions,"

- "tools,"

- "development plans,"

- "investors,"

- "transactions,"

- "acquisitions,"

- "marketing plans,"

- "strategies,"

- "forecasts,"

- "other technical or business information,"

- "existing … products, processes, techniques or know-how,"

- "contemplated products, processes, techniques or know-how," and

- "any data or information developed by me pursuant to the performance of my services hereunder."

It is difficult to conceive what topics, subjects, or things — besides cafeteria "lunch menus," holiday schedules, and the lyrics to the company fight-song — are not classified "confidential" by MSA.[14] Indeed, a neutral observer perusing the number and breadth of these categories of

---

[14]    MSA would not be the first entity to zealously classify everything in sight. "For example, a party could label a lunch menu 'CONFIDENTIAL.' Such a designation would not magically transform an innocuous document into one that warrants the protection of the court." *Est. of Warner by Norton v. Wellpath*, 119CV00774RLYMJD, 2021 WL 2042446, at *4 (S.D. Ind. May 20, 2021)(emphasis added). *See In re Photochromic Lens Antitrust Litig.*, 8:10-MD-2173-T-27EAJ, 2014 WL 12617458, at *4 (M.D. Fla. Jan. 3, 2014); *Williams v. Lawrence Livermore Natl. Security, LLC*, 20-CV-03510-JCS, 2021 WL 5906052, at *4 (N.D. Cal. Dec. 14, 2021).

ostensibly "confidential information" might easily imagine that MSA drafted its list of topics as much to set a new world-record for excess as to protect its legitimate interests.

Denson found that the categories of assertedly confidential information at issue in that case were "sufficiently broad and vague to cover any information about" the defendant corporation. 530 F. Supp. 3d at 432. "For example, terms such as 'political affairs,' 'decisions,' 'communications,' and 'strategies' are broad enough to encompass any matter that relates to the" defendant corporation. Id., at 433.

For these reasons, Denson held that the essentially "unlimited" subject-matter scope of the NDA made it "not reasonable" and, accordingly, not enforceable. 530 F. Supp. 3d at 433. Other courts have held the same on nearly identical grounds.[15]

As noted above, the second prong of the Ashland/BDO test permits enforcement of an NDA only if "necessary to protect the employer's legitimate interests." Ashland, 59 A.D.3d at 102, 869 N.Y.S.2d at 470 (quoting BDO). Altogether, "'New York courts have recognized four'" — and only four — "'legitimate interests that may be asserted to support a restrictive covenant.'" Oliver Wyman, Inc. v. Eielson, 282 F. Supp. 684, 693–94 (S.D.N.Y. 2017) (collecting cases and quoting Reed Elsevier Inc. v. Transunion Holding Co., Inc., 13 CIV. 8739 PKC, 2014 WL 97317, at *8 (S.D.N.Y. Jan. 9, 2014) (citing BDO)).

Importantly, "[f]ederal courts applying New York law have consistently found this list [of four legitimate interests] to be an exclusive one." Reed Elsevier, 2014 WL 97317, at *12

---

[15]  See Perrin v. Bayville Village Bd., 70 A.D.3d 835, 837-38, 894 N.Y.S.2d 131, 133-34 (N.Y. App. Div. 2010); Turner v. Caesar, 291 A.D.2d 650, 652, 737 N.Y.S.2d 426, 429 (N.Y. App. Div. 2002); Barton Mines Co., L.L.C. v. Miller, 1:14-CV-1003 MAD/CFH, 2014 WL 4437558, at *5 (N.D.N.Y. Sept. 9, 2014); Data Commc'n, Inc. v. Dirmeyer, 514 F. Supp. 26, 28 (E.D.N.Y. 1981).

(citing cases). The only four "interests" that New York courts recognize as sufficiently

"legitimate" enough to justify enforcement of a restrictive covenant are:

> (1)   protection of trade secrets,
>
> (2)   protection of confidential customer information,
>
> (3)   protection of the employer's client base, and
>
> (4)   protection against irreparable harm where the employee's services
>       are unique or extraordinary.

*Oliver Wyman,* 282 F. Supp. at 693-94; *Reed Elsevier,* 2014 WL 97317, at *8 (citing *BDO*).[16]

    *Denson* held that the NDA at issue there was not only generally overbroad in scope,

because it contained numerous vague and undefined "confidential" topics, but specifically

overbroad because it was "much broader than what the [corporation] asserts is necessary to

protect its legitimate interests, and therefore is not reasonable." 530 F. Supp. 3d at 433. Federal

and state courts have held the same on nearly identical grounds.

    For example, in *Columbia Ribbon,* 369 N.E.2d at 5, New York's high court considered

whether an NDA was unreasonably broad. That NDA in that case stated:

> Employee will not during his employment or after the end thereof, irrespective of
> the time, manner or cause of the termination of said employment, directly or
> indirectly, disclose to any person, firm or corporation, the name, address or
> requirements of any customer or prospective customer of the Company and . . . he
> will not divulge any other information that he has or shall have acquired during
> his period of employment, insofar as the same is or may be necessary to protect
> the Company's business.

The *Columbia Ribbon* court had no trouble concluding that "on its face the [confidentiality]

covenant is too broad to be enforced" inasmuch as "[i]t is clear that its broad-sweeping language

is unrestrained by any limitations keyed to uniqueness, trade secrets, confidentiality or even

---

[16]   *See Arthur J. Gallagher & Co. v. Marchese*, 96 A.D.3d 791, 792, 946 N.Y.S.2d 243, 244
(N.Y. App. Div. 2012); *Sutherland Glob. Services, Inc. v. Stuewe*, 73 A.D.3d 1473, 1474, 902
N.Y.S.2d 272, 274 (N.Y. App. Div. 2010); *24 Seven, LLC v. Martinez*, 19-CV-7320 (VSB), 2021
WL 276654, at *12 (S.D.N.Y. Jan. 26, 2021).

competitive unfairness," *i.e.*, the only four interests New York courts consider "legitimate" for NDA purposes. 369 N.E.2d at 6, 39.

Similarly, in *L.I. City Ventures v. Urban Compass, Inc.*, 18 CIV. 5853 (PGG), 2019 WL 234030 (S.D.N.Y. Jan. 16, 2019), the federal court assessed the "reasonableness" and enforceability of

> a non-disclosure provision, which provides that "any information to which [the employee] ha[s] access at [the corporation] and/or which is related to the business of [the corporation] … including without limitation, open listings, exclusive listings, co-exclusive listings, co-brokers listings, names, addresses and telephone numbers pertaining to or in connection with any such listings, is deemed confidential and proprietary to [the corporation].

2019 WL 234030, at *13. In that case, the court refused to enforce the contested NDA because it "[wa]s impermissibly overbroad in that it seeks to restrain [the employee] from disclosing 'any information to which [she] ha[d] access at [the corporate employer] and/or which is related to the business of [the corporate employer]' regardless of whether that material constitutes a trade secret or is otherwise proprietary and confidential." 2019 WL 234030, at *14 (citing *Columbia Ribbon*).[17]

---

[17]    *See also Up-Grade Educ. Serv., Inc. v. Rappaport*, 136 A.D.2d 628, 629, 523 N.Y.S.2d 872, 873, 1988 WL 3541 (N.Y. App. Div. 1988); *Intl. Markets Live, Inc.*, 20-23080-CIV, 2020 WL 9219150, at *15–16 (S.D. Fla. Nov. 25, 2020), *rept. & rec. adopted,* 2021 WL 870535 (S.D. Fla. Mar. 9, 2021), *appeal dismissed,* 2021 WL 2449777 (11th Cir. Apr. 19, 2021)(applying N.Y. law); *Markets Group, Inc. v. Oliveira*, 18CIV2089GHWRWL, 2020 WL 820654, at *13 (S.D.N.Y. Feb. 3, 2020), *rept. & rec. adopted*, 2020 WL 815732 (S.D.N.Y. Feb. 19, 2020).

In this case, only one of the forty (40) categories MSA's NDA lists as "confidential information," NDA ¶ 2, covers a topic — "trade secrets" — that New York courts consider among the four subject-categories that are "legitimate" and therefore reasonable and protectible. The other 39 are beyond the pale. For this additional reason, this Court should follow the decision in *Denson* and hold that the fact that 39 of the 40 topics and interests MSA's NDA declares to be "confidential" are not considered "legitimate" interests under New York law, which makes the NDA "not reasonable" and not enforceable. *Denson,* 530 F. Supp. 3d at 433.

      **b.  MSA's NDA also violates the first *Ashland/BDO* prong because it lacks any temporal limit**

As noted above, ¶ 3 of the NDA specifies that its confidentiality provision applies not only "[d]uring the term of my employment," but "for all times thereafter." As such, the NDA is indistinguishable from the non-disclosure provision at issue in *Denson*, which stated that "[i]t applies '[d]uring the term of your service and at all times thereafter.'" *Denson*, 530 F. Supp. 3d at 432. *Denson* held that because the confidentiality provision in dispute in that case "ha[d] no time limitation" it violated the *Ashland/BDO* "reasonable in time" requirement and thereby was invalid and unenforceable. *Id.*

To be sure, fifty years ago New York's high court held that a restrictive "covenant will not be stricken merely because it contains no time limit or is expressly made unlimited as to time." *Karpinski v. Ingrasci*, 28 N.Y.2d 45, 50, 320 N.Y.S.2d 1, 5, 268 N.E.2d 751 754 (1971) (emphasis added; internal quotation marks omitted)). Nevertheless, a recent federal court survey found that "[t]he law … disfavors agreements to keep non-trade-secret information confidential

for a duration that is not limited." *Cambridge Capital LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 470 (S.D.N.Y. 2021) (citing, *inter alia, Denson*, 530 F.Supp.3d at 431-32).

Because New York courts are guided by "'an overriding limitation of reasonableness'" in this area, *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 506 (S.D.N.Y. 2011) (quoting *Ticor Title,* 173 F.3d at 70), those courts greatly prefer time-limited covenants over limitless ones.

This explains why New York courts routinely reject the notion that an employee "would be liable for breach of the NDA [o]f 15 or 20 or 50 or more years." *Cambridge Capital*, 565 F. Supp. 3d at 470 (collecting cases). *See Freedom Mortg. Corp. v. Tschernia*, 20-CV-1206 (AJN), 2021 WL 1163807, at *4 (S.D.N.Y. Mar. 26, 2021) (25 years).[18]

Importantly, no court, state or federal, has upheld and enforced an NDA that, like MSA's NDA — was both expressly unlimited in time — that is, not only "[d]uring the term of [an MSA employee's] my employment," but "for all times thereafter" — and essentially unlimited in the types of information it defined as "confidential," including numerous types of information beyond the four interests recognized as "legitimate," and deemed protectible, by New York courts. Indeed, there does not appear to be any decision from any court in the country upholding an NDA that is unlimited in both scope and time.

---

[18]    *See also Natl. Elev. Cab & Door Corp. v. H & B, Inc*., 07CV1562(ERK)(RML), 2008 WL 207843, at *10, n.25 (E.D.N.Y. Jan. 24, 2008), *aff'd,* 282 Fed. Appx. 885 (2d Cir. 2008)(ten years). *Accord Baker's Aid, a Div. of Raubvogel Co., Inc. v. Hussmann Foods. Co*., 730 F.Supp. 1209, 1216 (E.D.N.Y.1990); *Todd Chem. Co. v. Di Stefano*, 30 A.D.2d 879, 292 N.Y.S.2d 811 (N.Y. App. Div. 1968); *Pure Power,* 813 F. Supp. 2d at 506-07.

### c.  MSA's NDA violates the *Ashland/BDO* test because it is "unreasonably burdensome to … employee[s]".

*Denson* held the NDA at issue in that case violated the *Ashland/BDO* test for a third, separate reason, which under *Ashland/BHO* and their progeny was sufficient to declare the NDA completely unenforceable. Thus, *Denson* ruled that the NDA's "vague, overbroad, and undefined terms also render it unduly burdensome to employees. 530 F. Supp. 3d at 433. This was so because the NDA's "vague, overbroad, and undefined terms" made it "difficult if not impossible for Denson or another [corporate] employee to know whether any speech might be covered by one of the broad categories of restricted information." *Id.* Here, as in *Denson,* "the vagueness and breadth of the [NDA] provision was such that an employee would have no way of knowing what may be disclosed, and accordingly employees are not free to speak about anything concerning" the corporation at any time. *Id.*

### d.  MSA's NDA violates *Ashland/BDO's* "harmful to the general public" prong.

As Dr. Iovino detailed in her FAC, "[o]n July 6, 2017, [she] made protected whistle-blower disclosures to the [DoS] OIG, of mistreatment of animals, misuse of government vehicles, conflicts of interest by an agency official, and unlawful billing practices by MSA." *Id.,* ¶ 61. *See id.,* ¶¶ 63, 65-68. There are two reasons why Dr. Iovino's claims about MSA's "mistreatment" and "misuse" of government property and "conflicts of interest" regarding such matters — *i.e.,* definitive examples of fraud, waste, and abuse — are matters of public concern and thereby fall within the protective ambit of the third prong of the *Ashland/BDO* test, which, as noted above, tolerates restrictive covenants only if they are "not harmful to the general public."

The first reason why MSA's NDA violates the "harmful to the general public" prong of the *Ashland/BDO* test is that disclosures about the fraud, waste, and abuse of a government

contractor are, by definition, matters of public concern because Congress has specifically

authorized and encouraged such disclosures through its 2013 addition of 41 U.S.C. § 4712 —

entitled "the National Defense Authorization Act for FY 2013" — Pub. L. 112–239, div. A, title

VIII, §828(a)(1), 126 Stat. 1837 (Jan. 2, 2013). The first paragraph of the first section of that

amendment — titled "(a) Prohibition of Reprisals" — provides, in full:

> **(1) In general.** — An employee of a contractor, subcontractor, grantee, or
> subgrantee or personal services contractor may not be discharged, demoted, or
> otherwise discriminated against as a reprisal for disclosing to a person or body
> described in paragraph (2) information that the employee reasonably believes is
> evidence of gross mismanagement of a Federal contract or grant, a gross waste of
> Federal funds, an abuse of authority relating to a Federal contract or grant, a
> substantial and specific danger to public health or safety, or a violation of law,
> rule, or regulation related to a Federal contract (including the competition for or
> negotiation of a contract) or grant.

Congress obviously would not have added this amendment — and this statutory prohibition

against reprisals — to the Federal Code unless Congress was convinced believed that employee

disclosures about "gross mismanagement of a Federal contract or grant, a gross waste of Federal

funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific

danger to public health or safety, or a violation of law, rule, or regulation related to a Federal

contract … or grant" were important to the general public and not just to individual

whistleblowers like Dr. Iovino. This squarely fits within *Ashland/BDO*'s "general public" prong.

The second reason why MSA's NDA violates *Ashland/BDO*'s "harmful to the general

public" prong is found in the 2018 report of the DoS' OIG, which expressly found that MSA's

NDA "violates federal law" because it "does not include an exception that allows employees to

report fraud, waste, or abuse to federal investigative or law enforcement entities …." OIG Report

at 1. "Violation[s] of federal law" are, by definition, "harmful to the general public." *See*

*Denson*, 530 F. Supp. 3d at 433 ("chilling" employees' speech "about matters of public interest

… is harmful not only to them but also to the general public.").

## CONCLUSION

For the reasons set forth above, Counterclaim Defendant Dr. Karen Iovino urges the

Court to dismiss the counterclaim of Defendant and Counterclaim Plaintiff Michael Stapleton

Associates, Ltd., *d.b.a.* MSA Security, Inc., pursuant to Fed.R.Civ.P. 12(b)(6), and for judgment

of the pleadings regarding MSA's counterclaim, pursuant to Rule 12(c).

Respectfully submitted on this 27th day of June by:

/s/ *John A. Kolar*
John A. Kolar
(DC Bar No. 953292)
GOVERNMENT ACCOUNTABILITY PROJECT
1612 K Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 966-3311
Jackk@whistleblower.org
(Admitted *pro hac vice*)

/s/ *Nate L. Adams III*
Nate L. Adams III
(VSB No. 20707
ADAMS AND ASSOCIATES, , P.C.
11 S. Cameron Street
Winchester, VA 22601
(540) 667-1330 nadams@nadamslaw.com

Of Counsel:
Ned Miltenberg
LAW OFFICES OF NED MILTENBERG
5410 Mohican Road
Bethesda, MD 20816
(202) 656-4490
NedMiltenberg@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2022, I electronically filed the foregoing with the Clerk

of Court of the United States District Court for the Western District of Virginia by using the

CM/ECF system. I certify that the following participants in the case are registered CM/ECF

users, and that service will be accomplished by the CM/ECF system.

Ryan C. Berry (VSB 67956)
Daniel S. Ward (VSB 45978)
WARD & BERRY, PLLC
1751 Pinnacle Drive, Suite 900
Tysons, VA 22102

/s/ John A. Kolar