IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| KAREN IOVINO, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 5:21-cv-00064 |
| | ) |
| v. | ) **MEMORANDUM OPINION** |
| | ) |
| MICHAEL STAPLETON ASSOCIATES, | ) By: Hon. Thomas T. Cullen |
| LTD. d/b/a MSA Security, Inc., | ) United States District Judge |
| | ) |
| Defendant. | ) |

Plaintiff Dr. Karen Iovino is a veterinarian who treats dogs that are specially trained to help law enforcement agencies detect explosives. Her employer, Defendant Michael Stapleton Associates, Ltd. ("MSA"), contracted with the United States Department of State ("State Department") to train and care for these dogs before their deployments.

While working at MSA, Iovino began talking to reporters about some of MSA's working conditions and practices. Apparently, she expressed concern about the dogs' health and welfare. MSA alleges that Iovino's statements have caused it reputational and financial harm, and the company has sued her for breach her employment contract's Non-Disclosure Agreement (the "NDA").

In response, Iovino has moved to dismiss MSA's counterclaim for failure to state a claim or, alternatively, for judgment on the pleadings. (ECF No. 39.) She has also filed a motion to strike MSA's affirmative defenses raised in response to her whistleblower retaliation claim. (*See* ECF No. 37.) For the reasons discussed below, Iovino's motions will be denied.

## I.   BACKGROUND

MSA is a government contractor based in New York. (*See* Countercl. ¶¶ 3, 9 [ECF No. 31].) The company provides "security, intelligence, and investigative services, including explosive screening services." (*Id.* ¶ 3.) Its contract with the State Department included "stringent requirements relating to the protection of confidential information of the State Department and the programs serviced by MSA." (*Id.* ¶ 9.) "[C]ommunicating any non-public information about the performance of services under the contract absent written authorization" was expressly prohibited. (*Id.* ¶ 10.)

As part of its operations, MSA trained dogs to detect explosive devices. (*Id.* ¶ 7.) Much of that training happened at the Diplomatic Security Global Canine Services Center ("GCSC") in Winchester, Virginia, which contains a fully operational veterinary hospital. (*Id.* ¶¶ 4, 8.) MSA's employees were required to sign an "Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement." (*Id.* ¶ 11.) Iovino signed this agreement when MSA hired her as a part-time veterinarian. (*Id.* ¶ 6.)

The NDA reads:

> During the term of my employment, and for all times thereafter, I will treat as confidential and, except as required in the performance of my employment duties and responsibilities, will not disclose, publish, use or otherwise make available to the public or to any individual, firm or corporation any confidential information.

(NDA at 2 [ECF No. 31-1].) Confidential information is defined as

> all information financial, technical or otherwise in whatever form written, oral or otherwise which is disclosed to me or acquired by me in the course of my employment in any way concerning the trade secrets, projects, activities, business, clients, trade practices, know-how or affairs of the Company that provide the Company

> an economic advantage over its competitors, including, without limitation, all information concerning products, business formulas, discoveries, ideas, concepts, know-how, techniques, diagrams, flow charts, data, client preferences, history and other information, computer software, technology, operations, solutions, tools, marketing and development plans, investors, transactions, acquisitions, marketing plans, strategies and forecasts and other technical or business information, regarding existing and/or contemplated products, processes, techniques or know-how, or any data or information developed by me pursuant to the performance of my services hereunder.

(*Id.*)

MSA alleges that Iovino "threatened" to disclose confidential information publicly, in violation of her NDA. (Countercl. ¶ 20.) Any such disclosures would also jeopardize MSA's contract with the State Department. (*Id.* ¶ 25.) So MSA suspended Iovino the day after it learned that she had told co-workers that she was considering publicizing confidential information to *The Washington Post*. (*See id.* ¶¶ 20, 21.) Further investigation revealed that Iovino had sent confidential documents to herself and others, allegedly in breach of her NDA. (*Id.* ¶¶ 23, 24.)

To date, Iovino has admitted to disclosing information about MSA and the GCSC to five reporters, two at *The Washington Post* and three at NBC 4 Washington (NBC's Washington, D.C. affiliate). (*Id.* ¶ 28.) Those media outlets have since published online stories about Iovino's experience at MSA, and NBC 4 Washington aired an interview with her about it. (*Id.* ¶¶ 29, 31.) Third parties have since republished the information Iovino gave to those organizations. (*Id.* ¶ 30.)

MSA claims that Iovino's disclosures are in violation of her NDA. (*Id.* ¶ 32.) Further, MSA alleges that these disclosures have cost it millions of dollars in damages because existing

and potential clients became concerned about the company's ability to protect their information. (*Id.* ¶ 33.)

Iovino filed suit against MSA in September 2021, alleging that her termination violated 41 U.S.C. § 4712. (*See* Compl. ¶¶ 183–190 [ECF No. 1].) MSA moved to dismiss her complaint, (ECF No. 7), and the court construed the filing as a motion to strike, which it then granted in part, (ECF No. 26). As directed by the court, Iovino filed an amended complaint. (ECF No. 30.) MSA then filed its answer and counterclaim, alleging that Iovino breached her NDA. (Countercl. ¶¶ 34–49.) Iovino timely filed a motion to strike MSA's affirmative defenses (ECF No. 37) and a motion to dismiss or, alternatively, for judgment on the pleadings (ECF No. 39).

## II. STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "naked assertion[s] devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555, 557).

Motions for judgment on the pleadings under Rule 12(c) are subject to the same standard that governs Rule 12(b)(6) motions. *See, e.g.*, *Edwards*, 178 F.3d at 243–44 (applying Rule 12(b)(6) standard of review to a Rule 12(c) motion); *see also Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002) (stating that, in a Rule 12(c) motion, all facts asserted in the complaint must be taken as true and all reasonable factual inferences must be drawn in favor of the nonmoving party). A court must grant a motion for judgment on the pleadings under Rule 12(c) where "it appears to a certainty that the nonmoving party cannot prove any set of facts in support of its claim that would entitle it to relief." *See Shooting Point, L.L.C. v. Cumming*, 238 F. Supp. 2d 729, 735–36 & n.4 (E.D. Va. 2002).

The Federal Rules of Civil Procedure allow district courts to strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" "from a pleading." Fed. R. Civ. P. 12(f). "[S]triking a portion of a pleading is a drastic remedy." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001). Accordingly, such motions are "generally viewed with disfavor." *Id.* The moving party bears the burden to show that the challenged material is prejudicial. *Hardy v. Lewis Gale Med. Ctr.*, 377 F. Supp. 3d 596, 605 (W.D. Va. 2019); *see also* 5C *Wright & Miller* § 1382 (3d. ed. 2021). Any doubt about whether the challenged material should be stricken should be resolved in favor of the non-moving party. *Sturdivant v. Arc of Haywood Cnty., Inc.*, No. 1:18 cv 123; 2018 WL 2138543, at *1 (W.D.N.C. May 9, 2018); *see also* 5C *Wright & Miller* § 1382. "[T]he decision of whether to strike all or part of a pleading rests within the sound discretion of the [c]ourt." *Smith v. Wash. Post Co.*, 962 F. Supp. 2d 79, 84 (D.D.C. 2013).

### III. ANALYSIS

Iovino's dispositive motions focus the court's attention on two questions. First, on its face, does MSA's counterclaim state a plausible claim for breach of contract? Second, if so, is the NDA illegal on its face, such that the court must grant Iovino's motion for judgment on the pleadings?

### A. MSA's Breach of Contract Claim

New York law governs the NDA's interpretation. (*See* NDA at 5.) "The essential elements of a cause of action to recover damages for breach of contract are (1) the existence of a contract, (2) the plaintiff's performance pursuant to the contract, (3) the defendant's breach of its contractual obligations, and (4) damages resulting from the breach." *Kollatz v. KOS Bldg. Grp.*, 137 N.Y.S.3d 491, 494 (N.Y. App. Div. 2020).

MSA has plausibly alleged all of these elements here. MSA alleges the existence of a contract; it attached the relevant NDA to its answer and counterclaim. (*See* ECF No. 31-1.) It alleges that Iovino's disclosures to various news outlets breached her NDA and caused the company "financial and reputational harm" that it values at "no less than $2,000,000.00." (Countercl. ¶ 49, Prayer for Relief.) And through it all, the company alleges that it fulfilled its contract duties by employing and compensating Iovino until it had reason to believe that she was considering violating her NDA. (*Id.* ¶ 37.)

Those plausible allegations are all that's needed to survive Iovino's motion to dismiss under Rule 12(b)(6). *See Iqbal*, 556 U.S. at 678.

### B. Iovino's Motion for Judgment on the Pleadings

Iovino's second dispositive motion presents a tougher question. Iovino argues that her NDA is illegal and therefore void and unenforceable. Defendants can properly move under Rule 12(c) for judgment on the pleadings to avoid defending themselves against the enforcement of an illegal contract. *See Clinical Colleagues, Inc. v. Hutchinson Reg'l Med. Ctr., Inc.*, No. 20-2297, 2021 WL 4355591, at *6 (D. Kan. Sept. 24, 2021); *cf. RCDI Constr., Inc. v. Spaceplan/Architecture, Plan. & Interiors, P.A.*, 148 F. Supp. 2d 607, 612–17 (W.D.N.C. 2001) (granting 12(c) motion on a claim of tortious interference with a contract after reasoning that the relevant contract was "illegal and violative of public policy").

Iovino argues that her NDA was illegal under both federal regulations and New York common law. MSA disputes both assertions.

Federal regulations prohibit the federal government from "contract[ing] with an entity that requires employees or subcontractors of such entity seeking to report waste, fraud, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information." 48 C.F.R. § 3.909-1(a). Neither party challenges this regulation's applicability to the Department of State and, consequently, to MSA's NDA with Iovino.

Instead, Iovino argues that her NDA is illegal under this regulation because it did not contain an explicit carve-out to allow for reports of "waste, fraud, or abuse to government officials." Her argument is rooted in a report by the State Department's Office of Inspector

General ("OIG"), which bluntly concluded that MSA's NDAs "violate[] federal law." (*See* ECF No. 36-1, at 2.) MSA offers two counterarguments. First, it contends that nothing in the NDA's definition of "confidential information" prohibits a report of waste, fraud, or abuse to an appropriate government official. And second, the relevant NDA is subject to a regulatory exception, so § 3.909-1(a) is inapplicable.

Iovino's argument is inappropriate for judgment on the pleadings. Neither party cites any authority, nor is the court aware of any, explaining the appropriate level of deference that a federal court owes to an administrative agency's OIG's findings.[1] And in the absence of any argument that the report's conclusion is binding, the court sees at least two reasons to hesitate before endorsing the document.

First, the OIG report implicitly interprets the relevant regulations as requiring all covered NDAs to include an explicit exception for reports of waste, fraud, and abuse to certain government employees.[2] But the regulations' plain text do not obviously support this

---

[1] Without the benefit of any briefing on this issue, the court assumes that an internal assistance report prepared by an agency's OIG is entitled to *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *Skidmore* deference applies to an agency's interpretation of a regulation or statute if that interpretation does not reflect the agency's authoritative or official position. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2416–18 (2019) (explaining this limitation on *Auer* deference); *United States v. Mead Corp.*, 533 U.S. 218, 227–35 (2001) (applying *Skidmore* deference to an agency's statutory interpretation in part because *Chevron* deference did not apply and the resulting classifications were akin to "policy statements, agency manuals, and enforcement guidelines"). The reviewing court is obligated to consider the agency's position only to the extent that it has "the power to persuade." *See Skidmore*, 323 U.S. at 140; *see also Mead*, 533 U.S. at 227–28. Here, the court does not find the report persuasive because the State Department's OIG declined to analyze a potentially applicable exception and does not ground its implicit position that the NDA must explicitly include an exception allowing reporting of waste, fraud, or abuse in the regulation's text. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2169–70 (2012) (applying *Skidmore* deference and rejecting the agency's position because it was "quite unpersuasive"). In future stages of this litigation, the court will welcome briefing on whether the OIG report is entitled to *Auer* deference or no deference at all.

[2] (*See, e.g.*, ECF No. 36-1, at 2 ("*The agreement does not include an exception* that allows employees to report fraud, waste, or abuse to federal investigate or law enforcement entities, such as OIG.) (emphasis added); *id.* ("In order for a confidentiality agreement to be valid, *it must have a carve out that specifically allows employees to report fraud, waste, or abuse* to government officials.") (emphasis added); *id.* at 3 ("The agreement broadly defines 'confidential

interpretation. On their faces, the regulations prohibit certain NDAs; they do not obviously mandate the inclusion of exceptions.[3] In any event, MSA argues that its NDA's definition of "confidential information" does not reach internal reports of waste, fraud, and abuse.

Second, MSA argues that a related regulation exempts its NDA from this requirement, and the OIG report never cites or considers this regulation. The regulations discussed above apply to "[i]nternal confidentiality agreement[s]," which are "confidentiality agreement[s] or any other written statement[s] that the contractor requires any of its employees or subcontractors to sign regarding nondisclosure of contractor information . . . ." 48 C.F.R. § 3.901. This definition, however, excepts "confidentiality agreements that contractor employees or subcontractors sign at the behest of a Federal agency." *Id.* MSA, in short, argues that it promulgated the NDA that Iovino signed "at the behest of" the State Department. It is not clear from the pleadings whether MSA did so or not, and Iovino disputes this

---

information' *and contains no exceptions* for the reporting of fraud, waste, or abuse.") (emphasis added); *id.* ("Because the MSA confidentiality agreements *do not include an exception* for disclosing fraud, waste, or abuse to a designated investigative or law enforcement representative, the Department is prohibited by law from expending any appropriated funds for a contract with MSA Security.") (emphasis added); *cf. id.* at 4 ("The recommendation can be closed *when OIG receives documentation that MSA has rescinded or modified ifs confidentiality agreement* and notified all employees of the change.") (emphasis added).)

[3] *See* 48 C.F.R. § 3.909-1(a) (prohibiting "internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information"); *see also id.* § 3.909-2(a) (requiring all eligible contractors to "represent that [they] will not require [their] employees or subcontractors to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or subcontractors from lawfully reporting waste, fraud, or abuse related to the performance of a Government contract to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information (e.g., agency Office of the Inspector General)").

characterization. What is clear is that whether a contractor adopted and promulgated an NDA "at the behest of a Federal agency" is a fact question that requires discovery.[4]

For these reasons—because the OIG report applying the relevant regulations to the challenged NDA is not entitled to conclusive deference; because the relevant NDA's definition of "confidential information" does not necessarily capture internal reports of waste, fraud, and abuse; and because fact discovery is necessary before the court can make a factual finding as to whether MSA required its employees to sign the challenged NDA "at the behest of" the State Department—the court will not grant Iovino's motion for judgment on the pleadings under her theory that the NDA was illegal under federal regulations.

The parties' second dispute is over New York law. New York construes NDAs as restrictive covenants. *Ashland Mgmt. Inc. v. Altair Invs. NA, LLC*, 869 N.Y.S.2d 465, 470 (N.Y. App. Div. 2008). Such contracts are "strictly construed" and viewed with "judicial disfavor." *Brown & Brown, Inc. v. Johnson*, 34 N.E.3d 357, 361 (N.Y. 2015) (cleaned up).

New York courts enforce restrictive covenants "to the extent that it is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public[,] and not unreasonably burdensome to the employee." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999). This reasonableness standard requires an NDA "(1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *Id.* "A violation of any prong renders the covenant invalid." *Id.*

---

[4] Additionally, the question seems to be one of first impression. The court has not found a written judicial decision interpreting this language.

"New York courts have recognized four legitimate interests that may be asserted to support a restrictive covenant: (1) protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary." *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 694 (S.D.N.Y. 2017).

"[O]verbroad restrictive covenants are partially enforceable to the extent necessary to protect the employer's legitimate interest." *Barton Mines Co., L.L.C. v. Miller*, No. 1:14-CV-1003, 2014 WL 4437558, at *4 (N.D.N.Y. Sept. 9, 2014) (cleaned up).

> [A] court should conduct a case specific analysis, focusing on the conduct of the employer in imposing the terms of the agreement. Under this approach, if the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anticompetitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing, partial enforcement may be justified.

*BDO Seidman*, 712 N.E.2d at 1226 (cleaned up). If this standard is met, the court may modify an otherwise invalid restrictive covenant rather than voiding it in its entirety "to the extent it deems reasonable" "[i]n the circumstances of [the] case." *Ashland*, 869 N.Y.S.2d at 473; *see also Crye Precision LLC v. Duro Textiles, LLC*, 689 F. App'x 104, 107 (2d Cir. 2017) (order) (describing this practice as "blue penciling").

Here, the court lacks the factual predicate necessary to decide whether partial enforcement—allowing MSA to enforce its NDA against employees for some conversations with media reporters—is appropriate. Whether Iovino had other employment options when she chose to work at MSA informs this inquiry. *See Brown & Brown*, 34 N.E.3d at 362. So would evidence of coercion by MSA, of a general plan to limit competition, or of MSA's knowledge

that its NDA was overbroad. *See Aqualife Inc. v. Leibzon*, No. 2717/2013, 2016 WL 56484, at *7 (N.Y. Sup. Ct. Jan. 5, 2016). Conversely, if MSA adopted its NDA at the State Department's insistence, that finding would likely weigh in favor of partial enforcement. *Cf. Brown & Brown*, 34 N.E.3d at 362 (explaining that whether an employee understood his non-compete and had the opportunity to negotiate it would weigh in favor of partial enforcement); 48 C.F.R. § 3.901 (recognizing that different considerations might apply to NDAs "sign[ed] at the behest of a Federal agency"). The substance of Iovino's disclosures may be important to the extent that MSA's enforcement of its NDA would conceal illegal or tortious activity. *See Eddystone Rail Co., LLC v. Bridger Logistics, LLC*, No. 2:17-cv-00495, 2021 WL 4262317, at *2 n.2 (E.D. Pa. Sept. 20, 2021) (collecting cases). Additional details about how Iovino's alleged breach affected MSA's business would further clarify the nature of the company's purported business interest. *See Adecco USA, Inc. v. Staffworks, Inc.*, No. 6:20-CV-744, 2021 WL 66563, at *3 (N.D.N.Y. Jan. 7, 2021) (reasoning that goodwill between the employer and existing customers is a legitimate business interest that can sustain an NDA); *cf. Magtoles v. United Staffing Registry, Inc.*, 21-CV-1850, 2021 WL 6197063, at *7 (E.D.N.Y. Dec. 30, 2021) (suggesting that an employee departure that would "jeopardize" an employer's "relationships with its clients" could sustain a restrictive covenant). And any revisions to the NDA that the State Department and MSA have agreed to since Iovino's termination would inform the feasibility of partial enforcement.

In short, "on this record and at this early stage of the action when little discovery has taken place, dismissal [] of the breach of contract claim based on the [NDA] in the employment agreement is inappropriate." *Brown & Brown*, 34 N.E.3d at 362. Iovino's motion for judgment on the pleadings will be denied.

### C. Iovino's Motion to Strike

Iovino also moved the court to strike MSA's affirmative defenses. (ECF No. 37.) Toward the end of its answer, MSA raised five enumerated affirmative defenses: failure to state a claim upon which relief can be granted, failure to mitigate damages, unclean hands, first material breach, and good faith. (*See* ECF No. 31, at 39.)

Iovino argues that taking discovery on these affirmative defenses would prejudice her by causing her to spend time and resources "litigating invalid, spurious issues." (Pl'.s Mot. Strike at 6 [ECF No. 37] (quoting *Spell v. McDaniel*, 591 F. Supp. 1090, 1112–13 (M.D.N.C. 1984)).) But it is not clear that the inclusion of these issues is spurious.[5] The second and fourth defenses are contract law doctrines, and this case is about a potential breach of contract. *See Rebecca Broadway Ltd. P'ship v. Hotton*, 37 N.Y.S.3d 71, 80–81 (N.Y. App. Div. 2016) (first material breach); *Holy Props. Ltd., L.P. v. Kenneth Cole Prods., Inc.*, 637 N.Y.S.2d 964, 965–66 (N.Y. 1995) (failure to mitigate). Similarly, unclean hands is an equitable doctrine, and both sides here seeks equitable relief. *See Ortiz v. Silver Invs.*, 7 N.Y.S.3d 50, 52 (N.Y. App. Div. 2018). And federal courts have read an affirmative defense of good faith into multiple federal statutes. *See, e.g, Akers v. Md. State Educ. Ass'n*, 990 F.3d 375, 379–80 (4th Cir. 2021) (joining six other circuits and recognizing that a "good-faith defense is available to [] private-party defendant[s] sued under [42 U.S.C.] § 1983"); *Lowery v. Cir. City Stores, Inc.*, 206 F.3d 431, 440–41, 445–46 (4th Cir. 2000) (interpreting *Kolstad v. American Dental Association*, 527 U.S. 526 (1990), as creating a good faith affirmative defense to punitive damages awards for violations

---

[5] The lone exception is perhaps the defense of failure to state a claim upon which relief can be granted, which MSA waived by filing an answer. *See* Fed. R. Civ. P. 12(b). In any event, the inclusion of this "boilerplate" affirmative defense does not prejudice Iovino.

of 42 U.S.C. § 1981a). MSA is within the bounds of zealous advocacy to advance some argument to that effect here.

Issues that are likely to come up in discovery, that may be the subject of dispositive motion practice, and that implicate the availability of certain remedies are not spurious; it does not prejudice either party to consider and litigate their potential application to this case. Because Iovino has not shown that MSA's inclusion of these affirmative defenses in its answer prejudices her, the court will exercise its discretion and deny her motion to strike. *See, e.g.*, *Tippman Eng'g, LLC v. Innovative Refrigeration Sys., Inc.*, No. 5:19-cv-00087, 2020 WL 1644985, at *2–3 (W.D. Va. Apr. 2, 2020) (denying a motion to strike an affirmative defense in part because of a lack of resulting prejudice); *Warren v. Tri Tech Lab'ys, Inc.*, No. 6:12-cv-00046, 2013 WL 2111669, at *7 (W.D. Va. May 15, 2013) (same, and noting that the inclusion of a "boilerplate" affirmative defense does not prejudice the opposing party).

Accordingly, Iovino's motion to strike MSA's affirmative defenses will be denied.

### IV. CONCLUSION

For the reasons set forth above, Iovino's motion to dismiss MSA's counterclaim for failure to state a claim upon which relief can be granted or, alternatively, for judgment on the pleadings (ECF No. 39) and Iovino's motion to strike MSA's affirmative defenses (ECF No. 37) will be denied.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 25th day of August, 2022.

                                                                                          */s/ Thomas T. Cullen*
                                                                                         HON. THOMAS T. CULLEN
                                                                                         UNITED STATES DISTRICT JUDGE