UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

************************************************************

| | |
|---|---|
| KAREN IOVINO,<br><br>Plaintiff,<br>vs.<br><br>MICHAEL STAPLETON ASSOCIATES, LTD.,<br><br>Defendant. | CIVIL CASE NO.: 5:21CV64<br>OCTOBER 12, 2022, 11:02 A.M.<br>TELEPHONIC MOTIONS HEARING<br><br>Before:<br>HONORABLE JOEL C. HOPPE<br>UNITED STATES MAGISTRATE JUDGE<br>WESTERN DISTRICT OF VIRGINIA |

************************************************************

APPEARANCES:

For the Plaintiff:

THAD M. GUYER, ESQUIRE
T.M. Guyer & Friends, PC
116 Mistletoe Street
Medford, OR 97501
206-954-1293

JOHN A. KOLAR, ESQUIRE
KENDRICK HOLLEY, ESQUIRE
Government Accountability Project
1612 K Street, NW, Ste 1100
Washington, DC 20006
202-926-3311

FTR OPERATOR: Karen Dotson

Court Reporter: Lisa M. Blair, RPR, RMR, CRR, FOCR

255 West Main Street, Suite 304
Charlottesville, Virginia 22902
434.296.9284

PROCEEDINGS RECORDED BY **ELECTRONIC RECORDING;** TRANSCRIPT PRODUCED BY COMPUTER.

APPEARANCES CONTINUED:

For the Plaintiff:

NATE LAVINDER ADAMS, III, ESQUIRE
Nate L. Adams, III, P.C.
11 South Cameron Street
Winchester, VA 2260
540-667-1330

For the Defendant:

DANIEL SAGE WARD, ESQUIRE
Ward & Berry, PLLC
1751 Pinnacle Drive, Suite 900
Tysons, VA 22102
202-331-8160

(Proceedings commenced, 11:02 a.m.)

THE COURT: Hi, this is Joel Hoppe. Who is on the line for the plaintiff?

MR. GUYER: Thank you, Your Honor. Your Honor, my name is Thad Guyer. I am *pro hac vice* lead counsel. And with me on the line is my client, Dr. Karen Iovino, as well as two co-counsel, which is the litigation director of the Government Accountability Project, Jack Kolar, who is counsel of record, and our general counsel, Karen Gray, who is not counsel of record.

MR. ADAMS: And as well as Nate Adams.

THE COURT: Good morning.

And who is on the line for Defendant MSA?

MR. WARD: Good morning, Your Honor. Dan Ward here on behalf of Defendant MSA, and with me is (inaudible).

THE COURT: Let's see. I think Ms. Dotson is on the line and is recording this call.

Is there anybody else on the line?

MS. FRITH: Good morning, Judge. You also have Krista Frith from the United States Attorney's Office on behalf of the Department of State, who is not a party to this case.

MR. HOLLEY: Good morning, Your Honor. You also have Kendrick Holley, who is a staff attorney with Government Accountability Project, listening in on the call.

THE COURT: All right. Well, thank you all for

calling in. This is a discovery hearing regarding a protective order. I have reviewed the parties' joint statement and the two different proposed protective orders.

What I'd like to do is to hear from plaintiff's counsel first, Mr. Guyer, and then hear -- (inaudible.)

MR. GUYER: Okay. Thank you very much, Your Honor. I would like to start out just by referencing where we're at. We have the joint statement that we filed in this case. And as Your Honor just indicated, you read that; and, therefore, you've undoubtedly seen, as indicated by their presence -- the Department of Justice's presence here today, is that the MSA repeatedly invoked the Department of State as the basis for -- really for this entire dispute. In the joint statement, defendant's position cites the Department of State and this requirement five different times; twice on page 2, once pages 2 to 3, twice on page 3, including this colorful but accurate statement, which is, quote: Perhaps, importantly, having such a glaring hole in the protective order gives the Department of State an even greater case of heartburn and would likely have a further chilling, delaying effect on the (inaudible). And that really gets down to (inaudible).

So the Court understands that, as I've stated, is we have a very cordial relationship with Mr. Berry. I think -- with Dan. And I think if you can't get along with him, you probably can't get along with anybody. So that is not our

issue here. We treat each other very respectfully, but we've been at this for a long time. Our earliest communications over this discovery dispute are in June of 2022. On July 12th of 2022, we sent a seven-page letter brief outlining all of our legal positions in this case, mostly of which basically said that to the extent that MSA has possession of these documents, the fact that there is a confidentiality agreement with the Department of State simply doesn't have any effect on their obligation of turning these documents over. As a result of it, we're in this kind of anomalous situation for a case that is really getting kind of long in the tooth, and not a single document has been produced in response to our discovery request. Again, we're not challenging the good faith on it. We're just at loggerheads in trying to deal with this. So having the Department of State is very important.

I will parenthetically say that we have given notice to the -- to the Department of State that in all likelihood we're going to have to -- we're going to have to try to join them as a party to this action as an indispensable party because they are claiming through MSA complete ownership of all of these documents. According to MSA they are pretty well calling the shots on what can and can't be released. So we'll cross that bridge when we get to it.

We've also given them notice that we intend to file a FOIA enforcement action. This doesn't occur in a vacuum. This

situation at the Department of State has literally been going on for years. So we'll look at that. But for today's purposes, as I understand that it, we're here really to look at whether or not the Court could enter a protective order with terms that -- that would then give the parties authoritative guidance on what can be done.

So with that, I would like to turn to the confidentiality agreement by MSA and give what our concerns are and our objections are. And by the way, if these concerns are resolved -- and there's really only two categories -- if they're resolved, then I think the case is going to go smoothly after this, unless the government is going to instruct MSA to not provide documents. We'll see about that when we get to it.

But here are the two areas. The two areas, first of all, we start at paragraph 2 on page 1 of MSA's proposed confidentiality agreement. And they define here in paragraph 2 what confidential information is. And you can see that on subparagraph 3 -- so it's 2(A)(3) -- they define confidential information as any documents deemed confidential information by the United States government; including, but not limited to, documents related to contract number and the contract in this case. So that there is no misunderstanding, Judge, that encompasses every single document in the case, because, as MSA briefed in our -- in a motion to dismiss on the counterclaim, as that has been briefed, MSA has made very clear -- as they do

in all documents -- that all these documents are the property -- literally, quote unquote, the property of the United States.

So unless that is resolved, we already know that MSA is going to deem every single document as confidential. That in itself, Your Honor, does not necessarily present a problem provided that that production under a protective order is not obstructed by the Department of Justice's exercise of dominion and control over its, quote unquote, property. The problem will be in the definition of attorneys' eyes only or highly confidential information. This is a major issue, as we've already pointed out. We have been actively involved, Your Honor, in litigating this attorneys' eyes only designation elsewhere. It's becoming a very big area of litigation and controversy in the federal courts because it was a Pandora's box that once this AEO was opened, it was opened. (Inaudible) -- copyright, intellectual property cases. But once it was opened, it started making its ways into all of these protective orders that the defense firm would propose, and that's where we're at now.

So if the AEO --

THE COURT: AEO designations are pretty common when the issue is some sort of competitive harm, disclosure of trade secrets or some sort of information to a decision-maker for the other party where there could be competitive harm. It is not

uncommon, and it seems like that's the area when they're used.

MR. GUYER: And we actually could live with that if you were to order it, because there isn't any competitive harm information possible in this case or asserted in this case.

So let's get, then -- because what you just give there, Judge, essentially is kind of definitional information. And so the problem with paragraph 2 when it comes to the definition is you have the definition of confidential information, but you don't have a definition of highly confidential information. And as a result of that, we don't have any definition as to what is going to be highly confidential information.

Instead, the proposed protective order by MSA moves on to paragraph 5 on page 3. And here it says, Highly confidential information under the terms of this order if such party in good faith reasonably believes that disclosure of the highly confidential information to persons other than the following is substantively likely to cause injury to the disclosing party.

Of course, that is no standard at all. And no court has adopted a standard like that, at least that we can find. We have found that all of the courts that have considered the AEO have got it precisely on the grounds that you stated. So that would have to be resolved. And if you were to resolve that -- if you're going to allow AEO, if you would simply

require or provide a definition of what highly confidential information is and carefully delineate what the AEO is going to be, then I think we're going to have a much easier time proceeding with this case.

The second issue -- because there's only two, as I said before -- has to do with whether or not all of the information, versions one and two, whether or not all of the information that is considered confidential by the government is intended to be designated as highly confidential for attorneys' eyes only. And again, that's where we would have to have -- we'd simply have to have a definition on that.

With that, Your Honor, that pretty well sets forth our positions.

THE COURT: It sounded like there was one other issue; and that's that you would want to be able to share this information -- the information that's produced and identified as confidential under the protective order, share that with other clients who are not parties to this litigation.

That seemed to be an issue. Is that resolved?

MR. GUYER: No. No. That's not resolved per se. It is resolved kind of as a matter of -- as a matter of construction. But this discussion, once we made clear that this is our construction, it will be an issue; and that is both of our other clients will be witnesses. And as a result of that, as witnesses they then have a right to have the

information shared with them as witnesses. So it actually would be covered. But having stated that now, and given the whole tenor of what MSA's position is going to be, of course, they are going to object to that.

Our position, obviously, is that however many -- however many people are going to have access to these, the whole nature of a protective order is simply to limit how broadly the confidential information can be shared. It has to be something less than public, but it has to be something more than simply the attorneys and the parties in the case.

So for example, among those that disclosure is allowable to is any kind of forensic examiners, consultants, litigation support. And what we plan to do in this case, to the extent that you allow any AEO -- which we urge you not to do -- you should require them to make individual application. There should be so little of it that they consult with us first. And then if we disagree, it comes to you. It should be a very small burden.

But to the extent that there is going to be an AEO designation that is broader than we think is necessary, we are going to retain a law firm or a law school clinic on this. We've been looking at the Yale Law School's FOIA clinic as one of the possibilities because they've been -- they're actively involved in a pattern and practice of FOIA violations in cases against the Department of State and have won a preliminary

determination that they can pursue. But we who have contact with Dr. Iovino, we under no circumstances want to see any AEO. And what we will have is a third-party law firm -- call that a litigation support service or what you will -- but we want to have a third-party law firm who is going to review the information. They are then going to give us summaries that do not disclose what the confidential specifics of it are, and then they are going to litigate those for us in the event that the parties can't resolve them.

THE COURT: All right. I would say on the disclosure to the confidential information to another client who may be a witness, you know, typically protective orders would allow disclosure of confidential information under some protections or a procedure to witnesses when it's necessary for that witness's testimony, but it's not just a wholesale disclosure. So I want to be real clear that I wouldn't expect that all confidential information would just be turned over to witnesses, I mean, unless it's necessary to their testimony.

MR. GUYER: We agree with that, Your Honor.

THE COURT: And it really is customary in protective orders -- I don't know that I've ever signed one that didn't contain some limitation on the information being used in that particular case. That's just -- I think if there is a need to have it disclosed in some other case, then that's an issue that can be taken up at a later time, but it just seems that it's --

it seems it's just necessary to have it limited to use in this case and not beyond that.

MR. GUYER: If I can make one additional comment just on that, Your Honor.

Certainly I understand that that is -- that most judges will run into that situation from time to time, but I would bet you have not run into a situation in which the lawyers -- the lawyers for the defendant and the lawyers for the plaintiff were the exact same lawyers with action against the exact same defendant under the exact same statute. I'd be very surprised if you faced that situation before.

THE COURT: Well, I had one that was similar. I think I wrote an opinion on it -- maybe six months or so -- where the attorneys in a subsequent action were against the same defendant, different plaintiffs. Some of the plaintiffs' attorneys were the same, and they wanted to share the information with their -- that they had obtained under the protective order in the prior case, they wanted to share that with new counsel in the subsequent case. What we did there didn't allow them to use -- to disclose the particular documents. In fact, I think plaintiff's counsel wasn't seeking to do that. They had already I think destroyed those documents. But they wanted to be able to share their mental impressions, and I certainly thought that that was appropriate. I don't know how I could -- how you could limit that under a

protective order. It's not sharing notes and things like that from the previous case. But certainly the things they learned from the previous case, they would be able to do that.

But I don't think it's appropriate to allow documents from one case produced under a protective order to be used in another case, unless there is some follow-up order that would allow that. I don't think that's appropriate.

MR. GUYER: Thank you, Your Honor.

THE COURT: And Ms. Frith, if you have something you want to say on this, I'd will be happy to hear from you after Mr. Ward.

MS. FRITH: Thank you, Judge.

MR. WARD: Thank you, Judge. I must confess I wasn't clearly following everything that Mr. Guyer was saying there with all sorts of different law firms and law clinics coming in, and some people use some language and some people have access to other documents.

I think this is a lot simpler. It's just there are two issues. We heard a preamble about a potential dispute they have with state. I don't see that as being properly before the Court either today. Of course, Your Honor can hear whatever Your Honor wishes to hear. But I do like the process you have, that we submit a letter.

So our letter is about AEO, and it's about -- and it's about sharing with others. It sounds to me like -- you

know, I don't need to argue past sharing with others. I think we're all on the same page. I will say this, that in the draft I posed -- our proposed protective order -- on page 3, it does make very clear -- because when I was hearing Mr. Guyer saying it -- and I respect Mr. Guyer, and I don't mean to say this pejoratively -- but my notes are sharing with others is the end run. It sounded like, well, I'm not worried about that because we'll just make -- (inaudible). And so that end run, whether that was intentional or just my initial impression, would be prevented as the Court identified. It would not be a wholesale production.

And in the protective order I posed on page 3, 5(F) says, During their depositions and deposition preparation of witnesses in the action to whom disclosure is reasonably necessary, and who -- (inaudible) -- attached hereto as Exhibit A. So that's the amount of disclosure they can get, that which is reasonably necessary for the deposition and deposition preparation.

THE COURT: And I think that you're -- Mr. Ward, I think that that portion of your protective order is correct. I think that's the appropriate language for disclosure to witnesses.

MR. WARD: Very narrow, and that we would not oppose. That would require the protective order. As to the lack of a definition of highly confidential information, Mr. Guyer

identified the definition right there. It is an enhancement to the confidential information definition. So the confidential information is defined on page 2(A) 1 through 3. And then there is an enhancement on page 5. And the enhancement is that we would have to have a good faith reasonable belief that producing this information -- disclosure of this information is substantially likely to cause injury to the disclosing party.

Now, the other issue that I think is very important to note here, as Mr. Guyer said, but we just can't live under these strictures, all of these can be challenged. All of these assertions can be challenged.

THE COURT: Yeah, but I just don't want to kick that down the road. I mean, there needs to be some standard. I agree with Mr. Guyer. The definition of highly confidential information -- I mean, I read through your protective order three times looking for it. I was like: Is this really it? Is it just substantially likely to cause injury? That doesn't strike me as a standard that I've seen before regarding AEO, because that really is limited to where there is competitive harm from disclosure to particular people for the other side. And it's just -- it seems so subjective. And I'm not even sure how you could litigate substantially likely to cause injury. If there's some further way to define that, what's the injury? What's the category of documents? I understand we refer back to the confidential information, but I'm just -- I'm not seeing

the highly confidential, the AEO portion is really properly defined.

MR. WARD: Your Honor, and we can work to more properly define it. The concern here is -- and I do agree that normally you see highly confidential -- and I used to do a little more patent litigation -- you would see it very oftentimes in things like that where there was technical information that would have, you know, such -- (inaudible) -- economic effect if disclosed to a client. And so lawyers get to look at it. Lawyers can see it. It's got to be -- (inaudible).

Here it's not a competitive -- economic competitive situation. It's a situation where we have a plaintiff who has admitted in discovery responses to leaking information about this program -- this government program to the media.

THE COURT: So a difference here -- I understand the difference here is that there would be a protective order that is backed up by sanctions. There could be monetary sanctions. There could be evidentiary sanctions imposed on any party that violates the protective order and discloses information improperly.

Is that something that -- I mean, is there evidence that there have been leaks in violation of other court orders or a law that would give you pause here?

MR. WARD: There is evidence that she has leaked

things in direct violation of her confidentiality agreement. She had leaked them in breach of that, and thus causing us to be in violation of our obligations to the Department of State. But this is the first time it's being litigated. So she has not -- I don't have evidence that plaintiff is someone who flouts protective orders. But I would rather build a fence before the horses get out, because I know that these horses run, and they've run to the press in the past.

So I'm concerned that -- I understand we need to litigate this case. I understand that she has claims that she wants litigated -- the plaintiff has claims that she wants litigated. But we've also seen, A, a predisposition in discovery responses in this case admitting that that was because she did, admitting that she did communicate with a number of different media outlets about these materials, about this program.

So given that case, I don't know how MSA can be a good steward of Department of State's information about a very sensitive program if we don't have a separate category saying: Okay, Mr. Guyer and your team of lawyers, you can see this, but you can't share it with the plaintiff because the plaintiff has a predisposition of sharing with the media. That's our concern.

THE COURT: Well, and I understand your concern. I hear your concern that there's -- that you're worried about

some track record of disclosure of the information. I think it's a different situation when there's a court order that says this information can be disclosed to a limited number of people for use in this case only; and that if there's a violation, the party can be found in contempt of court. I mean, there will be -- there can be evidentiary hearings on that. There can be monetary sanctions imposed. There can be evidentiary sanctions imposed as well that they can cause significant problems for, for litigating the case from any party that improperly discloses information in violation of a protective order.

Sanctions are serious. That's part of -- one of the reasons for the protective order is to make sure that people follow its terms. I think that that should give MSA and the Department of State some confidence that any materials that are turned over to the plaintiff and her counsel would be used properly, and would be used consistent with the terms of the protective order.

MR. WARD: Your Honor, I agree with you. I think that we can -- if we're going to have the sharpest teeth in that particular dog's mouth for that -- for those sanctions, any and all possible sanctions -- then, you know, I don't think we need AEO. I would want it to be -- I don't know how much you want to codify that in the protective order or just -- you know, for me if I know that, you know, everyone hears this and understands that there are sanctions, but we may want to have a

little greater codification in the protective order.

THE COURT: Well, if there were -- I wouldn't want to say what sanctions are appropriate now, not knowing, if there is going to be a violation, what that conduct would be. I would have to consider that, if there is one. But I think the necessary people are on the phone right now. And I think they're on notice that if there are violations of a court order, then contempt and all the sanctions that can come along with that are available as appropriate.

MR. WARD: And Your Honor, I'd just say -- go ahead, I'm sorry.

MR. GUYER: I'm sorry, I interrupted you.

THE COURT: Go ahead, Mr. Ward.

MR. WARD: I was just going to say, you know, that any sanctions -- I only say this -- I don't say this in any way to be pejorative of counsel, but they are counsel for a public interest firm. And actually on the first page of the joint statement they make a point of saying that, you know, certain -- certain things are antithetical to them. They represent whistleblowers, actively -- you know, legislatively active in anti-gag statute things. All these things -- (inaudible). So I would say that any sanctions, you know, if appropriate, that lawyers can be sanctioned just like clients I guess is what I'm trying to say. I should have been a little less verbose.

THE COURT: You have to see -- if there is a violation, you have to see who is responsible for it. I think -- I'm sure that plaintiff's counsel as -- their advocacy outside of this case and lobbying and policy positions, and I fully expect and I'm confident that they will follow the Court's orders in this case and any other -- even if those conflict with their policy and lobbying positions.

MR. WARD: Yeah. I think I'm more concerned -- and this now bleeds into the second point, the sharing with others. And we heard today, well, they wouldn't share, but -- and Mr. Guyer's presentation today was much -- he speaks much kinder than he writes. He's a very stern writer, which I understand. I seem to be the opposite.

But on page 1 he says we cannot agree to have our lawyers gagged by an AEO -- (inaudible) -- all relevant information to our clients. And I think my concern is that we go on to page 2, and he's talking about wanting to share with two other joint representation clients, but then it said they represent three employees. Their draft doesn't have a limit.

It would absolutely eviscerate it. Just saying, well, we're going to make every -- every client of ours, you know, put them on a potential witness list and dump a bunch of documents on them, A, would eviscerate the protective order; B -- and this goes back to being a public interest firm, and they have a focus on I know a less pastoral focus, as a former

FBI agent friend of mine would say. You know, I just focus on my client and he focuses on everything. And I don't see that it benefits -- it seems to be putting their mission ahead of their client's interest. And I understand that they may want to use things that they discover in this case to represent other clients, but it would just eviscerate the protective order. And I don't think it's a problem solved, as Mr. Guyer has said today. Like, oh, well, they'll just be witnesses. I think we've got to make sure there's real boundaries here. It's been laid bare in their position exactly what they want to do.

THE COURT: Well, and I think -- I mean, I think I addressed that as far as the witnesses and the language that is in your protective order about disclosure to witnesses. I think that language is acceptable. If there's something additional that you want to include in there to try and make it even more clear that, you know, the information that is disclosed to any witness, it really needs to just relate to that witness's testimony. It is not a wholesale disclosure of all confidential information. I think the language that you have is that it's reasonably necessary -- the disclosure is reasonably necessary. And perhaps what makes sense is to add disclosure is reasonably necessary to that witness's testimony, or to the topics of that witness's testimony, or something along those lines to really focus it in on the purpose of the

disclosure to the witness. I think that something along those lines would be appropriate, because I certainly would not expect that disclosure to witnesses would just be an end run around the limits on a protective order, that the information would only be used in this case.

MR. WARD: Yeah, and I'm just thinking out loud here, Your Honor, because this just came up today.

I wonder if maybe we have something that would say that any such disclosure should be made for this purpose shall be limited, and, you know, should be -- should be -- I don't know if we can time limit it, but I don't want things being produced and then -- like you might have to produce -- you might have -- (inaudible). Who knows? If it's for legitimate witness prep, that's fine. But we could say should only be produced to witnesses 30 days prior to their scheduled deposition. I don't think that prejudices them, but it prevents the end around.

THE COURT: All right. Mr. Ward, anything else?

MR. WARD: I think that's it, Your Honor. I think that, you know, we're happy to -- how you'd like us to go forward. If you'd like us to mark this up, and if you'd like us to -- you know, given what has been said today and I think is clear as a bell to everyone, if you want us to edit our protective order and take out all the AEO stuff and punch up that area on disclosure to witnesses, we're happy to do so, and

then we could circulate it to Mr. Guyer, and hopefully we'll have a happy ending.

THE COURT: I think that sounds like a good way forward. I do want to hear from Mr. Guyer again, and then also from Ms. Frith, if Ms. Frith has anything to say.

Ms. Frith?

MS. FRITH: Thank you, Your Honor. I don't have anything particular to say. You know, the Department of State really doesn't have a dog in this fight. We're not a party to the litigation and we have not been involved in this dispute over the protective order.

I disagree with many of Mr. Guyer's characterizations the Department of State's role in this case, but I don't think that that's appropriate for today's hearing. If and when that becomes a relevant issue before the Court, I'm happy to address those concerns at that point.

THE COURT: All right. Mr. Guyer?

MR. GUYER: Well, Your Honor, if I understood counsel for the government, they're waiving taking a position on this. They're not pushing MSA to protect their interest. As long as that's understood, we don't have a dispute; however, if you look at --

THE COURT: I think what they're saying is that they're not weighing in any further on the issue about the protective order. And that's the only thing that's before the

Court today.

MR. GUYER: What is before the Court -- I agree with that, Your Honor, but this is directly -- this directly is called into question by paragraph 24 of the confidentiality order proposed by MSA. Twenty-four states -- and this is on page 9, the last page -- 24 states, Any documents related to contract -- which is what we're here on -- may only be produced and/or used in this litigation pursuant to the Department of State's approval of a *Touhy* request by the requesting party.

That is totally unworkable, and this simply cannot stay in the order. And the reason that I wanted the Department of Justice to appear here today is because they need to tell us now if they want this in this order or not, because they're the only ones with an interest in paragraph 24, Your Honor. Now is the time for them to speak up because we're in a federal courthouse now. We are looking at a situation of extraordinary delay in this case with this relationship between MSA. So I ask you, Your Honor, to get that clarification. Does DOJ take the position stated in 24?

MR. WARD: Your Honor, if I may?

THE COURT: Sure. And I have to say I'm not up to speed on any of the *Touhy* proceedings.

MR. WARD: Your Honor, all I was going to say is that this is a sandbag. You know, Your Honor asked for a joint statement. We provided a joint statement. We addressed those

issues, and a week ago Mr. Guyer sends an email that has foggy bottom up in arms, has the AUSA here because he was threatening all sorts of things, attaching a draft complaint, and telling them we're going to discuss this at the hearing today. And in my discussions with Ms. Frith and my emails to Mr. Guyer were: That's not on the agenda today, fellas.

And this is a sandbag. It should not be tolerated by the Court. And I'm sorry to be a schoolmarm about it and tell the Court what it should and shouldn't tolerate. That's not my job, and I apologize. But this is -- I can see the sandbag here, and I don't like it. That's all. I don't mean to have a little righteous dander, but I have a little bit.

THE COURT: And it's not something that I've had an opportunity to consider until it was just raised a minute ago by Mr. Guyer.

So I do think, Mr. Guyer, just because I want to be able to make sure that I am able to make a proper decision on any issues. That wasn't something that was identified as an issue for today.

Mr. Guyer, as to the two primary issues, the AEO language which really is -- or in -- it was in MSA's proposed protective order, it's really I think standard. So I do think that it's a problem to have the highly confidential AEO. And I do think that having a protective order in place provides sufficient protections for disclosure of any information. So I

would want that to be -- that AEO language to be removed from the proposed protective order.

And then the other issue that was raised concerns disclosure beyond -- beyond this case and to other clients who are using this information produced under the protective order for other cases and disclosed to other clients. And I've said I think that that is not appropriate. It's just standard in protective orders that the information that's disclosed is used for this case and not used for other cases, absent some subsequent approval by the Court. So I think that -- otherwise, I think that generally the protective order that MSA has proposed is appropriate. And I think that you all can work within it as long as those two issues are addressed.

Mr. Ward suggested that he could do a redline and send that over to you. Is that an acceptable --

MR. GUYER: No, it's not. It's not acceptable to us. Under no circumstances will we agree or sign any protective order that proposes any AEO restriction. So you're going to have to independently order that one.

And under no circumstances are we going to sign any protective order that contains paragraph 24. This entire protective order is before you now, Judge. And the reason the Department of Justice is on the line now is because of this -- 24 has to be adjudicated by you, because we're not signing any protective order that --

THE COURT: Then I'm happy to do that, Mr. Guyer.

So what I would like, then, is for -- Mr. Ward, would you just go ahead and file on ECF your version of the protective order. And I would like you to make the edit consistent with what I discussed today. And then also email -- and, of course, cc plaintiff's counsel -- email a Word document of that protective order. And I will make any edits that I think are appropriate, and then I will have it entered.

MR. WARD: So Your Honor, would you like me to -- the ECF file, do you want that to show redlines or no red lines?

THE COURT: I would -- you don't need to do redlines. Just submit -- submit the draft. I would want you to -- I think it's -- I understand that Mr. Guyer has taken the position that they're not going to -- well, their cooperation in trying to reach an agreement on a protective order has ended. I would want you to redline the protective order and send him a copy of that so that he can see, and other counsel can see the edits that you've made. But the draft that you -- or the proposed protective order that you file on ECF does not need to contain redlines.

MR. WARD: Okay. Your Honor, so I will file with ECF a proposed protective order, final. I will send to the Court, and copy opposing counsel, an email with the -- showing final and showing redlines, two attachments.

Does that make sense?

THE COURT: Yes. Thank you.

MR. WARD: Thank you very much, Your Honor.

MR. GUYER: How long do we have -- does plaintiff have to file objections to this proposed protective order?

THE COURT: Well, I think we've already -- it's already been argued and I've heard your positions on it. I'm going to enter the protective order that I think is appropriate. You can file to modify it. You can file any objections to my order that you like. That's up to you. But I do want --

MR. GUYER: I'd request leave of 48 hours to file objections, Your Honor. It's not appropriate for the Court to enter a protective order that is submitted by one party, and not allow us to make specific objections. We need to make those objections, Your Honor. But I'll do it in 48 hours. I'll just put it at the top of my list.

THE COURT: Mr. Guyer, you've had that opportunity today to make your objections, and I've listened to them and considered your arguments. You certainly can file objections and make whatever arguments you think are appropriate, okay?

MR. GUYER: Thank you so much, Your Honor.

THE COURT: All right. Is there anything else that we need to address today?

MR. WARD: That's all for me, Your Honor. Thank you very much.

THE COURT: Thank you all. Take care.

(Proceedings adjourned, 11:49 a.m.)

C E R T I F I C A T E

I, Lisa M. Blair, RMR/CRR, Official Court Reporter for the United States District Court for the Western District of Virginia, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/s/ Lisa M. Blair Date: October 27, 2022