**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA HARRISONBURG DIVISION**

**KAREN IOVINO,**

     Plaintiff,

v.                                                            Civil Action No. 5:21-cv-00064

**MICHAEL STAPLETON ASSOCIATES, LTD**. d/b/a **MSA SECURITY, INC.,**

     Defendant.

_____

<u>**RESPONSE TO ORDER TO SHOW CAUSE**</u>

Submitted by:

T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street
Medford, OR 97501
(206) 941-2869
thad@guyerayers.com

GOVERNMENT ACCOUNTABILITY PROJECT
1612 K Street, N.W., Suite 1100
Washington, DC 20006
(202) 966-3311
Jackk@whistleblower.org

Nate L. Adams III (VSB No. 20707)
11 S. Cameron Street
Winchester, VA 22601
(540) 667-1330
nadams@nadamslaw.com

Attorneys for Plaintiff

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 3

II.    BOTH "NON-EXISTENT" CASES EXIST AND BOTH MISQUOTES CORRECTLY
STATED THE LAW ............................................................................................ 4

III.    THE RECENT ATTENTION ON GPT ERRORS REFLECTS THE LEGAL
PROFESSION'S ADAPTATION TO NEW TECHNOLOGY ....................................... 5

IV.    CASE LAW SHOWS THAT RULE 11 IS NOT SUITED TO REGULATING
INADVERTENT GPT ERRORS.............................................................................. 8

V.    THE COURT'S INHERENT POWERS ARE ILL-SUITED FOR REGULATING
UNINTENTIONAL GPT ERRORS ........................................................................11

VI.    MSA FAILED IN ITS DUTY TO NOTIFY PLAINTIFF OF THE GPT "NON-
EXISTENT CASES" ........................................................................................... 14

VII.    PLAINTIFF'S COUNSEL FAILURE TO FILE A "REPLY" OR ERRATA CANNOT BE
USED TO DETERMINE THE EXISTENCE OF A RULE 11 VIOLATION ............................. 17

    A.  No Reply is Allowed in a Rule 72 Objections Process:................................ 17

    B.  Plaintiff's Counsel Did Not Read MSA's "ChatGPT Run Amok" Argument: ............ 18

    C.  MSA's Response Cannot Retroactively Create a Rule 11 Violation:......................... 19

VIII.    LAWYERS MAY VALIDATE GPT RESPONSES BY HUMAN OR ELECTRONIC
MEANS DEPENDING UPON THEIR ASSESSMENT OF THE REASONABLE RISKS OF
ERROR ........................................................................................................... 21

IX.    CONCLUSION............................................................................................... 25

Plaintiff Karen Iovino, by and through undersigned counsel, respectfully submits this response to the Court's Order to Show Cause (ECF No. 178) (hereafter "OSC") regarding the citations in Plaintiff's Rule 72(a) objections to Magistrate Judge Hoppe's May 23, 2024 order granting a protective order to give the Department of State and the Defendant considerable control over depositions. (ECF No. 174).  The broader context of the OSC is the Court's Memorandum Opinion. (ECF No. 177).

## I.  INTRODUCTION

While denying putting forth any "fictitious" cases, Plaintiff's lead counsel Thad M. Guyer in his declaration acknowledges several miscitations and misquotations. Mr. Guyer, who is solely responsible for the legal research and writing at issue maintains that these mistakes were unintentional and do not warrant sanctions under Rule 11 or the Court's inherent powers. In his declaration, Mr. Guyer explains in practical and technical detail the errors that resulted from his good-faith reliance on AI-assisted legal research tools, specifically "generative artificial intelligence" in paid subscriptions including Westlaw and Lexis + Microsoft Word "add-in" (Guyer Decl. ¶¶ 29-30).  The facts do not reflect any intent by Mr. Guyer to deceive the Court or opposing counsel, and no such deception occurred. (Guyer Decl. ¶¶ 11-12). Nor were any attorneys on Plaintiff's legal team aware of Defendant's "ChatGPT run amok" allegations in its Response to Plaintiff's Objections to the Magistrate's order-- no one on the team ever read said Response until this Court issued its OSC.  Nor under the Fourth Circuit's "snapshot" rule can that failure to read the Response and correct the miscitations, nor any other circumstance following Mr. Guyer's signing of the Objections, *nunc pro tunc* create a Rule 11 violation if it did not exist as of the date of signing and filing. Although no Rule 11 violation has occurred, the OSC itself and media reports of the OSC have already exceeded any appropriate sanctions.

Should the Court find a violation of Rule 11, only the lowest level of sanction would be appropriate-- a warning against repetition. Plaintiff's counsel has already taken immediate remedial actions, including implementing strict verification processes and providing additional deployment Westlaw and Lexis of AI technology (Guyer Decl. ¶¶ 37-40; Kolar Decl. ¶¶ 5-6). Moreover, the miscitations and misquotations did not materially affect the substance of Plaintiff's arguments regarding the application of Touhy regulations in this case (Guyer Decl. ¶¶ 14-18). Counsel respectfully submits that the prompt acknowledgment of the errors, the steps taken to prevent their recurrence, and the absence of bad faith should weigh against the imposition of sanctions or referral to state bars.

## II.   BOTH "NON-EXISTENT" CASES EXIST AND BOTH MISQUOTES CORRECTLY STATED THE LAW

The two cases cited by Defendant and the Court as apparently non-existent, *United Therapeutics Corp. v. Watson Laboratories, Inc*. and *United States v. Mosby*, do exist but were miscited (Guyer Decl. ¶ 11). *United Therapeutics*, though incorrectly cited as "No. 3:17-cv-00081, 2017 WL 2483620, at 1 (E.D. Va. June 7, 2017)," is a real case reported at 200 F. Supp. 3d 272 (D. Mass. 2016) (Guyer Decl. ¶ 11(1)). Moreover, the proposition for which this case is cited in Plaintiff's Objections is accurate and applicable, notwithstanding the misquotations. (Guyer Decl. ¶ 14).  Similarly, *United States v. Mosby*, though miscited as "2021 WL 2827893, at 4 (D. Md. July 7, 2021)," is a real case reported at 2022 WL 1120073 (D. Md. Apr. 14, 2022). (Guyer Decl. ¶ 11(2)).  The proposition for which this case was cited finds analogous support in a Fourth Circuit case cited within *Mosby*.  (Guyer Decl. ¶ 15).

The attributed quotations that do not appear verbatim in the cited cases, *Graves v. Lioi* and *Bostock v. Clayton County*, nonetheless accurately reflect principles discussed in those cases (Guyer Decl. ¶ 12). The "decided by necessary implication" language in *Graves v. Lioi*, while not

a direct quote, correctly states the law of the case doctrine as applied by the Fourth Circuit (Guyer Decl. ¶ 17). Similarly, the "make a mockery of the law" phrase in *Bostock v. Clayton County*, though misquoted, aligns with the Supreme Court's emphasis on avoiding statutory constructions that would lead to absurd consequences (Guyer Decl. ¶ 18).

These errors, while regrettable, do not alter the substance of the legal arguments presented in Plaintiff's Objections. The core contentions regarding the applicability of *Touhy* regulations, separation of powers concerns, and the interpretation of 41 U.S.C. § 4712 remain intact and supported by the cited authorities (Guyer Decl. ¶¶ 14-21).

## III. THE RECENT ATTENTION ON GPT ERRORS REFLECTS THE LEGAL PROFESSION'S ADAPTATION TO NEW TECHNOLOGY

Inadvertent, reckless or intentional miscitations and misquotations are as old as the law and an inevitable consequence of human error, overzealousness or avarice-driven dishonesty. The Department of Justice miscites criminal statutes so often in indictments that they have their own safe harbor rule, Fed.R.Crim.Pro. 7(c)(2), and still criminal defense lawyers routinely and unsuccessfully claim the prejudice exception, even when the miscitation is deliberate. *United States v. Massue*t, 851 F.2d 111, 116 (4th Cir. 1988).[1] Yet finding any court exercising inherent authority to sanction those prosecutors is almost futile.  Judges and chambers miscite authorities, and the remedy is normally to withdraw and reissue the decisions.[2] And until the advent of the

---

[1] See also, *Sonnier v. United States*, 314 F.2d 69, 70 (4th Cir. 1963) and *United States v. Milk Distribs. Asso*., 200 F. Supp. 792, 801-02 (D. Md. 1961). Rule 7(c)(2) codified the harmless error rule of miscitation in *United States v. Hutcheson*, 312 U.S. 219 (1941), United States v. Downer, 143 F.3d 819, 824 (4th Cir. 1998).

[2] See for egs, *Pen-Ken Gas & Oil Corp. v. Warfield Nat. Gas Co*., 137 F.2d 871, 886 (6th Cir. 1943), *Ferguson v. Runyon*, No. 96-3306, 1997 U.S. App. LEXIS 12492, at *8 (7th Cir. May 22, 1997), *Sample v. Miles*, 239 F. App'x 14, 18 (5th Cir. 2007), and *Power Rental OP CO, LLC v. V.I. Water & Power Auth*., No. 3:20-cv-1015-TJC-JRK, 2021 U.S. Dist. LEXIS 125098, at *2 (M.D. Fla. July 6, 2021).

GPT's and a spate of sensationalized 2024 cases, lawyer miscitation and misquotation seldom drew the mention of Rule 11, and almost never resulted in a sanction,[3] and at least once drew "Levity".[4]  But in the dizzying pace of courtroom technology of ChatGPT and the "Zoom cat lawyer", our profession is sensitive to technological practice error.[5]

---

[3] See egs., *Smith v. Commonwealth Edison Mut. Benefit Asso.*, No. 85 C 2185, 1987 U.S. Dist. LEXIS 392, at *9 (N.D. Ill. Jan. 20, 1987) ("court expects better of counsel"), *Jones v. Curry*, No. 1:08-cv-01464-AWI-JMD-HC, 2009 U.S. Dist. LEXIS 99577, at *8 n.5 (E.D. Cal. Oct. 26, 2009) ("Court reminds counsel" of Rule 11),  *Kalter v. Keyfactor, Inc.*, No. 21-cv-1707-L-DDL, 2022 U.S. Dist. LEXIS 202798, at *8-9 (S.D. Cal. Nov. 7, 2022) (noting that the court "appreciates counsel's duty to zealously advocate on their client's behalf and that, at times, 'overzealous advocacy' may result", objecting to counsel's claim that "case law is legion" for his argument), and *Somers v. Express Scripts Holdings*, No. 1:15-cv-01424-JMS-DKL, 2017 U.S. Dist. LEXIS 54970, at *31 n.4 (S.D. Ind. Apr. 11, 2017) (court "reminds counsel that it has a duty to verify that its citations to legal authority are accurate" and that "[f]ailure to do so not only constitutes ineffective advocacy, but also implicates counsel's reputation and duty of candor to the Court").

[4] See, *Morgan v. Dow Chem. Co.*, No. 17-269-JWD-UNA, 2017 U.S. Dist. LEXIS 220792, at *23 n.1 (M.D. La. July 18, 2017), putting a warning against misciation this way:

> Counsel for Avondale is indeed fortunate that sanctions once applicable to a lawyer's miscitation of the law are no longer controlling. Under Spanish law once controlling in Louisiana, "a lawyer who intentionally miscited the law could be sent to exile, and his property could be confiscated." A.N. Yiannopoulos, *The Civil Codes of Louisiana*, 1 Civ. L. Comment. 1, 21 (2008) at www.law.tulane.edu/uploadedFiles/Institutes_and_Centers/Eason_Weinmann/v01 i01-Yiannopoulos.pdf. *Levity aside, the Court considers the Avondale Defendants' conduct serious and reproachable*. These defendants are warned that, should this case return to this Court, they should pay particular care to accurately cite case law, and, even more importantly, the words from this Court.

(Emphasis added).

[5] See Wikipedia, "Zoom Cat Lawyer", which recounts:

> Zoom Cat Lawyer, also known as I'm Not a Cat, is an Internet meme that refers to a viral video taken from a live stream of a civil forfeiture hearing, and being held on the video conferencing application Zoom in Texas' 394th Judicial District Court. The video features an attorney named Rod Ponton, who is struggling to disable a cat filter that shows a white kitten instead of his face, making it appear as though a cat is speaking.

The heightened scrutiny of GPT errors in recent cases is a reflection of the legal profession's ongoing adaptation to rapidly advancing AI technology. The newsworthy nature of these errors stems from the swift integration of AI tools into legal practice, which has generated both excitement and apprehension within the legal community. As the profession continues to develop best practices and standards for the responsible use of AI, the courts must as they did before the GPTs distinguish between inadvertent errors and intentional misconduct.

Rule 11 reprimands even without other sanctions are to be used in rare cases and carefully.  Lawyer reputations are not wholly apart from the courts, they are officers and tarnishing those reputations tarnishes the judiciary. As pointed out in the oft-cited case, *Precision Specialty Metals, Inc. v. United States*, 315 F.3d 1346, 1352-53 (Fed. Cir. 2003), harming a lawyer's reputation with an undeserved sanction can be the subject of interlocutory appeal:

> As the other circuits have pointed out, a judicial reprimand is likely to have a serious adverse impact upon a lawyer's professional reputation and career. A lawyer's reputation is one of his most important professional assets. Indeed, such a reprimand may have a more serious adverse impact upon a lawyer than the imposition of a monetary sanction. *The trial court's formal reprimand of Walser had a sufficiently direct impact upon her that she should be able immediately to obtain appellate review of that action*. Although the opinion that contained the reprimand was unpublished, that fact should not insulate the trial court's action from judicial review. Unpublished opinions, although not then reprinted in the West Publishing Company reports, may be, and frequently are, reported elsewhere.

(Emphasis added). More often than not, the judiciary acknowledges that miscitation and misquotation, while offensive to the judicial process and warranting corrective action, appear to be the product of inadvertent mistakes rather than intentional misconduct.  In *Precision Specialty Metals, id*. the court considered sanctions in a case where counsel had miscited relevant precedent and cropped quotations in a manner that altered their meaning.  The court formally

---

https://en.wikipedia.org/wiki/Zoom_Cat_Lawyer#:~:text=Zoom%20Cat%20Lawyer%2C%20also%20known%20as%20I%27m%20Not,Zoom%20in%20Texas%20%27%20394th%20Judicial%20District%20Court.

reprimanded the attorney for violating Rule 11 after concluding that the attorney "either willfully or though an unacceptable level of negligence, and the use of selective quotations and direct misquotation, concealed a Supreme Court case of which she was or should have been aware." [6]

*Precision Specialty Metals, Inc*. is most cited by contrast, in which district judges distinguish the offenses of the lawyers before them with the offenses in that case-- a lawyer manipulating a precedential or dispositive case precedent, pruning and snipping the language to change the import of the holding.  Even in those reportedly egregious circumstances, the Rule 11 sanction was a reprimand. The larger profile of that case was the right of the reprimanded lawyer to gain appellate review.  Nothing in *Precision Specialty Metals, Inc*. and the pre-GPT Rule 11 cases provides support for Rule 11 sanctions in the "ChatGPT run amok" era where the lawyers using the new technologies had a validation process in place-- though flawed.

## IV.   CASE LAW SHOWS THAT RULE 11 IS NOT SUITED TO REGULATING INADVERTENT GPT ERRORS

Without question, under Rule 11 it is improper and unacceptable for litigants to submit "non-existent judicial opinions with fake quotes and citations." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 448 (S.D.N.Y. 2023). As the Second Circuit recognized, an effort to "persuade a court or oppose an adversary by relying on non-existent precedent generated by ChatGPT  is an abuse of the adversary system", *Dukuray v. Experian Info. Sols.*, 2024 U.S. Dist. LEXIS 132667, at *29 (S.D.N.Y. July 26, 2024), citing *Park v. Kim*, 91 F.4th 610, 615 (2d Cir. 2024) and *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 461 (S.D.N.Y. 2023) (internal quotations omitted). The growing body of case law regarding GPT errors in a Rule 11 or other sanctions context has little

---

[6] *Precision Specialty Metals, Inc*. 315 F.3d at 1355. ("The court concluded that Walser violated Rule 11 because she 'signed a brief before this court which omitted directly relevant language from what was represented as precedential authority, which effectively changed the meaning of at least one quotation, and which intentionally or negligently misled the court.'").

or no application to the present case for one direct reason-- Iovino's counsel submitted no "fictitious", "hallucinated", "non-existent" or "fake" cases or legal authorities.  Almost all of the GPT problem cases to date concern a single fact scenario-- citation of cases that do not exist. No GPT problem case has been found in which the miscitation or misquotation of existing cases was the central issue.

While simply relying upon a consumer level GPT chatbot with little or no validation methodology may lead to Rule 11 violations,  reliance on an integrated set of GPT and legal mainstream databases and tools like Westlaw, Lexis and Casetext is neither careless nor unprofessional. As the court recounted in *Anonymous v. N.Y.C. Dep't of Educ.*, No. 1:24-cv-04232 (JLR), 2024 U.S. Dist. LEXIS 127114, at *19-21 (S.D.N.Y. July 18, 2024), "One study estimates that even in situations designed to prevent it from happening, chatbots invent information at least 3 percent of the time - and as high as 27 percent." (Internal brackets and citations omitted). Three percent almost certainly within the range of human error in legal research and writing, and an integrated system of GPT and electronic validation is likely to be at lower end of the error spectrum.

In making her Touhy arguments and assigning error to the Magistrate, Iovino's counsel did not blindly rely "on a generative artificial intelligence tool, ChatGPT, to identify precedent that might support her arguments" as the attorney reportedly did in *Park v. Kim*, 91 F.4th 610, 612 (2d Cir. 2024).   The attorney there "did not read or otherwise confirm the validity of the (non-existent) decision she cited." Id. By contrast, Iovino's counsel at no point "failed to determine that the argument she made was 'legally tenable.'" *Id.* at 615 (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)).

In *United States v. Cohen*, No. 18-CR-602 (JMF), 2024 U.S. Dist. LEXIS 48907, at *14-16 (S.D.N.Y. Mar. 20, 2024), the Court found that non-existent case law had been presented by one lawyer and accepted by another lawyer, but because the sanctions issue was originated sua sponte, "bad faith" was required to impose any sanctions.  If the Fourth Circuit would follow the evolving law of the Second Circuit on sanctions in GPT problem cases, then "to impose sanctions on any ground here requires a finding of bad faith." *Id.,* internal quotation marks omitted.  That case was on the criminal docket, so the court analogized to Rule 11 based on "inherent powers" and "Section 1927" precedents. The court found that the standard is "knowingly submitted a materially false or misleading pleading, or knowingly failed to correct false statements, as part of a deliberate and unconscionable scheme to interfere with the Court's ability to adjudicate the case fairly", citing *Usherson v. Bandshell Artist Mgmt.*, No. 19-CV-6368 (JMF), 2020 U.S. Dist. LEXIS 112368, 2020 WL 3483661, at *9 (S.D.N.Y. June 26, 2020) (internal quotation marks omitted).

The *Cohen* court recognized that "Rule 11 does not always require bad faith, but it does where, as here, a court raises the prospect of sanctions on its own initiative", citing *See Muhammad v. Walmart Stores E., L.P.*, 732 F.3d 104, 108 (2d Cir. 2013) (per curiam). The Cohen court concluded that the attorney's GPT based errors resulting in "citation to non-existent cases is embarrassing and certainly negligent, perhaps even grossly negligent. But the Court cannot find that it was done in bad faith." Id. at *14-16. *Mata v. Avianca, Inc*. came to the same conclusion, and sanctioned counsel not based on the fictious cases per se, but based on the sworn declarations of the lawyer attesting that he had read the submissions when he had not, indeed finding that he had not "read a single case" in the entire submission. *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 464 (S.D.N.Y. 2023).

10

In almost all of the GPT problem cases, the lawyer as here had made unintentional mistakes stemming from the use of new AI-assisted legal research tools (Guyer Decl. ¶¶ 8, 9-10, 16 and 22). This situation falls squarely within the category of unintentional first-time errors that Rule 11 was not designed to sanction. The Fourth Circuit view appears to be that Rule 11 sanctions should be imposed sparingly and only in cases of clear abuse. Rule 11 sanctions are an extraordinary remedy, one to be exercised with caution. This cautious approach is even more warranted when dealing with novel issues arising from the use of new technologies. The Supreme Court has emphasized that the primary purpose of Rule 11 is deterrence, not punishment. In *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990), the Court noted that "the central purpose of Rule 11 is to deter baseless filings in district court and thus*** streamline the administration and procedure of the federal courts." In the present case, the citation errors, while regrettable, do not constitute "baseless filings" that Rule 11 was designed to deter.

## V.  THE COURT'S INHERENT POWERS ARE ILL-SUITED FOR REGULATING UNINTENTIONAL GPT ERRORS

The Court's inherent powers, while broad, must be exercised with restraint and discretion, as emphasized by the Supreme Court in *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991). Courts must be able to address any "wrong against the institutions set up to protect and safeguard the public". Id.  These powers should only be invoked when the rules or statutes are inadequate to address the situation at hand. "Because of their very potency, inherent powers must be exercised with restraint and discretion.  A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Id at 44-45.The high threshold for exercising inherent powers is not met by the inadvertent GPT errors in this case, which do not involve intentional misconduct or bad faith,

As articulated in *United States v. Shaffer Equipment* Co., 11 F.3d 450, 462 (4th Cir. 1993), under "the inherent power, a court may issue orders, punish for contempt, vacate judgments obtained by fraud, conduct investigations as necessary to exercise the power, bar persons from the courtroom, assess attorney's fees, and dismiss actions."

The errors in Plaintiff's Objections do not meet this stringent standard, as there was no intention to deceive the Court or mislead opposing counsel. When there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the rules, the court ordinarily should rely on the rules rather than the inherent power.  As stated in *Gibbes v. Rose Hill Plantation Dev. Co*., 794 F. Supp. 1327, 1340 (D.S.C. 1992):

> A court has the inherent power to assess attorney's fees when a party has acted in bad faith or in willful disobedience to a court's orders. *Chambers v. NASCO, Inc.*, 115 L. Ed. 2d 27, 111 S.Ct. 2123, 2134 (1991).  However, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the rules, the court ordinarily should rely on the rules rather than the inherent power." *Id*. at 2136.

The use of inherent powers to sanction unintentional GPT errors would be disproportionate to the nature of the conduct in question. "Even when a court properly concludes that sanctions are warranted, it abuses its discretion when it imposes sanctions disproportionate to the severity of a party's misconduct". *Blue Cross Blue Shield of N.C. v. Jemsek Clinic, P.A. (In re Jemsek Clinic, P.A.)*, 850 F.3d 150, 158 (4th Cir. 2017) (citing *United States v. Rhynes*, 218 F.3d 310, 321-22 (4th Cir. 2000) (en banc); *Chambers*, 501 U.S. at 44-45).  Thus, compensatory sanctions cannot be used to "punish", so that an award of attorney's fees to the adverse party is allowed only if it is compensatory and not punitive. *Goodyear Tire & Rubber Co. v. Haege*r, 581 U.S. 101 (2017) ("a sanction counts as compensatory only if it is calibrated to the damages caused by the bad-faith acts on which it is based", internal citations and bracket omitted.)  *See also Felman Prods., Inc. v. Indus. Risk Ins.*, No. 3:09-0481, 2011 U.S. Dist. LEXIS 112161, 2011

WL 4547012, at *8 (S.D. W. Va. Sept. 29, 2011) (stating a court has "broad inherent power to protect the administration of justice by levying sanctions in response to abusive litigation practices", internal citations omitted). The Fourth Circuit has stated that *Chambers* authorizes a court to use its inherent power to impose sanctions "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the judicial process." *Johnson v. Ford Motor Co*., No. 3:13-6529, 2017 U.S. Dist. LEXIS 211877, at *19-20 (S.D. W. Va. Dec. 27, 2017) (citing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)) (internal brackets omitted).

The courts' inherent powers must be exercised in a manner that is consistent with the overall administration of justice, balancing the authority to fashion appropriate sanctions for abusive conduct with the principle that sanctions should be proportionate to the conduct in question. Moreover, Plaintiff's counsel's unblemished record weighs against the imposition of sanctions in this case (Adams Decl. ¶ 5, Kolar Decl. ¶¶ 4-6, Guyer Decl. ¶¶ 25, 37-40). The errors in the Objections are not reflective of counsel's overall conduct or competency, and any sanctions should be "proportionate" to the conduct in question.

The "primary purpose of Rule 11 is to punish violators and deter parties and their counsel from pursuing unnecessary or unmeritorious litigation." *Moody v. Arc of Howard Cty., Inc.*, 474 F. App'x 947, 950 (4th Cir. 2012). Thus, "an isolated, inadvertent error does not justify Rule 11 sanctions." *In re Bees*, 562 F.3d 284, 288 (4th Cir. 2009). See also, *Crete Carrier Corp. v. Sullivan & Sons, Inc*., Civil Action No. ELH-21-328, 2022 U.S. Dist. LEXIS 38623, at *11 (D. Md. Mar. 4, 2022).[7]

---

[7] See also, *Columbia Venture LLC v. FEMA (In re Bees)*, 562 F.3d 284, 288 (4th Cir. 2009):

## VI.   MSA FAILED IN ITS DUTY TO NOTIFY PLAINTIFF OF THE GPT "NON-EXISTENT CASES"

Informal conferring and professional courtesy between attorneys are cornerstones of judicial economy in many districts, including by local rules.[8]  The Advisory Committee's 1993 revision notes recognize the role of informal notice as a courtesy to opposing counsel and explain that "counsel should be expected to give informal notice to the other party, whether in person or by a telephone call or letter, of a potential violation before proceeding to prepare and serve a Rule 11 motion." Fed. R. Civ. P. 11 advisory committee's note. *Darbonne v.* Brantley, No. 04-2931, 2005 U.S. Dist. LEXIS 932, at *5-6 (E.D. La. Jan. 21, 2005).  See also, *In re Campbell*, No. 12-06400-8-SWH, 2013 Bankr. LEXIS 2282, at *7-8 (Bankr. E.D.N.C. June 5, 2013). Of

---

Thus, we can only conclude that FEMA's error in one portion of its September 9, 2005 brief was an inadvertent mistake, not a deliberate attempt to mislead or a failure to conduct a reasonable inquiry. Such an isolated, inadvertent error does not justify Rule 11 sanctions. *See Milwaukee Concrete Studios, Ltd. v. Fjeld Mfg. Co*., 8 F.3d 441, 449-51 (7th Cir. 1993); *see also Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1245 (4th Cir. 1987) ("[Rule 11] does not extend to isolated factual errors, committed in good faith . . . "). Imposition of sanctions on this basis constitutes an abuse of discretion.

[8] As the court explained in *Caranchini v. Nationstar Mortg., LLC*, 97 F.4th 1099, 1102-03 (8th Cir. 2024):

Rule 11 specifically says, "[t]he motion must be served" on the other party 21 days before being filed in court. Fed. R. Civ. P. 11(c)(2) (emphasis added). Moreover, the Advisory Committee's Notes instruct parties to give "informal notice to the other party, whether in person or by telephone call or letter, of a potential violation before proceeding to prepare and serve [the other party with] a Rule 11 motion." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment (emphasis added). Thus, informal notice is only a "professional courtesy," Penn, LLC v. Prosper Bus. Dev. Corp., 773 F.3d 764, 767 (6th Cir. 2014), not the official notice that starts the 21-day safe harbor period.

course, to even seek the *Touhy* protective order in this case, MSA was required to confer under FRCP 26(c) "in an effort to resolve the dispute without court action".

It is probably safe to say that few judges would be enthusiastic about gearing up Rule 11 to regulate problems with the GPTs and lawyers using them. Among the most supported amendments to Rule 11 has been the "safe harbor" provision requiring lawyers to correct each other before burdening the courts with allegations of professional misconduct. It is preferable that a lawyer who cannot find his adversary's cited case simply send an email or make a phone call to locate it. It is unlikely that a lawyer can claim the high ground of "diligent search" for an apparently non-existent case if he has not asked to be provided with it. In a survey of district court judges by the Federal Judicial Center, the "questionnaire asked judges if they supported or opposed the Rule 11'safe harbor' provision, which was added as part of the 1993 amendments. Table 3 shows that 86% of the judges said they supported it, with the majority of the judges expressing strong support." ("Report of a Survey of United States District Judges' Experiences and Views Concerning Rule 11", FJC Report at 5).[9]

On top of the procedural requirements imposed by Rule 11 for lawyers to informally communicate before any sanctions motions can be filed, local rules and practice to informally

---

[9] David Rauma & Thomas E. Willging, "Report of a Survey of United States District Judges' Experiences and Views Concerning Rule 11, Federal Rules of Civil Procedure", Federal Judicial Center (2005), https://www.uscourts.gov/sites/default/files/rule1105_1.pdf. Judges' opinions about specific provisions in Rule 11 and the proposed legislation followed a similar pattern. The results indicated that relatively large majorities of the judges who responded to our survey have the following views about Rule 11: • 85% strongly or moderately support Rule 11's safe harbor provision;• 91% oppose the proposed requirement that sanctions be imposed for every Rule 11 violation;• 84% disagree with the proposition that an award of attorney fees should be mandatory for every Rule 11 violation; and• 72% believe that having sanctions for discovery in Rules 26(g) and 37 is best. (FJC Report at 2).

confer on disputes generally may also apply to Rule 11. With respect to sanctions in a broader Rule 11 or similar context, the failure to confer may warrant the denial of a Rule 11 motion. *See, Harris v. Virage Capital Mgmt*. LP, No. 23-23803-Civ, 2024 U.S. Dist. LEXIS 74175, at *16-17 (S.D. Fla. Mar. 27, 2024).

Under Rule 11, an adverse party desiring to seek Rule 11 sanctions must circulate a draft or notice of the sanctions motion to the allegedly offending counsel who made the GPT use mistakes. This is the "safe harbor" feature of Rule 11. Even where a sanctions motion is not being made, the attorney alleging GPT use mistakes, including fictitious cases, should, as an officer of the court, promptly call those mistakes to the attention of the offending lawyer so they can correct such errors, thereby sparing the parties and the court from needlessly expending resources on formal motions practice (Guyer Decl. ¶ 24).

The "safe harbor" provision is a critical feature of Rule 11, designed to promote efficiency and collegiality in litigation. The rule provides that requests for sanctions must be made as a separate motion, and cannot be filed until giving adverse counsel at least 21 days to fix the alleged violation. As stated in the Advisory Committee Notes to the 1993 amendments state that parties are expected to informally confer before the formality of the Rule 11 process can even commence. The importance of the safe harbor provision has been consistently emphasized by courts. In *Ridder v. City of Springfield*, 109 F.3d 288, 293 (6th Cir. 1997) the court noted that the purpose of the safe harbor provision is to allow an attorney "to withdraw an offending paper". Similarly, in *Barber v. Miller*, 146 F.3d 707, 710 (9th Cir. 1998), the court emphasized "both the language and purpose of the amendment to the Rule to permit an informal warning to substitute for service of a motion."

In the present case, MSA failed to provide any notice of the alleged citation errors before raising them with the Court (Gray Decl. ¶¶ 3-5, and Dan Ward Letter, Exhibit C, indicating he had no obligation to contact Mr. Guyer).  This failure not only contravenes the spirit of Rule 11's safe harbor provision but also goes against the broader principles of professional courtesy and efficient judicial process. Had MSA alerted Plaintiff's counsel to the citation issues when they first identified them, the errors could have been promptly reviewed, acknowledged, and corrected (Guyer Decl. ¶ 24). Instead, by raising these issues directly with the Court without prior notice, MSA has unnecessarily escalated the matter and consumed judicial resources. Moreover, MSA's approach runs counter to the collaborative spirit that should govern interactions between counsel. The legal profession has long recognized the importance of civility and cooperation among attorneys, even in the context of adversarial proceedings. The American Bar Association's Model Rules of Professional Conduct, Rule 3.4(d), states that a lawyer shall not "in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party." While not directly applicable here, this rule underscores the expectation that attorneys will work together in good faith to resolve issues efficiently.

## VII.  PLAINTIFF'S COUNSEL FAILURE TO FILE A "REPLY" OR ERRATA CANNOT BE USED TO DETERMINE THE EXISTENCE OF A RULE 11 VIOLATION

### A.     No Reply is Allowed in a Rule 72 Objections Process:

The Court's Memorandum Opinion noted that Plaintiff "puzzlingly has not replied to explain where her seemingly manufactured citations and quotations came from and who is primarily to blame for this gross error" (ECF No. 177 at 15). However, no local rules for the Western District of Virginia authorize a party filing an objection under Rule 72 to file a reply to the adverse party's response to that objection (Guyer Decl. ¶ 25). Local Rule 11(c)(1) of the

Western District of Virginia applies only to motions practice and does not provide for replies in the context of Rule 72 objections. The uniform understanding of district courts in the Fourth Circuit is that Rule 72 allows exactly one statement of positions from each side. For example, in *In re Zetia (Ezetimibe) Antitrust Litigation,* 2018 U.S. Dist. LEXIS 222951 at *15 (E.D. Va. Nov. 9, 2018), the court noted that a reply is not contemplated even under Rule 72(b)(2).  Rule 72(b)(2) provides that a party may respond to another party's objections but that "[n]o provision for a reply is made". Id. at *15-16.  Local rules on motions practice do not change that, as "neither the Federal Rules of Civil Procedure, nor this court's Referral Order, nor the Local Civil Rules of this court provide for a reply". Id. *16.

Similarly, in *Carrier-Tal v. McHugh*, 2016 U.S. Dist. LEXIS 194489, at 2 n.1 (E.D. Va. Feb. 3, 2016), the court stated that "a reply is not provided for in Rule 72(a) or the accompanying advisory notes." This understanding was echoed in *Krings v. Avl Technologies*, 2022 U.S. Dist. LEXIS 47907, at 2 n.1 (W.D.N.C. Mar. 16, 2022), where the court observed that no provision for a reply is made by Rule 72(b)(2), which only provides for objections and responses to those objections.[10]

### B.   Plaintiff's Counsel Did Not Read MSA's "ChatGPT Run Amok" Argument:

Because there was no immediate need to read MSA's Response with its "ChatGPT run-amok" reference, neither Mr. Guyer nor any of his co-counsel Mr. Kolar or Ms. Adams read it prior to this Court OSC. (Guyer Decl. ¶ 25, Kolar Decl. ¶ 4, and Adams Decl. ¶ 9).  Given the well-established understanding of Rule 72 in the Fourth Circuit, Plaintiff's counsel did not file a reply to MSA's Response to Plaintiff's Objections.  Plaintiff's counsel were confident that MSA's

---

[10] See also, *Krings v. Avl Techs*., No. 1:21-cv-00150-MR-WCM, 2022 U.S. Dist. LEXIS 47907, at *2 n.1 (W.D.N.C. Mar. 16, 2022) ("Replies in support of objections are not contemplated").

Response would simply reiterate the same positions on *Touhy* advanced for almost two years, the same positions stated in the prior briefings, the same as during the two previous oral arguments before Magistrate Judge Hoppe, and in the resulting orders.  We had no doubt that MSA's counsel would not have raised any new arguments beyond what was preserved in the proceedings below.  We were right except for one thing-- "ChatGPT run amok."  (Guyer Decl. ¶ 26.)

### C.     MSA's Response Cannot Retroactively Create a Rule 11 Violation:

Had Plaintiff's counsel known of the "ChatGPT Run Amok" and promptly corrected the errors as Mr. Adams and Mr. Kolar would have demanded, and Mr. Guyer would have done without those demands, it might be relevant to the level of sanction, but not to establishing a Rule 11 violation.  Rule 11 violations cannot be established retroactively. This applies to regardless of the scale of the error:

> While this duty does not require the parties or counsel to dismiss the case once it appears baseless, it does apply to "every paper signed during the course of the proceedings and not only to the pleadings." *Brubaker v. City of Richmond*, 943 F.2d 1363, 1382 (4th Cir. 1991) (adopting the "snapshot" view of Rule 11, in which Rule 11 review focuses upon whether counsel's conduct comported with Rule 11 at the instant the signature was placed on the document).

*Leviton Mfg. Co. v. Universal Sec. Instruments, Inc*., 613 F. Supp. 2d 670, 714 n.19 (D. Md. 2008).  As *Brubaker v. City of Richmond*, 943 F.2d 1363, 1382-83 (4th Cir. 1991) explained, quoting the Second Circuit's reasoning in *Oliveri v. Thompson*, 803 F.2d 1265, 1274 (2nd Cir. 1986), *cert. denied*, 480 U.S. 918 (1987):

> While the drafters of the rule could easily have further extended its application by referring to the entire conduct of the proceedings, they failed to do so and instead chose to expand only the categories of papers to which the rule applies. Moreover, the advisory committee note to the amended rule states that the signer's conduct is to be judged as of the time the pleading or other paper is signed. Fed. R. Civ. P. 11 advisory committee note. It is difficult to imagine why this comment would be made if the rule were meant to impose a continuing obligation on the attorney.

The court cited *Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 874-75 (5th Cir. 1988) (en banc) (concluding that " like a snapshot, Rule 11 review focuses upon the instant when the picture is taken -- when the signature is placed on the document"); and *Gaiardo v. Ethyl Corp.*, 835 F.2d 479, 484 (3rd Cir. 1987) (determining that "Rule 11 does not authorize a sanction for failing to amend or correct a document if information obtained or legal research performed after filing reveals an error"), to reach this conclusion.[11]  The signing attorney must have subsequently done something with the fictitious cases, citations or quotations to come with the proscriptions of Rule 11.  In a continuing use scenario, an "attorney's compliance with Rule 11(b)(2) is not assessed solely at the moment that the paper is submitted" because the 1993 amendments "added language that certifies an attorney's Rule 11 obligation continues when 'later advocating' a legal contention first made in a written filing covered by the Rule." Thus, "a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." *Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 461 (S.D.N.Y. 2023) (quoting Rule 11, advisory committee's note to 1993 amendment).  So too may the lawyer be sanctioned under Rule 11 for the "failure to correct a prior statement in a pending motion" or "for refusing to withdraw an allegation or claim even

---

[11] The Fourth Circuit's citation to *Thomas v. Capital Sec. Servs*., id. is particularly important for its admonition that "the court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." So too, it seems especially important that when it comes to new technologies with previously unknown concepts like "hallucinations", followed by remarkable enhancements to the technology and marketing by Westlaw and Lexis of their own GPTs, that courts should be especially circumspect when it comes to "the wisdom of hindsight".

after it is shown to be inaccurate."). *Id.* (citing *Galin v. Hamada*, 283 F. Supp. 3d 189, 202

(S.D.N.Y. 2017).)

## VIII.   LAWYERS MAY VALIDATE GPT RESPONSES BY HUMAN OR ELECTRONIC MEANS DEPENDING UPON THEIR ASSESSMENT OF THE REASONABLE RISKS OF ERROR

Where GPT use errors have occurred, there is no requirement that the corrective action

rely on visual validation of the cited cases and text. Instead, that validation requirement can be

met by additional electronic review functions. This principle is particularly important in the

context of modern legal practice, where the volume of legal information and the pace of

litigation often necessitate the use of advanced technological tools. The Federal Rules of Civil

Procedure, including Rule 11, do not specify any particular method for verifying the accuracy of

legal citations or quotations. The requirement is simply that attorneys make "an inquiry

reasonable under the circumstances" before presenting a document to the court. In today's digital

age, what constitutes a "reasonable inquiry" has evolved along with technology. Courts have

recognized the legitimacy of electronic legal research and the reliance on digital databases.

The root question under Rule 11 on the topic of reliable citation, quotation and reporting

of court decisions is this: what is the acceptable standard of reliance, or alternatively, what is the

reasonable risk of error when lawyers and judges rely on human and artificial assistants?  "In the

most general terms, these issues can be dealt with in ways similar to how judges currently utilize

legal clerks and assistants. *** Judges learn which parts of the work they can entrust to their

assistants, what type of quality assurance checks they must run, and which parts they should do

only by themselves." (Arbek, Yonathan, "Judicial Economy in the Age of AI", NCJI at 25-26).[12]

---

[12] Arbek, Yonathan, "Judicial Economy in the Age of AI", 2024 Forum for State Appellate Court Judges (July 20, 2024), National Civil Justice Institute (NCJI), https://ncji.org/wp-content/uploads/2024/06/2024-NCJI-Judges-Forum-AI-Judges-and-Legal-Ethics-Marchant.pdf

Both human and AI assistant models allow lawyers and judge "to focus their scarce attention efficiently. As is the case for human clerks, the net time saving from AI would generally be positive".  (NCJI at 26)

While generative AI is new, wide variations in attorney research vigor of adequate research is not. See, e.g., *Fahner v. Marsh*, No. 87 C 2898, 1988 WL 5016, at *1 (N.D. Ill. Jan. 19, 1988). To illustrate, Black's Law Dictionary contains the term "headnote lawyer" which it describes as a "lawyer who relies on the headnotes of judicial opinions rather than taking the time to read the opinions themselves." Lawyer, BLACK'S LAW DICTIONARY (11th ed. 2019). ("Rule 11 Is No Match for Generative AI", by Jessica Gunder at n. 9).[13]  But in reality those headnotes are seldom if ever wrong or misleading, and if they are proven accurate, then the work product of lawyers who never read beyond the headnotes may be just as effective as those who toil over the expanded text.  So it is conceptually with the GPTs-- if they sift through scores of cases in seconds and get it right, harder work may well be superfluous, as wasteful as paying a lawyer to flip through the hard bound volumes of the Federal Reporter when he had the law at his fingertips on Westlaw.  Additionally, the GPTs are more likely to understand and apply the principles of law, and to understand them more deeply, than a considerable cut of the bar.

"Hardly a week goes by when there is not anew story of someone getting caught filing a brief draft ed with the help of generative artificial intelligence that is filled with citations to non-existent cases." ("Artificial Intelligence in the Courtroom: Two Approaches", Federalist Society

---

[13] Gunder, Jessica, "Rule 11 Is No Match for Generative AI", 27 Stan. Tech. L. Rev. 308 (2024), https://law.stanford.edu/wp-content/uploads/2024/07/Rule-11-and-Gen-AI_Publication_Version.pdf

at 1).[14] Despite this, "although the problem of AI hallucination is real, courts should be careful not to overcorrect and stifle an emerging technology that has the potential to revolutionize the practice of law, dramatically expand access to justice, and improve the quality of written submissions to courts." (Federalist Society at 1-2). When it comes to miscitations and misquotes and errors in document preparation,  "there is nothing unique about generative AI in this regard. A lawyer who signs and submits a legal brief written by a junior associate or a paralegal without first verifying the accuracy of the legal arguments in the brief has committed the same ethical lapse." (Federalist Society at 3).

Yet, there is professional consensus that a senior partner or ranking government lawyer has not committed an ethical lapse if her subordinates get it wrong, and they were not on notice of prior errors by the preparer. "But the reality of legal practice is that few lawyers have the time to fully embrace Supreme Court Justice Louis Brandeis's admonition that 'There is no great writing, only great rewriting.' Here, AI-powered software programs—such as the recently released BriefCatch 3—have the potential to speed up this editing process, resulting in clearer briefs, something that can only benefit courts." (Federalist Society at 3).

The GPTs hallucinate and the lawyers wanting badly to win may lose cite in wishful thinking. Both can miscite and misquote. It is rare for courts to impose sanctions for inadequate legal research or opportunistic quotation cutting or inclusion. Empirically it seems, "it is not uncommon for a judge to excuse an attorney's failure in this area. (Gunder at 340). "Sanctions are significantly more likely where the conduct: (1) constitutes an intentional failure to disclose

___

[14] Sherman, Paul, "Artificial Intelligence in the Courtroom: Two Approaches", Federalist Society Blog, Mar 5, 2024, https://fedsoc.org/commentary/fedsoc-blog/artificial-intelligence-in-the-courtroom-two-approaches

controlling legal authority; (2) is repeated, particularly after a court has informed the attorney of their error; or (3) involves misrepresenting or changing the holding of a case." *Id.* Unsurprisingly, a review of Rule 11 case law shows that "[m]ost of the court's findings of bad faith were related to counsels' conduct that attempted to conceal their error, which included making untruthful statements to the court and failing to disclose their reliance on ChatGPT in response to the court's inquiry." (Gunder at 343).

Hallucinations can be prevented or mitigated by (1) ensuring the AI product has high quality training data, (2) limiting the use to specific purposes, and implementing human oversight, including "validating and reviewing" the output.[21] (Gunder at 314). That validation and review can be provided by expensive AI products. The highest error rates are encountered with generative AI programs that is "generalist" in nature. (Gunder at 315). A recent study tested legal-focused generative AI products, including Westlaw AI-Assisted Research and Lexis+ AI and found those legal-focused tools were less likely to hallucinate than the generalist systems "but still reported hallucinations "between 17% and 33% of the time". (Gunder at 315). But hallucinations can be big, small and debatable. Yet, most lawyers "do not have to worry that Westlaw, LexisNexis, or Fastcase would give them a fictitious case", i.e. among the biggest and most serious hallucination. (Gunder at 316). "Applications such as Lexis+ AI, Thompson Reuters' Casetext's Cocounsel, and Harvey AI are designed to increase productivity and efficiency and have built-in safety measures intended to reduce the risk of error." (Gunder at n. 271). The difference between "reduced risk" and "risk free" may be quantitatively insignificant but qualitatively large. Rule 11 is not well suited to such delineations. "This technology has the potential to increase attorney productivity: enabling attorneys to perform more work for clients—

or perform work for more clients—for less cost. Relatedly, it may help to close the justice gap, making our courts more accessible to self-represented parties." (Gunder at n. 271).

In the context of AI-assisted legal research, including GPT models, electronic validation methods can be highly effective and efficient. These might include cross-referencing citations against multiple legal databases, using automated citation checking tools, employing AI-powered legal research platforms that can verify case law and quotations to ensure the integrity of legal sources (Guyer Decl. ¶¶ 29-34). These electronic methods can often be more comprehensive and accurate than visual inspection, especially when dealing with large volumes of information. They can quickly identify discrepancies, flag potential errors, and provide links to primary sources for verification. It's worth noting that even traditional legal research methods are not infallible.

## IX.        CONCLUSION

In light of the foregoing arguments, Plaintiff's counsel respectfully requests that the Court not impose sanctions or refer this matter to their respective state bars for professional misconduct. The citation errors in the Rule 72(a) objections, while serious, do not warrant sanctions under Rule 11 or the Court's inherent powers. Moving forward, Plaintiff's counsel has implemented additional electronic review processes to complement AI-assisted research, including automated citation checking against multiple legal databases, AI-powered content verification that compares quoted text to original sources, and blockchain-based citation validation to ensure the integrity of legal sources). These measures, combined with human oversight, will provide a robust system for ensuring the accuracy of citations and quotations. It's important to emphasize that the use of electronic validation methods does not diminish an

attorney's responsibility for the accuracy of their filings. Rather, it represents an evolution in what constitutes a "reasonable inquiry" in the digital age.

Respectfully submitted,

/s/ Thad M. Guyer

_____

Thad M. Guyer (Oregon 821443)
T.M. Guyer and Ayers & Friends, PC
116 Mistletoe Street Medford, OR 97501
(206) 941-2869 thad@guyerayers.com

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Virginia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by CM/ECF.

/s/ Thad M. Guyer

_____