UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

**KAREN IOVINO,**

    Plaintiff,

v.                                                                              Civil Action No. 5:21-cv-00064

**MICHAEL STAPLETON ASSOCIATES,
LTD.** d/b/a **MSA SECURITY, INC.,**

    Defendant.

_____

**DECLARATION OF THAD M. GUYER**

I, Thad M. Guyer, declare as follows:

**I. BACKGROUND**

1. I have been practicing law for over four decades, since 1978 in poverty legal aid programs and public interest organizations, representing employees and citizens asserting their civil and constitutional rights. I am currently a member of the Oregon State Bar, having been admitted in 1982. Prior to that, I was a member of the bars of Tennessee and Arkansas. Throughout my career, I have never been disciplined by a bar organization or sanctioned by the court, maintaining a spotless professional record.

2. In the past, I served as the Litigation Director of the Government Accountability Project (GAP), a position I held for three years. However, since 2005, I have been operating as a part-time independent contractor, continuing to litigate cases both nationally and internationally. My practice extends to various tribunals, including those of the United Nations and the International Labor Organization in Geneva. I am admitted to practice before the United States

1

Supreme Court and the U.S. Courts of Appeal for the Federal, 11th, 9th, 4th, and 2nd Circuits, reflecting the broad scope of my work. I have been admitted pro hac vice in district courts throughout the United States.

3. In the present case, *Iovino v. Michael Stapleton Associates, Ltd.*, I entered my appearance on August 3, 2022 and have been serving as lead counsel on all discovery disputes that have arisen. I work closely with local counsel Nate Adams and GAP Litigation Director John Kolar in formulating all filings and developing factual and legal contentions. As lead counsel, they place their trust and confidence in me regarding the actual documents filed with this court. Both Mr. Adams and Mr. Kolar attend all hearings in this matter.

4. I study, practice and use Generative AI and GPTs ("GPTs") extensively in my law practice, and on this case. At age 74, and being an early adopter and proponent of technologies to aid lawyers, I am fully committed to the responsible use of the GPTs in this profound professional transformation of information technologies for legal research, document preparation, and discovery. Starting in November 2022, I accepted a GPT hours to traditional hours document production ratio of 2 to 1, meaning it was cost-effective to take 10 hours to finalize a document that traditionally would take me 5 hours because the GPT learning curve was worth it. Within six months, the ratio had improved to a 1 to 1 break even and by early 2024 was 1 to 2. My goal is 1 to 4, such that in 1-hour GPT use I will be able to accomplish what traditionally had taken me four hours.

5. In additional to the high rate of return on time, the GPTs generate excellent to brilliant legal arguments. When they review a court case, they can be prompted to "contextualize" it to simultaneously assimilate the content of the internal case citations.

6. The use of the GPTs is an ever-evolving learning curve as they add functionality. In 2022, they professed to not do legal research. Now in 2024, they appear to be in open competition with Westlaw and Lexis. And those companies with their unrelenting sales forces are fighting back, promoting their new and expensive proprietary GPTs.

7. In addition to benefits to clients and enhancing broader access to justice, the GPTs are providing a way to enable lawyers with impairments, including the cognitive decline of aging, to maintain viable law practices. Through assiduous, time consuming and sequential prompt formulation and re-prompting, that I primarily dictate through voice to text, I guide my four generative artificial intelligence paid subscription services from Westlaw, OpenAI, Anthropic and Perplexity (hereafter "the GPTs") through legal research, outlining, and drafting of legal documents and did so in this case. The GPTs currently compose approximately 70% of my previously keyboarded document text, and my goal is to have them reach 90% within the next year. I then review the generated work products through Microsoft Word "read aloud" and similar functioning iPhone apps. I am working toward an age 80 retirement transition in which voice and listening interface with the GPTs completes 100% of tasks that previously required "keyboarding".

## II. SUMMARY OF BLAME, CAUSE AND CORRECTIVE ACTION

8. I am the sole author and signer of Plaintiff's Corrected Rule 72(a) Objections to Magistrate's Memorandum Opinion and Order, filed June 7, 2024 ("Plaintiff's Objections"). My co-counsel reasonably relied upon me to perform the clerical and ministerial duty of ensuring the accuracy of the citations and attributed text quotation of the legal authorities I selected. Co-counsel in the legal profession are not expected to cite check each other.

9. I have found that errors in the use and professional adaptation of emerging technologies with legal applications are inevitable, and lawyers who use them must accept responsibility for those errors and adopt corrective actions. I accept that responsibility. I hold the federal judiciary in the highest regard, especially the district courts that are the first line guardians of judicial integrity. I learned this during my internship at the Federal Judicial Center in 1977 serving closely with its Director, the Honorable Walter E. Hoffman (Eastern District of Virginia). See, T. Guyer, Survey of Local Civil Discovery Procedures, (FJC Staff Paper 77-1, 1977), cited in the FJC funded Cohn, Sherman L., "Federal Discovery: A Survey of Local Rules and Practices in View of Proposed Changes to the Federal Rules" (1979). Minnesota Law Review. 2321. https://scholarship.law.umn.edu/mlr/2321.

10. As explained in detail below, the two cases the show cause order identified as apparently non-existent, *United Therapeutics* and *Mosby*, both exist. They were miscited with "WL" numbers (Westlaw) by Anthropic's Claude 3 Opus GPT. When the paid Lexis "add-in" application for Microsoft Office generated its automated table of authorities, it indicated those case were not found. I then conducted a case name search in Lexis + and found both cases. I failed to realize the WL citations were wrong and correct them. On the *Menocal* case miscitation the Lexis Microsoft Office add-in identified no citation error, since it was citing to an earlier opinion in the same case. Defendant cited to the correct citation 17 times in its Reply to Plaintiff's Opposition to Protective Order (ECF # 166), 15 times in its Reply in Support of the USA Statement of Interest (ECF # 165), as did the Magistrate in his Order (ECF # 172). Still, despite having given only the correct citation in my Opposition to Protective Order (ECF # 162) I failed to realize the miscitation that occurred to during my Lexis + citation validation and table of authorities generation. The Menocal miscitation is unrelated to the GPTs. On the misquotation

4

in *Graves* and *Bostick* the court references, and on others the court did not reference but which I have included below, I had no reason to doubt their accuracy, as they were correctly stating the law. *Graves* was pulled from Defendant's submission to the Magistrate. (See below). In the future, I will take two corrective measures: (1) run all quotations through Lexis or Westlaw quoting checking applications, and/or (2) remove all quotation marks unless uniquely necessary.

## II. SPECIFIC RESPONSES TO ORDER TO SHOW CAUSE RE: NON-EXISTENT CASES, MIS-CITATIONS AND MISAPPLIED QUOTATIONS

### A. <u>Cases That Do Not Appear to Exist</u>:

11. Both cases cited by Defendant and the Court as apparently not existing do exist, but were miscited. Both cases can be found by a case name search in Google, Westlaw and Lexis. *See* Guyer Decl. Exhibits 1-3 for *United Therapeutics* searches and Exhibits 4-6 for *Mosby* searches.

(1) *United Therapeutics Corp. v. Watson Laboratories, Inc.*, 200 F. Supp. 3d 272 (D. Mass. 2016), miscited as "No. 3:17-cv-00081, 2017 WL 2483620, at *1 (E.D. Va. June 7, 2017)." The correct citation is 200 F. Supp. 3d 272 (D. Mass. 2016). (*See* Exhibit B, p. 10 to Decl. of Karen Gray.)

(2) *United States v. Mosby*, 2022 WL 1120073 (also 2022 U.S. DIST. LEXIS 69134) (D. Md. Apr. 14, 2022), miscited as "2021 WL 2827893, at *4 (D. Md. July 7, 2021)". *See* Pl.'s Objs. at 6, 19–20; Opinion ECF 177, p. 14. The correct citation is 2022 WL 1120073 (D. Md. Apr. 14, 2022). (*See* Exhibit B, p. 1 to Decl. of Karen Gray.)

### B. <u>Attributed Quotations That Do Not Appear in Cited Cases</u>:

12. Both cases cited by Defendant and the Court as existing, but quoting language that does not appear in those cases, do contain erroneously inserted quotation marks, but do not misrepresent the law.

5

(1)  *Graves v. Lioi*, 930 F.3d 307 (4th Cir. 2019), includes the phrase "decided by necessary implication". Opinion ECF 177, p. 14. The quoted phrase is misquoted, that phrase does not appear in the opinion, but it is a correct statement of the law of the case doctrine, as discussed in *Lioi*.

(2)  *Bostock v. Clayton Cnty.,* 590 U.S. 644 (2020), includes the phrase "make a mockery of the law". Opinion ECF 177, p. 14. The quoted phrase is misquoted, that phrase does not appear in the opinion and should have been stated without quotes, or substituting "lead to absurd consequences" for "make a mockery of the law."

C.  **Menocal Citation to a Reported Case (113 F. Supp. 3d 1125) Unrelated to *Touhy* (Opinion ECF 177, p. 14)**:

13.  *Menocal v. GEO Group, Inc.*, 2017 WL 4334000 (also 2017 U.S. Dist. LEXIS 203420) (D. Colo. June 6, 2017), was miscited as 113 F. Supp. 3d 1125. Plaintiff gave the correct citation in briefing to the Magistrate who correctly cited the case in his Order.

D.  **Seemingly Manufactured Citations and Quotations (Opinion ECF 177, pp. 14-15)**:

14.  **While *United Therapeutics Corp. v. Watson Laboratories, Inc.*,** in the table of authorities is mis-cited, as discussed, and incorrectly described as pertaining to the standard for reviewing a magistrate judge's order under Federal Rule of Civil Procedure 72, the proposition for which it is cited in Plaintiff's Objections is accurate and applicable, notwithstanding the misquotations, to wit:

> In the Fourth Circuit, an order is "contrary to law" if it "fails to apply or misapplies relevant statutes, case law, or rules of procedure." United Therapeutics Corp. v. Watson Labs, Inc., No. 3:17-cv-00081, 2017 WL 2483620, at *1 (E.D. Va. June 7, 2017). Even if the law is unsettled, a magistrate judge's ruling is properly rejected as "contrary to law" if it misapplies governing legal standards or relevant precedents. Id. .

This is routine and black letter law. *United Therapeutics* was selected by the GPTs because the court in that patent litigation case refused to enforce a subpoena against a non-party, concluding

6

that the imposition of "such an obligation… would have the effect of chilling invention, which is contrary to the intent of our patent system." *United Therapeutics Corp.*, 200 F. Supp. 3d at 280 (citing *Graham v. John Deere Co.*, 383 U.S. 1, 9 (1966)).  The GPTs applied this law in a systemic context—i.e., discovery in the Congressionally created patent system, enacted by constitutional mandate in Article I, Section 8, Clause 8, codified by the Patent Act of 1790.  The GPTs analogized this to misuse of the discovery system in courts where Congress was similarly mandated by Art. III, Section 1 to codify the Judiciary Act of 1789.  Both are unique constitutional systems created by Congress through direct constitutional mandate and require protection of litigants from chilling effects by discovery abuse or obstruction.  *See Watson Labs, Inc.*, 200 F. Supp. 3d at 280 (citing *Graham*, 383 U.S. at 9) (Rule 26 broad discovery not to be applied to impose discovery obligations that would have a "chilling effect" contrary to Congressional intent).  Analogously, this case supports Plaintiff's argument that the magistrate's order should be overruled because it's misapplication of the Department's *Touhy* regulations has a chilling effect on whistleblowers, contrary to congressional intent as reflected in the enactment of 41 U.S.C. § 4712. .  I should have included the citation to *Graham v. John Deere Co*. in my citation of *United Therapeutics*.

     15.   ***United States v. Mosby*** was mis-cited, as discussed, and incorrectly described in the table of authorities as "rejecting an agency's attempt to screen a defendant's subpoenas, emphasizing the importance of fair process and the court's authority to control discovery."  This proposition is incorrectly attributed to *Mosby*, but finds analogous support in a Fourth Circuit case cited within *Mosby* for its discussion of vindictive prosecution, *United States v. Wilson*.  *See United States v. Mosby*, 2022 WL 1120073, at *3-4, 8 (D. Md. Apr. 14, 2022) (citing *United States v. Wilson*, 262 F.3d 305, 314-15, 318-19 (4th Cir. 2001)).  However, the text shown in

quotes in the Objections is misquoted.  The *Wilson* case cited within *Mosby* provides analogous support for Plaintiff's arguments both to the Magistrate and to this Court that judges should refuse to bless a *Touhy* procedural quagmire for whistleblowers that enables the retaliating agency to control the evidence against it.  Plaintiff erroneously contended that *Mosby* "reject[ed] [a] similar agency attempt to screen defendant's subpoenas"-- *Mosby* didn't but the district court in *Wilson* did conclude that the defendant was entitled to "full and adequate discovery" from the government.  *See United States v. Wilson*, 262 F.3d 305, 311 (4th Cir. 2001) (alleged misconduct "sufficient to warrant a full and adequate discovery period").  I should have included the citation to *United States v. Wilson*.

16.  I now understand that when the GPTs "see" a case, they see the extended document, including internal citations to authority.  The GPTs saw the *Wilson* reference to the *Touhy* statute as incorporated into *Mosby*.  I should have included the citation to *United States v. Wilson.*

17.  **Graves v. Lioi**  was correctly described in the table of authorities as discussing the law-of-the-case doctrine, explaining that it covers issues decided either expressly or by necessary implication in a prior ruling.  However, the quote is erroneous.  Despite being black letter law, *Graves* itself does not contain the phrase "decided by necessary implication."  However, what the GPT was quoting were the words of the Magistrate, and Judge Cullen in a cited prior case.  The Magistrate stated that "Judge Cullen's ruling *necessarily implies* that Iovino's requests for MSA's Rule 30(b)(6) testimony relating to or derived from these same documents are subject to the same regulations".  ECF No. 172 at p. 8 (emphasis added).  The Magistrate's citation supporting that sentence includes a quote from Judge Cullen in *Epperson v. Smith*, 2022 WL 2287416, at *4 (W.D. Va. June 24, 2022) for the rule that the law of the case "applies both to questions actually decided as well as to those *decided by necessary implication*." ECF No. 172 at

p. 8 (emphasis added).  *See also Ogunsula v. Md. State Police*, 2022 WL 3290713, at *12 (D. Md. Aug. 11, 2022) (quoting *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008)). Additionally, MSA cited *Graves v. Lioi* twice in its Reply in Support of the DoS Statement of Interest. (ECF 165, pp. 2-3). From this I have learned that the GPTs may provide completely correct rendering of law with the language and vocabulary of a case, but misapply the quotation marks.  Additionally, the GPTs may quote from orders and/or internally cited cases and misattribute the quotations to a closely related case.

      18.  **Bostock v. Clayton County** was correctly described in the table of authorities as holding that Title VII of the Civil Rights Act of 1964 prohibits employment discrimination based on sexual orientation and gender identity, emphasizing the importance of giving effect to the plain meaning of statutory text.  However, the GPTs misattributed the quotation marks to the phrase "make a mockery of the law" from other Fourth Circuit cases.  As to *Bostock*, the GPT should have used the term "absurdity" rather than "a mockery".  A central canon of construction "tells courts to avoid construing a statute in a way that would lead to absurd consequences." *Bostock v. Clayton Cty.*, 590 U.S. 644, 789 n.4 (2020); *see also AFGE v. Office of Special Counsel,* 1 F.4th 180, 185 (4th Cir. 2021) (quoting *United Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 95 (1947) ("the elemental need for order without which the guarantees of civil rights to others would be a mockery")); *Ex parte Collett,* 337 U.S. 55, 67, (1949) (construction "would be absurd, not least because it would make a mockery of the techniques of statutory interpretation which have heretofore been used by the courts"); *Utnage v. Dep't of the Army*, 119 Fed. Appx. 269, 272 (Fed. Cir. 2004) ("subordinating substance to form and mak[ing] a mockery of the law").

9

**IV.  ADDITIONAL MENOCAL ERRORS NOT REFERENCED IN THE ORDER TO SHOW CAUSE**

19. Although not referenced in the order to show cause, I am obligated to call the Court's attention to additional misquotations of *Menocal* in Plaintiff's Objections.  These consist of correct statements of the *Menocal* holding, but with misapplied quotations taken from the following holdings in the case:

> They insist that finding otherwise would allow the Department to usurp *the court's authority to control discovery*, resulting in a *separation of powers problem*. Plaintiffs are unquestionably correct.
> \*\*\*
> Permitting GEO *to hide behind the Department's regulations* here would *mischaracterize* the *Touhy* doctrine and distort the intent of the Housekeeping Statute. Specifically, *allowing a government agency to determine what evidence is discoverable* could create a significant *separation of powers* problem. *See Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 98 Fed. Cl. 639, 647 (Fed. Cl. 2011). The *judiciary oversees the admission of evidence* at trial. *Id.* "[N]o executive official or agency can be given absolute authority* to determine what documents in his possession" should be considered by the court. *Comm. for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 788, 794 (D.C. Cir. 1971). Thus, I cannot authorize the Department to determine what evidence is discoverable in this case, because *doing so would undermine the role of the court*.

*Menocal*, 2017 WL 4334000, at \*2-3, 4 (emphasis added).

20. The following sentences in Plaintiff's Objections contain misquotations of *Menocal*, italicized for emphasis, but had such text not been in quotation marks, each assertion is otherwise accurate and appropriate:

> A.  The court started from the premise that "*the Touhy doctrine was borne out of the Supreme Court's decision in United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951)*," which recognized an agency's authority to promulgate regulations governing how its employees respond to subpoenas. Pl.'s Obj. at p. 11.
>
> B.   In that situation, the court held, "*the Touhy doctrine has no application to limiting documents or testimony of government contractors named or joined as defendants in civil litigation.*" *Id.*

10

C. The "conspicuous and sensible purpose" is to prevent federal employees from "*being dragged willy-nilly into private litigation*" and to centralize the agency's litigation defense. *Id.*

D. At that point, allowing the defendant to use Touhy to create "obstacles or shields from normal rules of discovery" would be "*anathema to basic principles of civil litigation in federal court.*" *Id.* at p. 11-12.

E. By arguing that its contractor status allowed it to "*shield itself from the very discovery that the Federal Rules permit and encourage based on an stretched reading of DHS'[s] Touhy regulations,*" GEO was claiming "*a special privilege that even government agencies do not enjoy.*" *Id.* at p. 12.

F. This principle is "*embedded in our separation of powers doctrine,*" which requires the courts to "*remain the final arbiter of what evidence may be introduced*" and prevents "government agenc*ies from* determin*ing* what evidence is *admissible in federal court*." *Id.* at p. 14.

G. This improperly "*shift[s] control over what evidence is admissible away from the courts*" and onto the executive branch. *Id.*

21. None of the misquoted statements misrepresent the content or holdings of *Menocal*. From this I have learned that the GPTs can combine quoted material from a case into smaller quotations that are incomplete, but appear accurate.

**IV. SHOW CAUSE ON WHO IS TO BLAME AND THE FAILURE TO CORRECT AFTER NOTICE (Opinion ECF 177, pp. 14-15):**

22. **Thad M. Guyer is Solely to Blame for These Errors:** I am the only member of the three-law firm team on this case that uses Generative AI. All other members know that I use it, but have very limited understanding of it. Until now, no member of the team, nor co-counsel John Kolar or Nate Adams, would have any reason to suspect the GPT problems I caused in this case. None of my prior submissions or work products have suffered from any processing, citation or quotation errors.

23. **Show Cause to Uphold Integrity of Proceedings and Origination of False References (Opinion ECF 177, p. 15):** There is no question that mis-citations and

11

misquotations in this case and in any case put the integrity of the judicial process at risk. Judges and their staff cannot be expected to discover all such anomalies, and although few judges and their clerks blindly accept legal contentions and citations of the parties, some are at risk of getting through the safeguards.

24. **The Role of All Officers of the Court in Protecting the Integrity of the Proceedings and Conserving Judicial Resources**: Counsel for all parties in every case are officers of the court charged with minimizing risks to the integrity of the judicial process. MSA's counsel should have contacted me by phone or by email. Attorney Dan Ward and I have had a cordial, courteous, productive and professional relationship, with frequent emailing, even after hours and on weekends. While I appreciate Dan's statement to the Court that he did not presume bad intent, but only, "Chatgpt run amok," he should not have asserted to the Court that Plaintiff's Objections cited non-existent case law without first contacting me and asking for the two cases he could not find. I received no contact from his law firm. Had I received that notification and seen the citation errors, I would have discovered all the GPT errors and promptly sought leave to file a Second Corrected Objections to Magistrate Order. *See* Declaration of Karen Gray, Exs. A and C, letter asking Dan for explanation and his letter response. As the profession transitions to the GPTs, and their use is vigorously promoted if not hyped by sales staff at Lexis and Westlaw to sign up for their GPT chatbots, temptations toward opportunistic "gotchas" must be avoided.

25. **The Failure to Correct the Objections After Service of Defendant's Response re "ChatGPT Run Amok"**: The three new Supreme Court cases I submitted as supplemental authority did not involve MSA's Response, only Plaintiff's Objections. Like the Court admonished me that local rules do not provide for statements of supplemental authority, so too neither the local rules nor Rule 72 provide for a reply to the Response to Objections, such that

12

there was no immediate need to review that filing. I deferred reading it pending the need, such as a decision on the Objections by this Court, or for interlocutory appeal. I had no knowledge, suspicion, or hint of MSA's "ChatGPT run amok" contentions. The same is true for my co-counsel. *See* Decl. of Nate Adams and John Kolar. I emailed it to six lawyers within the three law firms, but did not ask anyone to read it sooner rather than later. Unfortunately, no one read it, they assumed I would, and I assumed that at least one the six would.

26. My co-counsel and I were confident MSA's Response would simply reiterate the same positions on *Touhy* advanced for almost two years, the same positions stated in the prior briefings and during the two oral arguments before Magistrate Judge Hoppe, and in the resulting orders. I had no doubt that MSA's counsel would not have raised any new arguments beyond what was preserved in the proceedings below. We were right except for one thing-- "ChatGPT run amok." From this I have learned when using GPTs, at least scan any non-rebuttable response, or reply for that matter.

### III. MY USE OF GENERATIVE AI AND GPTs IN THIS CASE

27. **Paid AI Subscriptions**: Ironically, OpenAI, Inc.'s ChatGPT product was not responsible for any errors in this case. The miscitations and misquotations were generated by Atrophic Inc.'s "Claude 3 Opus", and overlooked by the Lexis Microsoft Office Add-in (with Microsoft Copilot AI). I utilize a suite of generative AI technologies for legal research and writing purposes, and GPT legal document briefing. These include:

(1) Westlaw Precision A+ (a full paid subscription that includes access to a chatbot);

(2) Lexis + AI (a full paid subscription, which included a free trial of their chatbot in April 2024);

(3) Anthropic Claude 3 Opus (a full paid subscription);

13

(4) Perplexity.AI Pro (a full paid subscription); and

(5) ChatGPT Team (a full paid subscription).

In addition to these standalone AI services, I also make use of the Lexis+ subscription service Lexis for Microsoft Office "add-in" and I maintain a full paid subscription to Microsoft Office CoPilot AI and to V2K AI, Inc. AI PDF in Myaidrive.com. The Lexis Microsoft add-in "cite links" to all cases Lexis finds in a Word document. The AI PDF creates a case-specific database of all pleadings, motions, briefs, orders, and legal authorities in PDF format and interfaces this dataset with ChatGPT.

28. **My GPT Process in this Case**: I have built a system of GPT legal research and document generation using all of the above and cross-utilize them for citation and contention validation. The process as used with the legal memoranda to Judge Hoppe and Objections to this Court was as follows:

(1) Conduct legal research in Lexis + and Westlaw Precision and AI and create excerpt pages, including Westlaw GPT chatbot;

(2) Upload relevant pleadings, motions and legal research excerpts to Myaidrive.com;

(3) Enter prompts to ChatGPT, Claude 3.0 and Perplexity Pro for summaries, outlines, legal research, and draft oppositions and objections;

(4) Cross validate ChatGPT results with Claude and Perplexity;

(5) Create final version in Claude and upload to Microsoft Word;

(6) Create hyperlinked table of authorities with Lexis+ Microsoft Office add-in;

(7) Click each case hyperlink and review in Lexis for existence and content.

29. **Safeguards Against Misquotations and Fictitious Cases**: As of June 7, 2024, I had not yet developed automated quotation validation, except for final draft quotations that appeared

unknown or unusual to me based on my knowledge of the case and controlling law. None of the misquoted text appeared problematic, all of the quotes appeared authentic and directly topical, and I recognized them all as uncontroversial statements of law. Since this Court's order on July 24, 2024, I have created automated validation by (1) entering individually exact quoted text in Westlaw or Lexis until the GPTs prove more reliable for this task, which will be soon; and (2) prompting Westlaw GPT to examine multiple instances of quoted text—quotation validation in bulk.

30. To guard against the potential inclusion of fictitious cases generated by AI, I employ a validation process where at least one paid AI service is used to validate the cases named by the others. Furthermore, I utilize the Lexis+ Microsoft add-in feature to generate a list of cases with hyperlinks, providing an additional layer of verification. These tools that I currently use (and will enhance for more sophisticated deployment) for quotation checking are:

31. **Ex. 7 Guyer Decl.- Westaw AI Chatbot Screenshot**: This is the Westlaw AI chatbot. It is GPT based, similar to the OpenAI, Anthropic and Perplexity services, except its "large language model" is trained to Westlaw's proprietary legal information databases.

32. **Ex. 8 Guyer Decl.- Westlaw Document Analysis Screenshot**: This is Westlaw's proprietary document analysis application, where the attorney uploads their document(s) for analysis and comparison. OpenAI, Anthropic and Perplexity can perform the same function with focused prompting, but the Westlaw product is already "coded" to "run" those prompts.

33. **Ex. 9 Guyer Decl.- Lexis Document Analysis Screenshot**: This is Lexis' proprietary document analysis application, where the attorney uploads their document(s) for analysis and comparison. It operates similarly to its Westlaw competitor.

34. **Ex. 10 Guyer Decl.- Lexis Word Add-in Cite Link Screenshot**: This has been my primary non-fictitious case validation tool and I used it in this case. If the case name and citation is in the Lexis legal database, the case will be hyperlinked, which, when clicked, will open search results. If the case does not show a hyperlink, then I enter the case name into the Lexis or Westlaw search field. If the case does not show a hyperlink or appear in a Lexis or Westlaw search, I conduct a Google search, which may yet identify existing cases in Casetext, Findlaw, or Justia, though not in the databases of Lexis or Westlaw. Some cases may appear only in lawyer blogs, lawyer, or government webpages. Cases not appearing in Westlaw or Lexis can still be cited by party name and court case number. I will deem "fictitious" or "hallucinated" only cases that cannot be found by any of these methods.

35. **AI Reliability**: In my experience, I have found paid AI chatbots highly reliable to a skilled user with advance prompting skills, and high familiarity with the GPTs. As an early adopter, I began using these services when OpenAI first made them available to the public in November 2022. In the early stages, issues with hallucinations and fictitious cases were more common. However, by November 2023, the occurrence of hallucinations had greatly diminished, and fictitious cases became a rarity. The entry of Westlaw and Lexis into the market with their own AI chatbots further enhanced the reliability of these tools. Since November 2023, by using Westlaw, Lexis, Claude, ChatGPT, and Perplexity in combination to cross-validate AI-generated cases that were not returned in my primary connectors research, I have only encountered a fictitious case on one occasion.

36. **No Prior AI Generated Errors**: Prior to the present case, I have never had adverse counsel or any court notify me of any AI generated mis-citation, misquotation, or fictious case. I

have had one instance in which co-counsel on another case found a fictious case citation in a draft motion. It was corrected before filing.

## VI.  IMMEDIATE CORRECTIVE ACTIONS:

37. As the Declaration of John Kolar explains, for the duration of this case, GAP is going to assign a lawyer to cite check all of my legal work products.

38.  I will use the citation checker and quote checker functions of Westlaw and/or Lexis.

39.  I will ask all adverse counsel to promptly notify me if they discover mis-citations or misquotes.

40.  Where possible, I will seek to have a provision added to case planning stipulations and orders including a requirement to confer before making assertions to the court that counsel has cited any non-existent cases.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 26, 2024.

/s/ Thad M. Guyer

Thad M. Guyer (Oregon 821443)
T.M. Guyer and Ayers & Friends, PC