```
                    UNITED STATES DISTRICT COURT

                FOR THE WESTERN DISTRICT OF VIRGINIA

                        HARRISONBURG DIVISION



* * * * * * * * * * * * * *
KAREN IOVINO                 * CIVIL ACTION 5:21-CV-64
                             * OCTOBER 9, 2024   2:15 P.M.
              Plaintiff,     * SHOW CAUSE
                             * VOLUME I OF I
vs.                          *
                             *
MICHAEL STAPLETON            * Before:
ASSOCIATES, LTD.             * HONORABLE THOMAS T. CULLEN
              Defendant.     * UNITED STATES DISTRICT JUDGE
* * * * * * * * * * * * * * * WESTERN DISTRICT OF VIRGINIA


APPEARANCES:

For the Plaintiff:        JOHN A. KOLAR, ESQUIRE
                          Government Accountability Project
                          Director of Litigation
                          1612 K Street, NW, Suite 1100
                          Washington, D.C. 20006

                          NATE L. ADAMS, III, ESQUIRE
                          Nate L. Adams, III, P.C.
                          11 South Cameron Street
                          Winchester, VA 22601

For the Defendant:        DANIEL S. WARD, ESQUIRE
                          RYAN C. BERRY, ESQUIRE
                          Ward & Berry, PLLC
                          1751 Pinnacle Drive, Suite 900
                          Tysons, VA 22102



Court Reporter:           Whitney M. Stier, CCR/CVR
                          116 North Main, Room 314
                          Harrisonburg, Virginia 22802
                          (540)434-3181, Ext. 8510

Proceedings recorded by voice stenography.
     Transcript produced by computer.
```

```
 1  APPEARANCES CON'T:

 2
    For the Plaintiff:      THAD M. GUYER, ESQUIRE
 3                          T.M. Guyer & Friends, P.C.
                            116 Mistletoe Street
 4                          Medford, OR 97501

 5  For Guyer & Kolar:      DENNIS QUINN, ESQUIRE
                            COLIN NEAL, ESQUIRE
 6                          Carr Maloney
                            2000 Pennsylvania Avenue, NW,
 7                          Suite 8001
                            Washington, D.C. 20006
 8
    For Nate Adams:         WILLIAM L. MITCHELL, III, ESQUIRE
 9                          Eccleston and Wolf Virginia Office
                            10400 Eaton Place, Suite 107
10                          Fairfax, VA 22030

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        (Proceedings commenced at 2:15 P.M.)
 2            THE COURT:  Good afternoon, Counsel.
 3            MR. WARD:  Good afternoon, Your Honor.
 4            MR. QUINN:  Good afternoon, Your Honor.
 5            THE COURT:  Ask the clerk to call the case.
 6            THE CLERK:  Yes, Your Honor.  We have Karen Iovino v.
 7   Michael Stapleton Associates, LTD., Civil Action Number
 8   5:24-CV-64.
 9            THE COURT:  Very good.  All right.  I know we had
10   Mr. Quinn and Mr. Neal notice appearances.
11            MR. QUINN:  Yes, sir.
12            THE COURT:  Good to see you all.  Thanks for being
13   here.
14            MR. QUINN:  Thank you, sir.
15            THE COURT:  And it looks like we have Mr. Guyer,
16   Mr. Kolar, and Mr. Adams as well.  Thank you all.  Thank you
17   for being here.
18            MR. MITCHELL:  Good afternoon, Your Honor.  William
19   Mitchell here on behalf of Mr. Adams.
20            THE COURT:  Okay.  Thank you, Mr. Mitchell.
21            MR. MITCHELL:  Good to see you again, Your Honor.
22            THE COURT:  Nice to see you, Mr. Mitchell.
23            First, counsel, let me say I apologize that we're
24   starting late.  I know you all traveled some distance to be
25   here.  I had a sentencing hearing this morning that was
```

1  supposed to last an hour that lasted three, and we needed a few
2  minutes to collect ourselves and get something to eat.  So I'm
3  sorry to keep you waiting.
4          Here's what I'm going to do.  And Mr. Ward, of
5  course, good to see you, sir.
6          MR. WARD:  Good afternoon, Your Honor.
7          THE COURT:  I'm going to recite, briefly, the
8  procedural history related to this discrete issue that I'm
9  going to take up this afternoon, and then I want to just recite
10 some general observations, first, to allay what I'm sure are
11 the plaintiff's concerns in some respect, because at the end of
12 the day, I agree with a lot of what you all have said and you
13 don't have to convince me of certain things that you might
14 think you have to.
15         But I do have some lingering concerns, and I'll point
16 those out and have you respond to those specifically, and we'll
17 go from there.
18         MR. QUINN:  Yes, sir.
19         THE COURT:  On May 23rd of 2024, Judge Hoppe issued
20 his opinion, an order granting the motion for a protective
21 order.  That's at ECF 172.  On June 6th, 2024, Mr. Guyer, on
22 behalf of the plaintiff and other counsel, filed an appeal to
23 Judge Hoppe's decision at ECF 173.
24         As we all know, that brief contained several
25 erroneous case citations and references that, as Mr. Guyer has

1 acknowledged, were the result of, for lack of a better term,
2 AI -- generative AI hallucination.
3     On June 20th, Mr. Ward, on behalf of the defendant,
4 filed a response in opposition to the appeal wherein he flagged
5 these issues, characterizing them "as chat GPT run amok" at ECF
6 175.  Thirteen days later, on July 3rd, Mr. Guyer filed a
7 pleading styled letter statement of supplemental authority in
8 support of the appeal.  That's at ECF 176.  As we know, he did
9 so without acknowledging the allegations in Mr. Ward's response
10 in opposition about the erroneous case cites and references.
11     I understand counsel, both Mr. Kolar and Mr. Guyer,
12 have represented that at that point, they had not yet read
13 Mr. Ward's response and didn't know of the existence of these
14 AI hallucinations at the time they filed the supplemental
15 pleading.
16     Shortly thereafter, the Court issued its mem-op
17 affirming Judge Hoppe's decision and ordering defense counsel
18 to show cause why they shouldn't be sanctioned for the
19 erroneous citations and references in the appeal brief at ECF
20 177.
21     As you all know, on July 30th, the plaintiff filed a
22 notice of interlocutory appeal on the motion to stay at ECF
23 numbers 180 and 181.  The issue presented and being addressed
24 by the Fourth Circuit is the applicability of the State
25 Department's 2E regulations on the plaintiff's discovery and

1  deposition request.

2          Plaintiff sought a stay, which was the wise course
3  given the interlocutory appeal, and I granted that stay.  So
4  that issue essentially divests the Court of jurisdiction to
5  deal with the merits of the dispute for the time being.

6          But I determined, because the show cause issue is
7  really separate and apart from the merits of the case and
8  doesn't pertain to the applicability of 2E and the like, I
9  certainly have authority to consider that issue, and I believe
10 the plaintiff has conceded as much in its briefing.

11         All right.  So let's talk about the relevant
12 landscape as I see it.  As a general proposition, as you all
13 know, district courts have authority to impose sanctions under
14 Rule 11 and inherent authority from various sources to preserve
15 the integrity of the judicial process.  Recognizing that, I
16 also recognize that I should use that authority sparingly,
17 reserving sanctions for particularly egregious violations akin
18 to a contempt of court.

19         The challenge presented here is applying these
20 well-established principles within the rapidly-changing
21 landscape of the practice of law at the advent of the
22 generative AI age.  So here is kind of how I see things from
23 30,000 feet.

24         First, the use of generative AI by lawyers for myriad
25 tasks, including case analysis and brief writing, is the new

1  normal.  Second, this Court has neither the authority nor the
2  inclination to curb that practice, even if it wanted to.  If I
3  did that, I would justifiably be perceived by some as
4  overstepping and unwisely decreeing that litigants can't use
5  this groundbreaking technology in a court of law.
6           As I said, the use of generative AI runs the gamut
7  across industries, professions, including medicine, certainly
8  the technology space, business, manufacturing, and the like.
9  And over the last really two or three years, its use within the
10 practice of law has proliferated.  And I think it's fair to say
11 it's widely accepted practice.
12          But, that being said, third, let me note that
13 litigants who utilize generative AI to prepare pleadings and
14 briefs must still adhere to basic tenets of conduct, including
15 taking reasonable measures to ensure that what they do file in
16 court, including cases cited to bolster legal arguments, is
17 true and accurate to the best of their ability.  And this makes
18 sense with respect to generative AI -- and I'm not a huge
19 proponent.  I don't -- I mean, I know the basics of how it
20 works and its advantages and its shortcomings.
21          With respect to shortcomings, I know -- and I think
22 it's generally accepted -- that there are inherent limitations
23 and failings attendant to generative AI, including the known
24 tendencies of the technology to conflate existing case law and
25 extrapolate and make inferences based on existing law that may

1  not be supported by a plain reading of the authorities.

2              In other words, generative AI sometimes goes out on a
3  limb trying to do a lawyer's job and stretches existing
4  precedent or logical inferences beyond the bounds of what a
5  lawyer would otherwise represent to a court.  That's a quirk,
6  and that's a problem.

7              So recognizing that, the fourth general proposition
8  is this.  At a minimum, this ethical obligation that we have,
9  whether we use generative AI or not, requires litigants to do
10 more than blindly rely on generative AI to churn out final work
11 product, including briefs, without implementing basic
12 safeguards such as Westlaw-assisted case citation checks and,
13 if you're so inclined, actual human Shepardizing or having a
14 lawyer or paralegal look up authorities that are cited and make
15 sure that, in fact, the cases cited are accurate in terms of
16 the party description, the date, the court identifier, and the
17 proposition for which it's stated.

18             Which brings me to our current predicament.
19 Mr. Guyer, to his credit, has essentially accepted sole
20 responsibility for the errors that occurred, and in so doing,
21 he acknowledged that he didn't utilize the safeguards that I
22 believe are necessary to ensure that AI is used effectively and
23 ethically in filing his appeal of Judge Hoppe's order.

24             And moreover to his credit, he pointed out additional
25 erroneous case cites that Mr. Ward and the Court missed,

1  initially.  He did that in good-faith.  He did it as an officer
2  of the court.  And I sincerely appreciated that.
3            Further, and perhaps just as importantly, Mr. Guyer
4  and Mr. Kolar have pledged to implement these types of
5  safeguards going forward.  Mr. Guyer has informed the Court,
6  and I understand Mr. Guyer's practice is he is heavily reliant
7  on generative AI.  He taught himself how to use it.  He was
8  kind of at the cusp of generative AI when it really hit the
9  scene three or four years ago, and he learned it from the
10 ground up and he's taught himself to be more efficient than he
11 otherwise would be.  And some would say that's laudable.
12           But he has represented that he is now utilizing legal
13 databases like Westlaw and other methods to check generative
14 AI-based case cites and discussions.  So that's a good thing,
15 and I appreciate that.
16           Mr. Kolar, on behalf of the Government Accountability
17 Project, has taken it a step further and represented in this
18 case the GAP has assigned a junior attorney to manually check
19 case cites of these briefs that are continuing to rely on
20 generative AI.  And that's an additional appropriate safeguard.
21           So in my mind, the error that occurred here,
22 reflecting on it at length over the last couple of months,
23 learning more about generative AI, comparing this case to the
24 facts presented in *Cohen* and the *Mata* case, this case is much
25 more like *Cohen* than it is *Mata*.

1          I don't believe that Mr. Guyer did anything
2   intentionally to mislead this court.  He has an unblemished
3   track record as a lawyer, practicing at a very high level over
4   the course of his career.  He made a mistake, and for the most
5   part, he's acknowledged that.
6          So I think this case falls pretty squarely under
7   *Cohen* in that it's not based on an intentional effort to
8   mislead or obfuscate or do nefarious things like that -- or
9   it's not like *Mata* in that respect and it's more like *Cohen*
10  where this is, look, this is happened.  I used this, and we
11  messed up, and going forward, we're going to do these things to
12  make sure that doesn't happen again.
13         All that said, I'd be remiss -- and this is where I
14  want to hear from Counsel -- if I didn't point out, I'm a
15  little frustrated, or I was, at the tone and some of the
16  substance of Mr. Guyer's initial defense to these errors, both
17  in response through a pleading and in his extensive comments to
18  the media.
19         Specifically, here are my concerns.  Number one,
20  persisting in the argument that the erroneous references in
21  *United Therapeutics* and *Mosby* were harmless miscites and that
22  they technically refer to real cases and that the Court should
23  have been able to figure that out.
24         Second, seeming to try to shift some fault to the
25  Court for not responding to this, pointing out that under

1  Rule 72, a reply brief is not provided for.  Disingenuous is a
2  strong word, but given that, you know, there was a supplemental
3  filing after the initial appeal was filed, and as Mr. Kolar
4  acknowledges, had at least he known, he would have quickly
5  filed a motion for leave to file a reply to respond to these
6  serious allegations.  So that argument, for me, missed the
7  mark, and just to be honest, was frustrating.
8        Then I think most concerning or as concerning as
9  saying, Court, you should have been able to figure this out, is
10 faulting opposing counsel for not alerting the plaintiffs to
11 the erroneous citations.  Mr. Ward didn't seek sanctions in
12 this case under Rule 11.  He didn't have to essentially allow
13 you the safe harbor provided for under that rule.
14       He diligently represented his client.  He ran this
15 down and determined that these cases were bogus, or at least
16 aspects of the citations and purported references were bogus,
17 and he called it out in a filing without taking an additional
18 step.  So the show cause with sua sponte, Mr. Ward didn't bring
19 that about.  And I don't think it's fair or helpful to blame
20 Mr. Ward for the current predicament.
21       So those are my three lingering concerns and how I
22 view this issue.  Hopefully that helps you.  And if you want to
23 address it, that would be great.
24       MR. QUINN:  Thank you, Your Honor, and thank you for
25 the opportunity to address it.

1              First off, I share the concerns you have.  I spoke to
2  Mr. Ward yesterday, and we predicted -- or I should say he
3  predicted and I agreed -- that you would have these concerns.
4              As far as the comments in the press, I represent a
5  lot of lawyers.  Sometimes they're high-profile cases.  I get
6  calls from the media, and I've learned over the years to have a
7  no-comment approach.  I feel like even when I think I'm giving
8  the best quote in the press, it never looks that good when I
9  see it in writing.
10             And I suspect Mr. Guyer feels the same way.  When I
11 read the comments, I'll share with the Court, and I shared with
12 Mr. Guyer, I had similar reactions.  And I think Mr. Guyer
13 recognizes that.  What he was doing is that he is such a
14 proponent of AI, because he's been on the cutting edge, that,
15 you know, instead of -- and I'm speculating now, and I don't
16 want to go too far afield -- but he was promoting AI as opposed
17 to recognizing the situation he was in.  I think those comments
18 were inappropriate and I think Mr. Guyer agrees with me on
19 that, and certainly, you can get his thoughts on it.  But we've
20 discussed that.  I don't think that's a problem.
21             And you know, I think he wishes he hadn't certainly
22 not blamed the Court, Your Honor, but certainly not blaming
23 Mr. Ward.  Again, I think he felt -- you know, it's hard for
24 lawyers to ever admit that we made a mistake.  It's something
25 about our personalities, our training.  I have been

1  representing lawyers for 30 years, and it's the hardest thing
2  to get them to do, is just to say, tell the other side you're
3  sorry, or tell the Court you're sorry.  It's something against
4  our nature.
5           And I think that's what was going on here, and he
6  wanted to be the lawyer and to point out, and oh, by the way,
7  opposing counsel could have done this.  I think the Court's
8  conclusion is correct, that that was inappropriate, and I don't
9  think Mr. Guyer is going to do that again.  I think in this
10 case, he's learned a lot of lessons, I think, Judge, and he --
11 it may have been since the comments to the press and since him
12 taking the time to do that detailed declaration and drafting
13 the filing that he did.
14          I mean, I'm not going to share my conversations with
15 my client, but I will share that he is incredibly remorseful,
16 and probably more so than he was three months ago.  He's very
17 sorry to the Court.  He's sorry to his opposing counsel.  And
18 he's very, very sorry to Dr. Iovino, who his actions have
19 caused a distraction from her case.
20          So Your Honor, you've hit the nail on the head.  But
21 I think his remorsefulness and his learning from this will
22 determine that he doesn't do that again.  And I just -- I don't
23 think -- it's a concern, but I don't think, under those
24 circumstances, and the other circumstances you've laid out,
25 that it rises to the level of sanctionable at this point.

1          THE COURT:  Thank you.

2          So I probably, by saying all I said at the outset,
3   took away a lot of what you wanted to say today.  Was there
4   anything else that you would like to address, or if
5   Mr. Guyer -- he certainly doesn't have to.  I'd be happy to
6   hear from anybody.

7          MR. QUINN:  Your Honor, you basically said all the
8   points I wanted to make, and I think to be fair, you said it a
9   little better than I probably would have said it.

10         But there's one thing I wanted to share.  One of the
11  issues you had to address in your show cause order is to either
12  sanction Mr. Guyer and/or refer him to the appropriate state
13  bars.  Mr. Guyer is only licensed in the State of Oregon.  He
14  has self-referred himself to the state bar, Your Honor.

15         The Virginia State Bar has opened an investigation on
16  its own initiative, which they're entitled to do.  They've
17  already referred this to a district committee.  He's not
18  licensed in Virginia, but the bar has certain powers over
19  attorneys who are admitted pro hac vice.  I don't know where
20  that's going to go, but I think it's in the appropriate forum
21  now, and I just hope that the Court recognizes that there's no
22  duty to self-report under the Oregon rules, but he did it
23  anyway, and he wanted me to share that with you.

24         THE COURT:  Thank you very much.

25         Mr. Ward, I don't think you have a dog in this fight,

1  but I'll give you an opportunity if you feel like you need to
2  say something.
3              MR. WARD:  I agree that I don't have a dog in this
4  fight.
5              THE COURT:  All right.  Thanks for coming.
6              All right.  So I have forecasted the outcome of this
7  proceeding, and I've thought a lot about this.  I had to learn
8  more about generative AI in so doing, and I read and reread the
9  briefs on this and to try to -- to get a better sense and
10 empathize with Mr. Guyer and what was going on.
11             So at the end of the day, certainly, the Court has
12 the inherent authority to impose sanctions for deliberate acts
13 that violate established rules and customs and decorum of the
14 Court.
15             But as I indicated, that authority should be used
16 sparingly, if at all, and it should be reserved for situations
17 where you have litigants who are dishonest, who consciously and
18 deliberately attempt to mislead the Court or engage in other
19 types of sanctionable conduct that we expect attorneys to
20 refrain from.
21             That's not what happened here.  Mr. Guyer, who is an
22 excellent lawyer, who has been practicing law for a very long
23 time at a high level in courts across the United States, made a
24 mistake.  It was a big mistake, right?  It's Federal District
25 Court.  This is a high-profile case involving a large

1  government contractor on one side and then an august government
2  nonprofit who's got a distinguished track record of doing
3  important work in the United States.
4           But Mr. Guyer, to his credit, owned the mistake.  He
5  took sole responsibility, didn't try to blame Mr. Kolar and
6  other counsel involved, and he immediately took steps to
7  correct the issues that led to the erroneous case cites and the
8  references that weren't supported by those cases in order to
9  bolster some of the arguments made.
10          This was a quirk.  It's one of the downfalls of
11 generative AI.  And I think Mr. Guyer, and all of us, have
12 learned an important lesson through this experience, and going
13 forward, steps are in place where I am quite confident this is
14 not going to happen again in any brief Mr. Guyer files in my
15 court or anywhere else, or any of you file in other cases.
16          So this case is like the *Cohen* case out of the
17 Southern District of New York.  This was an honest mistake.
18 This was not intentional misleading conduct, and sanctions are
19 not warranted.
20          The Court was concerned, and I was frustrated, by
21 Mr. Guyer's initial response, both publicly and in his filing.
22 It seemed like he was trying to walk away from the contrition a
23 little bit by saying, well, those cases actually do exist by
24 name, even though with respect to one of the two cases, it
25 belonged to another court.  The Westlaw references were

1  incorrect, years were incorrect, and they didn't stand for the
2  propositions cited.
3            I'll note, of course, they exist, right?  When AI
4  messes up, it's not that it invents cases.  It's that it
5  conflates existing case law.  So I didn't find that argument
6  persuasive.  And it was unhelpful, and I made my point there.
7            I also relatedly didn't like what I perceived to be
8  trying to say, well, Court, if you had been doing a better job,
9  you would have been able to determine that, really, there's no
10 harm, no foul, and you could find these cases and kind of
11 unravel and determine that this was unintentional.  And then
12 certainly, I didn't appreciate trying to drag defense counsel
13 into that.
14           I greatly appreciate the concession though,
15 Mr. Quinn, on behalf of your client.  Let me say this, too.
16 Having been involved in high-profile cases as a litigant and
17 having been criticized by a judge before, I know the instinct
18 of good trial lawyers is to defend yourself.  So I empathize
19 with that.  And I think you understand now, Mr. Guyer, that
20 better practice is probably just let the process play out.  So
21 I don't fault you too greatly for that.  That failing is, I
22 think, pretty common among good lawyers.
23           So I've been persuaded that you didn't mean any harm
24 by that, and I don't think any harm was done.  So I'm not going
25 to sanction Mr. Guyer or any of the defense lawyers.  I think

1  my opinion speaks for itself.  It got your attention.  There
2  was publicity that was adverse as a result of it.  Those things
3  happen.  But I think all things considered that that sent the
4  necessary message, and I've been convinced that going forward,
5  we're not going to have these issues, and Mr. Guyer is going to
6  continue to vigorously advocate for his client and make his
7  arguments to this court and do the best job that he possibly
8  can under the circumstances.
9            So, I'm not going to write a lengthy order, but I'm
10 going to ask my clerk -- and I'm sure you'll want a transcript
11 of this.
12           MR. QUINN:  Yes, sir.
13           THE COURT:  All right.
14           In my order, I'm going to direct that a transcript of
15 this proceeding be sent to the -- and you can let us know who
16 that is -- the state bar authorities in Oregon as well as the
17 Commonwealth of Virginia, because I want those bar agencies to
18 know the ultimate outcome here and how I view this issue.
19 Hopefully, that helps them figure out what they need to do, if
20 anything.
21           So if you all order the transcript, in my short
22 order, I will direct our clerk, once you give us the
23 appropriate contacts, to transmit my order and the transcript
24 to them directly.
25           MR. QUINN:  Yes, sir.

1              THE COURT:  All right.
2              Anything else that you think we need to do today?
3              MR. QUINN:  I don't think so, Your Honor.
4              MR. WARD:  No, sir.
5              MR. GUYER:  I just want to say thank you so much,
6    Your Honor, for the prompt disposition.  I find that something
7    like this could be around for a long, long time, and getting
8    right on it and resolving it, it will definitely help going
9    forward in fixing what needs to be fixed.
10             THE COURT:  You're Mr. Guyer, right?
11             MR. GUYER:  Yes.
12             THE COURT:  Okay.  I thought it was the gentleman
13   next to you.
14             Thank you, Mr. Guyer.  I appreciate that.  It's good
15   to see you all.  I'm glad this is behind us.  Let's move
16   forward.  And unfortunately, you're going to be in the Fourth
17   Circuit for two years.  I'll see you after that.
18             If there's nothing else, we'll be adjourned for the
19   day.  Thank you.
20        (Proceedings concluded at 2:42 P.M.)
21                           CERTIFICATE
22   I, Whitney M. Stier, certify that the foregoing is a
23   correct transcript from the record of proceedings in
24   the above-entitled matter.
25   /s/  Whitney M. Stier                     Date:  10-30-2024