**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **KAREN IOVINO,** | ) | |
| | ) | |
| **Plaintiff and** | ) | **Case No. 5:21-CV-00064-TTC** |
| **Counterclaim Defendant,** | ) | |
| | ) | |
| **v.** | ) | **DEFENDANT AND** |
| | ) | **COUNTERCLAIM PLAINTIFF'S** |
| **MICHAEL STAPLETON ASSOCIATES, LTD.,** | ) | **MEMORANDUM OF LAW** |
| **d/b/a MSA SECURITY, INC.** | ) | **IN SUPPORT OF ITS MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| **Defendant and** | ) | |
| **Counterclaim Plaintiff** | ) | |

Respectfully submitted,

March 16, 2026                                        */s/ Daniel S. Ward*

_____

Daniel S. Ward (VSB 45978)
Ryan C. Berry (VSB 67956)
Chelsea A. Cruz (VSB 96177)
WARD & BERRY, PLLC
1751 Pinnacle Drive, Suite 900
Tysons, VA 22102
(202) 331-8160
(202) 505-7100 Fax
dan@wardberry.com
ryan@wardberry.com
chelsea@wardberry.com

*Attorneys for Defendant Michael Stapleton
Associates, Ltd., d/b/a MSA Security, Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................1

LEGAL AUTHORITY ...........................................................................2

ARGUMENT ........................................................................................3

   I.  Plaintiff Made Protected Disclosures to Persons and Bodies Both Covered
      and Not Covered Under 41 U.S.C. § 4712(a)(2) .................................5

   II.  MSA Would Have Taken The Same Actions Even In The Absence Of
       Plaintiff's Disclosures ......................................................................7

        a.  The timeline of events does not support Plaintiff's theory ...............8

        b.  MSA has ample evidence in support of its personnel action .........10

           i.  Plaintiff was threatening to go to the media with
               confidential DoS information, and indeed, did do so ...............10

           ii.  The Dos Contract was modified to replace the part-time
               veterinarian position with a full-time veterinarian position......12

           iii.  Plaintiff was not selected to fill the full-time position for
                legitimate reasons......................................................13

           iv.  The part-time veterinarian position ended while Plaintiff was on
                administrative leave, rendering MSA's investigation into Plaintiff's
                unauthorized media disclosures largely moot............................14

        c.  MSA has taken similar actions against similarly situated
           employees who are not whistleblowers ..........................................15

   III. Plaintiff Admits to Knowingly and Willingly Violating MSA's Confidentiality
       Agreement ..................................................................................16

   CONCLUSION ...................................................................................22

# **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ..................................................................................................3

*Baber v. Hosp. Corp. of Am.,*
    977 F.2d 872 (4th Cir. 1992) ...................................................................................3

*Capstone Bus. Funding, LLC v. Shames Constr. Co.,*
    205 A.D.3d 606 (NY App. Div. 2022) ...................................................................21

*Carr v. Soc. Sec. Admin.,*
    185 F.3d 1318 (Fed. Cir. 1999) ...........................................................................4, 5

*DeJarnette v. Corning, Inc.,*
    133 F.3d 293 (4th Cir. 1998) .................................................................................14

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,*
    111 F.4th 337 (4th Cir. 2024) ..................................................................................2

*Jefferson v. Harris,*
    170 F. Supp.3d 194 (D.D.C. 2016) ..................................................................20, 21

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ...........................................................................................20

*Kolchins v Evolution Mkts., Inc.,*
    128 A.D.3d 47 (N.Y. App. Div. 2015) ..................................................................16

*Luqmaan v. Volvo Grp. North Am., LLC,*
    94 F. Supp. 3d 762 (W.D. Va. 2015) ....................................................................14

*McClain v. Lynchburg City Sch.,*
    531 F. Supp. 3d 1115 (W.D. Va. 2021) ................................................................14

*Mikhaylov v. Dep't of Homeland Sec.,*
    62 F.4th 862 (4th Cir. 2023) ....................................................................................4

*Mitchell v. Data Gen. Corp.,*
    12 F.3d 1310 (4th Cir. 1993) ...................................................................................3

*Muhammad v. Fleming,*
    No. 7:17-cv-00481, 2025 WL 2779306 (W.D. Va. Sept. 30, 2025)........................2

*Olech v Michael Stapleton Assocs., Ltd. d.b.a MSA Sec., Inc.*
No. 5:25-cv-00152-JHY-JCH ........................................................15

*Pritchard v. Metro. Wash. Airports Auth.,*
No. 1:18-cv-1432 (AJT/TCB), 2019 WL 5698660 (E.D. Va.
Nov. 4, 2019), *aff'd,* 860 F. App'x 825 (4th Cir. 2021) ........................4

*Pritchard v. Metro. Wash. Airports Auth.,*
860 F. App'x 825 (4th Cir. 2021) ........................................................4

*Resetarits Const. Corp. v. Olmsted,*
118 A.D.3d 1454, 988 N.Y.S. 2d 797 (N.Y. App. Div. 2014) ...........16

*Skidmore v, Swift & Co.,*
323 U.S. 134 (1944) ....................................................................20, 21

*Thompson v. Rockingham Cnty.,*
663 F. Supp. 3d 509 (W.D. Va. 2023) ..................................................3

*U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.,*
36 F. Supp. 3d 773 (S.D. Oh. 2014) ..................................................21

*Weber v. Dep't of Veterans Affairs,*
No. No. 19-2004, 2022 WL 1797321 (4th Cir. 2022) ...........................5

## Statutes and Rules

5 U.S.C. §1221(e)(1) ....................................................................................4

41 U.S.C. § 4712 ..............................................1, 2, 3, 4, 5, 7, 10, 12, 14

48 U.S.C. §3.9 ............................................................................................18

48 U.S.C. §3.909 ..........................................................................18, 19, 20

Fed. R. Civ. P. 56 ...................................................................................1, 2, 3

## Other

Katie Leslie, Jeff Piper, & Steve Jones, *State Department Oversight Report Finds*
*Bomb-Sniffing Dogs Dying From Neglect Overseas*, NBC4 (Sept. 17, 2019, 3:14 PM),
https://www.nbcwashington.com/news/local/state-department-oversight-report-finds-
bomb-sniffing-dogs-dying-from-neglect-overseas/1959667/ (streaming video
with Plaintiff's interview ...........................................................................6

Defendant Michael Stapleton Associates, Ltd., d/b/a MSA Security, Inc. ("MSA"), by counsel, respectfully submits this Memorandum of Law in Support of its Motion for Summary Judgment under Federal Rule of Civil Procedure ("FRCP") 56.

## PRELIMINARY STATEMENT

Summary judgment is appropriate here because there is no genuine dispute regarding any material fact. As such, MSA is entitled to judgment as a matter of law. Plaintiff alleges she was terminated in retaliation for whistleblowing under 41 U.S.C. § 4712. The timeline of events is fatal to her claim. There is no dispute that the U.S. Department of State ("DoS") began the process to modify its contract with MSA in February 2017 (well before Plaintiff made any protected and non-protected disclosures). The modification eliminated the part-time veterinarian position (held by Plaintiff) and replaced it with a full-time role. Plaintiff applied for that position. MSA chose to hire a different, more qualified candidate. That decision was made prior to any notice MSA had of Plaintiff's protected disclosures. The timeline does not lie, and it is fatal to Plaintiff's claim. No reasonable jury could conclude otherwise.

There is no dispute that Plaintiff was threatening to (and did) disclose confidential DoS information relating to MSA, the Canine Validation Center[1], and DoS to a number of news reporters and media outlets. Plaintiff's threats, which she made to MSA employees, prompted MSA to place Plaintiff on paid administrative leave while MSA investigated the situation. This all occurred after MSA had made its decision to hire Lee Palmer (not Karen Iovino) for the full-time

---

[1] The facility that MSA currently maintains and operates is called the Diplomatic Security Global Canine Services Center. In 2017, the facility was called the Canine Validation Center ("CVC"), which is what the Parties have called it throughout this litigation. MSA will refer to the facility as the CVC herein.

position, and after notifying Iovino[2] that it had chosen to hire Palmer, not her for the position. There is no dispute that Plaintiff made a series of unauthorized disclosures of confidential information to journalists (persons not covered by § 4712), contrary to the confidentiality obligations outlined in a confidentiality agreement that Plaintiff signed while onboarding at MSA. Plaintiff admits to knowingly and voluntarily violating her confidentiality agreement with MSA. MSA would have taken the same personnel actions (placing Plaintiff on administrative leave) in the absence of any protected disclosure. MSA applies its confidentiality restrictions consistently, including to non-whistleblowers who engaged in similar conduct.

Even if a jury could somehow conclude that MSA retaliated against Plaintiff, Plaintiff cannot establish damages. She remained on paid administrative leave through separation and has earned as much or more post-MSA than she would have at MSA. She is financially better off now than she was when she was working for MSA. That is beyond dispute.

## **LEGAL AUTHORITY**

Under Federal Rule of Procedure 56(a), the Court must grant summary judgment if the movant shows that "no genuine dispute as to any material fact" exists, and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment under Rule 56(a), the Court's role "is not to assess the truth of any fact alleged or to weigh facts, as would a jury in finding facts, but only to determine whether facts are disputed *and* whether the disputed facts are material." *Id.*; *see also Muhammad v. Fleming*, No. 7:17-cv-00481, 2025 WL 2779306, at *7 (W.D. Va. Sept. 30, 2025) (citing *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 352 (4th Cir. 2024)) (original emphasis).

---

[2] Tellingly, Plaintiff's first unauthorized disclosures to the media about DoS's sensitive program occurred the day after she filed a retaliation claim because she *assumed* she was not selected for the full-time position. Defendant's Statement of Undisputed Material Facts ("DSUMF") ¶ 20.

Under Rule 56, a court views the record as a whole and draws all reasonable inferences in favor of the nonmovant. *Thompson v. Rockingham Cty.*, 663 F. Supp. 3d 509, 522 (W.D. Va. 2023). To defeat a motion for summary judgment, the nonmovant must allege more than a "mere scintilla of evidence" on which a reasonable jury could rely to find in the nonmovant's favor. *Id.* The evidence offered by the nonmovant must be "in the form of admissible evidence" that would meet the burden of proof at trial. *Id.* (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). A nonmovant may not rely on "beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." *Id.* (citing *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992)). "[I]f the evidence of a genuine issue of material fact 'is merely colorable or is not significantly probative, summary judgment may be granted.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986)). If the record, viewed as a whole, would not allow a reasonable jury to find for the nonmovant, there is no genuine issue of material fact left for trial, and summary judgment should be granted. *Id.*

## ARGUMENT

Plaintiff claims that she was terminated in retaliation for her protected activity under 41 U.S.C. § 4712.[3] For Plaintiff to be protected under this statute, the following must occur:

(1) the employee reasonably believed they were disclosing "evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant" (41 U.S.C. § 4712(a)(1); and

(2) the employee made their protected disclosure to a covered "persons" or "bodies" (41 U.S.C. § 4712(a)(2)).

---

[3] Plaintiff's claim is limited to retaliation for her protected activity under 41 U.S.C. § 4712. She does not have a claim for retaliation for making an EEOC complaint.

3

*See Pritchard v. Metro. Wash. Airports Auth.*, No. 1:18-cv-1432 (AJT/TCB), 2019 WL 5698660, at *12 (E.D. Va. Nov. 4, 2019), *aff'd*, 860 F. App'x 825 (4th Cir. 2021).

Section 4712 adopts the burden of proof from the Whistleblower Protection Act of 1989 ("WPA"), 5 U.S.C. § 1221(e)(1). *See* 41 U.S.C. § 4712(c)(6); *see also Pritchard v. Metro. Washington Airports Auth.*, 860 F. App'x 825, 828 (4th Cir. 2021). Under § 1221(e)(1), the employee must show that the "protected activity was a contributing factor in the personnel action." This can be done through circumstantial evidence, such as: "(A) the official taking the personnel action knew of the disclosure or protected activity; and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure or protected activity was a contributing factor in the personnel action." 5 U.S.C. § 1221(e)(1).

"Even if the disclosure was a contributing factor, however, the employee is not entitled to corrective action if 'the agency demonstrates by clear and convincing evidence that it ***would have taken the same personnel action in the absence of such disclosure***.'" *Mikhaylov v. Dep't of Homeland Sec.*, 62 F.4th 862, 864 (4th Cir. 2023) (quoting 5 U.S.C. § 1221(e)(2)) (emphasis added).

If a party "would have taken the same personnel action in the absence of" any protected disclosure, the Court can apply the three-factor test adopted in *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318 (Fed. Cir. 1999). *Mikhaylov v. Dep't of Homeland Sec.*, 62 F.4th 862, 869–71 (4th Cir. 2023). In *Mikhaylov*, the Fourth Circuit applied the following three *Carr* factors when denying relief because "the Agency proved by clear and convincing evidence that it would have taken the action even in the absence of the disclosures":

> (1) "the strength of the agency's evidence in support of its personnel action"; (2) "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision"; and (3) "any evidence that the agency

takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated."

*Id.* at 869, 872 (quoting *Carr*, 185 F.3d at 1323); *see also Weber v. Dep't of Veterans Affairs*, No. No. 19-2004, 2022 WL 1797321, at *2 (4th Cir. 2022) (emphasis added) (explaining that if "***the balance*** of the [Carr] factors demonstrates that" an employer would have removed an employee "absent the protected disclosure," there can be no finding of retaliation).

Because this Court will review the evidence in the light most favorable to Plaintiff, MSA will concede for purposes of this Motion that Plaintiff believed that she was disclosing evidence of fraud, waste, and abuse under 41 U.S.C. § 4712(a)(1). MSA will focus on the remaining elements below.

## I.    Plaintiff Made Protected Disclosures to Persons and Bodies Both Covered and Not Covered Under 41 U.S.C. § 4712(a)(2).

In July 2017, Plaintiff submitted (1) a formal complaint to the Department of State's ("DoS") Office of Inspector General ("OIG") regarding alleged waste, fraud, or abuse; and (2) a Whistleblower Retaliation Form to the DoS OIG. DSUMF ¶¶ 12, 19. She also contacted the Director of the DoS's Office of Acquisitions Management ("AQM") with similar concerns. DSUMF ¶ 22. These disclosures may be protected under 41 U.S.C. § 4712(a)(2), as they appear to be made to a federal employee responsible for contract oversight and to the OIG itself, which are "persons" and "bodies" covered under 41 U.S.C. § 4712(a)(2).

However, Plaintiff also made unauthorized disclosures of confidential DoS information to various journalists, who are **not** covered by 41 U.S.C. § 4712(a)(2). DSUMF ¶¶ 20–21, 25, 31–32, 49–53, 55, 57–58, 60. These disclosures are not protected by statute and violate her confidentiality obligations to MSA. DSUMF ¶ 5. Plaintiff does not dispute these facts. DSUMF ¶¶ 63–64, 66–72.

5

On July 27, 2017, while still employed by MSA, Plaintiff emailed Ellen Nakashima, a reporter at the Washington Post, offering to discuss "significant issues at my current job" and describing "waste, fraud, abuse" at the CVC. DSUMF ¶ 20. On August 1, 2017, Plaintiff also contacted David Paredes, a reporter at NBC News, providing details about alleged misconduct at the CVC, including internal documents and references to her OIG complaint. DSUMF ¶ 25.

Throughout 2017 to 2019, Plaintiff continued to correspond with multiple reporters, including Carol Morello (Washington Post), Scott MacFarlane (NBC4 Washington), and Katie Leslie (NBC4 Washington), providing them with confidential information, internal emails, and photographs related to the DoS's program at the CVC. DSUMF ¶¶ 20–21, 25, 31–32, 49–53, 55, 57–58, 60. Plaintiff admits to sending DoS information, including but not limited to internal emails, photographs, and other documents, to reporters. DSUMF ¶ 63–64, 66–72. This includes a photograph of a working dog involved in the DoS program and an email from Dr. Ratcliff regarding a working dog involved in the DoS program. DSUMF ¶ 71.

As a direct result of Plaintiff's unauthorized disclosures, multiple articles were published, including two articles published on February 6, 2019 (from NBC Washington and the Washington Examiner) highlighting Plaintiff's allegations (DSUMF ¶ 54), and two Government Accountability Project (Plaintiff's lawyers in this case) articles celebrating Plaintiff's disclosures and their impact on public awareness and congressional oversight (DSUMF ¶ 62). Plaintiff also appeared on NBC4 for a live TV interview about the information in the articles. NBC4 has repeatedly broadcast that video segment.[4] DSUMF ¶ 54.

---

[4] Katie Leslie, Jeff Piper, & Steve Jones, *State Department Oversight Report Finds Bomb-Sniffing Dogs Dying From Neglect Overseas*, NBC4 (Sept. 17, 2019, 3:14 PM), https://www.nbcwashington.com/news/local/state-department-oversight-report-finds-bomb-sniffing-dogs-dying-from-neglect-overseas/1959667/ (streaming video with Plaintiff's interview).

While Plaintiff's disclosures to the OIG and AQM may be protected under 41 U.S.C. §
4712(a)(2), her repeated disclosures to journalists and news outlets were unauthorized releases of
confidential DoS information. There is no dispute that Plaintiff made these disclosures.

## II.    MSA Would Have Taken The Same Actions Even In the Absence Of Plaintiff's Disclosures.

MSA would have placed Plaintiff on administrative leave in the absence of Plaintiff's
alleged protected disclosures. Plaintiff was threatening to go to the media with confidential DoS
information and threatened to have the CVC "shut down" when she was told she was being placed
on paid administrative leave. DSUMF ¶¶ 24, 33–37. All of these actions made her a security risk
to a highly sensitive government program. DSUMF ¶ 39. Plaintiff made these threats because she
was being asked to apply for the new full-time veterinarian position, a position she incorrectly
assumed was hers for the taking. DSUMF ¶ 24.

In May 2017, DoS indicated to MSA that it wanted to modify its existing contract with
MSA to include, among other things, a full-time veterinarian position to replace the part-time
veterinarian position. DSUMF ¶¶ 9–11. After a competitive hiring process, MSA determined that
Plaintiff was not the best-qualified candidate for the full-time position and selected the more
qualified candidate. DSUMF ¶ 18.

Threatening to disclose confidential information because DoS was modifying its contract
to replace the part-time veterinarian position with a full-time veterinarian position is undeniable
evidence that Iovino was a security risk. DSUMF ¶ 36, 38–39. This is the only "retaliation" that
occurred between Iovino and MSA – Iovino retaliating against MSA by disclosing confidential
information about a sensitive government program to the media because she assumed she was not
going to be offered the full-time position. That is why she was suspended **with pay** in the final
two weeks of her employment with MSA – because she was a security risk to a sensitive DoS

program. DSUMF ¶ 36. During that time, MSA investigated what information Plaintiff had and what information she could potentially (and did) disclose. *Id.* Securing MSA's facility and DoS information was the top priority. DSUMF ¶¶ 36, 39. That is why Mr. Goss went to the CVC shortly after Plaintiff's suspension to check the facility from a security standpoint. *Id.*

    a.  <u>**The timeline of events does not support Plaintiff's theory.**</u>

Plaintiff's theory that her non-selection for the full-time position and placement on administrative leave were acts of retaliation for her protected disclosures to the OIG and AQM does not fit the factual timeline. MSA was not aware of Plaintiff's protected disclosures until, at the earliest, August 1, 2017. DSUMF ¶¶ 27–30. Plaintiff knew this was a problem when she filed her complaint and promised that "After a reasonable opportunity for further investigation and discovery, there likely will be evidence that MSA officials at most managerial levels had actual knowledge of Dr. Iovino's identity and the substance of her OIG complaint no later than July 19, 2017." Am. Compl. (ECF 30) ¶ 128; *see also* Am. Compl. ¶¶ 81,[5] 130,[6] 131,[7] 161.[8] Having had the benefit of over 4.5 years of discovery, including the production of over 10,000 pages of documents by MSA, DoS, and the DoS OIG, and Plaintiff taking 15 depositions, Plaintiff "still hasn't found what it's looking for." There is no evidence to support Plaintiff's alternative timeline. The **actual** timeline is fatal to Plaintiff's claim.

---

[5] "After a reasonable opportunity for further investigation and discovery, evidence of the identity of any who influenced the selection decision is likely to be found." Am. Compl. ¶ 81.

[6] "After a reasonable opportunity for further investigation and discovery, there likely will be additional evidentiary support that MSA decision-making officials had knowledge, both actual and constructive, of Dr. Iovino's protected activities before taking certain adverse actions against Dr. Iovino." Am. Compl. ¶ 130.

[7] "After a reasonable opportunity for further investigation and discovery, there likely will be evidence that Dr. Ratcliff's knowledge of Dr. Iovino's protected disclosures was shared with Mr. Bower, and Mr. Bower's knowledge of Dr. Iovino's protected disclosures was shared with Dr. Ratcliff." Am. Compl. ¶ 131.

[8] "After a reasonable opportunity for further investigation and discovery, further evidence of MSA's practice is likely to be found." Am. Compl. ¶ 161.

Plaintiff recounts a February, 2017 conversation between herself and Dr. Ratcliff, where Dr. Ratcliff informed her that the CVC was expanding, and the DoS Contract would likely require a full-time veterinarian in the future. DSUMF ¶ 6. Months before Iovino made her OIG complaint.

As Ratcliff predicted in February 2017, in May 2017, prior to Iovino's July 6, 2017 OIG complaint, DoS amended its contract with MSA, discontinuing the part-time veterinarian position held by Plaintiff and requiring MSA to create and fill a new full-time veterinarian position with expanded duties, including international travel and serving as a program representative abroad. DSUMF ¶¶ 7–11. The part-time position held by Plaintiff would be defunded as of August 18, 2017, and MSA was directed to fill the new full-time position in accordance with DoS's requirements. DSUMF ¶¶ 9–11.

MSA opened the application process for the new full-time veterinarian role on July 17, 2017. DSUMF ¶ 16. Plaintiff submitted her application that same day. *Id.* On July 26, 2017, MSA selected Dr. Palmer because of his superior qualifications. DSUMF ¶ 18.

There is **zero evidence** that MSA was aware of Plaintiff's OIG complaint at the time it made the decision to hire Dr. Palmer. DSUMF ¶¶ 27–30. Internal email exchanges between Plaintiff and MSA's HR executive, Peter Deegan, on July 25–26, 2017, confirm that MSA had no knowledge of any OIG complaint related to the CVC at that time. DSUMF ¶ 17.

On July 25, 2017, Plaintiff emailed Mr. Deegan informing Deegan that she had filed an EEOC complaint against MSA and stating that there are "very serious issues at the CVC" which "seems to operate separately." *Id.* When Deegan asked what those "serious issues" were, Plaintiff replied that she did not "feel it would be appropriate to elaborate on the issues at [the] CVC at this time," but "would be happy to have a face to face discussion at the appropriate time." *Id.* Deegan reminded Plaintiff that she has a fiduciary duty as an employee on a government contract to "bring

9

allegations of impropriety to [MSA's] attention." *Id.* Plaintiff again refused to elaborate on the "serious issues" and stated again that she would "be happy to discuss these matters at the appropriate time face to face." *Id.* It was not until August 1, 2017 (after Dr. Palmer had already been selected for the position and Iovino had been informed that she had not) that MSA could have learned of Plaintiff's OIG complaint. DSUMF ¶¶ 27–30.

The elimination of Plaintiff's position was the result of a change in the scope of work, not any retaliatory motive on the part of MSA. The timeline establishes that the decision to end Plaintiff's part-time position and to select another veterinarian for the new full-time role was made independently of, and prior to, any possible knowledge by MSA of Plaintiff's disclosures to OIG or AQM personnel. No reasonable jury could conclude otherwise.

**b. <u>MSA has ample evidence in support of its personnel action.</u>**

> *i. Plaintiff was threatening to go to the media with confidential DoS information, and indeed, did do so.*

The only "adverse" personnel action that MSA made after the first possible opportunity it had to learn (on August 1, 2017) that Plaintiff had made a complaint to OIG was placing Plaintiff on paid administrative leave[9] while it investigated Plaintiff's threats to take confidential official DoS information to the media (*i.e.*, persons not covered under 41 U.S.C. § 4712(a)(2)). DSUMF ¶¶ 24, 33–36. All other alleged "adverse" personnel actions occurred prior to August 1, 2017, and indeed, prior to when Plaintiff alleged in her complaint that MSA could have first known that she was a "whistleblower." Am. Compl. (ECF 30) ¶ 85.

---

[9] Even if there was liability (there is not) Plaintiff cannot prove she has any damages. There is no dispute that she suffered no lost wages while employed at MSA because she was placed on **paid** administrative leave through the end of her employment. DSUMF ¶ 36. MSA attempted to depose Plaintiff's financial expert, Dr. Hankins, but Plaintiff refused to make him available for a deposition. DSUMF ¶¶ 75–76. Plaintiff also refused to make her emotional damages expert available for a deposition. *Id.*

In late July or early August 2017, Plaintiff told two of MSA's kennel technicians (Ben Orndorff and Jonah Ballenger) that she was contemplating going to The Washington Post about MSA, the CVC, and the DoS Contract because she was being made to apply for the full-time position. DSUMF ¶¶ 24, 33. Plaintiff remembers this conversation happening in July 2017, whereas Mr. Orndorff remembers it happening on or about August 3, 2017. *Id.* Plaintiff told Mr. Ballenger and Mr. Orndorff that she believed she had been treated unfairly by MSA because she is a woman, and that she would not be around much longer because she did not think she was going to be selected for the new full-time veterinarian position. DSUMF ¶ 33. She further complained that DoS was not ensuring the care of canines provided to foreign governments under the ATA program. *Id.* Plaintiff threatened to find and tell anyone who would listen to her, including The Washington Post, the Better Business Bureau, and the government. *Id.*

Unsettled by this outburst, Mr. Orndorff reported Plaintiff's threats to disclose confidential DoS information to non-governmental sources to Brett Harshberger, the CVC Kennel Technician Manager, and to Jennifer Houston, a CVC veterinary technician. *Id.* Ms. Houston, in turn, informed CVC Program Manager Alan Bower and CVC Veterinarian Dr. Ratcliff. DSUMF ¶ 34. Mr. Bower then told Gerald Goss (Executive Vice President for Government Programs). DSUMF ¶ 35.

Concerned that Plaintiff may have already disclosed or was considering disclosing confidential DoS information to the media, MSA placed her on paid administrative leave while MSA investigated the situation and reminded her of her confidentiality obligations. DSUMF ¶ 36. Plaintiff responded by threatening to call the Virginia state veterinary board and have the CVC's veterinary facilities "shut down." DSUMF ¶ 37.

Mr. Goss promptly called Anna Garcia, DoS's Contracting Office Representative ("COR") assigned to the Contract, to provide DoS with notice of Plaintiff's threats and notice of the potential

11

that Plaintiff may make additional unauthorized disclosures of confidential information relating to the CVC (which she did, *see* DSUMF ¶¶ 20–21, 25, 31–32, 49–53, 55, 57–58, 60). DSUMF ¶ 38. Ms. Garcia told Mr. Goss to submit a written report of the situation, which Mr. Goss did on August 4, 2017. DSUMF ¶¶ 38–39.

MSA placed Plaintiff on paid administrative leave while it investigated Plaintiff's threats to take confidential and sensitive DoS information to the media (*i.e.*, persons not covered under 41 U.S.C. § 4712(a)(2). No reasonable jury could conclude otherwise.

ii. *The DoS Contract was modified to replace the part-time veterinarian position with a full-time veterinarian position.*

Plaintiff contends that the part-time position ending on August 18, 2017, is also an "adverse" personnel action. Am. Compl. ¶ 134. This is not true.

As early as February 2017, Plaintiff was aware that the CVC was expanding, and a full-time veterinarian position may replace the part-time veterinarian position to support this increased need. DSUMF ¶ 6.  In May 2017, DoS indicated to MSA that it wanted MSA to replace the part-time CVC veterinarian position with a full-time position that contemplated additional duties, including overseas travel and serving as a representative on behalf of the Government with regard to the CVC program. DSUMF ¶ 9. This change was required by the growing scope of the CVC program and the increasing operational tempo, which demanded greater veterinary resources to maintain the well-being of the canines. *Id.* DoS foresaw an increased need to send the veterinarians overseas and work in potential combat areas. *Id.*

On June 26, 2017, DoS confirmed that, with the new modification, the veterinarian position will require 40 hours per week. DSUMF ¶ 11. On August 1, 2017, DoS issued a new modification, exercising Option Year Number 1, which expanded the period of performance from August 17, 2017, to August 16, 2018. DSUMF ¶ 26. In the DoS deposition, the DoS's 30(b)(6) representative

confirmed that "[t]he Department requested a contract amendment as a contract change to make the previous part-time position a full-time position . . . ." DSUMF ¶ 9.

There is no dispute that DoS modified its contract with MSA to replace the part-time veterinarian position with a full-time veterinarian position, and that that modification occurred well before MSA knew or could have known of Iovino's protected whistleblower activity.[10] The part-time veterinarian position concluded on or about August 16, 2018. DSUMF ¶¶ 11, 26.

> ### iii. *Plaintiff was not selected to fill the full-time position for legitimate reasons.*

MSA posted this new full-time veterinary position online and accepted resumes. DSUMF ¶ 16. The job posting stated that applicants be willing to live and work in conflict/combat areas, or other international locations, for specific periods of time. *Id.* MSA invited Plaintiff to apply, which she did on July 17, 2017. DSUMF ¶¶ 14–16. This came as a surprise to MSA, not only because of her past unwillingness to work full-time or travel overseas, but also because she had chosen not to apply for the previous two full-time veterinarian positions added during her time at MSA. DSUMF ¶ 16.

When comparing the two final candidates, MSA found Plaintiff minimally qualified for the new position. DSUMF ¶ 18. There is a substantial disparity in the credentials of Plaintiff and Dr. Lee Palmer, the candidate that MSA ultimately selected for the position on July 26, 2017. *Id.* Dr. Palmer's extensive military and professional experience made him the superior candidate. *Id.* Dr. Palmer's credentials for the position greatly overshadowed Plaintiff's, as Plaintiff's resume showed that her experience was limited to the general practitioner level. *Id.* In contrast, Dr. Palmer's resume lists relevant emergency care experiences, extensive experience with working

---

[10] The discussion between DoS and MSA regarding replacing the part-time CVC veterinarian position with a full-time position began in February 2017, months before Iovino's July 6, 2017 OIG complaint. DSUMF ¶¶ 6, 12.

dogs, leadership roles within the Army Reserves, peer-reviewed articles, publications, lectures, and teaching positions, all of which position him as an experienced, articulate, and knowledgeable speaker and representative of a caliber befitting the DoS. *Id.*

Dr. Palmer was the more qualified candidate for the full-time position. DSUMF ¶ 18. MSA's decision to hire him (a decision that occurred prior to MSA having any knowledge of Iovino's protected whistleblowing activity) was a well-reasoned business decision that had nothing to do with Iovino's protected activity. *Id.* It is well established that it is not the Court's role to "sit as a kind of super-personnel department weighing the prudence of employment decisions" made by employers. *McClain v. Lynchburg City Sch.*, 531 F. Supp. 3d 1115, 1128 (W.D. Va. 2021) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)) (granting summary judgment because the defendant had an "articulated justification for eliminating [Plaintiff's] position" and explaining that the court will "not sit as a kind of super-personnel department"); *Luqmaan v. Volvo Grp. North Am., LLC*, 94 F. Supp. 3d 762, 775 (W.D. Va. 2015) (quoting *DeJarnette*, 133 F.3d at 299) (finding it is the court's "sole concern" to determine if an act is discriminatory, and not to determine the "prudence of employment decisions").[11]

> iv. *The part-time veterinarian position ended while Plaintiff was on administrative leave, rendering MSA's investigation into Plaintiff's unauthorized media disclosures largely moot.*

MSA's investigation into Plaintiff's access to and disclosure of confidential information continued for six weeks following the time she was placed on paid administrative leave. DSUMF ¶ 36. However, on August 18, 2017, two weeks after Plaintiff was placed on leave, and well before

---

[11] While these are not cases regarding a whistleblower retaliation claim under 41 U.S.C. § 4712, they provide persuasive guidance to the Court. Courts are not inclined to act as "a super personnel department" and "weigh[] the prudence" of a company's non-discriminatory employment decision. *Luqmaan*, 94 F. Supp. at 775. This is the case here, where MSA chose to hire a more qualified candidate over a less qualified candidate. DSUMF ¶ 18.

the investigation of Plaintiff's activities was completed, the part-time position she held ceased to be funded by the DoS, and thus MSA informed Plaintiff that her position had come to an end. DSUMF ¶ 42. As previously noted, this had been DoS's plan since February 2017 (DSUMF ¶ 6); well before Plaintiff made any protected disclosure. This was not a surprise to Plaintiff, as she was informed on or about July 31, 2017 that she had not been selected for the full-time position. DSUMF ¶ 23.  Prior to finding out whether she was selected for the full-time position, Plaintiff began her campaign of unauthorized leaks to the media about DoS's CVC and sensitive ATA program. DSUMF ¶ 20.

### c. **MSA has taken similar actions against other similarly situated employees who are not whistleblowers.**

MSA has taken similar disciplinary actions against employees who are not whistleblowers but were otherwise similarly situated. MSA's Rule 30(b)(6) deponent, Kevin Dragnett, testified that MSA has taken adverse employment actions against employees who were not whistleblowers, but who engaged in conduct similar to that of the Plaintiff. DSUMF ¶ 65.

Mr. Dragnett testified that in 2022, Dr. Carolyn Olech[12], an employee at the CVC, was terminated for sending work emails to her personal email address, a violation of company policy. *Id.* At the time of her termination, Dr. Olech was not identified as a whistleblower, yet MSA took corrective action against her for the unauthorized handling of confidential information. *Id.*

Mr. Dragnett described another instance in 2021 involving another MSA employee who used information obtained through his employment at MSA for personal gain. *Id.* This employee

---

[12] Carolyn Olech is also suing MSA in this Court. *See Olech v. Michael Stapleton Assocs., Ltd. d.b.a. MSA Sec., Inc.,* Case No. 5:25-cv-00152-JHY-JCH. Olech alleges that MSA improperly terminated her after MSA found that she took, without authorization, DoS and/or MSA property and emailed the documents and/or information to her personal email. Dr. Olech is represented by the Government Accountability Project (Plaintiff's lawyers) in that lawsuit.

learned of a forthcoming change to the name and acronym of the DoS's CVC and, through a friend, purchased the new domain name before MSA could do so. *Id.* MSA terminated this employee for violation of the code of conduct, specifically for using confidential information for financial gain. *Id.* That employee, like Olech, was not a whistleblower. That employee, like Olech, was terminated for misuse of confidential information.

MSA's disciplinary actions for confidentiality violations are not pretextual or selectively enforced against whistleblowers. MSA has taken similar actions against non-whistleblower employees who are otherwise similarly situated. No reasonable jury could conclude otherwise.

### III.    Plaintiff Admits to Knowingly and Willingly Violating MSA's Confidentiality Agreement.

The Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement between MSA and Plaintiff (the "Agreement") is valid and enforceable. DSUMF ¶ 5.

Under New York law, a valid and enforceable contract requires five essential elements: an offer, acceptance, consideration, mutual assent, and intent to be bound. *Resetarits Constr. Corp. v. Elizabeth Pierce Olmsted, M.D. Ctr. for the Visually Impaired*, 118 A.D.3d 1454, 1455, 988 N.Y.S. 2d 797 (N.Y. App. Div. 2014). There must be a "meeting of the minds . . . on all essential terms." *Id.* While a contract must not be "too indefinite," it "need not be fixed with complete and perfect certainty for a contract to have legal efficacy." *Kolchins v. Evolution Mkts., Inc.*, 128 A.D.3d 47, 61 (N.Y. App. Div. 2015).

The Agreement reflects a bargained-for exchange. In consideration of Plaintiff's employment by MSA and therefore access to non-public information concerning DoS, the CVC, and DoS's programs, Plaintiff expressly agreed not to "disclose, publish, use or otherwise make available to the public or to any individual, firm or corporation any confidential information." DSUMF ¶ 5. This condition included disclosures both during the term of her employment as well

as for all times thereafter. *Id.* There is no question that Plaintiff intended to be bound by the Agreement because she, at first, testified that she waited to reach out to the media until after she "knew" the OIG had found her confidentiality was allegedly not enforceable. DSUMF ¶¶ 67–68. She then admitted that she willingly violated the confidentiality agreement. DSUMF at 70.

Further, in Plaintiff's responses to MSA's fourth set of requests for production of documents, Plaintiff admits that she, without authorization, took DoS documents and information from the CVC before leaving MSA. DSUMF ¶ 77. Specifically, she states that she "[p]reserved work-related communications and data (CVC phone lists, OPOT/ATA OCONUS deployment records)" and emailed them to her "personal account for preservation." *Id.*

Plaintiff will likely argue that the Agreement was found "unenforceable" by the DoS OIG and, therefore, is an invalid agreement. Plaintiff is wrong.

In August 2018, DoS OIG released a report titled "Management Assistance Report: Use of Confidentiality Agreements by a Department of State Contractor" (the "Report"). DSUMF ¶ 44. In this Report, the OIG "finds" that:

> Because the MSA confidentiality agreements do not include an exception for disclosing fraud, waste, or abuse to a designated investigative or law enforcement representative, [DoS] is prohibited by law from expending any appropriated funds for a contract with MSA Security. Until MSA Security rescinds or modifies its confidentiality agreement, the Department is at risk of violating the Anti-Deficiency Act.

*Id.* The Report makes a "recommendation" to the Bureau of Administration, Office of Logistics Management ("A/LM") that it "*should* order" MSA to rescind or modify its confidentiality agreements, or else A/LM *should* terminate its contracts with MSA. *Id*. A mere "finding" of information in the OIG report, along with lax language such as "recommend" and "should," is not a direct order of termination or rescindment, nor is it an "explicit" finding that MSA's Agreement is "illegal." Rather, it is a suggestion that DoS (an entity at risk of violating the Anti-Deficiency

Act) mandate its government contractor (MSA) to change its confidentiality agreements or cancel the contract. That is precisely what happened.

After receiving the Report, DoS sent a letter to MSA requesting that MSA either rescind or modify its agreements to include the necessary language because *DoS* (not MSA) was at risk of violating the Anti-Deficiency Act on August 21, 2018, *over a year* after Plaintiff's employment with MSA ended. DSUMF ¶ 45. Accordingly, MSA *modified* its existing agreements for its current employees and never rescinded any agreements or created any new agreements. DSUMF ¶¶ 46–48. This modification was only requested for current employees (not including former employees). DSUMF ¶ 48.  At this point, Plaintiff was no longer an employee at MSA. Therefore, no such modification was necessary or required for her Agreement because she was no longer an employee under a federal government contract.

The Report explains that the OIG is making this recommendation based on its interpretation of the Federal Acquisition Regulation ("FAR"), which governs certain federal government contracts such as the DoS Contract. DSUMF ¶ 44. Specifically, the Report states that under the FAR, "***in order to be eligible for a contract award***, an offeror must represent that it will not require its employees or subcontractors to sign [] an agreement" that prohibits or otherwise restricts employees from reporting fraud, waste, or abuse. *Id.* (emphasis added).

The Report refers to FAR § 3.909 when "finding" that MSA was required to modify and/or rescind its confidentiality agreements. FAR § 3.909 is part of FAR § 3.9 (Whistleblower Protections for Contractor Employees). It addresses the "Prohibition on Providing Funds to an Entity that Requires Certain Internal Confidentiality Agreements or Statements." The purpose of FAR § 3.909 is to prohibit the Government from contracting with corporations that have internal confidentiality agreements that prohibit or restrict the lawful reporting of "waste, fraud, or abuse

18

to a designated Investigative or law enforcement representative . . . ." *See* 48 C.F.R. § 3.909-1.

The "prohibition" comes by regulating federal funding (*i.e.*, refusing to fund agencies when their

contractors implement restrictive internal confidentiality agreements). FAR § 3.909-1(a) states:

> The Government is prohibited from using fiscal year 2015 and subsequent fiscal
> year funds for a contract with an entity that requires employees or
> subcontractors of such entity seeking to report waste, fraud, or abuse to sign
> internal confidentiality agreements or statements prohibiting or otherwise
> restricting such employees or subcontractors from lawfully reporting such
> waste, fraud, or abuse to a designated investigative or law enforcement
> representative of a Federal department or agency authorized to receive such
> information.

*See* 48 C.F.R. § 3.909-1(a) (internal citations omitted).

FAR § 3.909-1 regulates the relationship between "The Government" and "an entity"

contracting with the Government. It does not regulate the relationship between MSA and Plaintiff.

Rather, the failure to include such a "carve-out" that specifically allows employees to report fraud,

waste, or abuse to government officials may affect a company's ability to obtain (or retain) federal

contracts, but does not affect the validity of the confidentiality agreement itself. Further, the

regulations do not mandate the inclusion of exceptions; they only "prohibit" agreements that

"prohibit[] or otherwise restrict[]" employees from lawfully reporting fraud, waste, and abuse. *Id.*

MSA's confidentiality agreement did neither. It merely did not include specific language to

emphasize the allowance of reporting "fraud, waste, or abuse to a designated investigative or law

enforcement representative of a Federal department or agency authorized to receive such

information." *Id.*

Any argument that, because the Agreement did not contain the specific language allowing

employees to report fraud, waste, or abuse to government officials, it has no force and effect on

Plaintiff is factually and legally incorrect. *Id*. FAR § 3.909 does not regulate MSA's Agreement

with Plaintiff. It certainly does not invalidate the Agreement. Instead, FAR § 3.909 establishes

parameters for the Government to regulate its contracts with the private industry. FAR § 3.909 prohibits the *Government* from selecting contractors that have an internal confidentiality clause that prohibits or restricts the ability of its employees to report "waste, fraud or abuse." The rule does not create a contractual nexus between the Government and an individual employee of MSA. DSUMF ¶ 79. It does not affect a contract between MSA and one of its employees (such as the Agreement). *Id.* In fact, it cannot because contractor employees are not federal employees, and the federal government cannot dictate the terms and conditions of contractor employees' relationship with their employer. *Id.*

This Court addressed this issue in its August 25, 2022 Memorandum Order on Plaintiff's Motion to Dismiss MSA's counterclaim for failure to state a claim or, alternatively, for judgment on the pleadings filed earlier in this litigation. ECF 55 at 8. The Court stated that "in the absence of any argument that the [OIG] report's conclusion is binding, the court sees at least two reasons to hesitate before endorsing the document." *Id.* The Court further noted that "[i]n future stages of this litigation, the court will welcome briefing on whether the OIG report is entitled to *Auer* deference or no deference at all." *Id.* n.1. The Court was correct in its assumption that "an internal assistance report prepared by an agency's OIG is entitled to *Skidmore* deference." ECF 55 at 8, n.1 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

This Court went on to explain that "*Skidmore* deference applies to an agency's interpretation of a regulation or statute if that interpretation does not reflect the agency's authoritative or official position." *Id.* (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416–18 (2019)). This is correct. Here, the OIG Report is merely OIG's investigative findings. OIG has no authority to bind DoS—it can only make "recommendations." DSUMF ¶ 44; *see also, e.g.*, *Jefferson v. Harris*, 170 F. Supp. 3d 194, 217 (D.D.C. 2016) ("While the IGA grants the OIGs extensive

powers to carry out their investigatory functions, the statute does not authorize them to take any follow[-]up action against federal employees on behalf of the agency.") (internal citations omitted); *U.S. ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, 36 F. Supp. 3d 773, 780 (S.D. Oh. 2014) (finding that OIG advisory opinions are not entitled to judicial deference because they "do not establish rules of decision"). In *Jefferson*, the court explains that the OIG is authorized to "conduct investigations, draft reports, and issue recommendations," and that "final action is left to the <u>agency</u> within which each OIG is housed." *Jefferson*, 170 F. Supp. 3d at 217 (original emphasis). This is what happened here. After the OIG submitted its "report of investigation" relating to Plaintiff's underlying OIG complaint recommending, among other things, granting relief to Plaintiff, DoS denied Plaintiff any relief because it found that MSA met its burden in presenting clear and convincing evidence that it would have made the same employment decisions in the absence of Plaintiff's disclosures. DSUMF ¶ 61.

Because the OIG's Report is not conclusive (*i.e.*, DoS is the only agency that can determine how it would proceed after reviewing OIG's investigation), it merely provides information the Court could utilize in making its legal determinations. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). Here, the legal determination to make is whether the Agreement is valid and enforceable, which is a question of law. *Capstone Bus. Funding, LLC v. Shames Constr. Co.*, 205 A.D.3d 606, 607 (NY App. Div. 2022) ("[T]he question of whether a document is an enforceable contract is a legal conclusion."). As explained above, the Agreement is a valid and enforceable contract under New York law.

Even taken in the light most favorable to Plaintiff, the Report does not purport to direct, control, or restrict a government contractor's contracts with its former employees, nor does the Court owe any deference to the OIG's recommendations.

The Agreement is a legally enforceable contract between Plaintiff and MSA. Plaintiff admits to violating that Agreement. No reasonable jury could conclude otherwise. Liability is irrefutably established. All that remains for the Jury to adjudicate is the proper measure of damages to award MSA on its counterclaim.

## CONCLUSION

No reasonable jury could find that MSA, in choosing to hire Dr. Lee Palmer, did so in retaliation for Iovino's protected whistleblower activity. MSA did not know about Iovino's whistleblowing when it chose to hire Dr. Palmer. MSA did not know about Iovino's whistleblowing when the part-time position was replaced with a full-time position. MSA may have learned about Iovino's whistleblowing 3 days before she was placed on paid administrative leave, but had independent legitimate reasons for doing so (her threats to release sensitive program information to the media). Iovino knew on July 31, 2017 that MSA chose to hire Dr. Palmer for the full-time position. At that time, she knew she would not have a job with MSA past August 18, 2017. MSA paid Iovino through August 18, 2017. Iovino has suffered no harm. For these reasons, MSA's Motion for Summary Judgment as to Plaintiff's claim should be granted.

Additionally, no reasonable Jury could find in favor of Iovino with regard to MSA's counterclaim. The Agreement is a legally enforceable contract between Plaintiff and MSA. Plaintiff admits to violating that Agreement. Of this, there is no dispute. Liability is irrefutably established. All that remains for the Jury to adjudicate is the proper measure of damages to award MSA on its counterclaim.

Respectfully submitted,

Date: March 16, 2026

*/s/ Daniel S. Ward*

_____

Daniel S. Ward (VSB 45978)
Ryan C. Berry (VSB 67956)
Chelsea A. Cruz (VSB 96177)
WARD & BERRY, PLLC
1751 Pinnacle Drive, Suite 900
Tysons, VA 22102
(202) 331-8160
(202) 505-7100 Fax
dan@wardberry.com
ryan@wardberry.com
chelsea@wardberry.com

*Attorneys for Defendant Michael Stapleton*
*Associates, Ltd., d/b/a MSA Security, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Virginia by using the CM/ECF system. I certify that the following participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Nate L. Adams III
Nate L. Adams III, P.C.
11 South Cameron Street
Winchester, VA 22601
(504) 667-1330
nadams@nadamslaw.com

Jack Kolar
Government Accountability Project
1612 K St. NW, Suite 1100
Washington, DC 20006
(202) 926-3311
jackk@whistleblower.org

Thad M. Guyer
T.M. Guyer & Friends, PC
116 Mistletoe Street
P.O. Box 1061
Medford, OR 97501
(206) 954-1203
thad@guyerayers.com

*/s/ Daniel S. Ward*
_____
Daniel S. Ward