# EXHIBIT E

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*



# Transcript of **Karen Iovino**

Wednesday, September 6, 2023

*Karen Iovino v. Michael Stapleton Associates, Ltd.*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 132786

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE WESTERN DISTRICT OF VIRGINIA

3                   HARRISONBURG DIVISION

4

5    ---------------------------------------
                                           :
6    KAREN IOVINO,                         :
                                           :
7    Plaintiff and Counterclaim Defendant, :
                                           :
8        v.                                :   Case No.
                                           :
9    MICHAEL STAPLETON ASSOCIATES, LTD.,   :   5:21-CV-
                                           :
10   d/b/a MSA SECURITY, INC.,             :   00064-TTC
                                           :
11   Defendant and Counterclaim Plaintiff. :
                                           :
12   ---------------------------------------

13

14        Video deposition of DR. KAREN IOVINO, the

15   Plaintiff and Counterclaim Defendant herein, held at

16   Ward & Berry, PLLC, 1751 Pinnacle Drive, Suite 900,

17   Tysons, Virginia, commencing at 10:49 a.m. on

18   Wednesday, September 6, 2023 and the proceedings

19   being taken down by stenotype and transcribed by

20   Catherine B. Crump, a Notary Public in and for the

21   Commonwealth of Virginia.

22

Karen Iovino                                                    9/6/2023
                                                               Page 38

1        A.    I would have to do the math, but yes,

2   probably.

3        Q.    And since you left MSA, have you made

4   more or less money per year?

5        A.    I would have to sit down and look at my

6   W-2, s but I do know that since leaving MSA, my work

7   schedule has gone from being something that was

8   consistent and nice to working weekends, holidays,

9   long shifts.  I am probably making close to what I

10  was, but it's not the same schedule that I had while

11  at MSA.

12       There's no snow days in veterinary medicine

13  when you work ER.  You have to go in, unlike at MSA

14  where they would close if there was heavy snow.

15       Q.    Now, would it surprise you that some of

16  those years, you made more money than you did at MSA?

17       A.    I might have, yes, but I was also

18  working myself into the ground, working crazy shifts.

19  Some days, I worked 12 noon to 12 midnight, would get

20  out of work at 1:30, get to bed at 3:30, still have

21  to get up at seven in the morning for my horses.  The

22  next day, I was at work at 7 a.m. and working until 7



1          A.    For me, it was anything over 30.

2          Q.    So it was still a part-time position?

3          A.    Correct.

4          Q.    Okay.  And did anyone at MSA ever ask

5    you to work full time?

6          A.    Yes.

7          Q.    When was that?  When was that?

8          A.    When was that?  I'm sorry.  I didn't

9    hear you.

10         That would be February 26, 2017.  Dr. Mike

11   Ratcliff said that he had a problem he needed to

12   solve and that he wanted me to take over the ATA

13   hospital as a full-time position, because it was

14   going to transition to a full-time position, and I

15   said yes, that I would talk to my husband, but he

16   said yes, my husband, Dave, and I assumed I was going

17   to get the full-time position.

18         Q.    And why did you understand that ATA

19   position became a full-time position?

20         A.    I was told by Dr. Ratcliff that they had

21   asked DOS to make it a full-time position.

22         Q.    Did you think that their making it a



*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

1  to say as an objection, she is perfectly free to do

2  that, but if you want to proceed now, you may.

3  BY MR. WARD:

4       Q.   Did your lawyers ever tell you to listen

5  to their objections?

6           MR. ADAMS:  Objection.  That's privileged.

7           MR. WARD:  Yeah.  Okay.  Good.

8           MR. ADAMS:  And that was more than two words,

9  wasn't it?

10          MR. WARD:  It was.  It was.

11  BY MR. WARD:

12      Q.   Did you honor the terms of this

13  agreement while you worked at MSA?

14          MR. ADAMS:  Objection to the form of the

15  question.

16  BY MR. WARD:

17      Q.   You can answer.

18      A.   No.

19      Q.   And how did you not honor the terms of

20  the agreement while you were at MSA?

21      A.   I reached out to the media in December

22  of 2018.



*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

1    Paredes and Scott MacFarlane and then, eventually

2    Katie Leslie.

3         Q.    And prior to leaving MSA, did you speak

4    to anyone at MSA, saying you're going to go to the

5    media?

6         A.    I said that I might go to the media.

7         Q.    And who did say that to?

8         A.    Jonah Ballenger and Ben Orndorff.

9         Q.    Okay.  And who are they?

10        A.    Kennel technicians.

11        Q.    And how did that conversation come up?

12        A.    Because they realized that was not --

13   that I had to apply for the position, that MSA had

14   reversed what they had said about me getting the

15   full-time job and they felt it was not fair and that

16   they liked working for me and they thought that I

17   should stay in that position.

18        Q.    And when you say MSA reversed it, you

19   mean that they reversed -- you're saying that the

20   Dr. Mike conversation on February 26, 2017 was a

21   formal job offer?

22        A.    I would think so.  He was my supervisor.



Karen Iovino                                                    9/6/2023
                                                                Page 80

1    technician to perform some of those duties and to

2    assist me, including at the time handling Schedule II

3    drugs, which are narcotics.  The DEA takes things

4    like that very seriously.

5          There was also at the end of July Josh Carter

6    heard screaming in the hallway that whoever was the

7    whistleblower and filed the complaint would be fired.

8          Q.    Josh Carter heard or was heard?

9          A.    Josh Carter was heard.

10         Q.    Was heard, okay.  And Josh Carter was a

11   Department of State employee?

12         A.    Correct.

13         Q.    Not an MSA employee?

14         A.    Correct.

15         Q.    So that's at the end of July, you're

16   telling me?

17         A.    Correct.

18         Q.    When was the call with the Jordanian

19   mentors?

20         A.    I don't remember the exact date, but I

21   do believe it was mid to late July.

22         Q.    When did you have your discussion with



*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

Karen Iovino                                              9/6/2023
                                                          Page 81

```
 1   the two techs saying that you might go to the press?

 2          A.    In July, but I don't remember the exact

 3   date.

 4          Q.    Was it before or after these three

 5   incidents?

 6          A.    It was after.

 7          Q.    You're certain of that?

 8          MR. ADAMS:  Asked and answered.

 9          Go ahead.

10          THE WITNESS:  To the best of my knowledge.

11   BY MR. WARD:

12          Q.    And what are the names of those two

13   techs again?

14          A.    Jonah Ballenger and Ben Orndorff.

15          Q.    And they're both honest?

16          A.    I don't have any idea.

17          MR. ADAMS:  Objection, speculation.

18   BY MR. WARD:

19          Q.    In your opinion, you've never known them

20   to lie to you?

21          A.    I've known Ben Orndorff to not perform

22   his job duties.  He was found sleeping one morning
```



Karen Iovino                                                9/6/2023
                                                              Page 98

1          Q.    So where does that excuse come from?

2          A.    The fact that it was two years since I

3  made my complaint about waste, fraud, and abuse, and

4  when we're talking about human lives, two years is a

5  long time.  Would you want to have somebody be blown

6  up while the government is slow in doing their

7  investigation?

8          That's a huge burden that I carried and I'm

9  still carrying it.

10         Q.    Did the furlough last for two years?

11         A.    I believe it lasted a couple of months.

12         Q.    Okay.  So I'm trying to understand when

13 you said you decided to go to the press as opposed to

14 the IG because you were in furlough, because it

15 wasn't moving fast enough.

16         A.    Correct.

17         Q.    Did you tell the IG that you were going

18 to go to the press?

19         A.    Zach Baumgart was aware of it.  Yes.

20         Q.    He was aware of it prior to you

21 contacting the press?

22         A.    No.  After.



*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

Karen Iovino                                                9/6/2023
                                                           Page 242

```
1          A.    Apparently, yes.

2          Q.    So the suspension was made for

3    legitimate purposes?

4          MR. ADAMS:  Objection, speculation.

5          THE WITNESS:  Not in my opinion.

6    BY MR. WARD:

7          Q.    You had disclosed confidential

8    information before August 4th.  Correct?

9          A.    Correct.

10         Q.    And on August 4th, you were suspended

11   for disclosing confidential information?

12         A.    Correct.

13         Q.    And it was in July, sometime in July,

14   that you told the two kennel techs that you were

15   contemplating going to "The Washington Post"?

16         A.    Yes.

17         Q.    Paragraph 97, page 27.

18         A.    Paragraph what?

19         Q.    97, nine-seven.  On page 25.  I'm sorry.

20         A.    Oh.

21         Q.    I was using too many sevens there.

22         You said:  In October 2017, Mr. Goss
```