# EXHIBIT J

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

MSA000319

| | |
|---|---|
| **MSA Security** | : |
| | : |
| v. | : OIG Whistleblower Case 2017-0044 |
| | : |
| **Karen Iovino** | : |

## DECLARATION OF DR. MICHAEL RATCLIFF
## TO SUPPLEMENT THE ADMINISTRATIVE RECORD

I, Dr. Michael Ratcliff, declare under the penalty of perjury:

1. I am over the age of 18 years old and have personal knowledge of the matters stated below.

2. I am a licensed veterinarian in the State of Virginia and was hired as the Lead Veterinarian for the Canine Validation Center ("CVC") by Michael Stapleton Associates, Ltd. d/b/a MSA Security ("MSA") in November of 2016.

3. As the Lead Veterinarian at the CVC, it was part of my duties to supervise Dr. Karen Iovino ("Iovino").

4. Iovino was never demoted and never held the position of "Lead Veterinarian" while working for MSA.

5. As a part-time veterinarian at the CVC, Dr. Iovino consistently displayed a lack of professionalism, often contradicting her managers and berating her co-workers. Iovino was overtly hostile and insubordinate to her corporate leadership team, and in particular to me, to whom she reported.

6. Her demeanor was consistently negative in that she complained voraciously about other people and operations generally, being intensely critical of the most mundane of events and openly shared this disdain and a self-imposed sense of importance and superiority in her daily interactions. This had an obvious negative effect on the moral and drive of CVC personnel.

Exhibit 020
PD
02/17/26

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

MSA000320

7. On November 14, 2016, soon after I was hired, I invited Iovino to a briefing meeting with the CVC's then Program Manager Zane Roberts. Upon entering the meeting, Iovino said to me, "I feel like the whole process, and the way you were brought in, was bullshit." After that, she constantly interrupted the meeting to interject, saying repeatedly "I have a problem with this," without any particular reason.

8. Iovino tended to interrupt technicians during their duties and insist that they drop their work and attend immediately to her concerns, no matter how small. I counseled her on the negative impact of her interruptions and advised her to allow technicians and personnel to attend to their mission-critical work first before assisting her on routine matters such as clean up, but she was unresponsive to the counseling.

9. Iovino's negative attitude did not improve with time, nor did her constant challenge and disrespect to authority figures.

10. On December 30, 2016, Iovino emailed me to demand why I and one of the veterinary technicians had left for the day. I had permitted the technician to leave early that day as there were no critical tasks that necessitated staying late, particularly on the last business day before the New Year's holiday. I explained to Iovino that there seemed to be minor record-keeping left and that is why I allowed the technician to leave early. Iovino replied to me by listing the cleaning tasks that had yet to be completed which to be seemed ludicrous, endemic of her being generally disgruntled and specifically targeted at challenging my authority. I concluded the email by writing that I would not engage in an argument over email.

11. On January 4 2017, Alan Bower and I met with Iovino to discuss proper protocols for requiring staff to stay late as well as the negative attitude she often displayed at work. We counseled her on this behavior, but the counseling was ineffective.

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

MSA000321

12. On February 27, 2017, Dr. Iovino emailed me to follow up on a purchase order I had missed. I acknowledged my oversight with the order, and jokingly suggested that I would do push-ups for my error. Dr. Iovino responded by stating, "Men!...Keeping track of you all is a FT job sometimes." I found these statements to be offensive and inappropriate.

13. Iovino was repetitively vocal about her opposition to our transferring canines to foreign governments, a critical mission of MSA and the Department that she was specifically employed to support and a key component of MSA's contract for the Department.

14. Iovino took every opportunity to express negativity about this program and point out the potential related issues at every juncture, as if MSA was engaging in wrongdoing at the Department's request. This obviously had an effect on morale at MSA.

15. Iovino's insubordination, lack of professionalism, poor leadership and failure to correct behavior she was counseled on would have justified MSA terminating her at-will employment at any time. She certainly was not a "phenomenal employee" as the OIG Report wrongly asserts.

16. In May 2017, the Department of State indicated to MSA that it wanted MSA to replace the part-time CVC veterinarian position held by Iovino with a new full-time position.

17. This change was required by the growing scope of the CVC program and the increasing operational tempo which demanded greater veterinary resources to maintain the well-being of the dogs.

18. The Department foresaw an increased need to send the veterinarians overseas and work in potential combat areas where its explosive detection canines were utilized and so indicated a preference that the new full-time position be filled by someone with military background and international experience.

3

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

MSA000322

19. Iovino overtly state on several occasions that she herself did not want to travel overseas and did not want a full-time position such as the position she now claims that she was wrongfully denied.

20. MSA posted the new full-time position online and accepted resumes. I explained to Iovino, via email, on July 17, 2017 that she had to apply online "because it's a new CLIN with a new PD (and bio approval), you'll need to submit your resume again through the website."

21. Iovino's claim that I offered her this position in February 2017 is false. I never offered her a position then or at any other time.

22. When I told Iovino about her old position ending and needing to apply online for the new position (if she was interested), I had no idea that she had filed complaints with the EEOC and the OIG.

23. Iovino applied for the new full time veterinary position on July 17, 2017.

24. Iovino's interest in applying came as a surprise to me, given her past unwillingness to work full-time or travel, as well as her failure to apply for the previous two-full time veterinarian positions added during her tenure with MSA.

25. The only time she expressed any willingness to work "full-time", she immediately caveated it by saying she would have to have a modified schedule providing for three very long days and one half-day.

26. MSA received four on-line applications the new position. After an initial review, we narrowed down the candidate pool to Iovino and Dr. Lee Palmer.

27. After deliberation, we ultimately chose Dr. Lee Palmer for the full-time position on July 25, 2017.

4

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

MSA000323

28. Due to Iovino's lack of military background or any international experience, we found her to be only minimally qualified for the new position. Additionally, Dr. Iovino's lack of support towards the mission, inadequacies in leadership skills, and her inability to work well with managers and subordinates alike also precluded her from being selected for the position in which international missions and diplomacy were key components.

29. Based on my extensive first-hand experience working with Iovino, I was certain she would not serve MSA and the Department effectively as an ambassador and leader for international missions. We conferred with Department personnel at the CVC who had likewise observed Iovino's lack of professionalism first-hand, and confirmed that the Government would not have been comfortable with MSA engaging Iovino in the newly-created position.

30. Dr. Palmer's vast military and professional experience made him the ideal candidate.

31. Dr. Palmer's credentials for the position vastly overshadowed Iovino's. Iovino's (3) page resume showed that her experience was limited to the general practitioner level. In contrast, Dr. Palmer's resume, which was twelve (12) pages long, listed relevant emergency care experiences, various leadership roles within the Army Reserves, peer reviewed articles, publications, lectures and teaching positions. Moreover, Dr. Palmer was also certified as an Emergency Medical Technician ("EMT"), which we found useful and highly relevant given that the position would require travel to combat zones.

32. On August 4, 2017, veterinary technician Jennifer Houston told me that two of the kennel technicians, Jonah Ballenger and Ben Orndorff, told her that Iovino was threatening to go to the media, including the Washington Post, with concerns about the CVC which purportedly included confidential information. I spoke with Ben Orndorff, who confirmed that Iovino had made this threat.

5

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

MSA000324

33. On August 4, 2017, MSA placed Iovino on administrative leave to investigate Iovino's threats to disclose confidential and sensitive information to the media. True to her character, Iovino reacted to the news of her being placed on leave in a highly unprofessional fashion – by threatening to call the state veterinary board and have the CVC's veterinary facilities shut down.

34. On March 26, 2018 I was interviewed by OIG Investigators. I was infuriated after reading the July 5, 2018 OIG Report, alleging that I knew of Dr. Iovino's protected disclosures when selecting Dr. Palmer for the full-time position.

35. As written in the report, that statement is false. I told the OIG that I did not become aware of the disclosures until after Dr. Iovino was terminated.

36. The question from the OIG during my interview was simply, "Are you aware that Iovino has filed complaints?" to which I replied something to the effect of "yes, that assumption can be drawn based on your [OIG] opening interview comments stating such." I then went on to tell the OIG that I did not become aware of these complaints until after her termination. Any insinuation that I had previous knowledge is categorically false.

37. Iovino was not suspended or fired because of any disclosures she made to the OIG. MSA encourages its employees to report suspected misconduct, including to the OIG.

38. MSA also later learned that Iovino wrongfully and secretly euthanized the pet of another MSA employee during her workday in the CVC parking lot in October of 2016.

39. In doing so, she used controlled medications purchased under Iovino's DEA license for (and billed to) the Department.

40. Iovino improperly directed a CVC veterinary technician to assist her in this procedure, which was performed during the workday with the labor for both Iovino and the technician billed to the Department.

6

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

MSA000325

41. Iovino then created a false medical record documenting the procedure by stating that the patient's owner was "MSA-CVC."

42. Although MSA only discovered this misconduct after Iovino's employment with the company had ended, this episode confirms Iovino's willful disregard for procedure and her untruthfulness.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated: July 05, 2019

Dr. Michael Ratcliff

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*