**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

**DR. KAREN IOVINO,**

      Plaintiff,

v.                                    No. 5:21-CV-00064-TTC

**MICHAEL STAPLETON ASSOCIATES, LTD.,**
**d.b.a. MSA SECURITY, INC.,**

      Defendant.

_____

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE**

**I.  PROTECTED DISCLOSURES (¶¶ 1–7)**

1. In early, 2017, Dr. Ratcliff instructed Dr. Iovino to take a PTO day she had requested off but not to submit it in BambooHR. Ex. 15, Iovino Decl. ¶16; Ex. 13, Iovino Dep. I 216:5–8. Beginning in April 2017, Dr. Iovino disclosed to Ratcliff and Alan Bower concerns regarding manipulation of the BambooHR timekeeping system, including that employees were claiming paid time off while simultaneously billing for overtime work. Ex. 15, Iovino Decl. ¶16; Ex. 13, Iovino Dep. I 215:11–216:18. James Olds, a Department of State Deputy Program Manager assigned to the CVC, told her he would look into it. Ex. 15, Iovino Decl. ¶16; Ex. 13, Iovino Dep. I 139:10–21.

2. In June 2017, Dr. Iovino reported concerns to Ratcliff about the health and welfare of canines being sent overseas, including veterinary-care standards and animal-treatment issues. Ex. 15, Iovino Decl. ¶17; Ex. 13, Iovino Dep. I 220:13–222:5.

3. Dr. Iovino reported concerns to Ratcliff about Ms. Houston's continued attendance problems (leaving early, coming in late, not showing up) and alcohol-related issues, which affected job performance and posed a serious threat to the safety of the canines. Ex. 15, Iovino Decl. ¶19; Ex. 13, Iovino Dep. I 191:1-7.

4. Dr. Iovino discovered that Jennifer Houston, a Licensed Veterinary Technician, had made a medical error during an anesthetic procedure on canine Blake that, had it not been caught in time, would have likely resulted in the canine's death. Dr. Iovino reported this incident to Dr. Ratcliff, who agreed via text message that the error could have resulted in the suffocation of Blake. Ex. 15, Iovino Decl. ¶20; Ex. 13, Iovino Dep. I 213:9–10, 214:15–17; Ex. I (Contemporaneous Notes; IOVINO_00000035–38).

5. In July 2017, Dr. Iovino escalated concerns about canine welfare and conditions at the CVC to Cathy Read, Director of the Office of Acquisitions Management (AQM), DoS, because she believed MSA was not adequately addressing the issues through internal channels. Dr. Iovino had previously met Ms. Read during a site visit at the CVC, where she learned that Read was an advocate for canine welfare. Ex. 15, Iovino Decl. ¶21; Ex. 13, Iovino Dep. I 122:2–5 (site visit meeting), 122:11–12 (end of July call), 123:5–8 (substance of communication).

6. Dr. Iovino also disclosed concerns about Josh Carter living at the government facility. Ex. 15, Iovino Decl. ¶24; Ex. 13, Iovino Dep. I 120:5–121:18; Ex. 9, Sabruno Dep. 45:7–9.

7. On or about July 6, 2017, Dr. Iovino filed a complaint with the DoS OIG Hotline reporting fraud, waste, abuse, and canine welfare violations at the CVC. Ex. 15, Iovino Decl. ¶25; Ex. 13, Iovino Dep. I 122:6–10, 125:3–126:10; Ex. 2, McDermott Dep. 45:5–7.

2

**II.  ADVERSE ACTION & PRETEXTUAL HIRING (¶¶ 8–15)**

8. In February 2017 Ratcliff told Plaintiff that the CVC was expanding and that she would likely move from part-time to full-time status. Ratcliff expressed that leadership was pleased with her performance and discussed the change as an expected conversion rather than a competitive vacancy. Ex. G at IOVINO_00000232–233; Ex. 12, James DoS 30(b)(6) Dep. 32:18–33:1; Ex. 5, Goss Dep. 47:3–48:3.

9. MSA's own contract modification request described the veterinarian CLIN as "currently filled" and requested that "the veterinarian assigned to this CLIN be increased from part-time (30 hours/week) to full-time status (40 hours/week)." Ex. F at IOVINO_00009214.

10. On July 14, 2017 eight days after Dr. Iovino's OIG complaint Ratcliff informed Dr. Iovino that the previously discussed conversion to full-time status would not occur and that she would have to compete for the full-time role. Ex. G at IOVINO_00000233.

11. On July 25, 2017, at 10:43 PM, MSA HR executive Peter Deegan initiated an email exchange with Dr. Iovino regarding 'Litigation Against the Company and Press Inquiries.' The next morning, July 26, 2017, at 7:51 AM, Dr. Iovino responded, confirming that she had filed an EEOC complaint and stating that there are 'very serious issues at the CVC' which 'seems to operate separately.' (Ex. N (Jul. 25–26, 2017 Iovino-Deegan Email Thread; IOVINO_00000261)). That same day, July 26, 2017, Dr. Ratcliff emailed Mr. Deegan, Michael Hayes, and Alan Bower a 'Hiring Decision & Justification' document dated July 26, 2017, selecting Dr. Lee Palmer for the new full-time veterinarian position. (Ex. 24 (ECF 251-1, Ex. R, Jul. 26, 2017 Ratcliff Email); Ex. 25 (Hiring Decision & Justification, Jul. 26, 2017))

12. Roberts told the OIG that requiring an incumbent to apply for a position in that setting was "extremely unusual." Ex. D at DOS OIG000145.

3

13. Roberts also told the OIG that many MSA employees assumed the posting was "just a means to get rid of Iovino." Ex. D at DOS OIG000145–146.

14. Ratcliff directly recruited his long time associate Dr. Lee Palmer, who later resided in Ratcliff's basement during his initial employment period. Ratcliff was the sole interviewer, and Dr. Iovino was not interviewed. Ex. 7, Palmer Dep. 15:14–19, 16:22–25; Ex. 10, Dragnett 30(b)(6) Dep. 37:20–23, 39:1–4.

15. The published CVC veterinarian position description required a minimum of two years of veterinary experience. While the position did not list military working dog handling as a minimum requirement, it did require willingness to 'live and work in conflict/combat areas or similar hazardous environments, or other international locations as mission requires, for periods of time ranging from seven (7) to ninety (90) days' and explicitly stated the position involved responsibility for 'canine health CONUS and OCONUS.' Ex. K at IOVINO_00000225–236, page 5. MSA's 30(b)(6) designee Dragnett testified that he could not confirm whether Dr. Palmer was ever required to travel overseas, stating: 'That is not something that I reviewed. I don't know if he had occasion to travel overseas or not.' Ex. 10, Dragnett 30(b)(6) Dep. 36:7–10. The DoS 30(b)(6) designee James testified that the Department of State 'requested a contract amendment as a contract change to make the previous part-time position a full-time position' but 'does...not get involved in how the company would have gone about in fulfilling that contractual requirement,' and that DoS did not direct MSA to make the position competitive with a job posting. Ex. 12, James (DoS 30(b)(6)) Dep. 37:4–12

## III.  KNOWLEDGE & CAUSAL CHAIN (¶¶ 16–22)

16. In mid-July 2017, Dr. Iovino learned that photographs taken documenting canine welfare conditions had reached Carter. The OIG later verified through Holmes that the

4

photographs had reached Carter. Ex. 15, Iovino Decl. ¶26; Ex. 13, Iovino Dep. I 134:12–135:8; Ex. 2, McDermott Dep. 89:17–22, 91:3–15.

17. Dr. Iovino was informed in approximately mid-to-late July 2017 that Carter had yelled in the hallway that "whoever had filed the OIG complaint would be fired." Dr. Iovino had filed an OIG complaint on or about July 6, 2017. Ex. 15, Iovino Decl. ¶27; Ex. 13, Iovino Dep. I 80:5–11, 123:9–11, 233:4–7; Ex. 9, Sabruno Dep. 19:23–20:13.

18. Read forwarded Dr. Iovino's communications to Sabruno and that those communications were then passed along through the DoS/MSA information chain. Ex. 2, McDermott 30(b)(6) Dep. 56:25–57:11; Ex. E at DOS OIG000147.

19. Sabruno shared Dr. Iovino's concerns with Carter, and Carter then shared those concerns with MSA personnel. Ex. 2, McDermott Dep. 56:25–57:11; Ex. 9, Sabruno Dep. 78:10–79:5; Ex. E at DOS OIG000147.

20. MSA officials had knowledge of Dr. Iovino's OIG complaint and her communications with DoS officials before the August 4, 2017 suspension. Ex. 2, McDermott Dep. 95:3–96:8.

21. On July 10, 2017, the OIG issued a Request for Information to Dr. Iovino seeking additional details to evaluate her complaint. (Ex. 17; Ref. H20171635.) Dr. Iovino submitted her response to the OIG RFI on July 28, 2017 to Cathy Read, Director of the Office of Acquisitions Management. (Ex. 18.) On July 29, 2017, Read forwarded Dr. Iovino's submission to DoS colleagues. (Ex. 19.) On August 1, 2017 at 8:43:58 AM, Read forwarded the OIG submission and supporting documents to Dominic A. Sabruno in the Bureau of Diplomatic Security. (Ex. 20 (DOS-IOVINO-00175), labeled 'FW: OIG Hotline - Request for Information, H20171635.') Thus, DoS received the OIG's initial RFI on July 10, 2017—at least twenty-five days before Dr.

5

Iovino's August 4, 2017 suspension, and was actively routing the whistleblower materials through its institutional channels days before the adverse action occurred.

22. On August 1, 2017, at 10:16 AM, DoS official Nick Sabruno emailed Barno and Bachman, characterizing Dr. Iovino as 'a MSA-employed veterinarian currently in the process of being terminated for documented ongoing poor performance' and noting that Dr. Iovino's termination 'will only add credence to the appearance of retaliation if Josh were informed' of the allegations. (Ex. 16 at DOS-IOVINO-00673–674, Sabruno Email, Aug. 1, 2017, 10:16 AM.) Later that afternoon, at 4:32 PM, Sabruno wrote to Barno and Bachman, stating he was 'simply content with getting Josh a tent to live in and firing the veterinarian.' (Ex. 16 at DOS-IOVINO-00672, Sabruno Email, Aug. 1, 2017, 4:32 PM.) At 4:45 PM that same afternoon, Loren Bachman, Deputy Chief of Worldwide Protective Services, responded: 'We can still fire the vet, and I have a GP medium for Josh to use on the back 40.' (Ex. 16 at DOS-IOVINO-00672, Bachman Email, Aug. 1, 2017, 4:45 PM.) These communications occurred three days before MSA placed Dr. Iovino on administrative leave on August 4, 2017. (Ex. 16 at DOS-IOVINO-00671, Sabruno Email, Aug. 4, 2017, 5:09 PM; Ex. 9, Sabruno Dep. 45:1–3.)

## IV.   SUSPENSION, NO INVESTIGATION & PRETEXT (¶¶ 23–34)

23. On August 4, 2017, MSA placed Dr. Iovino on paid administrative leave. Ex. B.

24. Bower imposed that suspension without first asking Dr. Iovino about the allegations. Ex. 11, Bower Dep. 134:5–135:12.

25. Bower admitted that he "didn't investigate it." Ex. 11, Bower Dep. 134:5–135:12.

26. Goss never investigated the substance of Dr. Iovino's complaints. Ex. 5, Goss Dep. 75:8–76:3.

6

27. MSA did not investigate the allegations against Dr. Iovino before suspending and terminating her. Ex. 2, McDermott Dep. 105:3–106:10.

28. The forensic analysis of MSA's electronic records was the full extent of MSA's internal investigation into Dr. Iovino's protected disclosures. According to the OIG Report, 'MSA never interviewed Dr. Iovino, the kennel technicians who originally had reported her alleged intention to contact the media or any other relevant witnesses.' (Ex. 21 (OIG Rep. of Investigation, July 5, 2018; DOS OIG000145–147); also cited and confirmed at Ex. 2, McDermott Dep. (OIG 30(b)(6)) 99:23–100:21.) No corrective action regarding Dr. Iovino's allegations was taken before her termination on August 18, 2017.

29. MSA Vice President of Human Resources Peter Deegan stated that Dr. Iovino's suspension was related to her 'speaking to clients and to other MSA employees about her concerns,' characterizing his concern as protocol violations because she did not first raise them with her chain of command. (Ex. J (OIG Interview of Peter Deegan, Nov. 15, 2017; IOVINO_00000158–159).) Although the interview summary mentions that other MSA employees had reported that Dr. Iovino 'threatened to go to the press,' Deegan's stated justification for the suspension focused on the broader pattern of her communicating with clients and employees rather than on the media threat itself. At his February 17, 2026 deposition, when shown Ex. N (the July 25–26, 2017 email exchange regarding Dr. Iovino's EEOC charge), Deegan testified: 'Yeah, I don't recall this exchange.' (Ex. 8, Deegan Dep. 19:20.)

30. MSA's 30(b)(6) corporate designee Kevin Dragnett testified that Dr. Iovino was placed on administrative leave on August 4, 2017 based on "a potential, if she followed through on her threat. There was a potential." Dragnett further testified that from August 4, 2017 through

7

Dr. Iovino's separation date, he did "not know if they discovered evidence of that disclosure in that time period." (Ex. 10, Dragnett 30(b)(6) Dep. 42:10–13, 42:18–25 (Feb. 24, 2026).)

31. Dr. Iovino told kennel technicians that she "might go to the media", a conditional statement of possibility, not a confirmed threat. MSA's own 30(b)(6) designee admitted he did not know whether MSA ever discovered evidence of any actual disclosure "in that time period." (Ex. 2, McDermott Dep. 93:15–18, 97:5–10; Ex. 13, Iovino Dep. I 55:6–8; Ex. 10, Dragnett 30(b)(6) Dep. 42:18–25.)

32. Goss characterized Dr. Iovino as a rogue employee after learning that she had contacted AQM and the OIG. Ex. 5, Goss Dep. 75:8–76:3 (alternatively 84:14–18); Ex. E at DOS OIG000147.

33. An August 1, 2017 email chain shows a discussion about terminating Plaintiff. Ex. 16 (DOS-IOVINO-00671–674).

34. MSA and DoS offered three distinct rationales for the adverse actions taken against Dr. Iovino. The August 4, 2017 suspension memo cited "disclosure of confidential information." The August 18, 2017 termination letter stated that her "part time assignment as Veterinarian has come to completion." On August 1, 2017—three days before the suspension—DoS official Sabruno described Dr. Iovino as "in the process of being terminated for documented ongoing poor performance." (Ex. B (Suspension Memo, Aug. 4, 2017); Ex. M (Termination Letter, Aug. 18, 2017; IOVINO_00000272); Ex. 16 at DOS-IOVINO-00674, Sabruno email, Aug. 1, 2017.)

## V.  PERFORMANCE RECORD & POST-HOC FABRICATION (¶¶ 35–48)

35. On April 19, 2017, MSA's CEO formally commended Dr. Iovino for her "above-and-beyond efforts" and "highest quality medical care and compassion." Ex. A.

36. Between April 19, 2017 and August 4, 2017, MSA generated no contemporaneous written performance documentation, counseling memos, incident reports, or disciplinary records regarding Dr. Iovino. Ex. 11, Bower Dep. 14:9–22; Ex. 1, Olds Dep. 33:22–34:4; Ex. 5, Goss Dep. 47:3–48:3.

37. Ratcliff never issued Dr. Iovino any written warning, counseling, or discipline. Ex. 4, Ratcliff Dep. 78:5–79:10; Ex. 26 (Ratcliff OIG Interview).

38. Ratcliff described Dr. Iovino as 'a good veterinarian,' a characterization corroborated by Department of State official James Olds, who testified in deposition that 'in my professional opinion, she was a competent veterinarian' and that he never observed her treat anyone disrespectfully or commit any misconduct. (Ex. 26 (Ratcliff OIG Interview, Mar. 26, 2018); Ex. 1, Olds Dep. 34:3–4, 33:12–22, 42:1–6.) This contemporaneous positive assessment contradicts the July 5, 2019 declarations in which Ratcliff joined other MSA employees in describing Dr. Iovino as 'consistently displaying a lack of professionalism'—declarations the OIG Report characterized as 'canned' responses required by MSA and its attorneys. (Ex. 28 (DOS OIG Production at 702); Ex. C (Ratcliff Decl.))

39. MSA Site Director Alan Bower characterized Dr. Iovino's time and attendance concerns as having 'no irregularities in the payroll system' when he investigated them, and provided limited detail regarding any performance issues. (Ex. 27 (Bower OIG Interview, Nov. 16, 2017).) However, Bower later signed a July 5, 2019 declaration characterizing Dr. Iovino as 'consistently displaying a lack of professionalism, often contradicting her managers and berating her co-workers', language significantly amplified from his contemporaneous OIG account, which

9

mentioned only that she was 'condescending' to kennel technicians and needed reminders about managing her hours.

40. Palmer was never told of performance concerns regarding Dr. Iovino. Ex. 7, Palmer Dep. 35:3–36:8.

41. Olds described Dr. Iovino as "a competent veterinarian" who never treated anyone rudely, never committed misconduct, and about whom Carter never expressed dissatisfaction. Ex. 1, Olds Dep. 41:3–12, 56:8–15.

42. Roberts described Dr. Iovino as a "phenomenal employee" and "heroic" in her work. Ex. D at DOS OIG000145–146.

43. Houston was involved in documented incidents of intoxication, combative behavior, and insubordination, and were removed from veterinary duties. She remained employed after reassignment rather than termination. Ex. H; Ex. 3, Hartley Dep.; Ex. 10, Dragnett 30(b)(6) Dep. 67:1–6, 75:17–76:8.

44. Roberts, who cooperated with the OIG investigation, was later removed by MSA corporate. Ex. D; Ex. 6, Hayes Dep. 36:17–37:6.

45. MSA's corporate designee testified that when asked whether MSA took action against Dr. Iovino at the direction of a federal executive, he "would say no." Ex. 10, Dragnett 30(b)(6) Dep. 28:12, 28:19.

46. DoS's institutional designee testified that DoS "is not involved in employers' decisions with their employees" because contractor personnel are not government employees and remain subject to their employer's employment agreements and contract terms. Ex. 12, James 30(b)(6) Dep. 32:18–33:1.

10

47. MSA submitted a formal written response to the OIG's Report of Investigation via an OIG Response Matrix documenting its position on each finding. Ex. 22 (MSA OIG Response Matrix; IOVINO_00000510–514).

48. Three MSA employees—Alan Bower, Jennifer Houston, and Michael Ratcliff—each submitted declarations dated July 5, 2019, each containing the identical sentence: "consistently displayed a lack of professionalism, often contradicting her managers and berating her co-workers." The declarations were submitted approximately two years after the events described and after Dr. Iovino filed her OIG hotline complaint on July 6, 2017. As set forth in ¶¶38–39 above, neither Bower nor Ratcliff used this characterization in their OIG interviews conducted in November 2017 and March 2018, respectively. Ex. L (Suspension Memo, Aug. 4, 2017; IOVINO_00000045); Ex. M (Termination Letter, Aug. 18, 2017; IOVINO_00000272); Ex. C (Ratcliff Decl., July 5, 2019; IOVINO_00000502–508).

Respectfully submitted,

*Ss Thad M. Guyer*

_____

Thad M. Guyer
Attorney for Plaintiff

11