**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

**DR. KAREN IOVINO**,

      Plaintiff and Counterclaim Defendant

v.                                   No. 5:21-CV-00064-TTC

**MICHAEL STAPLETON ASSOCIATES,
LTD.,** d.b.a. **MSA SECURITY, INC.,**

      Defendant and Counterclaim Plaintiff

_____

## PLAINTIFF'S OPPOSITION TO DEFENDANT MSA'S MOTION FOR SUMMARY JUDGMENT

**Contents**

I.  SUMMARY ................................................................................................. 3

II.  STATEMENT OF MATERIAL FACTS IN DISPUTE ............................................. 5

      A.    Protected Activity ............................................................... 5

      B.    Adverse Position Action & Pretextual Hiring ...................................... 6

      C.    Knowledge & Causal Chain.................................................... 8

      D.    Suspension, No Investigation & Pretext ............................................. 9

      E.    Performance Record & Post-Hoc Fabrication ..................................... 9

III. THE TOLAN, CLARK COUNTY, DESERT PALACE TRIUMVIRATE RULES THIS CASE ON SUMMARY JUDGMENT AND CONTRIBUTING FACTOR INTERPLAY ................................................................................................. 10

      A.    The Three Cases Fit Together as One Doctrinal Command ............................. 10

      B.    *Tolan* Supplies the Required Judicial Discipline ............................... 11

      C.    *Clark County Gives Close Timing Its Proper Evidentiary Force* .................... 13

      D.    *Desert Palace* Eliminates Any Preference for Direct Evidence ...................... 14

      E.    The Contributing-Factor Framework Is Dispositive at Step One ...................... 16

      F.    The Integrated Rule for This Case ........................................................ 17

1

IV. FACT INTEGRATION INTO THE CONTROLLING LAW .................................... 17

V.  MSA Cannot Carry Its Same-Action Defense By Clear and Convincing Evidence. . 22

        A.     Carr and Mikhaylov govern the same-action analysis. ..................................... 22

        B.     Whitmore explains how demanding that burden is. .......................................... 23

        C.     Carr factor one: MSA's evidence supporting the action is weak. ..................... 23

        D.     Carr factor two: the evidence of retaliatory motive is substantial. ................... 24

        E.     Carr factor three: comparator evidence also precludes summary judgment. ..... 24

        F.    Pritchard does not support summary judgment for MSA. .................................... 25

VI. SECTION 4712(A)(3)(B) FORECLOSES ANY EXECUTIVE-DIRECTION DEFENSE. 26

VII.    DR. CAROLYN OLECH IS A COMPELLING COMPARATOR ..................... 26

VIII.    CONCLUSION ............................................................................................ 27

## I. SUMMARY

MSA's motion for summary judgment should be denied because it suffers fatal legal errors. MSA writes as though Dr. Iovino must prove that whistleblowing was the sole or primary reason for the adverse actions or must separately prove some freestanding element of retaliatory intent before she can reach a jury. That is not the law under 41 U.S.C. § 4712. Section 4712 incorporates the federal whistleblower burden-shifting structure codified in 5 U.S.C. § 1221(e). Under that framework, Dr. Iovino need only show by a preponderance of the evidence that her protected disclosures were a contributing factor in the challenged personnel actions. She "need not . . . prove that [her] employer acted with 'retaliatory intent,'" and once she shows contribution, the burden shifts to MSA to prove "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of" the protected activity. *Murray v. UBS Securities, LLC*, 601 U.S. 23, 32, 27-28 (2024).

When those standards are correctly applied, MSA's motion collapses. Plaintiff's evidence permits a jury to find that protected activity began in April 2017 and continued through the summer of 2017; that Ratcliff and Bower knew of her internal disclosures; that AQM knew of her external disclosures before the OIG complaint; that she filed the OIG complaint on July 6, 2017; that on July 14, 2017, eight days later, Ratcliff reversed the previously discussed conversion of her incumbent position to full-time status; that her disclosures were routed through a leak chain involving Read, Sabruno, Carter, and MSA; that MSA decisionmakers knew of her protected reporting before suspension; that MSA did not conduct a genuine investigation before suspending her; and that the reasons MSA now offers are disputed, post hoc, and contradicted by contemporaneous evidence.

3

The Fourth Circuit's recent whistleblower decision in *Finley* is especially instructive. *Finley v. Kraft Heinz Inc.,* 146 F.4th 382 (4th Cir. 2025). There, the employer argued that a later HR investigation severed causation. The Fourth Circuit reversed summary judgment, holding that an "intervening event" is "not a talisman that makes all other evidence of causation disappear," and reiterating that at summary judgment courts may not weigh conflicting evidence or choose between competing explanations when the record as a whole could support a jury finding of contribution. *Id.* at 391. The Federal Circuit's foundational decision in *Marano* similarly forecloses MSA's effort to separate Dr. Iovino's disclosures from the actions that followed. *Marano v. Dep't of Justice*, 2 F.3d 1137 (Fed. Cir. 1993). *Marano* held that the "fact of, or the content of, the protected disclosure" can satisfy the contributing-factor standard and that where the disclosure and the personnel action are "inextricably intertwined," the employer cannot avoid liability by recharacterizing the action as a response to the situation the disclosure created. *Id.* at 1143.

MSA's same-action defense fares no better. Under the *Carr* framework, adopted by the Fourth Circuit in *Mikhaylov*, the Court must examine the strength of MSA's evidence, the existence and strength of retaliatory motive among the officials involved in or influencing the decision, and evidence of comparable treatment of non-whistleblowers. *Carr v. Social Sec. Admin.,* 185 F.3d 1318, 1323 (Fed. Cir. 1999); *Mikhaylov v. Dep't of Homeland Security*, 62 F.4th 862, 870 (4th Cir. 2023). Clear-and-convincing proof is a high burden, and it exists precisely because the employer controls most of the evidence bearing on its reasons. It must be evaluated against the whole record, including all evidence that detracts from the employer's account. *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012).

4

Here, the contemporaneous record does not clearly and convincingly support MSA. Plaintiff received a CEO commendation on April 19, 2017. Ratcliff never wrote her up. Bower could not recall any written discipline. Goss did not investigate the substance of her complaints. Olds described her as a competent veterinarian. Palmer was never told of performance concerns. Roberts described her as a phenomenal employee and reported that many MSA employees thought the job posting was "just a means to get rid of Iovino." The August 4 suspension was imposed before a genuine investigation and on MSA's own account was based on potential rather than confirmed conduct. No reasonable court could hold on this record that MSA has established its same-action defense as a matter of law.

## II. STATEMENT OF MATERIAL FACTS IN DISPUTE

### A. Protected Activity

**1.** On February 11, 2017, Dr. Ratcliff instructed Dr. Iovino to take a PTO day she had requested but not to submit it in BambooHR. Ex. 15, Iovino Decl. ¶16; Ex. 13, Iovino Dep. I 216:5–8.

**2.** Beginning in April 2017, Dr. Iovino disclosed to Michael Ratcliff and Alan Bower concerns regarding manipulation of the BambooHR timekeeping system, including employees claiming paid time off while billing for overtime. Ex. 15, Iovino Decl. ¶16; Ex. 13, Iovino Dep. I 215:11–216:18.

**3.** James Olds, a Deputy Program Manager, was aware that Dr. Iovino was not compensated for overtime and told her he would look into it. Ex. 15, Iovino Decl. ¶16; Ex. 13, Iovino Dep. I 139:10–21.

5

**4.** In June 2017, Dr. Iovino reported concerns to Ratcliff about the health and welfare of canines being sent overseas, including veterinary-care standards. Ex. 15, Iovino Decl. ¶17; Ex. 13, Iovino Dep. I 220:13–222:5.

**5.** On January 4, 2017, Dr. Iovino reported concerns to Ratcliff about Ms. Houston's attendance problems and alcohol-related issues, which affected job performance and posed a threat to canine safety. Ex. 15, Iovino Decl. ¶19; Ex. 13, Iovino Dep. I 191:1–7.

**6.** At the end of July 2017, Dr. Iovino escalated concerns about canine welfare at the CVC to Cathy Read, Director of the Office of Acquisitions Management, because she believed MSA was not adequately addressing the issues. Ex. 15, Iovino Decl. ¶21; Ex. 13, Iovino Dep. I 122:2–5, 122:11–12, 123:5–8.

**7.** Dr. Iovino also disclosed concerns about Josh Carter living at the government facility. Ex. 15, Iovino Decl. ¶24; Ex. 13, Iovino Dep. I 120:5–121:18; Ex. 9, Sabruno Dep. 45:7–9.

**8.** On or about July 6, 2017, Dr. Iovino filed a complaint with the DoS OIG Hotline reporting fraud and canine welfare violations at the CVC. Ex. 15, Iovino Decl. ¶25; Ex. 13, Iovino Dep. I 122:6–10, 125:3–126:10; Ex. 2, McDermott Dep. 46:5–7.

**B.** **Adverse Position Action & Pretextual Hiring**

**9.** In February 2017, Ratcliff told Plaintiff the CVC was expanding and she would likely move from part-time to full-time status. He expressed leadership was pleased with her performance and discussed conversion as expected rather than competitive. Ex. G at IOVINO_00000232–233; Ex. 12, James DoS 30(b)(6) Dep. 32:18–33:1; Ex. 5, Goss Dep. 47:3–48:3.

**10.** MSA's contract modification request described the veterinarian CLIN as "currently filled" and sought to increase the hours from part-time (30 hours/week) to full-time (40 hours/week). Ex. F at IOVINO_00009214.

**11.** On July 14, 2017—eight days after Dr. Iovino's OIG complaint—Ratcliff informed her the conversion would not occur and that she would have to compete for the position. Ex. G at IOVINO_00000233.

**12.** On July 25, 2017, at 10:43 PM, MSA HR executive Peter Deegan initiated an email exchange with Dr. Iovino regarding "Litigation Against the Company and Press Inquiries." Ex. N (Jul. 25–26, 2017 Iovino–Deegan Email Thread).

**13.** The next morning, Dr. Iovino confirmed her EEOC complaint and stated there were "very serious issues at the CVC." Ex. N at IOVINO_00000261.

**14.** That same day, Ratcliff emailed Deegan, Hayes, and Bower a "Hiring Decision & Justification" selecting Dr. Lee Palmer for the new full-time position. Ex. 24; Ex. 25.

**15.** Roberts told the OIG that requiring an incumbent employee to apply for a position was "extremely unusual." Ex. D at DOS OIG000145.

**16.** Roberts also told the OIG that many MSA employees assumed the posting was "just a means to get rid of Iovino." Ex. D at DOS OIG000145–146.

**17.** Plaintiff's evidence shows Ratcliff directly recruited Dr. Palmer, who lived in Ratcliff's basement, and that Ratcliff was the sole interviewer while Dr. Iovino was not interviewed. Ex. 7, Palmer Dep. 15:14–19, 16:22–25; Ex. 10, Dragnett Dep. 37:20–23, 39:1–4.

**18.** The CVC veterinarian position required two years of veterinary experience and willingness to deploy overseas for hazardous missions involving canine health CONUS and OCONUS. Ex. K at IOVINO_00000225–236.

**19.** MSA's designee could not confirm Dr. Palmer was required to travel overseas. Ex. 10, Dragnett Dep. 36:7–10.

**20.** DoS testified it requested a contract amendment to convert the position but did not direct MSA to post it competitively. Ex. 12, James Dep. 37:4–12.

C.  **Knowledge & Causal Chain**

**21.** In mid-July 2017, Dr. Iovino learned photographs documenting canine welfare conditions had reached Carter, later verified by OIG through Holmes. Ex. 15, Iovino Decl. ¶26; Ex. 2, McDermott Dep. 89:17–22.

**22.** Dr. Iovino was informed Carter yelled that "whoever had filed the OIG complaint would be fired." Ex. 15, Iovino Decl. ¶27; Ex. 13, Iovino Dep. I 80:5–11; Ex. 9, Sabruno Dep. 19:23–20:13.

**23.** Plaintiff's evidence shows Read forwarded Dr. Iovino's communications through DoS/MSA channels. Ex. 2, McDermott Dep. 56:25–57:11; Ex. E at DOS OIG000147.

**24.** Plaintiff's evidence shows Sabruno shared Dr. Iovino's concerns with Carter, who then shared them with MSA personnel. Ex. 2, McDermott Dep. 56:25–57:11; Ex. 9, Sabruno Dep. 45:1–3.

**25.** Plaintiff's evidence is that MSA officials knew of Iovino's OIG complaint before her August 4, 2017 suspension. Ex. 2, McDermott Dep. 95:3–96:8.

**26.** The OIG issued a Request for Information on July 10, 2017. Dr. Iovino responded July 28–29, and the materials were routed internally before her suspension. Exs. 17–20.

**27.** On August 1, 2017, Sabruno described Dr. Iovino as "in the process of being terminated," acknowledging retaliation risk. Ex. 16 at DOS-IOVINO-00673–674.

**28.** Later that day, Sabruno stated he was "content with getting Josh a tent to live in and firing the veterinarian." Ex. 16 at DOS-IOVINO-00672.

**D.    Suspension, No Investigation & Pretext**

**29.** On August 4, 2017, MSA placed Dr. Iovino on paid administrative leave. Ex. B.

**30.** Bower imposed the suspension without asking Dr. Iovino about the allegations. Ex. 11, Bower Dep. 17:21–18:15.

**31.** Bower admitted he did not investigate. Ex. 11, Bower Dep. 17:21–18:15.

**32.** Goss testified he did not interview Dr. Iovino before the suspension. Ex. 5, Goss Dep. 45:9–23.

**33.** The OIG found MSA conducted no investigation and interviewed no witnesses. Ex. 2, McDermott Dep. 86:12–15; Ex. 21.

**34.** The OIG found no corrective action taken before termination on August 18, 2017. Ex. 21.

**E.    Performance Record & Post-Hoc Fabrication**

**35.** On April 19, 2017, MSA's CEO commended Dr. Iovino for "above-and-beyond efforts." Ex. A.

**36.** Between April and August 2017, MSA generated no performance documentation. Ex. 11, Bower Dep. 14:9–22.

**37.** Ratcliff admitted he never issued discipline. Ex. 4, Ratcliff Dep. 39:8–12.

**38.** In 2018, Ratcliff and Olds described Dr. Iovino as a good and competent veterinarian. Ex. 26; Ex. 1.

9

**39.** Later declarations contradicted those assessments and were characterized by the OIG as "canned." Ex. C; Ex. 28.

**40.** Palmer had not seen termination or OIG documents before his deposition. Ex. 7, Palmer Dep. 10:2–12:16.

**41.** Olds testified Dr. Iovino never committed misconduct. Ex. 1, Olds Dep. 34:3–4.

**42.** Roberts described Dr. Iovino as "phenomenal" and "heroic." Ex. D.

**43.** Jennifer Houston engaged in misconduct but was reassigned rather than terminated. Ex. 10, Dragnett Dep. 75:17–76:8.

**44.** Roberts informed MSA he had spoken to OIG; Hayes testified HR pre-arranged leadership change. Ex. 2; Ex. 6.

**45.** MSA denied acting under federal direction. Ex. 10, Dragnett Dep. 28:12.

**46.** DoS testified it does not control contractor employment decisions. Ex. 12, James Dep. 32:18–33:1.

**47.** MSA listed "NONE" as corrective action for twelve of thirteen substantiated OIG findings. Ex. 22.

**48.** Declarations alleging poor professionalism were drafted two years later and contradict contemporaneous records. Exs. L, M, C.

Cir. 2023); *Pritchard v. Metro. Wash. Airports Auth.,* 860 F. App'x 825, 827 (4th Cir. 2021).

**III.   THE TOLAN, CLARK COUNTY, DESERT PALACE TRIUMVIRATE RULES THIS CASE ON SUMMARY JUDGMENT AND CONTRIBUTING FACTOR INTERPLAY**

   **A.   <u>The Three Cases Fit Together as One Doctrinal Command</u>**

10

This case is best understood through three Supreme Court decisions that operate at different but complementary levels. *Tolan* governs summary judgment: the court must believe the nonmovant's evidence and draw all justifiable inferences in her favor. *Clark County* addresses the significance of timing: when protected activity is followed by adverse action in close sequence, timing is recognized as circumstantial evidence of causation. *Desert Palace* establishes that circumstantial evidence is not inferior to evidence evidence and may be more evidence evidence persuasive. In a whistleblower case using the contributing-factor framework, these principles reinforce one another, preventing the defense from denying knowledge, minimizing timing, or demanding direct proof. *Tolan v. Cotton*, 572 U.S. 650 (2014), *Clark County School Dist. v. Breeden*, 532 U.S. 268 (2001), *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

The contributing-factor framework is plaintiff-protective. The Supreme Court has stated it is meant to be plaintiff-friendly and that courts may not "override [Congress'] policy choice by giving employers more protection than the statute itself provides." *Murray v. UBS Securities, LLC*, 601 U.S. 23, 39 (2024). Thus, when a whistleblower presents circumstantial evidence, the court must not insist on direct proof or weigh the employer's competing explanation. The court's role is to apply summary-judgment rules in a statutory scheme designed to let whistleblower claims reach the factfinder when protected activity plausibly played any role. *Finley v. Kraft Heinz Inc.*, 146 F.4th 382 (4th Cir. 2025).

### B.   *Tolan* Supplies the Required Judicial Discipline

*Tolan* is fundamentally about judicial self-restraint. The Supreme Court vacated summary judgment because the lower court had chosen one version of events over the other. *Tolan v. Cotton*, 572 U.S. 650 (2014). The Court reiterated that, in ruling on summary judgment, "the

11

evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his

favor." *Tolan* at 651 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A

"'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of

the matter but to determine whether there is a genuine issue for trial,'" and courts "may not

resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 656

(quoting *Anderson* at 249).

That principle matters not in the abstract but in exactly the way MSA wants the Court to

avoid applying it. Knowledge is disputed. The meaning of the chronology is disputed. The

inference drawn from the sequence of events is disputed. These are not defects in Iovino's case;

they make summary judgment inappropriate. Under *Tolan*, if Iovino's evidence allows a

reasonable inference that MSA learned of the OIG report and acted against her, the Court must

credit that inference. It may not claim that MSA's denial seems more plausible or consistent with

corporate decision-making. That is weighing, which *Tolan* condemns, including when the court

reaches "factual inferences contrary to [nonmovant's] competent evidence." *Id.* at 660.

In *Tolan*, the Supreme Court identified multiple places where the lower court improperly

decided jury issues for itself, taking seemingly small fact dispute and ratcheting them up into

dispositive fact disputes. (1) *Lighting conditions*: the lower court accepted the officer's view that

the porch was dimly-lit and fairly dark, even though Tolan's side offered contrary evidence that

floodlights were on, the gas lamp was not merely decorative, and he was not in darkness. (2) *The

mother's demeanor*: the lower court treated Tolan's mother as having refused orders to remain

calm and as very agitated, even though she testified she was neither aggravated nor agitated; that

dispute bore directly on how threatening the scene appeared and therefore had to be left to a

12

jury.  (3) *Whether Tolan was threatening or advancing*: the lower court characterized Tolan as shouting, verbally threatening the officer, and moving in a charging position, but Tolan testified he was not screaming, was on his knees, and wasn't going anywhere, allowing a jury to view his words as a plea for his mother rather than a threat.

*Tolan* also rejects importing a plausibility screen into summary judgment. Rule 56 does not ask whether the judge thinks the nonmovant's account is likely true. *Id.* It asks if there is record evidence from which a reasonable jury could find in her favor. If the chronology allows a reasonable juror to infer knowledge and retaliatory connection, the court cannot require something more because the employer's contrary account looks tidy. That is impermissible judicial selection of the winning narrative before trial.

In *Finley*, the Fourth Circuit identified concrete fact disputes the district court wrongly resolved against the whistleblower. (1) *Comparator evidence*: the district court accepted Kraft Heinz's view that Bobby Clark was not a valid comparator because Clark supposedly had not been dishonest, but the Fourth Circuit held that was a genuinely disputed question of fact because Finley denied Clark's account and offered contrary testimony suggesting Clark, not Finley, bore responsibility. (2) *Whether Finley lied*: the district court treated Kraft Heinz's explanation as established, but the Fourth Circuit held a jury could distinguish between an outright lie, and a mere inconsistency or lack of integrity, or could credit Finley's view that there was no inconsistency at all.

**C.**   ***Clark County Gives Close Timing Its Proper Evidentiary Force***

Once the Court applies the proper summary judgment lens, the next question is what legal significance to assign to the chronology. *Clark County* answers that question. *Clark County School Dist. v. Breeden*, 532 U.S. 268 (2001). The Supreme Court held that cases accepting

13

temporal proximity as sufficient evidence of causation "uniformly hold that the temporal proximity must be 'very close.'" *Id.* at 273-74. Properly read, this does not diminish the force of timing when it is very close. It recognizes that a close temporal sequence is powerful circumstantial evidence of causal connection. The doctrine asserts that timing is meaningful when the sequence is immediate or near-immediate.

That point is critical in a whistleblower case where direct admissions are rare, and retaliatory motive is usually inferred from sequence and surrounding circumstances. When adverse action follows closely on a protected disclosure, a reasonable factfinder may infer causation and awareness. Timing supports the inference that the disclosure mattered and that relevant actors learned of it before acting. *Clark County* recognizes that timing may carry causal weight where the sequence is very close. *Id.*

The Fourth Circuit's whistleblower cases align with *Clark County*. In *Finley*, the court held that "extremely close temporal proximity" between protected complaints and termination will "ordinarily" support an inference of contributing-factor causation. *Finley v. Kraft Heinz Inc.*, 146 F.4th 382 , 391 (4th Cir. 2025). In *Mikhaylov*, the Fourth Circuit explained that an employee may prove contributing factor through circumstantial evidence showing that the official knew of the protected disclosure and that the action occurred shortly after. *Mikhaylov v. Dep't of Homeland Security*, 62 F.4th 862 (4th Cir. 2023). In cases where discipline is initiated "fast on the heels" of the disclosure, the court stated the disclosure "must be viewed as a contributing factor." *Id.* at 868. Those cases operationalize *Clark County* in the whistleblower context.

D. *Desert Palace* **Eliminates Any Preference for Direct Evidence**

If *Clark County* explains why timing matters, *Desert Palace* clarifies why Iovino need not produce direct proof of what MSA knew. *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

14

The Supreme Court held that "direct evidence is not required," explaining that circumstantial evidence is not inferior. The Court stated that "circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Id.* at 92, 100 (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508 (1957). It noted that juries are instructed that "the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence." *Id.* at 100 (quoting 1A K. Omalley, J. Grenig, & W. Lee, Federal Jury Practice and Instructions, Criminal § 12.04 (5th ed.2000)). The adequacy of circumstantial evidence extends even to criminal cases, where proof beyond a reasonable doubt is required. *Id.*

That principle has special force where the issue is employer knowledge. Knowledge is almost always proved inferentially. Decisionmakers do not ordinarily write memoranda confessing they learned of a protected disclosure. The Supreme Court has made explicit what common sense suggests: "[a]ctual knowledge can be proved through inference from circumstantial evidence." *Intel Corp. Inv. Pol'y Comm. V. Sulyma*, 589 U.S. 178, 189 (citations omitted). Evidence of disclosure, access to relevant information, or actions taken in response may support that inference. If the facts allow a juror to infer that MSA actors were aware of the OIG report before adverse action, the absence of direct proof is legally irrelevant. Circumstantial proof of knowledge is still proof.

MSA cannot invoke the absence of a smoking-gun document as a defect in Iovino's case. *Desert Palace* rejects any such evidentiary preference, and *Sulyma* confirms that actual knowledge may be inferred from circumstances. If there is evidence of protected reporting, access channels for decisionmakers, and immediate adverse action, that is not speculation. It is ordinary circumstantial proof the Supreme Court has held sufficient.

15

### E.    The Contributing-Factor Framework Makes These Inferences Dispositive at Step One

These Supreme Court evidentiary and procedural principles are more powerful within the contributing-factor framework. Here, the whistleblower's burden is light. The Fourth Circuit describes the contributing-factor element as "broad and forgiving" and holds that the employee need show only that the protected activity "tend[ed] to affect in any way" the challenged action. The employee "need not show that the activities were a primary or even a significant cause" as long as they affected the decision "in at least some way." *Finley* at 390. This is a lower bar than but-for causation or the pretext-based sorting associated with *McDonnell Douglas*.

The knowledge-and-timing cases are important as they illustrate how this standard works in practice. In *Mikhaylov*, the Fourth Circuit recognized that circumstantial evidence of official knowledge plus timing may establish a contributing factor. *Mikhaylov* at 868. In *Kewley v. Department of Health and Human Services*, the Federal Circuit stated that if the deciding official knew of the disclosure and removal was initiated within a reasonable time, "no further nexus need be shown." *Kewley v. Dep't of Health and Human Services*, 153 F.3d 1357, 1363 (Fed. Cir. 1998). Once this *prima facie* showing is made, the burden shifts to the employer to prove by clear and convincing evidence that it would have taken the same action absent the disclosure. *Id.* Competing employer evidence does not erase the initial showing; it belongs to the affirmative defense. *Id.*

That same structural point appears in *Finley*. The Fourth Circuit held that an asserted intervening event is "not a talisman that makes all other evidence of causation disappear." *Finley* at 391. The district court erred when it determined that the employer's explanation could nullify the employee's showing as a matter of law at step one. Where the whistleblower has evidence of

16

close timing and protected activity that plausibly affected the decision, supporting employer evidence "does not negate the existence of evidence to support the [plaintiff's] own." *Id.* at 392. The summary judgment question remains whether a reasonable jury could find for the whistleblower on the whole record. *Id.*

### F. The Integrated Rule for This Case

When these authorities are read together, the governing rule is straightforward. *Tolan* instructs the Court to credit Iovino's evidence and draw all reasonable inferences in her favor. *Tolan* at 651, 656, 660. *Clark County* indicates that very close timing is recognized circumstantial evidence of causation. *Clark County* at 273-74. *Desert Palace* establishes that such circumstantial proof may be more persuasive than direct evidence. *Desert Palace* at 100. *Sulyma* confirms that actual knowledge may be proved by inference from circumstantial evidence. *Sulyma* at 189. *Mikhaylov, Kewley*, and *Finley* illustrate how these principles operate under the contributing-factor standard: knowledge plus close timing supports the inference, and the employer cannot dissolve that inference at summary judgment merely by offering a competing explanation. *Mikhaylov* at 868; *Kewley* at 1363; *Finley* at 391-92. *Tolan v. Cotton*, 572 U.S. 650 (2014), *Clark County School District v. Breeden*, 532 U.S. 268 (2001), *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), *Intel Corp. Investment Policy Comm. v. Sulyma* , 589 U.S. 178 (2020), *Mikhaylov v. Dep't of Homeland Security*, 62 F.4th 862 (4th Cir. 2023), *Kewley v. Dep't of Health and Human Services*, 153 F.3d 1357 (Fed. Cir. 1998), *Finley v. Kraft Heinz Inc.*, 146 F.4th 382 (4th Cir. 2025).

## IV. FACT INTEGRATION INTO THE CONTROLLING LAW

The threshold defect in MSA's motion is procedural. MSA does not merely argue that its evidence is persuasive. It asks the Court to adopt MSA's account as the account. Its motion

17

assumes, among other things, that the relevant protected activity began only in July 2017; that MSA could not have known of Dr. Iovino's disclosures before August 1; that the full-time veterinarian role was wholly distinct from Dr. Iovino's incumbent position; that the July 14 reversal was a neutral consequence of contract modification; and that the August 4 suspension was a standard response to verified confidentiality concerns. Each of those propositions is disputed.

Once the record is viewed under the correct summary-judgment standard, MSA's timeline is not dispositive. Plaintiff has evidence that protected disclosures began in April 2017, not July 2017. She has evidence that Ratcliff and Bower knew of those disclosures when they were made. She has evidence that AQM officials were contacted before the OIG complaint. She has evidence that the OIG complaint was filed July 6; that the expected full-time conversion was reversed July 14; that her concerns were routed through Read to Sabruno to Carter; that MSA officials learned of the disclosures before suspension; and that the August 4 suspension was imposed before any meaningful investigation.

MSA's account of the selection process illustrates the problem. MSA says the part-time position was simply replaced by a new full-time role with materially different duties and that Palmer was selected as the better candidate before MSA knew of protected activity. Plaintiff's evidence permits a different inference: that MSA itself asked DoS to increase the hours on a "currently filled" position, that Ratcliff had previously offered the conversion, that requiring the incumbent to compete for the expanded role was highly unusual, that Ratcliff directly recruited Palmer and interviewed him himself, and that Dr. Iovino was not even interviewed. That conflict alone prevents summary judgment.

18

MSA's motion implicitly treats retaliatory intent as though it were a threshold requirement. The Supreme Court rejected that in *Murray*. The Court held that a whistleblower must prove contribution, but "need not . . . prove that his employer acted with 'retaliatory intent.'" *Murray v. UBS Securities, LLC*, 601 U.S. 23, 32 (2024). The Court also explained that retaliatory animus is one way to prove contribution, "but it is not the only way." *Id.* at 37.

That principle matters here because Plaintiff does have evidence of retaliatory motive—hostile reactions, Carter's threat, the August 1 termination discussion, the "rogue employee" characterization, the reversal of the promised conversion, and the sham investigation. But under *Murray*, she does not need direct evidence of animus to survive summary judgment. *Id.* She needs evidence that her disclosures contributed to the adverse actions. The record provides far more than enough.

The Fourth Circuit's decision in *Feldman* defines a contributing factor as "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Feldman v. Law Enforcement Associates Corp.*, 752 F.3d 339, 348 (4th Cir. 2014). *Feldman* further explains that the element is "broad and forgiving" and was intended to displace older cases demanding proof that protected conduct was a significant, substantial, or predominant factor. *Id*. The Fourth Circuit repeated that understanding in *Greatwide*, again calling the standard "broad and forgiving" and identifying temporal proximity as a "significant factor" in circumstantial proof of contribution. *Greatwide Dedicated Transport II, LLC v. Dep't of Labor*, 72 F.4th 544 (4th Cir. 2023).

This case easily satisfies that standard. Dr. Iovino's disclosures began months before the formal OIG complaint. They addressed timekeeping fraud, alcohol-related safety risks, canine

welfare, a near-fatal medical error involving canine Blake, Carter's living arrangement, and broader CVC misconduct. Those disclosures were made to Ratcliff and Bower, then to AQM, then to OIG. Eight days after the OIG complaint, Ratcliff reversed the conversion. Plaintiff has evidence that the concerns then circulated through Read, Sabruno, Carter, and MSA; that hostile reactions followed; and that the suspension and separation came quickly thereafter. A jury could easily find that the protected disclosures affected the outcome in some way. *Feldman v. Law Enforcement Associates Corp.*, 752 F.3d 339, 348 (4th Cir. 2014); *Greatwide Dedicated Transport II, LLC v. Dep't of Labor*, 72 F.4th 544 (4th Cir. 2023).

In *Kewley*, the Federal Circuit held that when the deciding official knew of the protected disclosure and the personnel action was initiated within a reasonable time, that establishes a prima facie case, and "no further nexus need be shown, and no countervailing evidence may negate the petitioner's showing." *Kewley v. Dep't of Health and Human Services*, 153 F.3d 1357, 1363 (Fed. Cir. 1998). The Fourth Circuit echoed that principle in *Mikhaylov*, explaining that a disclosure becomes a contributing factor when "the confluence of the official's knowledge and the timing of the action reasonably suggests a connection between the two," and observing that when discipline is initiated "fast on the heels" of the disclosure, a reasonable person can infer retaliation. *Mikhaylov v. Dep't of Homeland Security*, 62 F.4th 862, 868 (4th Cir. 2023).

This record fits that template. Plaintiff's evidence supports knowledge by Ratcliff and Bower beginning in April, AQM knowledge by June and July, and OIG knowledge on July 6. Plaintiff's evidence also supports that the disclosures were communicated through the Read–Sabruno–Carter–MSA chain before suspension. The timing is exceptionally close: July 6 OIG complaint; July 14 reversal of the expected conversion; July 17 compelled application process;

20

July 26 selection; July 31 notice; August 4 suspension. Under *Kewley* and *Mikhaylov*, that is more than enough to establish contribution at the prima facie stage. MSA cannot use its competing explanations to erase that inference. Those explanations go, if at all, to the same-action defense. *Kewley* at 1361-62; *Mikhaylov* at 868.

*Finley* is the most directly analogous modern case. *Finley v. Kraft Heinz Inc.*, 146 F.4th 382 (4th Cir. 2025). Kraft Heinz argued there, as MSA does here, that a later event provided an independent explanation for the adverse action and therefore broke the causal chain. *Id.* at 386. The Fourth Circuit rejected that argument. It held that an "intervening event" is "not a talisman that makes all other evidence of causation disappear" and must instead be considered alongside the employee's timing evidence and other evidence of contribution. *Id.* at 391.

That holding defeats MSA's attempt to isolate the confidentiality/media issue as if it were a causation reset button. Even if the Court credits that MSA later had concerns about media contact, *Finley* says those concerns must be considered in conjunction with the earlier protected disclosures, the July 14 reversal, the leak chain, the timing, the lack of investigation, and the evidence undermining MSA's account. *Id.* MSA cannot treat the later rationale as a talismanic severance device. *Finley* also matters because the Fourth Circuit there refused to resolve disputed explanations on summary judgment. *Id.* at 391-92. It held that the court's role was not to choose between the employer's account and the employee's account but only to decide whether a reasonable jury could infer that the protected activity contributed to the adverse action. *Id.* Here, a jury could infer exactly that.

MSA's deeper theory is that the adverse actions were caused not by whistleblowing but by the consequences of whistleblowing—the management situation, the concerns it created, the

21

reactions it provoked. *Marano* rejects that distinction. *Marano v. Dep't of Justice*, 2 F.3d 1137 (Fed. Cir. 1993). The Federal Circuit held there that "the fact of, or the content of, the protected disclosure" can satisfy the contributing-factor element and that when the disclosure and resulting personnel action are "inextricably intertwined," the employer cannot escape liability by reframing the action as a response to the situation the disclosure created. *Id.* at 1143.

That reasoning applies squarely here. Plaintiff's disclosures concerned the very conduct and people whose reaction then drove the adverse actions. Her reports about Houston, Carter, canine welfare, and program deficiencies triggered responses within the same small institutional environment. The July 14 reversal, the forced competition, the August 1 termination discussion, the suspension, and the end of her employment were not unrelated events that merely happened after whistleblowing. A reasonable jury could find they were the institutional response to whistleblowing. Under *Marano*, that is enough. *Marano* at 1143.

## V. MSA CANNOT CARRY ITS SAME-ACTION DEFENSE BY CLEAR AND CONVINCING EVIDENCE.

### A. Carr and Mikhaylov govern the same-action analysis.

If Plaintiff establishes contribution, MSA can prevail only if it proves by clear and convincing evidence that it would have taken the same actions in the absence of the disclosures. *Carr* frames that inquiry through three factors: the strength of MSA's evidence in support of the action, the existence and strength of retaliatory motive among officials involved in or influencing the decision, and evidence that similarly situated non-whistleblowers were treated similarly. The Fourth Circuit adopted those factors in *Mikhaylov*. *Carr v. Social Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999); *Mikhaylov v. Dep't of Homeland Security*, 62 F.4th 862, 870-71 (4th Cir. 2023).

22

### B. Whitmore explains how demanding that burden is.

*Whitmore* is especially important because it explains that the clear-and-convincing burden is a "high burden of proof" imposed because the employer "controls most of the cards"—the documents, witnesses, and records of comparable disciplinary action. *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012). The court then articulated a principle that controls here: evidence supports a same-action defense clearly and convincingly only when it does so "in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion." *Id.* at 1368. If "considerable countervailing evidence is manifestly ignored or disregarded," the same-action defense fails. *Id.*

MSA's motion cannot satisfy that demanding standard because it does exactly what *Whitmore* forbids: it marshals the facts it likes and omits or minimizes the ones that detract from its explanation.

### C. Carr factor one: MSA's evidence supporting the action is weak, disputed, and post hoc.

MSA's evidence is not clear and convincing. The contemporaneous record is hostile to MSA, not Plaintiff. On April 19, 2017, Plaintiff received a CEO commendation praising her efforts and medical care. After that commendation, MSA generated no contemporaneous written performance discipline before the August 4 suspension. Ratcliff never wrote her up. Bower could not recall a written disciplinary record. Goss could not identify a contemporaneous performance record. Olds testified she was competent. Palmer testified he had not been told of performance concerns. Roberts called her phenomenal. Those facts make it impossible to say, as a matter of law, that MSA's evidentiary case was so strong that the same actions were inevitable.

23

The same is true of the confidentiality theory. MSA says Plaintiff was a security risk because she threatened to go to the media. But the record permits a jury to find that the August 4 suspension was imposed before a genuine investigation, based on MSA's fear of what Plaintiff might do rather than on confirmed misconduct, and after management learned she had gone to AQM and OIG. A jury could find that rationale pretextual or retaliatory. At a minimum, it is disputed. That defeats clear-and-convincing proof.

**D.    Carr factor two: the evidence of retaliatory motive is substantial.**

The motive evidence is also substantial. Plaintiff's evidence supports that she repeatedly reported misconduct to Ratcliff and Bower; that she went to AQM and OIG; that Read forwarded her complaints to Sabruno; that Sabruno shared them with Carter; that Carter yelled that whoever had filed the OIG complaint would be fired; that Roberts reported Hoover's derogatory language and stated many employees believed the posting was just a way to get rid of her; that an August 1 email reflected discussion of terminating her; that Goss labeled her a rogue employee after learning she had gone outside the chain; and that MSA suspended her without investigation. No serious same-action analysis can declare, as a matter of law, that retaliatory motive is absent on such a record.

*Whitmore* also makes clear that retaliatory motive is not limited to the final formal decisionmaker. *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1370-71 (Fed. Cir. 2012). It includes officials who influenced the decision. *Id.* That principle matters here because Plaintiff's theory is not that one isolated manager acted alone. It is that a network of DoS and MSA actors reacted to her disclosures and influenced what happened next. *Whitmore* says that influence counts in the motive inquiry. *Id.* at 1371.

**E.    Carr factor three: comparator evidence also precludes summary judgment.**

24

Plaintiff's comparator evidence also prevents MSA from carrying its burden. Houston/Hartley engaged in documented misconduct involving intoxication, insubordination, and removal from veterinary duties, yet remained employed after reassignment. Roberts, who supported Plaintiff and cooperated with OIG, was removed. Plaintiff, by contrast, had no contemporaneous performance discipline and had recently been commended by the CEO. A jury could infer retaliatory disparity from that evidence.

*Whitmore* is again instructive because it rejects a requirement that comparators be identically situated. *Whitmore* at 1373. The relevant inquiry is whether they are similarly situated enough to be useful in testing whether the employer truly would have taken the same action against a non-whistleblower. *Id.* Plaintiff's evidence meets that standard. At the very least, it creates a dispute that defeats summary judgment.

### F.   <u>Pritchard does not support summary judgment for MSA.</u>

MSA may invoke *Pritchard*, but *Pritchard* does not support summary judgment on this record. *Pritchard v. Metro. Washington Airports Auth.*, 860 F. App'x 825 (4th Cir. 2021). *Pritchard* simply confirms that § 4712 incorporates the clear-and-convincing same-action burden and that an employer can, in an appropriate case, prevail on that defense. *Id.* at 828. But *Pritchard* involved materially different facts, including a stronger independent evidentiary basis for the employer's action. Here, by contrast, there was no genuine investigation before suspension, no contemporaneous performance documentation, strong evidence favorable to Plaintiff's work history, and substantial evidence of retaliatory sequence and motive. This case is therefore not *Pritchard*; it is *Finley*.

25

## VI.  SECTION 4712(A)(3)(B) FORECLOSES ANY EXECUTIVE-DIRECTION DEFENSE.

Although MSA has not argued that it simply followed the wishes of State Department officials, any such defense would fail as a matter of law and fact. Section 4712 expressly provides that reprisal remains prohibited even if undertaken at the request of an executive-branch official unless the request was both a non-discretionary directive and within the official's authority. 41 U.S.C. § 4712(a)(3)(B).

There is no evidence of such a directive here. MSA's corporate designee testified that if asked whether MSA acted against Dr. Iovino at the direction of a federal executive, he "would say no." DoS's own institutional designee independently confirmed that DoS "is not involved in employers' decisions with their employees" because contractor personnel are not government employees. On this record, therefore, MSA cannot claim formal executive compulsion. At most, the record supports influence, leak-driven pressure, and informal coordination. The statute expressly says that is not enough to immunize reprisal.

## VII.  DR. CAROLYN OLECH IS A COMPELLING COMPARATOR

Despite MSA's incredulous claims to the contrary, Dr. Carolyn Olech is a compelling comparator to Dr. Karen Iovino because both brought whistleblower retaliation claims against the same defendant, MSA, under the same statute, 41 U.S.C. § 4712, in the same court. Dr. Olech filed *Olech v. Michael Stapleton Associates, LTD.*, No. 5:25-cv-00152-JHY-JCH (W.D. Va.), represented by the same counsel appearing here. Plaintiff asks the Court to take judicial notice of that action.  Her complaint pleads a claim for violation of 41 U.S.C. § 4712 and alleges that MSA retaliated against her for protected disclosures to MSA management and the

26

Department of State OIG concerning gross mismanagement, dangers to safety, and violations related to the federal contract.

Both Dr. Olech and Dr. Iovino were MSA veterinarians who were fired for attempting to expose the same basic category of wrongdoing at the same federal canine program: fraud, mismanagement, and serious canine-welfare and safety violations. That is classic comparator evidence.

## VIII.  CONCLUSION

For the foregoing reasons, Dr. Karen Iovino respectfully requests that this Court deny MSA's motion for summary judgment in its entirety and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Thad M. Guyer*

_____

Thad M. Guyer
T.M. Guyer & Friends, PC
116 Mistletoe Street
P.O. Box 1061
Medford, OR 97501
(202) 417-3910
thad@guyerayers.com

Attorneys for Plaintiff Dr. Karen Iovino

**CERTIFICATE OF SERVICE**

I hereby certify that on April 1, 2026, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send a notification of such filing to all counsel of

record.

*/S/ Thad M. Guyer*

_____

Thad Guyer, Esq.