# EXHIBIT 1

**Olds, James**
**January 8, 2026**

Page 33

A.    Yes, sir.

Q.    How frequently would you interact with Dr. Iovino?

A.    Approximately three days a week, sir.

Q.    Okay.  And would this always be around the animals?

A.    Yes, sir.

Q.    Did you have any kind of need or necessity as part of your job to have any office meetings with her of any kind?

A.    Not that I recall, sir.

Q.    Did Dr. Iovino ever treat you rudely?

A.    No, sir.

Q.    Did she ever treat you disrespectfully?

A.    No, sir.

Q.    Did you ever observe Dr. Iovino treat anybody rudely?

A.    No, sir.

Q.    Did you ever observe her treat anybody disrespectfully?

A.    No, sir.

Q.    Did you receive any complaints about Dr. Iovino while the two -- while she was there?

A.    No, sir.

Q.    Okay.  And I take it you had an opportunity to

Olds, James
January 8, 2026

Page 34

at least come to some idea as to how well she performed her job?

A.   Yes, sir.  In my professional opinion, she was a competent veterinarian.

Q.   Okay.  Was it part of your job to ensure that she was a competent -- that someone filling her position was a competent veterinarian?

A.   No, sir.

Q.   Whose job would that be from the State Department?

A.   At the time it was Mr. Josh Carter.

Q.   And Mr. Carter was a State Department employee?

A.   He was.  He was a personal services contractor.

Q.   I see.  Okay.  Let's talk -- I take it that you're a vested civil servant; is that right?

A.   No, sir.  I am a personal services contractor as well.

Q.   Oh.  Thank you.  See, I was remiss in not asking that.  So what's the difference then?  What does that mean that you're a personal services contractor rather than a civil servant?

A.   So the personal services contractor, it establishes an employer-employee relationship with the

Olds, James
January 8, 2026

Page 42

they had any concerns about the humane treatment or proper treatment of the animals, that they could come -- that they should come to you and let you know?

MS. CRUZ:  Same objection.

A.   No, sir.  I never said that to the MSA staff.

Q.   Okay.  Because that was not part of your job, right?

A.   Correct.

Q.   Okay.  And do you know whose job it was that if, say, Dr. Iovino had concern over the treatment of these animals, who was she supposed to report to?  Do you know?

A.   I do not know, sir.

Q.   Okay.  Did anybody ever report to you concerns about the humane and proper treatment of the animals?

A.   No, sir.

Q.   Did Dr. Iovino ever make any -- voice any concern to you about the humane or proper treatment of the animals?

A.   No, sir.

Q.   Did you ever see Dr. Iovino do anything inappropriate with the animals?

A.   No, sir.

Q.   Did you ever see -- or Dr. Iovino in any way mishandle any documentation or photographs regarding the animals?

**Olds, James**
**January 8, 2026**

Page 43

A.    No, sir.

Q.    I take it then that you're not aware of any instance in which Dr. Iovino committed any kind of misconduct; is that correct?

A.    That is correct, sir.  I'm not aware of any incident.

Q.    Okay.  Did you ever have any discussions with Mr. Carter about the performance of Dr. Iovino?

A.    No, sir.

Q.    Did Mr. Carter ever indicate to you that he was, in any way, dissatisfied with the conduct of Dr. Iovino?

A.    No, sir.

Q.    Did he ever indicate to you that he was dissatisfied with the performance of Dr. Iovino?

A.    No, sir.

Q.    Did you have any role or responsibility over the personnel policies of MSA governing the rights and conduct of the employees of MSA at the CVC?

A.    No, sir.

Q.    All righty.  So did -- do you have any role in the renewal of the MSA contract?

THE GUARDIAN:  Excuse me.  Can you say that question again?  I didn't get that.

MR. T. GUYER:  Yes.  Yeah.

# EXHIBIT 2

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 46

at whether or not Josh Carter would sleep at the MSA campus.

A.    Yes.

Q.    And why did you look at that issue?

A.    That was one of Dr. Iovino's underlying disclosures that she made in July of 2017, and our office of investigations looked into that.

Q.    Okay.  Do you -- is Mr. Carter still alive, do you know?

A.    I believe he is not.

Q.    And has the OIG office done any investigation, regarding his death, in any way?

MS. CRUZ:  Objection: Not relevant, not on the scope of the two topics.

Q.    Go ahead and answer.

MS. FRITH:  Objection.  I'm going to join in the objection and instruct the witness not to answer unless it is related to specifically Topic 18 and the use of rooms -- of a room at MSA's campus.  That is what the topic is.

Q.    I want you to answer whether or not the OIG has done any investigation into the circumstances concerning the death of Josh Carter and, in particular, whether or not that death was related to a hostile work environment.

MS. CRUZ:  Objection: Compound question, not on the

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 56

MS. FRITH: Oh, great. Sure.

THE GUARDIAN: Give me a second. All right. Mr. McDermott, I've given you control. You can use your mouse to scroll on the exhibit, if you'd like.

THE WITNESS: Okay.

MS. FRITH: All right. Thad, ask away.

**Q. Okay. This exhibit that Counsel just put up has nothing to do with my question. You are to get from your file whatever original you have there on Ms. Read.**

MS. FRITH: That is what this is.

MR. T. GUYER: No, but does it -- you're -- you mean, you just got that from the witness?

MS. FRITH: Yes.

MR. T. GUYER: Oh, he just now gave this to you out of his file?

MS. FRITH: Yes.

**Q. Oh, so, Mr. McDermott, you don't have paper copies there, then, I take it?**

MS. FRITH: He does, as well.

A. I do have a paper copy, yes.

**Q. I want you to get the paper copy out.**

A. I mean, I have the paper copy right here.

**Q. Okay. So I would like for you to read the third paragraph of the paper copy into the record.**

A. Certainly. "Some of Iovino's complaints

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 57

involved allegations of a COR in DS, Josh Carter.  Ms. Read recalls discussing the issues over e-mail with DS because DS would handle and not AQM.  Ms. Read sent the four to six e-mails from Iovino to Read directly to Nick Sabruno in DS.  If the complaint was against a COR, the issue would come to AQM, but AQM would examine whether it was a contract issue or misconduct issue.  If a contract issue, such as management of the contractor, whether certain things are allowed under the contract, AQM would investigate.  Because this was allegations of misconduct and the COR is a DS employee, DS would investigate the issue."

Q.    All right.  So who is Dick [sic] Sabruno?

A.    He, at the time, I believe, was in DS leadership.

Q.    Okay.  And what is your understanding as to why Ms. Read sent four to six e-mails to Nick Sabruno?

A.    She told us that the allegations were allegations against a -- allegations of misconduct against a DS employee, and that it was therefore DS's responsibility to investigate that -- those issues.

Q.    Okay.  And did you interview Nick Sabruno?

A.    No.

Q.    Do you know whether -- do you know what distribution Mr. Nick Sabruno made of those e-mails?

A.    Yes.

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 86

Q.    -- but also the media disclosures that Dr. Iovino was threatening to make?

A.    Yes.

Q.    Okay.  Thank you.  And then you said -- one second.  And then -- okay.  So after the first sentence, the second sentence, blah, blah, blah.  Can you read the third sentence too, "Mr. Goss heard"?

A.    "Mr. Goss heard from a kennel technician that Dr. Iovino had e-mailed concerns directly to people outside her chain of command, including officials at the department, including an AQM and OIG, and also heard that she planned to talk about her concerns with the media."

Q.    Okay.  So earlier you had testified that you weren't aware of Dr. Iovino going to the media with any department information.  Taking this into consideration, is that still correct?

A.    So the -- at the time that she filed her complaint with our office, I had no information that she had -- we had no evidence that she had gone to the media with her complaints or allegations.

Q.    Okay.  But you did learn about it through the investigation if it's in your report, correct?

A.    We heard that -- we -- several MSA officials told us that they heard rumors that she had threatened to go to the media.  But as we say in the report, they -- MSA

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 87

never conducted a formal investigation as to whether that, you know, was accurate or not.

Q.    Well, they do say in the report that they -- let me go back to that.  What did that just say?  You're saying nobody ever told you that MSA was investigating that?

A.    Let me -- let's see.

Q.    Go down -- let's look at the last paragraph of that same page and read the first few sentences there.

A.    Just give me one second, please.

Q.    No, that's fine.  Take your time.

A.    So MSA did conduct an investigation as to looking at Dr. Iovino's e-mails, but they did not investigate the allegations that she had threatened to go to the media.

Q.    Okay.  I'm going to -- can you read the first three sentences of the last paragraph?  "Mr. Goss had no direct knowledge," and that's on 000142, the top Bates stamp 000142.  The bottom one is Iovino 163.

A.    All right.  So what sentence do you want me to read?

Q.    Where it says, "Mr. Goss has no direct knowledge," that paragraph.  Read the first three sentences.

A.    "Mr. Goss has no direct knowledge of the

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 88

issues raised by Dr. Iovino.  He heard from a vet tech that Dr. Iovino planned to go to the media and that there was already an OIG investigation underway.  He thought it best that Dr. Iovino be placed on administrative leave with pay while MSA investigated."

Q.    **Okay.  So MSA did have an investigation into Dr. Iovino's media disclosure that you were aware of when you drafted this?**

A.    They were -- that's what doctor -- that's what Mr. Goss told us.  We asked what that constituted, and it was a forensic examination of her computer.

Q.    **Okay.  So you were aware of the investigation when you drafted this -- entered this interview report?**

A.    Yes.  Well, we were aware that there was an investigation by MSA of Dr. Iovino.

Q.    **Okay.  Thank you.  And then, let's go back to what my original question was about Josh Carter.  And you said that you believe Josh Carter had given -- had forwarded on that information he learned from Mr. Sabruno to individuals at MSA.**

A.    Yes.

Q.    **Did -- what individuals did he tell that to?**

A.    So Mr. Roberts stated --

Q.    **And can you tell me what Bates number you're looking at, just so I --**

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 89

A.    It's 000145.

Q.    **And what exhibit is this?  Do you know?**

A.    Thirty-nine.  Is that the -- well the --

MR. GILMORE:  This is within the investigative file that was provided to the parties by DOS OIG.

MS. CRUZ:  There it is.  Okay.  Krista sent it to me.  Okay.  145.

Q.    **All right.  I'm with you.  Where are you at?**

A.    So in the second to last paragraph --

Q.    **Mm-hmm.**

A.    -- Mr. Roberts stated, "In July 2017, Mike Hayes told MSA that he had heard rumors of OIG complaints, and he began asking around to who could be sending information to OIG.  Roberts told MSA (Joseph Atherall) that he had spoken to OIG and provided some information about his own concerns.

In mid-July 2017, OIG, Dave Holmes asked Iovino for photos of certain areas of the CVC, and she provided them. These photos made their way to Carter, who shared them with MSA, who tried to find out who took them.  Shortly thereafter, Iovino was placed on administrative leave and eventually terminated."

Q.    **Okay.  And who is, to your understanding, Zane Roberts?**

A.    Zane Roberts is a -- the former -- at this

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 91

Q.    And how did Mr. Holmes find out that information?

A.    How did Mr. Holmes find out what information?

Q.    That somebody was -- at MSA was told.

A.    Oh, no.  I'm sorry.  I'm saying Mr. Holmes told me -- I know for a fact that this statement that Mr. Roberts told us is true because I know that Dave Holmes verified it, is what I'm saying.  And that Mr. Roberts' statement that Josh Carter was -- knew about the photos and was trying to determine who took them, that he would have no reason to know that if -- I mean, he -- you know, it -- the fact that Mr. Holmes had asked for those photos and they were provided I think gives credence to Mr. Roberts' statement.

Q.    But Josh Carter is a state employee though, correct?

A.    That is correct.

Q.    Was.

A.    Yes.

Q.    Okay.  So not an MSA employee.  So how did -- you just said Mr. Holmes verified it.  How did he verify it?

A.    Mr. Holmes verified that he had asked Dr. Iovino for photos.

Q.    Okay.  So Dr. Iovino gave Mr. Holmes the

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 93

media."

A.    That's right.  Mr. Deegan also stated that he knew because -- prior to Dr. Iovino's suspension because he said that he was concerned by the fact that she was speaking to clients; presumably, that means AQM and OIG.

**Q.    Okay.  So, presumably.  Again, we don't know.**

A.    I mean, clients means -- I mean, that is the only client that Dr. Iovino would have worked with.

**Q.    Okay.  But, again, this was all surrounded by Iovino's disclosures to the media.  Like, this was -- this is what the investigation was about, and this is what MSA is talking about when they said that they were investigating Iovino and that they were aware of the disclosures that she made to the media, correct?**

A.    I don't -- I -- everyone that we spoke to -- that we interviewed said that they heard that she had threatened to go to the media, and no one ever said that she actually had gone to the media.

**Q.    Okay.  Even then, when we're talking about what MSA employees' quote/unquote knowledge was, the knowledge was about whatever she did or potentially was going to say or did say to the media.  Those were the disclosures that these MSA employees were talking about in their interviews were the media disclosures?**

A.    That's not correct.  It's both.

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 95

media and that she had spoken to clients.

Q.    About going to the media?

A.    No.  She had spoken to clients with concerns about the various allegations that she had raised.

Q.    **Okay.  But I think -- I mean, if anything, you should have been more clear in this report if that's what you meant.  Because the very first paragraph says that he learned about the information of her threatening to go to the press.  Then the second paragraph says, "Deegan was on vacation when these events occurred, but when it was brought to his attention, he stated that he decided that she should be suspended."  So the premise in the very first part of your -- this interview report here is that Deegan was concerned about the media disclosures; is that correct?**

A.    These are two different thoughts.  Yes, he was alerted that there were rumors that she was planning to go to the media, but he stated that one of the bases that he considered when suspending her was the fact that she had spoken to clients.

Q.    **Okay.  In conjunction with the fact that she spoke with media, correct?**

A.    No, he didn't say that.

Q.    **So then why did you put it in your report?**

A.    He stated that one of the concerns that he had --

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 96

Q.    Yes.

A.    -- and one of the bases that he used when deciding to suspend her was the fact that she had spoken to clients, which he believed raised protocol and chain of command issues.

Q.    Okay.  That sentence comes after the sentence talking about "When this was brought to his attention, stated that he -- he decided that she should be suspended." That was -- came directly after the sentence talking about her going to the media.  After that statement is when he says that she also potentially -- what did it say? "Speaking to clients to other MSA employees about her concerns."  Does that sentence come after the one that she said -- that says that she should be suspended?

A.    When it was brought -- yes, it does.  I mean, I think that the answer to your question is -- these are both potentially bases.  The -- you know, the allegations of threats to go to the media and the chain of command issues, I think, yes, both of those -- to be a fair reading of what he told us is that both of those were -- he took under consideration when deciding to suspend her.

Q.    Okay.  Then if it is both, then why did you earlier try to minimize the part in your sworn testimony that Dr. Iovino went to the media and that was a concern by MSA employees?  You left that part out earlier.  Why?

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 97

A.    I -- when was that?

Q.    **Earlier in your testimony, when you originally said that you weren't aware that Dr. Iovino had gone to the media or that there was --**

A.    I don't -- because we did not find -- we found evidence that MSA employees had heard rumors that she was threatening to go to the media.  Not that she had actually -- I think the distinction I was trying to make was that we found no evidence that she had actually, as of the date of her complaint, gone to the media.

Q.    **Okay.  So there -- you didn't find any evidence or you didn't investigate it?**

A.    We found no evidence that she actually went to the media as of the date of her complaint.  Obviously, she has subsequent to her employment, but as of the date of her complaint, we found no evidence that she actually had gone to the media.

Q.    **Okay.  And what day was her complaint?**

A.    Her retaliation complaint was July -- let's see, July -- July 26, 2017.

Q.    **Okay.  And so then the investigation, therefore, would have happened after July 26, 2017, correct?**

A.    Yes.

Q.    **Okay.  So -- and Dr. Iovino did not disclose**

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 99

at before?  I'm sorry.

A.    Yes.  This is our report of investigation.  So it's -- the Bates stamp is 00145.

Q.    Is this the -- one second.  One second.  I got a lot of tabs open here.  145, what exhibit is that?

MR. GILMORE:  Do you know what tab is it?

THE WITNESS:  It's tab two.

Q.    Two?

A.    Yeah.  No, sorry.  I'm talking --

MR. GILMORE:  So that's this report?

THE WITNESS:  The report, yeah.

MR. GILMORE:  It's actually in -- it's the DOS Iovino 137.

THE WITNESS:  Is where it starts.

MR. GILMORE:  It's the report.

MS. CRUZ:  Okay.

MR. GILMORE:  IG's report to the --

Q.    The July -- what date?

A.    It's July 5, 2018.

Q.    Okay.  So that report.  Okay.  What page are you on of that?

A.    So it's Bates -- the Bates stamp is 0015.  The page number is 8.

Q.    Eight.  Okay.  Sorry.  These -- this one has a different Bates number than the one that Thad gave us

**30(b)(6) Jeffrey McDermott**
**January 9, 2026**

Page 100

today, so bear with me.  Eight.  Okay.  What paragraph?

A.    It's the --

MS. FRITH:  I'm sorry, Chelsea, what exhibit are we on?

MS. CRUZ:  What is this?  This one is 2.

MS. FRITH:  Thank you.

MS. CRUZ:  Yep.  And it's PDF page 10.  It says 8 at the bottom.

MS. FRITH:  Thank you.

MS. CRUZ:  Yep.

A.    So it's the, like, second full paragraph.

Q.    Okay.

A.    It says, "According to MSA, the forensic computer analysis was the full extent of the investigation into the misconduct allegations raised against Dr. Iovino. MSA never interviewed Dr. Iovino, the kennel technicians who originally had reported her alleged intention to contact the media or any other relevant witnesses.  In addition, Dr. Iovino's supervisor never documented his conversation with the kennel technicians, which was used as the basis for her suspension."

Q.    Okay.  So the basis of your investigation into the media issue, with respect to Dr. Iovino, is that you just asked Dr. Iovino if she had made media disclosures; is that correct?

# EXHIBIT 3

**Jennifer Hartley**
**January 15, 2026**

Page 13

Q.    And how long have you had that position?

A.    November of 2020.

Q.    November of 2020?

A.    Yes, sir.

Q.    Okay.  And prior to November of 2020, what was your position?

A.    At which point in time?

Q.    Immediately prior to the day you assumed your present position.

A.    I was an administrative security logistics specialist.

Q.    And how long did you have that title?

A.    That would have been about six months prior.

Q.    Okay.  And so prior to that title, well, what job title did you have?

A.    The veterinary technician.

Q.    And who made the decision to give you a new job title?

A.    The company.

Q.    Yes, but who in the company?

A.    I don't recall who was on my hiring panel specifically.

Q.    You must recall who recommended you.  Do you?

MR. WARD:  Objection:  Calls for speculation.

Q.    Yeah.  We don't want you to speculate.  If you

**Jennifer Hartley**
**January 15, 2026**

Page 15

Q.    And did you know any of the other candidates?

A.    I don't remember who was in there, no.

Q.    Okay.  When did you first receive your LVT license from the -- from Virginia?

A.    I can't recall the specific date.  It was in 2016.

Q.    During the time that Dr. Iovino worked with you, did you ever have an alcohol problem?

A.    No.

Q.    All right.  So you should have some exhibits there available to you, hopefully.  Do you?

A.    Yes, sir.

Q.    So there are only six that I'll be going over here with you, if even that many.  Exhibit No. 1 is titled "CEO Commendation Letter," dated April 19th of 2017.  If you would take a look at that and let me know if you've ever seen that before.

MR. WARD:  At any time, including --

MR. T. GUYER:  At any time.

MR. WARD:  -- the ten minutes before this deposition when she looked at these documents?

MR. T. GUYER:  Including up to one minute ago, Dan.

MR. WARD:  Oh, okay.  That'll be an easy answer then.

Jennifer Hartley
January 15, 2026

Page 60

Q.     Okay.  Thank you.  And you say that this was an important part of MSA's contract with the department. Do you see that in 12?

A.     Okay.

Q.     And how do you know that?

A.     How do I know that the dogs going to foreign governments are part of the contract?

Q.     Was an important part of the contract.  Yes. How did you know that?

A.     It was 50 percent of the operational programs we supported.

Q.     Okay.  And how did you learn that?

A.     Just from working there.

Q.     Okay.  Thank you.  And then it says, "Iovino was extremely negative about this program that she was supposed to be supporting."  Other than what you've said already, can you think of any specifics of Dr. Iovino saying negative things about the program?

A.     No.  I think we've covered it.

Q.     All right.  Thank you.  All right.  Well, I'm sorry to say that's all the questions I have.  But what I would like to do is take a ten-minute break, and then I meet with my team and see if they think I missed any big things.  If they did, we'll come back for a few minutes, and if not, this should be fairly short, okay?

# EXHIBIT 4

**Dr. Michael Ratcliff**
**January 22, 2026**

Page 39

while you were Dr. Iovino's supervisor to discipline her?

MR. WARD:  Objection: vague.  I think it's outside the scope of the topics.

Q.    Go ahead and answer.

A.    To the best of my recollection, yes.  As a supervisor, that's part of the scope of supervision.

Q.    Okay.  Thanks a lot.  All right.  Okay.  So do you recall ever disciplining Dr. Iovino?

MR. WARD:  Objection: vague as to "discipline."

Q.    Go ahead.

A.    I have no recollection of formerly disciplining Dr. Iovino.

Q.    Okay.  Thank you.  All right.  So I think you've already answered Paragraph 6, correct?  You have no additional details; is that correct?

A.    That is correct, yes, sir.

Q.    And then Paragraph 7, do you have any -- do you recall any additional details other than what's here?

A.    No, sir.  Nothing additional.

Q.    Okay.  And Paragraph 8, any additional details?

A.    I just want to ask:  Are you asking me the same question that you did about Paragraph 8 before we broke for lunch?

Q.    No, this is a -- I'm asking now the same

**Dr. Michael Ratcliff**
**January 22, 2026**

Page 42

MR. T. GUYER:  No, no, no, no, no.

MR. WARD:  Yes, you have.

MR. T. GUYER:  Okay --

MR. WARD:  Yeah.

MR. T. GUYER:  -- let's get back to this.

MR. WARD:  Yeah, Let's get back.

MR. T. GUYER:  Let's just get to the basic thing.

Q.   **You did not write this declaration, did you? Someone gave it to you, you read it and you signed it, correct?**

MR. WARD:  Objection: Mischaracterizes and is argumentative and is testifying for the witness.  But --

Q.   **Answer.**

MR. WARD:  -- he can answer.

Q.   **You did not write this, correct?**

A.   I reviewed and signed this document.

Q.   **Someone else gave it to you, you reviewed it and signed it, correct?**

A.   I don't have a recollection of how the process played out this long --

Q.   **Okay.  Thank you.  Thanks.  Okay.  So let's get back to Dan's very good point, so -- which is -- start the second sentence of Paragraph 8 states, quote, I counseled her on the negative impact of her interruptions and advised her to allow technicians and personnel to**

**Dr. Michael Ratcliff**
**January 22, 2026**

Page 43

attend to their mission critical work first before assisting her on routine matters such as cleanup, but she was unresponsive to the counseling, unquote.  Do you see that?

A.    Yes, sir.  I see it.

Q.    So do you recall if you counseled her and the counseling was in written form or not?

MR. WARD:  Objection: Compound.  You can answer.

A.    I don't recall a written counseling.

Q.    All right.  Thank you.  And I take it you don't remember anything about what you said to her, correct?

A.    This long ago?  No, sir.  I don't recall any specific conversations.

Q.    Thank you.  Okay.  And then Paragraph 9, same thing.  Are there any details you could give us on Paragraph 9?

A.    No, sir.  I don't recall any additional details from Paragraph 9.

Q.    All right.  Then we'll go to Paragraph 11. After you've read 11, the question will be:  Can you give us any additional details on Paragraph 11?

A.    No, sir.  No additional details.

Q.    Okay.  And we'll go to 13.  Can you provide any details on 13?

# EXHIBIT 5

**Gerald Goss**
**January 30, 2026**

Page 45

Q.    And do you know if anyone attempted to interview Dr. Iovino about these beliefs that she may have been involved in confidentiality breaches?

A.    I would only be --

MR. WARD:  Objection:  Vague as to time.

THE WITNESS:  Sorry.

MR. WARD:  Go ahead.  You can answer.

A.    Yeah.  I don't --

Q.    Yeah.  Before she was put on administrative leave, did you or anybody else try to talk to her first, say, "What the hell are you doing?"

MR. WARD:  Objection:  Vague, calls for speculation.

Q.    Don't want no speculation.  I just want to know:  You either do know as a factual matter, you don't know or you don't recall whether or not you attempted to interview Dr. Iovino about these confidentiality concerns before she was put on administrative leave.

MR. WARD:  So now the question is just as to Mr. Goss?

MR. T. GUYER:  Yes.

MR. WARD:  You can answer that.

A.    I do not believe I interviewed her because that would not have been my role to do that.

Q.    Okay.

A.    Yeah.

**Gerald Goss**
**January 30, 2026**

Page 46

Q.    Whose role would it have been?

A.    Again, HR and legal would've had the responsibility to investigate those matters or expound on the circumstances regarding that.

Q.    Thanks a lot, Mr. Goss.

A.    Yes, sir.

Q.    Now, as I understand it, one of the actions taken was to do a forensic examination of Dr. Iovino's computer media.  Is that your understanding?

A.    Sounds correct.  Yes, sir.

Q.    And does MSA have some functional capacity to themselves perform such a forensic examination in-house as of 2017?

MR. WARD:  Objection:  Vague.  But you can answer if you don't have to speculate on it.

A.    We have an investigative department.  To the extent of what they did or didn't do, I couldn't tell you. That's not my department.

Q.    Okay.  Thank you.  And do you know whether or not any investigation was actually then completed that came to conclusions as to whether or not Dr. Iovino had committed confidentiality breaches during her employment?

A.    I don't recall specifically any specific outcomes.  If there are things that had been documented that had been presented to me, I don't recall reading the

**Gerald Goss**
**January 30, 2026**

Page 47

specific outcomes.  But if -- to the best of my knowledge, off the top of my head, I just don't recall the outcomes.

Q.    Okay.  Prior to August of 2017, had you ever heard any negative assessments by any MSA personnel as to Dr. Iovino's performance work conduct?

MR. WARD:  Objection:  Vague as to "negative assessments."  But you can answer.

A.    That traditionally would not have been my -- as far as the day-to-day goes, traditionally, my engagements would involve morale and welfare, meaning, you know, going up to employees, asking employees how they're doing.  Is there anything we could be doing better for you? Is there support we can provide you?  Same thing with our clients.  Those are -- that's about the extent, so...

Q.    Okay.  So you don't remember anybody ever saying -- ever giving a negative comment to you about Dr. Iovino's performance prior to August of 2017; is that correct?

A.    I don't recall if anything was mentioned about Dr. Iovino or not.

Q.    All right.  And as I understand it -- and correct me if I'm wrong -- you're saying receiving such reports would not have been within the normal scope of your job responsibilities in 2017; is that correct?

A.    Unless it would've -- unless it was something

**Gerald Goss**
**January 30, 2026**

Page 48

that was happening at the time, you know, or of such preponderance, traditional day-to-day human resources management was not within my normal scope or purview.

Q.    Okay.  Do you recall if Anna Garcia ever said anything negative to you about Dr. Iovino?

MR. WARD:  Objection:  Vague as to time and vague as to "anything negative."  But you can answer.

A.    I do not recall either way.

Q.    Okay.

A.    I'm not sure why --

Q.    And do --

A.    I'm not -- and, sir, to be honest with you, I'm not really sure why the Corps would comment specifically on an individual employee at that time anyhow.

Q.    Amen to that one.  And the same question then as to Cathy Read.  Did you have -- did you ever hear Cathy Read say anything negative about Dr. Iovino before her termination from employment?

MR. WARD:  Objection:  Vague as to time, mischaracterizes the facts with "termination from employment," and -- yeah.

A.    My engagements with the Department of State have only been professional.

Q.    Okay.  Do you recall Cathy Read ever telling you that the State Department wanted to transition Dr.

**Gerald Goss**
**January 30, 2026**

Page 59

A.    "Mr. Goss also noted that MSA has an audit

billing issues conducted, and that he was not aware of any

issues were uncovered during that audit."  Okay.

Q.    Any disagreement with that sentence?

A.    I -- I'm sure I said that at that time, I just

don't recall what the discussion was about.  I have no

reason to believe it wasn't accurate.

Q.    Okay.  The next paragraph, starting with

"regarding the whistleblowing," anything there you disagree

with?

A.    "Regarding the whistleblowing, Mr. Goss said

he went to the CVC the next day or day after and talked

with the program management team and also checked the

facility to see if anything was missing.  They may have" --

I'm not exactly sure what the specific reference was there

or what it was about specific to the topic of

whistleblowing.  So I don't know exactly what he was

referring to there with regard to the paragraph.

Q.    Okay.  But I need you to tell me --

A.    Can you clarify?

Q.    -- whether or not you disagree.  Do you

disagree with anything in that paragraph?

MR. WARD:  Objection:  Asked and answered.  I think

he just told you regarding the whistleblowing.

A.    I'm not really sure what the reference to

**Gerald Goss**
**January 30, 2026**

Page 60

"regarding the whistleblowing" means.  It doesn't really coincide with the rest of the paragraph.  I mean, it looked like two separate topics to me.  Whistleblowing doesn't have a lot to do with an investigation or the topic of media disclosures and confidentiality information or otherwise.  So I'm not exactly sure what the topic around the topic of whistleblowing was, but it seems as though that particular -- those three words are a little bit misplaced for the context with the paragraph, unless --

Q.    Okay.  So --

A.    -- my memory's refreshed.  If my memory's refreshed, then maybe I would feel otherwise.

Q.    Okay.  So let's take that phrase out and let's just break it down.  Do you disagree with the rendition by Mr. McDermott that, quote, Mr. Goss said he went to CVC the next day or day after and talked with the program management team at CVC and also checked the facility to see if anything was missing from a security standpoint?  Do you disagree with that statement?

A.    That seems correct, sir.

Q.    Okay.  And then last sentence, "He thought they may have a rogue employee on their hands," do you disagree with that statement?

A.    That sounds correct.  Yes, sir.

Q.    Next paragraph starting with "Mr. Goss noted

# EXHIBIT 6

Hayes, Michael
**February 13, 2026**

Page 36

Q.    All right.  Completely voluntary, I take it?

A.    Yes, sir.

Q.    All right.  And when did you first start working at the CVC?

A.    February 8, 2017.  Or it may have been February 6th.  It was either the 6th or the 8th.

Q.    Okay.  And did you replace Zane Roberts?

A.    I did.

Q.    And do you know anything about the reason why Zane Roberts left the CVC?

A.    I do not.

Q.    You said you don't know?

A.    I don't recall the specifics for him leaving, no.

Q.    Do you remember whether or not he left voluntarily or not?

A.    All I know is that HR contacted him and they had a meeting with him -- I believe it was HR -- and he left that day.

Q.    Okay.  And were you consulted in any way regarding that?

A.    Yes.

Q.    Okay.  What do you recall being consulted about?

A.    They informed me, "they" being corporate, that

Hayes, Michael
**February 13, 2026**

Page 37

Zane was going to be removed.

Q.    Did they tell you why?

A.    I don't recall that, no.

Q.    Did it ever come to your attention that Mr. Roberts had been providing information to the OIG?

A.    I had no idea.  No recollection of that.

Q.    All right.  Thanks.  Okay.  So what is your understanding as to why you ended up within MSA going to the CVC in 2017?

MR. WARD:  Objection:  Vague, compound.

Q.    You can answer.

A.    I don't quite understand the question.

Q.    How'd you end up there?  How'd you end up at the CVC?  You've been with the company since 2009. Suddenly in 2017, you're there at the CVC.  How'd that come about?

MR. WARD:  Objection:  Vague, argumentative as to "suddenly," but you can answer.

Q.    Go ahead.

A.    I was working for a different company at the time, and I spoke to Mr. Carter; and I mentioned if there was ever an opening at the CVC, I'd be interested in coming to work for them.

Q.    All right.  Did -- was Mr. Carter an employee the whole time you were at the CVC?

# EXHIBIT 7

**Palmer, Dr. Lee**
**February 17, 2026**

Page 10

hiring decision in which were hired.  Have you ever seen this document before I sent it to you?

A.    No.


(Exhibit 3, introduced)


Q.    All right.  We'll go on to Exhibit 3.  And Exhibit 3 is entitled, "CVC Vet Physician Description." And it's dated September 7 of 2017.  And have you seen this document before I sent it to you?

A.    If that's what was on the website for the job description, then yes, I have.  I mean, I saw what they posted on the website for the job description.

Q.    All right.  Thanks.

MR. WARD:  Objection.  He's seen a description.  The question is whether he's seen this e-mail.

THE WITNESS:  Oh, no.  I have not seen this e-mail.

Q.    So would you go ahead and -- it's fairly short here, the description itself, the e-mail -- and look through it and just read it to yourself.  And if you see something that you do not recall having been a requirement or a duty of the job or something you're not familiar with, just let us know.  Okay?

MR. WARD:  Objection:  Vague --

A.    Okay.

**Palmer, Dr. Lee**
**February 17, 2026**

Page 12

this document before.

    A.    No, I have not.


    (Exhibit 6, introduced)


    Q.    And we'll go on to Exhibit 6.  We've named it "OIG Substantiation Memo."  But this is essentially an OIG, Office of Inspector General report.  Ever see this before I sent it to you?

    A.    No.


    (Exhibit 7, introduced)


    Q.    And Exhibit 7 is entitled, "Ratcliff Declaration."  And have you seen this exhibit before?

    A.    No.


    (Exhibit 8, introduced)


    Q.    And Exhibit 8 is a letter regarding Dr. Iovino dated April 19th of 2017.  Have you ever seen this before?

    A.    No.


    (Exhibit 9, introduced)

**Palmer, Dr. Lee**
**February 17, 2026**

Page 13

Q.    And Exhibit 9 is an attorney rebuttal letter dated August 1 of 2018.  Have you seen this document before?

A.    No.


(Exhibit 10, introduced)


Q.    Exhibit 10 is an OIG interview notes of Dr. Michael Ratcliff dated March 26 of 2018.  Have you seen this document before I sent it to you?

A.    No.


(Exhibit 11, introduced)


Q.    Exhibit 11 is a termination letter regarding Dr. Iovino dated August 18 of 2017.  Had you seen this document before I sent it to you?

A.    No.


(Exhibit 12, introduced)


Q.    Exhibit 12 is a declaration from Mr. Alan Bower.  Have you ever seen this document before?

A.    No.

# EXHIBIT 8

**Deegan, Peter**
**February 17, 2026**

Page 19

A.    You can't --

THE GUARDIAN:  Can you speak up, Attorney Guyer, please?

A.    You need to speak up.

**Q.    Sorry, what'd you say?**

A.    You constantly trail off.  I can't hear you.

**Q.    Sorry about that.  Sorry about that.  I'll keep it going louder than that.**

THE GUARDIAN:  I think it's because you're leaning back.

MR. T. GUYER:  I'll bet you're right.

THE GUARDIAN:  Mm-hmm.  Let me know when you want me to scroll down.

THE WITNESS:  Please scroll.  Okay.  Stop for a second.  Can you scroll?

THE GUARDIAN:  Sure.

THE WITNESS:  And you can scroll down further.  Can you scroll down, please, further?  Down further.  Okay.

THE GUARDIAN:  That's the last page.

A.    Yeah, I don't recall this exchange.


(Exhibit 5, introduced)


**Q.    Okay.  And we'll go to Exhibit 5, and this is entitled "Termination Letter," August 18.**

# EXHIBIT 9

**Nick Sabruno**
**February 23, 2026**

Page 19

of the quality of the work that the -- that MSA was
providing regarding the CVC?

A.    No.

MR. WARD:  Objection:  Vague.

Q.    And your answer was "no"?

A.    Correct.  No.

Q.    Okay.  Did you ever hear any complaints in --
during any of those visits about Dr. Iovino?

MR. WARD:  Objection:  Vague as to time.  You can
answer.

A.    During the visits, no.

Q.    Okay.  How about in the 2017 time frame, did
you ever hear any complaints about Dr. Iovino?

A.    Yes, I vaguely remember complaints.

Q.    And what do you recall?

A.    Just that she was a difficult vet.  She was
considered to be a rabble-rouser and causing problems.

Q.    And do you recall what kind of problems she
was rabble-rousing over?

A.    Not really.  I just remember there was an
issue with her and concerns over what she was doing, and
then it led into these complaints.

Q.    And do you recall who you heard that from?

A.    It came in an OIG complaint.

Q.    And do you recall who you heard from that she

**Nick Sabruno**
**February 23, 2026**

Page 20

was a rabble-rouser or something to that effect?

MR. WARD:  Objection:  Asked and answered.

A.    Say again?  Sorry.

Q.    You can go ahead and answer.

A.    Josh Carter.

Q.    Anybody else?

A.    I remember Josh Carter specifically because he was the program manager.

Q.    And what do you recall him saying?

A.    Just that she had brought up all these issues related to care, but they were ungrounded, and she tried to instigate other employees to go along with what she was saying.

Q.    And did that cause you concern?

A.    It was documented by other staff and submitted up the chain.

Q.    And do you know, at the time of that documentation, if Dr. Iovino was still working at the CVC or was this after she was no longer working at the CVC?

A.    I don't recall.  I don't recall the timeline. I think this about eight and a half years ago.

Q.    Oh, yeah.  No.  We're all aware of that.  Our only hope would be that as you went through the exhibits, maybe you would -- it was -- you know, jog your memory on something.  And that's the main thing we're trying to find

**Nick Sabruno**
**February 23, 2026**

Page 39

(Off the record)

THE GUARDIAN:  The time is 3:59 p.m., and we're on the record.

(Exhibit 20, introduced)

Q.    Okay.  So, Mr. Sabruno, we're going to -- these are the five pages that are, from our view, the most significant.  We're going to guess that these are the ones that you were referring when you said you saw some documents recently that went into more detail.  So if you would take a look through these, you can say "up" and "down" and -- first thing, let me know, is -- are these five pages the documents you were talking about?

MR. WARD:  Objection:  Vague.

A.    No.

MR. WARD:  Talking about when?

Q.    No.  Is that because it's a different format?

A.    I'm not sure about the format, but these were just presented to me today.

Q.    I see.  All right.  Well, then, let's -- before we then get into this, tell me all you can remember about what this other document was that you were talking

**Nick Sabruno**
**February 23, 2026**

Page 40

about.

    A.    Can you say that again?

    Q.    **Yeah.**

    A.    The other document or this document?

    Q.    **No, no. The document you were telling us about earlier, that you had seen a document, that you would recognize it when you saw it. It was none of the exhibits that we went through that had a more detailed reference to your involvement. Describe for us what that -- what you recall about that document that you were looking at.**

    A.    This isn't that document.

    Q.    **Yeah, I understand that, but tell me what you do recall about what was the document.**

    A.    I think I mentioned before and it's still where I stand with it. It was a document that Paul Davies had presented to the director, Chris Schurman. And then I asked my staff to put something together so we could follow up with more details. That's the document I was talking about.

    Q.    **Okay. And -- okay. So tell me what the content was that your -- that you were asking your staff to follow up with.**

    A.    It was a summary document of, like, what had happened. Again, I don't recall it. I saw it for the first time after, like, eight and a half years or eight

**Nick Sabruno**
**February 23, 2026**

Page 41

years or whatever it was, just a week and a half ago.  But it just was a summary of what had transpired that we knew about.

Q.    Regarding Dr. Iovino?

A.    I think it was Dr. Iovino, and if I remember right -- again, I'd have to see the document.  I don't recall.  I'm speculating here.

Q.    **All right.  Well, we don't know what document you're talking about.  We've kind of gone through all -- or shown --**

A.    Yeah.

Q.    **-- you what we -- we're aware of.**

MS. FRITH:  And Thad, he has not seen anything that we have not produced.  So this is not some hidden document. I just want to be clear for the record.

MR. GUYER:  How disappointing.  It's always fun to have things like that going on here.  It's just as simple as that.

MS. FRITH:  Sorry.  We try to avoid that.

MR. GUYER:  Thanks a lot, Krista.  I appreciate it. Okey-dokey.

Q.    **All right.  So we're going to go over these. And these I would like for you to take your time, read it carefully and then tell the guardian, the court reporter to scroll to the next page and then read the next one and the**

**Nick Sabruno**
**February 23, 2026**

Page 42

next one.  It's not that much, so just go through all five of these pages first and let us -- and you'll let us know when you're finished.  If after you got to page 5 you still want to go back to page 2, that's fine.  Just take your time, okay?

THE WITNESS:  Can we start at the bottom of page 5 then?

THE GUARDIAN:  Sure.

THE WITNESS:  Okay.  You can scroll up now.

THE GUARDIAN:  All right.

THE WITNESS:  Okay.  You can scroll up now.  Okay.  You can scroll up now.

THE GUARDIAN:  All right.

THE WITNESS:  Okay.  You can scroll up now.

A.    Okay.  I'm done reading.

Q.    Okay.  Thanks a lot.  Let me ask you this:  Do you recall any complaint being filed against Dr. Iovino with the OIG?

A.    No, I don't recall it.  I mean, I was reading this, and from that, I can recall from that that there was something going on, but I don't recall it past reading this.

Q.    All right.  Okay.  So let's -- we'll start where you did.  So let's start on page 4, which is the big e-mail that you wrote.  Who is -- who's Loren Bachman?

**Nick Sabruno**
**February 23, 2026**

Page 43

A.    He was the deputy division chief for the Worldwide Protective Services Division.

Q.    So is that somebody who reported to you?

A.    He reported to the division chief and then the division chief reported to me.

Q.    Okay.

A.    And he was charged with canine oversight.

Q.    All right.  And then who is Courtney Barno?

A.    She was my executive assistant, one of them.

Q.    In your e-mail here, which is dated August 1, 2017, from you to Bachman and to Barno, subject, OIG request for information, etc., you're making a reference to a -- some sort of a -- maybe a documented history of poor performance by Dr. Iovino.  And there -- it kind of goes on into other e-mails as well.  Do you recall ever having reviewed any documented history of Dr. Iovino's poor performance?

A.    No.

Q.    Do you recall if you ever found out if, in fact, a documented history of Dr. Iovino's performance actually did exist?

MR. WARD:  Objection:  Vague.  Documented by who?

Q.    You go ahead and answer.

A.    No, I don't recall that.

Q.    Okay.  If you look to the second paragraph, it

**Nick Sabruno**
**February 23, 2026**

Page 44

says, "At some point, Josh began sleeping at the CVC," and it goes on then, it's directing him today to find alternate living arrangements. Does that refresh your memory that the -- Mr. Carter wasn't just there overnight every now and then, but he was actually living there? Is that your understanding?

A.   Not from what I remember, because look at the date of this e-mail.

Q.   Yep.

A.   So that came up afterwards with Josh, because I had spoke with him directly. And he said he was doing it because he needed to check on employees, and there was issues with reporting and time and attendance and things like that. And he said he wasn't living there full-time. It wasn't like it was his house or place of residence.

Q.   But there's nothing in here that says he had any other place of residence, is there?

A.   No, there's nothing written there. But that was a question afterwards to Josh when I spoke with him.

Q.   Well, isn't the --

A.   I do remember that.

Q.   Okay. Sorry. Do you recall there being a discussion about helping him find a place to live?

A.   No.

Q.   If you look at page 2 -- this is from Ms. --

**Nick Sabruno**
**February 23, 2026**

Page 45

Mr. Bachman to you and Barno -- it says, quote, We can still fire the vet, and I have a GP medium for Josh to use on the back 40.

A.    Do you know what a "GP medium" is?

Q.    No, I was going to ask you.

A.    Yeah, it's a tent.  It's a military tent.  I think it was meant as a joke.

Q.    Okay.  And could you tell me -- I'm not sure -- I don't understand the humor.  Are you able to describe the humor, or is it like trying to describe a piece of art, you just can't do it?

A.    I don't think anyone intended for Josh to live in a tent -- Mr. Carter to live in a tent.  It was a joke.

Q.    Well, I mean, the guy was, like, sleeping on the floor or on a couch at CVC.  It's not like he had a bedroom.

MR. WARD:  Objection:  Argumentative and misconstrues where this gentleman was sleeping and misconstrues past testimony.

Q.    Go ahead.  You can answer.

A.    Yeah.  And to that point, I remember speaking to Josh, and he said that he didn't live there.  He would come in very early hours because of time and attendance issues, and somebody, I don't know who, but, you know, someone may have construed that as living there.  But Josh

# EXHIBIT 10

**Kevin Dragnett**
**February 24, 2026**

Page 28

first question.  And question 1 is:  What is the answer to that?

A.    What is my answer to Question No. 1?  Was that your question?

Q.    Okay.  So -- yeah, let me help you out then.  So here's what we do.  All right.  So question 1 -- matter 1, we call it.  Matter 1 has three different questions in it.  So we'll go ahead with that.  So question 1:  Does MSA rely on 41 USC 4712(a)(3)(B) in defending this case?  That is my question to the corporation now, and you are speaking for the corporation.

A.    I would say no.

Q.    All right.  Thank you.  Question -- the second question of matter 1 is:  Does MSA contend that in its action vis-à-vis Dr. Iovino in 2017, it acted at the request of an executive branch official?

A.    I'm not sure I understand since I'm not an expert in 41 USC.  Does that second question apply to the first question?  If it does, I would say no.

Q.    Okay.  Thank you.  All righty.  So we'll go on to -- let me see.

MR. GUYER:  And you -- Dan, I know that you and I, as we prep-worked -- did we say 2 and 3 are not for MSA, or did we include 4 as well?

MR. WARD:  2, 3 and 4 are not for MSA.

**Kevin Dragnett**
**February 24, 2026**

Page 36

Q.   Okay.  All right.  Thank you.  And do you know who it is who got -- who was the successful candidate for the position?

A.   I do.  I know who was selected.

Q.   And who was that?

A.   That was Dr. Palmer.

Q.   And do you know if Dr. Palmer was ever required to travel overseas?

A.   That is not something that I reviewed.  I don't know if he had occasion to travel overseas or not.

Q.   Okay.  Thank you.

MR. WARD:  Do you want me to make a stipulation, Thad?

MR. GUYER:  If you want to, sure.

MR. WARD:  He was required to travel overseas and he did.

MR. GUYER:  Okay.  I won't stipulate to it, but I will stipulate that he did travel overseas, but I won't stipulate he was required.  All right.  And can we go one more on that part of the stipulation we do agree to, that he did that exactly once?

MR. WARD:  I don't know how many times.

MR. GUYER:  Okay.

MR. WARD:  But at least once.

MR. GUYER:  At least once.  So we still succeeded.

**Kevin Dragnett**
**February 24, 2026**

Page 37

We reached the stipulation.  Good.

MR. WARD:  Yeah.

MR. GUYER:  All right.

Q.    All righty.  All right.  So on -- let's go on to matter 6.  Matter 6, most of it, I think we all know the answer to, but we don't all know, I don't think, the answer on D, which is the last part of the matter, which is to identify all MSA representatives who conducted and/or participated in those interviews.  So go ahead and read it to yourself, and then if you would answer D for me, subsection D.

A.    Okay.

Q.    Okay.  So what's the answer to D, which is, quote, Identify all MSA representatives who conducted and/or participated in those interviews?

A.    That's part B?

Q.    Part D, as in --

A.    Oh, part D.

Q.    -- Dragnett.  Yeah.

A.    I understand that Dr. Ratcliff conducted that interview.

Q.    And he was the only one?

A.    As far as I'm aware, yes.

Q.    All right.  Thank you.

A.    And he -- the question is plural.  I don't

**Kevin Dragnett**
**February 24, 2026**

Page 39

A.   I noticed from Dr. Iovino's notes that she mentioned not having been interviewed, so I would assume she was not interviewed in the common definition of the term, "I went for a job interview."

Q.   Okay.  All right.  Great.  Do you know whether or not, if any of the four candidates had said, "I'd like the job, but I'm not willing to travel outside the United States"?  Would that have disqualified them, their candidacy?

MR. WARD:  Objection:  Calls for speculation.  Or you can answer if you can do so without guessing.

A.   It certainly would've -- it would've disqualified them.

Q.   Okay.

A.   The positioning needed to be able to perform that function.

Q.   Okay.  All right.  All right.  So we'll move on to matter 7.  And this one I'll go ahead and read.  It's simple enough.  "Identify and discuss all communications between MSA and Office of Acquisitions Management of DoS, relating to or discussing Dr. Iovino and further qualify that" -- for Dan and I had discussed this, Mr. Ward and I had discussed this -- "as pertained to her employment."

MR. WARD:  Well, yeah, let me add to that.  Thank you, Thad.  But what I have in my notes from our discussion

**Kevin Dragnett**
**February 24, 2026**

Page 42

Q.   Okay.  You said "for disclosing."  My understanding is on August 4th, MSA never alleged that she had disclosed anything.  Do you have information if she had actually disclosed something as of October -- as of August 4th?

MR. WARD: Objection: Mischaracterized.  She was placed on administrative leave for whatever he said.  Thad seems to think that it's okay that she threatened to disclose.  You can't fire her for that.

A.   Yeah.  I mean, with -- the belief was her -- if she followed through on her threat.  There was a potential, so she was placed on administrative leave while they looked into it.

Q.   Okay.  And when MSA looked into it, did they find that anytime before she was terminated, before her job came to an end, that, in fact, she had disclosed any MSA information?

A.   I think the communication with acquisition was to inform our client that potentially confidential information had been improperly disclosed.  When looking into that from the time Dr. Iovino was on administrative leave up until the time she was separated due to her position coming to a close, I do not know if they discovered evidence of that disclosure in that time period, from the 4th to the last day the part-time veterinarian was

**Kevin Dragnett**
**February 24, 2026**

Page 43

separated, but...

Q.    **Okay.**

A.    So the --

Q.    **Thank you.**

A.    -- dismissal is as a result of the position no longer existing.  The administrative leave was the potential for having disclosed information, if that makes sense.

Q.    **Yeah.  Yeah, that makes sense.  You're saying she was being put on paid administrative leave because of the potential of disclosing information she should not disclose.  But in the end, the reason she did not get the job, and the only official reason given for her not getting the job, was that she was not the successful candidate, correct?**

A.    I think that's a fair characterization.

Q.    **All right.  Thank you.  Are you aware that she was actually -- out of four, she was, nonetheless, despite all of this, a runner-up for the position?  Were you aware of that?**

A.    I am aware that there are two final candidates, Dr. Iovino and Dr. Palmer.  I have no awareness of the comparison of -- I only have awareness of the comparison between the just -- the pattern of justification between Dr. Iovino and Dr. Palmer.

**Kevin Dragnett**
**February 24, 2026**

Page 67

And this next one, I -- looks like a -- might be an entire -- and it's multiple pages, and it might be a number of pages from Jen Houston, a counseling memo dated December 27, 2016, regarding Jen Houston.

And the next one is October 25, 2018. Again, it's about Jen Houston, a complaint, multiple pages. What's that? Oh, you have the Bates number?

MS. CRUZ: Mm-hmm. Just that one.

MR. WARD: Oh, here, hand it to me. So the -- this group begins with Iovino_00000755 and ends with -- this is the whole set, right? Iovino_00000826. I think I already did that one. Oh, I don't know if -- I think we already got this one, but I'm not sure.

Next was a Washington Examiner article dated February 6, 2019. "Whistleblower Claims U.S. Anti-terrorism Dogs Dying Oversea from 'Poor Working Conditions.'" I did have that one because I remember the quote. And that's Iovino_00001360 to 1361. That's all. Was I on mute that whole time? Wouldn't that be great?

MR. GUYER: Thank you very much. That was incredible. You know, I -- you would have thought that that wouldn't have been so gripping, but it actually was. It was fascinating. So thank you so much. I greatly appreciate that professional courtesy, Dan.

Q. All right. So let me then kind of rephrase my

**Kevin Dragnett**
**February 24, 2026**

Page 75

And I'm not telling you how to run your deposition, but what I do want to make sure we don't have is a very clear record; that we don't have an unprepared witness because he's not going to just say, "Okay, just tell me everything about 18," because that is not, I think, a proper way to do it.  I mean, again, do it the way you want, but I want to make my concern known just with the, oh, 25 years I've been doing this.  Like I said, not as long as --

MR. GUYER:  Thank you very much.  So, anyway, back --

MR. WARD:  If you have questions about 18 or 17, fine.  But to just say, "How about 17, what do you got?"

MR. GUYER:  Yeah.  So I'm going to go back to that.

Q.    **So do you have any notes there with you that you would use to respond to matter 17?**

A.    Yes.  In reference to her final counseling, primarily.

Q.    **Okay.**

A.    Or in total.  I'm not sure if it was her final counseling, the final written warning that was October of -- was that 2018, if I recall the date correctly?

Q.    **And that was for Jennifer Houston?**

A.    Yes.  There is a final written warning counseling October --

**Kevin Dragnett**
**February 24, 2026**

Page 76

Q.    Okay.  All right.  Anything other than that that you have notes on?

MR. WARD:  That he has notes on?

MR. GUYER:  Yeah.

MR. WARD:  On this --

MR. GUYER:  Yeah, for 17.

A.    No, there's no -- I didn't make any notes on anything other than the final written warning.

Q.    Thanks a lot.  Okay.  All right.  So 18, take a look at that and let me know if you have information on Mr. Carter's use of a room at -- on the MSA CVC campus where he was using it, perhaps as a residence.

A.    I do not have any information on that.

Q.    All right.  And then 19, same question, whether or not he was using a government vehicle for personal business.

A.    I don't have any information on that either.

Q.    All right.  Now, we'll move on to the bigger subject.  And this has to do with the unauthorized -- the allegedly unauthorized disclosure of MSA information.  So have you been able to determine -- has MSA determined what information, if any, that Dr. Iovino disclosed that she had obtained through her MSA employment?

A.    Could you repeat the question?  I'm sorry.

Q.    Yeah, sure.  So is MSA prepared to identify

# EXHIBIT 11

Bower, Alan
February 25, 2026

Page 13

A.    Understood.

Q.    **Do you recall ever participating in any kind of counseling with Dr. Iovino in which you addressed some aspect of her performance?**

A.    Yes.

Q.    **Okay.  Tell me what you remember.**

A.    She was counseled, as far as I can remember sitting here today, for not being able to manage her time properly as a part-time veterinarian.

Q.    **Okay.  So tell me what you recall about that.**

A.    She was a part-time veterinarian who could only be billed certain amount of hours.  She was given those hours.  She knew how many hours they were, and she would consistently exceed those hours.

Q.    **All right.  Okay.  So she must've been regarded as very motivated, then, to help the dogs, correct?**

MR. WARD:  Objection:  Mischaracterizes, leading, argumentative.

Q.    **Answer.**

MR. WARD:  Bunch of other stuff.

A.    No.

Q.    **No?  You -- did you not know about the CEO of MSA in April of 2017 writing her this big commendation letter for going above and beyond the call of duty?  You**

**Bower, Alan**
**February 25, 2026**

Page 14

didn't know about that?

MR. WARD:  Objection:  Mischaracterizes, argumentative, "big commendation letter."

Q.     Go ahead.  Answer.

A.     No.

Q.     All right.

A.     I don't recall that at all.

Q.     All righty.  Thank you very much.  All right. Did you play any role in writing Dr. Iovino up for any of her performance or conduct problems?

MR. WARD:  Objection:  Vague, compound, vague as to time.

Q.     Go ahead.

A.     I can't recall if we actually wrote her up or verbally counseled her, to be honest with you.

Q.     All right.  So as you sit here today, you have no recollection of ever having generated any writing complaining about Dr. Iovino; is that correct?

MR. WARD:  Objection.

A.     As I sit here today --

Q.     Go ahead.

A.     I don't recall.

Q.     All right.  Thank you.  All righty.  Did -- do you recall whether or not in 2017 MSA had an HR department of some sort?

Bower, Alan
February 25, 2026

Page 15

A.    Yes.  I believe they did.

Q.    And was HR involved in this counseling that you gave to Dr. Iovino?

MR. WARD:  Objection:  Vague as to "involved," as to "this counseling."

Q.    Answer.

MR. WARD:  As to time.

A.    I don't recall.

Q.    Okay.  Do you recall HR ever being involved in any kind of personnel issues at the CVC in 2017?

MR. WARD:  Objection:  Vague as to "involved."  At least we got --

Q.    Go ahead.

MR. WARD:  -- the time nailed down.

Q.    Answer.

A.    No, not really.

Q.    Okay.

A.    I mean, I don't recall any HR interventions whatsoever.

Q.    Okay.  And how do you know they even had an HR department?

A.    Well, the HR department was in New York City where our headquarters is.

Q.    Did you ever get to go up there?

A.    I've been there once, yes.

**Bower, Alan**
**February 25, 2026**

Page 17

proposal before Dr. Iovino's job came to an end where there was no part-time position in there?

A.    I don't remember if I did or not.

Q.    All right.  Did you ever talk with anyone from the State Department about Dr. Iovino's job coming to an end because her part-time position was written out?

MR. WARD:  Objection:  Vague as to time, and compound.

Q.    Go ahead.  Answer.

A.    No, I didn't.

Q.    Okay.  Now, my understanding is that at some point in time, I believe it was -- I can't remember the date, maybe you do -- that Dr. Iovino was put on paid administrative leave.  Do you recall that?

A.    Yes.

Q.    Okay.  Do you remember what date that was?

A.    No.  No.

Q.    Okay.  I think it was August 4th of 2017, so we'll kind of go with that; on or about August 4th of 2017. Do you know why she was put on paid administrative leave?

A.    At the time, she was threatening other employees to go to the media.  So it wasn't my determination, but a determination was made to put her on administrative leave while we investigated.

Q.    And how do you know that she was threatening

Bower, Alan
February 25, 2026

Page 18

with -- threatening other employees that she was going to the media? How'd that come to your attention?

A. I mean, I spoke with someone about it. Who it was, I'm not sure. It could have been Gerald Goss, could have been Mike Ratcliff. I don't recall.

Q. Okay. And so when you asked Dr. Iovino, you know, along the lines of, "Wow, you're threatening to go to the media," what did she say?

A. I didn't.

MR. WARD: Objection: Calls for speculation.

A. I wouldn't --

Q. You mean you didn't ask her about it?

A. I didn't investigate it, no.

Q. You put her on paid administrative leave and you never asked her to her face about it?

A. Correct.

MR. WARD: Objection: Argumentative. Thad, I don't know what's --

Q. Why is that?

MR. WARD: -- in your cornflakes today, Thad, but your whole line of questioning today is totally different than the way you usually have done it. You're very aggressive. You're very argumentative. I'm going to object a lot. You do what you got to do, but, you know...

MR. T. GUYER: Thank you, Dan. Thank you so much,

# EXHIBIT 12

**Sharon James 30b6 DoS**
**February 26, 2026**

Page 32

MS. FRITH:  I should clarify that the Touhy approval letter says that the request 1 is granted and that the department will provide a deponent to speak to the department's general practice and policy of involvement or non-involvement in a contractor's employment decisions and any related information specifically concerning Dr. Iovino in 2017.

MR. GUYER:  Okay.  Great.  Wonderful.

MS. FRITH:  And so, Ms. James, I think you can provide the answer that you prepared for this --

MR. GUYER:  Yes.

MS. FRITH:  -- based on that approval.

MR. GUYER:  Yes.  I agree.

Q.    **You can just give us whatever answers you are --**

A.    Sure.

Q.    **-- prepared to give.**

A.    So in response to this, The department is not involved in employers' decisions with their employees. Contractor personnel are not government employees.  They're employees of their respective company and not subject to the same rules, regulations as that of federal employees. Contractor personnel are subject to the terms and conditions of their employment contracts or agreements, as well as the terms and conditions of their employers'

**Sharon James 30b6 DoS**
**February 26, 2026**

Page 33

contract with the government.

Q.    Okay.  And then we'll go on to matter 2.  If you already just have the answers, you know, I don't want to, you know, waste any time here at all.  So if you're able to then just read to us what answer you prepared to give as to matter 2.

A.    Okay.  In response to Topic 2?

Q.    Yes.

A.    Okay.  Just pointing out that information within the department is shared on a need-to-know basis, policy guidance.  Where information is shared, an individual has a -- and an individual has a legitimate work-related program that requires access to perform their specific job functions; information can be shared.  Ms. Read's sharing of information was appropriate in her role as head of contracting activity, and she did so in a professional manner to inform program leadership of an OIG complaint.

Q.    Okay.

MR. GUYER:  Now, Krista, just for the record, I'm going to ask the first question on No. 1, which I understand you're then going to say that Touhy says no to that or whatever.  You'll instruct her not to answer.

Q.    One is, I'm asking you this question now, Ms. James, but I understand you'll be told not to answer.  Does

**Sharon James 30b6 DoS**
**February 26, 2026**

Page 37

to the hours, sir.

Q.    Okay.  Thank you very much.

A.    Mm-hmm.

Q.    And if I understand your answer, the Department of State did not direct MSA to -- that it had to make that a competitive position with a job posting; is that correct?

A.    The department requested a contract amendment as a contract change to make the previous part-time position a full-time position and does, again, not get involved in how the company would have gone about in fulfilling that contractual requirement.

Q.    Thank you very much.

MS. FRITH:  And, Thad, based on the way some of these -- this information has come out, I need to rescind my prior objection to Exhibit 10.  So if you want to re-bring up Exhibit 10 and ask her about that, I think it falls within the realm of what we've been discussing of the approved area of Topic 1.

MR. GUYER:  Wonderful.  I only say "wonderful" because it's just going to make life easier.  All right. So we're going to display Exhibit 10, which is our little contract.  And I only got one question on it anyway, so...

THE GUARDIAN:  Are you able to see that okay, Ms. James?  You're muted.  You're muted, Ms. James.

# EXHIBIT 13

Q.    So you didn't reach out to the media until December of 2018?

A.    Correct.

Q.    And that was after you left MSA?

A.    Correct.

Q.    And when you reached out to the media, did you know that the IG had made a finding that this was not enforceable?

A.    Absolutely.

Q.    Okay.  And so your first contact with the media was in December of 2018?

A.    I believe so.  It was in the -- at the end of 2018.  I can't give you the exact date.

Q.    And how did that occur?  Did you reach out to the media or did they call you?

A.    I reached out to them.

Q.    And who did you reach out to?

A.    Ellen Nakashima, I believe her name is. I apologize for getting it wrong.

Q.    Nakashima.

A.    Yes.  She directed me to Carol Morello, who works at "The Washington Post".  I spoke to David



that made you think the walls were closing in?

A.    We; re specifically talking about July now.  Correct?

Q.    Talking about your state in mind in July.

A.    Okay.

Q.    So things previous to July could relevant to your state of mind in July.  Correct?

A.    Correct.

Q.    Okay.  So we're finally on the same page.  So tell me how you felt in July of 2017 that the walls were closing in?

A.    Well, there were the things I stated there of missing the -- not being invited to the computer meeting, not being on the call with the Jordanian mentors, and not being part of the web design for the medical records system.  There was also the lack of assistance that I was requesting for the licensed veterinary technician, the licensed -- by Virginia law, there are certain things that only a veterinarian and a licensed technician can do, and in order to run a full-service hospital, I needed a

Q.    Anything else?

A.    I told him I might go to the media.  He was also aware I was being -- I was told I had to apply to my position instead of just sliding into the full-time position.

Q.    And when you said you might go to the media, what did Jonah say?

A.    I don't recall if he addressed that, but he did say it was unfair that I was not getting position because I was the obvious candidate.

Q.    But at the time, you hadn't not gotten the position; you were just made to apply for it.  Right?

A.    Correct.

Q.    So a decision hadn't been made when you had that discussion with him --

MR. ADAMS:  Objection.

BY MR. WARD:

Q.    -- and Ben Orndorff that you know of?

MR. ADAMS:  Objection, speculation.

THE WITNESS:  I don't know.

BY MR. WARD:



Q.    I'm trying to understand.  Jonah said it was unfair you weren't getting the position; is that what you just said?

A.    Correct.

Q.    Had you not gotten the position then?

A.    I was having to apply for the position when it was -- I was led to believe that I was just going to transition from part time to full time.

Q.    Now, when you say led to believe, you just mean based on that one conversation with Dr. Ratcliff?

A.    Yes.

Q.    Ben Orndorff was with Jonah when you had the discussion about going to the media?

A.    Yes.

Q.    Does he know anything else?

A.    Not that I recall.

Q.    Josh Carter, we know about.  We know about Mike Hayes.

Cathy Read, how did it come to be that you had a conversation the Cathy Read?

A.    Well, Cathy Read, as you know, was the

acquisitions manager.  Thereby, under Section 4712, I was allowed to speak with her, and I knew that she was a big dog lover, heard that she somehow got tennis balls banned from working dogs when one choked on it, a pretty big thing.

Q.    Is that a thing?

A.    It actually is.

Q.    Okay.  I'm asking as a dog owner.

A.    Yeah.  Don't do it.

Q.    Is it the fur?

A.    No.  They can get --

Q.    Okay.  My dogs can't.

Working dogs can break them apart, you mean?

A.    No.  They could literally squoosh it and swallow it.

Q.    Oh, my god.  Okay.

A.    Yes.

Q.    I have Cavachons.  So they can't. They're tiny?

A.    I'm so sorry you have that kind of dog.

Q.    They're wonderful, the best dogs I've ever had.  I have two of them.

So she got them banned?

A.    Yes.   So and Cathy Read was instrumental in standing up the validation center and she had come through for a site visit and I was introduced to her, but it was just kind of in passing.  Then when I filed my OIG concerns on July 6th and I didn't hear anything and we had a group of dogs getting set to go to Jordan, I was very concerned about that, because this was a class that told me they were concerned about care of the dogs.  I called her.

Q.    When did you call her?

A.    The end of July.

Q.    So you filed the complaint on July 6th. Was that -- you mean the hotline complaint?

A.    If filed the -- yes, hotline complaint, yes.

Q.    On July 6th?

A.    Correct.  2017.

Q.    And then you hadn't heard anything in a few weeks and so you called Cathy Read?

A.    I had heard from David Holmes from the IG and he expressed his concern that when he started

Q.    I understand that, but just when you made that hotline complaint, as you said, things weren't getting done, so I called Cathy Read three weeks later, did you expect that was something that was going to take a matter of days or weeks or what?

A.    I was hoping that when I made my complaint that they would halt the program until they investigated so that the dogs that were currently in the United States would not be sent to Jordan.

Q.    So you were hoping that a hotline tip would halt the program?

A.    Yes, in order to not have dogs die or humans die.

Q.    Meaning right away?

MR. ADAMS:  Objection to the form of the question.

THE WITNESS:  I don't know how to answer that.

BY MR. WARD:

Q.    Well, sooner than when you called Cathy Read; you thought it would take less than three weeks for that to happen?



A.    Yes.

Q.    Did you just have that one contact with Cathy Read?

A.    Well, I had contact over several days. I mean, I talked to her and then I emailed her and then I re-emailed her when I hadn't heard back from anybody at the IG. So it was in a period of a few days. So I had numerous -- a couple of contacts with her.

Q.    After you re-mailed her when you hadn't heard from the IG, did you hear back from her?

A.    No.

Q.    Did she just stop responding?

A.    Correct.

Q.    Loren Bachman, who is Loren Bachman?

A.    Loren Bachman was at the time a Department of Stat employee that came on site occasionally. He worked with Josh Carter.

Q.    So what discoverable information regarding your protected disclosures and activities would he have?

A.    Well, it would be with conversations

I just want to tell you that Alan Bower told me not to talk to you.  And I said, Well, why is that?  And she said, He didn't really say; he just said not to talk to me.

Q.    And that was August 2nd?

A.    Yes.

Q.    And then what day were you suspended?

A.    August 4th.

Q.    August 4th.  Was August 2nd -- what day of the week that was?

A.    It would be a Wednesday.

Q.    So on August 3rd, did anything happen?

A.    I didn't go to the front desk.

Q.    Did you go to work?

A.    Yes.

Q.    And you're certain that the Amy Callihan conversation occurred before August 4th?

A.    I'm absolutely concerned, because I was still in the building and I have a contemporaneous note to that effect.

Q.    And did you share those contemporaneous notes --

Q.    The complaint says unusual practice and you just testified --

MR. ADAMS:  Objection to mischaracterization of her testimony.

THE WITNESS:  Can you repeat the question?

BY MR. WARD:

Q.    You just testified that this being called to the conference room on the PA had never happened before; is that right?

A.    Not to my knowledge.

Q.    Okay.  And here, in the complaint, you say it's an unusual practice that ensured that all employees -- ensured that all employees were aware of the identity of the employee getting reprimanded. I'm trying to understand if something has never happened before, then how then can that be viewed as that's going to ensure to everyone that they know I'm getting reprimanded?

A.    I guess you had to be there to understand it.

Q.    Okay.  And was it a reprimand?

Tell me about that meeting.



2017 and until MSA terminated her, Dr. Iovino's coworkers told her on numerous occasions that they had firsthand knowledge of Mr. Bower describing Dr. Iovino as, quote, a troublemaker and, quote, and, quote, a pain in the ass.

So what I'm trying to understand is which of your coworkers told you on which numerous occasions that they had firsthand knowledge of those two things?

A.    I already explained I don't remember the dates and it was -- I don't remember the specific individuals, but it was the kennel technicians and the trainers.

Q.    That told you that they were told that Bower called you a troublemaker and a pain in the ass?

Those have quotes around them.

A.    Yes.

Q.    Kennel technicians said that?

A.    Yes.

Q.    Okay.  Next page, 41:  "In early 2017, Mr. Carter successfully pressured Mr. Roberts to step

down as MSA program manager."

Can you explain that?  How did he successfully pressure him?

A.    You mean Mr. Carter?

Q.    Yeah.  Mr. Carter successfully pressured Mr. Roberts.

A.    By, one, constantly harping on everything he did, not listening to Mr. Roberts when he was trying to get SOPs in place for the working dogging overseas, and just a general animosity from Mr. Carter towards Mr. Roberts.

Q.    Anything else?

A.    Not that I can think of at this time.

Q.    And that's what you were thinking of when you approved this paragraph?

A.    Yes.

Q.    Okay.  Paragraph 43, same page, you recall a February 13th meeting between you and Mr. Hayes.  Can you tell me about that meeting.

A.    Mr. Hayes was the new program manager and he was having face-to-face meetings with all the employees and he asked to speak to me, and in that

meeting, he asked how the ATA hospital is running, and I told him how things were going and that I was having difficulty getting some of my mission-critical tasks completed and that I was required to have a licensed technician by the State of Virginia and that technician was working mostly on WPS side.

He asked for specifics. So I did tell him about Ms. Houston leaving early, coming in late, not showing up, having alcohol on her breath, about her almost fatal mistake with one of the working canines, and he told me that the days of hiring friends are over and he was sorry I had to experience that and hugged me before he left.

Q. The near fatal mistake that you just referred to, when did that occur?

A. That occurred in December of 2016.

Q. Okay. So the last sentence of this paragraph 43, you say: "As they wrapped up, Mr. Hayes hugged Dr. Iovino and apologized to her for that ugly episode as well as the painful and stressful treatment she had received that day."

So what ugly episode are you referring to?



A.    Being called into the conference room.

Q.    And the painful and stressful meeting was them telling you you're working too hard?

A.    Yes.

Q.    Okay.  Paragraph 49 on page 14, here, you reference disclosing to Hayes, Bower, and Olds your concerns of false or fraudulent government billing, and I'm wondering, was that one conversation or a series of conversations you had?

A.    It was different conversations.  I talked to Mr. Olds alone in the conference room or -- excuse me -- in the hospital about me not being paid for coming in to take care of Frank and I told Alan Bower that I was uncomfortable with being told to take PTO and not submit it into the HR system, Bamboo, and I told Mike Hayes the same thing, that I was uncomfortable with that.  I felt it was timesheet fraud, but I requested those days off, and what else was I supposed to do?

Q.    So you -- so it's three separate conversations, at least three separate conversations?

A.    That I recall, yes.



A.    No.  I had just learned about them.

Q.    And so throughout your time at CVC, you never had gone to those meetings?

A.    No.

Q.    And then you offered to attend?

A.    Um-hum.

Q.    But you say Dr. Ratcliff denied your request.  Did you request to attend or offer to attend?

A.    I verbally requested to attend.  It was my day off and I was going to come in to attend it.

Q.    Okay.  So given the timesheet issues that you raised, wouldn't that create a timesheet issue?

MR. ADAMS:  Objection, calls for speculation, objection to the form of the question.  It's vague.

THE WITNESS:  I wasn't going to charge them for coming in.

BY MR. WARD:

Q.    Okay.  Paragraph 55, you say:  "In May of 2017, Dr. Ratcliff promoted Brett Harshberger to lead kennel technician."



And when you -- and that you protested, "when she protested", meaning you, "to Dr. Ratcliff, he stated that it had been done so Dr. Iovino could focus on the ATA hospital.

Is it your contention that the promotion of Brett Harshberger was taken as a retaliatory act against you?

A.    Yes.

Q.    And retaliation for what?

A.    Me continuing to bring up my concerns about the dogs.

Q.    Paragraph 59, page 16, this is regarding a June 2017 disclosure by you to Doc Ratcliff that the canine handlers from the Kingdom of Jordan had describe to her their concerns with the treatment of canines gifted to Jordan, specifically, that they're working heat, all of these things.

Do you know the names of those canine handlers?

A.    No.

Q.    Were they Americans or Jordanians?

A.    They were Jordanian students.



Q.   They were Jordanian students, okay.
And was that done orally?

A.   Yes, through an interpreter.

Q.   So it while they were there training?

A.   We were in a classroom and I was going over hyperthermia, and then several of them raised their hands and spoke through an interpreter, and they put the temperature in Celsius, which we don't work in Celsius here.  So the ATA trainer who was sitting in the room, Sam Waiter, did the math really quick on his phone and told me it was 140 degrees, to which I got very concerned.

Q.   One-four-zero?

A.   One-four-zero.

Q.   In the kennel?

A.   No.  In the Dead Sea where they were working.

Q.   Okay.  So outside, it was 140?

A.   Yes.

Q.   And so you took that information to Dr. Ratcliff?

A.   I did.



Q.    Okay.  Paragraph 70, page 20, you say:

"On July 6, 2017, Mr. Hayes instructed Mr. Roberts to

leave the premises for 10 days."

Do you know why he instructed him to leave the

premises for 10 days?

A.    No.

Q.    Mr. Hayes.  No?

A.    No.

Q.    Next paragraph, 71:  "In mid-July 2017,

an unnamed Bureau of Diplomatic Security Agency

official provided Dr. Iovino's name and the substance

of her OIG hotline complaint to various MSA

officials."

How do you know that?

A.    Josh Carter yelling in the hallway that

the whistleblower would be fired and the fact that

Cathy Read told me she forwarded my concerns.

Q.    So who is the unnamed D.S. official?

A.    I don't know.  How do I know who an

unnamed person is?

Q.    Okay.

MR. ADAMS:  Maybe that's why she has a

