# EXHIBIT A

# EXHIBIT 004

Deposition of MSA 30 b 6
February 24, 2026

CEO Commendation Letter Apr 2017

Bates: IOVINO_00000036 (1 pp.)



## MSA SECURITY

**IN THE BUSINESS OF BUSINESS AS USUAL™**

NATIONAL CAPITAL REGION | 703-391-6014
NEW YORK | 212-509-1336
BOSTON | 617-438-0521
MIDDLE EAST | + 971-2-550-6760

April 19, 2017

Dr. Iovino,

On behalf of the entire MSA Security team, we wish to extend our sincere thanks and appreciation for all of your above-and-beyond efforts with Frank 9656. Frank is happy, healthy, and well-traveled down the road to recovery in large part to the care and compassion which you provided.

Frank suffered serious traumatic injuries to his right rear leg and toes, along with severe damage to the tip of his tail during the morning of March 16, 2017. You selflessly rushed in on your scheduled day off to provide emergent care and surgery. You stepped up and did an incredible job leading the team that provided the immediate surgical care. During the days that followed you continued to display the highest quality medical care and compassion in your efforts to treat the injuries and manage his pain.

As expected, the injuries progressed to where the leg required amputation. While performing the surgery you displayed an unparalleled amount of surgical skill and poise, successfully amputating the leg without complications. We fully understand and appreciate the high stress levels involved with these types of procedures. Your selfless actions during the surgery truly personify the high level of care that we provide to our canine patients, and service to our clients.

Your compassion and medical expertise remained steadfast throughout Frank's recovery. We recognize and thank you for all of the early mornings and late nights that you spent both on-site providing care, and from home constantly thinking and formulating medical plans to aid in recovery. In regards to recovery, you again went above-and-beyond to borrow a brand new Class IV therapy laser. Your compassionate calls for assistance were answered by the company express shipping the laser to use on Frank. Adding laser therapy to his recovery treatments truly helped expedite the excellent recovery that we still see today.

Through several more surgeries, numerous sedations, and countless bandage changes; Frank has fully recovered from his injuries. He has sense been adopted into the best of homes that will still allow him the option of visiting the CVC on a very regular basis. You were instrumental in this great outcome.

As we constantly strive to provide the best industry-leading veterinary care to our canines, this translates into us providing our clients with nothing short of the best. On behalf of the entire MSA team, the Canine Validation Center, Frank Olech, and all of our Canines worldwide; thank you for the outstanding job!

Michael O'Neil
Chief Executive Officer
MSA Security

9 Murray Street, 2nd Floor, New York, NY 10007
Phone: 212.509.1336 Fax. 212.509.1372 Web: www.msasecurity.net

**Exhibit 004**
MSA
02/24/26

# EXHIBIT B

# EXHIBIT 009

Deposition of MSA 30 b 6
February 24, 2026

Suspension Memo Aug 4

Bates: IOVINO_00000045 (1 pp.)

000024

August 4, 2017

Today at approximately 7:30am when I arrived at the CVC, Alan Bower and Mike Ratcliff were waiting for me at the door. Alan asked to speak to me. He ushered me into an empty office(Mike Hayes'). Mike also entered the office.

Alan informed me effective immediately I am suspended for disclosing confidential information. I asked if it was with or without pay. He said I should contact Peter Deegan. He asked if I had his contact information. I indicated 'no' and Alan provided his phone number on a piece of paper. I asked if I was allowed to go to the hospital to remove my personal items such as veterinary books and pictures. He said 'no', they would be returned to me.

I informed both Mike and Alan that Virginia Board of Veterinary Medicine requires 5 days notice on change of 'veterinarian in charge' and since I cannot provide that, the hospital should not be utilized.

Alan then asked for my key fob. I had two additional keys on the key ring. I informed Mike one was for the controlled drug lock box in the refrigerator and one was for the safe.

I was then escorted out of the building.

<table>
<tr><td><b>Exhibit 009</b></td></tr>
<tr><td>MSA</td></tr>
<tr><td>02/24/26</td></tr>
</table>

IOVINO_00000045

# EXHIBIT C

# EXHIBIT 016

Deposition of MSA 30 b 6
February 24, 2026

Ratcliff Declaration Jul 2019

Bates: IOVINO_00000502-IOVINO_00000508 (7 pp.)

MSA000319

MSA Security                             :

                                       :

                v.                        :      **OIG Whistleblower Case 2017-0044**

                                       :

Karen Iovino                          :

## DECLARATION OF DR. MICHAEL RATCLIFF
## TO SUPPLEMENT THE ADMINISTRATIVE RECORD

I, Dr. Michael Ratcliff, declare under the penalty of perjury:

1. I am over the age of 18 years old and have personal knowledge of the matters stated below.

2. I am a licensed veterinarian in the State of Virginia and was hired as the Lead Veterinarian for the Canine Validation Center ("CVC") by Michael Stapleton Associates, Ltd. d/b/a MSA Security ("MSA") in November of 2016.

3. As the Lead Veterinarian at the CVC, it was part of my duties to supervise Dr. Karen Iovino ("Iovino").

4. Iovino was never demoted and never held the position of "Lead Veterinarian" while working for MSA.

5. As a part-time veterinarian at the CVC, Dr. Iovino consistently displayed a lack of professionalism, often contradicting her managers and berating her co-workers. Iovino was overtly hostile and insubordinate to her corporate leadership team, and in particular to me, to whom she reported.

6. Her demeanor was consistently negative in that she complained voraciously about other people and operations generally, being intensely critical of the most mundane of events and openly shared this disdain and a self-imposed sense of importance and superiority in her daily interactions. This had an obvious negative effect on the moral and drive of CVC personnel.

Exhibit 016
MSA
02/24/26

IOVINO_00000502

7.  On November 14, 2016, soon after I was hired, I invited Iovino to a briefing meeting with the CVC's then Program Manager Zane Roberts. Upon entering the meeting, Iovino said to me, "I feel like the whole process, and the way you were brought in, was bullshit." After that, she constantly interrupted the meeting to interject, saying repeatedly "I have a problem with this," without any particular reason.

8.  Iovino tended to interrupt technicians during their duties and insist that they drop their work and attend immediately to her concerns, no matter how small. I counseled her on the negative impact of her interruptions and advised her to allow technicians and personnel to attend to their mission-critical work first before assisting her on routine matters such as clean up, but she was unresponsive to the counseling.

9.  Iovino's negative attitude did not improve with time, nor did her constant challenge and disrespect to authority figures.

10. On December 30, 2016, Iovino emailed me to demand why I and one of the veterinary technicians had left for the day. I had permitted the technician to leave early that day as there were no critical tasks that necessitated staying late, particularly on the last business day before the New Year's holiday. I explained to Iovino that there seemed to be minor record-keeping left and that is why I allowed the technician to leave early. Iovino replied to me by listing the cleaning tasks that had yet to be completed which to be seemed ludicrous, endemic of her being generally disgruntled and specifically targeted at challenging my authority. I concluded the email by writing that I would not engage in an argument over email.

11. On January 4 2017, Alan Bower and I met with Iovino to discuss proper protocols for requiring staff to stay late as well as the negative attitude she often displayed at work. We counseled her on this behavior, but the counseling was ineffective.

2

IOVINO_00000503

12. On February 27, 2017, Dr. Iovino emailed me to follow up on a purchase order I had missed. I acknowledged my oversight with the order, and jokingly suggested that I would do push-ups for my error. Dr. Iovino responded by stating, "Men!...Keeping track of you all is a FT job sometimes." I found these statements to be offensive and inappropriate.

13. Iovino was repetitively vocal about her opposition to our transferring canines to foreign governments, a critical mission of MSA and the Department that she was specifically employed to support and a key component of MSA's contract for the Department.

14. Iovino took every opportunity to express negativity about this program and point out the potential related issues at every juncture, as if MSA was engaging in wrongdoing at the Department's request. This obviously had an effect on morale at MSA.

15. Iovino's insubordination, lack of professionalism, poor leadership and failure to correct behavior she was counseled on would have justified MSA terminating her at-will employment at any time. She certainly was not a "phenomenal employee" as the OIG Report wrongly asserts.

16. In May 2017, the Department of State indicated to MSA that it wanted MSA to replace the part-time CVC veterinarian position held by Iovino with a new full-time position.

17. This change was required by the growing scope of the CVC program and the increasing operational tempo which demanded greater veterinary resources to maintain the well-being of the dogs.

18. The Department foresaw an increased need to send the veterinarians overseas and work in potential combat areas where its explosive detection canines were utilized and so indicated a preference that the new full-time position be filled by someone with military background and international experience.

3

IOVINO_00000504

19. Iovino overtly state on several occasions that she herself did not want to travel overseas and did not want a full-time position such as the position she now claims that she was wrongfully denied.

20. MSA posted the new full-time position online and accepted resumes. I explained to Iovino, via email, on July 17, 2017 that she had to apply online "because it's a new CLIN with a new PD (and bio approval), you'll need to submit your resume again through the website."

21. Iovino's claim that I offered her this position in February 2017 is false. I never offered her a position then or at any other time.

22. When I told Iovino about her old position ending and needing to apply online for the new position (if she was interested), I had no idea that she had filed complaints with the EEOC and the OIG.

23. Iovino applied for the new full time veterinary position on July 17, 2017.

24. Iovino's interest in applying came as a surprise to me, given her past unwillingness to work full-time or travel, as well as her failure to apply for the previous two-full time veterinarian positions added during her tenure with MSA.

25. The only time she expressed any willingness to work "full-time", she immediately caveated it by saying she would have to have a modified schedule providing for three very long days and one half-day.

26. MSA received four on-line applications the new position. After an initial review, we narrowed down the candidate pool to Iovino and Dr. Lee Palmer.

27. After deliberation, we ultimately chose Dr. Lee Palmer for the full-time position on July 25, 2017.

4

IOVINO_00000505

28. Due to Iovino's lack of military background or any international experience, we found her to be only minimally qualified for the new position. Additionally, Dr. Iovino's lack of support towards the mission, inadequacies in leadership skills, and her inability to work well with managers and subordinates alike also precluded her from being selected for the position in which international missions and diplomacy were key components.

29. Based on my extensive first-hand experience working with Iovino, I was certain she would not serve MSA and the Department effectively as an ambassador and leader for international missions. We conferred with Department personnel at the CVC who had likewise observed Iovino's lack of professionalism first-hand, and confirmed that the Government would not have been comfortable with MSA engaging Iovino in the newly-created position.

30. Dr. Palmer's vast military and professional experience made him the ideal candidate.

31. Dr. Palmer's credentials for the position vastly overshadowed Iovino's. Iovino's (3) page resume showed that her experience was limited to the general practitioner level. In contrast, Dr. Palmer's resume, which was twelve (12) pages long, listed relevant emergency care experiences, various leadership roles within the Army Reserves, peer reviewed articles, publications, lectures and teaching positions. Moreover, Dr. Palmer was also certified as an Emergency Medical Technician ("EMT"), which we found useful and highly relevant given that the position would require travel to combat zones.

32. On August 4, 2017, veterinary technician Jennifer Houston told me that two of the kennel technicians, Jonah Ballenger and Ben Orndorff, told her that Iovino was threatening to go to the media, including the Washington Post, with concerns about the CVC which purportedly included confidential information. I spoke with Ben Orndorff, who confirmed that Iovino had made this threat.

5

IOVINO_00000506

MSA000324

33. On August 4, 2017, MSA placed Iovino on administrative leave to investigate Iovino's threats to disclose confidential and sensitive information to the media. True to her character, Iovino reacted to the news of her being placed on leave in a highly unprofessional fashion – by threatening to call the state veterinary board and have the CVC's veterinary facilities shut down.

34. On March 26, 2018 I was interviewed by OIG Investigators. I was infuriated after reading the July 5, 2018 OIG Report, alleging that I knew of Dr. Iovino's protected disclosures when selecting Dr. Palmer for the full-time position.

35. As written in the report, that statement is false. I told the OIG that I did not become aware of the disclosures until after Dr. Iovino was terminated.

36. The question from the OIG during my interview was simply, "Are you aware that Iovino has filed complaints?" to which I replied something to the effect of "yes, that assumption can be drawn based on your [OIG] opening interview comments stating such." I then went on to tell the OIG that I did not become aware of these complaints until after her termination. Any insinuation that I had previous knowledge is categorically false.

37. Iovino was not suspended or fired because of any disclosures she made to the OIG. MSA encourages its employees to report suspected misconduct, including to the OIG.

38. MSA also later learned that Iovino wrongfully and secretly euthanized the pet of another MSA employee during her workday in the CVC parking lot in October of 2016.

39. In doing so, she used controlled medications purchased under Iovino's DEA license for (and billed to) the Department.

40. Iovino improperly directed a CVC veterinary technician to assist her in this procedure, which was performed during the workday with the labor for both Iovino and the technician billed to the Department.

6

IOVINO_00000507

MSA000325

41. Iovino then created a false medical record documenting the procedure by stating that the patient's owner was "MSA-CVC."

42. Although MSA only discovered this misconduct after Iovino's employment with the company had ended, this episode confirms Iovino's willful disregard for procedure and her untruthfulness.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated: July 05, 2019

Dr. Michael Ratcliff

7

IOVINO_00000508

# EXHIBIT D

(b)(6) McDermott

**Exhibit 39**

01/09/26 dsk

Interview with Karen Iovino

Date: November 2, 2017

Participants: Jeff McDermott, Lisa Warffeli, Nate Adams

Dr. Iovino worked for MSA Security (MSA) from October 2015 until August 2017. Dr. Iovino began documenting concerns she had with MSA in April 2016. She had multiple concerns with MSA including treatment of staff, hiring of friends, and treatment of the dogs.

Iovino learned that the dogs gifted by the Department of State's (Department) Bureau of Diplomatic Security (DS) to other countries were being mistreated. Iovino provided the example of the dogs working in 140 degree heat near the Syrian border and at least one dog dying of dehydration. The conditions the dogs lived in were deplorable as well. When the trainers complained, they were fired by MSA.

Iovino also was concerned about MSA hiring friends to fill positions. Iovino was forced to hire a veterinary technician who arrived to work with alcohol on her breath and almost killed a dog out of negligence. Trainers and handlers were hired who were friends of other MSA personnel and who may not have been qualified for the positions because dogs were unable to consistently locate explosives.

Iovino complained about the living and working conditions of the dogs overseas as well as the veterinary technician to her chain of command. She then complained to Cathy Read, Director of the Department's Office of Acquisition Management. Read told Iovino to contact the Department's Office of Inspector General (OIG). Iovino contacted the OIG on July 6, 2017.

Iovino believed MSA learned of her complaint on July 10, 2017 because after that date she was no longer included in meetings and no one would speak with her. Also, MSA withdrew its offer to Iovino for a full-time veterinarian position. Iovino explained that in February 2017, she had a long conversation with Michael Ratcliff where he asked her if she would work at MSA's facility full-time. Ratcliff told her the trainers liked working with her. She said the issue she had with the offer was that she was to work full-time at the facility. Ratcliff offered her the ability to work three long days and then half-days the other two days and be on call 24/7. On July 17, 2017, she informed Ratcliff that she would accept the position. On August 1, 2017, she was notified that there would be no full-time veterinarian and MSA would be creating a new position. She was notified that she would have to apply for this new position. Iovino then applied. On August 4, 2017, Iovino was met at the door by Michael Ratcliff and Alan Bower and was informed she was suspended for disclosing confidential information. They referred her to Peter Deegan for more information. Deegan told her she was suspended with pay and he reminded her of the confidentiality agreement she had signed. On August 18, 2017, Iovino was informed by letter that her employment with MSA was terminated.

Iovino was not allowed to access the hospital or the lab where any controlled drugs were kept. Iovino is required by the Virginia Board of Veterinary Medicine to provide a five day notice of a change in employment. Because MSA suspended her with no notice and then terminated her, she was unable to provide the five day notice. Iovino is also required to do a count of all controlled substances, which she was unable to do because MSA would not allow her into the lab. Iovino had copied the drug books prior to August 4, 2017. MSA put both her veterinary and DEA licenses at risk by suspending her and terminating her employment in the manner they did.

Interview with Peter Deegan, Vice President for Human Resources, MSA Security

Date: November 15, 2017

Participants:

Jeff McDermott, OIG

Lisa Warffeli, OIG

Valerie Price, Counsel, MSA Security

Mr. Deegan stated that certain MSA employees at the Canine Validation Center (CVC) alerted Alan Bower that Karen Iovino had threatened to go to the press with certain information. The information she was planning on sharing pointed to the fact that she had been in a restricted area, a private office at the CVC. Bower brought the issue to Gerald Goss, MSA's Vice President for Business Development.

Deegan was on vacation when these events occurred, but when it was brought to his attention, he stated that he decided that she should be suspended. Deegan was concerned because Dr. Iovino was speaking to clients and to other MSA employees about her concerns, which raised protocol issues because Iovino did not first raise them with anyone in her chain of command at CVC, such as Gerald Goss, Michael Hayes, Alan Bower, or Michael Ratcliff. Deegan stated that the information was not classified, and he is not sure if classified information even resides at the CVC.

Deegan asked clients and Iovino's colleagues about what Iovino had said, but never figured out how she got access to the information. Deegan also asked Iovino how she had gotten the information, but she refused to tell him.

Gerald Goss conducted the investigation of Iovino's conduct for MSA. Documentation was sent to the contracting officer, Ana Garcia, on September 4 regarding Iovino's suspension. Deegan is not sure how Cathy Read (AQM) found out about the concerns that Iovino was raising.

Deegan stated that earlier in 2017, the Department of State expanded its canine assistance under the Anti-Terrorism Assistance program, which necessitated the need for a full-time veterinarian. Dr. Iovino was only part-time, and therefore, MSA officials (including himself) decided that she should have to apply for the full-time position. Deegan stated that Iovino had applied for the full-time position, but other individuals did as well who he (and Dr. Michael Ratcliff, the selecting official) believed were more qualified.

Deegan stated that prior to the vacancy announcement, MSA already had concerns with Iovino's performance, including that she was disagreeable and prickly and resisted coaching on these issues. Deegan promised to send documentation of these issues, some of which were prepared as part of the EEO case that Iovino filed.

Deegan stated that the Department of State contract with MSA required overseas and military experience. According to Deegan, MSA did not think Iovino would be accepted overseas because of her

DOS OIG000137

lack of diplomacy. Deegan stated that he has never heard that Ratcliff offered Iovino the full-time position before it was announced.

Interview with Alan Bower, Deputy Program Manager, Canine Validation Center (CVC), MSA Security

Date: November 16, 2017

Participants:

Jeff McDermott, OIG

Claire Barnard, OIG

Valerie Price, Counsel, MSA Security

Mr. Bower stated that he has worked for MSA for seven years. As Deputy Program Manager, he is responsible for facilities and support, physical security, and administrative support at the CVC. Bower stated that he supervised Dr. Iovino for one week approximately a year ago, but the program manager at the time did not believe that Bower should be in Iovino's chain of command. Bower had few interactions with Iovino because she primarily worked in the hospital at the CVC. He did counsel her once with Dr. Michael Ratcliff on how she addressed the kennel technicians, which he found to be condescending. Bower also had to remind her to better manage her hours, because the contract with the Department of State only allowed her to bill for 30 hours/week.

According to Bower, Zane Roberts supervised Iovino at first, but Ratcliff became her supervisor once he was hired.

On August 4, 2017, Ratcliff and Bower informed Iovino that she would be placed on administrative leave because on August 3, one of the kennel techs told Bower that another kennel tech reported that Iovino had said that she wanted to go to the media with unspecified concerns. Bower said that Human Resources decided Iovino should be suspended. To Bower's knowledge, Iovino had never approached anyone with concerns at the CVC.

Bower sent Iovino's computer to a forensics lab in New York, which found that she was forwarding emails to her personal account. Although Bower did not believe this explicitly violated MSA's employee handbook, it did raise concerns similar to the rule in the handbook that company business should only be conducted using company email.

Bower stated that he looked into Iovino's concerns about time and attendance, and found no irregularities in the payroll system. He is not sure if anyone else at MSA investigated her other complaints. He was not aware at the time of her suspension that Iovino had approached OIG.

Bower stated that earlier in 2017, the contract line item number (CLIN) for Iovino's position changed and went to full-time, rather than part-time. Bower stated that the Project Manager told him that Iovino was offered the full-time position, but she declined it because she did not want to work full-time.

Bower had no information regarding the termination letter sent to Iovino.

DOS OIG000139

Interview with Dr. Michael Ratcliff

March 26, 2018

Participants: Jeff McDermott (OIG), Claire Barnard (OIG), Valerie Price (Counsel, MSA Associates)

Dr. Ratcliff has worked for MSA Associates since November 2016 and supervised Dr. Karen Iovino from November 2016 until August 2017. As a senior veterinarian, he supervises 2 veterinarians at the Canine Validation Center (CVC) and 3 veterinarians overseas.

Dr. Iovino was the veterinarian for the Antiterrorism Assistance (ATA) program, which initially had very few dogs, so there was only need for a part-time veterinarian. However, after several contract modifications in 2016 and 2017, the number of dogs tripled. Ratcliff then suggested to the Department of State (DoS) that the ATA veterinarian become a full time position because there was no way that a part-time position could support all of the dogs.

Ratcliff asked Iovino if she would be interested in working full time, and she said she would be. Four people applied for the position, including Iovino, which closed in August 2017. Ratcliff said that the selected candidate (Lee Palmer) had much greater qualifications that Iovino. Dr. Palmer had emergency critical care training, prior military experience, and a significant amount of publications. He also had practiced veterinary medicine in a combat zone. Ratcliff stated that these were not requirements in the job announcement. [Note: the announcement does state that the candidate must be "willing to live and work in conflict/combat areas." According to Ratcliff, Iovino's whistleblowing activity was not a consideration in the hiring decision, which he said was based solely on Palmer's more relevant experience.

On August 3, 2017, the lead veterinary tech told Ratcliff that two of the kennel techs had told him that Iovino had threatened to go to *The Washington Post*, in potential violation of MSA's confidentiality agreement. Ratcliff spoke to one of the kennel techs who confirmed that Iovino had made this threat. However, he did not ask and cannot recall ever being told what information she was threatening to release. Ratcliff and Bower spoke on August 3, and Bower said it would be in the best interest of the program to place her on administrative leave. Ratcliff concurred with this decision.

Ratcliff did not conduct any further investigation to confirm if Iovino had made such threats and he did not ask Iovino if she had. On August 4, 2017, Ratcliff and Alan Bower met Iovino on her way into the office and informed her she would be placed on administrative leave. To Ratcliff's knowledge, no one investigated the allegations against Iovino after she was placed on leave. Gerald Goss never contacted him regarding the allegations.

Ratcliff was aware that Iovino was in contact with DoS officials about her concerns about the treatment of dogs, as well as other issues at the CVC, but he is unsure if he learned of this contact before or after she was placed on leave. He believes he learned of the contacts afterwards when a senior CVC leader told him.

Ratcliff stated that while Iovino was a good veterinarian, she was difficult to work with. For example, she entered a meeting on his first day of work with Ratcliff's supervisor, Zane Roberts, and the DoS Deputy Program Manager, James Olds, and stated that she did not agree with the process of Ratcliff's hiring,

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

which was "bullshit." He and Bower did verbally counsel her once regarding her treatment of colleagues. Iovino was never given a performance appraisal.

Ratcliff has never been faced with an employee who violated the confidentiality agreement. He has given written reprimands for absenteeism and an incident with a dog.

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

DOS OIG000141

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

Contractor Whistleblower – Dr. Karen Iovino

Interview with Michael Stapleton Associates

Date: April 4, 2018

Participants: Gerald Goss (Executive Vice President of Business Development, MSA); Valerie Price (General Counsel, MSA); Jeffrey McDermott, Amy Bowser

Mr. McDermott provided Mr. Goss background about the whistleblower retaliation law and OIG investigations under section 4712.  Mr. McDermott explained that Mr. Goss was identified as a fact witness for this investigation.

Mr. Goss said he had been with MSA since 2015 as Executive Vice President for Business Development for federal and commercial sectors.

Mr. Goss first became aware of issues raised by Dr. Iovino on August 3, 2017.  He knew her as a part-time veterinarian at CVC.  Mr. Goss heard from a kennel technician that Dr. Iovino had emailed concerns directly to people outside her chain of command, including officials at the Department including in AQM and OIG, and also heard that she planned to talk about her concerns with the media.  Mr. Goss claims he visits CVC 2-3 times per week and makes sure to talk with each employee about their work and concerns (Note: he says later in the call that he was last at CVC a few weeks before Dr. Iovino sent her email).  Mr. Goss said that he recognizes the importance of protecting information about government programs and contracts from the media.  He was told by program management that Dr. Iovino had sent emails to various AQM officials at the Department and had threatened to talk to the media about a dog loaning or gifting program with Jordan.

Mr. Goss never spoke directly to Karen Iovino about her concerns or who she planned to discuss these concerns with.

Mr. Goss believed that Dr. Iovino's elevation of her concerns was a sign of irrational behavior and he thought that MSA needed to control the severity of the situation.  He called various officials at the Department (he noted the COR Josh Carter, the CO Ana Garcia, Cathy Read and Sharon James in AQM, Loren Bachman in DS) to alert them to the issue.  He wanted the Department to know that MSA planned to look into the issues and fully disclose to the Department what they find. He said that no one in the Department gave him direction or guidance on how to handle Dr. Iovino.  He also said that no one at the Department confirmed an OIG investigation or acknowledged they knew of Dr. Iovino's concerns.

Mr. Goss has no direct knowledge of the issues raised by Dr. Iovino.  He heard from a vet tech that Dr. Iovino planned to go to the media and that there was already an OIG investigation underway.  He thought it best that Dr. Iovino be placed on administrative leave with pay while MSA investigated.  This leave did not impact her clearance.  He said the decision to place Dr. Iovino on administrative leave was made at a senior executive level, which included the human resources team.  After placing Iovino on leave, MSA had a forensic team review her computer files.  Mr. Goss also made sure that Dr. Iovino's access to the CVC was restricted and that MSA had recovered her work computer and cell phone.  The forensics investigation showed that Dr. Iovino had forwarded emails to her personal email account.  Mr. Goss thought that the forensics report showed at least 10-13 categories of emails that had been forwarded.  He said examples were: (1) emails pertaining to Jordan; and (2) emails pertaining to photos

DOS OIG000142

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

of canines. He could not state the MSA policy on forwarding emails to personal accounts but said that there was at least an expectation that email transmissions from MSA are restricted to their secure network given the sensitivity of the work they do for the government.

Mr. Goss also heard that Dr. Iovino had taken photographs of various parts of the CVC facility. He was unaware of her intent and the exact locations that were photographed. He said he thought the forensics report found photos of closets and rooms at CVC and some were in locked areas. He was unsure how she gained access to those areas.

Mr. Goss said he followed up on all of the issues raised by Dr. Iovino and made sure they were investigated. (note: It sounded like what Mr. Goss meant what that he made sure that any contractual reports and reviews had been done in the past and did not do anything to examine any of her current claims). Mr. Goss also noted that MSA has an audit of billing issues conducted and that he was not aware that any issues were uncovered in that audit.

Regarding the whistleblowing, Mr. Goss said he went to CVC the next day or day after and talked with the program management team at CVC and also checked the facility to see if anything was missing (from a security standpoint). He thought they may have a rogue employee on their hands.

Mr. Goss noted that the part time veterinary position was in the process of being phased out before the whistleblowing occurred. He said that he and others decided to eliminate Dr. Iovino's part-time position based on the client's needs and to announce the new full-time position. He said it was a coincidence that the timing of the administrative leave and the position elimination coincided. He said the issues with Dr. Iovino remained under investigation and therefore she remained on administrative leave until the position was simply eliminated and she was then terminated. Ms. Price prompted and Mr. Goss confirmed that the forensics investigation did not come back until early September 2017 and her position as eliminated in late August 2017.

Mr. Goss confirmed he was not involved in the selection for the full time veterinary position.

Mr. Goss did not have information about another terminated employee – Zane Roberts. Ms. Price recalls that MSA heard rumors that Mr. Roberts was raising the same issues as Dr. Iovino. Ms. Price said that HR went to CVC to discuss these issues with Mr. Roberts but he refused to speak with them after repeated requests. Mr. Roberts claimed not to have any knowledge of the issues raised by Dr. Iovino. The forensics investigation showed that Dr. Iovino had forwarded MSA emails to Mr. Roberts's personal email account and that Mr. Roberts lied about this fact to HR. Ultimately MSA determined that Mr. Roberts' lies to HR warranted termination from his position.

DOS OIG000144

Telephone Interview with Zane Roberts

Participants: Jeff McDermott *JM*

Date: April 9, 2018

Roberts was the Program Manager for the Canine Validation Center (CVC) with MSA Security from 2014 to July 2017. He was moved to a research and development position in July 2017. In October 2017, he was terminated. He hired Dr. Karen Iovino and was her supervisor for her the majority of her tenure at MSA.

Roberts described Iovino as a "phenomenal employee" – a hard worker who answered calls 24/7 despite the fact that she was only part-time. (Because she was essentially always on call, MSA agreed to put her MSA email on her personal phone). The Department initially asked for a part-time veterinarian and Roberts hired her for that position. She had previously treated his dog so he knew of her capabilities. In April 2017, she saved a dog's life through "heroic" efforts and received a commendation from MSA for her efforts.

Roberts stated that the COR Josh Carter was getting jobs for his friends at the CVC by instructing MSA to create these positions. For example, he told MSA to create a position for Alan Bower, a friend and former colleague at the Roanoke Police Department. Carter also instructed MSA to create a training position for John Hoover, another friend and former colleague. Hoover was put in charge of the first Anti-Terrorism Assistance (ATA) class with Jordanian officials, which was not successful because the dogs that Hoover procured were not appropriately trained. However, Hoover blamed Iovino for the failure because she neutered the male dogs, which should have no effect on their ability to detect explosives. Hoover once referred to Iovino as a "cunt" and told Carter she needed to go.

In 2017, the CVC expanded, which included the hiring of addition veterinarians. Carter promised Michael Ratcliff, another friend, that he would get the lead veterinarian position. The expansion also included the part-time veterinarian position to be moved to full time. Ratcliff asked Iovino if she would be willing to work five days a week and she agreed. MSA then added travel as a requirement of the position, possibly to dissuade Iovino from applying because they knew she had a horse farm that would make travel difficult.

Roberts stated that it was extremely unusual for MSA to make an incumbent apply for a position if it just went from part-time to full-time. For example, MSA never advertised the training coordinator position that Hoover was given. Nor was Alan Bower's position advertised. Logistic techs were promoted to lead techs without advertising the position. Roberts said that many MSA employees assumed that advertising the full time position was just a means to get rid of Iovino.

In July 2017, Mike Hayes told MSA that he had heard rumors of OIG complaints and he began asking around as to who could be sending information to OIG. Roberts told MSA (Joseph Atherall) that he had spoken to OIG and provided some information about his own concerns. In mid-July 2017, OIG (Dave Holmes) asked Iovino for photos of certain areas of the CVC and she provided them. These photos made their way to Carter who shared them with MSA who tried to find out who took them. Shortly thereafter, Iovino was placed on administrative leave and eventually terminated.

DOS OIG000145

In October 2017, Peter Deegan (head of MSA HR) and Michael Kennedy (MSA Chief Financial Officer) interviewed Roberts and began with questions about why Iovino forwarded the photos to Roberts' personal email. He was told that these photos were provided to MSA by Carter. Roberts was terminated after refusing to answer these questions.

DOS OIG000146

Interview with Cathy J. Read, Director, Acquisitions Management

Date: April 20, 2018

Participants: Jeff McDermott, Amy Bowser

OIG met with Cathy Read (A/LM/AQM) to discuss concerns that information about an OIG whistleblower (Karen Iovino) may have been inappropriately shared with MSA. OIG shared information about allegations raised by Iovino to AQM and it is unclear whether AQM shared this information with MSA, Iovino's contractor employer, who later retaliated against Iovino for her disclosures. This meeting was to determine if Ms. Read or someone in AQM was the source of the leak of information to MSA.

Mr. McDermott provided a background of the Iovino case and OIG's role in investigating whistleblower retaliation. Ms. Read said that she became aware of Ms. Iovino's concerns because Iovino contacted her directly in the summer of 2017 by both email and phone and then Ms. Read was also forwarded information from OIG. Ms. Read said that when she received the phone calls and emails from Iovino that she notified DS and forwarded the emails to OIG. She was pretty sure that at the time OIG was already aware from Iovino's hotline complaints.

Some of Iovino's complaints involved allegations of a COR in DS, Josh Carter. Ms. Read recalls discussing the issues over email with DS because DS would handle and not AQM. Ms. Read sent the 4 to 6 emails from Iovino to Read directly to Nick Sabruno in DS. If the complaint was against a COR, the issue would come to AQM, but AQM would examine whether it was a contract issue or misconduct issue. If a contract issue, such as management of the contract or whether certain things are allowed under the contract, AQM would investigate. Because this was allegations of misconduct and the COR is a DS employee, DS would investigate the issue.

Ms. Read noted that she found it highly improper for Ms. Iovino to come to her directly with concerns. She said that it violated the MSA confidentiality agreements and that there are other mechanisms in place for these types of complaints. Mr. McDermott noted that confidentiality agreements in government contracts are against the law.

Ms. Read claims she did not provide any information that was shared by OIG to MSA. Ms. Read did become aware that MSA had fired Ms. Iovino and that MSA did apologize to her directly for Ms. Iovino breaking protocol and contacting her directly. Ms. Read also noted that AQM works directly with MSA and that she visits the CVC annually and that Josh Carter works directly with them daily.

DOS OIG000147

# EXHIBIT E

# EXHIBIT 008

Deposition of Gerald Goss
January 30, 2026

OIG Interview - Cathy Read

Bates: IOVINO_00000167 (1 pp.)

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

Interview with Cathy J. Read, Director, Acquisitions Management

Date: April 20, 2018

Participants: Jeff McDermott, Amy Bowser

OIG met with Cathy Read (A/LM/AQM) to discuss concerns that information about an OIG whistleblower (Karen Iovino) may have been inappropriately shared with MSA. OIG shared information about allegations raised by Iovino to AQM and it is unclear whether AQM shared this information with MSA, Iovino's contractor employer, who later retaliated against Iovino for her disclosures. This meeting was to determine if Ms. Read or someone in AQM was the source of the leak of information to MSA.

Mr. McDermott provided a background of the Iovino case and OIG's role in investigating whistleblower retaliation. Ms. Read said that she became aware of Ms. Iovino's concerns because Iovino contacted her directly in the summer of 2017 by both email and phone and then Ms. Read was also forwarded information from OIG. Ms. Read said that when she received the phone calls and emails from Iovino that she notified DS and forwarded the emails to OIG. She was pretty sure that at the time OIG was already aware from Iovino's hotline complaints.

Some of Iovino's complaints involved allegations of a COR in DS, Josh Carter. Ms. Read recalls discussing the issues over email with DS because DS would handle and not AQM. Ms. Read sent the 4 to 6 emails from Iovino to Read directly to Nick Sabruno in DS. If the complaint was against a COR, the issue would come to AQM, but AQM would examine whether it was a contract issue or misconduct issue. If a contract issue, such as management of the contract or whether certain things are allowed under the contract, AQM would investigate. Because this was allegations of misconduct and the COR is a DS employee, DS would investigate the issue.

Ms. Read noted that she found it highly improper for Ms. Iovino to come to her directly with concerns. She said that it violated the MSA confidentiality agreements and that there are other mechanisms in place for these types of complaints. Mr. McDermott noted that confidentiality agreements in government contracts are against the law.

Ms. Read claims she did not provide any information that was shared by OIG to MSA. Ms. Read did become aware that MSA had fired Ms. Iovino and that MSA did apologize to her directly for Ms. Iovino breaking protocol and contacting her directly. Ms. Read also noted that AQM works directly with MSA and that she visits the CVC annually and that Josh Carter works directly with them daily.

<div style="border:1px solid black; display:inline-block; padding:8px; text-align:center;">

**Exhibit 008**

GG

01/30/26

</div>

# EXHIBIT F

# EXHIBIT 010

Deposition of DoS 30b6 (Assignee Sharon James)
February 26, 2026

Contract Technical Proposal (PWS)

Bates: IOVINO_00009206-IOVINO_00009215 (10 pp.)

UNCLASSIFIED//PROPRIETARY

**MSA** SECURITY

26 June 2017

# PERFORMANCE WORK STATEMENT (PWS) RESPONSE

## CANINE VALIDATION CENTER

### CONTRACT NUMBER S-AQMMA-16-D-0106
### MODIFICATION 1 Rev 1



**26 June 2017**

**Prepared for:**
**Ms.** ▮▮▮▮▮▮▮▮
Branch Chief/Lead Contracting
Officer U.S. Department of State
Office of Acquisitions Management
Diplomatic Security Contracts Division – WPS

▮▮▮▮▮▮▮▮▮▮▮

**Submitted by:**
**Katie Brasfield**
Mobile: +1 (254) 644-1734 | +1 (254) 707-0543
kbrasfield@msasecurity.net

| Exhibit 010 |
| --- |
| DoS |
| 02/26/26 |

Restrictions on Disclosure and Use of Data. This Contract Response includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed—in whole or in part—for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of—or in connection with—the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the Government's right to use information contained in this data if it is obtained from another source without restriction. The data subject to this restriction are contained in sheets marked with the following legend: "Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this proposal. The information contained in this document is submitted in confidence, is privileged and is exempt from disclosure under the 'Freedom of Information Act' (5 U.S.C. Section 552) by reason of exemptions in Sections (b)(3) – by reference to 18 U.S.C. Section 1905 – and (b)(4) of said Act.

## TECHNICAL EXECUTION

The following is MSA's technical approach for Modification 1 to Contract S-AQMMA-16-D-0106. This response addresses the Modification to the Contract delivered by the U.S. Department of State's email for a Request for Proposal on 13 February 2017.

### Change Order to the CVC Base IDIQ, Contract S-AQMMA-16-D-0106:

### Revision to Section C.2.0 Facility Requirements to add security

**2.0. CVC Facility Requirements:** MSA will provide a facility that is fenced, gated and has security measures in place to restrict access from unauthorized to the facility and grounds. MSA will construct a fence around the entire perimeter of the CVC with DOS and MSA CVC staff having access with magnetic key cards. Students attending a course will be provided temporary access key codes that will expire at the end of their course.

### Revision to Section C.2.1 Office Space to add Annex 2

**2.1. Office Space:** MSA will expand the current CVC base requirement for office space to accommodate ▮▮▮▮▮ DS personnel with the space provisions outlined in the base and RFP documents. MSA will configure the office space to accommodate ▮▮▮▮▮ DS personnel in Annex 1 (A1) and ▮▮▮▮▮ DS personnel in Annex 2 (A2).

### Revision to Section C.2.2 Classroom to add a classroom

**2.2. Classrooms:** MSA will continue to provide a classroom in Annex 1 (A1) and provide an additional classroom in Annex 2 (A2).

### Revision to Section C. 2.3 Veterinary and Forensic Chemist Sections to add Annex 2

MSA will maintain the needs of these areas consistent with the overall support strategy (i.e. overnight kennel, medical equipment, forensic equipment).

MSA will maintain a surgical suite in A1, inclusive of radiography/ultrasound equipment. This surgical suite will be capable of performing any/all types of canine surgical procedures including but not limited to emergencies. MSA will also maintain an indoor kennel facility in A1 with ▮▮▮▮▮ kennels, and A2 capable of a minimum capacity of ▮▮▮▮▮ canines, complete with sanitary drainage and waste cleanout capabilities. Total capacity between A1 and A2 will be ▮▮▮▮▮ kennels.

### Revision to Section C.2.5 Utilities and Facility to add Annex

**2.5. Utilities and Facility Maintenance:** In addition to the current capability, MSA will provide an additional indoor kennel facility for ▮▮▮▮▮ canines in A2, with complete sanitary drainage and waste cleanout capability. MSA will continue to provide all maintenance,

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document

IOVINO_00009207

UNCLASSIFIED//PROPRIETARY

cleaning, and utilities for operations at the current CVC in Annex 1 and the Annex 2 expansion building.

## Revision to Section C.2.6 Contained off leash search area to add training, research, and development space

**2.6. Contained Off Leash Search Areas:** MSA will provide an indoor space conducive to conducting off-leash searches with the capability to accommodate a minimum of ▮ vehicles. The space will be capable of accommodating mass transit vehicles, including, busses, rail cars and cargo containers. The space will be large enough to accommodate vehicles that will have at least 3 feet of clearance on each side in order to provide freedom of movement for canine teams.

## Revision to Section C.3.0 Personnel and Services Requirement to add learning course to Annex 2

**3.0.** In addition to the current requirements, MSA will provide the personnel and services to facilitate and maintain a sufficient number of full-time personnel to operate the CVC, Annex 1, and Annex 2; manage approximately ▮ canines per day at the CVC working towards certification; and provide and manage an additional ▮ canines for Annex 1 in training for detection and/or patrol certification. MSA also provide an additional ▮ canines to assist in the learning courses for Annex 2. MSA will maintain the ability to increase personnel and capabilities as requested by DOS. MSA's personnel shall continue the oversight of familiarization training, imprintation of canines, all validations and assessments, explosive aid management and animal life support while at the CVC.

MSA will provide trained EDCs to validate all familiarization, and testing scenarios. Validation consists of completing a scenario by determining the source of explosive odor while adhering to the same standards as validation candidates. Validation teams will not have prior knowledge of training aid placement. MSA understands that attempts to circumvent validation standards will be considered a contract violation and will be grounds for removal from the program at no cost to the Government. MSA will bear all costs associated with the validation canines. This includes, but is not limited to, care, feeding, and lodging. The Government may provide health care services at the place of performance at its discretion. Canines must maintain good physical health, as determined by a staff veterinarian. Canines exceeding 9 years of age will not be eligible to perform.

## Additional Personnel Requirements to the Base Contract S-AQMMA-16-D-0106:

## Revision to Section C.3.5.3 Training Coordinator to add the position

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document

IOVINO_00009208

UNCLASSIFIED#PROPRIETARY

**MSA**
SECURITY

26 June 2017

**3.6. Training Coordinator:** MSA will provide a Training Coordinator to focus on operations, daily training and on-site activities that meets or exceed the requirements in the RFP and who is capable to execute the duties outlined in the Mod 1 RFP, as noted below:

### 3.6.1 Minimum Position Requirements:

- Will be a U.S. Citizen and possess a valid U.S. Passport.
- Will possess or be able to obtain a minimum MRPT level clearance
- Will have a High School Diploma or equivalent
- Will have a minimum military or law enforcement experience of which three (3) years, within the past (10) ten years, training, imprinting, and testing/evaluating explosive detection canines using DOJ NORT and other operational methods.
- Will have a minimum experience of three (3) years, within the past (10) ten years, training and validating EDCs of various breeds, using multiple reward systems.
- Will have knowledge of key components of explosives, proper care and handling, and application as it pertains to the environment and validation
- Will have the ability to evaluate, repair, and advise on EDC training and validation, housing/kenneling, overall well-being, and operational inefficiencies.
- Will have experience providing proper care for an EDC
- Will have a minimum experience of three (3) years, within the past (10) ten years, in the ability to recognize canine diseases, be familiar with canine hygiene requirements, and monitoring the physical condition of their assignments.
- Will have a minimum experience of three (3) years, within the past (10) ten years, maintaining canine training and operational records and similarly related documentation.
- Will have a minimum experience of three (3) years, within the past (10) ten years, conducting searches of bags, personnel, equipment, buildings, assigned facilities, vehicles, aircraft, and other items as directed, utilizing canine assets.
- Will have a minimum experience of three (3) years, within the past (10) ten years, conducting inspections of all equipment to ensure it is functional and report deficiencies as needed.
- Will have a minimum experience of three (3) years, within the past (10) ten years, teaching, instructing, developing curriculum, administering instruction, and coordinating instructional courses specifically related to all aspects of the canine industry.

### 3.6.2 Position Duties:

- Coordinate daily training schedules, and provides guidance to staff regarding the same.
- Prepares the training areas and assists with logistical requirements to accomplish the daily evaluation regimen.
- Provides guidance and training to assist EDC Teams increase their performance and capabilities
- Ensures EDC Teams/Center attendees are participating and adhering to CVC regulations

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document

IOVINO_00009209

- Develops training scenarios for both domestic and overseas EDC teams

## Revision to Section C.3.9 Deputy Project Manager to add to duties

**3.9. Deputy Project Manager Facilities and Support (DPMFS):** MSA will provide a DPMFS to assist the PM in the daily operations of the CVC and communicate directly with the Government authorized personnel as directed by the COR. The DPMFS will possess or be able to attain an MRPT clearance level and will meet or exceed the minimum requirements of the RFP. The person will be able to execute the duties as outlined in the Mod 1 RFP.

**3.10. Deputy Project Manager Training and Operations:** MSA will provide a DPM Training and Operations whose duties will now also include:

- Coordinate daily training schedules, and provides guidance to staff regarding the same.
- Prepare the training areas and assists with logistical requirements to accomplish the daily evaluation regimen.
- Provide guidance and training to assist EDC Teams increase their performance and capabilities
- Ensure EDC Teams/Center attendees are participating and adhering to CVC regulations
- Develop training scenarios for both domestic and overseas EDC team.

## Revision to the Section 3.12 Administrative and Logistics Security Specialist Manager (ALSSM) Position

MSA will provide an ALSSM who meets or exceeds the position requirements as noted in the RFP for Mod 1. These are:

- U.S. Citizen
- Must be able to obtain a Secret Clearance
- Must have a valid U.S. Driver's License and U.S. tourist passport
- Honorable military discharge, if applicable
- Accredited Bachelor's Degree, or 6 years' experience in a related job field
- Ability to maintain strong working relationships and deal effectively with senior U.S. Embassy personnel
- Two (2) to three (3) years' experience in a successful customer service role preferred
- Two (2) years overseas/military, or other federal Government security or Law Enforcement experience in administrative and logistical support issues/management preferred
- Supervisor experience as a preference

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document

IOVINO_00009210

UNCLASSIFIED//PROPRIETARY

## Revision to Section C.3.13 Administrative and Logistics Security Specialist (ALSS) to add the position

**3.13.1. Administrative and Logistics Security Specialist (ALSS):** MSA will provide an ALSS who will be responsible for managing and performing advanced, diversified, and confidential administrative support. This person will meet or exceed the minimum requirements of the RFP and be able to execute the duties outlined in the RFP in section 3.13.2.

## Revision to Section C.3.14 Research and Development Personnel to add the position

**3.14. Canine Research and Development Training Specialist (CR&DTS):** MSA will provide a Canine Research and Development Training Specialist (CR&DTS) that will focus on researching trends in terrorist techniques and tactics. This position will laisse with industry professionals in order to evaluate emerging training methodologies and practices and work with the Government and CVC staff to develop training curriculum for both CONUS and OCONUS EDC teams. This person will meet or exceed the requirements and be capable of executing the position duties as outlined in the RFP.

## Revision to Section C.5 Canine testing process to add instructional courses

**Canine Phase I and Phase II Validation Intent and Differences:** MSA recognizes that the canine validation process involves simple recognition of explosives odors. A blind validation method is used. For the purposes of this validation, blind validating means the handler will not know where the explosives samples are placed. This will help verify that the canine is actually recognizing explosives odors and not responding to other cues.

MSA CVC staff will administer the validation and be responsible for selecting and recording the placement of all sample containers (distraction odors and explosives odor samples) and evaluating the validation results. MSA acknowledges that in the event, WPS II Attachment 10 and this Contract differ regarding testing standards/requirements, MSA will differ to WPS II Attachment 10.

**Validation Requirements**

Per the proposed modification to the Contract, MSA acknowledges that the CVC staff is not responsible for remedial EDC training for WPS/other DOS subcontractors-clients that have failed the validation process. MSA maintains records of all CVC validation and failures.

**EDC Familiarization Training Course**

MSA proposes the below training schedule and plan for executing an instructional familiarization learning environment for Department of State personnel. This training schedule is flexible and can be refined as required by the COR. At a minimum MSA will provide familiarization instruction on:

- Specific canine procurement capability

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document

SAQMMA16D0106
PWS – Canine Validation Center

UNCLASSIFIED/PROPRIETARY

MSA SECURITY

26 June 2017

- Familiarization/testing preparation techniques used
- Imprinting technique and training methodology for detection canines
- Training technique and methodology for patrol canines
- Explosives used in imprinting and operational preparation
- Handler class course schedule for detection and patrol course(s)
- Instruction materials/presentations used for handler courses

| Training Day One | |
|---|---|
| 0900 | Welcome/Staff Intro |
| 1000 | Facility Tour |
| 1100 | Purpose of the CVC |
| 1200 | Lunch |
| 1300 | Purpose of the CVC Continued |
| 1400 | History of the Working Dog |
| 1500 | Dog Breeds |
| 1700 | Dismissal |
| Training Day Two | |
| 0900 | Diplomatic Security   Overview |
| 1000 | WPS2 Program Overview |
| 1100 | ATA Program |
| 1200 | Lunch |
| 1300 | Diplomatic Security   Overview |
| 1400 | K9 Utilization/Managing |
| 1500 | K9 Care/Maintenance |
| 1600 | Dog Bite Prevention |
| 1700 | Dismissal |
| Training Day Three | |
| 0900 | Intro to HME |
| 1000 | Current HME Trends |
| 1100 | K9 Behavior |
| 1200 | Lunch |
| 1300 | K9 First Aid |
| 1400 | Bloat |
| 1500 | Heat/Cold Injuries |
| 1600 | Foreign Object Ingestion |
| 1700 | Dismissal |
| Training Day Four | |
| 0900 | Training Problems / Issues |
| 1000 | K9 vs Technology |
| 1100 | Itemizer |
| 1200 | Lunch |
| 1300 | K9 First Aid |

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document

IOVINO_00009212

UNCLASSIFIED//PROPRIETARY

MSA SECURITY

26 June 2017

| 1400 | Sutures |
|------|---------|
| 1500 | Opening Airway |
| 1600 | Bandaging/Limb Mobilization |
| 1700 | Dismissal |
| | **Training Day Five** |
| 0900 | Practical Exercises |
| 1000 | Leash Control |
| 1100 | Search Patterns |
| 1200 | Lunch |
| 1300 | Practical Exercise Continued |
| 1400 | Target Areas |
| 1500 | Course Review |
| 1600 | Critique / Course Eval |
| 1700 | Dismissal |

## Revision to Section H. Facility Security to Change the Clearance Requirements

MSA notes changes to the Security Clearance Requirements on the contract.

**3.1.1 Project Manager Minimum Position Requirements:** The PM will have or be able to attain an MRPT level clearance.

**3.5 Validation and Training Specialist Minimum Position Requirements:** All Validation and Training Specialists will have or be able to attain an MRPT level clearance.

**3.9 Deputy Project Manager Facilities and Support Minimum Position Requirements:** The DPMFS will have or be able to attain an MRPT level clearance.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document

UNCLASSIFIED//PROPRIETARY

**MSA** SECURITY

26 June 2017

## Recommendation for Consideration

MSA respectfully offers an adjustment for consideration.

**CVC Veterinarian:** This position is a CLIN that is currently filled on Contract S-AQMMA-16-D-0106.  MSA recommends an increase from part-time to full-time position

**Justification**: With the CVC/OPOT EDC capacity doubling, MSA requests that the veterinarian assigned to this CLIN be increased from part-time (30 hours/week) to full-time status (40 hours/week.)  This increase in hour allocation is recommended and requested in order to account for the additional number of examinations, vaccinations, surgeries, and pre-purchase medical reviews required for expansion of CVC operational capacity.  The additional hours will also allow for additional veterinary coverage for routine, urgent, and emergent EDC injuries sustained during operational training.

Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document

IOVINO_00009214

SAQMMA16D0106
PWS – Canine Validation Center Mod 1

UNCLASSIFIED//PROPRIETARY

MSA SECURITY

26 June 2017



Use or disclosure of data contained on this sheet is subject to the restriction on the title page of this document

IOVINO_00009215

# EXHIBIT G

# EXHIBIT 005

Deposition of Dr Lee Palmer
February 17, 2026

Iovino-Ratcliff Email Exchange

Bates: IOVINO_00000232-IOVINO_00000233 (2 pp.)

MSA000049

**From:**    Karen Iovino </o=Michael Stapleton/ou=Exchange Administrative Group
(FYDIBOHF23SPDLT)/cn=Recipients/cn=Karen Iovino183>

**Sent:**    Monday, July 17, 2017 12:30 PM

**To:**    karenvet93@gmail.com

**Subject:**    FW: FT position

---

KAREN IOVINO, DVM

VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: 703.554.4497 | F: 540.545.4138

-----Original Message-----
From: Karen Iovino
Sent: Monday, July 17, 2017 7:44 AM
To: Michael D. Ratcliff <MRatcliff@msasecurity.net>
Subject: RE: FT position

Mike,

My resume is on my home computer. Will submit resume tonight. I assume it's just a formality?

No worries about the travel. Checking up on the oversea program and canines is a good move forward.

Karen

KAREN IOVINO, DVM
 VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: 703.554.4497 | F: 540.545.4138

-----Original Message-----
From: Michael D. Ratcliff
Sent: Monday, July 17, 2017 7:09 AM
To: Karen Iovino <KIovino@msasecurity.net>
Subject: RE: FT position

Karen,
Good deal. Because it's a new CLIN with a new PD (and bio approval), you'll need to submit your resume again
through the website. The posting will be up tomorrow and only run through the end of the week.

One thing that I forgot to mention last week is that the FT gig will involve travel. With the potential new projects
on the horizon, we will likely need to divide the travel up amongst each other to keep things moving efficiently here
at the CVC.

Holler with questions.

Thank you,
Mike

| Exhibit 005 |
| LP |
| 02/17/26 |

IOVINO_00000232

MSA000050

Mike Ratcliff, MS, DVM

-----Original Message-----
From: Karen Iovino
Sent: Friday, July 14, 2017 6:58 PM
To: Michael D. Ratcliff <MRatcliff@msasecurity.net>
Subject: FT position

Mike,

I would embrace the opportunity to move from 3/4 time to FT to help the ATA program grow. I will plan on moving to FT status Aug 19, 2017. Please send me any paperwork I need to complete to make the transition.

Thanks,
Karen

Karen Iovino, DVM
Veterinarian
Canine Validation Center

Sent from my iPhone

IOVINO_00000233

# EXHIBIT H

# EXHIBIT 023

Deposition of MSA 30 b 6
February 24, 2026

Houston Final Warning Memo

Bates: IOVINO_00000787 (1 pp.)



9 Murray Street • New York, NY 10007
Tel (212) 509-1336 • Fax (212) 509-1372 • msasecurity.net

| To: | Jenn Houston |
|---|---|
| From: | Mike Hayes |
| Date: | October 25, 2018 |
| Copies: | M. Ratcliff, A. Bower, P. Deegan, File |
| Subject: | Final Warning |

On several previous occasions, you were counseled and warned about your work related behaviors and performance.   Most notably:

- Coming to work in a manner that precludes performing your duties as a Veterinary Tech – disheveled, glassy bloodshot eyes, uncoordinated, and smelling of alcohol
- Combative outbursts and behavior in meetings and with staff
- Insubordinate behavior exhibited toward veterinarians
- Being removed from assignment of surgical duties on multiple occasions

Unfortunately, you have disregarded past performance warnings and continued to exhibit the above.  Most recently, on October 10th, you were scheduled to perform an anesthetic procedure during a dental prophylaxis. However, due to observed behavior, the veterinarian performing the procedure, Dr. Olech, had to reassign the duties to a colleague.

In your role, you are expected to be ready to assist the veterinarians at a moment's notice.  Under no condition is it acceptable for you to come to work unless you are in a state of readiness to perform your duties.   Anything less, represents a risk to the patients, coworkers, and the Company.

This memo serves as your final warning.   If you continue to exhibit the behaviors listed above and/or come to work unprepared to adequately and confidently perform your duties as a Veterinary Tech, you will be subject to further disciplinary action up to and including termination of employment.

Please be aware that MSA Security has an Employee Assistance Program through WorkLifeMatters.  The EAP provides resources and counseling in case there are matters outside work that are impacting your performance. You can reach them at http://www.ibhworklife.com/ or 1-800-386-7055.

I appreciate your immediate attention to this matter.

<div style="border:1px solid black">

**Exhibit 023**
MSA
02/24/26

</div>

| New York | Boston | San Diego | National Capital Region | Hong Kong |
|---|---|---|---|---|
| (212) 509-1336 | (781) 519-6494 | (858) 609-1541 | (703) 657-4095 | (852) 3690-8886 |

IOVINO_00000787

# EXHIBIT I

# EXHIBIT 014

Deposition of Alan Bower
February 25, 2026

Iovino Contemporaneous Notes

Bates: IOVINO_00000035-IOVINO_00000038 (2 pp.)

000014

February 26, 2017

At approximately 0730 on Friday February 24, 2017, Mike Ratcliff asked to speak to me. He said he had a problem he wanted help solving.

He began by saying 'what can I do to make you come on full time?'. I said I thought this request might be coming soon as the ATA side is becoming busier. I explained that I currently work 30-33/hrs week caring for up to 24 canines with little support as the LVT hired to work in the ATA hospital assists on Wednesday's only(that day we schedule procedures only). With the expansion, there will be an estimated additional 16 kennel spaces with no canines housed off site. That is essentially only 6 more canines for me to care for. I asked if there have been any complaints about my performance. He said 'no, quite the opposite, everyone loves you'. I explained I was hired as the 3/4 vet(the DoS contract is for 2 FT vets and one 3/4 vet). I also said I chose the 3/4 position as I thought (as did Zane Roberts) that a new hire would want the FT position.

We discussed hiring a PT veterinarian to work Tuesday's and Thursday's. I mentioned I had someone in mind and would be happy to reach out to her. I did indicate she doesn't have any working dog experience but is an excellent veterinarian and is willing to learn. At that point he asked if she was 'trainable'. I again said 'yes'.

I then asked if he would be comfortable with me working 3 11-12 hr days and one 1/2 day. Carolyn might be willing to work longer days(and fewer) so the facility could have veterinary coverage for longer periods of time. He said the WPS side has a different mission. He said he would be thrilled to have me work Mon, Wed, Fri 9 hrs and 5-6 hrs Thursday. I said that only adds up to 33 hrs. He said he knows I work from home and he has never had anyone so 'reachable' when they are off site. I am also on call for the kennel techs early mornings, nights and weekends. I said I would be comfortable with 3 10 hr days and 1-1/2 day for a total of 35-36/hrs on site and 4-5 hrs remotely. He said he is happy with that. When I asked if he had to ask Leadership he said he was told to run his shop the way he sees fit.

At 1400 the same day, we had our regularly scheduled Friday dvm outbrief. I asked if he spoke to Leadership about my schedule change. He said he had and they were very happy. Most likely the change would occur mid to late March.

Also during our meeting I brought up how Jenn was late again Wed Feb 22nd by 20 or so minutes(I did not mention the smell of alcohol on her breath). I asked what was being done about her chronic tardiness. He said he was tracking it. He said she gave a reason but he isn't sure he believes her.

Karen Iovino, DVM

**Exhibit 014**

AB

02/25/26

IOVINO_00000035

000017

July 14, 2017

Below is the summary of a discussion between Mike Ratcliff and myself this morning:

He started by stating that the contract mod(modification) was finally signed.  As of August 18, 2017, the ATA PT veterinary position will no longer exist.  As of August 19, 2017 the position will be FT.  I explained we had discussed this change in February 2017.  He then said the bad new is I must be on site Monday-Friday 7:30am-3:30pm.  I asked why our discussion in February isn't going to be honored(see write up Feb 26, 2017).  He said the position is a 5 day a week position. I mentioned our discussion regarding my on site schedule, it was 3 long days and 1/2 day, was due to the fact that I am on call for KT's evenings and weekends.  He said paid time must be on site per Leadership.

He asked that I think about it and discuss with Dave.  We then discussed a few other items.  He asked at the end of our meeting what I thought my decision would be.  I indicated I would have to speak to Dave but he would support me in whatever I decide and I needed time to think about my decision.

IOVINO_00000038

# EXHIBIT J

# EXHIBIT 010

Deposition of Nick Sabruno
February 23, 2026

OIG Interview  Deegan

Bates: IOVINO_00000158-IOVINO_00000159 (2 pp.)

000137

Interview with Peter Deegan, Vice President for Human Resources, MSA Security

Date: November 15, 2017

Participants:

Jeff McDermott, OIG

Lisa Warffeli, OIG

Valerie Price, Counsel, MSA Security

Mr. Deegan stated that certain MSA employees at the Canine Validation Center (CVC) alerted Alan Bower that Karen Iovino had threatened to go to the press with certain information. The information she was planning on sharing pointed to the fact that she had been in a restricted area, a private office at the CVC. Bower brought the issue to Gerald Goss, MSA's Vice President for Business Development.

Deegan was on vacation when these events occurred, but when it was brought to his attention, he stated that he decided that she should be suspended. Deegan was concerned because Dr. Iovino was speaking to clients and to other MSA employees about her concerns, which raised protocol issues because Iovino did not first raise them with anyone in her chain of command at CVC, such as Gerald Goss, Michael Hayes, Alan Bower, or Michael Ratcliff. Deegan stated that the information was not classified, and he is not sure if classified information even resides at the CVC.

Deegan asked clients and Iovino's colleagues about what Iovino had said, but never figured out how she got access to the information. Deegan also asked Iovino how she had gotten the information, but she refused to tell him.

Gerald Goss conducted the investigation of Iovino's conduct for MSA. Documentation was sent to the contracting officer, Ana Garcia, on September 4 regarding Iovino's suspension. Deegan is not sure how Cathy Read (AQM) found out about the concerns that Iovino was raising.

Deegan stated that earlier in 2017, the Department of State expanded its canine assistance under the Anti-Terrorism Assistance program, which necessitated the need for a full-time veterinarian. Dr. Iovino was only part-time, and therefore, MSA officials (including himself) decided that she should have to apply for the full-time position. Deegan stated that Iovino had applied for the full-time position, but other individuals did as well who he (and Dr. Michael Ratcliff, the selecting official) believed were more qualified.

Deegan stated that prior to the vacancy announcement, MSA already had concerns with Iovino's performance, including that she was disagreeable and prickly and resisted coaching on these issues. Deegan promised to send documentation of these issues, some of which were prepared as part of the EEO case that Iovino filed.

Deegan stated that the Department of State contract with MSA required overseas and military experience. According to Deegan, MSA did not think Iovino would be accepted overseas because of her

**Exhibit 010**

NS

02/23/26

000138

lack of diplomacy. Deegan stated that he has never heard that Ratcliff offered Iovino the full-time position before it was announced.

IOVINO_00000159

# EXHIBIT K

# EXHIBIT 007

Deposition of Dr Michael Ratcliff
January 22, 2026

Job posting for FT veterinarian position at MSA with
qualifications and hiring criteria

Bates: IOVINO_00000225-IOVINO_00000236 (12 pp.)

MSA000042

**MSA SECURITY**

IN THE BUSINESS OF BUSINESS AS USUAL™

NATIONAL CAPITAL REGION | 703-391-6014
NEW YORK | 212-509-1336
BOSTON | 617-438-0521

October 19, 2015

Karen Iovino
19744 Ridgeside Road
Bluemont, Virginia 20135

Dear Karen,

We are pleased to inform you that after careful consideration, MSA Security is offering you the position of *Veterinarian* for Canine Validation Center (CVC) in Winchester, Virginia, reporting to Richard Strobel, Forensic Chemist. This is a part-time, hourly position. This letter sets forth the terms of your position, which will govern your employment should you accept.

Duties and Responsibilities
The CVC Veterinarian is responsible for the health and welfare of an estimated twenty (20) canines per week. These duties include, but are not limited to:

- Verify canine identities when they arrive at the facility
- Provide general health exams to each canine
- Issue International Health Certificates
- Provide support for minor health issues while canines are on site
- Coordinate emergency care with local animal emergency facility in case of canine injury or illness
- Advise handlers regarding grooming standards, proper feeding, and the general care necessary to promote health and well-being of the animals
- Educate handlers/trainers about diseases that can be spread from animals to humans.
- Perform administrative duties such as maintaining records.
- Ensure environmental conditions at the CVC are appropriate to maintain health of canines.
- Coordinate as appropriate with veterinary providers and owners of visiting canines.
- Coordinate as appropriate with overseas veterinary care providers overseas.

Your compensation is as follows:

| | |
|---|---|
| Salary | $70.00 per hour |
| 401(k) Plan | Fidelity Investments, eligible ninety (90) days from date-of-hire |
| Company phone | TBD by Direct Report |
| Other company-issued equipment | As designated by Direct Report |

9 Murray Street, 2nd Floor, New York, NY 10007
Phone: 212.509.1336  Fax: 212.509.1372  Web: www.msasecurity.net

---

**Exhibit 007**

MR

01/22/26

IOVINO_00000225

MSA000043



NATIONAL CAPITAL REGION | 703-391-6014

NEW YORK | 212-509-1336

BOSTON | 617-438-9521

IN THE BUSINESS OF BUSINESS AS USUAL™

By signing below, you not only accept the terms of this agreement but also represent to MSA Security that you are under no obligation or agreement that would prevent you from becoming an employee of MSA Security or that would adversely affect your ability to perform the expected services. You also acknowledge and understand that you are an at-will employee and this agreement does not create any rights on your part for employment of any fixed period or length of time nor does it impose limitations on the right of MSA to terminate your employment for any reason at any time.

Sincerely,

*T.L. Scarito*

T.L. Scarito, MA, PHR
Director of Human Resources

_____          _____

**KAREN IOVINO**                                              **DATE**

9 Murray Street, 2nd Floor, New York, NY 10007
Phone: 212.509.1336  Fax: 212.509.1372  Web: www.msasecurity.net

IOVINO_00000226

MSA000044

# EXHIBIT H

IOVINO_00000227

11/14/2017                                                    Veterinarian

## Veterinarian
CVC - Winchester, Virginia

 **Hiring Lead**
Melissa Latella

**Status**
Filled

4 Applicants

Since 1987, MSA Security has served as an industry leader in high-consequence threat protection and specialized training for corporate and government clients. The MSA team is comprised of security professionals with diverse backgrounds in law enforcement, elite military units, and the private sector, all working together to provide unparalleled explosive detection, consulting, training and perimeter security services. MSA combines hands-on expertise with information and technology to minimize our client's vulnerabilities to threats and lessen risks in order to protect their personnel and property.

**Location**
Winchester, Virginia

**Department**
CVC

**Employment Type**
Contractor

**Minimum Experience**
Experienced

**Internal Job Code**
V-CVC

**Job Summary:**
This contractor position is responsible for overall canine health CONUS and OCONUS.

**Minimum Position Requirements:**
- Shall be a U.S. Citizen and possess a valid U.S. Passport.
- Shall possess or be able to obtain a minimum MRPT level clearance.
- Shall have a degree from a 4-year program at an accredited college of veterinary medicine
- Shall be licensed as a Doctor of Veterinary Medicine (D.V.M or V.M.D.)
- Shall have a minimum experience of two (2) years as a veterinarian in a private practice or the military
- Shall have knowledge of the chemical composition, structure, and properties of substances and of the chemical processes and transformations that they undergo (this includes uses of chemicals and their interactions, danger signs, production techniques, and disposal methods)
- Knowledge of plant and animal organisms, their tissues, cells, functions, interdependencies, and interactions with each other and the environment
- Experience in maintaining canine health records and canine international health certificates
- Shall have experience with a microchip program that scans, reads and tracks canines
- Shall be willing to live and work in conflict/combat areas or similar hazardous environments, or other international locations as mission requires, for periods of time ranging from seven (7) to ninety (90) days

**Position Duties:**
- Examine animals to detect nature of diseases or injuries.
- Treat sick or injured animals by prescribing medication, setting bones, dressing wounds, or performing surgery.
- Effectively interact and communicate with the COR and other leadership entities regarding veterinary care and recommendations.
- Inoculate animals against various diseases such as rabies and distemper.
- Collect body tissue, feces, blood, urine, or other body fluids for examination and analysis.
- Operate diagnostic equipment such as radiographic and ultrasound equipment, and interpret the resulting images.
- Advise handlers regarding sanitary, feeding, and general care necessary to promote health of animals.
- Educate handlers/trainers about zoonotic diseases
- Train and supervise workers who handle and care for animals.
- Euthanize animals at the direction of the COR.
- Establish and conduct quarantine and testing procedures that prevent the spread of diseases to other animals or to humans, and that comply with applicable government regulations.
- Conduct postmortem studies and analyses to determine the cause of animals' deaths.
- Perform administrative duties such as scheduling appointments and maintaining records.
- Inspect and test animals to detect the presence of communicable diseases.

4 Applicants   [ + Add ] - This job is not open. Edit this job opening to change its status.

IOVINO_00000228

MSA000046

# EXHIBIT I

IOVINO_00000229

MSA000047

11/14/2017                                        Veterinarian

## Veterinarian
CVC - Winchester, Virginia          👤 Hiring Lead          |  Status
                                       Melissa Latella      |  Filled

⌄ View Full Job Description

19 Applicants   [ + Add ] - This job is not open. Edit this Job opening to change its status.          Showing   All

| Name | Rating | Date | Phone | Status | |
|---|---|---|---|---|---|
| Jeffrey Zolklewicz | | Oct 04, 2016 | . | Reviewed (a year ago ) | 📄 ✉ |
| William Ley | | Oct 03, 2016 | | Reviewed (a year ago ) | 📄 ✉ 🔗 in |
| Hasan Albasan | | Oct 03, 2016 | · | Reviewed (a year ago ) | 📄 ✉ |
| Edwin Cuevas | | Sep 25, 2016 | . | Reviewed (a year ago ) | 📄 ✉ |
| Gabriele Tribertl | | Sep 19, 2016 | ...J | Reviewed (a year ago ) | 📄 ✉ in |
| Kimberly Arthur | | Sep 10, 2016 | | Reviewed (a year ago ) | 📄 ✉ |
| Kimberly Arthur | | Sep 10, 2016 | | Reviewed (a year ago ) | 📄 ✉ |
| David Bowen | | Sep 08, 2016 | ' | Reviewed (a year ago ) | 📄 ✉ |
| Heather Jue | | Sep 01, 2016 | .: | Reviewed (a year ago ) | 📄 ✉ |
| Guy Maxwell | | Sep 01, 2016 | | Reviewed (a year ago ) | 📄 ✉ |
| Edwin Cuevas | | Aug 31, 2016 | | Reviewed (a year ago ) | 📄 ✉ |
| Olivia Schlichting | | Aug 30, 2016 | | Reviewed (a year ago ) | 📄 ✉ in |
| Mallory Tate | | Aug 29, 2016 | | Reviewed (a year ago ) | 📄 ✉ in |
| April Grothe | | Aug 28, 2016 | | Reviewed (a year ago ) | 📄 ✉ |
| Edwin Cuevas | | Aug 25, 2016 | : | Reviewed (a year ago ) | 📄 ✉ |
| Paula Lenhard-Rogers | | Aug 25, 2016 | | Reviewed (a year ago ) | 📄 ✉ |
| Suma Rao | | Aug 24, 2016 | | Reviewed (a year ago ) | 📄 ✉ |
| Seth Finger | | Aug 24, 2016 | .... | Reviewed (a year ago ) | ✉ |
| Erika Alt | | Aug 24, 2016 | | Reviewed (a year ago ) | 📄 ✉ |

1 - 19 of 19

https://msasecurity.bamboohr.com/applicant_tracking/index.php/viewPosition?id=86          1/2

IOVINO_00000230

MSA000048

# EXHIBIT J

IOVINO_00000231

MSA000049

**From:**      Karen Iovino </o=Michael Stapleton/ou=Exchange Administrative Group
               (FYDIBOHF23SPDLT)/cn=Recipients/cn=Karen Iovino183>

**Sent:**      Monday, July 17, 2017 12:30 PM

**To:**        karenvet93@gmail.com

**Subject:**   FW: FT position

---

KAREN IOVINO, DVM

VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: 703.554.4497 | F: 540.545.4138


-----Original Message-----
From: Karen Iovino
Sent: Monday, July 17, 2017 7:44 AM
To: Michael D. Ratcliff <MRatcliff@msasecurity.net>
Subject: RE: FT position

Mike,

My resume is on my home computer.  Will submit resume tonight.  I assume it's just a formality?

No worries about the travel.  Checking up on the oversea program and canines is a good move forward.

Karen

KAREN IOVINO, DVM
 VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: 703.554.4497 | F: 540.545.4138

-----Original Message-----
From: Michael D. Ratcliff
Sent: Monday, July 17, 2017 7:09 AM
To: Karen Iovino <KIovino@msasecurity.net>
Subject: RE: FT position

Karen,
Good deal.  Because it's a new CLIN with a new PD (and bio approval), you'll need to submit your resume again
through the website.  The posting will be up tomorrow and only run through the end of the week.

One thing that I forgot to mention last week is that the FT gig will involve travel.  With the potential new projects
on the horizon, we will likely need to divide the travel up amongst each other to keep things moving efficiently here
at the CVC.

Holler with questions.

Thank you,
Mike

IOVINO_00000232

MSA000050

Mike Ratcliff, MS, DVM

-----Original Message-----
From: Karen Iovino
Sent: Friday, July 14, 2017 6:58 PM
To: Michael D. Ratcliff <MRatcliff@msasecurity.net>
Subject: FT position

Mike,

I would embrace the opportunity to move from 3/4 time to FT to help the ATA program grow. I will plan on moving to FT status Aug 19, 2017. Please send me any paperwork I need to complete to make the transition.

Thanks,
Karen

Karen Iovino, DVM
Veterinarian
Canine Validation Center

Sent from my iPhone

IOVINO_00000233

MSA000051

# EXHIBIT K

IOVINO_00000234

MSA000052

CONFIDENTIAL

**Hiring Decision & Justification:** CVC ATA Full time Veterinarian
**Hiring Manager:** Michael D. Ratcliff, MS, DVM; CVC Lead Veterinarian
Applicants:
Dr. Cuevas, Edwin
Dr. Iovino, Karen
Dr. Orta, Colleen
Dr. Palmer, Lee

Preliminary Screening:
Review of résumés excludes Drs. Cuevas and Orta from selection since they do not demonstrate significant experience with Working Dogs when compared to the other two applicants.

Final Candidates:
Dr. Iovino (current ATA part-time veterinarian) and Dr. Palmer

Assessment Parameters:
I have known and worked with both Drs. Iovino and Palmer as veterinary colleagues for a minimum of 6 months. Dr. Iovino has worked directly for me during this time. These assessments are based off of personal experience working side-by-side, ample conversations, and numerous email and telephone communications with each.

| Qualitative Criteria | | |
|---|---|---|
| Criteria/Applicant | Dr. Iovino | Dr. Palmer |
| Minimum 2 years veterinary experience[1] | X | X |
| Possess, or ability to possess, a SECRET clearance[1] | X | X |
| Willing to live/work in combat areas for up to 90 days[1] | X | X |
| Board Certified Veterinary Specialist | | X[2] |
| Canine Rehabilitation Certification | | X |
| Working Dog experience | X | X |
| Military Working Dog experience | | X |
| Military service | | X |
| Overseas (austere) deployed veterinary experience | | X |
| DoS Explosive Detection Canine veterinary experience | X | |
| Effective diplomacy & communications internationally | | X |
| Research and R&D experience | | X |
| Journal publications | | X |
| Textbook publications | | X |
| Conference lecture experience | | X |
| EOD experience | | X[3] |
| Additional advanced degree (MS, MA, PhD) | | X |
| Experience working with DHS/FEMA | X[4] | X |
| Experience training handlers on Tactical Combat Care | | X |
| Emergency Medical Technician (Human) | | X |
| Deputy Sheriff | | X |

[1] Mandatory DOS requirement
[2] Emergency/Critical Care specialist
[3] Senior EOD Technician with the U.S. Air Force
[4] CONUS deployments to assist after various natural disasters

IOVINO_00000235

MSA000053

**Additional Criteria**

Day-to-day Working Dog experience:            Candidate advantage:    NONE/TIE
Both candidates possess the abilities necessary to provide routine, day-to-day veterinary care (including elective surgical) to Explosive Detection Canines on the various ATA projects.

Emergency Response:            Candidate advantage:    Dr. Palmer
Though Dr. Iovino has significant experience as an Emergency Veterinarian, it is all at the General Practitioner level. Dr. Palmer is a board certified specialist in Emergency and Critical Care, which required a 1-year internship, 3-year residency, and passing a very strenuous examination.

Client and Leadership Professional Relationships:            Candidate advantage:    Dr. Palmer
Based on past performance and feedback from the client and MSA senior leadership, our confidence in Dr. Iovino's ability to work and communicate effectively with these entities is poor. She lacks the ability to professionally relate to these individuals, and she struggles to inspire confidence when she makes recommendations. Dr. Palmer has a long history of dealing with high-level government officials across a spectrum of agencies, including SOCOM. These entities frequently reach out to him for SME guidance regarding all aspects of Working Dog care. He comes recommended by SOCOM and HHS, among others.

Team Work/Leadership:            Candidate advantage:    Dr. Palmer
Dr. Iovino has failed to consistently work with her existing team with tactfulness, respect, or professionalism. Dr. Palmer displays a high capacity for interacting with a team with a better level of diplomacy. Dr. Palmer brings a vast history of leadership experience- including Military service as an Officer, University-level leadership, Law Enforcement, and leading numerous committees to advance veterinary protocols in emergent situations.

Teaching/Instructing:            Candidate advantage:    Dr. Palmer
Dr. Palmer is an international SME in regards to pre-hospital veterinary care. He is frequently invited to lecture and train with all levels of Canine Professionals, from the handler level all the way to human trauma surgeons who could potentially work on dogs (if needed). He demonstrates the ability to relate to all of these individuals, and provide viable training that could potentially save a K9's life in a tactical situation. Dr. Iovino does have experience training handlers on various K9 first aid topics, but her experience is vastly overshadowed by Dr. Palmer's.

International Travel/Diplomacy:            Candidate advantage:    Dr. Palmer
We are reluctant to send Dr. Iovino out on international missions, a large part of the newly-developed full time position, based on her attitude and personality when dealing with leadership. We worry that she does not possess the ability to relate to international canine personnel in an effective way, which could negatively impact the MSA/CVC mission in regards to client satisfaction.

**Recommended Selection:**        **Dr. Lee Palmer**

IOVINO_00000236

# EXHIBIT L

# EXHIBIT 015

Deposition of Alan Bower
February 25, 2026

Susp/Admin Leave Memo Aug 4

Bates: IOVINO_00000045 (1 pp.)

000024

August 4, 2017

Today at approximately 7:30am when I arrived at the CVC, Alan Bower and Mike Ratcliff were waiting for me at the door.  Alan asked to speak to me.  He ushered me into an empty office(Mike Hayes').  Mike also entered the office.

Alan informed me effective immediately I am suspended for disclosing confidential information.  I asked if it was with or without pay.  He said I should contact Peter Deegan.  He asked if I had his contact information.  I indicated 'no' and Alan provided his phone number on a piece of paper.  I asked if I was allowed to go to the hospital to remove my personal items such as veterinary books and pictures.  He said 'no', they would be returned to me.

I informed both Mike and Alan that Virginia Board of Veterinary Medicine requires 5 days notice on change of 'veterinarian in charge' and since I cannot provide that, the hospital should not be utilized.

Alan then asked for my key fob.  I had two additional keys on the key ring.  I informed Mike one was for the controlled drug lock box in the refrigerator and one was for the safe.

I was then escorted out of the building.

**Exhibit 015**

AB

02/25/26

IOVINO_00000045

# EXHIBIT M

# EXHIBIT 016

Deposition of Alan Bower
February 25, 2026

Term Ltr MSA HR Aug 18

Bates: IOVINO_00000272 (1 pp.)

MSA000089



IN THE BUSINESS OF BUSINESS AS USUAL™

NEW YORK | 212-509-1336
BOSTON | 617-136-0521
WEST COAST | 619-795-7143
NATIONAL CAPITAL REGION | 571-375-5018

August 18, 2017

Ms. Karen Iovino
19744 Ridgeside Road
Bluemont, VA

Dear Karen,

As per our previous discussions, your part time assignment as Veterinarian has come to completion as of today, August 18, 2017.

You will receive your final paycheck directly from our Payroll department. You will be paid for any accrued, but unused PTO. You will receive a separate letter from our HR department regarding continuation benefits under COBRA.

Sincerely,

Human Resources Department
MSA Security

Copies: HR, File

9 Murray Street, 2nd Floor, New York, NY 10007
Phone: 212.509.1336  Fax: 212.509.1372  Web: www.msasecurity.net

**Exhibit 016**
AB
02/25/26

# EXHIBIT N

# EXHIBIT 004

Deposition of Peter Deegan
February 17, 2026

Deegan HR Email Jul 25

Bates: GAPKI_006151-GAPKI_006154 (4 pp.)

From: **Karen Iovino** Klovino@msasecurity.net
Subject: FW: Litigation Against the Company and Press Inquiries
Date: July 26, 2017 at 11:50 AM
To: karenvet93@gmail.com

KAREN IOVINO, DVM



VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: 703.554.4497 | F: 540.545.4138

**From:** Karen Iovino
**Sent:** Wednesday, July 26, 2017 11:50 AM
**To:** Peter Deegan <PDeegan@msasecurity.net>
**Subject:** RE: Litigation Against the Company and Press Inquiries

Mr. Deegan,

I reported my many concerns to my supervisor and our HR rep at CVC. I followed proper protocol and was wrongly reprimanded by both individuals.  In addition, I was forced to continue to perform my job duties(which, I do well and have the support of the staff I work with) without a reliable technician.

Again, I will be happy to discuss these matters at the appropriate time face to face.

Karen

KAREN IOVINO, DVM



VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: 703.554.4497 | F: 540.545.4138

**Exhibit 004**
PD
02/17/26

**From:** Peter Deegan
**Sent:** Wednesday, July 26, 2017 11:16 AM
**To:** Karen Iovino <Klovino@msasecurity.net>
**Subject:** RE: Litigation Against the Company and Press Inquiries

Karen,
Thank you for your reply.   The EEOC complaint will be dealt with through the established channels since you chose to make us aware of your sex and age complaint via that process.

As I am sure you are aware, as an employee on a government contract, you have fiduciary

GAPKI_006151

responsibility to bring allegations of impropriety to our attention.  Accordingly if you have concerns of impropriety relating to the CVC aside from your complaint of sex and age discrimination, you must report these to me.  Additionally, if you have concerns (aside from your complaint of sex and age discrimination), we must make the client aware, as well as notify the IG of the issues for investigation.

I await your reply.

Kind regards,
Peter Deegan

**PETER DEEGAN | VICE PRESIDENT, HUMAN RESOURCES** | OFFICE: +1 (212) 509-1336 EXT. 242 | MOBILE: +1 (347) 949-3453
**MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™** | WEB: WWW.MSASECURITY.NET

**From:** Karen Iovino
**Sent:** Wednesday, July 26, 2017 7:51 AM
**To:** Peter Deegan <PDeegan@msasecurity.net>
**Subject:** RE: Litigation Against the Company and Press Inquiries

Mr. Deegan,

In light of the fact that I felt compelled to file an EEOC complaint, I don't feel it would be appropriate to elaborate on the issues at CVC at this time.

I would be happy to have a face to face discussion at the appropriate time.

Karen

KAREN IOVINO, DVM



VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: 703.554.4497 | F: 540.545.4138

**From:** Peter Deegan
**Sent:** Tuesday, July 25, 2017 10:43 PM
**To:** Karen Iovino <Klovino@msasecurity.net>
**Subject:** RE: Litigation Against the Company and Press Inquiries

Hi Karen,
Yes,  I am aware of your EEOC charge. We will be responding in due course.  When you say there are serious issues at CVC, what do you mean?

Kind regards,
Peter

GAPKI_006152

**PETER DEEGAN | VICE PRESIDENT, HUMAN RESOURCES** | OFFICE: +1 (212) 509-1336 EXT. 242 | MOBILE: +1 (347) 949-3453

**MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™** | WEB: WWW.MSASECURITY.NET

**From:** Karen Iovino
**Sent:** Tuesday, July 25, 2017 8:03 PM
**To:** Peter Deegan <PDeegan@msasecurity.net>
**Subject:** Re: Litigation Against the Company and Press Inquiries

Hi Mr Deegan,

I understand the company is under scrutiny. Are you aware of the EEOC complaint I filed against MSA?  The CVC seems to operate separately. There are some very serious issues at the CVC.

Karen

Karen Iovino, DVM
Veterinarian
Canine Validation Center

Sent from my iPhone

On Jul 25, 2017, at 4:50 PM, Peter Deegan <PDeegan@msasecurity.net> wrote:

Dear Colleagues:

As you might be aware, a lawsuit was filed against the Company recently.  The Post published an article this past weekend referencing the litigation and the group of former and current employees who are parties to it.   I know that many of you, understandably, have expressed concern and/or have questions regarding this matter.   What we can tell you now is that we are evaluating the claims alleged in the suit and intend to vigorously defend claims without merit.  However, as is the typical process when litigation is pending, we are unable to make any further comment to you regarding this matter at this time on the advice of our legal counsel.

Prior the article, the press made inquiries to staff members and attempted to gain information.   This is a good reminder to all employees that <u>all press inquiries in regards to this and any other legal or employee matter</u> should be brought to my attention so that we can review and channel internally as appropriate.

We also ask that employees be mindful of calls coming into the Company for information.   Even a seemingly harmless request could be misconstrued as you speaking on behalf of the Company.   If you have a question regarding these matters or you get a call that is questionable, please bring it to my attention immediately.

Thank you in advance for your cooperation in this matter.

GAPKI_006153

Regards,
Peter

**Peter Deegan | Vice President, Human Resources** | Office: +1 (212) 509-1336 ext. 242
| Mobile: +1 (347) 949-3453
**MSA Security | IN THE BUSINESS OF BUSINESS-AS-USUAL™** | Web:
WWW.MSASECURITY.NET

<image001.jpg>
<image003.png>

The information contained in, or attached to this email may contain confidential information, intended solely for the use of the addressed individual or entity, and may be subject to legal privilege. If you have received this email in error, you should (1) notify the sender immediately by reply email, and (2) delete the message from your system(s) and notify your IT department. Please do not copy, disclose, or disseminate the contents of this email to any other unintended person(s) or entity. The views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. The recipient should check this e-mail and any attachments for the presence of malicious software. The sender of this message accepts no liability for any damage caused, directly or indirectly, by any malicious software transmitted in this email.

GAPKI_006154

# EXHIBIT O

# EXHIBIT 020

Deposition of Peter Deegan
February 17, 2026


Ratcliff Declaration Jul 2019

Bates: IOVINO_00000502-IOVINO_00000508 (7 pp.)

MSA000319

MSA Security                                :

                         :

            v.                     :       **OIG Whistleblower Case 2017-0044**

                         :

Karen Iovino                           :

### DECLARATION OF DR. MICHAEL RATCLIFF
### TO SUPPLEMENT THE ADMINISTRATIVE RECORD

I, Dr. Michael Ratcliff, declare under the penalty of perjury:

1. I am over the age of 18 years old and have personal knowledge of the matters stated below.

2. I am a licensed veterinarian in the State of Virginia and was hired as the Lead Veterinarian for the Canine Validation Center ("CVC") by Michael Stapleton Associates, Ltd. d/b/a MSA Security ("MSA") in November of 2016.

3. As the Lead Veterinarian at the CVC, it was part of my duties to supervise Dr. Karen Iovino ("Iovino").

4. Iovino was never demoted and never held the position of "Lead Veterinarian" while working for MSA.

5. As a part-time veterinarian at the CVC, Dr. Iovino consistently displayed a lack of professionalism, often contradicting her managers and berating her co-workers. Iovino was overtly hostile and insubordinate to her corporate leadership team, and in particular to me, to whom she reported.

6. Her demeanor was consistently negative in that she complained voraciously about other people and operations generally, being intensely critical of the most mundane of events and openly shared this disdain and a self-imposed sense of importance and superiority in her daily interactions. This had an obvious negative effect on the moral and drive of CVC personnel.

Exhibit 020
PD
02/17/26

IOVINO_00000502

7. On November 14, 2016, soon after I was hired, I invited Iovino to a briefing meeting with the CVC's then Program Manager Zane Roberts. Upon entering the meeting, Iovino said to me, "I feel like the whole process, and the way you were brought in, was bullshit." After that, she constantly interrupted the meeting to interject, saying repeatedly "I have a problem with this," without any particular reason.

8. Iovino tended to interrupt technicians during their duties and insist that they drop their work and attend immediately to her concerns, no matter how small. I counseled her on the negative impact of her interruptions and advised her to allow technicians and personnel to attend to their mission-critical work first before assisting her on routine matters such as clean up, but she was unresponsive to the counseling.

9. Iovino's negative attitude did not improve with time, nor did her constant challenge and disrespect to authority figures.

10. On December 30, 2016, Iovino emailed me to demand why I and one of the veterinary technicians had left for the day. I had permitted the technician to leave early that day as there were no critical tasks that necessitated staying late, particularly on the last business day before the New Year's holiday. I explained to Iovino that there seemed to be minor record-keeping left and that is why I allowed the technician to leave early. Iovino replied to me by listing the cleaning tasks that had yet to be completed which to be seemed ludicrous, endemic of her being generally disgruntled and specifically targeted at challenging my authority. I concluded the email by writing that I would not engage in an argument over email.

11. On January 4 2017, Alan Bower and I met with Iovino to discuss proper protocols for requiring staff to stay late as well as the negative attitude she often displayed at work. We counseled her on this behavior, but the counseling was ineffective.

2

IOVINO_00000503

12. On February 27, 2017, Dr. Iovino emailed me to follow up on a purchase order I had missed. I acknowledged my oversight with the order, and jokingly suggested that I would do push-ups for my error. Dr. Iovino responded by stating, "Men!...Keeping track of you all is a FT job sometimes." I found these statements to be offensive and inappropriate.

13. Iovino was repetitively vocal about her opposition to our transferring canines to foreign governments, a critical mission of MSA and the Department that she was specifically employed to support and a key component of MSA's contract for the Department.

14. Iovino took every opportunity to express negativity about this program and point out the potential related issues at every juncture, as if MSA was engaging in wrongdoing at the Department's request. This obviously had an effect on morale at MSA.

15. Iovino's insubordination, lack of professionalism, poor leadership and failure to correct behavior she was counseled on would have justified MSA terminating her at-will employment at any time. She certainly was not a "phenomenal employee" as the OIG Report wrongly asserts.

16. In May 2017, the Department of State indicated to MSA that it wanted MSA to replace the part-time CVC veterinarian position held by Iovino with a new full-time position.

17. This change was required by the growing scope of the CVC program and the increasing operational tempo which demanded greater veterinary resources to maintain the well-being of the dogs.

18. The Department foresaw an increased need to send the veterinarians overseas and work in potential combat areas where its explosive detection canines were utilized and so indicated a preference that the new full-time position be filled by someone with military background and international experience.

3

IOVINO_00000504

MSA000322

19. Iovino overtly state on several occasions that she herself did not want to travel overseas and did not want a full-time position such as the position she now claims that she was wrongfully denied.

20. MSA posted the new full-time position online and accepted resumes. I explained to Iovino, via email, on July 17, 2017 that she had to apply online "because it's a new CLIN with a new PD (and bio approval), you'll need to submit your resume again through the website."

21. Iovino's claim that I offered her this position in February 2017 is false. I never offered her a position then or at any other time.

22. When I told Iovino about her old position ending and needing to apply online for the new position (if she was interested), I had no idea that she had filed complaints with the EEOC and the OIG.

23. Iovino applied for the new full time veterinary position on July 17, 2017.

24. Iovino's interest in applying came as a surprise to me, given her past unwillingness to work full-time or travel, as well as her failure to apply for the previous two-full time veterinarian positions added during her tenure with MSA.

25. The only time she expressed any willingness to work "full-time", she immediately caveated it by saying she would have to have a modified schedule providing for three very long days and one half-day.

26. MSA received four on-line applications the new position. After an initial review, we narrowed down the candidate pool to Iovino and Dr. Lee Palmer.

27. After deliberation, we ultimately chose Dr. Lee Palmer for the full-time position on July 25, 2017.

4

IOVINO_00000505

28. Due to Iovino's lack of military background or any international experience, we found her to be only minimally qualified for the new position. Additionally, Dr. Iovino's lack of support towards the mission, inadequacies in leadership skills, and her inability to work well with managers and subordinates alike also precluded her from being selected for the position in which international missions and diplomacy were key components.

29. Based on my extensive first-hand experience working with Iovino, I was certain she would not serve MSA and the Department effectively as an ambassador and leader for international missions. We conferred with Department personnel at the CVC who had likewise observed Iovino's lack of professionalism first-hand, and confirmed that the Government would not have been comfortable with MSA engaging Iovino in the newly-created position.

30. Dr. Palmer's vast military and professional experience made him the ideal candidate.

31. Dr. Palmer's credentials for the position vastly overshadowed Iovino's. Iovino's (3) page resume showed that her experience was limited to the general practitioner level. In contrast, Dr. Palmer's resume, which was twelve (12) pages long, listed relevant emergency care experiences, various leadership roles within the Army Reserves, peer reviewed articles, publications, lectures and teaching positions. Moreover, Dr. Palmer was also certified as an Emergency Medical Technician ("EMT"), which we found useful and highly relevant given that the position would require travel to combat zones.

32. On August 4, 2017, veterinary technician Jennifer Houston told me that two of the kennel technicians, Jonah Ballenger and Ben Orndorff, told her that Iovino was threatening to go to the media, including the Washington Post, with concerns about the CVC which purportedly included confidential information. I spoke with Ben Orndorff, who confirmed that Iovino had made this threat.

5

IOVINO_00000506

MSA000324

33. On August 4, 2017, MSA placed Iovino on administrative leave to investigate Iovino's threats to disclose confidential and sensitive information to the media. True to her character, Iovino reacted to the news of her being placed on leave in a highly unprofessional fashion – by threatening to call the state veterinary board and have the CVC's veterinary facilities shut down.

34. On March 26, 2018 I was interviewed by OIG Investigators. I was infuriated after reading the July 5, 2018 OIG Report, alleging that I knew of Dr. Iovino's protected disclosures when selecting Dr. Palmer for the full-time position.

35. As written in the report, that statement is false. I told the OIG that I did not become aware of the disclosures until after Dr. Iovino was terminated.

36. The question from the OIG during my interview was simply, "Are you aware that Iovino has filed complaints?" to which I replied something to the effect of "yes, that assumption can be drawn based on your [OIG] opening interview comments stating such." I then went on to tell the OIG that I did not become aware of these complaints until after her termination. Any insinuation that I had previous knowledge is categorically false.

37. Iovino was not suspended or fired because of any disclosures she made to the OIG. MSA encourages its employees to report suspected misconduct, including to the OIG.

38. MSA also later learned that Iovino wrongfully and secretly euthanized the pet of another MSA employee during her workday in the CVC parking lot in October of 2016.

39. In doing so, she used controlled medications purchased under Iovino's DEA license for (and billed to) the Department.

40. Iovino improperly directed a CVC veterinary technician to assist her in this procedure, which was performed during the workday with the labor for both Iovino and the technician billed to the Department.

6

IOVINO_00000507

MSA000325

41. Iovino then created a false medical record documenting the procedure by stating that the patient's owner was "MSA-CVC."

42. Although MSA only discovered this misconduct after Iovino's employment with the company had ended, this episode confirms Iovino's willful disregard for procedure and her untruthfulness.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated: July 05, 2019

Dr. Michael Ratcliff

7

IOVINO_00000508

# EXHIBIT P

# EXHIBIT 013

Deposition of Anna Garcia Durr
January 16, 2026

Contemporaneous Note Jan 5 2017 Confrontation

Bates: GAPKI_006239-GAPKI_006240 (2 pp.)

Exhibit 013

AGD

01/16/26

1

January 5, 2017

Yesterday at approximately 8 am, I was asked by Mike Ratcliff, DVM, Lead Veterinarian, via hand held radio, to come to the conference room.

When I arrived both he and Alan Bower, Deputy Program Manager, Facilities and Support, were present.

Mike indicated the meeting was to discuss my requested clarification of expectations of support staff, specifically Jenn Houston, LVT. (See email dated Friday, Dec 23, 2016).  Of note, this requested discussion was postponed the previous Wednesday by Mike.  He said we would discuss on Friday, Dec 30th at our weekly doctors out brief meeting. Said meeting was cancelled and when I asked to discuss again that day, he said he didn't want to.

Mike told me that my email to him last Friday (see email Friday, Dec 30, 2016) regarding Jenn leaving early was inappropriate. He had asked me earlier that day what they (he and Jenn) could do to help me complete tasks.  I discussed what I had left to do for the day.  At no time did he indicate he or Jenn would be leaving early.  Normally he checks in with me at the end of the day before he leaves the CVC. I asked to start the discussion with the events of Friday Dec 23rd as that was the impetus for the Friday Dec 30th email.  He would not discuss.  Instead he said I couldn't expect employees to stay late.  I explained, as I did in my email, that when Jenn was interviewed by phone, Alan, Josh Carter(Dept. of State Program Mgr.), and Zane Roberts (CVC Program Mgr.), were present and heard me indicate to Jenn that due to the nature of our job and the mission needs, there may be days that are longer than the normal 8 hrs in order to complete tasks and remain mission ready.  She indicated that she understood and accepted that fact.  I wanted to be sure that I clarified to everyone that staying late at times has always been a clear job expectation.

Alan then spoke up and stated that I need to 'not work so hard' and that 'everyone' is afraid of me.  His example for this was the Logistics employees now are working Sunday's.  He said they asked what to do if I asked them for help.  This statement is confusing to me as I don't work Sunday's and I rarely ask the Logistics employees for help.  Alan then said I am always running around working and need to relax.  I clarified with Alan that when the WPS side done, there are no canines left to care for.  The ATA side has kenneled canines on and off site and under my care.  He said I should have asked a kennel tech for help the day I asked Jenn to stay late.  I explained the kennel tech was busy caring for the 14 canines in the kennel.  I often times don't have the support I need as Jenn, who was hired to help me in the ATA hospital, is on the WPS side almost exclusively(except Wednesday's which are procedure/surgery days).

Mike brought up my concerns regarding Jenn's medical error Dec 21, 2016 (see write up).  He told me he does not want a climate where the veterinary team is afraid to make

GAPKI_006239

January 5, 2017

mistakes.  As an examples, he used a hypothetical case of one of his surgeries with a bleeding pedicle and the dog requiring additional surgery to explore.  He indicated that those 'things' happen.  Jenn's error was discussed with her and she took ownership of it. I stated that her errors are increasing in frequency and escalating in severity.  He told me that she is not 'going anywhere' and to stop writing her up for every mistake.

The meeting ended with me stating I understood.  It should be noted that this meeting in which I was reprimanded occurred early in the day approximately one hour before performing an ovariectomy and gastropexy on a 60# dog (a very challenging surgical procedure).

A few hrs later, Zane followed up with me as he had heard me being called in for a meeting.  I recounted the meeting to him as noted above.  He said he was angry with Alan for not including him in the meeting.  As Program Mgr he should have been present.  He also indicated he had a briefing and discussion with Alan after my meeting and he told Alan that the items discussed with me were not appropriate.  Jenn was told during her interview she may need to work late.  Alan indicated he was tired of my write ups of Jenn.  Zane said he informed Alan I was following his (Alan's) instructions to Zane regarding employee documentation.  I was to write up all issues with Jenn especially during her 90 day probationary period, which is what I performed as instructed.  During the 90 day period, Zane attempted to have Jenn released (see numerous write ups). Alan was reluctant.  Alan said during a discussion with me regarding Jenn's tardiness, 'how do I know the next LVT won't be as bad'.  MSA HR(NY) said she should have additional counseling discussions.  (She already had a counseling memo during that 90 day period).

Karen Iovino, DVM

GAPKI_006240

# EXHIBIT Q

# EXHIBIT 011

Deposition of Jennifer Hartley
January 15, 2026

Contemporaneous Note Confrontation

Bates: GAPKI_006239-006240 (2 pp.)

Exhibit 011

JH

01/15/26

1

January 5, 2017

Yesterday at approximately 8 am, I was asked by Mike Ratcliff, DVM, Lead Veterinarian, via hand held radio, to come to the conference room.

When I arrived both he and Alan Bower, Deputy Program Manager, Facilities and Support, were present.

Mike indicated the meeting was to discuss my requested clarification of expectations of support staff, specifically Jenn Houston, LVT. (See email dated Friday, Dec 23, 2016).  Of note, this requested discussion was postponed the previous Wednesday by Mike.  He said we would discuss on Friday, Dec 30th at our weekly doctors out brief meeting. Said meeting was cancelled and when I asked to discuss again that day, he said he didn't want to.

Mike told me that my email to him last Friday (see email Friday, Dec 30, 2016) regarding Jenn leaving early was inappropriate. He had asked me earlier that day what they (he and Jenn) could do to help me complete tasks.  I discussed what I had left to do for the day.  At no time did he indicate he or Jenn would be leaving early.  Normally he checks in with me at the end of the day before he leaves the CVC. I asked to start the discussion with the events of Friday Dec 23rd as that was the impetus for the Friday Dec 30th email.  He would not discuss.  Instead he said I couldn't expect employees to stay late.  I explained, as I did in my email, that when Jenn was interviewed by phone, Alan, Josh Carter(Dept. of State Program Mgr.), and Zane Roberts (CVC Program Mgr.), were present and heard me indicate to Jenn that due to the nature of our job and the mission needs, there may be days that are longer than the normal 8 hrs in order to complete tasks and remain mission ready.  She indicated that she understood and accepted that fact.  I wanted to be sure that I clarified to everyone that staying late at times has always been a clear job expectation.

Alan then spoke up and stated that I need to 'not work so hard' and that 'everyone' is afraid of me.  His example for this was the Logistics employees now are working Sunday's.  He said they asked what to do if I asked them for help.  This statement is confusing to me as I don't work Sunday's and I rarely ask the Logistics employees for help.  Alan then said I am always running around working and need to relax.  I clarified with Alan that when the WPS side done, there are no canines left to care for.  The ATA side has kenneled canines on and off site and under my care.  He said I should have asked a kennel tech for help the day I asked Jenn to stay late.  I explained the kennel tech was busy caring for the 14 canines in the kennel.  I often times don't have the support I need as Jenn, who was hired to help me in the ATA hospital, is on the WPS side almost exclusively(except Wednesday's which are procedure/surgery days).

Mike brought up my concerns regarding Jenn's medical error Dec 21, 2016 (see write up).  He told me he does not want a climate where the veterinary team is afraid to make

GAPKI_006239

January 5, 2017

mistakes.  As an examples, he used a hypothetical case of one of his surgeries with a bleeding pedicle and the dog requiring additional surgery to explore.  He indicated that those 'things' happen.  Jenn's error was discussed with her and she took ownership of it. I stated that her errors are increasing in frequency and escalating in severity.  He told me that she is not 'going anywhere' and to stop writing her up for every mistake.

The meeting ended with me stating I understood.  It should be noted that this meeting in which I was reprimanded occurred early in the day approximately one hour before performing an ovariectomy and gastropexy on a 60# dog (a very challenging surgical procedure).

A few hrs later, Zane followed up with me as he had heard me being called in for a meeting.  I recounted the meeting to him as noted above.  He said he was angry with Alan for not including him in the meeting.  As Program Mgr he should have been present.  He also indicated he had a briefing and discussion with Alan after my meeting and he told Alan that the items discussed with me were not appropriate.  Jenn was told during her interview she may need to work late.  Alan indicated he was tired of my write ups of Jenn.  Zane said he informed Alan I was following his (Alan's) instructions to Zane regarding employee documentation.  I was to write up all issues with Jenn especially during her 90 day probationary period, which is what I performed as instructed.  During the 90 day period, Zane attempted to have Jenn released (see numerous write ups). Alan was reluctant.  Alan said during a discussion with me regarding Jenn's tardiness, 'how do I know the next LVT won't be as bad'.  MSA HR(NY) said she should have additional counseling discussions.  (She already had a counseling memo during that 90 day period).

Karen Iovino, DVM

GAPKI_006240

# EXHIBIT R

# EXHIBIT 015

Deposition of Michael Hayes
February 13, 2026

Contemporaneous Note Jan 5

Bates: DOS-IOVINO-00193-DOS-IOVINO-00194 (2 pp.)

1

January 5, 2017

Yesterday at approximately 8 am, I was asked by Mike Ratcliff, DVM, Lead Veterinarian, via hand held radio, to come to the conference room.

When I arrived both he and Alan Bower, Deputy Program Manager, Facilities and Support, were present.

Mike indicated the meeting was to discuss my requested clarification of expectations of support staff, specifically Jenn Houston, LVT. (See email dated Friday, Dec 23, 2016).  Of note, this requested discussion was postponed the previous Wednesday by Mike.  He said we would discuss on Friday, Dec 30th at our weekly doctors out brief meeting. Said meeting was cancelled and when I asked to discuss again that day, he said he didn't want to.

Mike told me that my email to him last Friday (see email Friday, Dec 30, 2016) regarding Jenn leaving early was inappropriate. He had asked me earlier that day what they (he and Jenn) could do to help me complete tasks.  I discussed what I had left to do for the day.  At no time did he indicate he or Jenn would be leaving early.  Normally he checks in with me at the end of the day before he leaves the CVC. I asked to start the discussion with the events of Friday Dec 23rd as that was the impetus for the Friday Dec 30th email.  He would not discuss.  Instead he said I couldn't expect employees to stay late.  I explained, as I did in my email, that when Jenn was interviewed by phone, Alan, Josh Carter(Dept. of State Program Mgr.), and Zane Roberts (CVC Program Mgr.), were present and heard me indicate to Jenn that due to the nature of our job and the mission needs, there may be days that are longer than the normal 8 hrs in order to complete tasks and remain mission ready.  She indicated that she understood and accepted that fact.  I wanted to be sure that I clarified to everyone that staying late at times has always been a clear job expectation.

Alan then spoke up and stated that I need to 'not work so hard' and that 'everyone' is afraid of me.  His example for this was the Logistics employees now are working Sunday's.  He said they asked what to do if I asked them for help.  This statement is confusing to me as I don't work Sunday's and I rarely ask the Logistics employees for help.  Alan then said I am always running around working and need to relax.  I clarified with Alan that when the WPS side done, there are no canines left to care for.  The ATA side has kenneled canines on and off site and under my care.  He said I should have asked a kennel tech for help the day I asked Jenn to stay late.  I explained the kennel tech was busy caring for the 14 canines in the kennel.  I often times don't have the support I need as Jenn, who was hired to help me in the ATA hospital, is on the WPS side almost exclusively(except Wednesday's which are procedure/surgery days).

Mike brought up my concerns regarding Jenn's medical error Dec 21, 2016 (see write up).  He told me he does not want a climate where the veterinary team is afraid to make

<table>
<tr><td>**Exhibit 015**</td></tr>
<tr><td>MH</td></tr>
<tr><td>02/13/26</td></tr>
</table>

2

January 5, 2017

mistakes.  As an examples, he used a hypothetical case of one of his surgeries with a bleeding pedicle and the dog requiring additional surgery to explore.  He indicated that those 'things' happen.  Jenn's error was discussed with her and she took ownership of it. I stated that her errors are increasing in frequency and escalating in severity.  He told me that she is not 'going anywhere' and to stop writing her up for every mistake.

The meeting ended with me stating I understood.  It should be noted that this meeting in which I was reprimanded occurred early in the day approximately one hour before performing an ovariectomy and gastropexy on a 60# dog (a very challenging surgical procedure).

A few hrs later, Zane followed up with me as he had heard me being called in for a meeting.  I recounted the meeting to him as noted above.  He said he was angry with Alan for not including him in the meeting.  As Program Mgr he should have been present.  He also indicated he had a briefing and discussion with Alan after my meeting and he told Alan that the items discussed with me were not appropriate.  Jenn was told during her interview she may need to work late.  Alan indicated he was tired of my write ups of Jenn.  Zane said he informed Alan I was following his (Alan's) instructions to Zane regarding employee documentation.  I was to write up all issues with Jenn especially during her 90 day probationary period, which is what I performed as instructed.  During the 90 day period, Zane attempted to have Jenn released (see numerous write ups). Alan was reluctant.  Alan said during a discussion with me regarding Jenn's tardiness, 'how do I know the next LVT won't be as bad'.  MSA HR(NY) said she should have additional counseling discussions.  (She already had a counseling memo during that 90 day period).

Karen Iovino, DVM

DOS-IOVINO-00194

# EXHIBIT S

# EXHIBIT 014

Deposition of Anna Garcia Durr
January 16, 2026

Contemporaneous Note May 10 2017 Supervision Removal

Bates: GAPKI_006241-GAPKI_00242 (2 pp.)

May 11, 2017

Below is a summary of 3 meetings that occurred yesterday, Wed May 10th.  See previous write up dated Friday May 5th.

At 0900, Mike R. had requested a meeting (by email invite) with Brett Harshberger and me to discuss Brett as lead KT(kennel tech).  The meeting began with Mike explaining how he feels Brett is deserving of the position.  He said he updated Leadership this week at their weekly meeting.  At no time did he mention that he informed them the change was due to my job performance (or lack of).  When I asked him what specifically if he indicated it was not due to poor performance or mgt of KT's and kennel, he said 'well they all know that's not the case as you did such a great job with Frank'.

I told Brett that Mike and I had been discussing asking him to be lead KT for several months.  He is very deserving, he shows initiative, is caring and organized.

Mike presented us with a new org chart and Division of Duties and Responsibilities list(see 2 attachments).  Of note; on list Brett is supposed to attend Tuesday bimonthly meetings(Leadership) if he is able(Tuesday is one of this days off).  When I asked Mike why Brett is listed to attend and I am not, I was told bec. Brett is only to attend when there is something to report.  Recently at these meetings, significant issues with the ATA OCONUS canines have been discussed.  I indicated I would attend the meetings if requested(Tuesday is one of my days off).

We continued the meeting discussing how Brett and I would communicate in coordinating between ATA hospital and kennel needs.  At the end of the meeting, Brett thanked me for my confidence in his abilities, said he was excited to continue to work with me and hugged me.

At 1000, Mike R scheduled a meeting with myself, the KT's(Brett, Jonah Ballenger, Jessie Bellone, and Ben Orndorff), Carolyn Olech, and Jenn Houston.  He indicated at the email invite that Mike Hayes wanted to meet with us as he is meeting with all the areas of CVC.  At the meeting, Mike R. announced that Brett would be lead KT.  Mike H. updated us on the contract modification with DoS(still not signed) and a few other items.  He mentioned the fence being constructed around CVC. Brett mentioned wanting to ensure gates are installed.  Mike H. said he could mention this at the bi weekly Leadership meetings.  At no time did Mike H. indicate I should attend those meetings.   I asked when the generators would be hooked up(they were delivered several  months ago)as we are almost in hurricane season and no power in the kennel would be tough.  The temperature would most likely exceed 100 F during the summer months without any AC.  Mike H. said there were expected costs but he would look into it and get back to me.

May 11, 2017

<table>
<tr><td><b>Exhibit 014</b></td></tr>
<tr><td>AGD</td></tr>
<tr><td>01/16/26</td></tr>
</table>

GAPKI_006241

2

After the meeting, I asked Mike R. why Brett was to attend the meeting per Mike H. and I was not.  I felt I was being excluded. The org chart indicated both Brett and I are parallel.  Mike said he is going to ask for clarification from Mike H.

At approx. 1300, Brett asked to meet with me in private.  He began by thanking me for my support and saying he is excited for the opportunity to be lead KT.  He then said he does not feel the situation(him being asked to be lead) was handled properly.  I explained I agreed, that proper chain of command meant I should have been present for the meeting with him as I was his direct supervisor.  I mentioned the EMI(Emergency Mgt Institute) on line ICS courses that are classes on how chain of command works.  I have taken 100, 200, 700, 800. Those are applicable for Brett.  I have taken 300 and 400 which are each 40 hr classroom courses.  I said that I feel my vast field experience leading a Federal team in austere environments for almost 15 years is not recognized or appreciated by Leadership.

We discussed Jessie assisting me in the hospital.  Brett said he will work to have Jessie available to assist me. He's impressed by the amount I 'have on my plate' and still get it all done.  I said the bigger issue is that the LVT that was hired to help me is being protected by Leadership.  He said they(the KT's) all see how several times I have been treated unfairly by Leadership and it bothers them.

I mentioned to Brett how Josh insulted me in from of about 10 DoS visitors a few months ago.  I continue to work at CVC bec. of the KT's and trainers, not Leadership.

We ended our meeting with me indicating my support and willingness to help Brett.  I said I was excited to be working with him.  He hugged me again and thanked me for my support and leadership.

GAPKI_006242

# EXHIBIT T

# EXHIBIT 020

Deposition of Mike Hayes
February 13, 2026

Contemporaneous Note Jul 31 Position Meeting

Bates: DOS-OIG000026 (1 pp.)

August 1, 2017

Yesterday, July 31st, Mike Hayes asked me to meet him in the conference room at 1530.

At 1530 Mike H., Mike Ratcliff and I met.  Mike H. stated he was following up on my emails(add email)requesting an update on my position.  As of Aug 17, 2017 my position will no longer exist as there is a new contract modification.  They are still working on the applications.

He said he wanted to clarify one point in my email about new hires.  Per Mike H. they did have to apply on line.

I mentioned at the end of the meeting that per Va regs, the state must be notified 5 days prior to a change in veterinarian-in-charge.

At no time did he or Mike R. mention scheduling my job interview.

Karen Iovino, DVM

**Exhibit 020**

MH

02/13/26

DOS OIG000026

# EXHIBIT U

# EXHIBIT 015

Deposition of Anna Garcia Durr
January 16, 2026

Contemporaneous Note Aug 2 2017 Isolation Instruction

Bates: GAPKI_006243 (1 pp.)

August 2, 2017

Today at approximately 1000 am I went to Unit L to check whether a package was picked up.   Amy Callihan's desk is by the front door and there is a window so she can see hallway/front door area.

I mentioned to her that the package was supposed to be picked up.  She then quietly told me that Alan Bower told her not to speak to me about work.  Nolan Garcia was in her office.  He asked why.  I explained my last day is Aug 17th and I was required  to apply for the FT position.  He said he hadn't heard about that and was confused as to why.  I mentioned I also had an EEOC complaint against MSA.

I also informed KT's, Ben and Jonah, about my leaving.  They were both surprised and upset.  Jonah said I should be the obvious person for the job.  I asked if either had an issue with my job performance, was unable to reach, etc.  They said no. I also informed them I filed an EEOC and OIG complaint.

Karen Iovino, DVM

<div style="border:1px solid black; display:inline-block; padding:4px; text-align:center;">

**Exhibit 015**

AGD

01/16/26

</div>

GAPKI_006243

# EXHIBIT V

# EXHIBIT 010

Deposition of Jennifer Hartley
January 15, 2026

Contemporaneous Note Isolation

Bates: GAPKI_006243-006243 (1 pp.)

August 2, 2017

Today at approximately 1000 am I went to Unit L to check whether a package was picked up.   Amy Callihan's desk is by the front door and there is a window so she can see hallway/front door area.

I mentioned to her that the package was supposed to be picked up.  She then quietly told me that Alan Bower told her not to speak to me about work.  Nolan Garcia was in her office.  He asked why.  I explained my last day is Aug 17th and I was required  to apply for the FT position.  He said he hadn't heard about that and was confused as to why.  I mentioned I also had an EEOC complaint against MSA.

I also informed KT's, Ben and Jonah, about my leaving.  They were both surprised and upset.  Jonah said I should be the obvious person for the job. I asked if either had an issue with my job performance, was unable to reach, etc.  They said no. I also informed them I filed an EEOC and OIG complaint.

Karen Iovino, DVM

**Exhibit 010**

JH

01/15/26

GAPKI_006243

# EXHIBIT W

# EXHIBIT 011

Deposition of Michael Hayes
February 13, 2026

Contemporaneous Note Isolation

Bates: IOVINO_00000044 (1 pp.)

000023

August 2, 2017

Today at approximately 1000 am I went to Unit L to check whether a package was picked up.   Amy Callihan's desk is by the front door and there is a window so she can see hallway/front door area.

I mentioned to her that the package was supposed to be picked up.  She then quietly told me that Alan Bower told her not to speak to me about work.  Nolan Garcia was in her office.  He asked why.  I explained my last day is Aug 17th and I was required  to apply for the FT position.  He said he hadn't heard about that and was confused as to why.  I mentioned I also had an EEOC complaint against MSA.

I also informed KT's, Ben and Jonah, about my leaving.  They were both surprised and upset.  Jonah said I should be the obvious person for the job.  I asked if either had an issue with my job performance, was unable to reach, etc.  They said no. I also informed them I filed an EEOC and OIG complaint.

Karen Iovino, DVM

**Exhibit 011**

MH

02/13/26

IOVINO_00000044

# EXHIBIT X

# EXHIBIT 011

Deposition of DoS 30b6 (Assignee Sharon James)
February 26, 2026

OIG MAR Confidentiality Violations

Bates: IOVINO_00000547-IOVINO_00000552 (6 pp.)

UNCLASSIFIED



| ESP-18-03 | Office of Evaluations and Special Projects | August 2018 |
|---|---|---|

# Management Assistance Report: Use of Confidentiality Agreements by a Department of State Contractor

| Exhibit 011 |
|---|
| DoS |
| 02/26/26 |

**MANAGEMENT ASSISTANCE REPORT**

UNCLASSIFIED

IOVINO_00000547

## Summary of Review

An Office of Inspector General (OIG) investigation found that a Department of State (Department) contractor, MSA Security, Inc. (MSA), requires its employees to sign a confidentiality agreement that violates federal law. OIG recommends that the Department order MSA to modify or discontinue use of the confidentiality agreement or terminate the contract.

# BACKGROUND

OIG recently found that MSA requires its employees to sign a confidentiality agreement prohibiting disclosure of company information to external parties. The agreement does not include an exception that allows employees to report fraud, waste, or abuse to federal investigative or law enforcement entities, such as OIG.

# FINDINGS

Since 2015, Congress has annually enacted a provision that prohibits Federal agencies from using appropriated funds for any contract "with an entity that requires employees or contractors of such entity seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contactors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a Federal department or agency authorized to receive such information."[1] In order for a confidentiality agreement to be valid, it must have a carve out that specifically allows employees to report fraud, waste, or abuse to government officials.

The Federal Acquisition Regulation (FAR) implements this prohibition and states that in order to be eligible for a contract award, an offeror must represent that it will not require its employees or subcontractors to sign such an agreement.[2] The FAR states "any offeror that does not so represent is ineligible for award of a contract" and instructs the Contracting Officer to insert a clause into the contract containing this prohibition.[3]

In 2016, the Department awarded MSA Security a contract to operate the Canine Validation Center in Winchester, VA. OIG has learned that MSA requires its employees to sign an agreement that states:

---

[1] Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, § 743 (Dec. 16, 2014); Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, § 743 (Dec. 18, 2015); Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, § 743 (May 5, 2017); Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 743 (March 23, 2018).

[2] 48 C.F.R. § 3.909-2(a).

[3] 48 C.F.R. §§ 3.909-2(a), 3.909-3.

ESP-18-XX                                                                 1

IOVINO_00000548

During the term of my employment, and for all times thereafter, I will treat as confidential and, except as required in the performance of my employment duties and responsibilities, will not disclose, publish, use or otherwise make available to the public or to any individual, firm or corporation any confidential information.

The agreement broadly defines "confidential information" and contains no exceptions for the reporting of fraud, waste, or abuse. [4]

Because the MSA confidentiality agreements do not include an exception for disclosing fraud, waste, or abuse to a designated investigative or law enforcement representative, the Department is prohibited by law from expending any appropriated funds for a contract with MSA Security. Until MSA Security rescinds or modifies its confidentiality agreement, the Department is at risk of violating the Anti-Deficiency Act.[5]

# RECOMMENDATION

OIG makes one recommendation to the Bureau of Administration, Office of Logistics Management. Its complete response can be found in the appendix.

**Recommendation 1:** The Bureau of Administration, Office of Logistics Management (A/LM) should order MSA Security, Inc. (MSA) to rescind its confidentiality agreements or to modify them to include an exception for reporting fraud, waste, or abuse to a designated investigative or law enforcement representative and to notify all employees regarding the rescission or modification. If MSA does not promptly rescind or modify these agreements, A/LM should terminate its contracts with MSA for default.

**Management Response:** In its July 31, 2018, response, the Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management (A/LM/AQM) concurred with the recommendation. The A/LM/AQM Contracting Officer "will issue a letter to the vendor

---

[4] The agreement defines "confidential information" as "all information financial, technical or otherwise in whatever form written, oral or otherwise which is disclosed to me or acquired by me in the course of my employment in any way concerning the trade secrets, projects, activities, business, clients, trade practices, know-how or affairs of the Company that provide the Company an economic advantage over its competitors, including, without limitation, all information concerning products, business formulas, discoveries, ideas, concepts, know-how, techniques, diagrams, flow charts, data, client preferences, history and other information, computer software, technology, operations, solutions, tools, marketing and development plans, investors, transactions, acquisitions, marketing plans, strategies and forecasts and other technical or business information, regarding existing and/or contemplated products, processes, techniques or know how, or any data or information developed by me pursuant to the performance of my services hereunder."

[5] 31 U.S.C. § 1341(a)(1)(A). The Department has no funds available for a contract with an entity that uses a prohibited confidentiality agreement, so any funds expended for such a contract would exceed the amount available for such an obligation. Government Accountability Office, *Antideficiency Act—Applicability to Statutory Prohibitions on the Use of Appropriations* (B-317450, March 23, 2009).

---

ESP-18-XX                                                                                          2

requesting MSA rescind or amend the confidentiality agreement with their employees."
A/LM/AQM will "provide the vendor 60 days for employee notification and execution of
agreements."

**OIG Reply:** The recommendation can be closed when OIG receives documentation that MSA
has rescinded or modified its confidentiality agreement and notified all employees of the
change.

IOVINO_00000550

# APPENDIX: MANAGEMENT RESPONSE



**United States Department of State**

*Washington, D.C.   20520*

UNCLASSIFIED                              July 27, 2018

**MEMORANDUM**

TO:          OIG/ESP    Jeff McDermott, Acting

FROM:        A/LM    Jennifer A. McIntyre

SUBJECT:     Draft Report on *Management Assistance Report: Use of Confidentiality Agreements by a Department of State Contractor*

Thank you for the opportunity to provide our comments on the subject draft OIG Management Assistance Report.

**Recommendation 1:** The Bureau of Administration, Office of Logistics Management (A/LM) should order MSA Security, Inc. (MSA) to rescind its confidentiality agreements or to modify them to include an exception for reporting fraud, waste, or abuse to a designated investigative or law enforcement representative and to notify all employees regarding the rescission or modification. If MSA does not promptly rescind or modify these agreements, A/LM should terminate its contracts with MSA for default.

**Management Response to Draft Report (07/27/2018):** The Bureau of Administration, Office of Logistics Management, Office of Acquisitions Management (A/LM/AQM) concurs with the recommendation. The A/LM/AQM Contracting Officer (CO) will issue a letter to the vendor requesting MSA rescind or amend the confidentiality agreement with their employees. A/LM/AQM will provide the vendor 60 days for employee notification and execution of agreements. The letter will be issued during fourth quarter of Fiscal Year 2018.

UNCLASSIFIED

ESP-18-XX                                                                           4

UNCLASSIFIED



# HELP FIGHT

## FRAUD. WASTE. ABUSE.

1-800-409-9926
**www.stateoig.gov/hotline**
If you fear reprisal, contact the
OIG Whistleblower Ombudsman to learn more about your rights.
**OIGWPEAOmbuds@stateoig.gov**

**oig.state.gov**

Office of Inspector General • U.S. Department of State • P.O. Box 9778 • Arlington, VA 22219

UNCLASSIFIED

IOVINO_00000552

# EXHIBIT Y

# EXHIBIT 018

Deposition of Dr Michael Ratcliff
January 22, 2026

Letter from DoS Acting Procurement Executive regarding reinstatement and retaliation findings

Bates: IOVINO_00000753-IOVINO_00000754 (2 pp.)



**United States Department of State**

*Washington, D.C. 20520*
*www.state.gov*

October 3, 2018

Via Email to:
Ryan C. Berry, Counsel for MSA Security
Ward & Berry
2000 Pennsylvania Avenue, N.W. Suite 4500
Washington, D.C. 20006
ryan@wardberry.com

      Re:    Order Pursuant to 41 U.S.C. 4712
               OIG Whistleblower Case 2017-0044 (Karen Iovino)

Dear Mr. Berry:

In response to the Office of Inspector General's (OIG) Whistleblower Case 2017-0044, this letter
is to inform you after further review and investigation, the Department has determined that
sufficient basis exists to conclude that your client, MSA Security (MSA), subjected the
complainant, Dr. Karen Iovino, to a reprisal prohibited by 41 U.S.C. § 4712(a).

On August 4, 2017, Dr., Iovino filed a complaint with the OIG alleging wrongful termination
from her position with MSA. As required by law, the OIG investigated the complaints and
submitted its report of investigation to the complainant, the contractor, the Procurement
Executive, and the head of the agency. The report was referred to my office to determine
whether there was sufficient basis to conclude whether MSA subjected Dr. Iovino to a prohibited
reprisal.

Based on the OIG's investigation and my review, I have determined that:

- Dr. Iovino made protected disclosures by contacting the Director of the Department's
  Acquisition's office with good faith concerns, including mistreatment of animals, use of
  government vehicles for personal purposes, conflicts of interest by Department official,
  and unnecessary expenditures that were billed to the Department.
- Upon obtaining information regarding the complaints by Department officials, your client
  asked to convert the part time position Dr. Iovino was working to a full time one. Dr.
  Iovino had to compete for the job, and was not selected. Her part time position was then
  terminated in place of this full time position for which she was not selected.
- MSA was required to provide clear and convincing evidence that it would have
  terminated Dr. Iovino's employment without regard to her disclosure. In its investigation
  report, OIG concluded that MSA provided no such evidence, instead there was
  substantial evidence of retaliatory motive, including acknowledgment from other MSA
  officials that Dr. Iovino's suspension and subsequent firing were based on her protected
  disclosures.

**Exhibit 018**
MR
01/22/26

IOVINO_00000753

- OIG reported that MSA's Executive Vice President admitted that one of the reasons for suspending Dr. Iovino was due to her contact with the "client." The same MSA officials that were concerned with Dr. Iovino's disclosures were also involved in the advertising and selecting of the full time positon to which Dr. Iovino was not selected.
- 41 U.S.C. 4712 does not require conduct of a hearing or an additional investigation by the agency after receiving the report of the OIG, and doing so would be inconsistent with statutory timelines intended to promote prompt resolution of whistleblower complaints. Nevertheless, we have reviewed your letter of August 1, 2018, and the documents submitted therewith. We do not find that the information or arguments presented in this submission would warrant the agency reaching a different conclusion than that proposed by the OIG.
- Accordingly, I have determined that MSA committed retaliation against Dr. Iovino for protected disclosures as prohibited by 41 U.S.C. 4712.

In accordance with 41 U.S.C. 4712(c)(1) and DOSAR 603.905, I hereby order MSA Security to take the following actions: 1) To offer Dr. Iovino reinstatement to the position she held before the reprisal, together with compensatory damages (including back pay), employment benefits and other terms and conditions of employment that would have applied to her if the reprisal had not been taken; and 2) to pay Dr. Iovino an amount equal to the aggregate amount of all costs and expenses, including attorney fees, that were reasonably incurred by the Dr. Iovino for, or in connection with, bringing the complaint regarding the reprisal.

Please provide evidence within thirty (30) days that MSA has accepted and has complied with or is complying with this order. If MSA rejects or fails to comply with this order, the Department will seek enforcement in accordance with 41 U.S.C. 4712(c)(4).

Sincerely yours,

Acting Procurement Executive
U.S. Department of State

cc:   Mr. Nate Adams, Counsel for Dr. Karen Iovino
      Ms. Valerie Price, Counsel for MSA Security, Inc.
      Steve A. Linick, Inspector General

# EXHIBIT Z

# EXHIBIT 018

Deposition of Alan Bower
February 25, 2026

DOS Reinst Order Oct 3 2018

Bates: IOVINO_00000296-IOVINO_00000297 (2 pp.)



**United States Department of State**

*Washington, D.C. 20520*
*www.state.gov*

October 3, 2018

Via Email to:
Ryan C. Berry, Counsel for MSA Security
Ward & Berry
2000 Pennsylvania Avenue, N.W. Suite 4500
Washington, D.C. 20006
ryan@wardberry.com

      Re:    Order Pursuant to 41 U.S.C. 4712
              OIG Whistleblower Case 2017-0044 (Karen Iovino)

Dear Mr. Berry:

In response to the Office of Inspector General's (OIG) Whistleblower Case 2017-0044, this letter is to inform you after further review and investigation, the Department has determined that sufficient basis exists to conclude that your client, MSA Security (MSA), subjected the complainant, Dr. Karen Iovino, to a reprisal prohibited by 41 U.S.C. § 4712(a).

On August 4, 2017, Dr., Iovino filed a complaint with the OIG alleging wrongful termination from her position with MSA. As required by law, the OIG investigated the complaints and submitted its report of investigation to the complainant, the contractor, the Procurement Executive, and the head of the agency. The report was referred to my office to determine whether there was sufficient basis to conclude whether MSA subjected Dr. Iovino to a prohibited reprisal.

Based on the OIG's investigation and my review, I have determined that:

- Dr. Iovino made protected disclosures by contacting the Director of the Department's Acquisition's office with good faith concerns, including mistreatment of animals, use of government vehicles for personal purposes, conflicts of interest by Department official, and unnecessary expenditures that were billed to the Department.
- Upon obtaining information regarding the complaints by Department officials, your client asked to convert the part time position Dr. Iovino was working to a full time one. Dr. Iovino had to compete for the job, and was not selected. Her part time position was then terminated in place of this full time position for which she was not selected.
- MSA was required to provide clear and convincing evidence that it would have terminated Dr. Iovino's employment without regard to her disclosure. In its investigation report, OIG concluded that MSA provided no such evidence, instead there was substantial evidence of retaliatory motive, including acknowledgment from other MSA officials that Dr. Iovino's suspension and subsequent firing were based on her protected disclosures.

**Exhibit 018**

AB

02/25/26

IOVINO_00000296

MSA000114

- OIG reported that MSA's Executive Vice President admitted that one of the reasons for suspending Dr. Iovino was due to her contact with the "client." The same MSA officials that were concerned with Dr. Iovino's disclosures were also involved in the advertising and selecting of the full time positon to which Dr. Iovino was not selected.
- 41 U.S.C. 4712 does not require conduct of a hearing or an additional investigation by the agency after receiving the report of the OIG, and doing so would be inconsistent with statutory timelines intended to promote prompt resolution of whistleblower complaints. Nevertheless, we have reviewed your letter of August 1, 2018, and the documents submitted therewith. We do not find that the information or arguments presented in this submission would warrant the agency reaching a different conclusion than that proposed by the OIG.
- Accordingly, I have determined that MSA committed retaliation against Dr. Iovino for protected disclosures as prohibited by 41 U.S.C. 4712.

In accordance with 41 U.S.C. 4712(c)(1) and DOSAR 603.905, I hereby order MSA Security to take the following actions: 1) To offer Dr. Iovino reinstatement to the position she held before the reprisal, together with compensatory damages (including back pay), employment benefits and other terms and conditions of employment that would have applied to her if the reprisal had not been taken; and 2) to pay Dr. Iovino an amount equal to the aggregate amount of all costs and expenses, including attorney fees, that were reasonably incurred by the Dr. Iovino for, or in connection with, bringing the complaint regarding the reprisal.

Please provide evidence within thirty (30) days that MSA has accepted and has complied with or is complying with this order. If MSA rejects or fails to comply with this order, the Department will seek enforcement in accordance with 41 U.S.C. 4712(c)(4).

Sincerely yours,

Eric N. Moore
Acting Procurement Executive
U.S. Department of State

cc:    Mr. Nate Adams, Counsel for Dr. Karen Iovino
       Ms. Valerie Price, Counsel for MSA Security, Inc.
       Steve A. Linick, Inspector General

IOVINO_00000297