# EXHIBIT 15

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF VIRGINIA

HARRISONBURG DIVISION


KAREN IOVINO,

   *Plaintiff*,

v.                                                                                  Case No. 5:21-cv-00064-TTC

MICHAEL STAPLETON ASSOCIATES, LTD.,

d/b/a MSA SECURITY, INC.,

   *Defendant*.


## <u>DECLARATION OF DR. KAREN IOVINO UNDER 28 U.S.C. § 1746</u>


I, Dr. Karen Iovino, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge:

### <u>BACKGROUND</u>

1. I am a Doctor of Veterinary Medicine ("DVM"). I earned my DVM from the Ross University in the West Indies. I have extensive experience in canine health and welfare, including strength and conditioning, emergency care, and behavioral assessment. (Iovino Depo. I at 27:3–6)

2. The Defendant in this action, Michael Stapleton Associates, Ltd. d/b/a MSA Security, Inc. ("MSA"), is a government contractor that provides security-related services, including explosive detection canine services, to the United States Department of State ("DoS") under Contract No. SAQMMA16D0106 (the "Contract"). (<u>FAC</u> ¶¶8-11)

3. The Contract required MSA to provide canine training, handling, and veterinary services at the Canine Validation Center ("CVC") in Winchester, Virginia, where I was employed as a part-time veterinarian. (FAC ¶¶9–10; FAC ¶7)

4. I was employed by MSA as a part-time veterinarian at the CVC beginning October 9, 2015. My duties included providing veterinary care to explosive detection canines, monitoring their health and welfare, ensuring compliance with veterinary standards, supervising Kennel Technicians, overseeing the ATA hospital licensing, and serving as Veterinarian-in-Charge. (FAC ¶4)

5. During my employment, the CVC was managed by MSA under the supervision of the DoS Bureau of Diplomatic Security, Antiterrorism Assistance ("DS/ATA") program. (FAC ¶¶8, 10)

6. MSA's on-site management at the CVC included Dr. Michael Ratcliff, Lead Veterinarian, MSA, who became my direct supervisor in October 2016, and Alan Bower, first as MSA Human Resources/Facilities Manager and later as Deputy Program Manager, MSA. Gerald Goss served as Defendant's Vice President for Business Development, MSA, with oversight responsibilities. (FAC ¶¶18, 29, 41, 56)

7. DoS personnel involved in overseeing the Contract included Ms. Cathy Read, Head of Contracting Activity and Senior Procurement Executive (Sharon James Dep. 14:23–15:2); Nick Sabruno, Senior Executive for the Bureau of Diplomatic Security and Director for Overseas Procurement Operations (OPO) with high-level responsibility for the program (Sharon James Dep. 15:11–19); and Anna Garcia-Durr, Supervisory Branch Chief and Contracting Officer for the MSA contract (Sharon James Dep. 13:8–11). Sharon James served as Division Director for Diplomatic Security Contracts, not as Division Director of AQM, reporting directly to Ms. Read. (Sharon James Dep. 12:9–11, 14:20–22)

8. Josh Carter was a Program Manager, DoS Employee/contractor assigned to the CVC. Carter served for the canine program and had significant influence over MSA's operations at the CVC. (FAC ¶18)

9. Zane Roberts was the former Program Manager, MSA, at the CVC before Alan Bower replaced him. Roberts was my direct supervisor for a period and was supportive of my work. He was subsequently terminated by MSA in October 2017 after refusing to answer questions about my emails during an interrogation by MSA HR VP Peter Deegan, MSA, and CFO Michael Kennedy, MSA. (Roberts OIG Interview, DOS OIG000145-146)

10. I understand that Jeffrey McDermott served as Assistant Inspector General for Whistleblower Integrity and Special Projects with the DoS Office of Inspector General ("OIG") and was designated as the OIG's 30(b)(6) deponent in this litigation. (McDermott 30(b)(6) Depo., Jan. 9, 2026, pp. 18:2–6, 14:21–25)

11. During my employment, I received consistently positive feedback about my work. No supervisor ever issued me a written warning, a performance improvement plan, or any form of discipline. James Olds, a Department of State subject matter expert (not an MSA employee), worked with me and described me as "a competent veterinarian" (Olds Depo., Page 34:3–4) who never treated anyone rudely (Olds Depo., Page 33:16–21) and was never observed committing any misconduct (Olds Depo., Page 43:2–6).

12. In February 2017, Michael Ratcliff, CVC Site Lead, MSA, offered me a full-time position. He told me he had been given authority to increase my hours and staff the CVC per his discretion. He said, "What can I do to make you come on full time?" and told me there were "no complaints, everyone loves you" and that CVC leadership was "very happy" with my work. I accepted and we agreed on a schedule. There was no discussion of needing to apply or compete for the position. (PLT-AB-014, Iovino Contemporaneous Notes, Feb. 26, 2017; Iovino Depo. I at 43:10–44:11; FAC ¶¶45–46)

13. In his OIG interview, Zane Roberts, former Program Manager, MSA, described me as a "phenomenal employee" and recounted that I saved a dog's life through what he called "heroic"

efforts. Roberts also stated that many MSA employees assumed the full-time position advertisement was "just a means to get rid of Iovino." ((Roberts OIG Interview, April 9, 2018 DOS OIG000145–146))

14. Roberts further revealed to the OIG that Josh Carter, a State Department Contracting Officer's Representative (COR), had been using his position to get jobs for his friends, specifically Alan Bower and John Hoover. Roberts told the OIG that Hoover referred to Iovino with a vulgar epithet (calling her a "cunt") and told Carter she "needed to go." (DOS OIG000145–146, Roberts OIG Interview, April 9, 2018)

### PROTECTED ACTIVITY

15. On April 1 and 15, 2017, I made additional disclosures to my supervisors regarding what I reasonably believed to be violations of law, rule, or regulation, gross mismanagement, and abuse of authority related to the MSA canine program at the CVC. (FAC ¶¶48, 50)

16. In April 2017, I disclosed to Dr. Michael Ratcliff, Lead Veterinarian, MSA, and Alan Bower, Deputy Program Manager, MSA, concerns regarding manipulation of the BambooHR timekeeping system, including that employees were claiming paid time off ("PTO") hours while simultaneously billing for overtime work. James Olds, a Department of State subject matter expert assigned to the CVC, had also become aware that I was not being compensated for overtime work and told me he would look into it. On February 11, 2017, Ratcliff told me to take a PTO day I had requested off but instructed me not to submit it in BambooHR. (FAC ¶48; Iovino Depo. I at 139:10-21, 215:11-216:18)

17. In approximately June 2017, I reported concerns to Ratcliff about the health and welfare of canines being sent to Jordan, including concerns about veterinary care standards and the treatment of animals in the overseas program. (FAC ¶50; Iovino Depo. I at 220:13–222:5)

18. On January 4, 2017, Alan Bower, Deputy Program Manager, MSA, called me to a meeting with Dr. Michael Ratcliff, Lead Veterinarian, regarding my documentation of performance and attendance issues with Jenn Houston (a Licensed Veterinary Technician). Bower instructed me to stop documenting Houston's performance issues. Zane Roberts, my direct supervisor, subsequently expressed that he disagreed with Bower's approach and supported my documentation of these concerns. (PLT-AGD-013, PLT-JH-011, PLT-MH-015; FAC ¶34)

19. On January 4, 2017, I reported concerns to Dr. Ratcliff about Ms. Jenn Houston's continued attendance problems (leaving early, coming in late, not showing up) and alcohol-related issues (having alcohol on her breath), which affected job performance and posed a serious threat to the safety of the canines. (FAC ¶¶57–58; Iovino Depo. I at 56:7–13)

20. On December 21, 2016, I discovered that Jennifer Houston, a Licensed Veterinary Technician, had made a medical error during the treatment of canine Blake that, had it not been caught in time, would have likely resulted in the canine's death. I reported this incident to Dr. Ratcliff, who agreed via text message that the error could have resulted in the suffocation of Blake. I reported this to my supervisors as an example of the serious risk posed by Houston's ongoing performance issues. (FAC ¶57; Iovino Depo. I at 109:7-110:2; PLT-AB-014, Contemporaneous Notes, Dec. 22, 2016)

21. On July 28, 2017, I reported concerns about canine welfare conditions at the CVC to Cathy Read, Director of the Office of Acquisitions Management (AQM), DoS, because I believed MSA was not adequately addressing my concerns through internal channels. I contacted Ms. Read after having met her during a site visit at the CVC, where I learned she was an advocate for canine welfare. (FAC ¶83; Iovino Depo. I at 122:2–10)

22. In her OIG interview, Cathy Read, Director of the Office of Acquisitions Management (AQM), DoS, characterized my contact with her as 'highly improper' and stated that it violated MSA's confidentiality agreements and that there are other mechanisms in place for these types of complaints.' However, Mr. McDermott (the OIG investigator) immediately noted that confidentiality agreements in government contracts are against the law, directly refuting Read's characterization. Read also forwarded 4 to 6 of my emails directly to Nick Sabruno in the Bureau of Diplomatic Security (DS), routing my protected disclosures to a government official in the same bureau that oversees personnel who had conflicts of interest with me. This routing made Read's characterization appear to legitimize the forwarding of whistleblower disclosures outside proper OIG channels. (OIG Interview with Cathy J. Read, April 20, 2018, DOS OIG Production pages 147; 41 U.S.C. § 4712)

23. On May 10–11, 2017, my supervisory responsibilities over kennel technicians were stripped without explanation. I was excluded from meetings I had previously attended, including Leadership meetings discussing significant ATA OCONUS canine issues. Brett Harshberger, newly promoted to lead kennel technician, told me in private that all the kennel technicians saw how I had been treated unfairly by Leadership and that it bothered them. (PLT-AGD-014, Contemporaneous Notes, May 10–11, 2017, GAPKI_006241–006242; FAC ¶55)

24. I also disclosed concerns about Josh Carter, a Department of State (DoS) Contracting Officer's Representative (COR), living at the CVC facility, which I believed was improper use of government property and in violation of regulations concerning explosives storage. (FAC ¶¶67–68; Iovino Depo. I at 228:13–22 and 229:1–5)

25. On or about July 6, 2017, I filed a complaint with the DoS Office of Inspector General ("OIG") Hotline, reporting concerns about fraud, waste, abuse, and canine welfare violations at the CVC, including the overtime and timekeeping fraud, canine welfare deficiencies, and Carter living at the government facility. (FAC ¶61 [specifically pp. 17-18, listing complaint items including "Time sheet fraud," "living at facility (illegal [sic] as explosives are housed on site)"]; Iovino Depo. I at 122:6–18 [testimony confirming July 6, 2017 OIG hotline complaint filing]; McDermott Depo. at 25:23 [OIG confirmation of July 6, 2017 hotline complaint date])

26. In mid-July 2017, OIG official David Holmes asked me for photographs I had taken documenting canine welfare concerns at the CVC, and I provided them. These photographs subsequently made their way to Josh Carter, who shared them with MSA officials, attempting to determine who had taken them. Shortly thereafter, Carter was heard yelling in the hallway that the whistleblower would be fired. (McDermott Depo. at 88:15–89:22; Iovino Depo. I at 228:13–232:11, 245:1–8, 80:5–11; FAC ¶¶67–68)

27. I was informed that in approximately mid-to-late July 2017, Josh Carter yelled in the hallway that "whoever had filed the OIG complaint would be fired," a clear reference to my

whistleblower complaint and related to the photographs taken. I waived anonymity with the OIG on July 19, 2017. (FAC ¶76; Iovino Depo. I at 80:5-11, 123:9-11, 233:4-7; Sabruno Depo. at 19:23-20:13)

## ADVERSE ACTIONS

28. On July 14, 2017 — eight days after I filed my OIG complaint — Ratcliff informed me that the February full-time offer "isn't going to be honored" and that the part-time veterinarian position was being "abolished." I would now have to compete for a newly created full-time position with requirements that had not previously existed. (FAC ¶73; PLT-AB-014, Contemporaneous Notes, July 14, 2017 (Bates IOVINO_00000038); PLT-MR-010, Iovino FT Memo (7/14/17) (Bates IOVINO_00000038); Iovino Depo. I at 45:10–13)

29. On July 24, 2017, CVC leadership excluded me from a meeting regarding the ATA laptop canine program. When I asked Dr. Ratcliff why I had not been invited, he said he had 'forgot.' Yet he had remembered to invite two Kennel Technicians, Mr. Brett Harshberger and Mr. Jonah Ballenger. This was part of a broader pattern of excluding me from meetings that directly affected my work in the ATA program, including my exclusion from medical records system meetings in May 2017 and my denial of a request to attend bimonthly ATA leadership meetings on May 11, 2017. (PLT-MH-019, Iovino Contemporaneous Notes, July 24, 2017 (Bates DOS OIG000019); FAC ¶80; Iovino Depo. I at 69:17–22, 70:1–9)

30. On July 31, 2017, Michael Hayes, Site Manager, MSA, informed me that my position would cease on August 17 and that they were "still working on applications" for the full-time position. No interview had been scheduled with me. (PLT-MH-020, Contemporaneous Notes, July 31, 2017)

31. On August 2, 2017, I learned that Alan Bower, Program Manager, MSA, had told staff not to speak to me. Jonah Ballenger, a Kennel Technician, told me, "you should be the obvious person for the job." I felt increasingly isolated and targeted. (PLT-AGD-015, Contemporaneous Notes, Aug. 2, 2017; PLT-JH-010; PLT-MH-011)

32. Meanwhile, Ratcliff personally recruited Dr. Lee Palmer, Veterinarian, MSA, for the position while they were teaching classes together. Palmer lived in Ratcliff's basement during his early period of employment. (FAC ¶74-81; Palmer Depo. at 15:16–18, 16:22–25, 17:1–2; PLT-MSA-003, Hiring Decision Memo)

33. Ratcliff added selection criteria — including OCONUS and combat zone veterinary experience — that were not included in the original job posting and that I could not have anticipated or prepared for. (FAC ¶83; PLT-MR-007, Job Posting)

34. On August 4, 2017, I was placed on paid administrative leave by Bower (FAC ¶93). Bower admitted he never asked me about the media allegations before suspending me and did not investigate (Bower Depo. 17:4–19:13). The OIG later found that the confidentiality agreement MSA had required me to sign was "contrary to the law" (PLT-DoS-011, OIG Management Assistance Report, Aug. 2018; McDermott Depo. 42:10-45:16).

35. On August 18, 2017, MSA terminated my employment, citing the elimination of the part-time veterinarian position. (FAC ¶¶95–96; Goss Depo. 61:4–62:13)

36. I believe the true reason for my termination was my protected disclosures about fraud, canine welfare violations, and my OIG complaint. The timing — termination within weeks of my OIG complaint — and the circumstances described herein support this belief. (FAC ¶168-169)

37. Following the OIG's investigation, the DoS issued a determination ordering MSA to reinstate me. MSA did not comply. (FAC¶¶99-100; PLT-MR-018; PLT-AB-018)

38. In October 2017, MSA interrogated Zane Roberts, former Program Manager, MSA, specifically about my emails — why I had forwarded photographs to his personal email account. Roberts was terminated after refusing to answer their questions. His termination confirms that MSA conducted a campaign to identify and punish anyone who had assisted me. (Roberts OIG Interview, DOS OIG000145-146)

39. OIG Investigator McDermott testified that the OIG report itself was never redacted and was sent unredacted to DoS, MSA, and Dr. Iovino. McDermott confirmed he never redacted witness statements, only PII from case files. OIG has disclosed unredacted copies of the Roberts and Read OIG interviews to the parties in this litigation, revealing Sabruno's role in the leak chain and Roberts' account of MSA's campaign against Dr. Iovino. (McDermott Depo. at 43:4-12; McDermott Depo. at 45:7-16; Roberts OIG Interview, DOS OIG000145)

## EMOTIONAL DISTRESS

40. As a direct result of the actions described above, I have suffered severe emotional distress, including anxiety, depression, loss of sleep, and a profound sense of betrayal by the employer and government officials I had trusted. (FAC ¶177)

41. The emotional distress I suffered was exacerbated by MSA's and the DoS's continued refusal to acknowledge the wrongfulness of their actions, and the stigma associated with being terminated in circumstances suggesting I had engaged in misconduct. (FAC ¶177)

42. I continue to experience emotional distress and its effects, which have impacted my personal relationships, my professional confidence, and my overall quality of life. (FAC ¶177)

## FINANCIAL DAMAGES

43. As a result of my termination, I lost wages and benefits, including salary, health insurance, and retirement contributions, to which I would have been entitled had I continued in the full-time position I was offered in February 2017. (FAC ¶178)

44. I have diligently sought comparable employment since my termination and have been unable to obtain a position with equivalent compensation and benefits. (FAC ¶178)

45. I have incurred additional expenses as a direct result of my termination, including costs associated with seeking new employment and medical and counseling expenses related to the emotional distress I suffered. (FAC ¶178)

46. The financial harm I have suffered is ongoing and continues to accrue. (FAC ¶178)

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____, 2026.

Dr. Karen Iovino

# EXHIBIT 16

getting my job back.

Thanks again!
Karen

Sent from my iPhone

On Jul 31, 2017, at 12:26 PM, Read, Cathy J <ReadCJ@state.gov> wrote:

> Karen,
> I have coordinated with the OIG; they are now working all your points.   I'm not sure the length or the depth of that OIG contractual part, but rest assured, they are very good at doing this and we all care about the dogs.   Thanks so much!!!
>
> Best,
> Cathy
>
> Cathy J. Read
> Director, Office of Acquisitions Management
> Department of State
> ▮▮▮▮▮▮▮▮
> readcj@state.gov
>
>
> **From:** Karen Iovino [mailto:karenvet93@gmail.com]
> **Sent:** Saturday, July 29, 2017 3:49 PM
> **To:** Read, Cathy J
> **Subject:** Fwd:
>
> Cathy,
>
> Attached are the pages of the report/document that were left out of the Jordanian mentors report per his supervisor.  The report was presented to DoS earlier this year.
>
> As individuals (at my level) learn that I filed an OIG complaint, they are providing me with documentation.  They are as distressed as I am about the lack of care/concern for the EDC's but are afraid to make a formal complaint for fear of losing their jobs &/or retaliation.   They see how I will most likely losing my job as of Aug 19th.
>
> V/R,
> Karen
>
> **Official**
> **UNCLASSIFIED**

DOS-IOVINO-00240

getting my job back.

Thanks again!
Karen

Sent from my iPhone

On Jul 31, 2017, at 12:26 PM, Read, Cathy J <ReadCJ@state.gov> wrote:

> Karen,
> I have coordinated with the OIG; they are now working all your points.   I'm not sure the length or the depth of that
> OIG contractual part, but rest assured, they are very good at doing this and we all care about the dogs.   Thanks so
> much!!!
>
> Best,
> Cathy
>
> Cathy J. Read
> Director, Office of Acquisitions Management
> Department of State
> ▮▮▮▮▮▮▮▮
> readcj@state.gov
>
>
> **From:** Karen Iovino [mailto:karenvet93@gmail.com]
> **Sent:** Saturday, July 29, 2017 3:49 PM
> **To:** Read, Cathy J
> **Subject:** Fwd:
>
> Cathy,
>
> Attached are the pages of the report/document that were left out of the Jordanian mentors report per his
> supervisor.  The report was presented to DoS earlier this year.
>
> As individuals (at my level) learn that I filed an OIG complaint, they are providing me with documentation.
> They are as distressed as I am about the lack of care/concern for the EDC's but are afraid to make a formal
> complaint for fear of losing their jobs &/or retaliation.   They see how I will most likely losing my job as of
> Aug 19th.
>
> V/R,
> Karen
>
> **Official**
> **UNCLASSIFIED**

DOS-IOVINO-00240

getting my job back.

Thanks again!
Karen

Sent from my iPhone

On Jul 31, 2017, at 12:26 PM, Read, Cathy J <ReadCJ@state.gov> wrote:

> Karen,
> I have coordinated with the OIG; they are now working all your points.   I'm not sure the length or the depth of that
> OIG contractual part, but rest assured, they are very good at doing this and we all care about the dogs.   Thanks so
> much!!!
>
> Best,
> Cathy
>
> Cathy J. Read
> Director, Office of Acquisitions Management
> Department of State
> ███████████
> readcj@state.gov
>
>
> **From:** Karen Iovino [mailto:karenvet93@gmail.com]
> **Sent:** Saturday, July 29, 2017 3:49 PM
> **To:** Read, Cathy J
> **Subject:** Fwd:
>
> Cathy,
>
> Attached are the pages of the report/document that were left out of the Jordanian mentors report per his
> supervisor.  The report was presented to DoS earlier this year.
>
> As individuals (at my level) learn that I filed an OIG complaint, they are providing me with documentation.
> They are as distressed as I am about the lack of care/concern for the EDC's but are afraid to make a formal
> complaint for fear of losing their jobs &/or retaliation.   They see how I will most likely losing my job as of
> Aug 19th.
>
> V/R,
> Karen
>
> **Official**
> **UNCLASSIFIED**

DOS-IOVINO-00240

getting my job back.

Thanks again!
Karen

Sent from my iPhone

On Jul 31, 2017, at 12:26 PM, Read, Cathy J <ReadCJ@state.gov> wrote:

> Karen,
> I have coordinated with the OIG; they are now working all your points.   I'm not sure the length or the depth of that
> OIG contractual part, but rest assured, they are very good at doing this and we all care about the dogs.   Thanks so
> much!!!
>
> Best,
> Cathy
>
> Cathy J. Read
> Director, Office of Acquisitions Management
> Department of State
> ▓▓▓▓▓▓▓▓
> readcj@state.gov
>
>
> **From:** Karen Iovino [mailto:karenvet93@gmail.com]
> **Sent:** Saturday, July 29, 2017 3:49 PM
> **To:** Read, Cathy J
> **Subject:** Fwd:
>
> Cathy,
>
> Attached are the pages of the report/document that were left out of the Jordanian mentors report per his
> supervisor.  The report was presented to DoS earlier this year.
>
> As individuals (at my level) learn that I filed an OIG complaint, they are providing me with documentation.
> They are as distressed as I am about the lack of care/concern for the EDC's but are afraid to make a formal
> complaint for fear of losing their jobs &/or retaliation.   They see how I will most likely losing my job as of
> Aug 19th.
>
> V/R,
> Karen
>
> **Official**
> **UNCLASSIFIED**

# EXHIBIT 17

# Fwd: OIG Hotline - Request for Information, H20171635

| | |
|---|---|
| **From:** | Karen Iovino <karenvet93@gmail.com> |
| **To:** | "Read, Cathy J" <readcj@state.gov> |
| **Date:** | Fri, 28 Jul 2017 15:58:43 -0400 |
| **Attachments:** | Feb 10, 2017 Doctors meeting.docx (408.16 kB); April 1, 2017.docx (148.04 kB); April 7, 2017.docx (164.78 kB); Truck License plate.docx (194.65 kB); Josh's room.pdf (26.25 kB); Oct 8, 2016 Ratcliff visit.docx (177.88 kB); January 5, 2017 meeting with Mike and Alan.docx (152.97 kB) |

Hi Cathy,

I just got home and realize this document wasn't sent to you.

I eagerly await hearing from you.
Karen

Begin forwarded message:

**From:** Karen Iovino <karenvet93@gmail.com>
**Subject: OIG Hotline - Request for Information, H20171635**
**Date:** July 10, 2017 at 5:39:03 PM EDT
**To:** oighotline@state.go

Hello,

There isn't a mechanism to submit documents and pictures through your website.  Therefore I am answering in more detail below:
Additional information was requested to initial complaint.

1. Time sheet fraud, leaving work early yet claiming full day, OT encouraged: I am not a member of management so I don't have access to time sheets.  The entire building and parking lot has cameras, key fobs or pin needed to access building or move from area to area.  Review all for discrepancies.

2. taking PTO without claiming it: same as 1.

3. forcing employee to take PTO and not claim it instead of paying (me) for hrs worked: see documents dated Feb 10, 2017, April 1, 2017, April 7, 2017

4. hiring of friends for contracted work when not qualified: Matlock, LLC was hired bec they are 'friend's' with Gerald Goss.  They haven't produced software(working on project > 2 years)they were hired to produce. They also bid on large generators, were hired and generators are still not hooked up and usable. We have a with 14 dogs, loss of power would be significant especially during weather extremes.

5. use of government vehicle for personal use: Josh Carter used the attached vehicle while on PTO with his family.  See attached document 'truck license plate'

6. living at facility: Josh Carter lives in an office during the week.  This is illegal as we house explosives.  See attachment 'Josh's room'.

7. abuse of power-forcing subordinates to hire friends even though not qualified: Josh Carter and Alan Bower's friends, Brant Gower, Mike Hayes, Mike Ratcliff, John Hoover to name a few, were hired.  Brant was hired by then supervisor Zane Roberts bec he was told by Josh to hire him, Mike Hayes was hired after Zane was wrongly fully demoted, Mike Ratcliff was hired after I was discriminated against and demoted. See write up Oct 8, 2017  John Hoover worked on a 'project' for several months(new DoS training class), now that the class isn't moving forward(funding), Zane was suspended and John took position as Lead ATA trainer which Zane held. These are just a few examples.

8. abuse of power; supervisors without just cause are demoted to provide positions for friends: my demotion, Zane Robert's demotion. Also see unjust reprimand without my then supervisor, Zane, present, Jan 5, 2017.

9. procurement of equipment not utilized: see #4

10. 'gifting' of canines to foreign countries with no follow through: countries are not being held accountable for their lack of care provided to the canines given to them by DoS.  I have been told by several Jordanian students and a US contractor that dogs are dying in their(Jordan) country.  The contractor said they were told to 'leave the pictures out' of their report to DoS bec the condition of the dogs was so dire.  My supervisor, Mike Ratcliff, has told me to 'keep the emotion' out of my concern for the dogs.  We have gifted dogs to Romania, Jordan and Nepal so far with Jordan having 20+ dogs from us.

As I stated in my complaint, the abuse and fraud is deep seeded and on going.  I have approximately 30 write ups/documents.  Many employees would like to file a complaint but are afraid of retaliation.  However, when they learned I

# EXHIBIT 18

As individuals (at my level) learn that I filed an OIG complaint, they are providing me with documentation.  They are as distressed as I am about the lack of care/concern for the EDC's but are afraid to make a formal complaint for fear of losing their jobs &/or retaliation.   They see how I will most likely losing my job as of Aug 19th.


V/R,

Karen


**Official**

**UNCLASSIFIED**

DOS-IOVINO-00150

# EXHIBIT 19

June 27, 2017
Josh Carter, DoS Program Manager; Alan Bower, CVC/MSA HR

Time sheet fraud, leaving work early yet claiming full day;  OT encouraged(will recieve OT one day, leave early the next but claim 8 hr day-cameras and key fobs can be checked for these inaccuracies); taking PTO without claiming it; hiring of friends for contracted work when not qualified; use of gov't vehicles for personal use; living at facility(illegial as explosives are housed on site); abuse of power-forcing subordinates to hire friends even though not qualified for positions; demoting supervisors without just cause to provide a position for a friends(several demotions have occurred); procurement of equipment not utilized(large generators purchased but not connected therefore not usable); procuring dogs, sending to Foreign countries and not following through with DoS contract to assure their care.


As stated above, most at the facility are either too afraid to come forward or part of the group hired because they are friends with Leadership and usually not qualified for their positions. Several people have been wrongly demoted(no previous complaints, poor work performance, or counseling) so friends can be hired into those positions. The supervisors have a lack of concern for the well-being of the program, both WPS and ATA, and the canines that work overseas with the DoS contracted vendors and the Foreign countries awarded EDC's(explosive detection canines).

DOS-IOVINO-00039



The information contained in, or attached to this email may contain confidential information, intended solely for the use of the addressed individual or entity, and may be subject to legal privilege. If you have received this email in error, you should (1) notify the sender immediately by reply email, and (2) delete the message from your system(s) and notify your IT department. Please do not copy, disclose, or disseminate the contents of this email to any other unintended person(s) or entity. The views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. The recipient should check this e-mail and any attachments for the presence of malicious software. The sender of this message accepts no liability for any damage caused, directly or indirectly, by any malicious software transmitted in this email.

DOS-IOVINO-00164

# EXHIBIT 20

# FW: OIG Hotline - Request for Information, H20171635

| | |
|---|---|
| **From:** | "Read, Cathy J" <readcj@state.gov> |
| **To:** | "Sabruno, Dominic A" ███████@state.gov> |
| **Date:** | Tue, 01 Aug 2017 08:43:58 -0400 |
| **Attachments:** | Feb 10, 2017 Doctors meeting.docx (408.16 kB); April 1, 2017.docx (148.04 kB); April 7, 2017.docx (164.78 kB); Truck License plate.docx (194.65 kB); Josh's room.pdf (26.25 kB); Oct 8, 2016 Ratcliff visit.docx (177.88 kB); January 5, 2017 meeting with Mike and Alan.docx (152.97 kB) |

Cathy J. Read
Director, Office of Acquisitions Management
Department of State
████████████

readcj@state.gov

**Official**
**UNCLASSIFIED**

**From:** Karen Iovino [mailto:karenvet93@gmail.com]
**Sent:** Friday, July 28, 2017 3:59 PM
**To:** Read, Cathy J
**Subject:** Fwd: OIG Hotline - Request for Information, H20171635

Hi Cathy,

I just got home and realize this document wasn't sent to you.

I eagerly await hearing from you.
Karen


Begin forwarded message:

**From:** Karen Iovino <karenvet93@gmail.com>
**Subject: OIG Hotline - Request for Information, H20171635**
**Date:** July 10, 2017 at 5:39:03 PM EDT
**To:** oighotline@state.go

Hello,

There isn't a mechanism to submit documents and pictures through your website.  Therefore I am answering in more detail below:
Additional information was requested to initial complaint.

1. Time sheet fraud, leaving work early yet clamining full day, OT encouraged: I am not a member of management so I don't have access to time sheets.  The entire building and parking lot has cameras, key fobs or pin needed to access building or move from area to area.  Review all for discrepancies.

2. taking PTO without clamining it: same as 1.

3. forcing employee to take PTO and not claim it instead of paying (me) for hrs worked: see documents dated Feb 10, 2017, April 1, 2017, April 7, 2017

4. hiring of friends for contracted work when not qualified: Matlock, LLC was hired bec they are 'friend's' with Gerald Goss.  They haven't produced software(working on project > 2 years)they were hired to produce. They also bid on large generators, were hired and generators are still not hooked up and usable. We have a with 14 dogs, loss of power would be significant especially during weather extremes.

5. use of government vehicle for personal use: Josh Carter used the attached vehicle while on PTO with his family.

See attached document 'truck license plate'

6. living at facility: Josh Carter lives in an office during the week.  This is illegal as we house explosives.  See attachment 'Josh's room'.

7. abuse of power-forcing subordinates to hire friends even though not qualified: Josh Carter and Alan Bower's friends, Brant Gower, Mike Hayes, Mike Ratcliff, John Hoover to name a few, were hired.  Brant was hired by then supervisor Zane Roberts bec he was told by Josh to hire him, Mike Hayes was hired after Zane was wrongly fully demoted, Mike Ratcliff was hired after I was discriminated against and demoted. See write up Oct 8, 2017  John Hoover worked on a 'project' for several months(new DoS training class), now that the class isn't moving forward(funding), Zane was suspended and John took position as Lead ATA trainer which Zane held. These are just a few examples.

8. abuse of power; supervisors without just cause are demoted to provide positions for friends: my demotion, Zane Robert's demotion. Also see unjust reprimand without my then supervisor, Zane, present, Jan 5, 2017.

9. procurement of equipment not utilized: see #4

10. 'gifting' of canines to foreign countries with no follow through: countries are not being held accountable for their lack of care provided to the canines given to them by DoS.  I have been told by several Jordanian students and a US contractor that dogs are dying in their(Jordan) country.  The contractor said they were told to 'leave the pictures out' of their report to DoS bec the condition of the dogs was so dire.  My supervisor, Mike Ratcliff, has told me to 'keep the emotion' out of my concern for the dogs.  We have gifted dogs to Romania, Jordan and Nepal so far with Jordan having 20+ dogs from us.

As I stated in my complaint, the abuse and fraud is deep seeded and on going.  I have approximately 30 write ups/documents.  Many employees would like to file a complaint but are afraid of retaliation.  However, when they learned I filed a complaint, they said they would hope for a large, though investigation and would welcome an interview.   I encouraged them to file their own complaints but they are too fearful of being fired.

V/R,
Karen Iovino, DVM

On Jul 10, 2017, at 12:34 PM, DoS OIG INV (no reply) <noreply@oig.state.gov> wrote:

Karen Iovino,

We are writing regarding the confidential complaint that you submitted to the Office of Inspector General for the U.S. Department of State and Broadcasting Board of Governors. We have reviewed your complaint and determined that in order to further evaluate your complaint, we need some additional information from you.  Per our telephone conversation, please provide, to the best of your knowledge, specific details such as dates of occurrences, names of individuals involved in each area of your complaint, names of countries "gifted" canines, when this took place, and an explanation of the gifting process.

You may provide the information either by email at oighotline@state.gov, or by visiting our web page and resubmitting your complaint at https://oig.state.gov/hotline-form.

Please be sure to include Hotline reference #H20171635 either in the subject line of your email or in the body of your resubmission from our web page.

If there are others who wish to file their own complaints, the OIG encourages them to visit our web page at https://oig.state.gov/hotline-form.

We look forward to further assisting you with your complaint.

Sincerely,

Department of State OIG Hotline

# EXHIBIT 21

Telephone Interview with Zane Roberts

Participants: Jeff McDermott    *JM*

Date: April 9, 2018

Roberts was the Program Manager for the Canine Validation Center (CVC) with MSA Security from 2014 to July 2017. He was moved to a research and development position in July 2017. In October 2017, he was terminated. He hired Dr. Karen Iovino and was her supervisor for her the majority of her tenure at MSA.

Roberts described Iovino as a "phenomenal employee" — a hard worker who answered calls 24/7 despite the fact that she was only part-time. (Because she was essentially always on call, MSA agreed to put her MSA email on her personal phone).   The Department initially asked for a part-time veterinarian and Roberts hired her for that position. She had previously treated his dog so he knew of her capabilities. In April 2017, she saved a dog's life through "heroic" efforts and received a commendation from MSA for her efforts.

Roberts stated that the COR Josh Carter was getting jobs for his friends at the CVC by instructing MSA to create these positions. For example, he told MSA to create a position for Alan Bower, a friend and former colleague at the Roanoke Police Department. Carter also instructed MSA to create a training position for John Hoover, another friend and former colleague. Hoover was put in charge of the first Anti-Terrorism Assistance (ATA) class with Jordanian officials, which was not successful because the dogs that Hoover procured were not appropriately trained. However, Hoover blamed Iovino for the failure because she neutered the male dogs, which should have no effect on their ability to detect explosives. Hoover once referred to Iovino as a "cunt" and told Carter she needed to go.

In 2017, the CVC expanded, which included the hiring of addition veterinarians. Carter promised Michael Ratcliff, another friend, that he would get the lead veterinarian position. The expansion also included the part-time veterinarian position to be moved to full time. Ratcliff asked Iovino if she would be willing to work five days a week and she agreed. MSA then added travel as a requirement of the position, possibly to dissuade Iovino from applying because they knew she had a horse farm that would make travel difficult.

Roberts stated that it was extremely unusual for MSA to make an incumbent apply for a position if it just went from part-time to full-time. For example, MSA never advertised the training coordinator position that Hoover was given. Nor was Alan Bower's position advertised. Logistic techs were promoted to lead techs without advertising the position. Roberts said that many MSA employees assumed that advertising the full time position was just a means to get rid of Iovino.

In July 2017, Mike Hayes told MSA that he had heard rumors of OIG complaints and he began asking around as to who could be sending information to OIG. Roberts told MSA (Joseph Atherall) that he had spoken to OIG and provided some information about his own concerns. In mid-July 2017, OIG (Dave Holmes) asked Iovino for photos of certain areas of the CVC and she provided them. These photos made their way to Carter who shared them with MSA who tried to find out who took them. Shortly thereafter, Iovino was placed on administrative leave and eventually terminated.

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER
DOS OIG000145

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

In October 2017, Peter Deegan (head of MSA HR) and Michael Kennedy (MSA Chief Financial Officer) interviewed Roberts and began with questions about why Iovino forwarded the photos to Roberts' personal email. He was told that these photos were provided to MSA by Carter. Roberts was terminated after refusing to answer these questions.

DOS OIG000146

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

Interview with Cathy J. Read, Director, Acquisitions Management

Date: April 20, 2018

Participants: Jeff McDermott, Amy Bowser

OIG met with Cathy Read (A/LM/AQM) to discuss concerns that information about an OIG whistleblower (Karen Iovino) may have been inappropriately shared with MSA. OIG shared information about allegations raised by Iovino to AQM and it is unclear whether AQM shared this information with MSA, Iovino's contractor employer, who later retaliated against Iovino for her disclosures. This meeting was to determine if Ms. Read or someone in AQM was the source of the leak of information to MSA.

Mr. McDermott provided a background of the Iovino case and OIG's role in investigating whistleblower retaliation. Ms. Read said that she became aware of Ms. Iovino's concerns because Iovino contacted her directly in the summer of 2017 by both email and phone and then Ms. Read was also forwarded information from OIG. Ms. Read said that when she received the phone calls and emails from Iovino that she notified DS and forwarded the emails to OIG. She was pretty sure that at the time OIG was already aware from Iovino's hotline complaints.

Some of Iovino's complaints involved allegations of a COR in DS, Josh Carter. Ms. Read recalls discussing the issues over email with DS because DS would handle and not AQM. Ms. Read sent the 4 to 6 emails from Iovino to Read directly to Nick Sabruno in DS. If the complaint was against a COR, the issue would come to AQM, but AQM would examine whether it was a contract issue or misconduct issue. If a contract issue, such as management of the contract or whether certain things are allowed under the contract, AQM would investigate. Because this was allegations of misconduct and the COR is a DS employee, DS would investigate the issue.

Ms. Read noted that she found it highly improper for Ms. Iovino to come to her directly with concerns. She said that it violated the MSA confidentiality agreements and that there are other mechanisms in place for these types of complaints. Mr. McDermott noted that confidentiality agreements in government contracts are against the law.

Ms. Read claims she did not provide any information that was shared by OIG to MSA. Ms. Read did become aware that MSA had fired Ms. Iovino and that MSA did apologize to her directly for Ms. Iovino breaking protocol and contacting her directly. Ms. Read also noted that AQM works directly with MSA and that she visits the CVC annually and that Josh Carter works directly with them daily.

DOS OIG000147

# EXHIBIT 22

CONFIDENTIAL

MSA000327

**OIG Whistleblower Case 2017-0044 (Karen Iovino)**
**Support for Statements in OIG Report**

| Statements in OIG Report | Administrative Record (AR) Support for Statements in OIG Report | Administrative Record (AR) Contradictions to Statements in OIG Report |
|---|---|---|
| "The AQM Director encouraged Dr. Iovino to report these allegations to OIG, and Dr. Iovino did so on July 6, 2017." (pp. 1-2) | **NONE** | See AR 000146, 4/20/18 Interview with Cathy Read (AQM Director): "Ms. Read noted that she found it highly improper for Ms. Iovino to come to her directly with concerns." |
| "During her time at the CVC, MSA recognized Dr. Iovino as an excellent employee." (p. 2) | See AR 000015, 04/19/17 Letter from CEO Michael O'Neil to Dr. Iovino thanking her for taking care of a dog, "Frank."<br><br>See AR 000016, June 2017 handwritten note from Gerald Goss thanking Dr. Iovino for her "dedication, leadership & support regarding 'Frank.'" | See AR 000137, 11/15/17 interview with Peter Deegan: "Deegan stated that prior to the vacancy announcement, MSA already had concerns with Iovino's performance, including that she was disagreeable and prickly and resisted coaching on these issues."<br><br>See AR 000091-92, 12/30/16 Email chain between Ratcliff and Dr. Iovino. Dr. Iovino complaining about another employee leaving early. Dr. Ratcliff states that he does not want to argue via email.<br><br>See AR 000139, 11/16/17 Interview with Alan Bower. The interview notes that Bower "did counsel [Dr. Iovino] once with Dr. Michael Ratcliff on how she addressed the kennel technicians, which he found to be condescending. Bower also had to remind her to better manager her hours[.]"<br><br>See AR 000140, 3/26/18 Interview with Dr. Ratcliff. "Ratcliff stated that while Iovino was a good veterinarian, she was difficult to work with." Ratcliff then described the incident where Dr. Iovino called the process of Dr. Ratcliff's hiring "bullshit." Ratcliff also stated that he and Alan Bower did counsel her verbally regarding her treatment of colleagues. |

1

IOVINO_00000510

CONFIDENTIAL

MSA000328

**OIG Whistleblower Case 2017-0044 (Karen Iovino)**
**Support for Statements in OIG Report**

| Statements in OIG Report | Administrative Record (AR) Support for Statements in OIG Report | Administrative Record (AR) Contradictions to Statements in OIG Report |
|---|---|---|
| "The MSA official who supervised her for the majority of her time at MSA described her as a 'phenomenal employee' and a hard worker who answered calls around the clock despite the fact that she was only employed part time." (p. 2) | **NONE** | |
| "Shortly thereafter, the AQM Director provided Dr. Iovino's identity and the substance of her complaint to various officials in the Bureau of Diplomatic Security (DS) who oversee the contract with MSA. In mid-July, a DS employee provided Dr. Iovino's name and information about her concerns to various MSA officials." (p. 2) | **NONE** | See AR 000142, 4/4/18 Interview with Gerald Goss: "He called various officials at the Department to alert them to the issue" and "he also said that no one at the Department confirmed an OIG investigation or acknowledged they knew of Dr. Iovino's concerns." "He heard from a vet tech that Dr. Iovino planned to go to the media and that there was already an OIG investigation underway."<br><br>See AR 000146, Interview with Cathy Read (AQM Director). "Ms. Read claims she did not provide any information that was shared by OIG to MSA." |
| "MSA's Vice President for Human Resources, who made the decision to suspend Dr. Iovino, directly connected Dr. Iovino's protected disclosures to her suspension when he told OIG that one of his reasons for suspending her was that she was speaking with the 'client' (i.e., the Department) about information internal to MSA in violation of her confidentiality agreement." (p. 5) | **NONE** | See AR 000137-138, 11/15/17 Interview with Peter Deegan. The OIG Report leaves out that Deegan stated that "certain MSA employees" alerted Bower that Dr. Iovino "threatened to go to the press with certain information." And that Deegan asked clients/employees what Dr. Iovino said; he even asked Dr. Iovino but she refused.<br><br>See AR 000033, 8/4/17 Email from Deegan to Dr. Iovino, stating that she has been placed on paid administrative leave "while concerns involving you regarding the disclosure of confidential information are investigated."; See also AR 000029 8/4/17 Email from Bower to Deegan. |

IOVINO_00000511

CONFIDENTIAL

MSA000329

**OIG Whistleblower Case 2017-0044 (Karen Iovino)**
**Support for Statements in OIG Report**

| Statements in OIG Report | Administrative Record (AR) Support for Statements in OIG Report | Administrative Record (AR) Contradictions to Statements in OIG Report |
|---|---|---|
| "[M]SA's Executive Vice President for Business Development justified her suspension based upon the fact that Dr. Iovino's contacts with AQM and OIG violated company protocol because she did not raise these concerns within MSA." (p. 5) | NONE | See AR 000030-31, 8/4/17 Email from Gerald Goss to Anna Garcia (Contracting Officer) regarding Iovino's suspension; stating that he was advised on 8/3/17 that Dr. Iovino "may have or is considering engaging in discussions with media and other third-party personnel regarding confidential and privileged information." We continue to encourage our employees to report any irregularities to the Office of Inspector General and we would never retaliate against any employee for doing so." |
| "MSA hired temporary help between Dr. Iovino's termination and January 2018, which confirms MSA had a need for the work Dr. Iovino performed." (p. 6) | NONE | See AR 000118, Selection Memo: "Dr. Iovino's overall attitude towards the mission and inability to relate diplomatically to leadership preclude her from being selected for international missions, a key component of the full time position. The client is simply not comfortable with us using Dr. Iovino in this capacity." |
| "MSA also claimed it suspended Dr. Iovino because she forwarded work emails to her personal computer in violation of company policy. However, the evidence confirms that this rationale cannot be substantiated." (p. 7) | NONE | See AR 000143, 3/26/18 Interview with Gerald Goss. "After placing Iovino on leave, MSA had a forensic team review her computer files. […] The forensics investigation showed that Dr. Iovino had forwarded emails to her personal email account. Mr. Goss thought that the forensic report showed at least 10-13 categories of emails that had been forwarded. He said examples were: (1) emails pertaining to Jordan; and(2) emails pertaining to photos of canines. He could not state the MSA policy on forwarding emails to personal accounts but said that here was at least an expectation that email transmissions from MSA are restricted to their secure network given the sensitivity of the work they do for the government." |

3

IOVINO_00000512

MSA000330

**OIG Whistleblower Case 2017-0044 (Karen Iovino)**
**Support for Statements in OIG Report**

| Statements in OIG Report | Administrative Record (AR) Support for Statements in OIG Report | Administrative Record (AR) Contradictions to Statements in OIG Report |
|---|---|---|
| "[A]ccording to her original supervisor, MSA may have effectively granted Dr. Iovino permission to use her personal account because MSA agreed to put her MSA email on her personal phone to facilitate her ability to take emergency medical calls outside of her work hours." (p. 8) | **NONE** | |
| "MSA never interviewed Dr. Iovino, the kennel technicians who originally had reported her alleged intention to contact the media, or any other relevant witnesses." (p. 8) | **NONE** | See AR 000137, 11/15/17 interview with Peter Deegan. He tried to talk to Dr. Iovino but she refused. |
| "In addition, Dr. Iovino's supervisor never documented his conversation with the kennel technicians, which was used as a basis for her suspension." (p. 8) | **NONE** | See AR 000140, 3/26/18 Interview with Dr. Ratcliff. Never stated that he did not document this. |
| "[A] former MSA official told OIG that it was extremely unusual for MSA to make an incumbent apply for a position when it was converted from part time to full time. The official also stated that MSA routinely changed aspects of a position, such as adding hours or changing the supervisory status, without re-advertising the position." (pp. 8-9) | **NONE** | |

4

IOVINO_00000513

MSA000331
**OIG Whistleblower Case 2017-0044 (Karen Iovino)**
**Support for Statements in OIG Report**

| Statements in OIG Report | Administrative Record (AR) Support for Statements in OIG Report | Administrative Record (AR) Contradictions to Statements in OIG Report |
|---|---|---|
| "Furthermore, the selection documents indicate that the selecting official considered several criteria not listed as qualification criteria in the vacancy and that do not seem relevant to a veterinarian position." (p. 9) | **NONE** | See AR 000027, 9/7/17 Email from Alan Bower to Deegan regarding the position description for all vets at the CVC. That description includes requirements such as: *"Shall have a minimum experience of two (2) years as a veterinarian in a private practice or the military; Shall be willing to live and work in conflict/combat areas or similar hazardous environments."* <br><br> See AR 000114, MSA Security Veterinarian Job Vacancy. <br><br> See AR 000137, 11/15/17 Interview with Deegan. "Deegan stated that the DoS contract with MSA required overseas and military experience. According to Deegan, MSA did not think Iovino would be accepted overseas because of her lack of diplomacy." <br><br> See AR 000118, Selection Memo: "Dr. Iovino's overall attitude towards the mission and inability to relate diplomatically to leadership preclude her from being selected for international missions, a key component of the full time position. The client is simply not comfortable with us using Dr. Iovino in this capacity." |

5

IOVINO_00000514

# EXHIBIT 23

MSA000078

## Peter Deegan

| | |
|---|---|
| **From:** | Peter Deegan |
| **Sent:** | Wednesday, July 26, 2017 11:16 AM |
| **To:** | Karen Iovino |
| **Subject:** | RE: Litigation Against the Company and Press Inquiries |

Karen,

Thank you for your reply.   The EEOC complaint will be dealt with through the established channels since you chose to make us aware of your sex and age complaint via that process.

As I am sure you are aware, as an employee on a government contract, you have fiduciary responsibility to bring allegations of impropriety to our attention.  Accordingly if you have concerns of impropriety relating to the CVC aside from your complaint of sex and age discrimination, you must report these to me.  Additionally, if you have concerns (aside from your complaint of sex and age discrimination), we must make the client aware, as well as notify the IG of the issues for investigation.

I await your reply.

Kind regards,
Peter Deegan

PETER DEEGAN | VICE PRESIDENT, HUMAN RESOURCES | OFFICE: +1 (212) 509-1336 EXT. 242 | MOBILE: +1 (347) 949-3453
MSA SECURITY | IN THE BUSINESS OF BUSINESS-AS-USUAL™ | WEB: WWW.MSASECURITY.NET

**From:** Karen Iovino
**Sent:** Wednesday, July 26, 2017 7:51 AM
**To:** Peter Deegan <PDeegan@msasecurity.net>
**Subject:** RE: Litigation Against the Company and Press Inquiries

Mr. Deegan,

In light of the fact that I felt compelled to file an EEOC complaint, I don't feel it would be appropriate to elaborate on the issues at CVC at this time.

I would be happy to have a face to face discussion at the appropriate time.

Karen

KAREN IOVINO, DVM



VETERINARIAN, CANINE VALIDATION CENTER
O: 540.300.6028 X345 | C: 703.554.4497 | F: 540.545.4138

**From:** Peter Deegan
**Sent:** Tuesday, July 25, 2017 10:43 PM
**To:** Karen Iovino <Klovino@msasecurity.net>
**Subject:** RE: Litigation Against the Company and Press Inquiries

1

IOVINO_00000261

# EXHIBIT 24

Attorney Privilege & Confidential

MSA000107

## Subject: CVC FT ATA Veterinarian Selection



**Michael D. Ratcliff** <MRatcliff@msasecurity.net>

to Peter Deegan, Michael Hayes, Alan Bower

Wed, Jul 26, 2017, 9

You are viewing an attached message. Ward & Berry, PLLC Mail can't verify the authenticity of attached messages.

Sir,

Attached for your review is the proposed narrative regarding the selection of the full time ATA veterinarian. We wo greatly welcome your comments and guidance as we try to make this selection in the most appropriate way.

Thank you,
Mike

### Mike Ratcliff, MS, DVM



**LEAD VETERINARIAN**
**HEAD, DEPARTMENT OF CANINE WELLNESS & SUPPORT**
**CANINE VALIDATION CENTER**
**OFFICE: 540.300.6028 EXT.353 | MOBILE: 540.931.1160 | FAX: 540.545.4138**

*Confidentiality Notice | This e-mail (including attachments) is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2. confidential and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, disseminc distribution, or copying of this communications is strictly prohibited. Please reply to the sender that you have received the message in and delete it. Thank you.*



W 20170725 FT ATA ..

1/1

GAPKI_000252

*SUBJECT TO PROTECTIVE ORDER (PO) - PO CONFIDENTIAL*

# EXHIBIT 25

# EXHIBIT 003

Deposition of MSA 30 b 6
February 24, 2026

Hiring Decision Memo

Bates: IOVINO_00000137-IOVINO_00000139 (3 pp.)

CONFIDENTIAL

000116

**Hiring Decision & Justification:** CVC ATA Full time Veterinarian
**Hiring Manager:** Michael D. Ratcliff, MS, DVM; CVC Lead Veterinarian
Applicants:
Dr. Cuevas, Edwin
Dr. Iovino, Karen
Dr. Orta, Colleen
Dr. Palmer, Lee

Preliminary Screening:
Review of résumés excludes Drs. Cuevas and Orta from selection since they do not demonstrate significant experience with Working Dogs when compared to the other two applicants.

Final Candidates:
Dr. Iovino (current ATA part-time veterinarian) and Dr. Palmer

Assessment Parameters:
I have known and worked with both Drs. Iovino and Palmer as veterinary colleagues for a minimum of 6 months. Dr. Iovino has worked directly for me during this time. These assessments are based off of personal experience working side-by-side, ample conversations, and numerous email and telephone communications with each.

| Qualitative Criteria | | |
|---|---|---|
| Criteria/Applicant | Dr. Iovino | Dr. Palmer |
| Minimum 2 years veterinary experience[1] | X | X |
| Possess, or ability to possess, a SECRET clearance[1] | X | X |
| Willing to live/work in combat areas for up to 90 days[1] | X | X |
| Board Certified Veterinary Specialist | | X[2] |
| Canine Rehabilitation Certification | | X |
| Working Dog experience | X | X |
| Military Working Dog experience | | X |
| Military service | | X |
| Overseas (austere) deployed veterinary experience | | X |
| DoS Explosive Detection Canine veterinary experience | X | |
| Effective diplomacy & communications internationally | | X |
| Research and R&D experience | | X |
| Journal publications | | X |
| Textbook publications | | X |
| Conference lecture experience | | X |
| EOD experience | | X[3] |
| Additional advanced degree (MS, MA, PhD) | | X |
| Experience working with DHS/FEMA | X[4] | X |
| Experience training handlers on Tactical Combat Care | | X |
| Emergency Medical Technician (Human) | | X |
| Deputy Sheriff | | X |

[1] Mandatory DOS requirement
[2] Emergency/Critical Care specialist
[3] Senior EOD Technician with the U.S. Air Force
[4] CONUS deployments to assist after various natural disasters

**Exhibit 003**
MSA
02/24/26

IOVINO_00000137

000117

**Additional Criteria**

Day-to-day Working Dog experience:          Candidate advantage:    NONE/TIE
Both candidates possess the abilities necessary to provide routine, day-to-day veterinary care (including elective surgical) to Explosive Detection Canines on the various ATA projects.

Emergency Response:          Candidate advantage:    Dr. Palmer
Though Dr. Iovino has significant experience as an Emergency Veterinarian, it is all at the General Practitioner level. Dr. Palmer is a board certified specialist in Emergency and Critical Care, which required a 1-year internship, 3-year residency, and passing a very strenuous examination.

Client and Leadership Professional Relationships:          Candidate advantage:    Dr. Palmer
Based on past performance and feedback from the client and MSA senior leadership, our confidence in Dr. Iovino's ability to work and communicate effectively with these entities is poor. She lacks the ability to professionally relate to these individuals, and she struggles to inspire confidence when she makes recommendations. Dr. Palmer has a long history of dealing with high-level government officials across a spectrum of agencies, including SOCOM. These entities frequently reach out to him for SME guidance regarding all aspects of Working Dog care. He comes recommended by SOCOM and HHS, among others.

Team Work/Leadership:          Candidate advantage:    Dr. Palmer
Dr. Iovino has failed to consistently work with her existing team with tactfulness, respect, or professionalism. Dr. Palmer displays a high capacity for interacting with a team with a better level of diplomacy. Dr. Palmer brings a vast history of leadership experience- including Military service as an Officer, University-level leadership, Law Enforcement, and leading numerous committees to advance veterinary protocols in emergent situations.

Teaching/Instructing:          Candidate advantage:    Dr. Palmer
Dr. Palmer is an international SME in regards to pre-hospital veterinary care. He is frequently invited to lecture and train with all levels of Canine Professionals, from the handler level all the way to human trauma surgeons who could potentially work on dogs (if needed). He demonstrates the ability to relate to all of these individuals, and provide viable training that could potentially save a K9's life in a tactical situation. Dr. Iovino does have experience training handlers on various K9 first aid topics, but her experience is vastly overshadowed by Dr. Palmer's.

International Travel/Diplomacy:          Candidate advantage:    Dr. Palmer
We are reluctant to send Dr. Iovino out on international missions, a large part of the newly-developed full time position, based on her attitude and personality when dealing with leadership. We worry that she does not possess the ability to relate to international canine personnel in an effective way, which could negatively impact the MSA/CVC mission in regards to client satisfaction.


**Recommended Selection:        Dr. Lee Palmer**

IOVINO_00000138

000118

Summary:

Though both candidates satisfy DOS criteria for the full time ATA veterinary position, Dr. Palmer's additional experience and qualifications make him the superior candidate. Both demonstrate ample medical competencies, but Dr. Palmer being a board-certified veterinary specialist with a history of EOD and human EMT work makes him a more well-rounded fit for the overall future of the Canine Validation Center, the ATA program, and the K9 industry as a whole. Dr. Iovino's overall attitude towards the mission and inability to relate diplomatically to leadership preclude her from being selected for international missions, a key component of the full time position. The client is simply not comfortable with us using Dr. Iovino in this capacity. We would be fully comfortable deploying Dr. Palmer to these locations, and confident that he could deliver clear and concise recommendations in a diplomatic fashion back to the client and MSA/CVC leadership. It is for all of the above, in addition to the documented selection criteria, that we chose Dr. Lee Palmer as the overarching choice for the position of full time ATA veterinarian.

**Resumes** (double-click to open)

Dr. Iovino:



Dr. Palmer:



IOVINO_00000139

# EXHIBIT 26

Interview with Dr. Michael Ratcliff

March 26, 2018

Participants: Jeff McDermott (OIG), Claire Barnard (OIG), Valerie Price (Counsel, MSA Associates)


Dr. Ratcliff has worked for MSA Associates since November 2016 and supervised Dr. Karen Iovino from November 2016 until August 2017. As a senior veterinarian, he supervises 2 veterinarians at the Canine Validation Center (CVC) and 3 veterinarians overseas.

Dr. Iovino was the veterinarian for the Antiterrorism Assistance (ATA) program, which initially had very few dogs, so there was only need for a part-time veterinarian. However, after several contract modifications in 2016 and 2017, the number of dogs tripled. Ratcliff then suggested to the Department of State (DoS) that the ATA veterinarian become a full time position because there was no way that a part-time position could support all of the dogs.

Ratcliff asked Iovino if she would be interested in working full time, and she said she would be. Four people applied for the position, including Iovino, which closed in August 2017. Ratcliff said that the selected candidate (Lee Palmer) had much greater qualifications that Iovino. Dr. Palmer had emergency critical care training, prior military experience, and a significant amount of publications. He also had practiced veterinary medicine in a combat zone. Ratcliff stated that these were not requirements in the job announcement. [Note: the announcement does state that the candidate must be "willing to live and work in conflict/combat areas." According to Ratcliff, Iovino's whistleblowing activity was not a consideration in the hiring decision, which he said was based solely on Palmer's more relevant experience.

On August 3, 2017, the lead veterinary tech told Ratcliff that two of the kennel techs had told him that Iovino had threatened to go to *The Washington Post*, in potential violation of MSA's confidentiality agreement. Ratcliff spoke to one of the kennel techs who confirmed that Iovino had made this threat. However, he did not ask and cannot recall ever being told what information she was threatening to release. Ratcliff and Bower spoke on August 3, and Bower said it would be in the best interest of the program to place her on administrative leave. Ratcliff concurred with this decision.

Ratcliff did not conduct any further investigation to confirm if Iovino had made such threats and he did not ask Iovino if she had. On August 4, 2017, Ratcliff and Alan Bower met Iovino on her way into the office and informed her she would be placed on administrative leave. To Ratcliff's knowledge, no one investigated the allegations against Iovino after she was placed on leave. Gerald Goss never contacted him regarding the allegations.

Ratcliff was aware that Iovino was in contact with DoS officials about her concerns about the treatment of dogs, as well as other issues at the CVC, but he is unsure if he learned of this contact before or after she was placed on leave. He believes he learned of the contacts afterwards when a senior CVC leader told him.

Ratcliff stated that while Iovino was a good veterinarian, she was difficult to work with. For example, she entered a meeting on his first day of work with Ratcliff's supervisor, Zane Roberts, and the DoS Deputy Program Manager, James Olds, and stated that she did not agree with the process of Ratcliff's hiring,

DOS OIG000140

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

which was "bullshit." He and Bower did verbally counsel her once regarding her treatment of colleagues. Iovino was never given a performance appraisal.

Ratcliff has never been faced with an employee who violated the confidentiality agreement. He has given written reprimands for absenteeism and an incident with a dog.

CONFIDENTIAL
SUBJECT TO CONFIDENTIALITY AND PROTECTIVE ORDER

DOS OIG000141

# EXHIBIT 27

Interview with Alan Bower, Deputy Program Manager, Canine Validation Center (CVC), MSA Security

Date: November 16, 2017

Participants:

Jeff McDermott, OIG

Claire Barnard, OIG

Valerie Price, Counsel, MSA Security

Mr. Bower stated that he has worked for MSA for seven years. As Deputy Program Manager, he is responsible for facilities and support, physical security, and administrative support at the CVC. Bower stated that he supervised Dr. Iovino for one week approximately a year ago, but the program manager at the time did not believe that Bower should be in Iovino's chain of command. Bower had few interactions with Iovino because she primarily worked in the hospital at the CVC. He did counsel her once with Dr. Michael Ratcliff on how she addressed the kennel technicians, which he found to be condescending. Bower also had to remind her to better manage her hours, because the contract with the Department of State only allowed her to bill for 30 hours/week.

According to Bower, Zane Roberts supervised Iovino at first, but Ratcliff became her supervisor once he was hired.

On August 4, 2017, Ratcliff and Bower informed Iovino that she would be placed on administrative leave because on August 3, one of the kennel techs told Bower that another kennel tech reported that Iovino had said that she wanted to go to the media with unspecified concerns. Bower said that Human Resources decided Iovino should be suspended. To Bower's knowledge, Iovino had never approached anyone with concerns at the CVC.

Bower sent Iovino's computer to a forensics lab in New York, which found that she was forwarding emails to her personal account. Although Bower did not believe this explicitly violated MSA's employee handbook, it did raise concerns similar to the rule in the handbook that company business should only be conducted using company email.

Bower stated that he looked into Iovino's concerns about time and attendance, and found no irregularities in the payroll system. He is not sure if anyone else at MSA investigated her other complaints. He was not aware at the time of her suspension that Iovino had approached OIG.

Bower stated that earlier in 2017, the contract line item number (CLIN) for Iovino's position changed and went to full-time, rather than part-time. Bower stated that the Project Manager told him that Iovino was offered the full-time position, but she declined it because she did not want to work full-time.

Bower had no information regarding the termination letter sent to Iovino.

DOS OIG000139

# EXHIBIT 28

## IN RE: KAREN IOVINO V. MSA SECURITY
### OIG WHISTLEBLOWER CASE NO. 2017-0044

### KAREN IOVINO'S REPLY TO MSA SECURITY MEMORANDUM

COMES NOW Karen Iovino, by counsel, and files this Reply to the MSA Security Memorandum in Support of her claim of retaliatory discharge from her former employer, Michael Stapleton Associates (MSA).

MSA Security essentially focuses upon two areas in support of its position that it did not discharge Dr. Iovino (hereinafter "Iovino") in relation for making protected disclosures: 1) that it would have suspended and ultimately terminated Iovino in the absence of her protected disclosures and that 2) the OIG investigation and report are so "tainted" that it cannot be used in support of a finding in favor of Karen Iovino.

Both areas disregard the documentary evidence produced by MSA during the investigation as well as the admissions of MSA personnel. An Affidavit from Iovino addressing some of the issues raised by MSA in the Declarations attached to its Memorandum to OIG is attached hereto as **Exhibit G** and incorporated herein.

**A. The documentary evidence produced by MSA clearly reflects that Iovino was a valuable employee who would not have been terminated.**

MSA emphasizes that Karen Iovino was "terminable at will" and asserts that she was unprofessional, difficult to work with, and, oh by the way, it was the Department of State that eliminated Iovino's position, not MSA, which resulted in her termination. Almost two years after Iovino's termination, it now provides certain "Declarations" - not under oath in front of a notary public -in support of its assertions.

IOVINO_00000706

First, given the fact that Iovino was "terminable at will," MSA had the ability to, "at any time, terminate [Iovino's] employment with or without cause and with or without notice." [Page No. 000045, Paragraph 8b] Yet despite all of the assertions that MSA now makes about the "unprofessionalism" of Iovino, her "insubordination," "poor leadership," and "failure to correct behavior" which MSA now contends occurred, it chose not to terminate her although it could have done so for any reason or *no* reason.

Her employment file, produced by MSA in the course of the OIG investigation, had no write ups, no disciplinary actions taken against her, and no evaluations. The file contains a letter of commendation written April 19, 2017, by the Chief Executive Officer of MSA Security relating to Iovino's treatment for a dog identified as Frank 9656, recognizing Iovino's "above and beyond efforts," her "selflessly" rushing in on her scheduled day off, her "compassion and medical expertise," her "above and beyond" conduct in borrowing a laser, and that she was "instrumental" in Frank 9656's full recovery. [Page No. 000015]

This praise by MSA's CEO is absolutely inconsistent with the type of employee MSA now describes.[1]

One must also examine the Declarations which were submitted in support of MSA. The Declarations all assert, *in identical language,* that Iovino "consistently displayed a lack of professionalism, often contradicting her managers and berating her

---

[1]It is noteworthy Iovino specifically inquired of Ratcliff on February 26, 2017, whether there had been any complaints about her performance to which Ratcliff said "no, quite the opposite, everyone loves you." Page No. 000014.

IOVINO_00000707

co-workers." Jennifer Houston [¶4], Alan Bower [¶3], Michael Ratcliff [¶5]. The Declarations all assert, using substantially the same verbiage, that she had a negative attitude, Houston [¶10], Bower, [¶5], Ratcliff [¶6], and tended to interrupt other staff. It is clear to see that these are all "canned" responses that the employees were required by MSA and its attorneys to provide.[2] MSA failed to submit any Declarations from those kennel technicians that she allegedly berated.

The criticisms leveled by Jennifer Houston in her Declaration are best explained by both her bias against Iovino and her status as a current employee who does not desire retaliation against her by MSA. Houston was the LVT technician that Iovino complained to MSA personnel concerning competence issues, and was the subject of a complaint filed with the Virginia Board of Veterinary Medicine.

MSA's focus on the transformation of the part time position to a full time position resulting a Iovino's termination - instead of retaliation - is a  non-sequitur. Ratcliff acknowledged in his statement to OIG - presumably under the same penalty of perjury he makes in his Declaration - that he was the one who recommended to the Department of State that the ATA veterinarian become a full time position. [Page 000140]. Ratcliff asked Iovino if she would be interested in working full time and she said "she would be." **Id.**

Iovino described the conversation, which occurred in February 2017, in her statement given to OIG. [Page No. 000014] She agreed to the full time position in February 2017. The Ratcliff Declaration clarifies that DoS approved the full time

---

[2]As further proof, Gerald Goss was "outraged" when he read the July 5, 2018, report. Declaration ¶16. Michael Ratcliff was "infuriated." Declaration ¶34.

IOVINO_00000708

position in May 2017 but now denies, not under oath, that he offered her the position in February 2017. Ratcliff ¶21.

It was therefore known *prior* to the approval by DoS in May 2017 that Iovino's position would become full time. By that time, Iovino had accepted the position and anticipated becoming full time. However, the whistleblower disclosure made in July then changed everything.[3] MSA decided to post the position and make Iovino apply for it, suspended Iovino for making disclosures in violation of the MSA non-disclosure agreement later found by DoS to be illegal, and hired Iovino's replacement taking into account qualifications not advertised.

## B. The Quality of the OIG Investigation

In the course of the investigation, the OIG investigator spoke to numerous persons identified by the parties as familiar with the situation and requested documentation in order to establish the facts. Interviews began in November 2017 and continued through April 2018. As the redacted record reflects, MSA employees Deegan, Bower, Ratcliff, and Goss were all interviewed by OIG's Jeff McDermott with Valerie Price, counsel for MSA Security participating. A second OIG person also participated in those interviews. The statements are initialed by OIG

---

[3]Protected disclosures by Iovino include those made to DoS and OIG. Although Iovino threatened to go the media on August 4, disclosures to media are protected as notice to the government agency. Wedderspoon v. Milligan, 80-WPCA-1, slip op. of ALJ, at 10-11 (July 11, 1980), adopted by SOL (July 28, 1980); Donovan v. R.D. Andersen Constr. Co., 552 F. Supp. 249 (D. Kan. 1982); Dobreuenaski v. Associated Universities, Inc., 96 ERA-44, D&O of ARB, at 9 (June 18, 1998); Simon v. Simmons Industries, Inc., 87-TSC-2, D&O of SOL, at 4 (Apr. 4, 1994), citing Legutko v. Local 16, International Brotherhood of Teamsters, 606 F. Supp. 352 , 358-59 (E.D.N.Y. 1985, aff'd, (2d Cir. 1988); Nunn v. Duke Power Co., 84-ERA-27, D&O of Remand by Deputy SOL, at 13 (July 30, 1987).

IOVINO_00000709

representatives to attest to their accuracy.

MSA not only provided materials in response to the requests of OIG (albeit in an untimely manner), Pages 000008-000013, but also other materials it thought relevant to the matter. See Pages 000073-000135. Nothing prohibited MSA from providing such materials as it believed would show that it did not discharge Iovino in retaliation for her protected disclosures.

Other than additional Declarations apparently prepared by MSA's attorneys to file with the case, there are no new documents which MSA has chosen to produce in support of its position that it did not retaliate against Iovino. The original decision made by OIG that MSA retaliated against Iovino should stand.

Simply put, MSA has had ample due process with regard to the notice and the ability to defend itself against the complaint. Simply because MSA did not prevail does not mean that due process was denied.

**KAREN IOVINO**

By:_____
Counsel

Nate L. Adams, III, Esq.                Thomas M. Devine, Esq.
VSB No. 20707                           Government Accountability Project
Nate L. Adams, III, P.C.                1612 K St. NW, Suite #1100
ADAMS AND JONES, PLC                     Washington, DC  20006
11 South Cameron St.                    (202) 457-0034 ext. 124
Winchester VA 22601                     TomD@whistleblower.org
(540) 667-1330
(540) 667-7165 facsimile
nadams@nadamslaw.com
Counsel for Karen Iovino, DVM
Memorandum reply190716.wpd

IOVINO_00000710

# EXHIBIT 29

# EXHIBIT 019

Deposition of Mike Hayes
February 13, 2026

Contemporaneous Note Jul 24 Meeting Exclusion

Bates: DOS-OIG000019 (1 pp.)

July 24, 2017

Below are two conversations with Mike Ratcliff that occurred today.

This morning the ATA trainers informed me that the laptop program contract is close to being signed by DoS.  It will require procurement of approx 40 canines.  The timeline for having canines trained is short.  They heard that the dogs will not be spayed/neutered or have prophylactic gastropexy They will be deployed to foreign 3rd world countries (3rd world countries have substandard veterinary care). Around 10 am, I asked Mike for an update on the laptop canine program.  He said the timeline is short.  I specifically asked if the canines would be spayed/neutered/pexied after the initial 2-3 week imprinting period.  He said the timeline is up to John(John Hoover is new ATA Lead).  Of note, the surgical procedures are performed to mitigate pyometra/mammary cancer in females, testicular or prostatic cancer/disease in males.  Gastropexy prevents GDV(gastric dilation and volvulus which is life threatening and the #1 cause of preventable deaths in working canines).

At approx 2:30 pm today, I learned an ATA meeting was held (recently ended)about the laptop program.  I was not invited to attend.  I asked Mike why I wasn't included.  He said he 'forgot' and he would provide me with updates when he has them.  I said he remembered to invite Brett and Jonah(they are kennel tech's-the kennel is located next to the ATA hospital).  I said since the meeting involved discussion of the ATA program, I should have been included as it directly affects my work.  I asked about procurement of canines, when I can expect records/radiographs. He said they would be coming to him and we could review together.  This is a change as in the past records/radiographs came directly to me for review.

There is a pattern of excluding me from meetings that involve the ATA program.  See write up May 11, 2017 where I ask to be included in the bi-weekly ATA conference calls with the Jordanian mentors.

Karen Iovino, DVM

<table>
<tr><td><strong>Exhibit 019</strong></td></tr>
<tr><td>MH</td></tr>
<tr><td>02/13/26</td></tr>
</table>