**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

**DR. KAREN IOVINO,**

Plaintiff and Counterclaim Defendant,

v. Case No. 5:21-CV-00064-TTC

**MICHAEL STAPLETON ASSOCIATES, LTD**., et al.,

Defendant and Counterclaim Plaintiff.

_____

<u>**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT AGAINST COUNTERCLAIM**</u>

I.  INTRODUCTION…................................................................................. ..3

II.  REPLY TO DEFENDANT'S STATEMENT OF DISPUTED FACTS... 4

    A.  Iovino Pre-Complaint Background .......................................................4

    B.  The Universe of MSA's Disclosure Allegations ...............................4

    C.  Post-Complaint — OIG Finding on the NDA...................................8

    D.  Post-Complaint — Congressional Oversight ...................................9

    E.  Nature of the Information — Four-Category Classification ...........10

        1.  Category (i): Internal Documents Transmitted...........................10

        2.  Category (ii): Photographs of Conditions Personally Observed..10

        3.  Category (iii): Descriptions of What She Witnessed...................11

        4.  Category (iv): Her Professional Veterinary Opinions. ...............11

    F.  Scope What the Agreement Covers Versus What MSA Claims ........12

    G.  MSA's Claimed Damages Lack Item-Specific Causation ..............13

        1.  Delta Air Lines / Larkin................................................13

        2.  San Francisco 49ers (~$1.6 million)...........................................14

3.    Expeditors (~$1.9 million)...........................................................14

4.    Google (unquantified, canine program 2019)............................14

5.    Unmeasurable Reputational Harm..............................................15

H.    Independent Sources of MSA's Business Exposure ......................15

LEGAL ARGUMENT .............................................................................. 16

I.    MSA'S OPENING AUTHORITIES DO NOT ADDRESS THE
ENFORCEABILITY OF THE NDA. ................................................... 16

II.   NEW YORK LAW TREATS THIS NDA AS AN OVERBROAD EMPLOYEE
RESTRAINT, NOT AS A ROUTINE CONFIDENTIALITY CLAUSE.17

III.  THE FACTS SHOW THAT THE NDA OPERATES AS A BLANKET
SPEECH RESTRAINT, NOT AS A NARROW PROTECTION OF
PROPRIETARY INFORMATION. ..................................................... 19

IV.   EVEN APART FROM OVERBREADTH, MOST OF THE ALLEGED
INFORMATION DOES NOT QUALIFY AS PROTECTABLE
CONFIDENTIAL INFORMATION. ................................................... 20

V.    PROTECTED DISCLOSURES TO OIG AND THE DEPARTMENT OF
STATE MOVED THE MATTER INTO A GOVERNMENTAL
INVESTIGATIVE CHANNEL THAT MSA CANNOT RECAPTURE BY
CONTRACT. ..................................................................................... 21

VI.   THE OIG FINDING AND MSA'S LATER AMENDMENT CONFIRM
THAT THE ORIGINAL NDA WAS DEFECTIVE............................. 23

VII.  MSA CANNOT PROVE DAMAGES BECAUSE IT LACKS ITEM-
SPECIFIC CAUSATION.................................................................... 23

VIII. MSA'S REQUEST FOR INJUNCTIVE RELIEF FAILS BECAUSE
THERE IS NO MEANINGFUL FUTURE HARM LEFT TO ENJOIN.24

IX.   CONCLUSION.................................................................................. 25

CERTIFICATE OF SERVICE................................................................. 27

Plaintiff Dr. Karen Iovino respectfully submits this reply in support of her motion for summary judgment against MSA's counterclaim. For the reasons below, and on the undisputed facts set out in Plaintiff's Reply Statement of Facts, the counterclaim fails as a matter of law.

## I.  INTRODUCTION

MSA's opposition does not identify authority that validates the NDA it seeks to enforce. Instead, it offers generic summary-judgment law, retaliation authorities addressed to a different claim, and a procedural contract case that does not address overbreadth, public policy, or whistleblower reporting. The dispositive facts are not genuinely disputed. Dr. Iovino reported her concerns to the State Department OIG before any identified media contact. OIG later concluded that MSA's NDA was inconsistent with law. MSA then modified the NDA to add the government-reporting carveout the original lacked. OIG also independently confirmed the substance of Dr. Iovino's concerns. And MSA's own item-by-item disclosure record shows that only 3 of 56 alleged media-disclosure items were actual internal documents, while 53 of 56 items—94.6%—were Dr. Iovino's observations, photographs, firsthand descriptions, and professional veterinary opinions. (SOF ¶¶ 10-19.)

Under New York law, that is not an enforceable employee restraint. A restrictive covenant is reasonable only if it is no greater than necessary to protect a legitimate employer interest, does not impose undue hardship on the employee, and is not injurious to the public. A violation of any prong renders the covenant invalid. New York applies a stricter standard of reasonableness to employee restraints because of the powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood. Measured against that standard, MSA's NDA is facially overbroad, unsupported by a legitimate proprietary interest as to most of the alleged disclosures, and incapable of supporting either damages or injunctive relief.

3

## II.  REPLY TO DEFENDANT'S STATEMENT OF DISPUTED FACTS

### A.  <u>Iovino Pre-Complaint Background</u>

**1.** MSA hired Iovino in 2015 as a Part-Time Veterinarian to work on a veterinary clinic for dogs contract with the United States Department of State at the Diplomatic Security Global Canine Services Center ("GCSC," formerly the "Canine Validation Center" or "CVC") in Winchester, Virginia. ECF 31 ¶¶ 4, 12; Ex. 1 (Dragnett Dep.) 103:25-104:2.

**2.** On October 16, 2015, Iovino signed MSA's "Employee Confidentiality, Invention Assignment and Non-Solicitation Agreement" (the "NDA"). ECF 31-1. Section 2 of the NDA defines "confidential information" as "all information financial, technical or otherwise in whatever form written, oral or otherwise which is disclosed to [the employee] or acquired by [the employee] in the course of [the employee's] employment in any way concerning the trade secrets, projects, activities, business, clients, trade practices, know-how or affairs of the Company . . . ." *Id.* § 2. Section 3 imposes a perpetual non-disclosure obligation: "During the term of my employment, and for all times thereafter." *Id.* § 3. The NDA contains no carve-out for government reporting, OIG complaints, or Congressional inquiries.

**3.** MSA's counterclaim (ECF 31) seeks compensatory damages in an amount "no less than $2,000,000.00" (Prayer A), a permanent injunction prohibiting Iovino from "continuing to disclose MSA's confidential information" (Prayer E), attorneys' fees (Prayer C), and costs (Prayer D). MSA alleges that Iovino's disclosures to the Washington Post and NBC 4 Washington constitute breaches of the NDA. ECF 31 ¶¶ 38-43.

### B.  <u>The Universe of MSA's Disclosure Allegations</u>

**4.** MSA's media-disclosure allegations in the DSUMF are concentrated in paragraphs 20-21, 25, 31-32, 49-53, 55, 57-58, and 60. DSUMF ¶¶ 20-21, 25, 31-32, 49-53, 55, 57-58, 60.

4

Additional paragraphs address Iovino's litigation admissions (DSUMF ¶¶ 63-64, 66-72) and document-preservation conduct (DSUMF ¶ 77). Every media-contact allegation in paragraphs 20-21, 25, 31-32, 49-53, 55, 57-58, and 60 cites a single exhibit: Ex. A (DSUMF Exhibit W), a consolidated compilation of email threads between Iovino and journalists. Ex. A at IOVINO_00009547-9603.

**5.** MSA identifies five journalists as the recipients of Iovino's communications: (1) Ellen Nakashima at the Washington Post (DSUMF ¶ 20; Ex. A at IOVINO_00009552-54); (2) Carol Morello at the Washington Post (DSUMF ¶¶ 20-21, 25, 31, 49-50, 52; Ex. A at IOVINO_00009550-52); (3) David Paredes at NBC Universal (DSUMF ¶¶ 25, 32, 49; Ex. A at IOVINO_00009547-48); (4) Scott MacFarlane at NBC Universal (DSUMF ¶¶ 49-53, 55, 57-58, 60; Ex. A at IOVINO_00009555, 9589-9603); and (5) Katie Leslie at NBC Universal (DSUMF ¶¶ 53, 55, 58, 60; Ex. A at IOVINO_00009596-9601). The first documented media contact occurred on July 27, 2017 — twenty-one days after Iovino filed her OIG complaint on July 6, 2017. DSUMF ¶ 20; Ex. 1 (Dragnett Dep.) 85:10-11.

**6.** MSA's own Rule 30(b)(6) deposition notice organized the counterclaim's disclosure allegations into Topics 20 through 31, corresponding to specific counterclaim paragraphs within ¶¶ 38–49. Ex. B (30(b)(6) Deposition Notice). Topic 20 asked MSA to identify all "confidential information" Iovino allegedly disclosed to the Washington Post and NBC 4 Washington. Topics 21 through 25 asked MSA to identify specific confidential information disclosed to each journalist individually: Nakashima (Topic 21), Paredes (Topic 22), Morello (Topic 23), MacFarlane (Topic 24), and Leslie (Topic 25). Dragnett did not identify specific items disclosed to any individual journalist for Topics 21 through 25. Ex. 1 (Dragnett Dep.); Ex. B. Topics 26

through 27 addressed published articles. Topics 28 through 31 addressed MSA's damages theories, including jeopardized confidentiality obligations (Topic 28), client concerns (Topic 29), and financial and reputational harm (Topics 30-31). On damages, Dragnett conceded that MSA "can't measure full extent of the harm." Ex. 1 (Dragnett Dep.) 99:9-10.

**7.** Before Iovino filed any complaint or contacted any media outlet, the Explosive Detection Canine Program ("EDCP") operated without written policies or standards governing canine health and welfare. The OIG subsequently confirmed that during the period 2008-2016, at least ten dogs died in Jordan alone from preventable causes including parvovirus, heat stroke, and renal failure. Ex. 3 (OIG ESP-19-06) at 5 (absence of written policies, procedures, or standards of care), 10 (at least ten canine deaths in Jordan, 2008–2016), 11 (parvovirus; heat exhaustion), 14 (hyperthermia/heat stroke; renal failure). The conditions Iovino later reported were pre-existing and independently documented by the OIG.

**8.** Media and Congressional attention to the canine program confirmed the conditions Iovino had reported through protected channels. In February 2019, the Washington Examiner published an account of canine deaths in overseas deployments referencing Iovino's concerns as reported by NBC 4. Following the OIG's September 2019 evaluation, the Animal Welfare Institute documented systemic program failures, and U.S. Senator Mark Warner issued a public call for reform citing the OIG's conclusions, and Senator Chuck Grassley initiated a formal oversight inquiry demanding a briefing and written answers from the Secretary of State. Ex. 4; Ex. 6. Bipartisan Congressional oversight followed. The House Committee on Oversight and Reform under both Chairman Gowdy (December 2018) and Chairman Cummings and Vice Chair Hill (February 2019) demanded briefings from the Inspector General on the CVC

6

investigation, citing the OIG's finding that "MSA Security violated federal law protecting whistleblowers" and that Dr. Iovino "was suspended and fired … for reporting waste, fraud, and abuse." Ex. 6 at 2-3, 9-11. Senator Grassley initiated a formal oversight inquiry demanding written answers from the Secretary of State. Ex. 6 at 12-15. Senator Warner issued public calls for reform in 2019 and 2022. Ex. 6 at 18-21. The government-wide GAO study that followed expressly cited the OIG evaluation as foundational context, see Ex. 8 (GAO-23-104489) at 1 n.2 (citing ESP-19-06), which in turn was prompted by Iovino's July 2017 hotline complaint, Ex. 3 (OIG ESP-19-06) at 1, and led to enactment of the Working Dog Health and Welfare Act of 2023 (Ex. 7). The coverage and advocacy that followed arose from government-verified conditions, not from any misuse of confidential information by Iovino.

**9.** MSA itself placed information about its canine detection operations into the public domain through its own promotional activities. MSA published press releases describing its canine detection teams, their deployment capabilities, and the scope of its government contracts, including a March 2016 press release detailing its explosive detection canine training on five families of explosives and a December 2018 announcement of TSA Third-Party Canine Cargo certification. Ex. 5. MSA's promotional materials identify the same categories of information, canine operations, deployment locations, program capabilities that MSA now characterizes as confidential in its counterclaim.

**10.** Iovino filed a complaint with the State Department Office of Inspector General on July 6, 2017 before any identified media contact. DSUMF ¶ 12. Her first identified contact with a journalist occurred on July 27, 2017, when she emailed Ellen Nakashima at the Washington Post. DSUMF ¶ 20; Ex. A at IOVINO_00009552-54. Her NBC tip email to David Paredes

7

followed on August 1, 2017. DSUMF ¶ 25; Ex. A at IOVINO_00009547-48. The OIG channel thus preceded media contacts by twenty-one days. DSUMF ¶¶ 12, 20.

### C. **Post-Complaint - OIG Finding on the NDA**

**11.** The OIG investigated MSA's NDA and concluded it was inconsistent with the requirements of the law. Ex. G (OIG Mgmt. Assistance Rep. ESP-18-03, Aug. 2018) at IOVINO_00000547-552; Ex. 1 (Dragnett Dep.) 104:12-15 (MSA's corporate designee: "I am aware."). This finding by the federal government's own inspector general directly addresses the enforceability of the agreement MSA now seeks to enforce as the basis for its counterclaim.

**12.** Following the OIG's finding, MSA modified the NDA effective September 11, 2018, adding the government-reporting carve-out the original lacked. Ex. 1 (Dragnett Dep.) 105:23-106:2; Ex. F (Modified MSA Nondisclosure Agreement with FAR Compliance Paragraph) at IOVINO_00001345. MSA's decision to modify the agreement is an implicit acknowledgment that the original NDA, the version signed by Iovino on October 16, 2015, and attached as Exhibit 1 to MSA's counterclaim, required modification to comply with federal law. MSA's counterclaim is based on the pre-modification version of the NDA.

**13.** OIG ESP-19-06 (September 2019) was initiated in response to a July 2017 OIG hotline disclosure. Each claimed loss has independent alternative causes documented in the public record, independently confirming the conditions Iovino had reported: dogs dying from preventable causes in Jordan, absence of written policies or standards of care, no signed agreements with partner nations governing canine welfare, no standardized follow-up schedule for deployed canines, and no formal retirement policy. *Id.* at 5-8, 10. Five recommendations were issued. *Id.* at 20-22.

**14.** The substance of Iovino's disclosures to media was the same substance she reported to the OIG. Dragnett testified that the accusations in Iovino's media communications included the same accusations reported to the OIG. Ex. 1 (Dragnett Dep.) 78:4-5 ("It seems like some of the same accusations were included."); 83:1-12; 83:15-18 (MSA's characterization of disclosures as unauthorized). The OIG's independent validation of those concerns refutes MSA's characterization of Iovino's disclosures as unauthorized releases of proprietary business information.

### D.   Post-Complaint — Congressional Oversight

**15.** Bipartisan Congressional oversight of the EDCP began in December 2018 and continued through March 2022. Republican members initiated oversight: Representative Trey Gowdy (House Oversight Chairman) wrote to Secretary Pompeo on December 10, 2018, demanding documents regarding "fraud, cronyism, misuse of government funds, and whistleblower retaliation" at the CVC. Ex. 6 at 2. Senator Charles Grassley wrote to Secretary Pompeo on September 12, 2019 and issued a public Q&A on September 20, 2019, confirming whistleblower complaints prompted the OIG investigation. Democratic members continued oversight: Representative Elijah Cummings and Representative Katie Hill wrote to IG Linick on February 11, 2019. Senator Mark Warner pressed the State Department on canine safety on September 17, 2019 and again on March 17, 2022. Ex. 6  at 2-3 (Gowdy letter), 9-11 (Cummings/Hill letter), 12-15 (Grassley letter), 16-17 (Grassley Q&A), 18 (Warner press release and letter, 2019), 19-20 (Warner letter, 2022).

**16.** Congress enacted the Working Dog Health and Welfare Act of 2023, signed into law on December 23, 2024 (Public Law 118-195). This federal legislation addresses the conditions Iovino reported and mandates implementation of GAO recommendations for working dog health

and welfare standards, supporting the public-interest character of her disclosures. Pub. L. 118-195; Ex. 7; *see also* Ex. 8 (GAO-23-104489).

### E. The Nature of the Disclosed Information — Four-Category Classification

**17.** MSA's counterclaim characterizes Iovino's disclosures as a single category of "unauthorized disclosures" that "include, but are not limited to, internal MSA emails, photographs, reports, and assessments concerning MSA's State Department contract." ECF 31 ¶ 24. The record does not support this characterization. Plaintiff's item-by-item review of the 56 discrete media-disclosure assertions contained in MSA's DSUMF (¶¶ 20-21, 25, 31-32, 49-53, 55, 57-58, 60) reveals that they fall into four distinct categories that must not be conflated. The remaining ten DSUMF paragraphs (¶¶ 63-64, 66-72, 77) address litigation admissions and document-preservation conduct, not media disclosures, and are addressed separately below.

#### 1. Category (i): Internal Documents Transmitted.

Three items (5.4%) are classifiable as actual internal MSA documents materials such as internal emails or reports that could plausibly fall within even a properly scoped confidentiality agreement. *See* DSUMF ¶¶ 20-21, 25, 31-32, 49-53, 55, 57-58, 60 (Plaintiff's item-by-item classification of disclosed information by type). This is the only category where MSA can assert a direct proprietary interest.

#### 2. Category (ii): Photographs of Conditions Personally Observed.

Three items (5.4%) are photographs documenting conditions Iovino personally witnessed at the GCSC. *Id.* A photograph is personal observation in visual form. The employer does not acquire a proprietary interest in an employee's visual perceptions of workplace conditions, particularly where the photographs document health and safety conditions that the employee was

10

professionally obligated to assess. The photographs document actual conditions that were later independently confirmed by the OIG. Ex. 3.

### 3. Category (iii): Descriptions of What She Witnessed.

Forty-nine items (87.5%) are Iovino's verbal or written accounts of events she personally observed firsthand witness descriptions of canine welfare conditions at the GCSC. *Id.* An employee who sees workplace conditions retains the right to describe what she saw. This is firsthand witness knowledge that exists in the employee's memory, not in a filing cabinet.

### 4. Category (iv): Her Professional Veterinary Opinions.

One item (1.8%) consists solely of Iovino's professional veterinary assessment of program operations. *Id.* Dr. Iovino is a licensed Doctor of Veterinary Medicine. Her professional assessments of canine health, welfare standards, and program adequacy are professional judgments that belong to the professional, not the employer.

18. The remaining ten DSUMF paragraphs (¶¶ 63-64, 66-72, 77) contain litigation admissions required by court rules and document-preservation conduct — neither of which is classifiable as a "disclosure" in any reputational sense. *See* DSUMF ¶¶ 63-64, 66-72 (litigation admissions); DSUMF ¶ 77 (document preservation). In total, 53 of 56 media-disclosure items (94.6%) fall into categories (ii) through (iv) personal observations, witness descriptions, and professional opinions. Only 3 items (5.4%) involve actual internal documents.

19. The derogatory-content analysis further undermines MSA's theory. Of the 56 media-disclosure items, only one item (1.8%) is classifiable as derogatory to MSA, and that item involves a licensed veterinarian's professional obligation to report animal welfare concerns to a regulatory authority. Forty-seven items (83.9%) are mixed, containing factually accurate content about conditions later confirmed by federal investigators. Four items (7.1%) are neutral,

11

including workplace communications to coworkers. Four items (7.1%) are favorable to Iovino, including photographs of program conditions and internal documents including a written commendation from her supervisor (MSA admits the commendation at ECF 31 ¶ 51). *See* DSUMF ¶¶ 20-21, 25, 31-32, 49-53, 55, 57-58, 60 (Plaintiff's item-by-item classification by derogatory content).

**20.** MSA itself submitted media articles reporting on Iovino's disclosures as its own exhibits. The Washington Examiner article was attached as Ex. C and the NBC 4 Washington article as Ex. D. MSA's decision to introduce this coverage as its own evidence is inconsistent with a claim that the same coverage constitutes actionable harm caused by unauthorized disclosures.

F.    **NDA Scope - What the Agreement Covers Versus What MSA Claims**

**21.** For 53 of 56 media-disclosure items (94.6%), MSA's NDA-breach theory requires treating the Agreement as a blanket prohibition on speaking about work, not a narrower bar on disclosing actual internal files. The NDA's definition of "confidential information" encompasses "all information… in whatever form… in any way" acquired during employment. ECF 31-1, § 2. Under this definition, a veterinarian's observation that dogs are receiving inadequate care qualifies as "confidential information" subject to a perpetual non-disclosure obligation, a reading that the OIG found inconsistent with the requirements of the law. Ex. G (OIG Mgmt. Assistance Rep. ESP-18-03, Aug. 2018) at IOVINO_00000547-552; Ex. 1 (Dragnett Dep.) 104:12-15 (MSA's corporate designee: "I am aware.").

**22.** MSA's own counterclaim acknowledges a distinction it then fails to observe. Paragraph 23 alleges that Iovino emailed "sensitive company (and/or USG) materials." ECF 31 ¶ 23. The parenthetical "(and/or USG)" recognizes that the information at issue includes United

States Government information, information about a government program, relating to government-owned canines, under a government contract. Government program conditions are not MSA's proprietary business assets. The NDA's public-information exclusion (§ 2) requires that information became public "through no wrongful act of mine", but MSA's counterclaim treats Iovino's disclosures as the "wrongful act," rendering the exclusion unavailable to the very employee whose protected reporting brought the information to light. The post-OIG modified NDA (Ex. F) confirms that MSA itself recognized the original agreement required revision to comply with federal requirements.

### G.   <u>MSA's Claimed Damages Lack Item-Specific Causation</u>

**23.** MSA identifies five categories of claimed damages in the Dragnett deposition: (1) the resignation of West Coast Sales Director Mike Larkin from MSA and the resulting loss of Delta Airlines as a client (approximately $5.3M); (2) the loss of the San Francisco 49ers as a client (approximately $1.6M); (3) the loss of Expeditors International as a potential client (approximately $1.9M); (4) the loss of a Google canine-services RFQ (unquantified); and (5) unmeasurable general reputational harm. Ex. 1 (Dragnett Dep.) 94:13-99:10; Ex. E (MSA Interrogatory Responses). None is supported by evidence of item-specific causation, that is, evidence connecting any particular Iovino disclosure to any particular business loss. Each claimed loss has independent alternative causes documented in the public record.

### 1.     *Delta Air Lines / Larkin.*

**24**. MSA identifies the resignation of West Coast Sales Director Mike Larkin from MSA as a business loss, claiming Larkin "referenced Ms. Iovino's allegations regarding the CVC as a contributing factor in his decision to resign." Ex. E. MSA further claims that "soon after Mr. Larkin left MSA, the Delta Contract was awarded to a competing company that Mr. Larkin

joined." Ex. E. Dragnett did not identify which of Iovino's disclosures caused the Larkin departure, and MSA's own interrogatory response describes Iovino's allegations as only "a contributing factor," not the sole cause. The Delta contract ended approximately August 31, 2019 — coinciding with the $14.5 million FLSA class action settlement (Ex. 9, approved August 9, 2019), the September 2019 OIG report (ESP-19-06), and bipartisan Congressional oversight, all independent sources of public scrutiny unrelated to any Iovino media disclosure.

### 2. *San Francisco 49ers (~$1.6 million).*

**25.** MSA references a 49ers contract loss but provides no timeline and only attenuated, speculative evidence linking any specific Iovino disclosure to this loss. Ex. 1 (Dragnett Dep.) 94:21-95:2.

### 3. *Expeditors (~$1.9 million).*

**26.** Dragnett testified that MSA "was informed that the recent news articles were impediment to [its] selection for that business." Ex. 1 (Dragnett Dep.) 96:1-2. The "news articles" in question reported on OIG findings and Congressional oversight, government activity independent of and protected from attribution to Iovino. Dragnett did not identify which articles or which of Iovino's disclosures caused the Expeditors loss.

### 4. *Google (unquantified, canine program 2019).*

**27.** Dragnett identified "OIG media" as the impediment to a Google contract. Ex. 1 (Dragnett Dep.) 97:17-20. Media coverage of OIG findings is reporting on a federal government investigation, protected activity and public record. Google's 2019 decision coincides with the September 2019 OIG report and Congressional inquiries, not with any identified Iovino disclosure.

14

### 5.  *Unmeasurable Reputational Harm.*

28. MSA acknowledges it "can't measure [the] full extent of the harm." Ex. 1 (Dragnett Dep.) 99:5-10. The reputational exposure MSA describes, competitors citing press reports in bid situations (Ex. 1 (Dragnett Dep.) 98:11-17), is traceable to OIG findings, Congressional oversight, media coverage of those government findings, the $14.5 million FLSA settlement (Ex. 9), and the USPS contract disqualification for organizational conflicts of interest (Ex. 10; Court of Federal Claims, November 2022). Each of these is independent of Iovino's disclosures.

## H.  **Independent Sources of MSA's Business Exposure**

**29.** The record identifies multiple independent sources of business exposure for MSA during the relevant period, none attributable to Iovino: (a) the OIG's own published evaluation (ESP-19-06, September 2019); (b) bipartisan Congressional oversight from five Members of Congress across both parties (2018-2022) (Ex. 6); (c) the GAO's government-wide review of working dog health and welfare (Ex. 8, GAO-23-104489, October 2022); (d) the $14.5 million FLSA class action settlement (Ex. 9), involving a class of MSA handlers alleging unpaid overtime and wage violations, the same company that Peter Deegan, VP of HR, managed when Iovino raised her internal complaints (Ex. 1 (Dragnett Dep.) 48:12-17); (e) separate retaliation payments to McWilliams ($25,000) and Gomez ($10,000) in the same litigation (Ex. 9); and (f) MSA's disqualification from the USPS Canine Mail Screening Program for immitigable organizational conflicts of interest, with appeal pending at the Federal Circuit (No. 24-1842) (Ex. 10).

**30.** MSA's reputational exposure arose from government-verified conditions, not from any misuse of confidential information. The Washington Examiner, the Animal Welfare Institute, and members of Congress each reported on canine welfare failures that the OIG

15

independently confirmed. Ex. 4. MSA's own promotional materials placed program details —

canine operations, deployment locations, contract capabilities, and government partnerships —

into the public domain. Ex. 5. MSA cannot attribute to Iovino reputational damage arising from

government findings it could not suppress, media reporting that confirmed those findings, and

information MSA publicized itself.

**31.** MSA's request for a permanent injunction (ECF 31, Prayer E) seeks to prohibit

Iovino from "continuing to disclose MSA's confidential information in breach of the Non-

Disclosure Agreement." The information at issue is now in the public domain through OIG

reports, Congressional correspondence, GAO reports, federal litigation records, enacted federal

legislation, and MSA's own promotional materials. An injunction cannot restrain disclosure of

information already publicly available through government sources and MSA's own publications

independent of Iovino.

## LEGAL ARGUMENT

### I.   MSA'S OPENING AUTHORITIES DO NOT ADDRESS THE ENFORCEABILITY OF THE NDA.

MSA begins with unremarkable Rule 56 propositions and with § 4712 retaliation

authorities. Those authorities do not answer the question presented by the counterclaim. The

issue is not whether summary judgment requires the absence of a genuine dispute, and it is not

whether MSA can contest causation on Dr. Iovino's retaliation claim. The issue is whether MSA

has an enforceable NDA and a viable contract counterclaim.

MSA's reliance on *Resetarits Construction Corp. v. Olmsted*, 118 A.D.3d 1454 (N.Y.

App. Div. 2014) is similarly misplaced. That case is a procedural memorandum dismissing an

appeal from an intermediate order after entry of final judgment; it does not address whether an

16

otherwise formed contract may still be unenforceable as against public policy or because it is

overbroad. *Resetarits* at 1455. It therefore has no bearing on the enforceability of MSA's NDA.

The governing authorities on this point are New York's employee-restrictive-covenant cases —

*Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303 (N.Y. 1976); *BDO Seidman v.*

*Hirshberg*, 93 N.Y.2d 382 (N.Y. 1999); *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364 (N.Y.

2015); and *Long Is. Minimally Invasive Surgery, P.C. v. St. John's Episcopal Hosp.*, 164 A.D.3d

575 (N.Y. App. Div. 2018) — and they all cut against MSA.

## II.   NEW YORK LAW TREATS THIS NDA AS AN OVERBROAD EMPLOYEE RESTRAINT, NOT AS A ROUTINE CONFIDENTIALITY CLAUSE.

New York disfavors employee restraints because of the "powerful considerations of

public policy" against limiting an employee's livelihood, and therefore "restrictive covenant[s]

will only be subject to specific enforcement" to the extent they are reasonable, necessary to

protect legitimate employer interests, not harmful to the public, and not unreasonably

burdensome to the employee. *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 307 (N.Y.

1976). In *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388-89 (N.Y. 1999), the Court of Appeals

held that a restraint is reasonable only if it is no greater than required to protect the employer's

legitimate interests, imposes no undue hardship, and is not injurious to the public. *Brown &*

*Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 369-70 (N.Y. 2015) repeats the same rule; both *BDO*

*Seidman* and *Brown & Brown* make explicit that a violation of any one prong invalidates the

covenant. *BDO Seidman* at 389; *Brown & Brown* at 369-70.

The facts of those cases show why MSA loses here. In *BDO Seidman*, the employer was

an accounting firm and the employee had actually serviced some of the firm's clients. *BDO*

*Seidman* at 387. Even so, the court found the covenant overbroad because it reached clients with

17

whom the employee had not developed a relationship through direct, substantive work "at the employer's expense [or] to the employer's competitive detriment." *Id.* at 392. The court only recognized "the employer's legitimate interest in employee anti-competitive agreements" insofar as they protected "customer relationships the employee *acquired* in the course of employment" by "exploiting or appropriating [client] goodwill . . . created and maintained" by the employer; because the covenant went further, it failed. *BDO Seidman* at 391-92. In *Brown & Brown*, the covenant was held to be overbroad under New York law because it covered customers the employee "had never met, did not know about and for whom she had done no work." *Brown & Brown* at 370-71. The court also emphasized unresolved facts suggesting possible overreaching because the covenant had been presented on the employee's first day of work, after she had already left prior employment. *Brown & Brown* at 371-72. In *Reed, Roberts Assocs.*, the court refused to restrain a former executive because the supposed confidential information was either publicly available or part of the employee's general skill and knowledge, and there had been no commercial piracy. *Reed, Roberts Assocs.* at 308-309. The court stressed that "no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment." *Id.* at 307. And in *Long Island Minimally Invasive Surgery*, the Appellate Division refused even partial enforcement of a covenant that barred a surgeon from practicing within ten miles of all affiliated sites, including sites where he had never worked, holding that a clearly overbroad covenant itself "casts doubt on the plaintiff's good faith in imposing it." *Long Is. Minimally Invasive Surgery* at 577-78.

MSA's NDA is broader than the covenants rejected in those cases. The version MSA sued upon imposed a perpetual nondisclosure obligation and contained no carveout for OIG

18

complaints, congressional inquiries, or other government reporting. (SOF ¶ 2.) The record further shows that after OIG found the NDA inconsistent with law, MSA amended it to add the very government-reporting carveout the original lacked. (SOF ¶¶ 11-12.) If New York would not enforce covenants that merely extended to customers the employee never serviced, it will not enforce an NDA that MSA reads to forbid Dr. Iovino from disclosing virtually anything she learned, observed, or thought while working as a veterinarian on a government canine program. *BDO Seidman* at 392; *Brown & Brown* at 370-71.

### III. THE FACTS SHOW THAT THE NDA OPERATES AS A BLANKET SPEECH RESTRAINT, NOT AS A NARROW PROTECTION OF PROPRIETARY INFORMATION.

The most important fact in this record is that MSA's own disclosure theory is overwhelmingly not about internal documents. Of the 56 alleged media-disclosure items, only 3 were actual internal documents. The remaining 53 items (94.6%) were Dr. Iovino's photographs of conditions she personally observed, her firsthand descriptions of events she witnessed, and her professional veterinary opinions. (SOF ¶¶ 17-18.) That matters because New York permits enforcement only to protect actual trade secrets, confidential customer information, or similarly limited proprietary interests, not to suppress an employee's eyesight, memory, or professional judgment. *Reed, Roberts Assocs.* at 308.

The commendation example illustrates the point vividly. The SOF identifies among the allegedly disclosed items a written commendation from Dr. Iovino's supervisor, and classifies that item as favorable to Dr. Iovino rather than derogatory to MSA. (SOF ¶ 19.) Under MSA's reading of the NDA, even disclosing a favorable commendation could constitute a breach simply because it existed in writing during employment. That demonstrates that MSA is not defending a narrowly tailored confidentiality agreement. It is defending a perpetual prohibition on speaking

19

about one's work. New York law does not permit such a restraint. *Brown & Brown* at 371-72; *Reed, Roberts Assocs.* at 308.

Nor can MSA rescue the NDA through partial enforcement. Under *BDO Seidman*, partial enforcement requires a "case specific analysis" focused on the employer's conduct and is justified only where the employer shows an absence of overreaching, coercive use of dominant bargaining power, or other anticompetitive misconduct. *BDO Seidman* at 394. *Long Island Minimally Invasive Surgery* adds that factors weighing against blue-penciling include imposition of the covenant at hiring or continued employment and the employer's knowledge that the covenant was overly broad. *Long Is. Minimally Invasive Surgery* at 578. Those factors cut against MSA. The NDA was imposed in the employment relationship, OIG later found it inconsistent with law, and MSA revised it only after federal scrutiny. (SOF ¶¶ 2, 11-12.) That is not a record of narrow drafting in good faith.

## IV. EVEN APART FROM OVERBREADTH, MOST OF THE ALLEGED INFORMATION DOES NOT QUALIFY AS PROTECTABLE CONFIDENTIAL INFORMATION.

New York confidentiality law starts with secrecy. In *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395 (N.Y. 1993), the Court of Appeals held that a trade secret "must first of all be secret" and evaluated, among other things, how widely the information was known outside the business and how easily it could be acquired or duplicated. *Ashland Mgmt.* at 407-08. There, the asserted investment model was not protected because an analyst could reproduce it from public disclosures without access to internal commands. *Id.* In *Marietta Corp. v. Fairhurst*, 301 A.D.2d 734 (N.Y. App. Div. 2003), the Appellate Division rejected an "overly expansive definition" of trade secret that would have "encompass[ed] nearly all confidential business documents,"

20

reiterating that the appropriate legal question is whether the information is truly secret and not readily ascertainable. *Marietta Corp.* at 738.

Those principles fit the record here. The conditions Dr. Iovino reported predated any media contact and were independently documented by OIG. (SOF ¶ 7.) OIG later confirmed the same lack of written standards, preventable canine deaths, and systemic failures that Dr. Iovino had reported. (SOF ¶¶ 13-16.) Bipartisan congressional oversight, a GAO review, and federal legislation followed. (SOF ¶¶ 8, 15-16, 29, 31.) MSA also publicized aspects of its canine operations and capabilities. (SOF ¶¶ 9, 30-31.) On those facts, MSA cannot plausibly maintain that the same subject matter is "truly" secret. *Marietta Corp.* at 738.

This point is even stronger because, again, 94.6% of the alleged disclosures were not internal documents at all. (SOF ¶¶ 17-18.) Dr. Iovino's photographs were of conditions she personally saw. Her descriptions were accounts of events she personally witnessed. Her professional opinions were her own veterinary judgments. (SOF ¶¶ 17-18.) An employer does not acquire a perpetual proprietary interest in an employee's observations or professional reasoning simply because the employee exercised those faculties at work. *Long Is. Minimally Invasive Surgery* at 577.

## V. PROTECTED DISCLOSURES TO OIG AND THE DEPARTMENT OF STATE MOVED THE MATTER INTO A GOVERNMENTAL INVESTIGATIVE CHANNEL THAT MSA CANNOT RECAPTURE BY CONTRACT.

The chronology is undisputed and important. Dr. Iovino filed her OIG complaint on July 6, 2017. Her first documented media contact came twenty-one days later. (SOF ¶¶ 5, 10.) OIG then investigated the concerns she raised and independently validated them. (SOF ¶¶ 13-16.) OIG also found the NDA inconsistent with law, leading MSA to modify it. (SOF ¶¶ 11-12.)

21

MSA's own witness admitted that the accusations in Dr. Iovino's media communications included some of the same accusations reported to OIG. (SOF ¶ 14.)

Section 4712 protects contractor-employee disclosures to official recipients, including inspectors general and responsible management officials. *Armstrong v. Arcanum Grp., Inc.*, 897 F.3d 1283, 1287 n.4 (10th Cir. 2018). Once Dr. Iovino transmitted her complaints and supporting information to that protected channel, the matter ceased to be merely private MSA information in any practical sense. It entered a governmental oversight process.

Courts confronting similar attempts to use confidentiality agreements against whistleblowers have refused to let private contracts override reporting to the government. In *United States v. Cancer Treatment Centers of America*, 350 F. Supp. 2d 765 (N.D. Ill. 2004), the court held that a relator could disclose documents to the government "without breaching the confidentiality agreement" because the public interest in producing records related to suspected fraud trumped confidentiality obligations. *United States v. Cancer Treatment Ctrs. of Am.* at 773. In *United States ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033 (C.D. Cal. 2012), the court held that taking and publishing documents relevant to alleged fraud against the government was not wrongful notwithstanding nondisclosure agreements, given the strong public policy protecting whistleblowers who report fraud to the government. *United States ex rel. Ruhe v. Masimo Corp.* at 1039.

Those cases are persuasive here because they recognize the same principle MSA denies: a private NDA cannot give an employer continuing contractual dominion over the Government's own investigative process. Once OIG received, reviewed, investigated, and validated the substance of Dr. Iovino's concerns, MSA could not by private contract pull that information back

22

into exclusively private control. And if some narrower category of information remained protected after disclosure to the government, that would require an independent legal prohibition, such as classified information or material specifically prohibited from disclosure by statute or Executive Order, not merely a private NDA. *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 397-98 (2015).

## VI.   THE OIG FINDING AND MSA'S LATER AMENDMENT CONFIRM THAT THE ORIGINAL NDA WAS DEFECTIVE.

MSA says the OIG report is not binding and that the revised NDA did not supersede the old one as to Dr. Iovino. Neither point helps MSA. Plaintiff does not need the OIG report to be binding to make it relevant. The report matters because it is an undisputed fact that OIG found the NDA inconsistent with law and that MSA then modified the NDA to add the missing government-reporting carveout. (SOF ¶¶ 11-12.) That sequence is powerful evidence that the original NDA lacked required tailoring.

The amendment likewise matters even if it did not formally supersede the old NDA as to Dr. Iovino. MSA changed the very feature Plaintiff challenges, the absence of a carveout for protected government reporting, after federal scrutiny exposed that defect. (SOF ¶¶ 11-12.) That makes the amendment probative of overbreadth and public-policy conflict, not irrelevant.

## VII.   MSA CANNOT PROVE DAMAGES BECAUSE IT LACKS ITEM-SPECIFIC CAUSATION.

MSA seeks more than $2 million in damages, yet its own designee admitted MSA "can't measure full extent of the harm." (SOF ¶¶ 6, 23, 28.) That concession is not incidental. It goes directly to MSA's failure to connect any particular alleged disclosure to any particular loss.

The SOF identifies MSA's claimed damages as involving Delta/Larkin, the San Francisco 49ers, Expeditors, Google, and generalized reputational harm. (SOF ¶ 23.) But each

23

category has obvious independent causes. The Delta/Larkin theory coincided with the FLSA settlement, the September 2019 OIG report, and congressional scrutiny, and MSA's own interrogatory response characterized Dr. Iovino's allegations as only "a contributing factor." (SOF ¶¶ 24, 29.) The 49ers loss lacks a clear timeline or specific causal proof. (SOF ¶ 25.) Expeditors and Google were attributed by MSA to "news articles" and "OIG media," which means reporting on public government findings rather than any isolated confidential disclosure by Dr. Iovino. (SOF ¶¶ 26-27.) And MSA's broader reputational-harm theory is independently explained by the OIG report, bipartisan congressional oversight, the GAO review, the FLSA settlement, retaliation payments to others, and the USPS conflict-of-interest disqualification. (SOF ¶¶ 28-30.)

MSA's 30(b)(6) proof failure reinforces the same point. Although MSA was issued a deposition notice specifically asking it to identify all confidential information allegedly disclosed to the individual journalists, its designee could not identify item-specific confidential disclosures to those journalists. (SOF ¶ 6.) A counterclaim for millions of dollars cannot survive summary judgment on such a generalized causation theory.

## VIII. MSA'S REQUEST FOR INJUNCTIVE RELIEF FAILS BECAUSE THERE IS NO MEANINGFUL FUTURE HARM LEFT TO ENJOIN.

MSA seeks a permanent injunction prohibiting Dr. Iovino from "continuing" to disclose confidential information. (SOF ¶ 31.) But the relevant facts and circumstances are now in the public domain through OIG reports, congressional correspondence, GAO materials, federal litigation records, enacted legislation, and MSA's own publications. (SOF ¶¶ 8-9, 13-16, 29-31.) Once information is public, secrecy cannot be restored by injunction. Courts recognize that

24

"public disclosure of a trade secret destroys the information's status as a trade secret." *Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006).

Injunctive relief is also prospective. A plaintiff "cannot rely on past injury" but must show a likelihood of future injury that is "actual and imminent, not conjectural or hypothetical." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 146-47 (2d Cir. 2020). Likewise, a movant must show injury that is neither remote nor speculative and cannot be remedied by money damages. *Under Seal v. Under Seal*, 273 F. Supp. 3d 460, 472 (S.D.N.Y. 2017). And "the purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result" absent relief. *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018).

MSA cannot make that showing here. Dr. Iovino's employment ended years ago. The operative information dates to 2017. OIG has already investigated. Congress has already investigated. The subject has already entered public judicial records. And MSA identifies no concrete body of still-secret information in Dr. Iovino's possession and no imminent future disclosure an injunction could prevent. (SOF ¶¶ 10, 13-16, 29-31.) At this point, an injunction would be meaningless.

## IX.  CONCLUSION

The undisputed facts establish that Dr. Iovino reported to OIG before any identified media contact; OIG found MSA's NDA inconsistent with law; MSA then amended the NDA to add the government-reporting carveout the original lacked; OIG independently validated the substance of Dr. Iovino's concerns; 94.6% of MSA's alleged media-disclosure items were Dr. Iovino's observations, photographs, descriptions, and professional opinions rather than internal documents; MSA cannot prove item-specific causation for damages; and the information MSA

25

seeks to enjoin is now public through multiple independent sources. (SOF ¶¶ 10-19, 23-32.)

Under controlling New York law, MSA's NDA is facially overbroad, injurious to the public, and

unenforceable as the basis for this counterclaim.

WHEREFORE, Plaintiff respectfully requests that this Court grant summary judgment in

her favor on MSA's counterclaim, dismiss the counterclaim with prejudice, deny MSA's

requests for damages, injunctive relief, attorneys' fees, and costs on the counterclaim, and award

such other and further relief as the Court deems just and proper.

Date: April 10, 2026

Respectfully submitted,

/s/ Thad M. Guyer

_____

Thad M. Guyer
T.M. Guyer & Friends, PC
116 Mistletoe Street P.O. Box 1061
Medford, OR 97501

(202) 417-3910
thad@guyerayers.com

Nate L. Adams III, P.C.
11 South Cameron Street
Winchester, VA 22601
nadams@nadamslaw.com

Jack Kolar
Government Accountability Project
1612 K St. NW, Suite 1100
Washington, DC 20006
jackk@whistleblower.org

Attorneys for Plaintiff Dr. Karen Iovino

26

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2026, I electronically filed the foregoing with the Clerk of Court of the United States District Court for the Western District of Virginia by using the CM/ECF system. I certify that the following participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system:

Ryan C. Berry (VSB 67956)
Daniel S. Ward (VSB 45978)
Chelsea A. Cruz (VSB 96177)
WARD & BERRY, PLLC
1751 Pinnacle Drive, Suite 900
Tysons, VA 22102 r
yan@wardberry.com
dan@wardberry.com
chelsea@wardberry.com


*/s/ Thad M. Guyer*

_____