# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

| | | |
|---|---|---|
| **KAREN IOVINO,** | ) | |
| | ) | |
| **Plaintiff and** | ) | **Case No. 5:21-CV-00064-TTC** |
| **Counterclaim Defendant,** | ) | |
| | ) | **DEFENDANT AND** |
| **v.** | ) | **COUNTERCLAIM PLAINTIFF'S** |
| | ) | **MEMORANDUM IN SUPPORT** |
| **MICHAEL STAPLETON ASSOCIATES, LTD.,** | ) | **OF ITS MOTION IN LIMINE** |
| **d/b/a MSA SECURITY, INC.** | ) | **NO. 1: MOTION TO EXCLUDE** |
| | ) | **THE OPINIONS AND** |
| **Defendant and** | ) | **TESTIMONY OF A. BENTLEY** |
| **Counterclaim Plaintiff** | ) | **HANKINS, PH.D.** |

Respectfully submitted,

April 28, 2026

*/s/ Daniel S. Ward*

_____

Daniel S. Ward (VSB 45978)
Ryan C. Berry (VSB 67956)
Chelsea A. Cruz (VSB 96177)
WARD & BERRY, PLLC
1751 Pinnacle Drive, Suite 900
Tysons, VA 22102
(202) 331-8160
(202) 505-7100 Fax
dan@wardberry.com
ryan@wardberry.com
chelsea@wardberry.com

*Attorneys for Defendant Michael Stapleton
Associates, Ltd., d/b/a MSA Security, Inc.*

Pursuant to Federal Rule of Civil Procedure ("FRCP") 26(a)(2) and Federal Rule of Evidence ("FRE") 702, Defendant and Counterclaim Plaintiff Michael Stapleton Associates, Ltd., d/b/a/ MSA Security, Inc. ("MSA"), through counsel, respectfully files this memorandum in support of its motion to exclude the opinions and testimony of A. Bentley Hankins, Ph.D.

## I.    INTRODUCTION

The Court should exclude or substantially limit the economic damages testimony of Plaintiff's expert, A. Bentley Hankins, Ph.D., because his methodology rests on a number of unrealistic assumptions and calculations that inflate damages, including:

- His calculations extend for nearly fifty years to age 100 despite Plaintiff's stated intention to retire at age 60;

- He assumes 100% employment probability in violation of standard forensic economics practice;

- He ignores peer-reviewed literature on career catch-up periods;

- His future damages calculations depend on a disputed PTSD diagnosis and work-limitation recommendation that the defense psychiatrist has rejected;

- His "but-for" earnings projections significantly exceed typical veterinarian compensation in the relevant labor market;

- His upper-bound estimates rest on an unverified verbal offer for full-time employment that was never formalized; and

- His calculations improperly rely on Plaintiff's self-serving statements without independent verification.

These methodological failures render his opinions unreliable under FRE 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and create an impermissible "analytical gap" between the data and his conclusions under *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered").

## II.    LEGAL STANDARD

FRE 702 governs the admissibility of expert testimony. FRE 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. FRE 702.

In *Daubert*, the Supreme Court established a non-exclusive list of factors for assessing reliability, including (1) "whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; (4) "the existence and maintenance of standards controlling the technique's operation"; and (5) whether the theory or technique has attracted "[w]idespread acceptance" within a relevant scientific community. 509 U.S. at 593–94.

The Fourth Circuit and this Court have emphasized that the trial court must act as a "gatekeeper" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589; *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017); *Dillard v. Smith,* 558 F.Supp.3d 308, 314 (W.D. Va. 2021). The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). Expert opinions that are "connected to existing data only by the *ipse dixit* of the expert" are properly excluded. *Gen. Elec. Co.*, 522 U.S. at 146.

2

Additionally, FRCP 26(a)(2)(B) imposes mandatory disclosure requirements for retained expert witnesses. A party must disclose a written report prepared and signed by the expert containing: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the preceding 10 years; (v) a list of all cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case." FRCP 26(a)(2)(B). A party that fails to comply with FRCP 26(a) "is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." FRCP 37(c)(1).

## III.   ARGUMENT

Dr. Hankins performed an "evaluation" of Plaintiff "based on the Vocational and Rehabilitation Assessment Model (Robinson & Pomeranz, 2011)" at the request of Plaintiff's counsel. **Exhibit 1** (Hankins Expert Report) at 1, **Exhibit 2**[1] (Financial Records considered by Hankins – submitted under seal). He issued a report dated May 21, 2023, estimating Plaintiff's economic losses from her August 2017 "termination"[2] from MSA Security. *Id.* His methodology "consisted of a records review and structured interview," culminating in an earning capacity

---

[1] Dr. Hankins' Report references hundreds of pages of Dr. Iovino's financial records which contain sensitive information. Those attachments are not included here and will be submitted under seal.

[2] Plaintiff (and Dr. Hankins) use the term "termination." Defendant disputes that it terminated Plaintiff. She was not chosen for the full-time veterinarian position, and her part time position was eliminated. Defendant will use the term "termination" herein in quotation marks (or "scare quotes" when being used like this) to indicate Defendant's disagreement with Plaintiff's misleading interpretation.

analysis that compared Plaintiff's projected earnings absent "termination" to her actual earnings given "termination." *Id.*

Dr. Hankins calculated two estimates—a "lower-bound" estimate and an "upper-bound" estimate, assuming Plaintiff's losses persist until age 100. *Id.* at 9. Alternatively, Dr. Hankins calculated Plaintiff's losses until age 60 (Plaintiff's stated retirement intention). *Id.* at 10. In his "Lower-Bound Estimates," he calculated past earnings and fringe benefit losses of $152,039, and potential future losses of $196,372 in present value (assuming losses persist until age 100), for a total of $348,411. *Id.* at 9. In his "Upper-Bound Estimates," using higher but-for earnings, he calculated past earnings and fringe benefit losses of $168,613, and potential future losses of $352,619 in present value (assuming losses persist until age 100), for a total of $521,232. *Id.* Alternatively, assuming Plaintiff would have worked until age 60 (her intended retirement age), he calculated total losses of $225,915 (lower bound) to $285,727 (upper bound). *Id.* at 10.

Dr. Hankins's future lost earning capacity calculations rely in part on Christian Greene's[3] "clinical recommendation" that Plaintiff "limit her work hours in an effort to help her manage her stress and safeguard her well-being while navigating the litigation process." *Id.* at 2, 5. Dr. Hankins acknowledged this may not be "necessary post-litigation." *Id.* at 9.

### a. **Dr. Hankins's 50-Year Damage Period Is Unrealistic And Unsupported.**

Dr. Hankins calculated earnings losses from 2017 until 2067, when Plaintiff will be 100 years old. *Id.* at 19, 21, 23, 25, 27, 29. This calculation assumes that Plaintiff would have remained

---

[3] Plaintiff represents that Christian Greene is Iovino's psychotherapist. Ms. Greene is not listed as an expert or fact witness in this case. Plaintiff refused to make Dr. Hankins available for deposition, preventing MSA from exploring Dr. Hankins' reliance on Ms. Greene's psychotherapy notes (and opinions in general). DSUMF ¶ 76 (ECF 251-1).

4

working and employed by MSA for fifty additional years. This assumption is unrealistic and unsupported by any evidence in the record.

According to the work-life expectancy data that Dr. Hankins included in his report (citing the Markov Process Model published in the Journal of Forensic Economics), women of Plaintiff's age at the time the report was made (56), gender, and professional/doctoral degree have a median work-life expectancy of 11.90 years, approximately to age 67.5, not to age 100. *Id.* at 6. Dr. Hankins's calculation extends nearly thirty-three years beyond the statistically expected work life – and indeed, far beyond the expected biological life of 56-year-old woman in Virginia.[4]

Dr. Hankins admitted that Plaintiff "indicated that she had ideally intended to retire from her work as a veterinarian by age 60." *Id.* at 9. Despite this, he provided primary calculations extending to age 100, with the age-60 calculations presented only as an "alternative."

The difference is substantial. Earnings and fringe benefit losses calculated to age 100 exceed those calculated to age 60 by $122,496 ($348,411 minus $225,915) to $235,505 ($521,232 minus $285,727) in present value. *Id.* at 9–10.

| Scenario | Age 60 Value | Age 100 Value | Difference | Percentage Increase |
|---|---|---|---|---|
| Lower bound | $225,915 | $348,411 | $122,496 | $122,496 ÷ $225,915 = **54.2%** |
| Upper bound | $285,727 | $521,232 | $235,505 | $235,505 ÷ $285,727 = **82.4%** |

This inflates Plaintiff's claimed damages by 54% to 82% based on a flawed assumption refuted by actuarial data and Plaintiff's stated intentions.

---

[4] *See* VA. CODE §8.01-419, which states that a 56-year-old female has 27 years of continued life expectancy.

b. **Dr. Hankins Unreasonably Assumes 100% Employment Probability Each Year.**

Dr. Hankins adjusted Plaintiff's estimated annual economic losses by joint probabilities of worker life expectancy and labor force participation, but he did not consider any probability of unemployment. In other words, his calculations assume that there is 100 percent certainty that Plaintiff would continue to be employed each year between 2023 and 2067. Standard forensic economics methodology requires adjusting future earnings projections by unemployment probability. By omitting this adjustment, Dr. Hankins overstates Plaintiff's damages.

c. **Dr. Hankins Ignores Peer-Reviewed Literature on Career Catch-Up.**

As Dr. Dubravka Tosic explained, the peer-reviewed literature in forensic economics establishes that displaced workers typically reestablish their career trajectory within three to five years. **Exhibit 3** (Tosic Expert Report) at 7. Dr. Michael Shahnasarian published an article in the Journal of Forensic Economics, finding that "a period of 3 to 5 years generally suffices for an individual to reestablish his or her career development and stature to previous levels." *Id.*

Dr. Hankins ignored this catch-up phenomenon. Instead, he assumed that the differential between Plaintiff's but-for MSA earnings and her actual earnings would persist for nearly <u>fifty years</u>. This contradicts the peer-reviewed literature and the evidence in this case and ignores the fact that Plaintiff's actual earnings after her termination from MSA exceeded her MSA earnings in most years between 2019 and 2022. As Dr. Tosic documented, "based on her total earnings after her termination from MSA, Plaintiff has already caught up to the earnings she had while employed by MSA." *Id.* at 12. Dr. Hankins's refusal to address this fact—that Plaintiff's post-termination earnings have largely equaled or exceeded her MSA earnings—renders his future damages calculations unreliable.

d. **Dr. Hankins's Work-Limitation Assumption Depends On A Disputed PTSD Diagnosis.**

A significant component of Dr. Hankins's damages calculation rests on Ms. Greene's "clinical recommendation for limited work hours." Exhibit 1 at 9. Dr. Hankins acknowledged that "it is currently unclear if the clinical recommendation for limited work hours by Dr. Iovino's treating psychotherapist will be necessary post-litigation." *Id.*

Ms. Greene's letter recommended that Plaintiff reduce her work hours to allow "time and space for litigation responses, court, and the pending trial" and to invest in "finding joy in her life such as riding her horses." *Id.* at 53. This recommendation is explicitly tied to the pendency of this litigation (that Iovino initiated), not to any alleged harm suffered as a result of any retaliation by MSA or any permanent work limitation caused by PTSD. Dr. Hankins' work-limitation recommendation is largely dependent on Ms. Greene's PTSD diagnosis, which (1) MSA's expert, Dr. Keyhill Sheorn, has rejected; and (2) will not be before the trier of fact.[5] If the Court excludes Ms. Greene's testimony and her "Mental Health Treatment Records" (as it should, considering Plaintiff never disclosed Ms. Greene as an expert or fact witness), Dr. Hankins's future damages calculations that rely on work limitations collapse. An economic expert cannot reliably calculate damages based on work restrictions that rest on an unreliable and disputed psychological diagnosis. *See, e.g.*, *Copeland v. Bieber*, No. 2016 WL 7042946, at *4 (E.D. Va. Sept. 8, 2016) (quoting *E.E.O.C. v. Freeman*, 778 F.3d 463, 468–89 (4th Cir. 2015)) ("The Fourth Circuit has regularly cautioned experts against drawing conclusions from incomplete data, a principal which

---

[5] Iovino has not identified Ms. Greene as a fact or expert witness. While Iovino listed 302 pages of "Mental Health Treatment Records" as a proposed exhibit "PX-057" in Plaintiff's Trial Exhibit List, ECF 290, Defendant will challenge the admission of those records into evidence.

follows from 'a common sense idea: expert work should not be considered when the assumptions made by the expert are not based on fact.'")

e. **Dr. Hankins's "But-For" Earnings Significantly Exceed Typical Veterinarian Compensation.**

Dr. Hankins projected Plaintiff's but-for earnings at $166,400 to $177,882 per year in 2023 dollars. These figures significantly exceed typical veterinarian compensation in the relevant labor market. Dr. Hankins acknowledged that "Veterinarians . . . receive mean annual pay of $109,080 in 2022 dollars . . . in Winchester, VA-WV MSA, mean annual pay of $102,110 in 2022 dollars . . . in Virginia." Exhibit 1 at 6. His but-for projections exceed the mean by $57,000 to $69,000 annually—52% to 63% above typical compensation. Projecting these already above-market earnings forward for fifty years compounds the overstatement.

f. **Dr. Hankins Did Not Account for Plaintiff's Pre-Termination Employment Instability.**

Dr. Hankins assumed Plaintiff would have remained employed by MSA for fifty years. Yet Plaintiff's own employment history shows no comparable tenure with any employer. Plaintiff worked part-time for MSA for less than two years before her "termination." There is no basis to assume she would have remained with MSA for fifty years when her employment history demonstrates much shorter tenures with every employer she has ever had. This assumption lacks foundation and inflates damages. Dr. Hankins ignores this.

g. **Dr. Hankins's Upper-Bound Projections Rest on Plaintiff's Unsupported *Belief* That She Received A Verbal Offer For Full-Time Employment (She Did Not).**

Dr. Hankins's "Upper-Bound Estimates" assume but-for earnings of $177,882 annually, derived from extrapolating a part-time hourly rate of $70 to a full-time salary based on an alleged "verbal offer" that Plaintiff *believes* she received for full-time employment. That never happened. DSUMF ¶ 6 (ECF 251-1). Dr. Hankins acknowledged in his report that this projection was based

8

on Plaintiff's "prior pay of $70 per hour" that she received while at MSA, combined with her *subjective representation* that full-time employment had been offered. Exhibit 1 at 5.

This creates the "analytical gap" prohibited by *Gen. Elec. Co. v. Joiner*. *Gen. Elec. Co.*, 522 U.S. at 146. The leap from a part-time position paying $70/hour to a full-time salary of $177,882 rests entirely on Plaintiff's fabricated assertion of a verbal offer. Without documentation or corroboration, this projection amounts to rosy speculation dressed as expert opinion. The resulting damage differential between Dr. Hankins's lower-bound ($348,411) and upper-bound ($521,232) estimates—a spread of $172,821—depends entirely on this unsubstantiated assumption. Exhibit 1 at 9.

### h. Dr. Hankins Improperly Relies on Unverified Self-Reported Statements.

Beyond the fabricated verbal offer, several other key assumptions underlying Dr. Hankins's calculations derive from Plaintiff's self-serving statements during a structured interview, without independent verification:

- Plaintiff's stated intention to retire at age 60, which Dr. Hankins used to calculate alternative damages estimates while inexplicably providing primary calculations to age 100;

- Plaintiff's characterization of her employment trajectory and prospects for advancement at MSA; and

- Plaintiff's self-reported psychological condition and its effect on her work capacity.

While FRE 703 permits experts to rely on information that would otherwise be inadmissible, the reliance must be reasonable. An economic expert who builds his damages model primarily on a party's self-serving and unverifiable statements—particularly where those statements contradict objective evidence like employment records and actuarial data—produces opinions that are unreliable under *Daubert*. Dr. Hankins's calculations are infected by this foundational flaw.

9

i. **Alternative Calculations Demonstrate The Impact Of Dr. Hankins's Assumptions.**

Dr. Tosic's alternative calculations demonstrate how significantly Dr. Hankins's assumptions inflate damages:

| Scenario | Dr. Hankins | Dr. Tosic |
|---|---|---|
| Past losses to December 2023 (full-time but-for) | $152,039 - $168,613 | $124,884 |
| Past losses to December 2023 (part-time but-for) | N/A | $29,382 |
| Total losses to age 100 | $348,411 - $521,232 | N/A (not calculated) |
| Total losses to age 60 | $225,915 - $285,727 | $27,226 - $173,049 |
| 3-year catch-up (to December 2020) | N/A | $47,444 (full-time) or negative (part-time) |
| 5-year catch-up (to December 2022) | N/A | $110,041 (full-time) or $29,261 (part-time) |

*Compare* Exhibit 1 at 9–10, *with* Exhibit 4 at 12–15.

Dr. Tosic's analysis further showed that using a 3-year catch-up period and assuming Plaintiff continued part-time work, her estimated losses are a negative value (-$3,448), "show[ing] that Dr. Iovino fully caught up to the earnings she would have had at MSA, if she continued working part-time there." Exhibit 3 at 13.

IV. **CONCLUSION**

For the reasons set forth above, the Court should exclude the testimony of A. Bentley Hankins, Ph.D., under FRE 702 and *Daubert*. Dr. Hankins's economic damages calculations rest on unrealistic assumptions—fifty-year damage periods, 100% employment probability, work limitations tied to disputed diagnoses, and upper-bound projections based on an unverified verbal offer—that inflate Plaintiff's claimed damages far beyond what the evidence and accepted forensic economics methodology support. Dr. Hankins' reliance on Plaintiff's self-serving statements without independent verification creates an impermissible "analytical gap" between the data and

his conclusions under *Gen. Elec. Co.*, 522 U.S. at 146. At a minimum, the Court should limit the

expert's testimony to eliminate the unreliable components of his opinions.

Respectfully submitted,

Date: April 28, 2026

*/s/ Daniel S. Ward*

_____

Daniel S. Ward (VSB 45978)
Ryan C. Berry (VSB 67956)
Chelsea A. Cruz (VSB 96177)
WARD & BERRY, PLLC
1751 Pinnacle Drive, Suite 900
Tysons, VA 22102
(202) 331-8160
(202) 505-7100 Fax
dan@wardberry.com
ryan@wardberry.com
chelsea@wardberry.com

*Attorneys for Defendant Michael Stapleton
Associates, Ltd., d/b/a MSA Security, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 28, 2026, I electronically filed the foregoing with the Clerk

of the Court for the United States District Court for the Western District of Virginia by using the

CM/ECF system. I certify that the following participants in the case are registered CM/ECF users

and that service will be accomplished by the CM/ECF system.

Nate L. Adams III
Nate L. Adams III, P.C.
11 South Cameron Street
Winchester, VA 22601
(504) 667-1330
nadams@nadamslaw.com

Jack Kolar
Government Accountability Project
1612 K St. NW, Suite 1100
Washington, DC 20006

11

(202) 926-3311
jackk@whistleblower.org

Thad M. Guyer
T.M. Guyer & Friends, PC
116 Mistletoe Street
P.O. Box 1061
Medford, OR 97501
(206) 954-1203
thad@guyerayers.com

*/s/ Daniel S. Ward*

Daniel S. Ward