# Exhibit 3

Case 5:21-cv-00064-TTC-CKM     Document 298-2     Filed 04/28/26     Page 1 of 32
Pageid#: 4790



**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

_____

| | |
|---|---|
| KAREN IOVINO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 5:21-cv-0064 |
| -vs- | ) |
| | ) |
| MICHAEL STAPLETON ASSOCIATES, LTD.) | |
| d.b.a. MSA SECURITY, INC., | ) |
| | ) |
| Defendant. | ) |

_____

# ESTIMATED ECONOMIC LOSS OF
## Dr. Karen Iovino

**Prepared by**

**Dubravka Tosic, Ph.D.**
**Berkeley Research Group, LLC**

**Prepared for**

**Ward & Berry, PLLC**
**1751 Pinnacle Drive, Suite 900**
**Tysons Corner, Virginia 22102**

**December 15, 2023**



# I.    INTRODUCTION

This report presents estimates of economic loss, if any, of Dr. Karen Iovino, DVM (hereon "Dr. Iovino") associated with her allegation of discrimination in violation of 41 USC §4712 against Defendant Michael Stapleton Associates, Ltd. d.b.a. MSA Security, Inc., (hereon "MSA").  In  presenting these estimates of economic loss, I assume that liability has been found, but state no opinions as to whether Defendant is liable. The estimates of economic loss provided herein should not, therefore, be construed as evidence of liability. This report was prepared at the request of counsel for the Defendant.

I am a labor economist with extensive experience in statistical analyses of employment practices and in the computation of estimated economic loss. I hold a Bachelor's degree in economics from the University of Maryland at College Park, and a Master's degree and a Ph.D. in economics (with a concentration in labor economics) from The Florida State University.  I am a Partner and Practice Director at Berkeley Research Group, LLC ("BRG"), and based in New Jersey. Prior to joining BRG,  I was a Principal at ERS Group, and a Director at PricewaterhouseCoopers LLP.  BRG charges $590 per hour for my services, including testimony.

The documents I reviewed while  preparing this report are provided in Appendix A, and my qualifications are summarized in my curriculum  vitae provided in Appendix B. The opinions expressed in this report are based on the data and information  currently available to me.  To the extent additional relevant information becomes available in this matter, I   may amend or supplement my opinions as necessary.

This report is organized as follows: Section II  provides background information regarding the Plaintiff Dr. Iovino; Section III provides a review of the economic loss appraisal prepared by Plaintiff's economic expert A. Bentley Hankins, Ph.D. dated May 21, 2023; Section IV describes the methodology used to estimate the economic loss of Plaintiff; and Section V provides a conclusion of the findings, followed by tables and Appendix A.



## II.    BACKGROUND INFORMATION

Dr. Karen Iovino, Plaintiff in this matter, was born on May 17, 1967[1] and is presently 56.6 years old. She received a Bachelor of Science degree from Wilson College in 1989, and in 1993 graduated from Ross University, St. Kitts with a Doctor of Veterinary Medicine ("DVM") degree[2]. According to Plaintiff's Complaint[3], she was hired by the Defendant on October 9, 2015 as a part-time Veterinarian[4] and worked at the Defendant's Canine Validation Center ("CVC") in Winchester, Virginia. According to Plaintiff's Complaint, Dr. Iovino acted as the CVC Lead Veterinarian until November 2016 and was the designated "Veterinarian-in-Charge" of the Anti-Terrorism Assistance program ("ATA") hospital from April 2016[5]. She was suspended on August 4th, 2017 (with pay[6]) and terminated from MSA effective August 18, 2017.

According to Plaintiff's resume, prior to joining MSA she worked for the following employers:

- Valley Veterinary Emergency and Referral Center (VVERC), from August 2009 to February 2018[7];

- National Veterinary Response Team (NVRT) from August 2001 to June 2016 (as Group Supervisor and Deputy Chief Veterinary Officer from August 2013 to June 2016);

- Old Mill Veterinary Hospital, from July 2010 to July 2013; and

- Blue Ridge Veterinary Associates, from August 2002 to June 2010[8].

Her resume also lists a number of volunteer activities related to providing veterinary services.

After her termination from MSA, Dr. Iovino continued working for VVERC until February 2018, and has also been working as a Veterinarian[9] for other employers including Artemis, Banfield Pet Hospital,

---

[1] Document titled "Your Social Security Statement, Social Security Administration," dated May 15, 2023.

[2] Dr. Iovino's resume.

[3] First Amended Complaint, filed May 2, 2022.

[4] Ibid.

[5] First Amended Complaint, filed May 2, 2022, paragraph 16.

[6] Dr. Iovino was paid for sixty hours for the 08/05/2017 to 08/18/2017 period.

[7] Dr. Iovino worked for VVERC while employed by MSA and afterwards.

[8] Based on Dr. Iovino's Social Security Statement dated May 15, 2023, she had earnings in the period between 1993 (when she received her Doctor of Veterinary Medicine degree) and 2001 (when she started working for NVRT), but there is no information on her employers and positions held during this time period.

[9] Plaintiff's Deposition taken September 6, 2023, page 31.



Justworks Employment Group, Veterinary Staffing Solutions and VCA. Dr. Iovino testified in her deposition that since June 2023, she has been working as a locum relief Veterinarian for Linden Heights Animal Hospital, Veterinary Park Potomac, and VCA Animal Emergency and Critical Care[10]. Based on Dr. Iovino's resume and available W-2 earnings statements, she worked for multiple employers at the same time during years prior to her employment with MSA, during her employment with MSA, and has continued to work for multiple employers after her employment with MSA ended. For example, while employed by MSA as a part-time employee, she also worked for the VVERC and the NVRT, also part-time.

Table 1 provides a summary of Plaintiff's gross earnings from 2012 to 2022 while working for various employers during this time period[11]. Based on Dr. Iovino's bi-weekly MSA paystubs between November 2015 and August 2017, she was always paid $70 per hour and did not receive a raise during her employment with MSA. Based on time and pay records produced in discovery by Dr. Iovino, Dr. Iovino was paid $80 per hour at VVERC.

Table 2 shows the total annual hours and the average number of bi-weekly hours Dr. Iovino worked at MSA during her employment[12]. The accompanying graph shows the total number of hours Plaintiff worked every two weeks while employed at MSA. While in 2015, Dr. Iovino's bi-weekly hours worked ranged between 22 and 35.5 hours, in 2016 her bi-weekly hours ranged between 13 and 75.5 hours, with an average of 53 hours. In 2017 until her termination, Dr. Iovino worked mostly 60 hours every two weeks (or approximately 30 hours per week), and mostly in 10 hour shifts on days worked.

In addition to Dr. Iovino's allegation of discrimination in violation of 41 USC §4712 by the Defendant, she also alleges that, before her termination, she was verbally offered a full-time position as a Veterinarian with the Defendant. Instead, Dr. Iovino alleges that another Veterinarian[13] was hired for this full-time position.

---

[10] Plaintiff's Deposition taken September 6, 2023, pages 31 to 32.

[11] Information on Plaintiff's earnings in 2023 have not been provided as of the writing of this report. If such information is provided at a later time, my expert report may be updated.

[12] Data provided in Table 2 are based on Dr. Iovino's MSA paystubs.

[13] Dr. Lee E. Palmer, Exhibit 10 of Plaintiff's deposition taken September 6, 2023.



# III.  REVIEW AND ASSESSMENT OF PLAINTIFF'S ECONOMIC EXPERT REPORT

A. Bentley Hankins, Ph.D. ("Dr. Hankins" hereon), Plaintiff's economic expert, prepared estimates of economic loss associated with Plaintiff's allegation of discrimination in violation of 41 USC §4712.  He provides two scenarios with estimates of Plaintiff's earnings and fringe benefit losses:

1) First scenario ("Lower-Bound Estimates") - Assuming a joint probability of life and labor force participation, Dr. Hankins calculates earnings and benefit losses all the way until Plaintiff's 100th birthday by assuming that there is a probability that Dr. Iovino would remain alive, active in the labor force, and employed by MSA each and every year until age 100 and year 2067. Based on these assumptions and losses up to year 2067, Dr. Hankins calculates past earnings and fringe benefit losses of **$152,039** (see Page 9 of his expert report) and potential future earnings and fringe benefit losses assuming losses persist until age 100 of **$196,372** in present value, for a total of **$348,411**.[14] Assuming Dr. Iovino would have worked until age 60, Dr. Hankins calculates past and future economic losses equal to **$225,915** in present value (consisting of the same $152,039 in past losses and $73,876 in future losses).

2) Second scenario ("Upper-Bound Estimates") – Uses the same assumptions as in the first scenario, except that in the second scenario Dr. Hankins assumes higher but-for earnings for Plaintiff, based on the annualized pay of $70 per hour Dr. Iovino received while at MSA. Based on these assumptions and losses up to year 2067, Dr. Hankins calculates past earnings and fringe benefit losses of **$168,613** (see Page 9 of his expert report) and potential future earnings and fringe benefit losses assuming losses persist until age 100 of **$352,619** in present value, for a total of **$521,232**.[15] Assuming Dr. Iovino would have worked until age 60, Dr. Hankins calculates past and future economic losses to equal **$285,727** in present value

---

[14] Page 9 of Plaintiff's expert report.
[15] Page 9 of Plaintiff's expert report.



(consisting of the same $168,613 in past losses and $117,114 in future losses).

Plaintiff's economic expert makes the following inappropriate and speculative assumptions, resulting in overstated estimates of economic loss:

1) Plaintiff's economic expert calculates earnings losses for a total of almost 50 years, from 2017 until 2067 when Plaintiff will be 100 years old. By calculating earnings losses for a total of 50 years, Dr. Hankins is assuming that Dr. Iovino (currently 56.6 years old) would have remained working and employed by MSA for an additional 50 years, and until age 100. According to the most recent worklife expectancy data[16], women of Dr. Iovino's current age, gender, and a Professional or Doctoral degree have a median worklife expectancy of 10.9 years. As such, it would have been appropriate to provide the damage calculations up to at most age 67.5. Additionally, Dr. Hankins reports in his expert report that Dr. Iovino indicated that she intended to retire from her work as a Veterinarian by age 60. Therefore, it is not clear why Dr. Hankins calculates Dr. Iovino's economic losses until year 2067 and age 100 at all. Further, it is not clear what basis Dr. Hankins has for the assumption that Dr. Iovino, but for the termination, would have remained employed by MSA for an additional 50 years, until year 2067. Based on Dr. Iovino's resume, the longest employment with a single employer she had was with VVERC (part time for less than nine years) and Blue Ridge Veterinary Associates (for less than eight years)[17]. Based on Dr. Hankins' tables which provide calculations of past and future earnings and fringe benefit losses, earnings and fringe benefit losses calculated until age 100 are between **$122,496** (the difference between $348,411 and $225,915) **and $235,505** (the difference between $521,232 and $285,727) **higher** in present value than the earnings and fringe benefit losses calculated up to age 60 (Dr. Hankins writes in his report that Dr. Iovino "intended to

---

[16] Skoog, Gary R., James E. Ciecka, and Kurt V. Krueger "The Markov Model of Labor Force Activity 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," Journal of Forensic Economics, 28(1), 2019, pp. 15-108.

[17] Dr. Iovino was also associated with NVRT for less than fifteen years, being deployed during natural disasters.



retire from her work as a veterinarian **by age 60**)"[18].

2) Dr. Hankins adjusts Plaintiff's estimated annual economic losses by joint probabilities of worker life expectancy and labor force participation. He does not, though, adjust Plaintiff's estimated annual economic losses by the probability of unemployment. In his calculations, Dr. Hankins implicitly assumes that there is 100 percent certainty that Dr. Iovino would have continued to be employed each and every year between 2023 and 2067. This assumption is an unrealistic one, causing Plaintiff's projected economic loss to be overstated. Due to many different and sometimes unexpected factors, such as changes and shifts in the economic environment, all workers are exposed to some probability that they would not be employed in any given year. Plaintiff's expert did not take into account that everyone in any given year has less than a 100 percent probability of being employed. When calculating a Plaintiff's potential economic loss, this probability should be taken into account, and by not doing so, Plaintiff's expert has overstated Dr. Iovino's estimated economic loss.

3) According to a peer-reviewed article published in the Journal of Forensic Economics by vocational expert Dr. Michael Shahnasarian[19], "a period of 3 to 5 years generally suffices for an individual to reestablish his or her career development and stature to previous levels." Given Plaintiff's extensive work experience, the dynamic nature of the current labor market, and the low number of Veterinarians in the Winchester VA-WV MSA[20], it is reasonable to assume that Dr. Iovino may catch up to the earnings she had while at MSA in 3 to 5 years at most, from the date of her termination. This would mean that Dr. Iovino may have caught up to the earnings she would have had at MSA by either the end of 2020 (three years from her termination) or the end of 2022 (five years from her termination). In fact, based on Dr. Iovino's earnings records,

---

[18] Page 9 of Plaintiff's expert report.

[19] Shahnasarian, Michael, "Front Pay Damage Assessment: A Summary of Vocational and Psychological Considerations," Journal of Forensic Economics, 16(2), 2003, pp. 177-184.

[20] Based on Bureau of Labor Statistics data, there were 40 Veterinarians (Occupation Code 29-1131) in the Winchester VA-WV MSA in 2016, and 70 Veterinarians in the same MSA in 2017.



while she earned in total between $116,978 and $127,901 per year while employed at MSA, her actual annual earnings were $143,846 in 2019, $141,159 in 2020, and $134,083 in 2022. Except for year 2021 when her earnings were $112,126 (these lower earnings may be related to the COVID-19 pandemic), her annual total earnings since 2019 have been significantly higher than the annual total earnings she had while employed by MSA. Additionally, if one observes her annual earnings at individual employers, while she earned $97,833 at MSA in year 2016 (the only full year of employment at MSA), she earned $129,192 in 2020 at Banfield Pet Hospital, and in 2021 and 2022 she earned $97,620 and $134,083 respectively with Veterinary Staffing Solutions. Based on Dr. Iovino's total earnings since her departure from MSA and her history of working for multiple employers at any given time, it appears that her total earnings have already fully caught up to the total earnings she had while employed by MSA[21]. Dr. Hankins does not address the fact that Plaintiff's total earnings since her termination from MSA have been higher than her total earnings while employed by MSA, in most years between 2019 and 2022.

4) Dr. Hankins states that "Dr. Iovino's projected wage base absent termination can be compared to the typical remuneration of Veterinarians who receive mean annual pay of $109,080 in 2022 dollars in Winchester, VA-WV MSA, mean annual pay of $102,110 in 2022 dollars in Virginia[22]...". "Typical remuneration" is generally identified by the mean or median of the earnings distribution for an occupation. Data from the Bureau of Labor Statistics shows that the average annualized earnings of Veterinarians in 2016 (the only year Dr. Iovino worked at MSA for the entire year) were $94,930 in the Winchester, VA-WV MSA and $107,730 in Virginia. The same data shows that the annualized median earnings of Veterinarians in 2016 were $79,530 in the Winchester, VA-WV MSA and $91,790 in Virginia. Given that Dr.

---

[21] This observation does not take into account any differences that may exist between hours worked, hourly wages paid, or other differences between the employers.

[22] Page 6 of Plaintiff's expert report.



Iovino's earnings at only MSA in 2016 for part-time work (about 1,385 hours in total in 2016) were $97,833, her 2016 MSA earnings based on part-time work were significantly more than the average annualized earnings of Veterinarians in the Winchester, VA-WV MSA, and the median annualized earnings of Veterinarians in the Winchester, VA-WV MSA and the State of Virginia. As such, Dr. Iovino's annualized earnings at MSA in 2016 would have been $145,600 (assuming an hourly wage of $70 and 2,080 hours per year), which is between the 75th and the 90th percentile of earnings of Veterinarians in the Winchester, VA-WV MSA and in the State of Virginia in the same year. As such, Dr. Iovino's earnings were higher than the "typical remuneration" of Veterinarians in the relevant labor market.

5) Dr. Hankins opines that "considering her treating psychotherapist's opinion that she continue to limit her work hours, Dr. Iovino's economic losses also likely include future lost earning capacity, or front pay."[23] It is not clear what the basis is for this opinion. Dr. Hankins does not rely on any data that would show Plaintiff's hourly rates at each employer since her termination from MSA (with the exception of VVERC where she was paid $80 per hour), the total number of hours Plaintiff worked at all employers between 2015 and 2017 (while employed by MSA), the total number of hours she has been working every year since her termination from MSA, and what impact a reduction of her current hours may have on her earnings. What is known is that her total annual earnings have been significantly higher in most years since her employment with MSA ended which could be a result of having a higher hourly rate, working more hours per week, and/or a combination of a higher hourly rate and working more hours. As such, with the information and data Dr. Hankins relied upon, one cannot determine what impact a reduction in her current hours would have on Dr. Iovino's future earnings as compared to what she would have earned if she remained employed by MSA. That said, according to the expert report of Dr. Keyhill Sheorn, a psychiatrist, dated December 12, 2023, Dr. Iovino does

---

[23] Page 9 of Plaintiff's expert report.



not suffer from PTSD and is able to work full-time in her line of work[24]. In fact, Dr. Iovino has consistently been working since her termination from MSA and has been able to generate earnings which exceed the earnings she generated during the time of her employment with MSA.

## IV. ECONOMIC LOSS CALCULATIONS FOR DR. IOVINO

Tables 4 and 5 provide estimates of earnings and fringe benefit losses for Plaintiff. In Table 4, it is assumed that Dr. Iovino would have started working full-time at MSA on August 19, 2017 at an annual salary of $140,000. In Table 5, it is assumed that but-for the termination, Plaintiff would have continued working part-time at MSA and would have continued working for other employers also part-time. In Tables 4 and 5, the same assumptions are used to estimate Plaintiff's mitigating earnings and fringe benefits.

**Table 4:**

For the remainder of year 2017, I assume that Dr. Iovino, but for the allegations, would have worked full-time for MSA with an annualized salary of $140,000. This annualized salary is based on the annual salary the individual who was selected for the full-time position received at the start of his employment with MSA[25]. From 2018 until the end of the damage period, I assume an annual growth rate in but-for earnings of 2.2505 percent. This growth rate is the same as what Dr. Hankins uses in his estimation of the "lower-bound" economic losses. This is a generous assumption (applied every year of the damages period) as Dr. Iovino did not receive a single increase in her hourly wage during her employment at MSA.

Regarding the estimated value of Plaintiff's but-for fringe benefits, I consider what the employer match towards 401(k) retirement benefits would have been, but for the termination. Losses associated with MSA's 401(k) benefits are based on the annual employer match of 2.5% of annual earnings, per Plaintiff's bi-weekly paystubs[26]. This is the same percent as Dr. Hankins uses in his calculations of fringe benefit

---

[24] Expert report of Keyhill Sheorn, MD, dated December 12, 2023, pages 15 to 17.

[25] This information was provided to me by Counsel for the Defendant.

[26] This loss calculation is based on the assumption that Dr. Iovino would have continued to contribute an amount of her earnings to MSA's 401(k) benefit which would result in the 2.5% employer match.



losses.

In Table 4, I use Plaintiff's actual earnings as mitigating earnings from August 19, 2017 to 2022. For year 2023, I use the same estimated mitigating earnings as Dr. Hankins, equal to $143,500. From 2024 until the end of the damage period, I assume an annual growth rate in mitigating earnings of 2.5% (the same rate used by Dr. Hankins).

For estimated mitigating fringe benefits, I assume a 3.43% employer match towards Dr. Iovino's 401(k) benefits, the same rate used by Dr. Hankins.

Dr. Iovino's future (from December 16, 2023 until the end of the damage period) but-for earnings and fringe benefits and her future mitigating earnings and fringe benefits are adjusted by the probability of unemployment, equal to 2.6 percent. This annual adjustment is based on the average of the annual unemployment rates in the Winchester VA-WV MSA between 2022 and October 2023 (see Table 3)[27].

Earnings loss is calculated as the difference between but-for and mitigating earnings and fringe benefits, adjusted for the probability of unemployment. All future earnings and fringe benefit losses (estimated to occur from December 16, 2023 to the end of the damage period) are brought to present value using a laddered portfolio of the current yields (as of December 11, 2023) on U.S. Treasuries from a 1-year Treasury bill to a 3-year Treasury bill[28]. As of December 11, 2023, the one-year Treasury bill was 5.14 percent, the two-year Treasury bill was 4.71 percent, and the three-year Treasury bill was 4.42 percent.

Calculations of future economic losses are provided for each year from December 16, 2023 until May 17, 2027 when Plaintiff will turn 60 years old. Based on Dr. Hankins' expert report, Plaintiff intended to retire from her work as a Veterinarian by age 60.

When evaluating an appropriate end of a Plaintiff's damage period, one may consider the peer-reviewed article published in the Journal of Forensic Economics by vocational expert Dr. Michael

---

[27] "Local Area Unemployment Statistics," 2022 until October 2023, Winchester VA-WV MSA, Bureau of Labor Statistics, U.S. Department of Labor.

[28] Board of Governors of the Federal Reserve System, Federal Reserve Board Statistics and Releases H.15 Historical Interest Rates, accessed December 12, 2023, https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.



Shahnasarian.[29] Based on the research published in the article, "a period of 3 to 5 years generally suffices for an individual to reestablish his or her career development and stature to previous levels." Given Plaintiff's extensive work experience, it is reasonable to assume that Dr. Iovino may have caught up to the earnings she had while at MSA in 3 to 5 years from her termination date (around years 2020 to 2022). As discussed previously, based on her total earnings after her termination from MSA, Plaintiff has already caught up to the earnings she had while employed by MSA.

Calculations of past economic losses are provided in Table 4 for each year up to December 15, 2023. If it is assumed that it would have taken Dr. Iovino about 3 years to catch up to her earnings she had while employed by MSA (up to December 2020), her estimated earnings and fringe benefits losses are equal to approximately **$47,444.** If it is assumed that it would have taken Dr. Iovino about 5 years to catch up to her earnings she had while employed by MSA (up to December 2022), her estimated earnings and fringe benefits losses are equal to approximately **$110,041.** Past losses up to December 15, 2023 are equal to **$124,884**. Note that based on calculations provided in Table 4, Dr. Iovino's assumed but-for earnings in year 2022 are equal to $156,479. These earnings are significantly higher than the mean annual earnings of Veterinarians in year 2022, equal to $109,080, in the Winchester VA-WV MSA, as mentioned by Dr. Hankins in his expert report. As such, Plaintiff's estimated but-for earnings are indeed significantly higher than the "typical remuneration of veterinarians," as suggested by Dr. Hankins[30].

If one considers also future economic losses, the last column of Table 4 provides the cumulative present value of economic losses up to December 31 of each future year. For example, if one considers economic losses up to December 31, 2023 (representing the sum of past and future losses up to this date), their present value is **$125,618**. Similarly, if one considers economic losses up to when Dr. Iovino will turn 60 years old, their present value is **$173,049**.

---

[29] Shahnasarian, Michael, "Front Pay Damage Assessment: A Summary of Vocational and Psychological Considerations," Journal of Forensic Economics, 16(2), 2003, pp. 177-184.
[30] Page 6 of Plaintiff's expert report.



**Table 5:**

In Table 5, all assumptions regarding Dr. Iovino's actual and projected mitigating earnings and fringe benefits are the same as in Table 4. For Dr. Iovino's estimated but-for earnings, it is assumed that, but for her allegations of wrongful termination, she would have continued working part-time for MSA and part-time for VVERC, despite the fact (as alleged in Plaintiff's Amended Complaint) that the part time position was being eliminated and replaced with a full time position[31]. For the remainder of 2017, it is assumed that she would have continued to work for MSA 30 hours per week at $70 per hour. It is further assumed that she would have continued to work for VVERC at $80 per hour for 200 hours per year. The 200 hours per year assumption is based on the estimated number of hours Dr. Iovino worked for VVERC in year 2017, until August 18, 2017 (while also working for MSA).[32] All other assumptions regarding Dr. Iovino's but-for earnings used in Table 5 are the same as Table 4.

Calculations of past economic losses are provided in Table 5 for each year up to December 15, 2023. If it is assumed that it would have taken Dr. Iovino about 3 years to catch up to her earnings she had while employed by MSA (up to December 2020), her estimated earnings and fringe benefits losses are a negative value **(-$3,448).** This damage estimate shows that Dr. Iovino fully caught up to the earnings she would have had at MSA, if she continued working part-time there. If it is assumed that it would have taken Dr. Iovino about 5 years to catch up to her earnings she had while employed by MSA (up to December 2022), her estimated earnings and fringe benefits losses are equal to approximately **$29,261.** Past losses up to December 15, 2023 are equal to **$29,382**.

If one considers also future economic losses, Table 5 provides the cumulative present value of economic losses for each future year up to year 2027 when Plaintiff will turn 60 years old. For example, if one considers economic losses up to December 31, 2023 (past and future losses), their present value is **$29,388**. Similarly, if one considers economic losses up to when Dr. Iovino will turn 60 years old, their

---

[31] Amended Complaint of Plaintiff, dated May 2, 2022, Paragraph 73.
[32] In 2017, Dr. Iovino earned $9,960 from VVERC up to August 18, 2017, and the annualized value of this amount equals about $16,000.

13



present value is **$27,226**.

Since Dr. Iovino's estimated annual losses between 2017 and 2027 include negative values in certain years (i.e., her estimated but-for earnings and fringe benefit losses are lower than her actual or projected mitigating earnings and fringe benefits), Table 5 also provides the cumulative present value of economic losses for each year between 2017 and 2027, by setting the negative loss values to $0. If it is assumed that it would have taken Dr. Iovino about 3 years to catch up to her earnings she had while employed by MSA (up to December 2020), her estimated earnings and fringe benefits losses equal **$18,787.** This damage estimate shows that Dr. Iovino almost fully caught up to the earnings she would have had at MSA, if she continued working part-time there. If it is assumed that it would have taken Dr. Iovino about 5 years to catch up to her earnings she had while employed by MSA (up to December 2022), her estimated earnings and fringe benefits losses are equal to approximately **$51,495.** Past losses up to December 15, 2023 are equal to **$51,617**. If one considers also future economic losses, the last column of Table 5 provides the cumulative present value of economic losses for each future year up to 2027. For example, if one considers economic losses up to December 31, 2023 (past and future losses), their present value is **$51,623**. The present value of future losses up to when Dr. Iovino will turn 60 years old remain **$51,623**.

In summary, if one considers the years when Dr. Iovino earned more than she would have at MSA, the present value of her estimated economic losses up to when Dr. Iovino will turn 60 years old equals **$27,226**. Alternatively, if one "zeros out" the positive gains in years where Dr. Iovino had them, the present value of her estimated economic losses up to when Dr. Iovino will turn 60 years old is **$51,623**.

## V.    CONCLUSIONS

Based on the described assumptions and calculations presented in Tables 4 to 5, it is my professional opinion that estimated back pay earnings and fringe benefit losses, up to December 15, 2023, for Plaintiff Dr. Iovino range between **$29,382** (assuming, but for the allegations, she would have continued working part-time for MSA and other employers) **and $124,884** (assuming, but for the allegations, she

14

**BRG**
Berkeley Research Group

would have continued working for MSA, but in a full-time capacity).

If one assumes that Dr. Iovino would have retired in May 2027 at the age of 60, the present value of <u>total earnings and fringe benefit losses,</u> if any, ranges between **$27,226 and $173,049**.

The trier of fact may determine what the estimated earnings and fringe benefit losses are up to each year of calculations by referring to the cumulative columns in Tables 4 to 5.

To the extent that additional relevant information becomes available, certain conclusions in this report are tentative and subject to additional research and analyses. I reserve the right to conduct additional research and analyses at a later date should additional information become available. This report may be modified or amended if additional information comes to my attention after the date of issuance of this report. The procedures I performed were solely for the information and assistance of counsel with respect to this matter. This report is not to be reproduced, distributed, disclosed or used for any purpose other than in connection with this lawsuit without my prior approval.

December 15, 2023

_____          _____

Dubravka Tosic, Ph.D.                              Date

15

**Table 1**
**Annual Earnings of Dr. Karen Iovino**
**2012 to 2022**

| Year | SSA Statement Medicare Earnings | W-2 Medicare Wages | | | | | | | | |
| | | MSA | Valley Emergency Vet Clinic | Defense Finance | Artemis | Banfield Pet Hospital* | Justworks Employment Group | Veterinary Staffing Solutions | VCA | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | $116,871 | | | | | | | | | N/A |
| 2013 | $94,237 | | | | | | | | | N/A |
| 2014 | $93,848 | | | | | | | | | N/A |
| 2015 | $120,484 | $7,735.00 | $70,792.50 | $41,956.62 | | | | | | $120,484 |
| 2016 | $116,977 | $97,833.04 | $14,192.50 | $4,952.03 | | | | | | $116,978 |
| 2017 | $127,900 | $73,010.62 | $54,890.00 | | | | | | | $127,901 |
| 2018 | $110,335 | | $19,060.00 | | $80,638.70 | $10,636.35 | | | | $110,335 |
| 2019 | $143,846 | | | | $73,899.31 | $68,022.06 | $1,924.75 | | | $143,846 |
| 2020 | $141,158 | | | | $4,740.80 | $129,191.60 | | $5,626.10 | $1,600.00 | $141,159 |
| 2021 | $112,125 | | | | | $14,505.64 | | $97,620.31 | | $112,126 |
| 2022 | $134,083 | | | | | | | $134,083.28 | | $134,083 |

Sources: W-2 Statements for each respective employer and year.

* W-2 Statements are from Medical Management International.

N/A indicates information not available.

**Table 2**
**Dr. Iovino**
**Total Number of Hours Worked at MSA**
**November 2015 to August 2017**

| Year | Hours Worked | Average Hours Worked Bi-Weekly |
|---|---|---|
| 2015 | 110.5 | 28 |
| 2016 | 1384.5 | 53 |
| 2017 | 1015.0 | 60 |



Source: Dr. Iovino's bi-weekly paystubs from MSA Security, with check dates from 11/20/15 to 08/25/17.

**Table 3**
**Unemployment Rates**
**2022 to October 2023**

| Year | Loudon County | Frederick County | Winchester VA-WV MSA | Washington-Arlington-Alexandria, DC-VA-MD-WV MSA |
|---|---|---|---|---|
| 2022 | 2.4% | 2.4% | 2.5% | 3.0% |
| 2023* | 2.5% | 2.5% | 2.6% | 2.6% |
| **Average** | **2.5%** | **2.5%** | **2.6%** | **2.8%** |

* January to October 2023.

Source: "Local Area Unemployment Statistics", 2022 until October 2023, Bureau of Labor Statistics, U.S. Department of Labor.

**Table 4**
**Estimated Earnings and Fringe Benefit Loss of Dr. Karen Iovino**
**Assuming Full Time Work at MSA Would Have Started August 19, 2017**
**Actual and Estimated Mitigating Earnings Based on Part Time Work at Various Employers**

| Period Begin Date | Period End Date | Age at The End of Period | Estimated Projected MSA Earnings Assuming Full Time Work | Estimated Projected MSA 401(k) Employer Match | Actual and Projected Mitigating Earnings | Estimated Projected Mitigating 401(k) Employer Match | Probability of Unemployment Adjustment | Lost Earnings and Fringe Benefits Adjusted for Prob. of Unemployment | Present Value Factor | Present Value of Adjusted Earnings Loss | Cumulative Present Value of Adjusted Earnings Loss Excluding Negative Values |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/19/17 | 12/31/17 | 50.6 | $51,362 | $1,284 | $44,930 | $1,541 | 1.000 | $6,175 | 1.000 | $6,175 | $6,175 |
| 01/01/18 | 12/31/18 | 51.6 | $143,151 | $3,579 | $110,335 | $3,784 | 1.000 | $32,610 | 1.000 | $32,610 | $38,785 |
| 01/01/19 | 12/31/19 | 52.6 | $146,372 | $3,659 | $143,846 | $4,934 | 1.000 | $1,252 | 1.000 | $1,252 | $40,037 |
| 01/01/20 | 12/31/20 | 53.6 | $149,666 | $3,742 | $141,159 | $4,842 | 1.000 | $7,408 | 1.000 | $7,408 | **$47,444** |
| 01/01/21 | 12/31/21 | 54.6 | $153,035 | $3,826 | $112,126 | $3,846 | 1.000 | $40,889 | 1.000 | $40,889 | $88,333 |
| 01/01/22 | 12/31/22 | 55.6 | $156,479 | $3,912 | $134,083 | $4,599 | 1.000 | $21,708 | 1.000 | $21,708 | **$110,041** |
| 01/01/23 | 12/15/23 | 56.6 | $152,444 | $3,811 | $136,723 | $4,690 | 1.000 | $14,842 | 1.000 | $14,842 | **$124,884** |
|  |  |  |  |  |  |  |  |  |  |  |  |
| 12/16/23 | 12/31/23 | 56.6 | $7,556 | $189 | $6,777 | $232 | 0.974 | $736 | 0.998 | $734 | **$125,618** |
| 01/01/24 | 12/31/24 | 57.6 | $163,601 | $4,090 | $147,088 | $5,045 | 0.974 | $15,558 | 0.949 | $14,763 | $140,381 |
| 01/01/25 | 12/31/25 | 58.6 | $167,283 | $4,182 | $150,765 | $5,171 | 0.974 | $15,529 | 0.910 | $14,133 | $154,513 |
| 01/01/26 | 12/31/26 | 59.6 | $171,048 | $4,276 | $154,534 | $5,301 | 0.974 | $15,489 | 0.877 | $13,577 | $168,090 |
| 01/01/27 | 05/17/27 | 60.0 | $65,123 | $1,628 | $58,979 | $2,023 | 0.974 | $5,749 | 0.863 | $4,958 | **$173,049** |
|  |  |  |  |  |  |  |  |  |  |  |  |
| Total |  |  | $1,527,119 |  | $1,341,344 |  |  | $177,945 |  | **$173,049** |  |

**Table 5**
**Estimated Earnings and Fringe Benefit Loss of Dr. Karen Iovino**
**Assuming Continuation of Part-Time Work at MSA and Other Employers**
**Actual and Estimated Mitigating Earnings Based on Part Time Work at Various Employers**

| Period Begin Date | Period End Date | Age at The End of Period | Estimated Projected MSA Earnings Assuming Part Time Work | Estimated Projected MSA 401(k) Employer Match | Actual and Projected Mitigating Earnings | Estimated Projected Mitigating 401(k) Employer Match | Probability of Unemployment Adjustment | Lost Earnings and Fringe Benefits Adjusted for Prob. of Unemployment | Present Value Factor | Present Value of Adjusted Earnings Loss | Cumulative Present Value of Adjusted Earnings Loss Including Negative Values | Present Value of Adjusted Earnings Loss, Excluding Negative Values | Cumulative Present Value of Adjusted Earnings Loss Excluding Negative Values |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08/19/17 | 12/31/17 | 50.6 | $126,811 | $3,170 | $127,901 | $4,387 | 1.000 | -$2,307 | 1.000 | -$2,307 | -$2,307 | $0 | $0 |
| 01/01/18 | 12/31/18 | 51.6 | $129,664 | $3,242 | $110,335 | $3,784 | 1.000 | $18,787 | 1.000 | $18,787 | $16,479 | $18,787 | $18,787 |
| 01/01/19 | 12/31/19 | 52.6 | $132,583 | $3,315 | $143,846 | $4,934 | 1.000 | -$12,883 | 1.000 | -$12,883 | $3,597 | $0 | $18,787 |
| 01/01/20 | 12/31/20 | 53.6 | $135,566 | $3,389 | $141,159 | $4,842 | 1.000 | -$7,045 | 1.000 | -$7,045 | **-$3,448** | $0 | **$18,787** |
| 01/01/21 | 12/31/21 | 54.6 | $138,617 | $3,465 | $112,126 | $3,846 | 1.000 | $26,111 | 1.000 | $26,111 | $22,663 | $26,111 | $44,897 |
| 01/01/22 | 12/31/22 | 55.6 | $141,737 | $3,543 | $134,083 | $4,599 | 1.000 | $6,598 | 1.000 | $6,598 | **$29,261** | $6,598 | **$51,495** |
| 01/01/23 | 12/15/23 | 56.6 | $138,082 | $3,452 | $136,723 | $4,690 | 1.000 | $122 | 1.000 | $122 | **$29,382** | $122 | **$51,617** |
| 12/16/23 | 12/31/23 | 56.6 | $6,845 | $171 | $6,777 | $232 | 0.974 | $6 | 0.998 | $6 | **$29,388** | $6 | **$51,623** |
| 01/01/24 | 12/31/24 | 57.6 | $148,188 | $3,705 | $147,088 | $5,045 | 0.974 | -$240 | 0.949 | -$227 | $29,161 | $0 | $51,623 |
| 01/01/25 | 12/31/25 | 58.6 | $151,523 | $3,788 | $150,765 | $5,171 | 0.974 | -$625 | 0.910 | -$568 | $28,593 | $0 | $51,623 |
| 01/01/26 | 12/31/26 | 59.6 | $154,933 | $3,873 | $154,534 | $5,301 | 0.974 | -$1,028 | 0.877 | -$901 | $27,692 | $0 | $51,623 |
| 01/01/27 | 05/17/27 | 60.0 | $58,987 | $1,475 | $58,979 | $2,023 | 0.974 | -$540 | 0.863 | -$466 | **$27,226** | $0 | **$51,623** |
| Total | | | $1,463,537 | | $1,424,315 | | | $26,957 | | **$27,226** | | **$51,623** | |



# ATTACHMENT A



# Documents Reviewed

1.  First Amended Complaint dated May 2, 2022;
2.  Report Submitted by Jacqueline Garrick, LCSW-C, SHRM-CP, Dr. Karen Iovino Whistleblower Retaliation Checklist (WRC) Assessment Report, dated May 22, 2023;
3.  Economic Expert Report of A. Bentley Hankins, PhD, dated May 21, 2023;
4.  Expert Report of Keyhill Sheorn, MD, dated December 12, 2023;
5.  Resume of Karen Iovino, DVM
6.  Transcript of deposition of Karen Iovino, taken September 6, 2023, with Exhibits Iovino 001 to Iovino 018;
7.  Bi-Monthly paystubs for Karen Iovino from MSA Security, with check dates from 11/20/15 to 08/25/17;
8.  Plaintiff document with a heading "Facility," which includes a description of work, hours and pay at VVERC between August 19, 2017 and January 17, 2018;
9.  W-2 Statements for MSA Security for 2015, 2016, and 2017;
10. W-2 Statements for Valley Emergency Vet Clinic for 2015, 2016, and 2017;
11. W-2 Statements for Defense Finance & ACTG Serv for 2015 and 2016;
12. W-2 Statements for Artemis for 2018, 2019, and 2020;
13. W-2 Statements for Medical Management International for 2018 to 2021;
14. W-2 Statement for Justworks Employment Group for 2019;
15. W-2 Statements for Veterinary Staffing Solutions for 2020, 2021, and 2022;
16. W-2 Statement for Vicar Operating, Inc. dba VCA for 2020;
17. Document titled "Your Social Security Statement, Karen A. Iovino" Social Security Administration, dated May 15, 2023;
18. Skoog, Gary R., James E. Ciecka, and Kurt V. Krueger "The Markov Model of Labor Force Activity 2012-17: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors," Journal of Forensic Economics, 28(1), 2019, pp. 15-108;
19. Shahnasarian, Michael, "Front Pay Damage Assessment: A Summary of Vocational and Psychological Considerations," Journal of Forensic Economics, 16(2), 2003, pp. 177-184;
20. "Local Area Unemployment Statistics," 2022 until October 2023, Winchester VA-WV MSA, Loudon County, Frederick County, and Washington-Arlington-Alexandria, DC-VA-MD-WV MSA, Bureau of Labor Statistics, U.S. Department of Labor;
21. Occupational Employment and Wage Statistics, May 2016 and May 2017, for Winchester VA-WV MSA and the State of Virginia, Bureau of Labor Statistics, U.S. Department of Labor;
22. Board of Governors of the Federal Reserve System, Federal Reserve Board Statistics and Releases H.15 Historical Interest Rates, accessed December 12, 2023, https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.

# ATTACHMENT B

## Curriculum Vitae



**Dubravka Tosic, Ph.D.**
BERKELEY RESEARCH GROUP, LLC
250 Pehle Avenue, Suite 301 | Saddle Brook, NJ 07663


Direct: 201-587-7130
dtosic@thinkbrg.com


## EDUCATION

| | |
|---|---|
| Ph.D., Economics | Florida State University, 1997<br>Area of Concentration: Labor Economics |
| M.A., Economics | Florida State University, 1991 |
| B.A., Economics | University of Maryland,   1989 |


## PRESENT EMPLOYMENT

Berkeley Research Group, LLC, Director, December 2015–Present

Labor economist with significant experience in all aspects of the application of labor economics, statistical analysis, damage calculations, and research to problems involving labor and employment issues.

As a consulting expert or testifying expert, provide assistance and prepare economic expert reports in a variety of complex disputes, litigation and arbitration matters, and pro-active risk management and compliance reviews:

Economic and statistical analyses performed in connection with matters involving allegations of employment discrimination with respect to various employer actions (compensation, hiring, demotion, promotion, discipline, performance evaluations, job assignment, training, termination), executive compensation, breach of employment contract, personal injury and wrongful death, and wage and hour litigation.  Analyses may involve the development and use of large and complex analytical databases and the design and estimation of sophisticated econometric models.

Extensive experience in the calculation of economic loss involving allegations of discrimination in pay, hiring, promotion, discipline, and termination, personal injury, and wrongful death.  Estimation of economic loss related to all forms of compensation and fringe benefits including stock options and stock shares, defined benefit and defined contribution pension plans, analyses of job availability by occupation and/or industry, and calculation of present value of



lost household services and life care plans. Damage calculations prepared in single-plaintiff, multi-plaintiff, and class action matters. This includes assisting The Office of the Special Master and the team working on the September 11th Victim Compensation Fund by developing and updating complex economic loss models used to value claims of personal injury and/or wrongful death.

Research and analyses of compensation and fringe benefit costs for various occupations, industries, and geographic regions, in support of negotiations of collective bargaining agreements.

Analyses of reasonableness of employee compensation as compared to the relevant labor market.  Analyses may involve a review of base, incentive, and total compensation, and the use of various compensation surveys and company disclosure documents.

Prepare pro-active economic studies and reviews involving analysis of compensation and pay equity, labor force reductions, economic impact of proposed projects, regulations or laws, and utilization of minority and women-owned businesses in procurement activities.

Supervise and coordinate the work of economists and other research staff. Lead and manage projects by designing, organizing, planning and directing the preparation of cases from initial client contact through the final report and/or expert testimony.

## PREVIOUS POSITIONS

ERS Group, Principal, 2010 to December 2015

PricewaterhouseCoopers LLP, Director, 1997 to 2009

Director, Forensic Services, (2005 - 2009)
Manager, Dispute Analysis and Investigations (2001 – 2005)
Senior Associate, Dispute Analysis and Corporate Recovery (1997 – 2001)

ERS Group, Research Associate, 1991 to 1996

The World Bank, Intern/Consultant, 1994

The Florida State University, Research Assistant, 1989 to 1991.

## PROFESSIONAL AWARDS, RECOGNITION, AND PRIZES

PricewaterhouseCoopers Chairman's Award for Market Leadership, 2009

2

United Nations Association of the United States, 2006 International Visionaries' Award, 2006

PricewaterhouseCoopers Chairman's Award for work done on the September 11th Victim Compensation Fund (VCF), 2004

## PUBLICATIONS

"Implications of Remote Work on Company Pay Equity," BRG White Paper, Forthcoming.

"#ME TOO: Calculation of Economic Damages in Matters Involving Allegations of Sexual Harassment" BRG White Paper, Forthcoming.

"Want to Put the "S" in ESG? Start With Human Capital Measurement," ThinkSet Magazine, October 4, 2023, https://thinksetmag.com/insights/the-s-in-esg-human-capital-measurement.

Chapter titled "Emerging Areas of Group and Class Actions Related to ESG Disclosures," in Class and Group Actions Laws and Regulations 2023, 15th Edition, International Comparative Legal Guides, November 10, 2022, https://iclg.com/practice-areas/class-and-group-actions-laws-and-regulations/05-emerging-areas-of-group-and-class-actions-related-to-esg-disclosures

"Advancing Pay Equity Through Compensation Analysis," Human Resources Director (HRD) Magazine, September 20, 2022, https://www.hcamag.com/us/specialization/employment-law/advancing-pay-equity-through-compensation-analysis/421091.

"The Impact of COVID-19 on Women in Law," ThinkSet Magazine, Berkeley Research Group, November 2021. https://thinksetmag.com/insights/impact-of-covid-19-on-women-in-law.

"The Use of Statistical Evidence in Class Action Litigation: Class and Group Action Laws and Regulations 2021," The International Comparative Legal Guide to Class & Group Actions 2021, Co-Author.  Global Legal Group, November 11, 2020. https://iclg.com/practice-areas/class-and-group-actions-laws-and-regulations/6-the-use-of-statistical-evidence-in-class-action-litigation

"Reductions in Force and Furloughs During the COVID-19 Pandemic, Managing Employment Discrimination Risks by Conducting Disparate Impact Analyses" BRG Insights, September 1, 2020. https://www.thinkbrg.com/insights/publications/tosic-rif-furloughs-covid/

"The Current State of the U.S. Labor Market as a Result of the Pandemic, Return to Work, and Potential Employment Litigation Risks," BRG White Paper, May 2020. https://brg-crisis-response.com/crisis-management-and-recovery/claims-and-disputes/labor-market-return-to-work/

3



"The EEOC's Proposal to Start Collecting Data on Compensation and Hours Worked", BRG White Paper, March 1, 2016
http://www.thinkbrg.com/newsroom-publications-tosic-eeoc-compensation.html.

"SEC and New Executive Compensation Disclosure", May 13, 2015, ERS Group Blog, http://www.ersgroup.com/blog/sec-new-executive-compensation-disclosure

"A Basic Introduction to the Methodology Used to Determine a Discount Rate," in "Pocket MBA: Finance for Lawyers, October 2014," Practicing Law Institute, 2014, New York, New York.

"Regression Analysis Applications in Litigation", with Robert Mills, in "Pocket MBA: Finance for Lawyers, June 2011", Practicing Law Institute, 2011, New York, New York.

"Sampling Applied to Pension Calculations," with Dr. Jessica Pollner, Data Management Review, July 6, 2007.

"Report on the Civil Appeals Management Program (CAMP) Survey," Prepared for The Litigation Committee of the Association of the Bar of the City of New York, November 2006.

"The Changing Economic Status of Women in Several Countries of Central and Eastern Europe during the Transition," Ph.D. Dissertation, Department of Economics, Florida State University, 1997

"The Relationship between Investments in Human Capital and Economic Growth – A Critical Review of the Literature," Manuscript prepared for the International Youth Foundation, August 1996.

"The Americans with Disabilities Act – 101 Questions and Answers," with Michael J. Piette, Lawyers and Judges Publishing Company, January 1994.

"The Social Sectors and Social Expenditures Review of Croatia," The World Bank Working Paper, September 1994.

"The Returns to Higher Education in the Republics of Yugoslavia," Working Paper, The Florida State University, November 1992.

## PRESENTATIONS

Presentation titled "Calculation of Economic Damages in Matters Involving Allegations of Employment Discrimination, Sexual Harassment, and Retaliation," Annual Conference of the American Rehabilitation Economic Association, May 19, 2023.

Presentation titled "An Update on ESG Human Capital Disclosures," Annual Conference of the Business Valuation & Litigation Services Committee, NYSSCPA, May 15, 2023.



Panelist for Session Titled: ""How to Avoid Litigation with Pre-Suit Claims Analytics," 2023 ALM Complex Claims and Litigation Forum, February 27, 2023.

Panelist for Session Titled: "Diversity, Equity, and Inclusivity in Complex Litigation," Complex Litigation Ethics Conference, University of California Hastings College of Law, October 22, 2022.

Panelist for Session Titled "Session 2: Expertise, Technical Points, and Stories – A Round Table Discussion," National Association of Forensic Economics (NAFE), Eastern Economic Association Annual Meetings, February 25, 2022.

Panelist for Presentation Titled "The Impact of the Pandemic on Women in Law," National Association of Women Lawyers (NAWL), Women in Employment Law, September 28, 2021.

Moderator of Panel Titled "Education During the COVID-19 Pandemic and Beyond – Impact on Schools, Students, Parents, Teachers, and Staff," Class Action Money & Ethics 2021 Conference, June 30th 2021.

Panelist for National Association of Forensic Economics (NAFE) Panel Discussion, Virtual 96th Annual Conference, Western Economic Association International, June 27 and June 28, 2021.

Panelist for Presentation Titled "Class Action Litigation in an Era of Change: What to Expect in 2021 from the Biden Administration, Congress, and the US Supreme Court," BRG Virtual Conference, Co-Moderator of Labor & Employment Session, January 28, 2021.

Panelist for Presentation Titled "Current Challenges and Hot Topics in Labor and Employment and Benefits," Provider Conference Webinar Series, with Haynes and Boone LLP, October 29, 2020.

Podcast Presentation Titled "Episode 6: Insights into Reopening the Economy," COVID Conversations on Risk: Webinars and Podcasts, Society for Risk Analysis, with Robin Cantor, Ph.D., May 12, 2020.  https://sra.org/covid-19-resources

Panelist for Presentation and Live Webinar titled "Calculating Economic Damages in Wage and Hour Litigation Matters," Practicing Law Institute (PLI) One-Hour Briefing, January 16, 2020.

Panelist for Presentation and Live Webinar titled "Calculating Economic Damages in Employment Litigation Matters," Practicing Law Institute (PLI) One-Hour Briefing, June 25, 2019.

Panelist for Presentation and Live Webinar titled "Conducting an Effective Equal Pay Audit," North Texas Industry Liaison Group (NTILG), March 21, 2019, Dallas, Texas.

Panelist for Presentation and Webinar titled "Testing Your Company's Compliance – Conducting Pay Equity Audits" with Greenberg Traurig, September 17, 2018, New Jersey.

5



Panelist for Webinar presentation titled "Effective Use of Statistical Evidence in Employment Class Action Litigation: Practical Guide in 2017," The Knowledge Group, January 31, 2017. https://theknowledgegroup.org/effective-use-of-statistical-evidence-in-employment-class-action-litigation-practical-guide-in-2017-live-webcast

Presenter for Session titled "Beyond Base Pay: Understanding and Addressing Pay Disparities in Variable Compensation," The 34th Annual National Industry Liaison Group (NILG) Conference, Charlotte, NC, August 5, 2016.

Panelist for segment titled "Using Financial Information in Business Transactions" at conference titled "Pocket MBA: Finance for Lawyers and Other Professionals", Practicing Law Institute (PLI), San Francisco, June 20-21, 2016.

Panelist for segment titled "Using Financial Information in Business Transactions" at conference titled "Pocket MBA for Attorneys", Practicing Law Institute (PLI), San Francisco, May 7-8, 2015.

Panelist for segment titled "Using Financial Information in Business Transactions" at conference titled "Pocket MBA for Attorneys", Practicing Law Institute (PLI), New York, October 9-10, 2014.

Panelist for segment titled "Using Financial Information in Business Transactions" at conference titled "Pocket MBA for Attorneys", Practicing Law Institute (PLI), San Francisco, May 5-6, 2014.

Presenter at The Associated General Contractors of America (AGC) HR and Training Professionals Conference, "Leave No Stone Unturned: OFCCP's New Outlook on Compensation", Chicago, October 16, 2013.

Panelist for segment titled "Practical Elements of Finance" of conference titled "Pocket MBA for Attorneys", Practicing Law Institute (PLI), New York, October 10-11, 2013.

Panelist for segment titled "Practical Elements of Finance" at conference titled "Pocket MBA for Attorneys", Practicing Law Institute (PLI), San Francisco, June 3-4, 2013.

Panelist for segment titled "Practical Elements of Finance" of conference titled "Pocket MBA for Attorneys", Practicing Law Institute (PLI), New York, October 11-12, 2012.

Presenter of Webinar titled "Worker Misclassification and How It May Impact the Bottom Line", Associated Builders and Contractors, Inc., October 3, 2012.

Panelist, Diversity in the Workplace, at the Argyle Chief Legal Officer Executive Forum, New York, NY, March 7, 2012.

Presenter of Webinar titled "Wage and Hour Litigation in the Construction Industry", Associated Builders and Contractors, Inc., December 13, 2011.



Panelist for segment titled "Practical Elements of Finance" at conference titled "Pocket MBA for Attorneys", Practicing Law Institute (PLI), New York, June 13-14, 2011.

Panelist for segment titled "Economics and Finance" of conference titled "Pocket MBA for Attorneys", Practicing Law Institute (PLI), New York, July 29-30, 2010.

"Calculating Economic Damages," The Wharton School of Business, University of Pennsylvania, April 2009.

"Conducting Risk Assessments and Risk Management", UNICEF New York, Brazil, and Bangladesh, June 2008.

## OTHER ACTIVITIES

Member of Advisory Board, Seton Hall University, Stillman School of Business, Customer Experience Executive Certification Program.

Invited Peer Reviewer for Articles Submitted to Journal of Forensic Economics, for Publication.

Volunteer with Spark Business Academy (A Non-Profit Organization that Teaches Students Financial and Economic Skills); Review and Grade Final Projects of Participating Elementary School Students, and Present to Students on Economics.

## AFFILIATIONS

American Economic Association, Member.

National Association of Forensic Economics (NAFE), Member.

Labor and Employment Relations Association (LERA), Member.

American Bar Association, Section of Litigation and Section of Labor and Employment Law, Member.

New York State Society of Certified Public Accountants (NYSSCPA), Member of Business Valuation and Litigation Services Committee.

Financial Women's Association (FWA), Member of New Jersey Committee.

**TRIAL AND DEPOSITION TESTIMONY IN PAST FOUR YEARS**

Trial: Joyce Carroll, Maria Pavia, Verlyn L. Papillon, And Gary D. Saballos, et al. v. City And County of San Francisco et al., Superior Court Of California in and For The City And County Of San Francisco, Case No. CGC-17-562580, April 12, 2023;

Deposition: Allison Schloss vs. City of Chicago et al., Maureen Bresnahan vs. City of Chicago et al., Melissa Tapia vs. City of Chicago et al., United States District Court For The Northern District Of Illinois Eastern Division, March 15, 2023;

Deposition: Joyce Carroll, Maria Pavia, Verlyn L. Papillon, And Gary D. Saballos, et al. v. City And County of San Francisco et al., Superior Court Of California in and For The City And County Of San Francisco, Case No. CGC-17-562580, February 14, 2023;

Deposition: Graham Chase Robinson vs. Robert De Niro and Canal Productions, Inc., United States District Court Southern District of New York, Case No. 1:19-cv-09156 (LJL) (KHP), April 28, 2022.

Deposition: Christine Walika vs. American Bankers Association, The Superior Court for The District of Columbia, Civil Division, Civ. Action No. 2018 CA 007374 B, November 10, 2021.

Deposition: Adrian Arrington, et al v. National Collegiate Athletic Association, Civil Action No. 1:11-cv-6356, United States District Court, Northern District of Illinois, November 20, 2019.

Deposition: Adam Sandler v. Montefiore Health System, et al, Civil Action No. 1:16-cv-02258-JPO, United States District Court, Southern District Of New York, December 19, 2018.