# EXHIBIT 1

# KEYHILL SHEORN, MD

3801 Commodore Point Place   Midlothian, Virginia  23112
804-323-0003   Sheorn@mac.com
www.KeyhillSheornMD.com

PLAINTIFF: Karen Iovino
REFERRED BY:  Ward & Berry, PLLC
DATE OF BIRTH:  05/17/1967
DATE OF INCIDENT:  August 2017
CASE NO.:  5:21-CV-00064-TTC
EVALUATOR:  Keyhill Sheorn, MD
DATE OF EVALUATION:  11/28/2023

## I.    INTRODUCTION

### A.    QUALIFICATION, LIST OF CASES, AND STATEMENT OF COMPENSATION

I, Dr. Keyhill Sheorn, am a psychiatrist and solo practitioner since July of 1989 under the name Keyhill Sheorn, MD, specializing in the diagnosis and treatment of Posttraumatic Stress Disorder.  In addition, I am an Associate Professor at VCU Medical College of Virginia Department of Psychiatry where, as the Director of Psychodynamic Psychotherapy, I train the residents in the diagnosis and treatment of general psychiatric disorders.  I am the recent past president of the Virginia Psychoanalytic Society and serve as a liaison between the community analysts and MCV Department of Psychiatry.

A copy of my CV including my last 10 years of publications is attached to this report as Exhibit A. A list of cases I have testified in as a witness for the last 4 years is attached as Exhibit B. My fee schedule which states the compensation I am receiving for the study and testimony in this case is attached as Exhibit C.

### B.    RETENTION IN THIS MATTER

Karen Iovino, DVM was working as a veterinarian with Michael Stapleton Associates, Ltd. d/b/a MSA Security ("MSA") at the Canine Validation Center in Winchester, VA.  After making a protected whistleblower disclosure, Dr. Iovino claimed that MSA retaliated against her.  She is referred for an independent medical evaluation to determine her current psychiatric status.

## II.    DOCUMENTS REVIEWED

Christian Greene, LCSW   Counseling June 2022 - May 2023
Jacqueline Garrick, LCSW Whistleblower Retaliation Checklist assessment

Karen Iovino – Deposition Transcript and Video
OIG Report of Investigation dated 7/5/2018
OIG Determination and Order dated 10/30/2019
OIG - Management Assistance Report: CHWC Canines
Hankins & Hankins Vocational and Rehabilitation Economic Consulting Assessment

As discovery is ongoing, I reserve the right to supplement the materials I have reviewed in rending my opinions. I reserve the right to supplement my opinions as appropriate.

SUMMARY FROM DOCUMENTS

Documents from the Office of the Inspector General are available.  On 7/5/18, a Report of Investigation was prepared.  It outlined the events relating to Dr. Iovino's August 4, 2017 complaint alleging that MSA had suspended her in retaliation for making a protected whistleblower disclosure.  She also alleged that MSA required her to apply for the full-time conversion of her part-time job; did not select her for the full-time position; and terminated her part-time employment.  OIG concluded that MSA committed retaliation against Dr. Iovino.

On 10/30/19, OIG issued a Determination and Order stating that, after a review of the administrative record, the Department of State determined that MSA Security did not subject Dr. Iovino to reprisal.  According to the OIG Determination and Order, Dr. Iovino stated that she had been aware that her part-time position was being terminated and she had not decided if she wanted the full-time position.  She did not expect there would be competition if she did want the position.  She alleged that she'd received assurances from the Lead Veterinarian that she would be offered the job.  However, the 10/30/19 Order states, 'it does not appear that Dr. Iovino can reasonably claim that an alleged oral job offer made by a fellow employee who is neither an officer of the corporation nor in its personnel office and which is otherwise unsupported by circumstantial evidence can be held to be binding on the corporation.'  The full-time position went to the superior, of four, applicants and not to Dr. Iovino.  Her difficult personality was mentioned to be problematic.  The Order denied the relief.

In December of 2019, OIG prepared a Management Assistance Report regarding the Continued Health and Welfare Concerns (CHWC) for Antiterrorist Assistance Explosive Detection Canines.  OIG was concerned that the Department of State had not taken adequate steps to protect the health and safety of the dogs provided to some foreign partner nations.  Recommendations were made to 'cease providing additional canines to Jordan and Egypt until there were plans in place to ensure their health and welfare and to provide continuous monitoring of their care.'

Dr. Iovino met with licensed clinical social worker Christian Greene for a brief 15 - minute introduction on 5/25/22.  Ms. Greene diagnosed her with a mental disorder not otherwise specified (diagnosis code F99.)  They had a first session a month later, on 6/22/22.  Ms. Greene documented that it was 'clear that there is childhood abuse and neglect' as well as the loss of her sibling at age 17.  Ms. Greene noted that these issues were only touched on 'given the

2

sensitivity.'  It was documented next that Dr. Iovino was a whistleblower and needed some additional support 'regarding coping skills.'  Ms. Greene said there were no safety concerns.

Ms. Greene documented that Dr. Iovino had a trauma history, a history of domestic violence, and some chronic pain.  She was anxious and sad.  Dr. Iovino also reported that she was angry, disruptive, impulsive with poor impulse control, and she was hostile and aggressive.  The goal of therapy was to reduce her symptoms.  She was taking Wellbutrin for 'exhaustion and hormones' but not for depression.

They met a week later, on 6/29/22.  Dr. Iovino reported at this session that her partner was supportive and she enjoyed riding and working with animals.  They talked about the impact of what Dr. Iovino referred to as the SLAPP suits.

Ms. Greene met with Dr. Iovino again on 7/6/22.  They worked on coping skills.  Ms. Greene assigned homework at each session.  The diagnosis F99 continued.

Dr. Iovino was traveling abroad and met with Ms. Greene again on 7/27/22.  They 'caught up' and reviewed her homework.  Dr. Iovino had become anxious reading over litigation notes.  The pending legal stressors left her 'emotionally exhausted.' She was disappointed to have lost some relationships due to the whistleblowing.  She struggled with how much information to share with her primary relationships so they would understand her stress and irritability.  She had trouble sleeping and was to start a sleep journal.  She had financial strain.  They worked on improving her coping skills.

At the next session on 8/3/23, Dr. Iovino reported that the stress of litigation was disrupting her daily life.  She was disturbed that, five years now into her whistle-blowing experience, she was (according to her) still being pursued by a SLAPP suit.  They discussed her sense of safety.  She was encouraged to tell people, 'I don't need you to understand, I need you to respect it.'  Her sleep journal revealed that her sleep was disrupted frequently due to her anxiety about the pending litigation.  They discussed breathing techniques.  Diagnostic testing was discussed.

On 8/10/22, Ms. Greene noted that a hearing was pending on 'the SLAPP suit' and the whistleblower suit was still moving forward.  Dr. Iovino was stressed by the pending litigations.  Testing showed her to be moderately anxious and depressed, as well as moderately angry.  Ms. Greene also administered a quiz for autism.

On 8/17/22, Dr. Iovino and Ms. Greene talked about her interactive style and her disappointment in both personal and professional relationships.

The two met again on 8/24/22.  The hearing had been suspended.  Ms. Greene documented her concern with Dr. Iovino's 'emotional dysregulation.'  She had some interpersonal difficulty at work.  She was encouraged to inform her partner, 'I just need to vent.'  She was encouraged not to be so reactive.  At the next week's visit, she had been "spinning out of control" after receiving a legal document she didn't understand.  She was reassured that this is what whistle-blowers have to go through.  She was encouraged to focus on more positive issues.  She was attributing hair loss to stress.

3

Dr. Iovino met with Ms. Greene four times in September.  On 9/5/22 she reported that, personally, she'd had an amazing week.  Ms. Greene planned to explore symptoms of PTSD rather than just generalized anxiety and depression.  Ms. Greene continued to document that there were no safety concerns.

On 9/14/22, Ms. Greene prepared a four-page record to document symptoms of PTSD.   She noted that Dr. Iovino had some primary trauma related to watching and learning some aspects of her job.  She'd had some early childhood trauma with her parents' mental health and with the death of her sister. Dr. Iovino continued to have critogenic stress.  She was still taking Wellbutrin for a medical diagnosis of exhaustion and hair loss, not depression.

Under the heading of 'Diagnostic Information,' Ms. Green documented that she felt that Dr. Iovino met Criterion A for PTSD because she had been both directly and indirectly exposed to the traumatic events; she had heard that a violent or accidental traumatic event had occurred to a close family member; and that she had been repeatedly exposed to aversive details of traumatic events.  She met Criterion B in that she was having recurrent and involuntary memories of the traumatic event, as well as flashbacks and dissociation; and she had intense psychological and physiological distress with those memories.  She attempted to avoid that stimulation and so met Criterion C.  Ms. Greene documented that Dr. Iovino recalled all the important aspects of the traumatic events.  She had negative thoughts about herself and had distorted thoughts about the events and consequences.  Ms. Greene included Criterion D6 and said that Dr. Iovino felt detached and estranged from others and from her previously enjoyable activities and emotions.  She was said to meet Criterion E because she was hypervigilant and had trouble staying asleep.  Her symptoms were present for more than a month and affected her personally and professionally.  Ms. Greene felt that Criterion H was not applicable.  Criterion H states that the *'disturbance is not attributable to the physiological effects of a substance (medication or alcohol) or another medical condition.*'

On 9/19/22, Ms. Greene wrote that Dr. Iovino's traumatic childhood events 'did not reach diagnosable status.' But concern for her own safety because of whistleblowing did, as did Dr. Iovino's concern for the dogs placed overseas.  It was Ms. Greene's opinion that this would be diagnosed as Complex PTSD and now five years later she was in the acute phase.

At the next session on 9/28/22, Ms. Greene diagnosed Dr. Iovino with Acute PTSD.  She had taken a week for equestrian events and had been able to relax away from the stress of litigation.  She was disappointed not to be involved in the hurricane rescue effort.  Dr. Iovino was attempting to advocate for the protection of "the animals that serve us and if the animals are injured/not trained - endangering the lives of the military they serve present or international."

They met five times in October of 2022.  On 10/5/22, Ms. Greene defined the terms used in the Whistleblower Retaliation Checklist: Gaslighting, Mobbing, Marginalizing, Shunning, Devaluing, Double binding, Accusing, Physical and Emotional Violence.  This was in prep for completing the checklist.  On 10/12/22, Dr. Iovino was frustrated and physically sick that the litigation took so much of her time, money, and energy.  The rest of the note was cut and pasted from the week before.  At the next session, the two reviewed the events of the week and

4

continued to review the vocabulary for the checklist.   Her primary stressor was said to be 'the pending litigation that is in response to her whistleblowing to protect vulnerable animals.'  On 10/24/22 and 10/25/22, they talked about litigation being "a heavy cloud that follows every life decision."

In November, Ms. Greene and Dr. Iovino continued to work on the Whistleblower Retaliation Checklist.  Her life outside the litigation was 'relatively calm, swim or rides once or twice a week.'  They met on 12/27/22 and discussed her pending court appearance in January.

On 1/12/23, Dr. Iovino reported the stress of having her court date postponed.  Her job was stressful due to Covid.  She was encouraged to stay calm and 'take the venom out of the discussion.'  That was reiterated the next week and she was encouraged again not to take things personally.  In February she had some pain from a pinched nerve and Herpes Type I breakouts.  Riding helped reduce her stress.  Ms. Greene documented that Dr. Iovino was suffering from 'Severe Whistleblowing Retaliation.'  The notes become reiterative.

They met twice in March, and again, the notes repeat themselves.  Dr. Iovino or Ms. Greene appeared to devalue Dr. Iovino's coworkers.  It is documented that Dr. Iovino has a 'healthy relationship' with her partner and enjoyed her leisure time.

Dr. Iovino started a better paying job.  There were no immediate safety concerns in April, but Ms. Greene documented that they had planned for safety concerns regarding litigation.  Dr. Iovino was burned out and stressed with people not saying thank you.  One of the 'main witnesses in her case' committed suicide.  This was stressful and Dr. Iovino reported that she cried for three hours.  On 4/27/23, Dr. Iovino reported that she planned to go to a horseshow because she did not want to be in her 'professional head right now.'

Ms. Greene met with Dr. Iovino in May for a total of five times.  The notes dated 5/4/23 and 5/11/23 were nearly identical to 4/27/23.  She'd had some nice time off and the horse show went well.

On 5/15/23, a Whistleblower Retaliation Checklist assessment was conducted by licensed clinical social worker Jacqueline Garrick.  Dr. Iovino worked part-time as a veterinarian for MSA, a federal contractor to train and validate explosive detection canines.  Dr. Iovino disclosed that there had been gross mismanagement of the contract; abuse of authority; and regulatory violation.  The OIG (Office of Inspector General) investigated and reportedly substantiated Dr. Iovino's complaints.

Ms. Garrick, who founded a nonprofit organization called Whistleblowers of America, spent some time providing peer support to Dr. Iovino.  She assessed the impact that retaliation had on Dr. Iovino's psychosocial functioning.  Based on her reported symptoms, Ms. Garrick diagnosed Dr. Iovino with posttraumatic stress disorder and a persistent depressive disorder.  Ms. Garrick determined these diagnoses were due to the trauma she suffered.  Her overall screening with Ms. Garrick's Whistleblowing Retaliation Checklist gave her a moderate score of 48.

5

It was Dr. Iovino's perception that working for MSA became hostile in 2017 when she started to raise concerns and protest for change.  When her supervisor, Zane Roberts, was demoted and Michael Ratcliff became her direct supervisor, she said the hostility compounded.

The retaliation was said to have come in the form of MSA failing to promote her to a full-time position as she had been offered before her whistleblowing.  Her position was terminated in August of 2017, she reported, after she had voiced her concerns.  Ms. Garrick documented that Ms. Iovino was 'again targeted by MSA for additional retaliation' because she was interviewed for a December 2019 NBC News program about the canines.  Details of that retaliation are not documented.

Ms. Garrick documented that Dr. Iovino's 'sense of traumatic stress' stemmed from her termination and the two SLAPP suites filed by MSA against her, her husband, and their farm.  The suits were filed 'because of her cooperation with the news story about the state of the canines sent overseas.'

At the time of the evaluation, Ms. Garrick documented that Dr. Iovino had to "work every day to stay afloat."  She stated that Dr. Iovino and her husband had to make constant choices about what to do to stay fiscally solvent, and that she was "working three jobs" - listing them to be her work at a veterinarian clinic; taking care of her farm and animals; and challenging MSA"s retaliation.  Ms. Garrick documented that Dr. Iovino was 'anxious about where they will be able to get the money to survive.'

In her report, Ms. Garrick defined the term 'gaslighting' as the psychological manipulation of someone to the point that they question their own memory, perception, and sanity.  She then qualified, however, that Dr. Iovino, throughout this process, 'had not had others question the legitimacy of her memories or the facts she provided' and '[a]lthough MSA and State officials tried to get her to minimize her concern, they never disputed the limits legitimacy of the harm to the dogs.' Ms. Garrick continued: 'Therefore, her trust in her own judgment has not been diminished.'

Ms. Garrick documented that Dr. Iovino felt she had been "mobbed" by Josh Carter, a Department of State employee.  She felt she had been marginalized by having her work assignments minimized and by not having been given enough resources to do her job.  She felt humiliated, disrespected, and belittled in front of others.  The stated example was that Josh Carter 'did not give her credit for knowing what to do' to stabilize a dog with hyperthermia.  'His comments were a slight to her and her work and diminished her capacities in front of her colleagues, company, and government superiors.'  She felt humiliated after being told that 'she worked too hard and expected too much from others and she should stop asking for help.'  Because of this, Dr. Iovino said she felt threatened and betrayed.

Ms. Garrick documented that Dr. Iovino was disgruntled with her new job and "hates it" although 'she knows she is lucky to have a job right now.'  Dr. Iovino felt the job was not as rewarding as it used to be.  The clinic was short-staffed and she felt overworked.  She got no breaks and had to respond to critical cases every hour.  She had "horrible shifts, but needs to make money to live."

6

Dr. Iovino felt her reputation had been harmed within the community of veterinarians who cared for working dogs. In the greater veterinarian community, she did not believe others knew about her situation. But, Ms. Garrick noted, 'she felt alienated from others and ignored by many of the people involved in her chain of command.' She felt ignored, ostracized, and terminated and 'her sense of belongingness' was thwarted. She felt isolated from others, even close friends and confidants because they saw the retaliation and feared it might happen to them.

Dr. Iovino felt she had been devalued when her work assignments were changed and when she was not promoted to full-time. She felt she had been put in a double-bind by not being given the resources she needed to properly care for the canines. She felt she had been blackballed because of the whistleblowing and has been under-employed since. She was having to work harder to make ends meet and had less time to see her husband and family.

Dr. Iovino felt she was improperly terminated just prior to the end of her contract when she expected to be promoted to full-time. She was told she was fired because she threatened to talk to the press. But "in reality, it was retaliation because she had shared her concerns and information with the State Department OIG."

Ms. Garrick documented that Dr. Iovino felt bullied when she had been reprimanded for doing a good job. 'The bullying and intimidation have left her very fearful for her safety and security.'

Listed symptoms included a decreased ability to concentrate and stay focused; nightmares; worry about the dogs and others involved with them; financial worries; disillusionment about fairness and justice; suspiciousness; flashbacks; panic; low self-esteem; social withdrawal; isolation; and suicidal thoughts. "[s]he has given up her hobbies, sports, relaxation, and recreational activities."

Although she reported intrusive thoughts, Ms. Garrick documented that Dr. Iovino was able to "push the intrusive thoughts aside" in order to take care of the animals.

Ms. Garrick documented that she heard examples of nepotism, cronyism, and favoritism in MSA's hiring process. Dr. Iovino felt as if she were discriminated against for being an older woman.

Ms. Garrick documented that Dr. Iovino was having active suicidal thoughts.

In conclusion, Ms. Garrick assessed that Dr. Iovino was having health problems due to the stress. These included menopausal symptoms, hypertension, anorexia. However, she is exercising regularly. She was being treated for her medical problems and for PTSD.

Ms. Garrick went through the diagnostic criteria for PTSD. She felt Dr. Iovino had been exposed to traumas significant enough to meet criterion A for actual or threatened death. These traumas were listed as being exposed to dogs being harmed or injured and seeing photographs and reports of dogs being harmed or injured. She also met criterion A, Ms. Garrick stated, because of her termination, the SLAPP suits, and her financial insecurity.

7

Ms. Garrick opined that Dr. Iovino met criterion B because she had intrusive thoughts and ruminations about her situation.  She had nightmares about the dogs.  She met Criterion C because she avoided social situations and she was suicidal and did not want to deal with life anymore.  She met Criterion D because she had grief over the dogs and was disappointed by the lack of responsiveness of her chain of command.  Because she lost her profession, she lost her sense of purpose and meaning.  Ms. Garrick also felt that Dr. Iovino met Criterion E in that she gets lost in her own thoughts and has a hard time concentrating on other things.  She is suspicious that she is being tracked and so is hypervigilant.

Ms. Garrick feels that Criterion F is met in that Dr. Iovino has had symptoms for longer than a month.  Criterion G is met in that Dr. Iovino's distress had interfered with her functioning socially and occupationally.

Ms. Garrick did not address Criterion H.

Ms. Garrick diagnosed Dr. Iovino with Dysthymia and with PTSD related to whistleblower retaliation.

Ms. Greene's session notes on 5/17/23 and 5/18/23 contained no new content.  However, on 5/18/23, Ms. Greene wrote an open letter to whom it may concern summarizing the counseling.  She stated, 'Often with whistle blowing there is an aspect of identity disruption especially when an expert is pushed out of their field of practice when doing the right thing to protect those they serve.'  She said she was attempting to help Dr. Iovino in 'finding joy in her life.'

Bentley Hankins, PhD performed an assessment of the potential financial impact Dr. Iovino was facing since losing her job with MSA.  It was his conclusion that 'Dr. Iovino has likely sustained economic losses as a result of her August 2017 employment termination with MSA Security.'  He estimated the financial loss of past earnings as well as the potential loss from having to only work part-time.  This was based on Ms. Greene's recommendations for the duration of her work life expectancy.

On 5/25/23, Ms. Greene and Dr. Iovino continued to talk about a safety plan.  Dr. Iovino's horse was sick and she needed to stay with it overnight.  Ms. Greene continued to document that there were no immediate safety concerns.

The next available record is Dr. Iovino's deposition transcript, dated 9/6/23.  There is an accompanying video file.  The events leading up to her claim were reviewed.
At some point she was asked about the people who would have discoverable information regarding her protected disclosures and activities.  She answered, "Well, it would be with conversations with Josh Carter, but, obviously, we can't ask him."  The question was restated and she repeated, "We can't ask Josh Carter", and she smiled.  She bit her bottom lip, smiled again, and kept the expression
until some exception was taken to the fact that she was "laughing about someone that just got murdered."  Her smile did not completely fade even as her attorney attempted to minimize it.

8

She finally broke eye contact and looked down as the attorneys discussed what had just happened.

Back on track, Dr. Iovino's training was reviewed and further details of the claim were discussed. She acknowledged that she was claiming damages for PTSD. When asked the cause of the PTSD, she answered part of it was that she was currently underemployed and this affected her professional identity. She testified that, in spite of feeling despondent on some days, she was able to put on her happy face and go to work. She testified that it would be a huge burden on her if she were to owe MSA some money.

Dr. Iovino was walked through the counselor's records. She recalled the conversations about PTSD and recalled running through a checklist of symptoms. She qualified that the traumatic event that she actually witnessed was the death of her sister, as well as being a part of her family's grief. She stated that her traumatic event was "not being able to put SOPs in place for the dogs and being worried about people dying." She described her dreams as being about her signing dogs' health certificates and the dogs leaving when she knew they shouldn't leave. She described having flashbacks over losing her job and her grief over that. When asked to describe what caused her to experience intense or prolonged psychological distress, she said that she ruminated about not being able to help the dogs. She added that she also worried about humans dying.

She was asked about the report of other symptoms that Ms. Greene documented. Dr. Iovino said when she had intrusive thoughts she pushed them out of her head. She said she avoided working with dogs in the emergency room because she didn't want to be recognized. She didn't like driving toward Winchester and took a different route. She said she didn't like to talk about the events. When asked about Criterion D, the negative changes that affect some traumatized people, she said she had negative thoughts about herself because she couldn't "enact the changes I wanted to with the canines."

Her detachment from others, Dr. Iovino testified, was not due to the loss of her sister, was not due to domestic violence, and was not due to some other trauma. Rather, she said, it was due to the loss of her job. She described 'hypervigilance' as not wanting to run into people from the validation center. She said that these people had the training, means, and access to weapons and explosives. Two people had been murdered and she felt unsafe. She had been uncomfortable in a meeting when she was told she worked too hard.

Dr. Iovino did not deny that the primary focus of the therapy was about the litigation. She agreed that her symptoms were due to the legal process.

The deposition was ended.

III.    EXPERT OPINION

HISTORY OF PRESENT ILLNESS

9

Dr. Iovino was early for the evaluation.  She was friendly as she greeted the examiner and was fully cooperative throughout.  The purpose of the evaluation was explained, and she understood that the examiner would not be a treating psychiatrist.  The limits of confidentiality were reviewed and she agreed to proceed. She said that she was glad to have a report written and circulated so that everyone would be informed.

Dr. Iovino was asked if she had a previous diagnosis of PTSD.  She said that traumatic things had happened in her life "but I cope."  She said she'd had to deal with difficult things in her job, like euthanasia.  She said she started to see Ms. Greene because "I knew I needed help cause I couldn't get through my day."  She said she had reached out to Ms. Garrick first, who had been a whistleblower, and was referred to Ms. Greene who had been a whistleblower "and was very active in the whistleblower community."  She has had symptoms now for six and a half years but feels the Wellbutrin helps.  When she tried to stop it, she felt as if her energy decreased.

She was asked if she understood why Ms. Greene had diagnosed her with 'acute' PTSD, given that her symptoms had been present for years.  She said that just before the deposition she was crying the whole time.  She said she uses Ms. Greene to vent to, saves it up and then tells her everything.   She said she wants to continue to see "Christine," but does not want group therapy.  She doesn't want to hear other people's problems.

Dr. Iovino said she went to see attorney Nate Adams in 2017 about her concerns and her impulse to be a whistleblower.  She said he cautioned her that she would be fired and she disagreed with him.  But, she added, "What kind of person would I be if I hadn't done it?"  She said, "It was not only the moral thing to do for the dogs, but also the lives lost because they were not cared for.  I think about it every single day that we sent dogs to Jordan.  The day ISIS invaded Israel I had to turn off the news cause I didn't know if our dogs missed explosives.  I took an oath.  I had to do the right thing."

She was asked if she had known about the potential for a SLAPP suit, would she have done the same.  She said she had loved her job.  She'd told her husband that she had alerted leadership at the Validation Center.  He said he didn't care about the financial cost, but the people couldn't get away with what they were doing.  She said there were two problems with the SLAPP suit.  "One, it is against the law.  And two, they said it harmed their business but their contracts actually increased from $95 million to $200 million."  Dr. Iovino explained that in 2020 she was accused of disclosing to the media.  Arlington Circuit Court non-suited "cause they didn't have proof.  This caused stress to all involved with a chilling effect."

A good bit of what Dr. Iovino talked about had a scripted tone.  She seemed to be engaged with the examiner and could be spontaneous, but the evaluation had almost the feel of a testimony.  She stated, "I have always been concerned about my safety.  The Validation Center has explosives and weapons.  They are all ex-police officers.  This is why I'm scared."

She continued.  "Josh Carter, the program manager, and Pam - they thought it was murder suicide.  This caused me to feel like I was related to the murder- suicide.  I kept calling about it and after two months he said it wasn't related.  In July, another MSA employee, Jason Bower, was arrested for murder."  There was a hint of salaciousness when she said, "There were multiple

10

rounds in Pam - he already had an affair with Pam."  She grew serious and said she felt suspicious just after this happened.  She and her husband placed cameras on their property.

Dr. Iovino said that in 2019 the CDC stated that veterinarians have a high suicide rate.  "Working at the Validation Center was my dream job, but I had to go back to the ER and run off my feet.  It's older vets returning, it's understaffed.  The stress level has gone up.  I start spiraling because I had the ideal job."  She was asked what she meant by the word "spiraling".  She said she starts to ruminate about losing her job and what was happening to the dogs.  She said she did box-breathing in her car.  She laughed and said, "It really works!"  She said people at work are very understanding if she has moments of feeling overwhelmed.  She was asked about Jackie's documentation that she had suicidal thoughts about the case.  Dr. Iovino minimized that and said that she did talk to Christian about sometimes having a passive wish to "go away."

Just after saying that, Dr. Iovino's affect rallied and she urged, "I'm still pushing for legislation!  Warner, Pompeo . . ."  She dropped several other names.  "It has taken over my life.  I also want to tighten Whistleblower laws."

In a more engaged voice she said, "I'm lucky to have support and I can still get work.  Work is necessary, but not satisfying.  I joke with people and I stay positive, I don't talk about it.  It's isolated me from my friends because I want to protect them.  And my husband."

Currently, Dr. Iovino said, she was waiting for MSA to release documents.  She's anticipating trial in April for both her retaliation claim and the SLAPP suit "all rolled out into one."

She sighed and said she works ten to twelve hour shifts and has to drive to and from work an hour each way in traffic.  Before she leaves and when she comes home she has to take care of her animals.

Dr. Iovino was asked what did the diagnosis of PTSD mean to her.  She said there was a gray area for her between PTSD and depression.  But for her, she said, depression has always been short and she can get through it. She said, "I have constant anxiety about seeing a working animal on the board.  Or if I might be recognized.  I spiral then."  She was asked again to explain what she meant by the word "spiral".  She said, "I start thinking, I did the right thing and I was punished.  One dog came back to be euthanized.  One was emaciated.  Did you read the IG report on my concerns on SOP?  You should read that."  She told the story of being asked to clear a dog who had hip dysplasia and refusing to do it.  She thought there might have been some kickback going on.  She said, "They can't bully me."  Almost as an afterthought she added, "If I walked outside and saw a black lab I would have memories of it all."

She was asked if she had flashbacks.  She said, "Well, I'll remember something, but I can push it out of my mind."  She was asked about nightmares.  She laughed and said she dreamed she asked Antony Blinken if he would answer her letter.  Sometimes she'll dream of a dog who died.

Dr. Iovino was asked, next to this period of time, what had been the worst thing that happened in her life.  She said it would have been her younger sister dying in a car accident.  The sister had been "twelve going on thirteen."  After a moment's hesitation she said she had been seventeen

11

and she was driving. She added quickly that it was fine, they had all worked through it and she never felt as if her parents blamed her. "It really was just an accident." She said only her father sought counseling after the accident. "He said it was life changing for him." Neither she nor her mother went. She said her parents became overinvolved with her, she thought they were probably afraid she would die. It didn't prevent them from allowing her to ride and she 'buried" herself in her horse. When it was pointed out that she'd used the word "buried', she shrugged and didn't attend to it. She said that she'd always had a weird relationship with them. It wasn't until she was in college, or even vet school, or when she was working to pay off her school loans that she started to realize that her family was different. She noticed her friends' parents weren't like hers. She said, "They did the best they could. But mother would get vindictive and mean. Dad didn't stop it. It came to a head, she got mad at me and would withhold. It all came to a head with the first SLAPP suit. She told me, 'Well, you should have kept your mouth shut.' I asked her to go to counseling and she said no." At some point, her mother approached her and said, "Can we just forget about it?" "And I said not until you go to counseling and she said no." She and her parents are still estranged.

As Dr. Iovino described her education and work experience, she said that she initially wanted to be a medical technologist. She worked as a phlebotomist but found it "boring and people are gross." She lived in New York and mentioned that Cornell was very hard to get in, so she went out of country to Ross. She said, "I have a great long-term memory!"

Dr. Iovino said she had been "briefly depressed" after her sister died. She also was "a little depressed" when her first marriage ended. She said her husband yelled and he was like her dad "who always yelled." She was asked about the reports of domestic violence and assault in that marriage and she explained that her husband had grabbed her arm during an argument. She knew that was assault and she reported it. She said she just feels sad for him - "his mother beat him and his siblings. He wouldn't go to counseling either." She said as one of her screening tools she asked her current husband before they married if he would go to counseling if she asked him to. He answered yes.

She was asked if it felt now as if her parents' hyperfocus on her was being repeated. Again, the question did not seem to resonate. She said strongly, "No! I want the story to come out! I want it in the media! I may feel sorry for myself and I might take time to heal, but I am laser-focused on getting this out. They want to scare me."

She was asked if she felt she'd been chronically depressed. She said not with earlier events in life. But with this it has been chronic. "When I get really sad it stems from I took an oath to protect them and I didn't. There's always an undercurrent. I felt guilty at Thanksgiving cause I was having fun. Even Dave - he's a professional engineer, he took a new job. It's more travel for him, but he was bored and his work will disappear in the next few years. So, now he's working for big networking connection."

She was asked how bad was her financial strain. She said she and her husband share a car and a truck. They had not taken a vacation and they haven't bought a new car. She said they collaborate very well.

12

She was asked, of all of the difficulties during this period of time, what had been the worst moment. She said, "There were two. Probably seeing the whistleblower report from the IG because it never should have happened. I was right. And then also the IG report in September of 2019 that listed the condition of the dogs and no SOP and then in December of 2019, a vet overseas read that report and he whistleblew that he left dogs in Jordan."

She was asked her worst symptom and she said, "It's my lack of enjoyment from riding." She said her favorite horse, Walt, had rain rot from crying so many tears into his neck. She said, "My amygdala is fight or flight all the time. I'm worried about the effect of chronic stress."

Dr. Iovino stated again that she had an excellent memory. She said she spent ten hours preparing for her deposition. She said, "I remember very vividly the shift, like there was a bullseye on my back. I refused to be bullied! When I'm stressed or feel like I'm not focused I drink more water. And caffeine. Coffee, tea. I have good relationships in all the places I work now. If I'm stressed I ask them to check my math. They understand."

She said at MSA there was nepotism, no SOP, billing irregularities. She was asked, then, why she had wanted to keep working there. She said she thought she could make a change. She wanted to work full-time. She had been promised the job in February of 2017. The whistleblowing occurred in July of 2017 and she was told she had to apply for the job. On August 4, 2017, she was suspended and escorted out of the building. The worst moment, she said, was because she was the Vet-in-Charge and she wasn't allowed to reconcile the drugs before she was escorted out. She said she filed her complaint and got anxious because the Jordanian students were there because the dogs were being worked in 100+ degree temperatures. She reported that to Mike Ratcliff and he told her to take the emotion out of the job *(similar to Ms. Greene telling her to 'take the venom out of the discussion.')*. She went to acquisitions manager, Cathy Read, in the State Department because she'd been told she could talk to her without disclosure. She told her she had filed a complaint with the Inspector General and Cathy said, "Send me a copy of your complaint," which she did. Cathy Read, she said, must have told Josh Carter because others heard him say, "When I find out who the whistleblower is, I'm going to fire them."

Dr. Iovino was directed back to her symptoms. She said she did not dissociate. She has no depersonalization or derealization.

Immediately she slipped back to her grievances. She said there had been a day at work when a 16-year-old dog should have been euthanized. She said she was overwhelmed and left the room because she had ten other dogs to tend to. She was told that she didn't care. "That hurt," she said.

She said her friends are scared of retaliation due to their relationship with her. "One has two small boys. She's afraid." In spite of some friends keeping their distance, Dr. Iovino is able to make new friends - personally and professionally.

She was asked if she felt as if she were mentally ill. Her answer was that she had been married fifteen years and they did not rely on his parents for money. She said she and her husband share

13

the same values.  Her horse, Mozart, got really sick and she had to take money from her defense fund.  "Part of the claim is for attorneys fees, and time to heal.  But I am one of those people to make something positive out of it."  Her plan, she says, after her case is settled and she had some money, is to "retire and get an RV to go take care of people's animals" in underprivileged areas like someone she knew.  "I'll have to do something to get back to where I was, to continue advocacy.  Last year, October of 2022, I was bugging Senator Warner to put in from the Senate to the State Department that they have to check on the working dogs."

The mental status exam was administered.  As the evaluation was ended, Dr. Iovino leaned forward and whispered confidentially that she made about twice as much money as her husband did.  She was gracious as she left.

PAST PSYCHIATRIC HISTORY
"Briefly depressed" when sister was killed.
Peer-support   WoA (Whistleblowers of America)  April 2019
Christian Greene, LCSW   Counseling June 2022 - May 2023

FAMILY PSYCHIATRIC HISTORY
None reported.  Mother is "vindictive."

PAST MEDICAL HISTORY
Right knee - surgery staph infection 1990
Right little finger amputation - caught in manure spreader 2003
Endometriosis
Hypothyroid
Hypertension - for a year and a half
Hair loss - secondary to hypothyroid/menopause/stress

MEDICATIONS
Wellbutrin 150mg a day
Levothyroxine. 0.75mcg a day
Losartan

SUBSTANCES
Social alcohol
No tobacco

ACTIVITIES OF DAILY LIVING
Fully able to manage her daily life and affairs.

SOCIAL/FAMILY HISTORY
Born in upstate New York to intact, lower middle-class family with mother (ran a dental office), father (construction foreman), and sister.  Sister died MVA when patient was 17 years old.  She was married at age 29 and divorced after two years.

14

She met her current husband, an engineer, fifteen years ago through eHarmony. They have been married fourteen years. They live in rural Bluemont and own 13 acres. One horse has died, and so now they have two horses and one boarder. They have two dogs. Parents live in Virginia but she is estranged from them following an argument over this case about three years ago.

EDUCATIONAL/WORK HISTORY
High school
Penny Savers - helped mother with her deliveries.
Babysitting
Burger King - saved money for horse showing
Wilson College Chambersburg, PA BS in Physical and Life Sciences 1989
RA in college
Ross University West Indies - DVM 1993
Veterinarian Hospital - Queens, living at home
National Veterinarian Response Team - 15 years
Team leader during natural and man-made disasters
Veterinarian - shelters, hospital management/admin, animal welfare spokesman.
Fear Free Tier 2
Security Clearance
MSA (Michael Stapleton Associates) part-time veterinarian 10/9/15 - 8/18/17
Locums work now


LEGAL HISTORY
Strategic Lawsuit Against Public Participation (SLAPP)


MENTAL STATUS EXAM
Dr. Iovino engaged quickly with the examiner and was socially friendly and fully cooperative. She was well-groomed and neatly dressed in a sweater, gray trousers, and flat shoes. She was missing the distal two joints of her right little finger. She had minimal jewelry and there were no visible markings. Her eye contact was good and her speech was fluent with a normal rate and tone. She sat comfortably and there was no psychomotor agitation or retardation. Her mood was described as strong, her affect was full. There was no evidence of thought disorder, no delusion, no illusion. She denied any active suicidal thoughts, although she'd had a passive wish to be gone a few years ago. She had no homicidal thoughts. She was fully oriented and cognitively intact by clinical exam. She was intelligent but resisted insight. Her judgment is good by history. Similarities were intact, her proverb interpretation was limited – the burned child fears the fire because he had a trauma that involved fire. She was neurologically intact by mini-Bender.


SPECIFIC QUESTIONS
1. Does Dr. Iovino have PTSD? No. A diagnosis of PTSD can only be made after the criteria are met as laid out in the DSM-5-TR *(please see Appendix A below)*. The first criterion A states that the person must have been exposed to death or the threat of death or sexual violence. There is no

15

Criterion A in that she has not been exposed to death and there has been no threat of death.  Dr. Iovino, by her education, training, and experience, has been well exposed to hurt or traumatized animals.  While her coworkers were murdered, there is no evidence to link those killings to her, her work, or her position as a whistleblower.  She does not express grief or shock in their deaths but only as how it may affect her.  She made a joke and laughed at the death during her deposition - perhaps out of relief that it was not connected to her.  She may have some fantasy that a similar fate will find her, but her claim of retaliation certainly does not meet that criterion. There has been some effort to establish that she has a fear for her life because she knows of some people who have access to weapons and explosives.  However, PTSD is a disorder of memory, not of fantasy.  Her imagined fear of violence and her sense of having a "bullseye on her back" do not meet this criterion.  Therefore, symptoms that might be categorized as intrusive thoughts, avoidance, dispiriting, or hypervigilance would be symptoms of some other state of mind, and not of PTSD.

Dr. Iovino has specifically denied that she's had any moments of being unaware during these events.  She takes pride in her very clear long-term memory.  There can be no claim of delayed expression.  Ms. Greene's diagnosis of acute PTSD, now six and a half years after the events, is not related to any component of retaliation that is being associated with MSA.

Dr. Iovino was not able to generate any credible description of a flashback.  She said, "Well, I'll remember something, but I can push it out of my mind."  Her coping skill was documented by Ms. Greene and reported by her in her deposition.  It cannot be overstated that a bad memory is exponentially different than the near-psychotic phenomenon of a flashback. Similarly, when she was asked if she had nightmares, she laughed and said she dreamed she asked Antony Blinken if he would answer her letter.  Sometimes she'll dream of a dog who died.  Dreams of getting attention from public figures or dreams about our daily work are not consistent with traumatic nightmares.  Ms. Garrick stated that Dr. Iovino met Criterion D because she had "grief over the dogs and was disappointed by the lack of responsiveness of her chain of command.  Because she lost her profession, she lost her sense of purpose and meaning." However, being disappointed by others is not a cognitive change as mandated by Criterion D.  It is a rational feeling based on her circumstances.  In addition, Dr. Iovino did not lose her profession and is still functioning as a veterinarian.  Ms. Garrick also felt that Dr. Iovino met Criterion E in that she gets lost in her own thoughts and has a hard time concentrating on other things.  She is suspicious that she is being tracked, and so, is hypervigilant.  This also, is based in the stress of her reality and is not due to a reenactment of a trauma.  She does not meet Criterion E.

Dr. Iovino has no psychiatric diagnosis.  She has some reasonable symptoms of anxiety and depressiveness due to her stressful life - as anyone would.  It can be said that she has suffered a 'narcissistic injury,' as also documented by Christian Greene.  This is not related to a narcissistic personality.  A narcissistic injury can happen to any of us when our sense of who we are is thwarted.  Her sense of identity as a superb and valued veterinarian who has the best interest of dogs at heart has been challenged because of her job change.  She is perfectly fine operating as a general veterinarian, but, as she says, the work is not satisfying.  She feels stigmatized by these lawsuits and doesn't want to be recognized for who she feels she is now.  The word stigma means 'spoiled identity' and it can happen to any of us when we lose a job or lose a marriage or get scarred by an accident.  We don't want to be a part of 'that' group, and yet we no longer fit in

16

the "normal" group.  It feels terrible, but eventually we get beyond it and acclimate to who we have become.  Dr. Iovino consistently states that she might need some time to heal, but she will be fine and she'll get back to living her life in a way that has meaning to her.

2. <u>If she has PTSD, what caused the PTSD</u>?  There is no trauma-related illness.  There is no PTSD, past or present, acute or chronic.

3. <u>If she has PTSD, does it prevent her from working full time</u>?  She does not have PTSD.  She is fully able to work full-time in any line of work she is trained for.

4. <u>If she does not have PTSD, does she suffer from any other emotional injuries</u>?
It is understandable that Dr. Iovino has some underlying sadness and disappointments from her childhood, from the terrible events surrounding her little sister's death, and from her mother's vitriol.  While she claims that is all resolved, there were tinges of how it still affects her.  This was primarily evident in how quickly she rejected any attempt at insight or solace.  Her providers have documented that there is no element of trauma related to past incidents and it must be left at that.  Dr. Iovino has found a way to sublimate earlier losses and has good ego strength and resiliency.

There is no emotional injury related to her sense of retaliation by MSA.  When she was asked if she felt as if she were mentally ill, her answer centered around her precarious financial situation. She explained the financial strain she was under with attorney fees, caring for her horses, her husband's new job that pays less.  She outlined her future fantasy to have the financial freedom to provide veterinarian services for underprivileged communities.  In spite of the current stressors, she said she is the type of person who can put a positive spin on things.  Although she has some anxiety about the current events, she is optimistic about the outcome and has solid plans for new opportunities.  She has no psychiatric disorder connected to the events associated with MSA.

5. <u>If she suffers from other emotional injuries, what are they and what are the causes</u>?  As stated above, there is no emotional injury related to MSA.  While Dr. Iovino is emotional about her current circumstances, she is anxious as anyone would be who is facing legal proceedings.  She is secure with the support from her counselor, her husband, and her friends.  She relies on her good relationships at work.  She feels people are understanding that she might be occasionally over-whelmed by all she has to do in a day - including her responsibilities at home.  When asked whether she feels affected by the events surrounding her sister's catastrophic death, she said she had a brief depression but that passed.  She has had difficult moments associated with the care and treatment of sick and injured animals.  However, she feels she has always rallied with stressful periods and does not feel as if she has had any sustained depression until faced with the current legal difficulties.  She said she worries about her amygdala and the effects of sustained stress - but then negates that concern by outlining her good coping skills, excellent support system, and her resilient, positive nature.  Dr. Iovino carefully outlined her full participation and decision-making process in the events that have led to the current litigation.  While stressful, she is clear that she feels she did the right thing, regardless of the sequela.  Twice during this evaluation, Dr. Iovino said that she was not going to fall prey to bullying.  Although Ms. Greene

17

spent a good bit of time prepping her for the whistleblower checklist inventory, it is notable that her organic expression of her experience belies some of the answers in that inventory.

6. <u>Are her emotional injuries caused by the litigation or other sources?  Is there any indication that the emotional injuries are at all related to MSA</u>?  Again, Dr. Iovino has no emotional injury related to MSA.  She has anxiety and stress as anyone would, given her current legal circumstances.  It has been documented, and she confirms, that her stress will be removed when these proceedings are concluded and she can get back to her chosen work and her advocacy.  She anticipates her financial strain will be resolved and she will have the financial freedom to retire and volunteer her time to worthy causes.

Dr. Iovino's symptoms, rather than PTSD or emotional injury, are far more likely due to her situational reactivity; character structure; iatrogenic forces; secondary gain; and critogenic pressures.  They can be expected to resolve when litigation is completed.  She values the counseling with Ms. Greene, and this could continue electively if she chooses.  The treatment is not related to any issues with MSA.  These are my opinions based on a reasonable degree of medical certainty.

*Keyhill Sheorn, MD*

Keyhill Sheorn, MD
Psychiatrist


<u>12 December 2023</u>
Date

18

APPENDIX A

A.   DSM 5-TR CRITERIA FOR PTSD

B.   Criterion A: Stressor


C.   The person was exposed to death, threatened death, actual or threatened serious injury, or actual or threatened sexual violence:

1.  Direct exposure.
2.  Witnessing, in person.
3.  Indirectly, by learning that a close relative or close friend was exposed to trauma.  If the event involved actual or threatened death, it must have been violent or accidental.
4.  Repeated or extreme indirect exposure to aversive details of the event(s), usually in the course of professional duties (e.g., first responders, collecting body parts; professionals repeatedly exposed to details of child abuse). This does not include indirect nonprofessional exposure through electronic media, television, movies, or pictures.

D.   Criterion B: Intrusion symptoms
Presence of one or more of the following intrusion symptoms associated with the traumatic event, beginning after the traumatic event occurred:

1.  Recurrent, involuntary, and intrusive memories.
2.  Recurrent distressing dreams.
3.  Dissociative reactions (e.g., flashbacks) which may occur on a continuum from brief episodes to complete loss of consciousness.
4.  Intense or prolonged distress after exposure to traumatic reminders.
5.  Marked physiologic reactivity after exposure to trauma-related stimuli.

E.   Criterion C:  Avoidance
Persistent effortful avoidance of distressing trauma-related stimuli after the event evidenced by one or both of the following:

1.  Trauma-related thoughts or feelings.
2.  Trauma-related external reminders (e.g., people, places, conversations, activities, objects, or situations).

F.   Criterion D:  Negative Alterations in Cognitions and Mood
Negative alterations in cognitions and mood that began or worsened after the traumatic event, as evidenced by two or more of the following:

1.  Inability to recall key features of the traumatic event
2.  Persistent (and often distorted) negative beliefs and expectations about oneself or the world (e.g., "I am bad," "The world is completely dangerous.").
3.  Persistent distorted blame of self or others for causing the traumatic event or for resulting consequences.

19

4. Persistent negative trauma-related emotions (fear, horror, anger, guilt, shame).
5. Markedly diminished interest in (pre-traumatic) significant activities.
6. Feeling alienated from others (e.g., detachment or estrangement).
7. Constricted affect: persistent inability to experience positive emotions.

G.    Criterion E: Alterations in Arousal and Reactivity
Trauma-related alterations in arousal and reactivity that began or worsened after the traumatic event, as evidenced by two or more of the following:

1. Irritable or aggressive behavior.
2. Self-destructive or reckless behavior.
3. Hypervigilance.
4. Exaggerated startle response.
5. Problems in concentration.
6. Sleep disturbance.

Criterion F:
Duration of the disturbance (Criteria B, C, D, and E) is more than one month.

Criterion G:
The disturbance causes significant distress or impairment in social, occupational, or other important areas of functioning.

Criterion H:
The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition.

**Specify whether:**

**With dissociative symptoms:** The individual's symptoms meet the criteria for posttraumatic stress disorder, and in addition, in response to the stressor, the individual experiences persistent or recurrent symptoms of either of the following:

1. **Depersonalization:** Persistent or recurrent experiences of feeling detached from, and as if one were an outside observer of, one's mental processes or body (eg, feeling as though one were in a dream; feeling a sense of unreality of self or body or of time moving slowly.)

2. **Derealization:** Persistent or recurrent experiences of unreality of surroundings (eg, the world around the individual is experienced as unreal, dreamlike, distant, or distorted).

20

# Exhibit A

# KEYHILL SHEORN, MD

3801 Commodore Point Place   Midlothian, Virginia  23112
804-323-0003   Sheorn@mac.com
https://KeyhillSheornMD.com

## QUALIFICATIONS

Solo Practice of Psychiatry - Specializing in the diagnosis and treatment of Post- traumatic Stress Disorder 1989 -  current

Director, Psychodynamic Psychotherapy Training - VCU/MCV Department of Psychiatry 2020 - current

President, Virginia Psychoanalytic Society 2014 - 2016

President-elect, Virginia Psychoanalytic Society 2012 -2014

Director, Psychotherapy Training - VCU/MCV Department of Psychiatry 2011 - 2020

Medical Back-up and Supervision of Psychologists and other Mental Health Professionals 1989 - current

Associate Professor – Teaching psychiatric residents in specialty areas of Diagnostic Interviewing, Mental Status Exam, Psychodynamic Psychotherapy, Object Relations, Human Psychological Development, Group Therapy 2009 - current

Expert - Post-Traumatic Stress Disorder 2009 - present

## PRESENTATIONS

Pro-Bono Conferences Effects of Domestic Violence on Children 1999

American Bar Association Conference on Post-Traumatic Stress Disorder 2001

Psychopharmacology School of Psychology and Social Work VCU 2000 -2002

NIMH Consultant - Medical Communication and Research 2005

American College of Forensic Psychiatry 'How to Begin a Forensic Practice' October 2006

Virginia Psychoanalytic Society  'The Woman Who Dreamed of Dracula'
Sexual Trauma in a Young Child  January 2006
American College of Forensic Psychiatry  'PTSD or NOT? Iatrogenically-induced
Post-Traumatic Stress Disorder' March 2009

Medical College of Virginia Grand Rounds 'PTSD or NOT? Iatrogenically-induced
Post-Traumatic Stress Disorder'  October 2009

American College of Forensic Psychiatry 'How to Deal with Difficult Retaining
Attorneys  April 2010

American College of Forensic Psychiatry 'Appearing before the Board of Medicine'
March 2011

Richmond Psychiatric Society 'The Use of Psychosis as a Defense' October 2012

Medical College of Virginia Grand Rounds - 'Newest Trends in Medicine - Can Psychiatry
Lead the Leading Edge?' March 2012

Psychiatric Society of Virginia - 'The Woman Who Dreamed of Dracula' The
Relevance of Psychotherapy Today March 2013

Alaska Northern Insurance - 'Trade Secrets from an IME Psychiatrist' Sept 2013

Alaska Mutual Insurance - 'Trade Secrets from an IME Psychiatrist' Sept 2013

Liberty Mutual Insurance - 'Trade Secrets from an IME Psychiatrist' Sept 2013

SEAK 35th Annual National Workers' Compensation and Occupational Medicine
Conference 'PTSD within the Workplace: Diagnosis and Misdiagnosis'
Chicago, Illinois June 2015

Richmond Psychiatric Society 'Psychodynamic Principals in the Treatment of Trauma'
April 2017

Strafford Publications CLE Webinar  'Post-Traumatic Stress Disorder Claims in Auto
Accident Cases'  October 2017

Virginia Psychoanalytic Society `Technique of Psychodynamic Principles in the
Training of Resident Psychiatrists' February 2018

2

Psychiatric Society of Virginia Spring Meeting `Psychodynamic Developmental Theories and Stages and How They May Guide Formulation of Treatment' Mar 2018

Virginia Commonwealth University/Medical College of Virginia Hospitals Grand Rounds 'A Missing Piece – a History of the Diagnosis and Treatment of Psychopathy' November 2018

Northern Virginia Mental Health Institute Grand Rounds 'A Missing Piece – a History of the Diagnosis and Treatment of Psychopathy' March 2019

Worker's Compensation Seminar McCandlish Holton Law 'PTSD - Diagnosis and Treatment' 10/14/2020

MCV Department of Psychiatry 'The Woman Who Dreamed of Dracula - Sexual Trauma in a Young Child.   April 2021

Allied World Virtual DBA Symposium  'Understanding the DBA PTSD Claim and the Future Impact from the Afghanistan Withdrawal'  January 2022

Strafford Publications CLE Webinar 'Post-Traumatic Stress Disorder Claims in Auto Accident Cases' (October 2022)


## EMPLOYMENT

01/2020 - Present Director, Psychodynamic Psychotherapy Training  VCU/MCV Department of Psychiatry

09/2011 - 01/2020 Director, Psychotherapy Training VCU/MCV Department of Psychiatry

03/2010- present Human Psychological Development Seminar VCU/MCV

07/2005- present Co-Chairman Clinical Faculty Committee VCU/MCV

07/2005- present  Residency Education Training Committee VCU/MCV

09/2004 – 06/07  Consultant to Judge Kim O'Donnell's Family Drug Treatment Court

07/2004 - present  Group Therapist for Resident Trainees VCU/MCV

02/2004 - present  Physician for Human Rights, Pro-Bono adjunct

3

08/2000 - -06/03 Clinic Psychiatrist and Supervisor University Counseling
Services VCU Richmond, Virginia

07/1997-present  Associate Professor VCU/MCV Department of Psychiatry

07/1991 -present  Group Therapy Psychiatry Resident Training VCU/MCV
07/1989 - present  Solo Practice Psychiatry Keyhill Sheorn, M.D.

07/1989 - 07/1991  Group Therapy University Counseling Services VCU

10/1985 - 10/1991 Physician to the American Weight Loss Clinics with primary focus
on medical management of patients with Eating Disorders

05/1979 - 08/1980 Trauma ER Coordinator, Operating Room Technician - Emory
Hospitals, Atlanta, Georgia

05/1978 - 08/1981 Surgical Technician/Trauma Technician Richland Memorial
Hospital, Columbia, South Carolina

08/1974 - 05/1978 Mental Health Technician South Carolina State Hospital
Forensic Unit Columbia, South Carolina


## PROFESSIONAL AWARDS
Favored Teacher Award Resident Body Award VCU/MCV 2016

Nicest. Person. Ever. Residents' Award VCU/MCV 2015

Distinguished Teacher Award for Innovative Teaching VCU/MCV 2015

Joel J. Silverman, MD Award for Excellence in Medical Education 2014

Favorite Teacher Resident Award VCU/MCV 2012

Most Effective Resident Supervisor VCU/MCV 2004

Most Effective Group Therapy Supervisor VCU/MCV 2004

Most Effective Leader Diagnostic Interview Seminar VCU/MCV 2004

4

Most Effective Lecturer Psychoanalytic Seminar VCU/MCV 2004


## PROFESSIONAL ASSOCIATIONS AND MEMBERSHIPS

American Medical Association

American Psychiatric Association

Richmond Psychiatric Society

Virginia Psychoanalytic Society - President 2014 - 2016

Psychiatric Society of Virginia

American Association of Directors of Psychotherapy Training

American College of Forensic Examiners

America Academy of Psychiatry and the Law

American College of Forensic Psychiatry


## EDUCATION

07/1988 - 06/1998 Object Relations Theory Study Group

09/1987 - 05/1989 Advanced Psychodynamic Psychotherapy Training, Washington School of Psychiatry, Georgetown, D.C.

07/1985 - 06/1989 Residency Training Psychiatry, MCV Hospitals, Richmond, VA

08/1981 - 06/1985 Doctor of Medicine, University of South Carolina School of Medicine, Columbia, South Carolina

5

# Exhibit B

| | A | B | C |
|---|---|---|---|
| 1 | | | EXPERT WITNESS AND DEPOSITION TESTIMONY |
| 2 | | | KEYHILL SHEORN, MD |
| 3 | | | |
| 4 | | | TRIAL TESTIMONY |
| 5 | 2/8/2023 | D | TAMIYA DAVIS v CERES MARINE TERMINAL |
| 6 | | | NEWPORT NEWS, VIRGINIA |
| 7 | | | |
| 8 | 1/12/2023 | D | CARON NAZARIO v ISLE OF WIGHT |
| 9 | | | US DISTRICT COURT RICHMOND, VIRGINIA |
| 10 | | | |
| 11 | 4/1/2021 | D | KENNETH KENETI v GENERAL DYNAMICS NASSCO |
| 12 | | | NORFOLK, VIRGINIA |
| 13 | | | |
| 14 | 1/7/2020 | P | TRACIE CLEAVES-MCCLELLAN vs MUKESH SHAH, MD AND HAMPTON-NEWPORT NEWS CSB |
| 15 | | | CIRCUIT COURT FOR THE CITY OF HAMPTON VIRGNIA |
| 16 | | | |
| 17 | 5/8/2019 | D | MELANIE CHAVEZ ET AL. V. PHC-LOS ALAMOS MEDICAL CENTER, INC. D/B/A LOS ALAMOS MEDICAL CENTER ET AL. |
| 18 | | | FIRST JUDICIAL DISTRICT CASE NO. D-101-CV-2016-02803 |
| 19 | | | STATE OF NEW MEXICO, COUNTY OF SANTA FE– |
| 20 | | | DECLARED AS TESTIFYING EXPERT |
| 21 | | | |
| 22 | 8/7/2018 | D | GERTRUDE MILLAR v JB BRUNSON TRUCKING, INC. |
| 23 | | | CIRCUIT COURT OF CAROLINE COUNTY, VA |
| 24 | | | |
| 25 | 7/25/2018 | P | MJ, BY HER FATHER/MOTHER AND NEXT FRIEND  v  CRYSTALLA STAVROU SAYLOR |
| 26 | | | ABLEMARLE COUNTY CIRCUIT COURT VIRGINIA |
| 27 | | | |
| 28 | 1/16/2018 | D | SHANNON PATTERSON v ALASKA SCHOOL SYSTEM |
| 29 | | | ANCHORAGE, ALASKA |
| 30 | | | |
| 31 | 10/25/2017 | D | CHARLAYNE O'BRIEN v CENTRAL PENNINSULA HOSPITAL |
| 32 | | | ALASKA WORKERS COMPENSATION BOARD |
| 33 | | | |

| | A | B | C |
|---|---|---|---|
| 34 | 8/13/2017 | P | COMMONWEALTH OF VA  v  TROY VANDIVER |
| 35 | | | CIRCUIT COURT FOR THE COUNTY OF PRINCE WILLIAM, VA |
| 36 | | | |
| 37 | 2/8/2017 | P | COMMONWEALTH OF VA  v  TROY VANDIVER |
| 38 | | | CIRCUIT COURT FOR THE COUNTY OF PRINCE WILLIAM, VA |
| 39 | | | |
| 40 | 10/24/2016 | P | DEBORAH JOHNSTON  v  DAVID PANELLA |
| 41 | | | CIRCUIT COURT FOR THE COUNTY OF CHESTERFIELD, VA |
| 42 | | | |
| 43 | | | |
| 44 | | | DEPOSITION |
| 45 | 11/2/2023 | P | SARA HATCH v DANIEL SALZBERG |
| 46 | | | RICHMOND, VIRGNIA |
| 47 | | | |
| 48 | 8/30/2023 | D | HANG SWANSON v DANIEL BULLINGTON |
| 49 | | | RICHMOND, VIRGINIA |
| 50 | | | |
| 51 | 1/10/2023 | D | OSCAR ESCOBAR v RICHMOND AMBULANCE AUTHORITY |
| 52 | | | RICHMOND, VIRGINIA |
| 53 | | | |
| 54 | 10/24/2022 | D | TAMIYA DAVIS v CERES MARINE TERMINAL |
| 55 | | | RICHMOND, VIRGINIA |
| 56 | | | |
| 57 | 6/23/2021 | P | JOYCE FLORES v VIRGINIA DEPARTMENT OF CORRECTIONS |
| 58 | | | NORFOLK, VIRGINIA |
| 59 | | | |
| 60 | 6/21/2021 | D | WILLIAM OSTRANDER  v LONGSHORE AND HARBOR WC |
| 61 | | | NORFOLK, VIRGINIA |
| 62 | | | |
| 63 | 2/23/2021 | D | FESTIM RAMADANI v FLUOR CON/OPS, LTD |
| 64 | | | NORFOLK, VIRGINIA |
| 65 | | | |
| 66 | 2/18/2020 | D | BRIAN WHITE v  SERVICE EMPLOYEES INTERNATIONAL, INC |

| | A | B | C |
|---|---|---|---|
| 67 | | | RICHMOND, VIRGINIA |
| 68 | | | |
| 69 | 10/9/2019 | D | NANCY DIAZ DELGADO v MT. SINAI MEDICAL CENTER |
| 70 | | | NEW YORK, NEW YORK |
| 71 | | | |
| 72 | 6/21/2019 | P | TRACI CLEAVES-MCCLELLAN v MUKESH SHAH, MD |
| 73 | | | RICHMOND, VIRGINIA. |
| 74 | | | |
| 75 | 5/14/2019 | P | CODY BAKER (DECEASED) |
| 76 | | | WESTERN DISTRICT OF KENTUCKY |
| 77 | | | |
| 78 | 4/9/2019 | P | CUSTIS  v  HARTLE |
| 79 | | | RICHMOND, VIRGINIA |
| 80 | | | |
| 81 | 9/19/2018 | D | BRETT WAYMAN v PERDUE AGRIBUSINESS |
| 82 | | | RICHMOND, VIRGINIA |
| 83 | | | |
| 84 | 7/3/2018 | P | ANNETTE PORTER v VENEZIA BULK TRANSPORT, INC |
| 85 | | | RICHMOND, VIRGINIA |
| 86 | | | |

# Exhibit C

# KEYHILL SHEORN, MD

3801 Commodore Point Place   Midlothian, Virginia  23112
804-323-0003   Sheorn@mac.com
https://KeyhillSheornMD.com

## FEE SCHEDULE

| | |
|---|---|
| Review of Records and Reports (per hour) | $ 500.00 |
| Independent Medical Exam  (up to 4 hours) | $ 6000.00 |
| Deposition Testimony per hour | $ 500.00 |
| Video Deposition per hour | $ 500.00 |
| Court Appearance per half day (up to 4 hours) | $ 3,000.00 |
| Court Appearance per full day (up to 8 hours) | $ 6,000.00 |
| Out of town per day | $ 1600.00 |

## INDEPENDENT MEDICAL EXAM (IME)

The IME includes: review of records and reports, evaluation, and report preparation.  If records are excessive, an additional fee of $500.00 per hour  will be charged.

## PREPAYMENT

IME – $600 prepayment is required at least one week in advance of the scheduled Independent Medical Exam unless other arrangements are made.

Deposition/Court Appearance – Prepayment is required at least three  weeks in advance unless other arrangements are made.

## CANCELLATION POLICY

**IME** - A $1000.00 cancellation fee will be charged for IME appointments that are cancelled less than three days prior to the scheduled appointment, whether rescheduled or not.  A $3000.00 cancellation fee will be charged for appointments cancelled less than one week notice if the IME is scheduled out of town.
**Oral Deposition** – A $1000.00 cancellation fee will be charged for Oral Depositions that are cancelled less than 10 full business days prior to the scheduled appointment.
**Video Deposition** – A $1000.00 cancellation fee will be charged for Video Depositions that are cancelled less than 10 full business days prior to the scheduled appointment.
**Court Appearance -**  A $1000.00 cancellation fee will be charged for Court Appearances that are cancelled less than 10 full business days prior to the scheduled appearance.

**TAX IDENTIFICATION NUMBER**  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