**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **KAREN IOVINO,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | **No. 5:21-CV-00064-TTC** |
| **MICHAEL STAPLETON ASSOCIATES,** | ) | |
| **LTD., d/b/a MSA SECURITY, INC.,** | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**<u>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION IN
LIMINE NO. 1: MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF
A. BENTLEY HANKINS, PH.D.</u>**

Plaintiff Karen Iovino, by and through undersigned counsel, respectfully submits this

Memorandum in Opposition to Defendant Michael Stapleton Associates, Ltd., d/b/a MSA

Security, Inc.'s ("MSA") Motion in Limine No. 1 (ECF Nos. 297, 298), which seeks to exclude

the opinions and testimony of A. Bentley Hankins, Ph.D. For the reasons set forth below, the

Motion should be denied.

**I. INTRODUCTION**

Dr. A. Bentley Hankins is a qualified forensic economist whose May 21, 2023, expert

report applies the published Vocational and Rehabilitation Assessment Model (Robinson &

Pomeranz, 2011) and standard work-life expectancy data to calculate Plaintiff's economic

damages. His methodology is reliable, his assumptions are transparent, and his conclusions are

tied to the record evidence. MSA's nine-point critique is a roadmap for cross-examination, not a

basis for exclusion under Federal Rule of Evidence 702.

1

MSA's Motion proceeds from a misapplication of the gatekeeper standard. *Daubert* and its progeny ask whether an expert's principles and methods are reliable, not whether the expert's assumptions match those preferred by opposing counsel. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). The Fourth Circuit has repeatedly reinforced the boundary between admissibility and weight: "questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility" of the witness' assessment, "not its admissibility." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017).

Each of MSA's nine attack points (a)-(i) is based on a quintessential weight argument. MSA disagrees with Dr. Hankins' choice of damages horizon, his treatment of unemployment probability, his application of catch-up literature, his reliance on Plaintiff's treating mental health provider, and his use of Plaintiff's own factual statements. MSA may explore each disagreement through the cross-examination of Dr. Hankins and through the affirmative testimony of its own retained economist, Dr. Dubravka Tosic. The jury will hear both sides and decide. That is exactly how Rule 702 is supposed to operate.

MSA's Motion also asks the Court to disregard the proper division of labor between expert and trier of fact. An economist who reasonably relies on a treating psychotherapist's clinical recommendation acts within the express permission of Federal Rule of Evidence 703. An economist whose upper-bound estimate is anchored to a contested factual premise (the 2017 full-time expansion discussions documented in MSA's own Statement of Undisputed Material Facts) frames a battle of facts for the jury, not a *Daubert* admissibility problem. And an economist who presents both age-100 and age-60 alternatives gives the jury a transparent menu, not a methodological defect.

The Motion should be denied in its entirety. To the limited extent the Court entertains MSA's narrower alternative—limiting components of Dr. Hankins' testimony—any such limitation must be tightly drawn to avoid invading the jury's province under Rule 702.

## II. LEGAL STANDARD

Federal Rule of Evidence 702, as amended effective December 1, 2023, governs the admissibility of expert testimony. Per the 2023 amendment, to establish evidentiary admissibility the proponent must demonstrate by a preponderance of the evidence that the expert is qualified; that the testimony will help the trier of fact; that it is based on sufficient facts or data; that it is the product of reliable principles and methods; and that the expert's opinion reflects a reliable application of those principles and methods to the facts of the case. Fed. R. Evid. 702. The Fourth Circuit applies this standard with the recognition that "expert witnesses have the potential to be both powerful and quite misleading." *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 481 (4th Cir. 2018) (quoting *Westberry* at 261); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018).

The *Daubert* reliability factors are non-exhaustive and flexible. *Daubert*, 509 U.S. at 593–94; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150–51 (1999). Where the expert applies an established discipline (forensic economics) using published models and data, the inquiry focuses on whether the methodology is reliable, as applied. Disagreements about an expert's selected assumptions and inputs go to weight, not admissibility itself.

The Fourth Circuit has long recognized that disagreements about an expert's underlying assumptions and inputs go to weight, not admissibility. "[Q]uestions regarding the factual underpinnings of the expert witness' opinion affect the weight and credibility of the witness'

assessment, not its admissibility." *Bresler*, 855 F.3d at 195 (citation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The Western District of Virginia has applied this same principle to admit damages-expert testimony over input-level disagreements. *Acosta v. Vinoskey*, 310 F. Supp. 3d 662 (W.D. Va. 2018).

Federal Rule of Evidence 703 expressly authorizes experts to rely on facts or data "that the expert has been made aware of or personally observed" and that need not themselves be admissible if they are "of a type reasonably relied upon by experts in the particular field." Fed. R. Evid. 703. An economist's reliance on a treating clinician's work-limitation recommendation is precisely the type of inter-disciplinary reliance that Rule 703 contemplates, and that courts routinely permit. *See, e.g., United States v. Dukagjini*, 326 F.3d 45, 51-52 (2d Cir. 2003).

Finally, the gatekeeping function does not authorize the trial court to resolve genuine disputes about underlying facts. Where an expert's projection rests on a disputed factual premise, the dispute does not itself create a *Daubert* defect; the admissibility inquiry remains whether the expert applied reliable principles and methods, while disputes over underlying factual premises are tested through cross-examination and contrary proof. *Daubert*, 509 U.S. at 596; *Bresler*, 855 F.3d at 195.

## III. ARGUMENT

### *A. Dr. Hankins Applies a Published, Generally Accepted Forensic Economics Methodology.*

Dr. Hankins's analytical framework is the Vocational and Rehabilitation Assessment Model (Robinson & Pomeranz, 2011), a published methodology in the forensic economics literature. Hankins Report at 1. He applied the model through a records review and structured interview, and he calculated earning capacity by comparing Plaintiff's projected earnings absent termination to her actual post-termination earnings. *Id.* The methodology is testable and has been tested across the discipline; it is the same general framework that MSA's own retained economist, Dr. Dubravka Tosic of BRG, used to perform her rebuttal analysis. Tosic Report at 7–15.

MSA does not (and cannot) contend that the Vocational and Rehabilitation Assessment Model is unreliable as a methodology. Instead, MSA contends that within an admittedly reliable methodology, Dr. Hankins should have selected different inputs at certain analytical steps. That is the textbook posture of a weight argument. *See Bresler*, 855 F.3d at 195. As shown below, each of MSA's nine attack points (a)-(i) is simply disagreement with the specific data being used, or data framing, or underlying factual assumptions for using specific data—none of which warrant exclusion under Rule 702.

### B. The Age-100 and Age-60 Alternative Calculations Are a Transparent Methodological Choice.

MSA's first attack frames Dr. Hankins's age-100 calculations as "unrealistic and unsupported." MSA Mem. ISO MIL #1 at 4–5. The premise of that critique misreads the Report. Dr. Hankins did not opine that Plaintiff would in fact work to age 100; he calculated two horizons—an outer-bound calculation extending to age 100 and an alternative calculation through age 60—and disclosed both prominently in the same table. Hankins Report at 9–10.

Presenting alternative horizons is a standard forensic-economics practice; it gives the trier of fact a transparent menu of possible damages periods, each tied to identifiable assumptions.

MSA argues that the age-100 horizon "inflates" damages by 54% to 82% over the age-60 alternative. MSA Mem. ISO MIL #1 at 5. That is precisely why Dr. Hankins disclosed both. The jury is fully capable of selecting the more conservative horizon if it credits Plaintiff's testimony about retirement intentions, or the longer horizon if it credits other record evidence. MSA in effect challenges specific data. However, disagreement over data should target its evidentiary weight, not the admissibility of data itself. *Bresler*, 855 F.3d at 195.

Even MSA's own actuarial citation refutes its argument. MSA invokes Va. Code § 8.01-419 to assert that a 56-year-old female has 27 years of continued life expectancy. MSA Mem. ISO MIL #1 at 5 n.4. That figure is a biological life expectancy, and the Virginia legislature has codified it precisely to provide statutory guidance for damages computation in tort cases—a use directly inconsistent with MSA's argument that long-horizon damages projections are inadmissible.

### C. The Treatment of Unemployment Probability Goes to Weight.

MSA next argues that Dr. Hankins "assumes 100% employment probability each year." MSA Mem. ISO MIL #1 at 6. The Report itself refutes that characterization. Dr. Hankins expressly adjusted Plaintiff's projected losses by joint probabilities of worker life expectancy and labor force participation. Hankins Report at 6 (citing the Markov Process Model published in the Journal of Forensic Economics). Whether his adjustments fully captured every component of unemployment risk is a textbook question for cross-examination.

6

MSA's own retained economist, Dr. Tosic, presented a competing set of unemployment and labor-force-participation assumptions. Tosic Report at 7–15. The proper resolution of any methodological disagreement is presentation to the jury through direct and cross-examination, not exclusion under Rule 702. *Daubert*, 509 U.S. at 596.

### D. The Career Catch-Up Literature Is a Disputed Methodological Question for the Jury.

MSA's third attack argues that Dr. Hankins "ignored" the catch-up literature reflected in Shahnasarian's article. MSA Mem. ISO MIL #1 at 6. The literature MSA invokes is itself contested in the discipline; it asserts a generalized 3–5-year catch-up window, but practitioners disagree about whether and how that window applies to occupations with specialized credentialing requirements (such as veterinary medicine) or to displaced workers in narrow geographic labor markets.

Whether Plaintiff has "already caught up" to her MSA earnings is precisely the type of contested empirical question the jury must resolve. The Fourth Circuit has been clear that disagreement over inputs and ranges goes to weight, not admissibility. *Bresler*, 855 F.3d at 195.

### E. Dr. Hankins's Reliance on Plaintiff's Treating Psychotherapist Is Permissible Under Rule 703.

MSA's fourth attack argues that a portion of Dr. Hankins' damages model rests on Christian Greene's clinical recommendation that Plaintiff limit her work hours, and that this reliance is fatal because (i) Ms. Greene was not designated as an expert witness and (ii) MSA disputes the underlying PTSD diagnosis. Neither premise supports exclusion under Rule 702.

Federal Rule of Evidence 703 expressly authorizes experts to rely on facts or data "of a type reasonably relied upon by experts in the particular field," regardless of whether those facts or data are themselves admissible. Fed. R. Evid. 703. Forensic economists routinely incorporate the work-capacity and work-limitation opinions of treating clinicians; that inter-disciplinary reliance is a defining feature of the field. *See United States v. Dukagjini*, 326 F.3d 45, 51 (2d Cir. 2003). The discipline of forensic economics, as articulated in the National Association of Forensic Economics' Statement of Ethical Principles and Principles of Professional Practice (NAFE SE4P), expressly contemplates that practitioners will rely on case-specific information provided by other professionals, including treating clinicians, vocational experts, and rehabilitation counselors, and that practitioners are not responsible for independently verifying medical or vocational determinations. NAFE SE4P (rev. Jan. 4, 2020). Forensic economics by design takes vocational findings, life-care plans, and treating-clinician opinions about work capacity and converts them into dollar values; that is the discipline's standard methodology, and it is squarely within Rule 703.

MSA's argument that Ms. Greene's diagnosis is "disputed" because MSA's IME psychiatrist (Dr. Sheorn) reached a different conclusion is a battle-of-the-experts framework that the jury exists to resolve. The trial court does not decide whether Plaintiff has PTSD; it decides whether the experts on both sides have used reliable methodologies. Dr. Hankins' damages model is reliable whether the jury accepts Ms. Greene's clinical recommendation; the model produces both lower-bound and upper-bound estimates that allow the jury to discount or reject the work-limitation component if it credits MSA's contrary medical evidence. Hankins Report at 9–10.

MSA's challenges to the underlying clinical evidence are the subject of Plaintiff's separate submissions: Plaintiff is concurrently defending the Garrick PTSD diagnosis (in opposition to MSA's MIL #2) and the admissibility of PX-057 (the Greene treatment records, ECF 290) under FRE 803(4) and FRE 803(6). The success of MSA's Daubert challenge to Dr. Hankins does not turn on the resolution of those separate evidentiary questions. Under Rule 703, an economist may rely on facts of a type reasonably relied upon by experts in the field even where those facts are themselves inadmissible. Fed. R. Evid. 703.

### F. The But-For Earnings Methodology Is Sound.

MSA's fifth attack argues that Dr. Hankins' but-for earnings projections of $166,400 to $177,882 per year exceed mean veterinarian compensation in the Winchester MSA and in Virginia. MSA Mem. ISO MIL #1 at 8. The argument conflates the but-for benchmark for an MSA-specific federal contractor position with regional mean compensation across the entire veterinary profession. Plaintiff did not work as a small-animal practitioner in Winchester; she worked as a contract veterinarian on a Department of State counter-terrorism program at the Canine Validation Center. The relevant comparator is the compensation actually paid for that specialized contract role—which Dr. Hankins derived directly from Plaintiff's MSA pay history. Hankins Report at 5–6.

Whether Dr. Hankins should also have benchmarked against general-veterinarian compensation is a methodological choice that MSA may probe on cross-examination. It is not a *Daubert* problem. *Bresler*, 855 F.3d at 195.

### G. Plaintiff's Pre-Termination Tenure Is Not a Methodological Defect.

9

MSA's sixth attack argues that Plaintiff's relatively short pre-termination tenure with MSA undermines any projection of long-term continued employment. MSA Mem. ISO MIL #1 at 8. This is a factual argument about Plaintiff's career trajectory in a specialized federal-contract role, not a methodological defect in Dr. Hankins' model. Dr. Hankins' projections assume that Plaintiff would have continued in her chosen veterinary career—whether at MSA or in a substantially similar position—over the relevant horizon.

MSA's preferred inference—that short pre-termination tenure forecloses long-horizon projections—is a fact-bound inference that the jury can accept or reject after hearing the evidence. *Bresler*, 855 F.3d at 195.

## H. The Upper-Bound Estimate Is a Standard Bounding Calculation; the Underlying Factual Premise Is Documented in MSA's Own Defendants Statement of Undisputed Material Facts (DSUMF).

MSA's seventh attack targets the upper-bound estimate of $177,882 in annual "but for" earnings, which Dr. Hankins extrapolated by scaling Plaintiff's documented $70-per-hour MSA part-time rate to a full-time equivalent. MSA argues this rests on a "fabricated" verbal offer for full-time employment. MSA Mem. ISO MIL #1 at 8–9 DSUMF ¶ 6). The Motion conflates two distinct issues: the methodological soundness of bounding analysis (admissibility) and the factual premise of the upper-bound scenario (weight). MSA's own DSUMF, moreover, refutes the "fabricated" framing.

On methodology: bounding analysis—the calculation of multiple scenarios across a range of factual assumptions—is a standard and well-accepted technique in forensic economics. Practitioners routinely present lower-bound, mid-range, and upper-bound estimates to assist the

10

trier of fact in evaluating damages under competing factual scenarios. Dr. Hankins' lower-bound estimate uses Plaintiff's actual hours at MSA; his upper-bound estimate scales the documented hourly rate to full-time equivalent. Hankins Report at 5, 9–10. His mathematics is transparent, and his data are fully disclosed.

On the underlying factual premise: the record—including MSA's own DSUMF and the testimony of MSA's own personnel—establishes that full-time expansion of Plaintiff's role was actively under discussion in the relevant period. DSUMF ¶ 6 (ECF 251-1) acknowledges that "In February 2017, Dr. Michael Ratcliff informed Plaintiff that the CVC was expanding, and the DoS Contract would likely require a full-time veterinarian in the future." DSUMF ¶ 14 documents Plaintiff's July 14, 2017, email to Dr. Ratcliff stating she "would embrace the opportunity to move from 3/4 time to FT to help the ATA program grow" and that she "will plan on moving to FT status Aug 19, 2017." When told that the new CLIN required a formal application, Plaintiff applied for the position the same day. DSUMF ¶¶ 15–16. The position ultimately went to Dr. Lee Palmer. DSUMF ¶ 18.

MSA's own personnel under oath confirmed the full-time (FT) expansion and the competitive process. Michael Hayes, MSA's Program Manager, testified that "the part-time position was going to move to a full-time position. It wasn't so much about Dr. Iovino as much as it was about the position." Hayes Dep. 33:5–7 (Feb. 13, 2026). Hayes further testified, "I mean, it -- what I recall when I'm talking about the position is, yes, she was a part-time employee. We reopened the position and folks applied. Dr. Palmer was selected." *Id.* at 32:1–4. Alan Bower, MSA's Deputy Project Manager, testified, "there was a competition for this full-time position, as you put, that was written into the contract. Dr. Iovino and some others applied." Bower Dep. 21:21–24 (Feb. 25, 2026). Dr. Ratcliff confirmed at his deposition that Plaintiff

11

"applied for this full-time position" and that Plaintiff and Dr. Palmer "were the finalists" for the role. Ratcliff Dep. 47:15–22 (Jan. 22, 2026). Whether Plaintiff had a reasonable expectation of moving to full-time status, and at what compensation, is a contested factual question—but it is also an issue with substantial documentary and testimonial support, not fabrication.

That contested factual premise is exactly why Dr. Hankins disclosed both a lower-bound estimate (which does not depend on the disputed full-time premise) and an upper-bound estimate (which does). Hankins Report at 9. The jury will hear MSA's contrary evidence and decide which estimate to credit. That is a classic question of weight, properly resolved through cross-examination and contrary expert proof rather than wholesale exclusion. *Bresler*, 855 F.3d at 195; *accord Stephenson v. Family Sols. of Ohio, Inc.*, 645 F. Supp. 3d 755 (N.D. Ohio 2022).

MSA invokes *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), for the proposition that an "analytical gap" between data and conclusion warrants exclusion. *Joiner* is inapposite. There, the expert's epidemiological conclusion was untethered to any reliable underlying study; here, Dr. Hankins' upper-bound estimate is mathematically derivable from Plaintiff's documented MSA hourly rate and standard full-time-equivalent methodology. Hankins Report at 5. The premise that informed the extrapolation—the ongoing 2017 discussions about full-time expansion of Plaintiff's role—is documented in MSA's own statement of undisputed facts and is a contested fact for the jury, not an *ipse dixit* leap by the expert.

### I. Dr. Hankins' Use of Plaintiff's Statements Is Standard Forensic Practice Under Rule 703.

MSA's eighth attack argues that Dr. Hankins improperly relied on Plaintiff's "self-serving" statements during the structured interview. MSA Mem. ISO MIL #1 at 9. Forensic economists routinely conduct structured interviews with claimants to capture career intentions,

retirement preferences, and other inputs uniquely within the claimant's knowledge. Such reliance is standard practice and is permitted by Rule 703.

An expert does not become unreliable merely because the opposing party can posit other inputs; exclusion is warranted only where the expert "utterly fails" to consider obvious alternatives or to explain why those alternatives do not defeat the analysis. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001). Dr. Hankins disclosed his reliance on Plaintiff's statements in the Report itself, and his methodology accommodates competing inferences through the disclosed lower- and upper-bound estimates.

### J. The Hankins–Tosic Disagreement Is a Classic Battle of Experts; Dr. Tosic's Own Methodology Is Itself Contestable.

MSA's ninth attack presents Dr. Tosic's alternative calculations side-by-side with Dr. Hankins' and argues that the discrepancy demonstrates Dr. Hankins' unreliability. MSA Mem. ISO MIL #1 at 10. The argument inverts the *Daubert* inquiry. The existence of competing expert calculations is not evidence that Dr. Hankins used an unreliable methodology; competing damages calculations are the ordinary state of affairs in any case where damages are vigorously contested. *Daubert*, 509 U.S. at 596; *Bresler*, 855 F.3d at 195.

Dr. Tosic's competing analysis rests on contestable methodological choices of its own. Dr. Tosic adopts the Shahnasarian 3-to-5-year catch-up window as if it were settled, but, as noted in Section III.D supra, the catch-up literature is itself disputed in the discipline and is not designed to address narrow specialty labor markets like the federal-contractor canine-validation role at issue here. Tosic Report at 7. Dr. Tosic relies on regional mean veterinarian compensation as her benchmark, but the Bureau of Labor Statistics data she invokes covers the entire

13

veterinary profession and does not isolate federal-contractor compensation. *Id.* at 9–10. And Dr. Tosic's "already caught up" conclusion depends on aggregating Plaintiff's post-termination earnings across multiple part-time positions—an aggregation that itself involves methodological choices. *Id.* at 12. The methodological soundness of Dr. Tosic's competing analysis is a question for the jury, informed by cross-examination of both experts.

If the existence of a competing expert report sufficed to exclude the first expert, no party in any complex damages case could ever reach a jury. The Court should reject MSA's invitation to convert the gatekeeping function into a winner-take-all comparison of expert outputs.

### K. The Deposition Footnote (DSUMF ¶¶ 75–76) Misframes the Procedural Record; MSA Had a Rule 45 Path It Did Not Use.

MSA's footnote 3 cites DSUMF ¶ 76 (ECF 251-1) for the assertion that Plaintiff's counsel responded that "[w]e do not control these witnesses and we are not going to take any responsibility to produce them," and frames the exchange as a refusal that should inform the Court's Daubert analysis. MSA Mem. ISO MIL #1 at 4 n.3. The cited correspondence (Exhibit ZZ to MSA's MSJ Record, ECF 251-53) tells a different story when read in full.

On January 9, 2024, MSA's counsel proposed deposition dates for Drs. Hankins and Garrick. Ex. ZZ at 3. Plaintiff's counsel responded that, until certain *Touhy*-related discovery issues concerning Department of State witnesses were resolved, Plaintiff was not in a position to agree to deposition dates desired by MSA, and noted that, because the experts were non-parties, MSA could "proceed with Rule 45 subpoenas." *Id.* On January 10, 2024, MSA served Rule 30 deposition notices rather than Rule 45 subpoenas. *Id.* at 5. Plaintiff's counsel responded that, as to non-party expert witnesses, a Rule 30 notice is not effective to compel appearance and

14

directed MSA to use Rule 45 subpoenas as the proper procedural mechanism: "At such time as you issue a Rule 45 subpoena please send us a copy as the rule requires." *Id.*

MSA never issued Rule 45 subpoenas. Plaintiff's procedural position was correct: Rule 30(a) governs depositions of parties; non-party witnesses (including retained experts who are not within a party's control) are subject to deposition by Rule 45 subpoena. Fed. R. Civ. P. 30(a), 45. Plaintiff's counsel did not refuse to make Dr. Hankins available for deposition; Plaintiff's counsel directed MSA to the proper procedural mechanism, and MSA did not pursue it. Whatever the Court makes of the Touhy-related context (which Plaintiff raised in connection with parallel discovery limitations), the fact remains that MSA had an available procedural path under Rule 45 and chose not to use it.

On that record, MSA's invocation of DSUMF ¶ 76 to support a *Daubert* exclusion is misplaced. Rule 37(c)(1) preclusion remedies are not authorized where the moving party had an unused procedural mechanism for obtaining the testimony at issue. To eliminate any residual concern the Court may have about MSA's lack of a Hankins deposition, Plaintiff stands ready to produce Dr. Hankins for a focused deposition before trial to allow MSA to evaluate his methodology. That standing offer—made now—moots any inference that MSA was deprived of a fair opportunity to depose Dr. Hankins.

## IV. CONCLUSION

Dr. Hankins applied a published forensic-economics methodology, transparently disclosed his assumptions and alternatives, and produced a Report that gives the jury the analytical tools to assess Plaintiff's economic damages. MSA's nine-point critique describes a vigorous cross-examination, not a Daubert defect. Each of MSA's disputes—about damages

15

horizons, unemployment probability, catch-up periods, treating-clinician reliance, benchmark compensation, pre-termination tenure, the upper-bound factual premise (which is documented in MSA's own DSUMF), reliance on Plaintiff's statements, and the existence of a competing expert—are textbook weight arguments. None is a basis for exclusion under Rule 702.

Plaintiff respectfully requests that the Court deny MSA's Motion in Limine No. 1 in its entirety and grant such other and further relief as is just and proper.

Respectfully submitted,

Dated: May 11, 2026

/s/ John A. Kolar

Jack Kolar
Government Accountability Project
1612 K Street NW, Suite 1100
Washington, DC 20006
Email: jackk@whistleblower.org

Thad M. Guyer
T.M. Guyer & Friends, PC
116 Mistletoe Street, P.O. Box 1061
Medford, OR 97501
Telephone: (202) 417-3910
Email: thad@guyerayers.com

Nate L. Adams III, P.C.
11 South Cameron Street
Winchester, VA 22601
Email: nadams@nadamslaw.com

*Counsel for Plaintiff Karen Iovino*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2026, I electronically filed the foregoing with the Clerk of the

Court for the United States District Court for the Western District of Virginia by using the

CM/ECF system, which will provide notice to all counsel of record.


/s/ John A. Kolar
_____

Jack Kolar
Government Accountability Project
1612 K Street NW, Suite 1100
Washington, DC 20006
Email: jackk@whistleblower.org

*Counsel for Plaintiff*